IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARTIN O. LONG,                          *

    Plaintiff,                           *

vs.                                      *          Case Number:  2:06cv816-MHT

STATE FARM FIRE AND                      *
CASUALTY COMPANY,
                                         *
    Defendant.


**DEFENDANT STATE FARM'S BRIEF IN SUPPORT OF ITS MOTION FOR A
SUMMARY JUDGMENT**

    COMES NOW, State Farm Fire and Casualty Company, Defendant in the above-styled

case ("State Farm"), and, by and through its undersigned counsel, files this brief in support of its

Motion for a Summary Judgment, which is being filed contemporaneously herewith.  As grounds

for that motion, State Farm contends that there is no genuine issue of material fact with respect to

Plaintiff's breach of contract and bad-faith claims and that State Farm is therefore entitled to a

judgment as a matter of law on those claims.  In further support of its motion, State Farm states

as follows:

## I. PROCEDURAL HISTORY

    Plaintiff Martin Long was insured under an automotive policy issued by State Farm

("policy" or "automotive policy").  This case arises out of the denial of a claim for benefits under

that policy.  Long made a claim under the policy after the alleged theft of his 2000 Chevrolet

Corvette, which was an insured vehicle under the policy.[1]  State Farm denied Long's claim based

---

[1] Long also made a claim under a State Farm homeowner's policy.  Under that policy, Long claimed coverage for personal property that was allegedly stolen along with the vehicle.  He also made a claim for that same property

1

on its conclusion that Long had misrepresented material facts in the presentation of his claim and, in the alternative, its conclusion that a "loss" had not occurred under the policy because the alleged theft of Long's vehicle had been committed by or at the direction of Long himself.[2] (Ex. A, SF1 - 132).[3]

On or about June 14, 2006, Long commenced this civil action in the Circuit Court of Elmore County, Alabama, alleging breach of contract and bad faith. State Farm removed the case to this Court on September 11, 2006.

## II. SUMMARY-JUDGMENT STANDARD

State Farm is entitled to summary judgment on Long's claims if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [State Farm] is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.

> "Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the nonmoving party to demonstrate why summary judgment would be inappropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, '[f]or issues ... on

---

under the auto policy. Todd Smith, a State Farm claims representative, was assigned to both claims, and investigated both claims together. State Farm considered facts and representations common to both claims in its investigation of both claims. See generally, Ex. A. See also, Ex. M (specific portions of the claim files for both claims, showing Todd Smith as the claim representative for both claims, and showing that common facts and representations were considered by State Farm in investigating both claims).

[2] State Farm denied the claim made under the homeowner's policy based on State Farm's conclusion that Long had concealed or misrepresented material facts or circumstances relating to the policy. (Ex. F (letter from State Farm to Tucker Burge, dated June 29, 2005); Ex. G, at page 18 of the homeowner's policy).

[3] Exhibit A consists of excerpts from the claim files for Long's claim made under his automotive policy and the companion claim that he made under his homeowner's policy. Citations to SF1 are to Bates-labeled portions of the claim file for the claim under the automotive policy, and citations to SF2 are to Bates-labeled portions of the claim file for the claim under the homeowner's policy.

which the non-movant would bear the burden of proof at trial, ... the moving party [for summary judgment] simply may show[ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the non-moving party's case.' *Fitzpatrick*, 2 F.3d at 1115-16 (citations and quotation marks omitted)."

*Lynn v. Amoco Oil Co.*, 459 F. Supp. 2d 1175, 1177-78 (M.D. Ala. 2006).

### III. FACTUAL OVERVIEW

On February 19, 2005, Long contacted State Farm and reported that his Corvette had been stolen from the parking lot of a hotel near Atlanta, Georgia. (Ex. A, SF1 - 23). At the time of the alleged loss, Long was a resident of Millbrook, Alabama. (Ex. A, SF1 - 459 (lines 11-18)). Long's Corvette was eventually recovered, but it was severely damaged and determined to be a total loss. Long made a claim under his automotive policy, as well as a claim under his homeowner's policy. Only State Farm's denial of benefits under the automotive policy forms the basis of Long's Complaint.

Based on certain "red flags," Long's automotive claim was referred to State Farm's Special Investigations Unit.[4] State Farm's investigation of Long's claim included the following:

1. Interviewing the Dekalb County (Georgia) Police Department regarding the alleged theft (Ex. A, SF1 - 20);

2. Reviewing the police reports that had been generated as a result of the alleged theft (Ex. A, SF1 - 370-385);

3. Inspecting the Corvette after it had been recovered (Ex. A, SF1 - 19);

4. Hiring an independent consultant to inspect the vehicle after it had been recovered (Ex. A, SF1 - 228-274; Ex. B, Ex. C);

5. Having State Farm's inside consultant, Earl Hyser, review the outside consultant's report (Ex. A, SF1 - 9-10);

6. Obtaining a recorded statement from Long regarding the claim (Ex. A, SF1 - 315-354);

---

[4] Those "red flags" included the following: Long had a high frequency of insurance claims; Long was unemployed, disabled and had marital problems; Long claimed a large amount of expensive items stolen along with his car; Long's car and insurance policy had been recently purchased. (Ex. A, SF1 - 63).

7. Obtaining a recorded statement from the shift manager of the hotel from whose parking lot the Corvette was allegedly stolen (Ex. A, SF1 - 307-314);

8. Obtaining a recorded statement from Long's wife regarding their recent separation (Ex. A, SF1 - 14);

9. Obtaining a recorded statement from Long's girlfriend, Valerie Ware-Temple, who accompanied Long to Georgia the weekend the vehicle was allegedly stolen (Ex. A, SF1 -167-168);

10. Interviewing Donald Ware, Valerie's brother, who lives near the location of the alleged theft and whom Long and Valerie visited the night before the alleged theft (Ex. A, SF1 -12);

11. Interviewing Ricky Ware, Valerie's other brother, who also accompanied Long and Valerie to Georgia the weekend the vehicle was allegedly stolen (Ex. A, SF1 - 9);

12. Obtaining Long's Examination Under Oath with the assistance of attorneys (Ex. A, SF1 - 455-570);

13. Submitting all of the evidence regarding the claim to an Auto Claim Committee made up of several individuals who subjected the results of the investigation to a cognitive review and made the final determination to deny the claim based on the evidence and the policy (Ex. A, SF1 - 59-68).

State Farm's investigation revealed evidence indicating that Long misrepresented several material facts related to his claim, as well as evidence indicating that Long was involved in orchestrating the theft of his own vehicle. The specific evidence State Farm uncovered will be discussed more thoroughly below.

## IV. DISCUSSION

### A. Bad Faith

State Farm will address Long's bad faith claims first. "'Bad faith ... is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.'" *Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 283 (Ala. 2005) (quoting *State Farm Fire & Casualty*

*Co. v. Slade*, 747 So .2d 293, 303-04 (Ala. 1999) (quoting in turn, *Gulf Atlantic Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981))). Bad faith is an intentional tort and, under Alabama law, the plaintiff in a bad faith case bears an extraordinarily heavy burden. See *Jones v. Alabama Farm Bureau Mutual Casualty Co.*, 507 So. 2d 396 (Ala. 1986); *Bishop v. State Farm Auto Mutual Insurance Co.*, 600 So. 2d 262 (Ala. Civ. App. 1991).

> "In the 'normal' bad-faith case, the plaintiff must show the absence of any reasonably legitimate or arguable reason for denial of a claim. *Slade*, 747 So. 2d at 306. In the 'abnormal' case, bad faith can consist of: 1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim. 747 So. 2d at 306-07.

*Singleton*, 928 So. 2d at 283. *Ex parte Simmons*, 791 So. 2d 371, 378-79 (Ala. 2000). In the instant case, Long attempts to allege both types of bad faith.

## 1. Normal Bad Faith

As noted, in a "normal" bad-faith case, a plaintiff must show the absence of any reasonably legitimate or arguable reason for the denial of the insurance claim. Therefore, to prevail on his normal bad faith claim, "[Long] must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment *without any reasonable ground for dispute*." *Adams v. Auto Owners Insurance Co.*, 655 So. 2d 969, 971 (Ala. 1995) (emphasis added).

A test that has been applied in normal bad faith cases is the directed-verdict test. In *National Savings Life Insurance Company v. Dutton*, 419 So. 2d 1357 (Ala. 1982), the Supreme Court of Alabama stated:

> "In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim

and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury."

419 So. 2d at 1362.  Further, Long must show State Farm's knowledge of the absence of any legitimate or arguable reason for the denial. *National Security Fire & Casualty Co. v. Bowen*, 417 So. 2d 179 (Ala. 1982).

Long's policy provides as follows:

"SECTION IV - PHYSICAL DAMAGE COVERAGES

"*Loss* - means, when used in this section, each direct and <u>accidental</u> loss of or damage to:

"1.     *your car*;

"…

"3.     Clothes and luggage insured …

"CONDITIONS

"….

"8.     Concealment or Fraud

"There is no coverage under this policy if *you* or any other *person* insured under this policy has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy."

(Ex. D, at pages 13 and 21 of the policy) (italics in original) (emphasis added).  Therefore, there is no coverage under Long's policy if he was involved in the alleged theft of the vehicle or personal property *or* if he made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under the policy.

The information uncovered by State Farm during its investigation showed that Long had motive and opportunity to make misrepresentations regarding the circumstances surrounding the alleged theft of his vehicle and the contents in his vehicle, as well as to be involved in the theft of

his own vehicle. That investigation also uncovered significant evidence indicating that Long did indeed make material misrepresentations and was involved in the theft. Therefore, the results of State Farm's investigation certainly revealed a reasonably legitimate or arguable reason for the denial of Long's claim.[5]

### a. Financial Problems

According to his income tax returns, Long and his wife earned approximately $14,000 in 2003 and approximately $16,000 in 2004. (Ex. A, SF1 - 713, 721). Long has been unemployed since March of 2003, when he was injured while working for CSX Railroad. (Ex. A, SF1 - 465 (beginning at line 22) - 466 (through line 17)). As a result of that injury, Long received a settlement check in the approximate amount of $175,000, after deducting the fees and expenses associated with the law suit. (Ex. A, SF1 - 467 (beginning at line 19) - 468 (through line 1)). Long admitted during his deposition, taken after he filed suit, that, before receiving the settlement, he was experiencing financial difficulties. (Ex. H, 41 (lines 1-9)). Long received the settlement funds on or about February 4, 2005, and, just two weeks later, had approximately $5,000 remaining. (Ex. A, SF1 - 478-480). Most of the money went to pay off Long's and his wife's previously incurred debt, although $25,000 was used to purchase the vehicle that was allegedly stolen two weeks later. (Id.; Ex. A, SF1 - 481). Other than what remains of the settlement, Long's sole source of income is a monthly disability check he receives from the military. (Ex. A, SF1 - 478 (lines 2-7)). Finally, Long and his wife were going through a divorce at the time of the alleged theft. (Ex. A, SF1 - 464 (lines 14-22)).

Long has experience in filing insurance claims. Approximately two years before the claim made the basis of this suit, Long filed a homeowner's claim under a policy issued by State

---

[5] In fact, as stated below, State Farm's investigation revealed not only a reasonably legitimate or arguable reason for the denial of the insurance claim, but it also revealed evidence requiring a summary judgment in favor of State Farm

Farm after his roof was damaged in a hail storm. (Ex. A, SF1 - 473 (lines 5-14)).  According to entries in the claim file, Long used the money he received for that claim not for roof-repairs, but to pay other bills. (Ex. A, SF2 - 10).  Additionally, about five or six years ago, Long had a different Corvette stolen from his yard.  The vehicle was recovered, but the rims and tires were missing.  Long filed a claim, and State Farm paid for the missing rims and tires. (Ex. A, SF1 - 471 (beginning at line 9) - 473 (through line 4)).  Finally, a couple of weeks before the alleged theft of his Corvette in Georgia, Long was apparently involved in a shoot-out in which he shot through the roof of his other car, a Ford Mustang. (Ex. A, SF - 558 (beginning at line 14) - 560).  Long made a claim for the resulting damage, which State Farm paid. (Ex. A, SF1 - 432-435).

### b. Circumstances Surrounding Trip to Georgia

On February 18, 2005, Long took a trip to Lithonia, Georgia (near Atlanta), where he stayed at the Country Hearth Inn. (Ex. A, SF1 - 489).  In a recorded statement taken by Claims Representative Todd Smith, Long stated that he took that trip alone:

"Q.     Who'd you go with?

"A.     Just me.

"….

"Q.     What about the, now from apparently the previous claim reps that were involved in it spoke with someone at the hotel and they told that apparently it appeared you had some people with you?  Is that, no you didn't once again you did not have any, in other words they said that it looked like it appeared that you did have someone with you that morning [that Long allegedly discovered the car missing]?

"A.     No."

(Ex. A, SF1 - 337, 348-349).  See also, Ex. A, SF1 - 291 ("Name and address of others who were present").  That was a misrepresentation.  In his later Examination Under Oath, taken by

---

on Long's breach-of-contract claim.

Attorney Angela Taylor, Long admitted that he did not travel to the Atlanta area alone that weekend:

> "Q.     Okay.  Did you travel from Millbrook to Atlanta alone?
>
> "A.     No.
>
> "Q.     Okay.  Who was with you?
>
> "A.     A girl.
>
> "Q.     Can you give me her name?
>
> "A.     Valerie.
>
> "Q.     Does Valerie have a last name?
>
> "A.     Yes.  But I don't know what her last name is."

(Ex. A, SF1 - 489 (beginning at line 22) - 490 (through line 8)).[6]  Valerie was not the only person who accompanied Long to Georgia that weekend.  Valerie's brothers, Ricky and Sandy, and their girlfriends, also went. (Ex. A, SF1 - 493-494 (through line 9)).  Therefore, contrary to what Long told Todd Smith during his recorded statement, Long was accompanied by several other people on his trip to Georgia.

During his recorded statement, Long also stated that he did not go to Georgia to visit anyone:

> "Q.     Okay. And … no specific reason why you were in Atlanta, you weren't going there shopping and you weren't going there to visit people?
>
> "A.     I was relaxin.'
>
> "…
>
> "Q.     Where did you go while you [were] in town that weekend?

---

[6] Long contended that he did not know Valerie's last name even though she had apparently been on an earlier trip to Georgia with Long (prior to the weekend in question), and even though she had procured Long a cellular phone and cellular service. (Ex. A, SF1 - 509, 511 (through line 12)).  Valerie's last name is Ware or Ware-Temple. (Ex. A, SF1 - 511 (line 3)).

"A.     Nowhere really.  Just went to get somethin' to eat and I just chilled out.

"Q.     'Cause obviously that's a long drive to go just to chill out, I mean you can go to Birmingham or somewhere a lot closer than that but…

"A.     Yeah, but I didn't want to go to Birmingham.

"….

"Q.     [D]o you have any friends or family or anybody in the Lithonia area where this took place?

"A.     No.

"….

"Q.     That Friday night?  So when you got to the hotel you just went straight [to] your room, didn't go anywhere, didn't go out to eat, didn't go …

"A.     Huh uh."

(Ex. A, SF1 - 349, 350, 352, 353).  Again, these were misrepresentations.  Long later admitted during his Examination Under Oath that he and the others visited Valerie's brother, Donald, who lives in Lithonia. (Ex. A, SF1 - 509 (beginning at line 16) - 510 (through line 10), 561 (through line 12)).

### c. Circumstances Surrounding Alleged Theft of Vehicle

Long's vehicle was parked in a well-lit area, less than 100 feet from the door of the hotel. (Ex. A, SF1 - 95).  While the evidence indicated that someone had attempted to make the Corvette's ignition look like it had been defeated, according to a report completed by Michael E. Bresnock of Transportation Technology, whoever drove the car last had to have had the correct ignition key. (Ex. A, SF1- 17; Ex. C (Report of Michael Bresnock) at SF1 - 233, 254).  Long admitted that, when he purchased his car, it came with two sets of keys. (Ex. A, SF1 - 545 (lines 19-21)).  And, while he had purchased the car only two weeks before the alleged theft, *he could*

*not account for the second set of keys.* (Ex. A, SF1 - 481, 545 (beginning at line 22) - 546 (through line 22)).[7]

Long told State Farm that the car was locked and the alarm was functioning when he left it in the parking lot of the hotel. (Ex. A, SF1 - 338-339, 291).  But the hotel shift manager on duty the night and morning of the alleged theft did not hear any alarm go off, and he was of the opinion that, had the alarm sounded, he would have heard it. (Ex. A, SF1 - 311).

### d. Discovery of and Reporting of the Theft

Long originally claimed that *he* discovered his vehicle missing on the morning of February 19, after he walked out of the hotel to get breakfast. (Ex. A, SF1 - 291, 340).  Those statements turned out to be false.  Long later stated during his Examination Under Oath that the girlfriend of one of Valerie's brothers "knocked on the door" of Long's hotel room and let him know the car was missing. (Ex. A, SF1 - 492 (lines 16-23), 494 (lines 10-14)).[8]  Long also initially claimed that *he* called the police with *his* cell-phone to report the theft. (Ex. A, SF1 - 341).  That story also later changed when, during his EUO, Long claimed that Sandy, one of Valerie's brothers, used his own cell-phone to call the police and that Sandy then handed his phone to Long. (Ex. A, SF1 - 496 (beginning at line 20) - 497 (through line 13)).  There is evidence in the claim file indicating that Long and his friends allegedly discovered the theft around 7:00 a.m. (Ex. A, SF1 - 291, 307, 339, 495 (beginning at 21) - 496 (through line 3)).  But there is also evidence indicating that the theft was not reported to the police until 9:30 or later. (Ex. A, SF1 -  374-375, 504 (lines 3-14), 733).

---

[7] Long had indicated during his earlier recorded statement that he may have left the second set of keys in the car before it was stolen, but during his later Examination Under Oath, he was emphatic that he had not and that he did not know what had happened to the second set.
[8] Valerie told State Farm that her brother's girlfriend *called* the hotel room after she had discovered the theft and that, after receiving the call, she, her brothers, and Long went downstairs to the lobby. (Ex. A, SF1 - 168).

According to State Farm representative Tony Nix, after the car had been recovered, and when Long was informed of that recovery, rather than inquiring as to the condition of the vehicle or as to its whereabouts, Long's first statement was simply that he did not want the car back. (Ex. A, SF1 - 95).

### e. Personal Property Claims

The shift manager at the Country Hearth Inn (the hotel from which the Corvette was taken) indicated in his recorded statement that he overheard two men in the hotel lobby telling Long to claim that a suitcase had been stolen along with the car:

"Q.    Did he [Long] mention anything about having personal items like clothing in the car?

"A.    Nope.  But he did, the other guy did say to him to say that you had a suitcase in the car with some stuff in it. …

"Q.    In other words he was telling him you need to make up like and just say that you had some, even though it might not have been in there?

"A.    I would say that was fairly the intent and I, and that's what I perceived it was."

 (Ex. A, SF1 - 311).  The manager was of the opinion, which he expressed to State Farm, that Long was involved in the theft of his own vehicle. (Ex. A, SF1 - 314).

Although Valerie Ware told Todd Smith, a State Farm Claims Representative, that Long had removed some of his luggage upon arrival at the hotel (Ex. A, SF1 - 168), Long claimed that, when his vehicle was stolen, it  nevertheless contained a fairly large amount of expensive personal property.  That property included:

1.  One black leather jacket - $250

2.  One .45 automatic hand-gun - $378

3.  Three suits - $600

4.  Two pant-suits - $180

5.  Four pairs of shoes - $1100

6.  Four bracelets - $2500

7.  Three rings - $1200

8.  One DVD player - $160

9.  One watch - $1000

10. $5000 in cash

(Ex. A, SF1 - 752).[9]  The initial report completed by the Dekalb County Police did not identify any stolen property. (Ex. A, SF1 - 374-375 (narrative report)).  Long claimed that he attempted to report the items stolen when he first talked to the police, but that they would not list them in the report until he obtained the serial number for the allegedly stolen pistol.  Nothing in the narrative of the initial police report supports that claim. (Id.).  The report was later supplemented to add the personal property. (Id.).

According to entries in the automotive and companion homeowner's claim files, when Long originally reported the alleged theft of his personal property, he indicated that all of that property was in his vehicle at the time of the alleged theft *because he had been on a shopping trip in Georgia*. (Ex. A, SF1 - 21 ("[Long] was upset that the contents coverage was only $200. … He said he had a lot of stuff in veh as he had been on a shopping trip in Atlanta."); SF2 - 3 ("Insd was in Atlanta staying hotel/motel.  Car was stolen with newly purchased items in it."); SF2 - 8 ("cr questioned why cash and items in vehicle.  Reason for all items in vehicle at time of loss, he just purchased.")).  The following colloquy occurred during a recorded statement taken in connection with Long's companion homeowner's claim:

---

[9] At the time he made his claim, Long was unaware of the personal property limits of his automotive policy. (Ex. A, SF1 - 350).  As noted, Long later made a claim under his homeowner's policy, which was also denied.

"Q.    And why, why were all of these items in the car at the time of the loss?

"A.    I, I, I just bought most of it some of it I, I had anyway.

"Q.    Okay.

"A.    I mean it wasn't like I you know I mean I don't have an excuse for that. They were just in the car.

"Q.    Okay do you have any documentation for the items that [were] taken?

"A.    Are you talking about receipts?

"Q.    Um hum.

"A.    I got some receipts.

"Q.    Okay.

"A.    But some of the receipts is in the car with the stuff.  I got some receipts *from some of the stuff I bought here before I left*."

(Ex. A, SF2 - 98-99) (emphasis added).   As can be seen, Long originally claimed that a substantial amount (if not all) of the personal property that was supposedly in his vehicle at the time of the alleged theft was in the vehicle because it was purchased during the trip to Georgia.[10]

However, Long later testified in his EUO (and on a personal property inventory form) that he had purchased all of the personal property that was in the car *before* the Georgia trip took place in February of 2005:

1.  Black leather jacket - Purchased in April of 2003. (Ex. A, SF1 - 520 (beginning at line 18) - 521).

2.  Hand gun - Purchased in February of 2005, but in Montgomery, not Georgia. (Ex. A, SF1 - 522 (lines 1-6)).[11]

---

[10] While Long originally stated that he had receipts for some of the personal property he allegedly purchased before he went to Georgia, Long later testified in his deposition, taken after Long sued State Farm, that he does not keep receipts for items he purchases. (Ex. H, 105 (line 15) ("I don't keep no receipts.")).

[11] Long testified in his EUO that the gun was in the center console of the Corvette when it was stolen.  According to Long, it could fit in the console because it "was kind of a small gun.  It's not as big as the usual .45." (Ex. A, SF1 - 525 (lines 1-2)).  After Long sued State Farm, he testified in deposition that the gun was in the back of the car, rather than in the center console. (Ex. H, 106 (lines 6-10)).

3. Three suits - Purchased in February of 2005, but in Montgomery. (Ex. A, SF1 - 526, 529, 752).[12]

4. Two pant-suites - Purchased in February of 2005, but in Montgomery. (Id.)

5. Four pairs of shoes - Purchased in February of 2005, but in Montgomery. (Id.)

6. Four bracelets - One purchased in February of 2003. (Ex. A, SF1 - 529 (beginning at line 18) - 530 (through line 15)). Two apparently purchased in February of 2005, but in Montgomery. (Ex. A, SF1 - 536 (beginning at line 22) - 537). Apparently the fourth bracelet was purchased in Ohio. (Ex. A, SF1 - 351). The record does not reveal when Long went to Ohio.[13]

7. Three rings - Purchased in February of 2005, but in Montgomery. (Ex. A, SF1 - 538 (beginning at line 15) - 541 (through line 4)).

8. DVD player - Purchased in January of 2005 in Montgomery. (Ex. A, SF1 - 533 (beginning at line 23) - 534 (through line 11)).

9. Watch - Purchased from Long's nephew in January of 2005, through installment payments. (Ex. A, SF1 - 541 (lines 11-18)).[14]

As can be seen, contrary to Long's original claim that so much personal property was in his car at the time of the theft because he had been on a shopping trip in Georgia, he testified later that all of the property was purchased elsewhere, before the Georgia trip.

As for the $5,000 in cash that Long reported stolen along with his vehicle, when asked if he thought it was safe to leave so much money in the car, Long said that he did and that he didn't leave it in the car for any particular reason. (Ex. A, SF1 - 525 (lines 14-21)).[15] The claim file for the companion homeowner's claim indicates that Long originally claimed that the money was left over from his CSX settlement proceeds. (Ex. A, SF2 - 8 ("mr advised that he was in Atlanta

---

[12] While Long testified that he bought the suits in February of 2005 at "Looking Good" clothing store in Montgomery, the owner of that store told State Farm that Long had not purchased them recently. (Ex. A, SF2 - 6).

[13] While Long originally claimed he purchased one of the bracelets in Ohio, during his deposition taken after he sued State Farm, he claimed that he had purchased the bracelet in Montgomery. (Ex. H, 121).

[14] Long first testified that the watch was gold. Then he said it was silver, with a "clear" face. (Ex. A, SF1 - 541 (beginning at line 23) - 542 (through line 7)). Long's nephew, who sold Long the watch, stated that it was silver with a black face, and he denied that he received installment payments. (Ex. A, SF2 - 6).

and someone stole car from his hotel.  Items inside include: suits, jewelry, dvd player, $5000 cash *(from lawsuit stlmt)* …"), SF2 - 98 ("Q. And what was this amount of cash the $5,000 doing in the car at the time of the loss? A. Well I left it in there.  I mean I just got a lawsuit and I was so called splurging.").   However, during Long's Examination Under Oath, he testified that the $5,000 allegedly left in the Corvette was *not* money left over from the settlement. (Ex. A, SF1 - 525 (beginning at line 22) - 526 (through line 2)).[16]

Long could produce *authentic* receipts only for the hand gun and one bracelet. (Ex. A, SF1 - 754-755).  He did produce what appeared to be a receipt for the three suits, two pantsuits, and four pairs of shoes he claimed were stolen, but he admitted that he had had the owner of the store where he allegedly purchased those items generate those receipts *after* the loss had occurred. (Ex. A, SF1 - 526 (beginning at line 22) - 529 (through line 17)).  He also admitted that the owner of the store, in generating those receipts, did not have the originals. (Id.)  Rather, he simply filled in the items and amounts specified by Long.  (Id.)  As noted, Long originally claimed to have purchased the items represented by that receipt less than a month before the alleged theft.  As discussed below, Long later admitted during his deposition that he had made misrepresentations regarding the personal property allegedly stolen with his car.  Specifically, he admitted that he had made misrepresentations regarding the three suits, two pantsuits, and four pairs of shoes.

Long also could not produce any receipts (original or otherwise) for the leather jacket, three bracelets, three rings, DVD player or watch.  Further, Long testified that he doesn't remember from whom he purchased the rings and three of the bracelets, (Ex. A, SF1 - 534

---

[15] Long later testified during deposition that he purposely parked his Corvette under a security camera at the hotel because he thought there was a possibility that someone might steal something, (Ex. H, 59 (lines 5-14)), but, notwithstanding that fear, he left the $5,000 in the car overnight. (Id. at 107-08 (through line 3)).

(beginning at line 14) - 540), but that all of his jewelry was in "something like a box" in the back of his Corvette when it was allegedly stolen. (Ex. A, SF1 - 531 (beginning at line 23) - 532 (through line 3)).

During his deposition, taken after Long filed suit, *Long expressly admitted that he had made misrepresentations regarding the personal property that was allegedly stolen*. He admitted that, contrary to what he had originally claimed on his personal property inventory form and during his examination under oath, he did not purchase the suits, pantsuits, and shoes in February of 2005, and they did not cost as much as he had claimed that they had. (Ex. H, 128 (lines 3-18), 108-118. In fact, contrary to what he had earlier claimed, he testified that he only had two pairs of shoes in the car, not four. (Ex. H, 128 (lines 3-18), 108-118). In other words, he admitted to falsely claiming personal property that was not in the car (shoes), and to inflating the value of those items that he contends were in the car (suits and pantsuits).[17] He claims that he made those misrepresentations because he was angry at State Farm for accusing him of being involved in the theft of his own car. (Ex. H, 108-118, 129 (lines 1-13)). However, he testified further during deposition that State Farm did not actually accuse him of such until *after* Long had made the misrepresentations he has admitted to making. (Ex. H, 114 (beginning at line 17) - 116 (through line 18)).

Long has expressly confirmed State Farm's conclusion that Long had indeed made material misrepresentations in connection with the alleged loss and claim under the policy. In addition, as discussed below in the section of this brief dealing with Long's breach-of-contract claims, the depositions that have been taken in this case reveal additional evidence indicating

---

[16] During his deposition, Long changed his story again and testified that the money *was* left over from his settlement. (Ex. H, 172 (beginning at line 21) - 173 (through line 19)).

[17] It is worth noting that Long originally claimed that he had lost $1,100 worth of shoes when his car was taken. (Ex. H, 117 (lines 10-17)).

that Long made misrepresentations in connection with his insurance claims and was involved in the theft of his own vehicle.

To argue that State Farm did not have a reasonably legitimate or arguable reason for the denial of Long's claim under the definition of "loss" in the policy or based on the concealment or fraud provision of the policy would be to ignore the very substantial evidence in State Farm's claim files indicating that Long intentionally made several material misrepresentations relating to his claim, as well as indicating that he participated in the "theft" of his own vehicle. In fact, Long has expressly confirmed that he made misrepresentations regarding his claims. Accordingly, State Farm is due a summary judgment on Long's normal bad faith claim.

## 2. Abnormal Bad Faith

As noted, to prevail on an "abnormal" bad faith claim, an insured must show that the insurer intentionally or recklessly failed to investigate a claim, intentionally or recklessly failed to properly subject the claim to a cognitive evaluation or review, manufactured a debatable reason to deny the claim, intentionally failed to determine the existence of a lawful basis to deny the claim, or relied on an ambiguous portion of the policy as a lawful basis for denying the claim. *Singleton v. State Farm Fire & Cas. Co.*, 928 So. 2d 280, 283 (Ala. 2005); *Ex parte Simmons*, 791 So. 2d 371, 378-79 (Ala. 2000).

Long does not contend in his Complaint that State Farm relied on an ambiguous portion of the policy in order to deny his claim. In any event, Long's policy unambiguously states that a loss has not occurred unless the loss of, or damage to, the subject vehicle or covered property was accidental. (Ex. D, at page 13 of the policy). The policy further unambiguously provides that there is no coverage if an insured has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under the policy. (Id

at page 21 of the policy).  Accordingly, there is no evidence that State Farm relied on an ambiguous portion of the policy in order to deny the claim.

Long also does not expressly allege that State Farm manufactured a debatable reason to deny his claim.  In any event, all of the evidence presented above that was uncovered during State Farm's investigation of Long's claim, and which is documented in the claims files, shows that State Farm did not *manufacture* such a reason.  Rather, the evidence of Long's misrepresentations and/or his involvement in the theft of his car is real and substantial, and, at the least, a debatable reason to deny the claim exists.

Finally, the evidence shows that State Farm did not intentionally or recklessly fail to investigate the claim, intentionally fail to determine the existence of a lawful basis to deny the claim, or intentionally or recklessly fail to properly subject the claim to a cognitive evaluation or review.  As noted above, State Farm's investigation of Long's claim included the following:

1. Interviewing the Dekalb County (Georgia) Police Department regarding the alleged theft (Ex. A, SF1 - 20);

2. Reviewing the police reports that had been generated as a result of the alleged theft (Ex. A, SF1 - 370-385);

3. Inspecting the Corvette after it had been recovered (Ex. A, SF1 - 19);

4. Hiring an independent expert consultant to inspect the vehicle after it had been recovered (Ex. A, SF1 - 228-274; Ex. B; Ex. C);

5. Having State Farm's inside consultant review the outside consultant's report (Ex. A, SF1 - 9-10);

6. Obtaining a recorded statement from Long regarding the claim (Ex. A, SF1 - 315-354);

7. Obtaining a recorded statement from the shift manager of the hotel from whose parking lot the Corvette was allegedly stolen (Ex. A, SF1 - 307-314);

8. Obtaining a recorded statement from Long's wife regarding their recent separation (Ex. A, SF1 - 14);

9. Obtaining a recorded statement from Long's girlfriend, Valerie Ware-Temple, who accompanied Long to Georgia the weekend the vehicle was allegedly stolen (Ex. A, SF1 -167-168);

10. Interviewing Donald Ware, Valerie's brother, who lives near the location of the alleged theft and whom Long and Valerie visited the night before the alleged theft (Ex. A, SF1 -12);

11. Interviewing Ricky Ware, Valerie's other brother, who also accompanied Long and Valerie to Georgia the weekend the vehicle was allegedly stolen (Ex. A, SF1 - 9);

12. Obtaining Long's Examination Under Oath with the assistance of attorneys (Ex. A, SF1 - 455-570);

13. Submitting all of the evidence regarding the claim to an Auto Claim Committee made up of several individuals who subjected the results of the investigation to a cognitive review and made the final determination to deny the claim based on the evidence and the policy (Ex. A, SF1 - 59-68).

After engaging in a proper and thorough investigation of Long's claim, State Farm submitted all of the information that had been gathered during that investigation to its Auto Claim Committee, which generated an exhaustive summary of that information and made a reasoned determination that a loss had not occurred under the policy and that material misrepresentations had been made. (Ex. A, SF1 - 59-68).

Further, Alabama law is clear that "in order to prove a bad-faith-failure-to-investigate claim, the insured must prove that a proper investigation would have revealed that the insured's loss was covered under the terms of the contract." *Slade*, 747 So. 2d at 318. Long cannot present sufficient evidence (if any at all) indicating that, had State Farm "properly" investigated his claim, it would have discovered facts requiring that the claim be paid.

It must be remembered that "[b]ad faith ... is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will." *Singleton v. State Farm Fire & Cas. Co.*, 928

20

So. 2d 280, 283 (Ala. 2005) (internal quotation marks omitted).  State Farm is due a summary

judgment on Long's bad faith claims.[18]

## B. Breach of Contract

A "[p]laintiff can establish a breach-of-contract claim by showing '(1) the existence of a

valid contract binding the parties in the action, (2) his own performance under the contract, (3)

the defendant's nonperformance, and (4) damages.' *Southern Medical Health Systems, Inc. v.*

*Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) (citations omitted)." *State Farm Fire & Cas. Co. v. Slade*,

747 So. 2d 293 (Ala. 1999).  State Farm is not liable for breach of contract because it was not

required to pay Long's claim under the policy.  As set out above, the undisputed evidence

discovered by State Farm during its investigation clearly shows that Long made false statements

with the intent to conceal or misrepresent material facts or circumstances in connection with a

claim under the policy.  He made material misrepresentations regarding the circumstances of his

trip to Georgia (i.e., who went with him and what he did while he was there), the theft (i.e.,

where Long's second set of keys were), the discovery of the theft (i.e., who discovered it and

who reported it), and the claim of missing personal property (i.e., when and how he purchased or

acquired it).  In fact, as noted, Long has now expressly *admitted* making misrepresentations

regarding the personal property he claimed was in the car.

Evidence discovered after Long filed suit  (in addition to Long's admission) further

supports State Farm's argument that it is entitled to a summary judgment on Long's breach-of-

contract claim.  Long testified during deposition that the trip in question was not the first time he

and the others (Valerie, Sandy, Ricky, and Felicia) had traveled together to the Lithonia area to

---

[18]Long has not alleged in his complaint that State Farm breached the homeowner's policy, or that State Farm acted in bad faith with respect thereto.  However, out of an abundance of caution, State Farm notes that, because the claims under both policies were investigated together, all of the evidence discussed above certainly establishes that a

visit Donald. Rather, he testified that the same group had gone a couple of months earlier. (Ex. H, 43 (beginning at line 14) - 44); (Ex. H, 48 (beginning at line 15) - 49). However, contrary to what Long claims, the others testified that the trip in question was the first time that they had gone to Lithonia with Long. (Ex. I (Valerie), 16 (beginning at line 11) - 17 (through line 17)); (Ex. J (Ricky), 12-13); (Ex. K (Felicia), 11 (lines 7-13)); (Ex. L (Sandy), 12 (beginning at line 19) - 13 (through line 4).

Further, as noted above, Long claimed during State Farm's investigation that the handgun that was allegedly stolen along with the vehicle was in the center console and that it fit in the console because it "was kind of a small gun. It's not as big as the usual .45." (Ex. A, SF1 - 525 (lines 1-2)). However, during his deposition, Long testified that the gun was in the *back* of the car when it was taken. (Ex. H, 106 (lines 6-10)). In addition, while Long originally told State Farm that he purchased one of the missing bracelets in Ohio, during his deposition, he claimed that he bought that bracelet in Montgomery. (Ex. A, SF1 - 351); (Ex. H, 119 - 121).

Further, as noted, Long claimed insurance benefits for the loss of a DVD player that was allegedly in the car. However, during Valerie Ware's deposition, she testified that *she* left a DVD player in the car. (Ex. I, 31 (lines 4-22)). While Long had claimed during his examination under oath that *his* DVD player was in the front of the car on the floor (Ex. A, SF1 - 103 (beginning at line 20) - 104 (through line 11)), Valerie testified during deposition that she never saw that DVD player. (Ex. I, 32 (lines 7-16)).

Finally, as noted above, Long told State Farm that the jewelry he lost was in the back of the car in "something like a box." (Ex. A, SF1 - 531 (beginning at line 23) - 532 (through line 3)). He has also claimed that the cash he lost with the car was in an envelope inside the console

---

reasonably legitimate or arguable reason existed to deny the homeowner's claim, and that State Farm engaged in an adequate investigation of the same.

between the seats of the car. (Ex. H, 105 (beginning at line 17) - 106 (through line 5)). However, Valerie testified in deposition that she could see the jewelry that Long allegedly lost, because it was in a cup holder or something similar between the seats of the vehicle. (Ex. I, 34 (beginning at line 12) - 36 (through line 4)). She also testified that she saw the money folded up beside the jewelry. (Id. at 36 (beginning at line 5) - 38 (through line 8)).

Accordingly, based on the evidence State Farm discovered during its investigation and the evidence discovered after Long filed suit, State Farm is due a summary judgment on Long's breach-of-contract claim because of the fraud and misrepresentation provision in the contract.

Additionally, the evidence discussed above shows that Long was involved in the theft of his own vehicle and any property that was contained in the vehicle. Accordingly, State Farm is also due a summary judgment on the breach-of-contract claim because a "loss" did not occur under the definition of that term in the policy.[19]

Finally, State Farm points out that, if it is due a summary judgment on Long's breach of contract claim, it is also due a summary judgment on Long's bad faith claims. *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 317 (Ala. 1999) ("[W]hen this Court recognized the tort of bad faith, it intended to limit liability under that tort to those instances in which the insured's losses were covered under the policy."); *Congress Life Ins. Co. v. Barstow*, 799 So. 2d 931, 937 (Ala. 2001) ("[O]ne who cannot prove she was entitled to benefits under an insurance policy cannot recover on a bad-faith claim.").

Respectfully submitted,

**/s/ James B. Newman**
JAMES B. NEWMAN (NEWMJ8049)

---

[19]Again, while Long has not made a breach of contract claim under the homeowner's policy, the evidence clearly shows that he concealed or misrepresented material facts or circumstances relating to that policy. Therefore, the evidence clearly shows that State Farm would be entitled to a summary judgment on a breach of contract claim based on that policy as well.

D. ANDREW STIVENDER (STIVD4909)
Attorneys for Defendant State Farm Fire
and Casualty Company

OF COUNSEL:
HELMSING, LEACH, HERLONG,
      NEWMAN & ROUSE
POST OFFICE BOX 2767
MOBILE, ALABAMA   36652
(251) 432-5521
Facsimile:   (251) 432-0633
Email:   jbn@helmsinglaw.com
      das@helmsinglaw.com

<u>CERTIFICATE  OF  SERVICE</u>

      I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

      F. Tucker Burge
      Burge & Burge
      2001 Park Place North, Suite 850
      Birmingham, Alabama   35203

this 15th day of May, 2007.

      **/s/James B. Newman**
      OF COUNSEL

136876



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARTIN O. LONG,               *

      Plaintiff,             *

vs.                     *        Case Number:  2:06cv816-MHT

STATE FARM FIRE AND     *
CASUALTY COMPANY,
                       *

      Defendant.

## DECLARATION OF TONY NIX

I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.     My name is Tony Nix.  I am a citizen of the State of Georgia, am over nineteen years of age, and have personal knowledge of the matters contained in this declaration.

2.     I am a Claim Team Manager with the Special Investigations Unit of State Farm Fire and Casualty Company.

3.     I am familiar with how State Farm's records, including claim files, are made and kept by State Farm.

4.     Attached as Exhibit "1" to this declaration are true and correct copies of excerpts of the State Farm claim files for Claim No. 01-6596-564 and Claim No. 01-Q177-057.  Both claims were made by Martin Long and involved the alleged theft of his 2000 Chevrolet Corvette.

1

5.     The excerpts referred to above were made at or near the time of the occurrence of the subjects of the excerpts by persons with knowledge of these matters. These records are kept by State Farm in the course of regularly conducted business and it is the regular practice of State Farm to make these records.

I am making this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 in Decatur, Georgia this _____ day of March, 2007.

_____
TONY NIX

#131651

2

RBZ0003M
date: 08-25-06

**EXHIBIT**

*A-1*

page:    8

UTO
aim number
1-6596-564

## ACTIVITY LOG

| e | time | entered by | | office | region | no |
|---|------|-----------|---|--------|--------|-----|
| -28-05 | 08:44 AM | Smith, Todd | | GASCSIU | GA-SC | 92 |

.st night, I spk w/ Mike Bresnock as he had secured his transcribed reinspect
n report.  Earlier this morning, I went to Mr. Bresnock's office & secured
e report.  Issuing payment for his services.
.so, spk w/ my TM re: the report.

| | time | entered by | | office | region | no |
|---|------|-----------|---|--------|--------|-----|
| 5-27-05 | 09:57 AM | Smith, Todd | | GASCSIU | GA-SC | 91 |

1 6-22, met Mike Bresnock at Verastar S & reinspected the IV again.  Afterwar
3, he indicated his opinion had not changed.  I requested he complete his sup
emental report ASAP & fax it to me.
.wards, the end of the week, briefly spk w/ my SM re: the matter.
.lso, spk w/ Jason at Enterprise 404 299-3245 & xtd the insured's rental anoth
r week at this time.
arlier this morning, I f/u w/ Mike Bresnock re: his report & he indicated it
.ad been dictated & he was waiting on receipt of the transcribed report & woul
review it & fax it to me upon receipt & review.

| te | time | entered by | | office | region | no |
|---|------|-----------|---|--------|--------|-----|
| 6-21-05 | 02:13 PM | Smith, Todd | | GASCSIU | GA-SC | 90 |

arlier today, I spk w/ Earl Hyser & discussed the O & C report further.  Then
spk w/ O & C expert Mike Bresnock & requested a reinspection of the IV in
der to recheck the theft deterrent system, oil pressure, etc.  We'll meet
morrow morning at Verastar S at approx 10:00 a.m.

| te | time | entered by | | office | region | no |
|---|------|-----------|---|--------|--------|-----|
| 6-20-05 | 01:09 PM | Smith, Todd | | GASCSIU | GA-SC | 89 |

ver the past few days, I've had a # of conversations w/ my SM & TM re: the
laim.  Earlier today, I f/u'd w/ Mr. Hyser & verified his receipt of the O &
report.  He'll complete his review & c/b to discuss tomorrow.

| ate | time | entered by | | office | region | no |
|---|------|-----------|---|--------|--------|-----|
| 6-17-05 | 06:36 AM | Smith, Todd | | GASCSIU | GA-SC | 88 |

esterday evening, I spk w/ Ricky Ware & discussed the claim.

| ate | time | entered by | | office | region | no |
|---|------|-----------|---|--------|--------|-----|
| 06-16-05 | 11:52 AM | Smith, Todd | | GASCSIU | GA-SC | 87 |

: have previously tried to reach both Ricky & Sandy Ware at cellular #'s provi
.ied by their sister Valerie Ware-Temple & lmtc.  After lunch, I tried Ricky
Ware again at 334 451-0045 & lmtc.  Note, the message on the voice mail does
.ot specifically say who's voice mailbox it is.  I tried Sandy Ware again at
334 294-2113 & he answered.  He said he was at work & on emergency call & did
.ot have time to discuss this matter.  I offered to give him my # to call & he
said I would have to try him back after 4 or 5:00 this afternoon.

RBZ00030
date: 08-25-06

page:   9

# AUTO
claim number
## 01-6596-564

## ACTIVITY LOG

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 06-16-05 | 11:12 AM | Smith, Todd | GASCSIU | GA-SC | 86 |

Earlier today, spk w/ my SM re: the claim.  F/u'd w/ Earl Hyser at Corp & requested he review our O & C report & requested his opinion in the matter.  We'll forward a copy of Mr. Bresnock's report to him ASAP.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 06-15-05 | 09:23 AM | Smith, Todd | GASCSIU | GA-SC | 85 |

Spk w/ Sean & xtd the insured's rental another week for now.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 06-06-05 | 03:35 PM | Wascom, Kirk | MONTGOME | Al-Miss | 84 |

TRACY:  This file is assigned to SIU CR.  However, IV salvage is still open in the ASR to CR Bill Cooper.
     Please update ASR and make correction update to ASR.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 06-03-05 | 10:11 AM | Smith, Todd | GASCSIU | GA-SC | 83 |

Spk w/ Sean w/ Enterprise 770 622-2764 xtn 115 & xtd the insured's rental another week at this time.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 06-01-05 | 12:04 PM | Smith, Todd | GASCSIU | GA-SC | 82 |

Earlier today, spk w/ my TM re: the CCR previously submitted, the addendum report rec'd from Mike Bresnock.  Forwarding copy of Mr. Bresnock's report to Atty Taylor.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 05-31-05 | 08:20 AM | Smith, Todd | GASCSIU | GA-SC | 81 |

Called Mike Bresnock this morning as a f/u re: his opinion on the alarm system He'll fax us a copy of his supplemental opinion tomorrow.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 05-26-05 | 08:28 AM | Smith, Todd | GASCSIU | GA-SC | 80 |

Mr. Long previously requested a certified copy of his policy.  We received it & I'm forwarding it to his Atty.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 05-25-05 | 09:58 AM | Smith, Todd | GASCSIU | GA-SC | 78 |

Spk w/ Sean at E & xtd the insured's rental another week at this time.

Long/State Farm
SF1  00010

date: 08-25-06

page:    11

**AUTO**
claim number
**01—6596—564**

## ACTIVITY LOG

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 04-27-05 | 11:07 AM | Smith, Todd | GASCSIU | GA-SC | 70 |

Earlier this morning, I briefly discussed the claim w/ my TM & the opinion letter from Mr. Beers.  Also, returned Shawn's call at Enterprise & xtd the insured's rental another week at this time.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|

Also, spk w/ Mr. Long earlier today re: a status.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 04-21-05 | 09:13 AM | Smith, Todd | GASCSIU | GA-SC | 68 |

Returned Monique's call at Enterprise 404 299-3245 & spk w/ Shannell re: the insured turning the car in.  I advised her we have not finalized Mr. Long's rental & if they want him to turn in the car, that was between them & Mr. Long However, once again, we have not finalized his rental & we will continue to authorize the rental until a decision is reached.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 04-19-05 | 01:36 PM | Smith, Todd | GASCSIU | GA-SC | 67 |

Spk briefly w/ Donald Ware & secured his address.  He confirmed his sister, Valerie, our insured & his other 2 brothers & 2 friends of theis came to his ome that Friday night and stayed a while.  He confirmed seeing our insured's orvette & said it was nice.  He said he learned the vehicle was stolen that next day. He could not recall when they left that Friday night & confirmed this was the second time they had visited him in the past.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 04-19-05 | 07:39 AM | Green, Pennie | ALMSSIU | Al-Miss | 66 |

Per Todd Smith - spoke w/Shawn at Enterprise 770-622-2764 ext 115 - extended rental one week - also spoke w/Shanelle at Enterprise 404-299-3385 ref exten on rental.

no
64

Long/State Farm
SF1  00012

date: 08-25-06

**AUTO**
claim number
**01-6596-564**

## ACTIVITY LOG

| date | time | entered by | | office | region | no |
|------|------|-----------|---|--------|--------|-----|
| 04-01-05 | 07:42 AM | Smith, Todd | | GASCSIU | GA-SC | 56 |

| date | time | entered by | | office | region | no |
|------|------|-----------|---|--------|--------|-----|
| | | | | | | 55 |

| date | time | entered by | | office | region | no |
|------|------|-----------|---|--------|--------|-----|
| 03-23-05 | 01:24 PM | Smith, Todd | | GASCSIU | GA-SC | 54 |

Called Evelyn Long, the insured's separated wife & secured a r/s from her re: their separation, which she said has just occurred the end of Feb '05, etc.

| date | time | entered by | | office | region | no |
|------|------|-----------|---|--------|--------|-----|
| 03-23-05 | 12:29 PM | Smith, Todd | | GASCSIU | GA-SC | 53 |

Called ADP for IV valuation, request # 14822284, base value $24,900.00.

| date | time | entered by | | office | region | no |
|------|------|-----------|---|--------|--------|-----|
| 03-23-05 | 08:23 AM | Smith, Todd | | GASCSIU | GA-SC | 52 |

Returned Mr. Long's call re: the upcoming EUO, doc's he's to provide. He had a question re: his cell phone records & I advised him to bring the records he has & if he needs to get add'l records, he could request them after the EUO. Also, I reminded him I would reimburse him for any out of pocket expenses associated w/ securing the records. He mentioned an expense of $60.00 from his bank for those records. Also, reminded him of the continued rental xtns.

| date | time | entered by | | office | region | no |
|------|------|-----------|---|--------|--------|-----|
| | | | | GASCSIU | GA-SC | 51 |

| date | time | entered by | | office | region | no |
|------|------|-----------|---|--------|--------|-----|
| 03-23-05 | 07:35 AM | Smith, Todd | | GASCSIU | GA-SC | 50 |

On 3-22, xtd the insured's rental another couple of weeks w/ Shawn at Enterprise 404 442-7088.

| date | time | entered by | | office | region | no |
|------|------|-----------|---|--------|--------|-----|
| 03-21-05 | 08:56 AM | Smith, Todd | | GASCSIU | GA-SC | 49 |

Rec'd & reviewed the report from Transportation Technology for payment.

**AUTO**
claim number
**01-6596-564**

date: 08-25-06                                                     page:    16

## ACTIVITY LOG

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-08-05 | 12:14 PM | Smith, Todd | GASCSIU | GA-SC | 39 |

Earlier this morning, I met Mike Bresnock w/ Transportation Technology at Vera star South & inspect the IV. I gave him the key I previously secured from our insured & he was able to start the IV using that key. It appeared someone tri ed to make the ignition look like it was defeated; however, in his opinion, whoever last drove the IV had a key to it.
A few minutes ago, I spk w/ the insured & advised him in the O & C's opinion, whoever last drove the IV had a key to it. Once again, we discussed the key issue, as the insured cannot account for the second set of keys to his vehicle & he still can't give an explanation where the other set went. During our con versation, he got very mad & started cussing & kept saying we need to just pay his claim & stop messing (except he used another word for it) w/ him. Finall y, I advised him I would not listen to his cussing anymore & that I would be happy to discuss this matter in a business like manner. He then started sayin g do ya'll think I had someone steal my vehicle. I addressed the fact that he told me he was along the night & morning of the theft & then he changed his st ory to say he was w/ another woman. I advised him I interviewed the shift man ager at the hotel where he stayed & he said our insured called two other men & they showed up & the insured continued to say he did not meet w/ anyone there. Finally, the insured said the woman he was w/, her brother showed up. I advis ed him of the fraud & concealment endorsement on his policy & that his misrepr esenting facts to us could result in a denial of his claim & that he needed to start telling me all the information relating to his claim. I assured him it as not our intent to get him in trouble w/ this woman or his ex-wife; however we have the right to discuss this matter w/ them if it corroborates &/or confi rms the facts that he has reported to us. In the meantime, I requested he sec ure copies of his cell phone records from the weekend of the alleged theft & I advised him I would speak w/ my TM re: our future handling of his claim & be back in touch w/ him.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-07-05 | 09:50 AM | Smith, Todd | GASCSIU | GA-SC | 38 |

Spk w/ the insured again a few minutes ago re: the title issue. He was concer ned if this would hold up the process. I advised him we are still investigati ng the matter & not prepared to make a decision on the claim at this time. As for the title, I advised him he would need to secure it as the owner of the vehicle.
Then, I spk w/ Max at City Auto, who confirmed our insured purchased the IV on 2-4-05 for $23,250.00. He originally thought the insured rec'd one key to the vehicle then, he admitted he did not know for sure how many keys they had to the vehicle. He said they applied for the title & mistakenly listed there was a lien on the vehicle, so they are reapplying for the title solely in our insu red's name. I asked him to fax me copies of the purchase information.

Long/State Farm
SF1  00017

AUTO
laim number
01-6596-564

date: 08-25-06

page: 18

## ACTIVITY LOG

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-02-05 | 12:25 PM | Smith, Todd | GASCSIU | GA-SC | 31 |

Earlier this morning, I met w/ Mr. Long at the Montgomery CSO & secured his
R/S re: the claim.  He completed an Aff of Veh Theft while there.  Also, secur
ed 1 key & keyless remote to his vehicle, copy of his tag receipt & copy of
recent purchase of tires & alignment he had performed on the 18th of Feb '05.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-01-05 | 09:10 AM | Smith, Todd | GASCSIU | GA-SC | 30 |

Spk w/ Mr. Long re: the IV condition, etc.  He still hasn't rec'd the Aff of
Veh Theft; however, his wife said she rec'd something in the mail.  He said he
& his wife are going thru a divorce & he doesn't live at the address we have
on our records, which is 1705 Deatsville Hwy, Millbrook.  He said he actually
lived at 2752 Caroline Dr. in Millbrook for the past 5 years.  I advised him
he would need to make sure his agt's records are updated to reflect his correc
t address.  I reconfirmed our scheduled appt for tomorrow in Montgomery & once
again advised him to bring the keys, doc's, etc.  He said he did not have a re
ceipt supporting his stay in Lithonia & paid cash.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-01-05 | 08:50 AM | Federick, Shatoya | TCGASC | GA-SC | 29 |

Rec 01 Ref.Title docs pend

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-01-05 | 08:47 AM | Smith, Todd | GASCSIU | GA-SC | 28 |

Referred to TCGASC    GA-SC    27-380
Referral type  Title review        Vech No.    01

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-01-05 | 08:45 AM | Smith, Todd | GASCSIU | GA-SC | 27 |

Earlier this morning, went to TopCat Towing & met w/ Stephanie, who confirmed
our insured called them yesterday re: the IV & ok'd the release to SF.  She
said our insured was not happy w/ them as they couldn't release the condition
of the IV over the phone.  Afterwards, I inspected the IV & secured photos.
The following damages were noted: the T-tops & seats were missing, the front
center caps were missing along w/ numerous lug nuts, the ignition cylinder &
column were damaged, the vehicle had been rained in very heavily over the past
weekend.  The exterior of the IV & engine appeared to be ok.  There was no tag
on the vehicle.
Afterwards, called Verastar South (Emily) & requested the IV p/u, confirmation
# 10503619.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-28-05 | 02:34 PM | Smith, Todd | GASCSIU | GA-SC | 26 |

Called TopCat (Stephanie) & verified the IV was located there.  She said the
owner would have to release the vehicle to us & he could do that by calling
them.

Long/State Farm
SF1  00019

date: 08-25-06                                                     page:    19

**AUTO**
**claim number**
**01-6596-564**

## ACTIVITY LOG

| date | time | entered by | office | region | no |
|------|------|------------|--------|--------|-----|
| 02-28-05 | 02:27 PM | Smith, Todd | GASCSIU | GA-SC | 25 |

Spk w/ Detective Fitzpatrick w/ the Dekalb County PD, who confirmed the theft
was reported to them on 2-19-05 around 9:30 a.m. He'll fax me a copy of the
theft report. He said the vehicle was recovered on 2-25-05 in Dekalb County
& is located at Top Cat Towing 770 982-2699. He said the vehicle was apparent
ly located abandoned & he was unaware of any arrest associated w/ it. He said
there was no indication that the owner had been contacted yet re: the vehicle.
After our conversation, I called the n.i. at his hm # & left a message re: the
IV recovery.

| date | time | entered by | office | region | no |
|------|------|------------|--------|--------|-----|
| 02-28-05 | 08:36 AM | Smith, Todd | GASCSIU | GA-SC | 24 |

Earlier this morning, I went to the Country Hearth Inn at 5400 Fairington Rd,
Lithonia, GA 30038 & attempted to locate Ram, the shift manager on duty the
night of the alleged theft. I spk w/ Judith, who on duty at the time. She
recalled hearing about the matter, but was not on duty at or around that time.
She confirmed Ram was working that night & would have got off duty around 9:00
a.m., then the manager Anna Jacobo would have been on duty afterwards. She
said both Ram & Anna were out. She indicated Ram was next scheduled to be on
duty Thursday night from 11:00 p.m. to Friday morning at 9:00 a.m. Anna was
scheduled to be on duty late this afternoon. I left 2 business cards w/ her &
asked her to have both call me. While there, I secured photos of the alleged
theft site.

| date | time | entered by | office | region | no |
|------|------|------------|--------|--------|-----|
| 02-25-05 | 11:58 AM | Craig, Pat | ALMSSIU | Al-Miss | 23 |

AT THE REQUEST OF TODD SENT THEFT AFFIDAVIT TO INSURED THIS DATE.

| date | time | entered by | office | region | no |
|------|------|------------|--------|--------|-----|
| 02-25-05 | 10:03 AM | Smith, Todd | GASCSIU | GA-SC | 22 |

Called Dekalb County Police 404 294-2560 & spk w/ a Detective Warner, who indi
cated the matter was being handled by a Detective Fitzpatrick, who works night
shift. He connected me to his voice mail & I lmtc.

| date | time | entered by | office | region | no |
|------|------|------------|--------|--------|-----|
| 02-25-05 | 09:51 AM | Smith, Todd | GASCSIU | GA-SC | 21 |

Called Mr. Long at 334 290-0344 & advised him this claim & associate h.o.'s
claim 01-Q177-057 are being reassigned to me. I s/u an appt to meet next Wed,
morning 3-2-05 at the Montgomery CSO to discuss the matter. I asked him to
bring all the keys to the IV, any paperwork re: the recent purchase. He indic
ated he did not have a title to it. He said the matter has now been reported
to the police in GA under case # 05-023612, ph # 404 294-2560. He said he att
empted to request a copy of the report via fax; however, they would not fax it
to him. I asked if he rec'd an Aff of Veh Theft & he said he had not. I'll
mail him one & I asked him to complete it & bring it w/ him next week.

Long/State Farm
SF1  00020

AUTO
laim number
01-6596-564

## ACTIVITY LOG

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-24-05 | 12:57 PM | Cooper, Bill | MONTGOME | Al-Miss | 20 |

Sending physical file to CR Todd Smith.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-24-05 | 12:22 PM | Dean, Martha | MONTGOME | Al-Miss | 19 |

Moved to ALMSSIU Al-Miss  09-305
Moving file to SIU per TM Wascom.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-23-05 | 03:31 PM | Cooper, Bill | MONTGOME | Al-Miss | 18 |

Spoke with Ada at Enterprise, extended rental through 2/28/05, Monday

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-23-05 | 10:09 AM | Meek, Krystie | MONTGOME | Al-Miss | 17 |

Completed log #10, routed file to Bill

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-23-05 | 09:50 AM | Smith, Todd | GASCSIU | GA-SC | 16 |

On 2-22-05, at approx 5:15 eastern time, I spk w/ the insured's agt re: the
matter.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-21-05 | 03:43 PM | Cooper, Bill | MONTGOME | Al-Miss | 15 |

Called PH and asked him to contact the Police Dept where the i/v was stolen
and report it stolen as well as the contents of the veh.  I told him he need-
ed to itemize the contents to the police so they could put it on the report.
I told him that no police dept had reported his vehicle stolen to date.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-21-05 | 03:12 PM | Phillips, Kelly | ALMSSIU | Al-Miss | 14 |

SIU is reviewing this claim.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-21-05 | 10:54 AM | Cooper, Bill | MONTGOME | Al-Miss | 13 |

PH called, spoke with him and went over rental coverage, $25 per day, he
understood, he was upset that the contents coverage was only $200.  Told him
we would wait about two weeks and if veh not recovered, we would settle as a
total loss.  He said he had a lot of stuff in veh as he had been on a shopping
trip in Atlanta.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-21-05 | 10:31 AM | Cooper, Bill | MONTGOME | Al-Miss | 12 |

Called PH, nobody home, left message for c/b on a/m

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-21-05 | 10:30 AM | Cooper, Bill | MONTGOME | Al-Miss | 11 |

NICB Theft Report sent regarding 2000 CHEV COR

Long/State Farm
SF1  00021

# AUTO
claim number
# 01-6596-564

## ACTIVITY LOG

| date | time | entered by | | office | region | no |
|------|------|-----------|--|--------|--------|-----|
| 02-19-05 | 08:53 AM | Pullen, Pam | | CLMCENTA | GA-SC | 3 |

F: IV stolen from hotel in Atlanta.  PR is being file at the time the claim is
being reported.
A: D500
C: Took transfer call from CRC
   Insd is Atlanta only through today and is returning to Alabama as soon as
he gets a rental.
   Vehicle was stolen from his hotel's parking lot.  Gave him ph# to
Enterprise in Decatur, GA. 404-325-8833.  Branch code 0305.
   Verified w/ AL ACC that D covers $25 a day under 331/334.
T: AL FCO to handle total theft- unrecovered at this time
   AL can set up rental w/ Enterprise in GA.
   No further handling in GA unless veh recovered here
S: TBD

| date | time | entered by | | office | region | no |
|------|------|-----------|--|--------|--------|-----|
| 02-19-05 | 08:23 AM | REMSEN, N | | CRC | Al-Miss | 1 |

Remarks from CRC
POWER CALL: INSURED IS 200 MILES AWAY FROM HOME AND WILL NEED A RENTAL. CLAIM
REPRESENTATIVE: RHONDA ROBBINS
CUSTOMER IS REPORTING

## SYSTEM GENERATED LOG

total system log entries:    4

| date | time | | office | region | no |
|------|------|--|--------|--------|-----|
| 08-23-06 | 07:15 AM | | ALMSSIUA | Al-Miss | 115 |

Litigation selected from work queue by Erica Scott

| date | time | | office | region | no |
|------|------|--|--------|--------|-----|
| 07-07-05 | 03:01 PM | | TCGASC | GA-SC | 100 |

Incoming Correspondence selected from work queue by Jena Settles

| date | time | | office | region | no |
|------|------|--|--------|--------|-----|
| 03-08-05 | 02:46 PM | | ALMSSIU | Al-Miss | 41 |

A Claim Rep Review message has been created for Smith, Todd
Q0087 Rental reservation extension request was received for LONG, MARTIN

| date | time | | office | region | no |
|------|------|--|--------|--------|-----|
| 02-19-05 | 08:23 AM | | CLMCENTA | Al-Miss | 2 |

Initial agent acknowledgment sent for reporting agent
01-1973  DEVERS

Long/State Farm
SF1  00023

# AUTO CLAIM COMMITTEE REPORT

| | |
|---|---|
| Preparer's State Code: 01 | Rehearing  ☐Yes  X No |
| Prepared by: Tony Nix | Rehearing Number: |
| Claim #: 01-6596-564      Pol #1: | Date of Last Hearing: |
| Claim #:                          Pol #2: | |
| Claim #:                          Pol #3: | |
| Named Insured: Martin Long | |
| Address: 2752 Caroline Dr. | |
| City: Millbrook | |
| State/Zip: AL, 36054 | Agent: Mike Devers          Code: 01-1973 |

**Policy #1**

Policy No: 0886-750-01                          Policy Form No: 9811A
Coverage and Limits
A 100/300/50, C 5,000, D500, G500, H, U 20/40

Appl. Endors. Numbers: 6082 AJ.1
Coverage Involved: D500 (331)
Present Reserve: 27,500.00                       Date Set: 05-11-05
Prior Reserve: 5,000.00                          Date Set: 02-19-05

**SECTION MANAGER'S RECOMMENDATION:**

I.    Questions:

      Has the insured failed to cooperate with us by virtue of providing false and conflicting information, has there
      been direct and accidental loss of or Damage to property covered as defined in Section IV – Physical Damage
      Coverages, and has the insured concealed and misrepresented information material to the claim?

II.   Issues:

      Our investigation has revealed that a loss as defined in Section IV - Physical Damage Coverages of the policy
      has not occurred and the insured concealed and misrepresented information material to the claim.

III.  Recommendation:

      Deny the claim to the insured as the damage was not caused by a loss as defined in Section IV – Physical
      Damage Coverages and due to material misrepresentations made during the presentation of the claim.

Date of Decision: June 22, 2005                  Return file copy? ☐Yes ☒No
Present: Jeff Crow, David Fisher,                Chairperson (E-Mail alias): David Thomas (BLVB)
Jon Hatch, Tony Nix, Lloyd Renfrow, Logan Smith, Chairperson Phone #: 770-418-5936
Nancy Stevens, Brett Suiter

Long/State Farm
SF1   00059

## STATEMENT OF FACTS

Date of Loss: February 19, 2005                    Time: Approximately 7:00 a.m.

Location of Loss: Country Hearth Inn, 5400 Fairington Rd, Lithonia, GA.

Include the following information:

    A)    Described vehicle for each policy involved.
            2000 Chevrolet Corvette, VIN 1G1YY22G9Y5132554.

    B)    Vehicle involved in loss.
            As described above.

    C)    Driver of vehicle involved.
            Unknown.

    D)    Brief statement of facts of loss.
            According to Mr. Long, on Friday, February 18, 2005, he drove the insured vehicle to Lithonia, GA in order to relax for the weekend.  He stayed at a Country Hearth Inn located off I-20 in Lithonia, GA.  On Saturday morning, February 19, 2005, at approximately 7:00 a.m., the insured discovered his vehicle missing from the parking lot.  He called the Dekalb County Police Department and reported the theft of his vehicle.

            On February 25, 2005, the insured vehicle was recovered, partially stripped and abandoned near an apartment complex in Decatur, GA.

## DESCRIPTION OF CLAIMS

List separately EACH Insured involved in the loss and provide all available information regardless of the status of that claim. Include as a minimum on Injury Claims:

    A)    Identifying information on the insured (Age, employment, marital status, position in vehicle).
            Martin O. Long was born August 13, 1968 and is thirty six (36) years old.  He has been unemployed since he was injured on the job at CSX Transportation in March 2003.  A settlement in the amount of $256,000.00 was reached with CSX Transportation in January 2005.  Mr. Long received $175,568.99 after attorney fees and expenses. Mr. Long was previously in the Army for approximately ten and a half (10 ½ ) years.  In 1992, at a rank of E5, Mr. Long received an honorable discharge from the Army due to an injury he received parachuting out of a plane.  He currently receives $1,140.00 a month in disability benefits from the Army.

            Mr. Long is currently separated from his wife, Evelyn Long, who resides at 1705 Deatsville Hwy, Millbrook, AL.  Mrs. Long is employed with the State of Alabama in the Department of Human Resources.  Mr. Long and Mrs. Long confirmed they have filed for divorce, but the agreement has not been finalized.

            Mr. Long has no children and/or dependents.

    B)    Detailed description of injuries and treatment.
            N/A.

    C)    Discussion of impairment.
            N/A.

    D)    Description and analysis of all damages.

Long/State Farm
SF1   00060

The insured vehicle was recovered with the following damages and/or parts missing: The front bumper cover was damaged; the removable top and/or roof panel was missing; the front seats were missing; the wheels and tires were removed and replaced with another set; the passenger side window had been knocked out; scratches and minor damage to the interior upholstery; all over exterior scratches to the body; the exterior portion of the ignition lock cylinder was damaged; the cover around the column was loose; and finally, while sitting at the recovering wrecker service, the vehicle sat through a snow and ice storm completely soaking the interior. As a result, the vehicle was determined to be a total loss. CR Todd Smith requested an NADA valuation on the described vehicle and it reflects a base value of $24,900.00. When considering tax and fees, the actual cash value of the insured vehicle is $25,789.50 less the $500.00 deductible.

Mr. Long purchased the insured vehicle on February 4, 2005, for approximately $25,000.00 cash; therefore, there is no lien on the insured vehicle. A copy of the certificate of title was secured from the insured.

Mr. Long secured a rental vehicle from Enterprise RAC in Georgia the weekend of the alleged theft. He currently remains in the rental.

E)   Current demand and offers (specify if a time limit demand is involved).
     Affidavit of Vehicle Theft submitted by the insured indicates that he is making claim for $25,000.00."

F)   Current evaluation and range of values.
     The actual cash value of the insured vehicle less the applicable deductible is $25,289.50.

1.   Any convictions or pleas?
     None.

2.   If claim in suit, when and where filed? Trial Date? Does Excess Assurance Protection (EAP) apply? ☐Yes  x No
     Date EAP Letter Sent?

3.   Other car insured? ☐Yes ☐No    Limits              Company

4.   Is there an umbrella policy or excess policy in existence? (**Note: Both the Agent and the Insured must be contacted**.) ☐Yes  x No
     If so, list name of carrier and advise date they were notified.

5.   Name of insured's attorney.
     On May 24, 2005, we received notice of representation from attorney F. Tucker Burge with Burge and Burge in Birmingham, AL.

7.   Name of our claim representative and recommendation.
     SIU CR Todd Smith recommends we deny the insured's claim.

8.   Recommendation of Claim Team Manager.
     Tony Nix recommends we deny the insured's claim.

9.   Unusual conditions affecting trial or verdict.
     N/A.

10.  Non-Waiver obtained? ☐Yes  X No

11.  Reservation of Rights Letter Sent? X Yes  ☐No

12.  From whom, or to whom? Date? Reason?

Long/State Farm
SF1  00061

A Reservation of Rights letter was mailed to Mr. Long on March 4, 2005 with the following reason noted:

"It is questionable whether there has been direct and accidental loss of or Damage to property covered by the Physical Damage Coverages of the policy."

13. Issues (if needed to determine coverage, attach application file and coverage record, and copies of any pertinent endorsements.) When applicable, the following sub-headings should be covered:

A) Question

1. Has the insured failed to cooperate with us by providing false and conflicting information?

2. Has there been direct and accidental loss of or damage to property covered as defined in Section IV – Physical Damage Coverages?

3. Has the insured misrepresented information material to the claim?

B) Policy Language.

## REPORTING A CLAIM – INSURED'S DUTIES

...

5. **Insured's Duty to Cooperate with Us**

b. The **insured** shall cooperate with us and , when asked, assist us in:
...

(2) securing and giving evidence;

...

## SECTION IV – PHYSICAL DAMAGE COVERAGES

**Loss** – means, when used in this section, each direct and accidental loss of or damage to:

1. **your car**;
...

## CONDITIONS

...

9. **Concealment or Fraud**

There is no coverage under this policy if **you** or any other **person** insured under this policy has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy.

Long/State Farm
SF1   00062

C) Evidence.

Prior to the referral to SIU, the following indicators and/or questions were recognized by the line unit:

- In February 2005, the insured filed a claim under number 01-6596-758 where he was involved in an exchange of gunfire with another person. This claim was referred to SIU.
- Insured is unemployed.
- Insured claimed a large amount of expensive items stolen from his vehicle. Specifically, he filed a homeowner's claim under number 01-Q177-057, which was also referred to SIU.
- Insured has had a high frequency of claims.
- Insured is currently disabled.
- Insured vehicle was recently purchased.
- Loss on New Business (policy inception date was February 4, 2005).
- Insured has recent or current marital problems.
- Line unit indicated there was a delay and/or no report made to the police.

Upon referral to SIU, CR Todd Smith researched NICB On-line and found the insured vehicle was entered on NCIC as an active, stolen vehicle contrary to what the original referral to SIU indicated. On February 28, 2005, Todd spoke with a Detective in the Dekalb County Police Department's Auto Theft Unit and confirmed the vehicle was reported stolen on the date of loss. While discussing the case, the detective indicated the vehicle was recovered on Friday, February 25, 2005 abandoned in Decatur, GA. CR Smith called the insured and notified him of the recovery.

On February 28, 2005, Todd secured copies of the initial theft and recovery reports. Upon review, it was noted that the insured vehicle was recovered near an apartment complex less than ten (10) miles from the theft site. Also, the initial theft report failed to document any personal items stolen along with the described vehicle.

On March 1, CR Smith inspected the insured vehicle at Top Cat Towing in Lithonia, GA. At that time, he observed the damages as previously documented in this report. Even though there was minor damage to the column and exterior damage to the ignition lock cylinder, the steering wheel was in the locked position. He verified that the insured called Top Cat and gave them permission for State Farm to secure his vehicle. After the initial vehicle inspection, CR Smith spoke briefly with Mr. Long regarding the vehicle recovery and condition. Mr. Long advised Mr. Smith that he did not want the vehicle back after it had been stolen.

CR Smith conducted data research and secured documentation supporting Mr. Long's recent workers compensation case filed against CSX Transportation Railroad. Also, he secured documentation supporting a separate civil case Mr. Long filed against a man named Bobby Long in 2004.

Todd Smith met with Mr. Long in Montgomery, AL and secured his recorded statement regarding this claim. At that time, CR Smith gave Mr. Long an Affidavit of Vehicle Theft for his completion. As for the facts of the loss, Mr. Long stated he went to the Atlanta area Friday evening February 18, 2005, in order to get away and relax. He said he stayed at the same hotel four or five months ago. He could not recall the exact time he checked into the hotel, but thought it was possibly 10:00 or 11:00 a.m. Mr. Long claimed he went to the Atlanta area alone and just stopped off the interstate and got a room. CR Smith specifically asked him who he went with and he replied "just me." CR Smith questioned if a female was with him and he continued to claim he was by himself. He said he parked the insured vehicle directly in front of a door and/or entrance to the hotel with a surveillance camera nearby. He indicated he locked his vehicle and did not leave any keys inside the passenger compartment. On Saturday morning, February 19, 2005, at approximately 7:00 a.m., he discovered his vehicle missing. When asked why he was leaving the hotel at this time in the morning and he replied, "probably to get something to eat." Mr. Long observed glass in the parking lot next to where his vehicle was parked. After the discovery of his missing vehicle, he asked the hotel manager to review the camera and was told that it was not on. The insured called the local police and reported the theft. Mr. Long indicated the theft seemed like it was a set up and he believed the hotel manager had something to do with

it. Mr. Long admitted he cussed out the hotel manager during the course of their conversation regarding the fact that the surveillance camera was not on.

As for the keys to the insured vehicle, Mr. Long confirmed receiving two (2) sets of keys when he purchased it on February 4, 2005. He gave CR Smith one set but indicated that he did not know where the second set was located. Specifically, he said "I'm thinking I must have either left them in the car or somewhere. I don't know where the other set of keys are at." He confirmed the set of keys he provided State Farm was in his possession at the time of the alleged theft.

Mr. Long claimed he had a large amount of personal items in the vehicle at the time of the alleged theft. These items included the following: a 45 caliber handgun; a black leather jacket; $5,000.00 cash; three (3) suits and two (2) pant suits; four (4) pairs of shoes; four (4) bracelets; three (3) rings; one (1) portable DVD player; and, a watch. CR Smith asked Mr. Long if he told the police about everything in his vehicle when he reported the theft and he admitted he did not. However, he indicated that a lady with the police department told him to wait and call back with everything in the vehicle and complete an additional information form. A supplemental narrative was added to the original theft report on March 2, 2005. At that time, the insured listed the personal items allegedly stolen from his vehicle. Mr. Long filed a separate claim under his homeowner's policy for the items reported as stolen.

During Mr. Long's recorded statement, CR Smith questioned him regarding his financial situation. Mr. Long admitted he recently settled a worker's compensation claim against CSX Transportation Railroad for $256,000.00, of which he received approximately $175,000.00. Also, he indicated that he currently receives approximately $1,100.00 per month in disability benefits from the Army and these payments are his main source of income. Mr. Long acknowledged that he was having financial problems before he settled his worker's compensation claim. Upon receiving the settlement, he used a majority of the money to pay bills. These bills included approximately $50,000.00 in credit card debt, $43,000.00 for his wife's student loan and $25,000.00 was used to purchase the insured vehicle. He stated that he only had $5,000.00 left out of his settlement proceeds.

In addition to the described vehicle, the insured owns a Ford Mustang. As result of the insured being declared disabled from his employment with CSX Transportation Railroad, a disability benefit included in the finance agreement pays the remaining monthly payments on the vehicle. Thus, the insured is no longer obligated to make that monthly note.

Mr. Long previously filed a catastrophe hail claim in April 2003 regarding damage sustained to his home. As a result, he received payment in the amount of $2,873.41. The policy notes on the Claim Service Record under claim number 01-Q177-057 reflect that the repairs were not made to the insured's home as he needed the money to pay his bills. Also, it states that he was expecting to go to court on January 31, 2005 to get compensation for an injury he received on the job. As of December 2004, no repairs had been made to the home. This information reflects that Mr. Long was having financial problems prior to the theft alleged theft.

Mr. Long was questioned about his recent auto claim which was filed February 13, 2005, under claim number 01-6596-758. He indicated that he was involved in an exchange of gun fire while driving his Ford Mustang in Millbrook, AL. Mr. Long admitted he accidentally shot his own vehicle after another person started shooting at him. As a result, State Farm paid $3,363.80 for the damages. A copy of the incident report referencing this claim was secured from the Millbrook, AL Police Department. In addition, Mr. Long acknowledged that he had another Chevrolet Corvette stolen from his residence five (5) or six (6) years ago. As a part of this investigation, CR Smith researched frequency tracking, NICB data base, ISO data base, and interviewed the State Farm Agent. He could not locate any record of a previous claim involving a corvette.

On March 8, 2005, Mike Bresnock with Transportation Technology inspected the insured vehicle at Verastar South in Forest Park, GA. CR Smith met Mr. Bresnock at Verastar and gave him the key and keyless remote provided by our insured in order to assist with his inspection. The key functioned satisfactorily on the driver's side door lock, enabling it to open and lock with no irregularities. Mr. Bresnock's first attempt to start the vehicle using the key provided by Mr. Long was unsuccessful. After inspecting the pellet reader, Mr.

Long/State Farm
SF1  00064

Bresnock was of the opinion that the pellet reader was simply mis-positioned which prevented the ignition key from rotating the ignition cylinder to the start position. When the pellet reader was properly positioned, the engine was able to start and run. While the engine was in operation the following messages appeared: low brake fluid, service traction sys, service active hndlg, and, brake before shift. The odometer reflected that the mileage on the insured vehicle was 71,064.

Mr. Bresnock then located the theft deterrent relay located on the passenger side floor surface. A visual inspection of the relay provided no evidence to indicate that it had been altered in anyway to enable the engine to be started without the correct key. After completing the ignition system and theft deterrent system test, it was Mr. Bresnock's opinion that the vehicle had not been started and operated without the correct ignition key. Also, Mr. Bresnock noted some marks on the rubber sections of the passenger side window weather stripping and the roof panel weather stripping. These areas may have been subjected to a sharp object which enabled access to the interior. Mr. Bresnock noted the glass breakage and missing parts as previously indicated in this report.

On June 22, 2005, Mr. Bresnock re-inspected the vehicle to conduct follow-up tests. He advised that the results of that testing did not change the opinion that had been previously communicated to State Farm.

In conclusion, Mr. Bresnock noted "the insured vehicle was equipped with the General Motors Pass Key System, which is a subsystem of the body control module. The body control module provides all of the logic to operate the pass key system. The body computer uses input information from other systems and components to determine the status of the pass key. The body computer controls its output functions based on the status of the pass key. The pass key fuel enable function is provided by the power control module. When the correct pass key is inserted into the ignition key lock, the key reader transfers the pellet information to the body computer. The body computer in turn signals the power train control module to enable or disable fuel injection in order for the engine to run. The ignition cylinder and key used by the pass key system is supplemented by a pellet reader to determine if the correct key is being used to start the vehicle. When the ignition is first turned on, the body control module measures the value of the key through the sensing contacts located on the pellet reader. The theft deterrent relay is part of the pass key system and can disable engine cranking through the theft deterrent relay. When the body control module detects the correct pass key, the body computer allows the engine to be cranked and simultaneously instructs the power train control module to enable fuel injection. Inspections and tests conducted on this vehicle provided no evidence to indicate that any of these systems had been by-passed to enable the vehicle to be started and driven without the use of the correct ignition key. In consideration of the tests and inspections along with the summary of this vehicle's theft control system it is Mr. Bresnock's opinion that this vehicle was not operated without the correct ignition key.

Mr. Long claimed his vehicle was equipped with a factory alarm system. He testified that his vehicle was locked and the alarm system was engaged. Mr. Bresnock completed an addendum to his original report addressing the alarm system on the insured vehicle. He indicated the 2000 Chevrolet Corvette was equipped with UTD (Universal Theft Deterrent System) in addition to the Pass Key theft deterrent system. The UTD and Pass Key security systems were standard equipment for the 2000 Chevrolet Corvette. The UTD system monitors the following through the BCM (Body Control Module): Driver & Passenger door ajar switches, courtesy switch, ignition switch (for an incorrect key), hood ajar switch, parking headlamp switch and power door lock switches. If the BCM senses an intrusion in any of the above, it enters the alarm mode, which consists of the horn sounding, the lights flashing, and the cranking and fuel are disabled.

Mr. Long testified that he received two (2) sets of keys when he purchased the vehicle only two (2) weeks before the alleged theft. At the time of the alleged loss, he only had one (1) set of keys with him. He provided this set to CR Todd Smith. He also identified this set of keys at his EUO and testified he recognized them as his key. Mr. Long testified that he does not know the location of the second set of keys. After Mr. Bresnock's inspection on March 8, 2005, Mr. Smith spoke with Mr. Long and discussed the key issue. Specifically, he addressed Mr. Long's inability to account for the second set of keys. At that time, Mr. Long got very angry. Once again, during Mr. Long's recorded statement, he could not explain where the other set of keys were located. He suggested they may have been left in the insured vehicle or somewhere? However, in his EUO, he testified that he did not give the second set of keys to anyone and

that they were not in the insured vehicle on the date of loss. Mr. Long testified that he had tried to look for the keys but was unable to locate them.

On March 4, 2005, Todd Smith met with Ram Naidu, shift manager at the Country Hearth Inn in Lithonia, and secured his recorded statement. He confirmed working Friday night, February 18, 2005 until Saturday morning, February 19, 2005. He said his shift did not start until after 8:00 p.m. and Mr. Long had already checked in prior to his shift starting. On Saturday morning, at approximately 7:00 a.m., he recalled Mr. Long came down into the lobby, walked outside and came back inside to report his vehicle stolen. Mr. Naidu confirmed sitting in the lobby with a friend that night and he recalled last seeing the insured vehicle between 2:30 a.m. and 3:00 a.m. He said Mr. Long asked him about the surveillance camera; however, he did not want to tell him that it was not working. Specifically, he indicated their computer that controlled the camera crashed a week before the alleged loss. He provided Mr. Long with the hotel manager's business card and recommended he follow up with his supervisor. Mr. Naidu said the insured made a couple of calls and approximately 15 to 20 minutes later, two of his friend's showed up in the lobby area. In addition to the two men, he said Mr. Long was accompanied by a woman. He overheard the two men and Mr. Long having a conversation. One of the men told Mr. Long to say that he had a suitcase in the car. Mr. Naidu understood the conversation to mean that Mr. Long should make up items which were in the car when the theft occurred in order to claim these on insurance. He also confirmed seeing glass in the parking lot and thought it was strange that the alarm did not go off if someone smashed the glass. He added he was sure he would have heard the alarm if it went off. Mr. Naidu indicated that the parking lot was well lit and he was surprised that the car was stolen. Mr. Naidu had no knowledge of any other vehicles being stolen from their location.

Based on the indicators present and the questions raised during the course of our investigation, we referred the matter to Attorney Angela Taylor to secure Mr. Long's EUO. On March 31, 2005, Mr. Long submitted to an EUO and provided all the requested documents in connection with the matter. During his testimony, he changed his story regarding the alleged facts of the loss. He testified that he and a lady named Valerie went to the Atlanta area the weekend of the alleged theft. He initially testified that he did not know Valerie's last name and he thought she lived somewhere in the Montgomery, AL area. We later learned she worked at the Doctor's office in Montgomery, AL that treated Mr. Long after his injury at CSX. Upon review of his cellular phone records, we noticed his account was actually under the name of Valerie Ware. Mr. Long confirmed Valerie purchased the phone for him, but he continued to act as if he wasn't sure of her last name. He testified that two of Valerie's brother's named Ricky and Sandy and two of their girlfriends followed them to the Atlanta area that weekend. He indicated the purpose of their trip was to relax. He said they arrived at the hotel in Lithonia on Friday, February 18, 2005 around 9:00 or 10:00 p.m. and this was the last time he saw his vehicle. The next morning, around 7:00 a.m., Ricky's girlfriend knocked on his door and asked about his vehicle. He claims she had gone to the Wal-Mart, which is located across the street earlier that morning and noticed the vehicle was gone when she returned. At that time, Mr. Long went downstairs and discovered his vehicle missing. He observed glass in the parking lot next to where his vehicle was originally parked. In Mr. Long's recorded statement, he said that he called the police and reported the theft. However, in his EUO, he testified that Valerie's brother, Sandy, actually called the police to report the theft while he called his niece in Millbrook, AL to get a phone number to call State Farm and file the claim. He testified that the police never came to the hotel to complete the report.

Mr. Long was asked if he recalled having any conversation with Ricky or Sandy regarding the contents in the insured vehicle. He testified that he could not recall any conversations he had with them about the contents. However, the shift manager at the Country Hearth Inn overheard the two men advising Mr. Long to claim his suitcase was stolen with the vehicle.

CR Smith identified a phone number for a Dr. Chung's office in Montgomery, AL. Afterwards, he confirmed they had a secretary at their office named Valerie. He spoke with Valerie and confirmed she knew Mr. Long. Specifically, she identified herself as Valerie Ware-Temple and she confirmed being with Mr. Long the weekend of the alleged theft. She confirmed her two brothers Ricky Ware and Sandy Ware and two of their lady friends also went with them to Atlanta that weekend. She said they went to visit her older brother, Donald Ware, who resides in the area. During Mr. Long's recorded statement, he said he did not go anywhere that weekend. During his EUO testimony, he failed to discuss going to Donald's home that Friday night.

Long/State Farm
SF1   00066

CR Smith spoke with Donald Ware and confirmed that the insured had visited him on Friday evening. After leaving Donald's residence, Valerie said they arrived at the hotel around 10:00 p.m. She stated that Mr. Long parked his vehicle in the parking lot near an area supposedly monitored by surveillance cameras and this was the last time she saw his vehicle. On Saturday morning, at approximately 7:00 a.m., she said one of the girls named Felicia called their room and advised them the vehicle was missing. However, Mr. Long testified that the girl knocked on their door to discuss the vehicle missing. She acknowledged that there was glass in the parking lot and that Mr. Long confronted the shift manager about the camera. She advised that her brother Sandy reported the theft to the police. After returning to Alabama, Valerie confirmed having a conversation with Mr. Long regarding the keys to his vehicle. Specifically, she said Mr. Long told her he had a second set of keys that may have been left in the vehicle. However, she only confirmed seeing one set that weekend.

The insured claimed several expensive personal items were stolen from the insured vehicle. He filed a homeowner's claim under number 01-Q177-057, which was also investigated in connection with this matter. Misrepresentations were noted in the presentation of that claim and are addressed in a separate Recommendation for Claim Resolution.

On May 12, 2005, Mr. Long advised he was seeking legal council and requested a certified copy of his policy. On May 24, 2005, CR Smith spoke with Attorney F. Tucker Burge with Burge and Burge out of Birmingham, AL and confirmed his representation of our insured. Afterwards, CR Smith secured a faxed letter of representation. On May 26, 2005, a certified copy of Mr. Long's policy was mailed via certified mail return receipt requested to Attorney Burge.

D)    Statutory and Case Law.

**GENERAL LAW ON MISREPRESENTATION**

Section 27-14-28, *Code of Alabama*, (1975) states:

> "No misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy unless such misrepresentation is made with actual intent to deceive as to a matter material to the insured's rights under the policy."

In *American Fire & Cas. Co., Inc. v. Archie*, 409 So.2d 854 (Ala. Civ. App, 1981), the court stated:

> "After a loss, a misrepresentation need only be made with the actual intent to deceive and be related to a matter which is material."

E)    Discussion/Recommendation

To recap the issues at hand, we know the following:

- This is a loss on new business. Mr. Long purchased the insured vehicle on February 4, 2005, which was also the policy inception date. The alleged theft occurred approximately two (2) weeks later.
- Mr. Long is on a limited income due to his disabilities.
- Mr. Long has admitted he was experiencing financial problems prior to his injury settlement with the railroad.
- He spent approximately $170,000.00 of his $175,000.00 settlement proceeds within a two week period. Specifically, he testified that he only had approximately $5,000.00 left out of his settlement money.
- Mr. Long is currently going thru a divorce.
- The insured misrepresented material information related to the facts of the loss. Specifically, in his recorded statement, he claimed he was alone the weekend of the loss. After his statement and off the record, he admitted a female was with him; however, he refused to give us any of her contact information. He later testified that

Long/State Farm
SF1   00067

there were four other people with him and his lady friend named Valerie.
- An inspection of the insured vehicle by expert Mike Bresnock revealed it was not operated without the correct ignition key.
- The insured indicated that when he exited the car at the hotel it was locked with the alarm system activated.
- The insured has been unable to provide us with the second set of keys to his vehicle and he is unable to explain their whereabouts. In his recorded statement, he said the second set of keys may have been in the insured vehicle. At a later date, while discussing Mr. Long's inability to account for the other set of keys, he got very mad and demanded payment. In his EUO, Mr. Long testified that the other set of keys were not left in his vehicle.
- A witness overheard two of the men with our insured advising him to claim his suitcase was stolen along with the vehicle. However, the insured testified that he could not recall any conversation he had with Valerie's two brothers.
- As for the reporting of the alleged theft to the police, Mr. Long claimed he called the police in his recorded statement. However, in his EUO, he testified that one of Valerie's brothers called the police.
- The insured claimed several expensive, personal items were stolen along with his vehicle. Inconsistencies were revealed in the investigation of the homeowner's claim filed in connection with this matter.
- The insured admitted he has had a prior vehicle theft involving the same type of vehicle.. In addition, he has recently filed another claim whereas he accidentally shot his own vehicle while exchanging gun fire with another person.

Based on our investigation, it would appear that there is sufficient evidence that Mr. Long had a financial motive to procure this vehicle theft.

We have revealed discrepancies and inconsistencies in the insured's recorded statements versus his sworn statement that support he misrepresented information material to the claim.

In summary, there is sufficient circumstantial evidence to support our insured's involvement in the alleged theft of his vehicle.

As a result of the above, it is my recommendation that we deny the insured's claim based on the fact that it does not meet the definition of a loss as defined in Section IV - Physical Damage Coverages and based on the Concealment or Fraud provision of the policy.

Long/State Farm
SF1   00068

**Todd Smith**

**From:**      Tony D Nix
**Sent:**      Wednesday, June 08, 2005 11:06 AM
**To:**        Jon Hatch
**Cc:**        Todd Smith; Pennie Green
**Subject:**   Long Claim committee

Jon:

Attached is the committee with the additional information. According to Todd, the vehicle would have been repairable if it had not been for the exposure to the elements. The interesting point is that when Todd notified the insured of the recovery, Mr. Long's first statement was I do not want the car back. He did not inquire as the condition of the vehicle or any details as to its whereabouts.

In reference to the glass, Todd advised the he did see a minor amount of glass chards in the vehicle but not to the extent one would expect with a window being broken out.

I added information that indicates the vehicle was parked less than 100 ft from the front door of the hotel and was not visible from the main road. Thus, the thief would have to enter the hotel property looking for vehicle to steal in a well lit parking lot near the lobby of the hotel.

I hope this clarifies some of the information.

Tony


Martin Long claim
comm final.d...

Long/State Farm
SF1   00095

1

June 29, 2005

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
**PERSONAL AND CONFIDENTIAL**

Attorney F. Tucker Burge
Burge & Burge
850 Park Pl Tower
Birmingham, AL 35203

RE: Claim Number: 01-6596-564
      Policy Number: 0886-750-01
      Vehicle: 2000 Chevrolet Corvette
      VIN: 1G1YY22G9Y5132554

Dear Mr. Burge:

This letter is being sent to you as legal representative of Martin Long.

State Farm Fire and Casualty Company has made a comprehensive investigation into the reported incident of February 19, 2005, involving the above mentioned vehicle and policy.

Based on the investigation, we must advise you a "loss" as defined in the policy has not occurred as the destruction of the insured vehicle was by or at the direction of an insured. We must additionally advise you that our investigation has established that your client misrepresented material facts in the presentation of his claim. Because of these findings, we will be unable to make any payments under the policy.

By providing the above information, State Farm Fire and Casualty Company does not waive any of its rights, but rather, specifically reserves it rights to deny coverage and defend any action based on all information now known or which may become known to State Farm.

Sincerely,

Tony D. Nix, CPCU, CIFI
Team Manager
State Farm Fire and Casualty Company

TN/pg

bcc: Attorney Angela Taylor/Mike Beers
      Todd Smith

Long/State Farm
SF1   00132

# State Farm Fire and Casualty Company



April 18, 2005

Todd Smith
Claim Representative
Special Investigative Unit

Office 770-593-6570
Fax 770-593-6496

Valerie Ware-Temple
6936 Winton Blount Blvd
Montgomery, AL 36117

RE:  Claim Number: 01-6596-564
     Insured:      Martin Long
     Date of Loss:  February 19, 2005

Dear Ms. Ware-Temple:

First and foremost, thank you for taking the time to discuss the above-referenced claim with me earlier today.  This letter will serve to confirm our brief conversation.

As discussed, you confirmed working at Dr. Chung's office in Montgomery, AL and you indicated this was the best address and number to contact you.  As for Mr. Long, you confirmed being friends with him.  More specifically, you confirmed accompanying him to the Atlanta and/or Decatur, Lithonia, GA area the weekend of February 19, 2005. You confirmed your two (2) brother's Ricky Ware at cellular # 334 451-0045 and Sandy Ware at cellular # 334 294-2113 as well as two lady friends of theirs named Felecia Powell and Latoya accompanied you and Mr. Long that weekend.  You confirmed staying at the Country Hearth Inn at I-20 and Panola Road.  That Friday night, you confirmed visiting your other brother, Donald Ware, who resides in an apartment and/or condo in the Decatur, Lithonia, GA area.  As for Donald, you confirmed his cellular # is 678 887-1851.  Also, you confirmed recently speaking with Mr. Long, as he contacted you and secured a phone number to contact your brother Donald in order to give this information to State Farm.  After visiting your brother, you went to the Country Hearth Inn and arrived there around 10:00 p.m. Georgia time.  You indicated Mr. Long parked his 2000 Chevrolet Corvette near an area supposedly monitored by a surveillance camera and this was the last time you saw the vehicle.

As for the keys to Mr. Long's vehicle, you indicated Mr. Long had one (1) set of keys with him that weekend.  However, you confirmed having a conversation with Mr. Long after the reported theft regarding the number of keys he had.  Specifically, you said Mr. Long told you he had a second (2nd) set of keys and they may have been left in the vehicle.  However, you only confirmed seeing one (1) set that weekend.

Long/State Farm
SF1  00167

April 18, 2005
Page -2-

On Saturday morning, at approximately 7:00 a.m., you confirmed receiving a call from Felecia indicating Mr. Long's vehicle was missing and there was glass in the parking lot. As for Felicia, you indicated that Saturday morning, she had apparently gone to WalMart, which is located across the street from the Country Hearth Inn, and discovered the missing vehicle when she returned.

After receiving the call from Felecia, you confirmed you, Mr. Long and your brothers all went downstairs to the lobby. After discovering the vehicle missing and noticing the glass in the parking lot, you indicated Mr. Long asked the shift manager about the surveillance camera and the manager gave conflicting information about the video. As for the report, you indicated Mr. Long attempted to report the theft to the police; however, your brother Sandy ended up calling them a second time to report the matter. You did not recall any conversation between your brothers and Mr. Long regarding the items he had in his vehicle and/or items he needed to claim stolen from his vehicle. You also indicated after the theft was discovered, Mr. Long called his niece in AL to secure a phone number to report the matter to State Farm. Also, you confirmed Mr. Long secured a rental vehicle in order to return home from Georgia.

You confirmed Mr. Long had the following items in his vehicle at the time of the alleged theft: some suits, shoes, jewelry, some cash, a gun, CD's and a CD changer. You confirmed Mr. Long had removed some of his luggage upon your arrival at the Inn.

In addition, you confirmed securing a cellular phone for Mr. Long under your account. However, as you were traveling to Georgia that weekend, you did not use Mr. Long's cellular phone to call anyone, as you had your own phone to use.

If I have misstated any information discussed in our conversation, please make the appropriate changes on this letter and return it to my attention. In the absence of the receipt of any changes, the information contained in this letter will stand as affirmed. Once again, thanks for your time and attention to this matter.

Sincerely,

Todd Smith
Claim Representative
(770) 593-6570

COPY

Long/State Farm
SF1   00168

Consulting Service

# *Transportation Technology*

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

## 1.0 ASSIGNMENT

**1.1 Client:**          State Farm Insurance Company

                       Todd Smith

**1.2 Subject:**          2000 Chevrolet Corvette

                       Ser# 1G1YY22G9Y5132554

                       Mileage: 71,064

**1.3 Location:**          Verastar South

                       Rex Road

                       Forest Park, Georgia

**1.4 Purpose:**          Reinspection

**1.5 Date of inspection:**     June 21, 2005

## 2.0 Participating Personnel

**2.1 Investigator:**        Michael E. Bresnock- Consultant

                       Transportation Technology

Long/State Farm
SF1   00228

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*

## 3.0 EXAMINATION OF VEHICLE

3.1 At the request of State Farm Insurance Company the above mentioned vehicle was re-examined while it was being retained at Verastar South in Forest Park, Georgia. State Farm Insurance Company had custody of the key and remote transmitter which was made available for this inspection.

3.2 As indicated in the original report this vehicle featured the General Motors Pass Key System. Tests conducted during the initial inspection and during this inspection indicated the pass-key system was functioning. The pellet reader had been pulled from the ignition key lock when this vehicle was initially examined. It was reinstalled in the proper position during the preliminary inspection. At the time of this inspection the pellet reader was removed from the key lock, the key was inserted into the key lock and then rotated to the "On" then "Crank" positions. The engine would not crank or start. The pellet reader was then placed in its original factory installed mounting position on the ignition key lock. _The key was inserted through the pellet reader into the key lock and rotated clockwise to the "On" then "Crank" positions. The engine cranked and started._ The initial test that was performed on

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

March 8, 2005 and this test (June 21, 2005) both produced the same results. "This vehicle will not start with a key that does not have the correct pellet". *The key lock would not rotate to "On" or "Start" position with a key that was incorrectly cut for the lock.*

3.3 Several of the plastic close out dash panels were removed to access the ignition switch wiring (Photo #1). *None of the ignition switch wiring showed signs of temporary or permanent over-rides to enable the engine to start without the correct key cut and key pellet (Photo #2, #3).*

3.4 When this vehicle was manufactured the specifications called for an electronic steering lock which prevented the steering wheel from turning when the key was removed. Each time the ignition key was inserted into the key lock and rotated a buzzing noise was able to be heard.  A similar noise was heard each time the ignition key lock was turned to the "Off Lock" position and the key was withdrawn. With each insertion and removal of the ignition key, the steering column never locked or unlocked. An examination of the steering column wiring provided no evidence to indicate an alteration had been performed (Photo #4). It was later

Long/State Farm
SF1  00230

Consulting Service

# *Transportation Technology*

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

determined that this Corvette was part of recall #04V06000 which required the lock plate to be removed (Photocopy #1). This finding would account for the steering column's failure to lock and unlock when the key was inserted rotated and removed from the ignition key lock.

3.5 This vehicle was equipped with the UTD alarm system. The system was able to be armed (as indicated by the security lamp on the dash) but when the system was violated by operating the power door lock switch, parking lamp switch, opening doors or opening the hood, *the alarm failed to operate*. Tests conducted on the system enabled some electrical switches and components to be eliminated but the end result indicated *the UTD (Universal Theft Deterrent ) system did not work as intended.*

3.6 During the initial inspection the transmission shift control lever could not be moved from the "P" Park position. During this inspection the plastic panels and covers were removed to access the mechanical portion of the transmission controls (Photo #5). It should be noted that Federal Motor Vehicle Safety Standards #102 and #114 apply to this vehicle's transmission shift control mechanism. In order to

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

comply with the safety standards, the manufacturer chose to use a cable that extended from the ignition key lock to the transmission shift control. After disconnecting the cable from the transmission linkage, it was possible to remove the transmission from the "P" Park position (Photo #6). While the engine was in operation the shift mechanism was moved into the "D" Drive and "R" Reverse positions. The vehicle's transmission responded by allowing the vehicle to move forward and rearward. There was considerable difficulty in moving the shift mechanism into the "P" Park position after conducting the above mentioned tests. It is likely that the linkage was bent.

3.7 The vehicle was elevated for an undercarriage examination (Photo #7). There were indications of undercarriage interference contact (Photos #8, #9). The message center on the instrument cluster indicated brake system and traction control system failures. The brake system problem was able to be verified when a brake application allowed the pedal to travel almost to the floor board. The traction control system problem could not be verified or diagnosed because it required an undercarriage inspection. Undercarriage inspections are routinely denied because of safety concerns at all Verastar salvage lots.

Long/State Farm
SF1  00232

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*

3.8 While the engine was in operation the oil pressure gauge was in a full travel position. Additional tests indicated the gauge was not functioning properly. The gauge moved to the full travel position and remained in that position even when the engine was not in operation.

## 4.0 CONCLUSIONS

4.1 Numerous tests were conducted on this vehicle's alarm and theft deterrent systems. *The General Motors Pass Key System was not defeated in a manner which enabled the engine to be operated without a key having the correct cut and correct resistor pellet.* The UTD (Universal Theft Deterrent System) was not functioning at the time the vehicle was inspected. The UTD system is an alert which sounds the horn and temporarily inhibits starting. *The General Motors Pass Key is still required to start the engine.* The other malfunctioning equipment (shifter, brakes and traction control, etc.) have no bearing on the actual starting of the engine and driving the vehicle. *The results of an incorrect ignition key cut or incorrect key pellet can be shown, demonstrated and tested.*

Long/State Farm
SF1   00233

Steering Column Lock: Recalls
Recall 04V060000: Steering Column Lock Defect

DEFECT: On certain passenger vehicles equipped with electronic column lock systems (ECL), when the ignition switch is turned to "lock," the ECL prevents turning of the steering wheel. When the vehicle is started, the ECL unlocks the steering column. The vehicle is designed so that if the column fails to unlock when the vehicle is started and the customer tries to drive away, the fuel supply will be shut off stopping the engine. This prevents the vehicle from being driven when it cannot be steered. However, if voltage at the Powertrain Control Module is low or interrupted, the fuel shut off may not occur and the vehicle can be driven while the steering column is locked. If this occurs, a crash could occur.

REMEDY: On vehicles equipped with an automatic transmission, the dealer will disable the steering column lock by removing the column lock plate. When the ignition key is removed, the transmission shifter will lock, but the steering column will not lock. On vehicles equipped with a manual transmission, the dealer will reprogram the powertrain control module. The steering column on these vehicles will continue to lock when the key is removed. The manufacturer has reported that owner notification is expected to begin during the second quarter of 2004. Owners may contact Chevrolet at 1-800-630-2438.

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*



Photograph: #1                    Transportation Technology : *25050.ADD*
Date Taken: June 21, 2005
Description of Subject: 2000 Corvette Interior

Note: Panels removed to access ignition switch wiring.

Long/State Farm
SF1  00235

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: **#2**          Transportation Technology : **25050.ADD**
Date Taken: **June 21, 2005**
Description of Subject: **Ignition Switch Wiring**

**Note: No wire penetrations, damaged or altered wiring.**

Long/State Farm
SF1  00236

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: **#3**          Transportation Technology : **25050.ADD**
Date Taken: **June 21, 2005**
Description of Subject: **Ignition Switch Wiring**

Note: No damaged wire insulation. No jumpered wires.

Long/State Farm
SF1   00237

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*



**Photograph: #4**          **Transportation Technology :** *25050.ADD*
**Date Taken: June 21, 2005**
**Description of Subject: Dash & Steering Column**

**Note: Panels removed to access wiring.**

Long/State Farm
SF1   00238

**Consulting Service**

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**



Photograph: #5                    Transportation Technology : *25050.ADD*
Date Taken: June 21, 2005
Description of Subject: Transmission Shift Control Assembly

Note: Cover removed to access the mechanical components.

Long/State Farm
SF1  00239

Consulting Service

# Transportation Technology

**1184 Wind Hill Lane**
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*



Photograph: **#6**            Transportation Technology : **25050.ADD**
Date Taken: **June 21, 2005**
Description of Subject: **Shift Lock Out Cable**

Note: **Removed from shifter to enable the transmission to be shifted from "P" Park.**

Long/State Farm
SF1  00240

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*



Photograph: **#7**          Transportation Technology : *25050.ADD*
Date Taken: June 21, 2005
Description of Subject: 2000 Corvette

Elevated for an undercarriage inspection.

Long/State Farm
SF1   00241

Consulting Service

# Transportation Technology

**1184 Wind Hill Lane**
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: **#8**          Transportation Technology : **25050.ADD**
Date Taken: **June 21, 2005**
Description of Subject:  **Undercarriage**

**Note: Contact marks.**

Long/State Farm
SF1   00242

Consulting Service

# Transportation Technology

**1184 Wind Hill Lane**
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: #9          Transportation Technology : 25050.ADD
Date Taken: June 21, 2005
Description of Subject: Undercarriage

Note: Contact marks.

Long/State Farm
SF1  00243

Route

**FROM (Company)**
STATE FARM INS
Street Address
5301 SNAPFINGER PARK DR
City
DECATUR
State GA  ZIP CODE (Required) 30035
Sent by (Name/Dept) Todd Smith
Phone (Required) 770-593-6508

**2 TO (Company) PLEASE PRINT NEATLY**
State Farm Ins.
Street Address
2309 E. Oakland Ave
City Bloomington  State IL  ZIP CODE 61701
Attention: (Name/Dept)
Earl Hyser  conf # 307-766-8643
Description
Claim info.  103700

Sender's Signature
Todd Smith  6/16/05

www.airborne.com

**3 Payment**
Bill Number **2717691760**

**Office Code** Region: 05
**Date of theft: 02-19-05**

AIRBORNE EXPRESS.
PO BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

SENDER'S COPY

VEHICLE INFORMATION

Year: 00   Make: CHEV   VIN/HIN: 1G1YY22G9Y5132554

RECOVERY INFORMATION

Date recovered: 02-25-05
Recovering LEA: DEKALB CO POLICE DEPARTMENT
City: DECATUR                      State: GA

Vehicle location:                  Phone: (404)294-2650
Reference number:

MESSAGE:    THE CAPTIONED VEHICLE WAS CLEARED FROM THE NATIONAL
            POLICE COMPUTER ON 02/25/05 FOR UNKNOWN REASON(S).

Long/State Farm
SF1  00244

RECEIVED
APR 0 4 2005
SIU

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
***www.vehicleinvestigator.com***

June 1, 2005

**Todd Smith**
**State Farm Insurance Company**
**P.O. Box 370568**
**Decatur, GA 30037**

Re:        Post Theft Inspection
           Transportation Technology No. :           25050
           Claim No#                                  01-6596-564
           Owner:                                     Long

Dear Mr. Smith:

Enclosed is the addendum we recently discussed.  Please contact me if you have
any questions or need further assistance.

Thank you again for the opportunity to assist you.

Sincerely,

Michael E. Bresnock

**Michael E. Bresnock**

Long/State Farm
SF1   00245

### _Addendum to file: 25050_

This 2000 Chevrolet Corvette was equipped with *UTD* (Universal Theft Deterrent System) in addition to the *Pass Key* theft deterrent system. The *UTD and Pass Key* security systems were standard equipment for the 2000 Chevrolet Corvette. The *UTD* system monitors the following through the *BCM* (Body Control Module) :

**Driver Door Ajar Switch**
**Passenger Door Ajar Switch**
**Courtesy Switch**
**Ignition Switch (for an incorrect key)**
**Hood Ajar Switch**
**Parking Headlamp Switch**
**Power Door Lock Switch**

If the *BCM* senses an intrusion in any of the above , it enters the alarm mode. The horn sounds, the lights flash, and cranking and fuel are disabled. The alarm mode is active for 2 minutes. The fuel and cranking system are disabled for an additional 3 minutes (alarm system violation). If no intrusions are detected after the time out, the horn is kept off. The alarm system must be disarmed or the intrusion must be eliminated after the time out for the system to exit the alarm mode.

Long/State Farm
SF1   00246

Consulting Service

# *Transportation Technology*

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**

## INVOICE

| | | |
|---|---|---|
| CASE NO. : | 25050 | DATE : **March 17, 2005** |
| CLIENT : | **State Farm Insurance Company** | |
| CLAIM NO. : | **01-6596-564** | |
| INSURED : | **Long** | |

| INVESTIGATION: | Hourly Rate | $95.00 | Hours | 3.8 | $361.00 |
|---|---|---|---|---|---|
| TRAVEL: | Hourly Rate | $45.00 | Hours | 0.7 | 31.50 |
| EXPENSES: | | | | | |
| Mileage | Per Mile | 0.38 | Miles | 37 | $14.06 | |
| Photo Processing | | | | 19.20 | |
| | | | | | |
| Supplies | | | | 6.75 | |
| Postage Avg. | | | | 3.85 | |
| Other Misc. | | | | | |
| TOTAL EXPENSES: | | | | $43.86 | 43.86 |
| TOTAL INVOICE: | | | | | $436.36 |

**FEID #582446483**

| | |
|---|---|
| Please Make Checks Payable To : | **Transportation Technology Inc.** |
| Address : | **1184 Wind Hill Lane** |
| | **Marietta, GA  30064** |

## Payable Upon Receipt

Long/State Farm
SF1   00247

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

RECEIVED

MAR 1 8 2005

SIU

March 17, 2005

Todd Smith
State Farm Insurance Company
P.O. Box 370568
Decatur, GA 30037

Re:    Fire Loss
       Transportation Technology No. :     25050
       Claim No#                           01-6596-564
       Owner:                              Long

Dear Mr. Smith:

Enclosed are the report and invoice for subject investigation. Please contact me if you have any questions or need further assistance.

Thank you again for the opportunity to assist you.

Sincerely,

Michael E. Bresnock

Long/State Farm
SF1   00248

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

CASE 25050

TABLE OF CONTENTS

1.0 ASSIGNMENT

    1.1 Client

    1.2 Subject

    1.3 Location

    1.4 Purpose

    1.5 Date of Inspection

2.0 PARTICIPATING PERSONNEL

3.0 EXAMINATION OF VEHICLE

4.0 CONCLUSIONS

5.0 PHOTOGRAPHS

Long/State Farm
SF1   00249

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta,  Ga.  30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

## 1.0 ASSIGNMENT

**1.1 Client:**           State Farm Insurance Company

                  Todd Smith

**1.2 Subject:**          2000 Chevrolet Corvette

                  Ser# 1G1YY22G9Y5132554

                  Mileage: 71,064

**1.3 Location:**         Verastar South

                  Rex Road

                  Forest Park, Georgia

**1.4 Purpose:**          Post theft inspection.

**1.5 Date of inspection:**   March 8, 2005

## 2.0 Participating Personnel

**2.1 Investigator:**      Michael E. Bresnock- Consultant

                  Transportation Technology

Long/State Farm
SF1   00250

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

## 3.0  EXAMINATION OF VEHICLE

3.1 At the request of State Farm Insurance Company, the above mentioned vehicle was inspected while it was being retained at Verastar South in Forest Park, Georgia. Information obtained from the insurance company indicated this vehicle was reported stolen and at some later date it was recovered and eventually made its way to Verastar South in Forest Park, Georgia.  A key along with the electronic remote control were provided by State Farm to assist in the investigation. The key was able to function satisfactorily on the driver's side door lock, enabling it to open and lock the door with no irregularities.  All four of the vehicle's original wheels had been removed and replaced by some aftermarket type (Photo #1, #2).  You will note that the wheels were secured by a loosely fastened wheel lug nuts.

3.2 The vehicle was equipped with the corvette 5.7liter fuel injected engine (Photo #3).  It was noted that the brake master cylinder reservoir was empty (Photo #4).  The engine oil level was within a safe operating range (Photo #5).  There were no personal belongings found in the interior of the vehicle (Photo #6).  It was also noted that both front seats were missing (Photo #7, #8).  The initial attempt to start the vehicle using the keys provided by State Farm Insurance Company was

Long/State Farm
SF1  00251

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

unsuccessful because the key pellet reader had been mis-positioned.    After loosening the retaining screws and repositioning the center console, it was possible to remove the pellet reader for inspection (Photo #9, #10, #11, #12). It is our position that the pellet reader was simply mis-positioned, thereby preventing the ignition key from rotating the ignition cylinder to the start position.  The theft deterrent relay was located on the passenger's side vertical floor surface as indicated on photocopy #1. A visual inspection of the theft deterrent relay provided no evidence to indicate that it had been altered in any way to enable the engine to be started without the correct key (Photo #13).  The key was inserted through the pellet reader and into the ignition key lock and then rotated to the crank and start positions.  When the pellet reader was properly positioned, the engine was able to start and run.  While the engine was in operation (as indicated by the tachometer), several messages appeared in the operator information center (Photo #14, #15, #16, #17, #18).  After completing the ignition system and theft deterrent system test, it was our opinion that this vehicle had not been started and operated without the correct ignition key.  There were some marks on the rubber sections of the passenger's side window weather strip and on the weather strip for the roof panel.  These areas may have been subjected to a sharp object which enabled access to the interior.  The roof panel was missing

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*

at the time of this investigation and some of the door glasses were broken. The engine was allowed to operated for approximately twenty minutes. During that period of time temperature and oil pressure was monitored (Photo #19). There were no operational irregularities. It was not possible to move the shift lever from the park position after the engine was in operation. This may have been caused by the low brake fluid as the system requires the brake pedal to be depressed before switching from the park position.


## 4.0 CONCLUSIONS

4.1 This vehicle was equipped with the General Motors Pass Key System, which is a subsystem of the body control module. The body control module provides all of the logic to operate the pass key system. The body computer uses input information from other systems and components to determine the status of the pass key. The body computer controls its output functions based on the status of the pass key. The pass key fuel enable function is provided by the power control module. When the correct pass key is inserted into the ignition key lock, the key reader transfer the pellet information to the body computer. The body computer in turn signals the power train control module to enable or disable fuel injection in order for the engine

Long/State Farm
SF1   00253

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**

to run. The ignition cylinder and key used by the pass key system is supplemented by a pellet reader to determine if the correct key is being used to start the vehicle. When the ignition is first turned on, the body control module measures the value of the key through the sensing contacts located on the pellet reader. The theft deterrent relay is part of the pass key system and can disable engine cranking through the theft deterrent relay. When the body control module detects the correct pass key, the body computer allows the engine to be cranked and simultaneously instructs the power train control module to enable fuel injection. Inspections and tests conducted on this vehicle provided no evidence to indicated that any of these systems had been by-passed to enable the vehicle to be started and driven without the use of the correct ignition key. In consideration of the tests and inspections along with the summary of this vehicle's theft control system it is our opinion that this vehicle was not operated without the correct ignition key.

Investigator: *Michael E Bresnock*

**Michael E. Bresnock**

Long/State Farm
SF1   00254

# Antitheft Relay: Locations



**Legend**

(1) Theft Deterrent Relay
(2) Instrument Panel Electrical Center
(3) Blower Motor Relay
(4) Starr Connector 2
(5) Body Control Module C3

(6) Body Control Module C1
(7) Starr Connector 1
(8) Body Control Module C2
(9) Steering Column Lock Relay

**Locations View**

RH footwell, mounted to the toe board, above the body control module.

Long/State Farm
SF1   00255

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
**www.vehicleinvestigator.com**

RECEIVED

MAR 18 2005

SIU



Photograph: <u>#1</u>          Transportation Technology : <u>*25050*</u>
Date Taken: <u>March 8, 2005</u>
Description of Subject: <u>2000 Chevrolet Corvette</u>

<u>Note: Alternate brand wheels installed on passengers side of vehicle.</u>

Long/State Farm
SF1    00256

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
**www.vehicleinvestigator.com**



**Photograph: #2**          **Transportation Technology :** _25050_
Date Taken: March 8, 2005
Description of Subject:  Wheel (passenger's side front)

Note: Missing and loose wheel lug nuts.

Long/State Farm
SF1  00257

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**



Photograph: #3          Transportation Technology : 25050
Date Taken: March 8, 2005
Description of Subject: Engine Compartment

Note: 5.7L fuel injected engine.

Long/State Farm
SF1   00258

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**



Photograph: **#4**          Transportation Technology : **25050**
Date Taken: **March 8, 2005**
Description of Subject: **Brake Master Cylinder Reservoir**

Note: **Empty reservoir.**

Long/State Farm
SF1   00259

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
**www.vehicleinvestigator.com**



Photograph: **#5**          Transportation Technology : **25050**
Date Taken: **March 8, 2005**
Description of Subject: **Engine Oil Level Dip Stick**

**Note: Oil level was in a safe operating range.**

Long/State Farm
SF1   00260

Consulting Service

# Transportation Technology

**1184 Wind Hill Lane**
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
**www.vehicleinvestigator.com**



**Photograph: #6**          **Transportation Technology :** _25050_
**Date Taken:** March 8, 2005
**Description of Subject:** Interior (rear storage area)

**Note: No personal belongings.**

Long/State Farm
SF1   00261

Consulting Service

# Transportation Technology

### 1184 Wind Hill Lane
### Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: #7                    Transportation Technology : 25050
Date Taken: March 8, 2005
Description of Subject: Interior

Note: Missing driver's side front seat.

Long/State Farm
SF1    00262

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: #8            Transportation Technology : 25050
Date Taken: March 8, 2005
Description of Subject:  Interior

Note: Missing passenger's side front seat.

Long/State Farm
SF1   00263

Consulting Service

# Transportation Technology

**1184 Wind Hill Lane**
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*



Photograph: <u>#9</u>          Transportation Technology : <u>*25050*</u>
Date Taken: <u>March 8, 2005</u>
Description of Subject: <u>Interior</u>

<u>Note: Console retaining fasteners were removed.</u>

Long/State Farm
SF1  00264

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



**Photograph: #10**          **Transportation Technology :** _25050_
**Date Taken:** March 8, 2005
**Description of Subject:** Reader Pellet

**Note: Removed for inspection.**

Long/State Farm
SF1   00265

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
**www.vehicleinvestigator.com**



Photograph: **#11**        Transportation Technology : **25050**
Date Taken: **March 8, 2005**
Description of Subject:  **Ignition Key Lock (with pellet reader removed)**

**Note: No Physical damage to the ignition key lock.**

Long/State Farm
SF1   00266

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: #12        Transportation Technology : 25050
Date Taken: March 8, 2005
Description of Subject: Reader Pellet

Note: No physical damage to the electrical components.

Long/State Farm
SF1  00267

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
*Marietta, Ga. 30064*
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*



**Photograph: #13**          **Transportation Technology : 25050**
**Date Taken: March 8, 2005**
**Description of Subject: Passenger's Side Front Angled section Of the Floor Pan**

**Note: Relay wires had not been altered.**

Long/State Farm
SF1  00268

Consulting Service

# Transportation Technology

**1184 Wind Hill Lane**
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



**Photograph: #14**          **Transportation Technology : _25050_**
**Date Taken: March 8, 2005**
**Description of Subject: Instrument Cluster**

**Note: Low brake fluid message.**

Long/State Farm
SF1   00269

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**



Photograph: **#15**          Transportation Technology : **25050**
Date Taken: **March 8, 2005**
Description of Subject: **Instrument Cluster**

**Note: Service traction system symbol and message.**

Long/State Farm
SF1  00270

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**



Photograph: #16          Transportation Technology : 25050
Date Taken: March 8, 2005
Description of Subject: Instrument Cluster

Note: Service active handling message.

Long/State Farm
SF1   00271

Consulting Service

# Transportation Technology

**1184 Wind Hill Lane**
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**



Photograph: **#17**              Transportation Technology : **25050**

Date Taken: **March 8, 2005**

Description of Subject: **Instrument Cluster**

**Note: Brake before shift message.**

Long/State Farm
SF1   00272

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta,  Ga.  30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*



Photograph: #18          Transportation Technology : 25050
Date Taken: March 8, 2005
Description of Subject: Instrument Cluster

Note: tachometer which indicated engine was in operation.

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**



**Photograph: #19**         Transportation Technology : *25050*
**Date Taken: March 8, 2005**
**Description of Subject: Instrument Cluster**

**Note: Temperature and oil pressure were monitored while the engine was in operation.**

Long/State Farm
SF1   00274

**STATE FARM INSURANCE**

☐ State Farm Mutual Automobile Insurance Company
☐ State Farm Fire and Casualty Company
☐ State Farm County Mutual Insurance Company of Texas
☐ State Farm Indemnity Company

Barcode Only

Claim Number ___**01-6596-564**___

## AFFIDAVIT OF VEHICLE THEFT

1. Name of Insured _Martin O'Long_    Name of Owner _Martin O'Long_

   Address _2752 Caroline Dr._    Home Phone _(334) 290-0344_

   Date of Birth _8/13/68_    Marital Status: ☑ Married  ☐ Single    No. of Dependents _____

   Social Security No. _____    Driver's License No. _5415781_

   Occupation _Unemployed_  (Optional)

   Employer's Name _____

   Address _____    Phone _____

2. Date of Theft _2/19/05_    Time _7:00_    ☑ A.M. ☐ P.M.

   Make of Vehicle _Chevrolet_ Year _2000_ Model _Corvette_ Body Type _Coupe_ Color _Silver_

   Vehicle ID # _1G1YY226945132554_    License Plate # _B18D5_    State _Al_

   Certificate of Title # _____    If none, why? _____

   Number of cylinders _8_    H.P. or C.I. or Liter _____    Odometer reading _____

   Was vehicle locked? ☑ Yes ☐ No    Were keys left in vehicle? ☐ Yes ☑ No

   Was vehicle equipped with anti-theft device? ☑ Yes ☐ No

   Amount for which you are making claim $ ~~If~~ _Paid 25,000.00_

   Specific location from which vehicle was taken _5400 Fairington Rd. Lithina GA_

   Reason vehicle was left at this location _Relaxing / Sleeping_

   Name and address of person who left auto at this location _Martin O'Long 2752 Caroline Dr_
   _Millbrook, Al (36054)_    Their driver's license no. _5415781_

   When did you last see your vehicle? Date _2/18/05_    Time _9:00_    ☐ A.M. ☑ P.M.

   Name and address of others who were present _____

   _____

   When was the theft discovered?  Date _2/19/05_    Time _7:00_    ☑ A.M. ☐ P.M.

   Who made the discovery? _Martin O'Long_

   When was theft reported to police?  Date _2/19/05_    Time _7:00_    ☑ A.M. ☐ P.M.

   Name and Location of Police Station _# 404-294-2512/2000_

Long/State Farm
SF1  00291

105351.1   Rev. 07-19-2004                    Page 1 of 3

This is Todd Smith interviewing Ram. Today's date is March the 4th, the year 2005, and it's currently 8:30 A.M. This is concerning a claim filed by Martin Long regarding the theft of his 2000 Chevrolet Corvette. This interview is taking place at the Country Hearth Inn off of Berington(sp?) Drive in Lithonia, Ga.

Q.   Ram could you please pronounce your name and spell it for me?
A.   Uh, first name is uh, Ram R-A-M, the last name is Naidu N-A-I-D-U.

Q.   Now you're a Manager here at the Country Hearth Inn is that correct?
A.   Uh, well...

Q.   Shift Manager is that...
A.   Shift Manager you could say not the Manager.

Q.   Okay. Are you aware of the gentleman that we're discussing Martin Long?
A.   Um hum, yes.

Q.   Okay. How do you know, did he stay here at your hotel?
A.   Uh, yes I believe so, he did.

Q.   Do do you remember the night that he came in to stay?
A.   Uh, I don't exactly remember checking him in. He probably checked in before I got on the shift 'cause I didn't start 'til um, I think a little after 8:00 that night, so he'd already checked in.

Q.   Okay.
A.   Um...

Q.   Would that have been on a Friday night, does that sound correct?
A.   Friday night, that's right.

Q.   Okay. And then so you were on shift then all through Friday night and then Saturday morning were y- you still on the shift?
A.   Um hum.

Q.   What happened Saturday morning?
A.   Uh, Saturday morning uh, been close to just after 7:00 uh, uh, this gentleman came down and uh, he he walked right out turned around and came back and said his car was stolen. Uh, didn't look, really look like he was going out for a drive the way he was dressed.

Q.   What was he dressed as at the time?

A.   He was just a shabby T-shirt some shorts.  Uh...

Q.   What time of the morning was this?
A.   Fl- fl- flip flops.  Um, just after 7:00.

Q.   Okay.
A.   Uh, unless he unless he went to pick something out of his car I mean, ya know, to get some belongings I guess.  But uh, he didn't look dressed to go out in a Corvette for sure.

Q.   Did he have any keys on him at the time?
A.   Nope.

Q.   He didn't have any keys in his hands?
A.   Nothing in his hands unless he had something in his pocket.

Q.   So what did he do, did he come back in to the front desk then?
A.   Um hum.  He came back in and asked me where his Corvette was.  And I said I said which Corvette.  And he goes the one parked there.  And uh, I quite remember telling him that I had seen it the previous night.

Q.   You did remember seeing the Corvette in the parking lot?
A.   Um hum.  Uh, I had a very good friend of mine a girl who actually came here and we both sat here in the lobby and I was sitting right here and I saw the Corvette.

Q.   Okay.  And was it parked then just right over here is that correct where those...
A.   Yeah it was parked right next, in between those two cars there, exactly.  Next to that uh, SUV there that Jeep.

Q.   Okay.
A.   Probably that's the exact location.  Um, and he came and he jumped on me as to why I didn't see it so I explained to him that I sit down there in that corner and most of the time I'm sitting down ya know, 'cause I'm on a 12 hour shift all through the night I'm not gonna be standing all night.  And um...

Q.   When was the last time you remember seeing the Corvette, just when you were sitting here on this couch that evening?
A.   Um hum.  Um, I don't I don't fairly recollect but uh, probably been between 2:30 and 3:00 A.M.  But I could confirm it because I was with 'cause I did mention it to her...

Q.   Okay.
A.   That the Corvette had got stolen.

Q. Do you need to grab that phone right quick?
A. Yes.

Q. Okay. (tape stopped) All right now you said you made a call to a friend of yours that was here and the last time that you all recall seeing the vehicle was what about 3:00 in the morning 3:30?
A. Um hum.

Q. Is that correct?
A. That's when.

Q. All right, so that would have been that Saturday morning. After that, after he discovered his vehicle and he came back in what all conversation took place?
A. Um, well firstly he demanded where his Corvette was and I was I didn't know what he was talking about. For a moment it didn't strike me that that was his Corvette he was talking about. And then I said what are you talking about, he said my car was parked right there in front of you and you didn't see it? That's when I remembered that that it was exactly the car I'd just seen a few hours back and I mentioned it to him, I said was it gold or champaign color Corvette? He said yeah, how come, how come you didn't see it he says? And I just said from where I sit I can't see that car.

Q. Did he ask you anything about your surveillance cameras?
A. Um hum, he sure did. Uh, he was he said you manage the surveillance camera and uh, and I said uh, I said I don't have access to those surveillance cameras.

Q. Was your surv- surveillance cameras working that night?
A. Huh uh.

Q. They were not?
A. They were not.

Q. What was wrong?
A. Um, the computer crashed about about a week ago and...

Q. A week before that?
A. Yeah. A week before that. And um, when he asked me about it I really didn't want to tell him much about the situation with surveillance camera, I just said to him I don't know nothing about it you can take it to the boss and this is his name and number, and I gave him the card. And um, and then he made a few phone calls and a couple of his buddies showed up and...

Q. A couple of his buddies showed up?

A.  Yeah.  It was very strange.  They were inside doing most of the questioning to me.

Q.  Who was did they stay in here or where did they come from?
A.  (Inaudible)  They just came from outside and they were very pushy uh, they had uh, they had kind of a Jamaican accent.  That was very unusual.  The other two guys, 'cause this guy...

Q.  Y- and they were with him?
A.  They were not with him he was with a girl.

Q.  Okay.  But in other words when he made some calls then they came up?  Did you see what they were driving?
A.  No.

Q.  In other words were they a guest here that just came up?
A.  No, they were definitely not staying here, they came from outside.

Q.  And so he definitely called them...
A.  He called them.

Q.  And they were friends?
A.  Yeah, th- they showed about close to I'd say 15 to 20 minutes later.

Q.  Okay.  When did he call the police?
A.  Yeah, that was not the thing what happened is um, I, while he was there standing and demanding surveillance tape and uh, I said I said sir you should call 911, and he just stood there.  So then I said to him I said I'm not going to do anything.  He goes what you waiting for he asked me.  I said I'm not going to dial 911.  It's it's you who should be making the call because it's your property stolen, ya know, so you could tell the police exactly what your problem is.  So then he asked me to dial the number and I dialed 911 and I gave it to him.

Q.  Did the police come here or did they...
A.  Um, actually the police didn't show up 'til I left.

Q.  What time was your shift over that morning?
A.  Uh, I got off close to 9:00, 9:00 A.M. that morning and he, police had not shown up by that time.

Q.  Now did any of the guys that showed up did they have any conversations regarding what he should do about filing the...

A.    Yeah. Well the other two guys who came in, oh they were they were having a lot of conversation out there in in the front. Uh, they they were particularly concerned about that camera on top of the building. Didn't realize that camera actually looks right there on that side. And uh, then they stood back there. Spoke for again some time. Went up to the room, came back down.

Q.    Did the guys go up in the room with him?
A.    Um hum. Yep. Then they came back down and um, they wanted to gain um, get hold of the surveillance cameras.

Q.    Did they ever have any conversation with him di- or did you ever overhear any conversation about what he should claim was stolen in the vehicle?
A.    Um hum.

Q.    What happened there?
A.    Well one of the guys was suggesting that he just say that a suitcase was in there with some belongings.

Q.    Did he ever mention what was in the car?
A.    No.

Q.    He never mentioned it? Did he have do you ever recall...
A.    He did say that he had a bunch of keys in there he said.

Q.    A bunch of keys in the car?
A.    Um hum.

Q.    Did he mention anything about having any personal items like clothing in the car?
A.    Nope. But he did, the other guy did say to him to say that you had a suitcase in the car with some stuff in it. I I do...

Q.    In other words he was telling him you need to make up like and just say that you had some, even though it might not have been in there?
A.    I would say that was fairly the intent and I, and that's what I perceived it was.

Q.    Did you see any glass or any evidence that, in the parking lot?
A.    Yes, there was there was a fair amount of glass out there.

Q.    Right beside where the car would have been parked?
A.    Um hum. The the funniest thing is I mean as far as I know uh, to his car if you smash the glass and the alarm doesn't go off it's very shocking. I'm sure if the alarm went off there I would definitely hear it.

Q. Have you ever had any, or can you recall any vehicles being stolen from this location before?

A. Nope. No as a matter of fact we did have one broken in last week. Very, the very next week after this Corvette was stolen. And the officer who showed up here I in fact spoke to him and I mentioned to him about the Vet too. I mentioned to him that we are having a serious problem and said you guys should be patrolling this area a little more, ya know, at night. And he gives me his card and says I I charge $25 an hour if you want me to come and do some surveillance with you guys.

Q. Thanks, thanks for doing your job.

A. Yeah.

Q. Oh.

A. If you want me to file taxes it will be $35 an hour.

Q. Oh, did you ev- did he rent the room in his name?

A. I I can't exactly recollect.

Q. Did he stay through the weekend?

A. I I'm not sure. Believe it or not I didn't even know whose, what his name was um, because it all happened so quickly and I just got off the shift. I just kinda like handed it over to the next person.

Q. Was he up- did he appear to be upset as far as that his car was missing or did how was his reaction?

A. Well the only time he was upset was when he came in demanding for the surveillance tape and after that. There was a lot of loitering around going on. They just kept going up and down, up and down, standing out there and talking.

Q. Did he, you said he made some calls and then tw- two guys showed up?

A. Um hum.

Q. The calls did he make that from his cell phone?

A. Um hum.

Q. Okay.

A. Yes.

Q. Now who took over after you left that morning who was the next person on shift do you remember?

A. Uh, Saturday morning, it was uh, a guy by the name Alfredo.

Q.    Fredo?
A.    Alfredo.


Q.    Alfredo?
A.    Yeah, I think he'll be, he should shortly be here in the next uh, 10 minutes for sure.


Q.    So after you left then he would have been here when the report was made...
A.    Um hum.


Q.    And if the police showed up?
A.    Yeah.


Q.    Okay. And I seem, did you ever hear the name of the girl or or any of the guys that were here with him?
A.    Um, no. See this is what happened actually, I forgot to mention this. Yes sir? (speaking to unidentified person) (tape stopped). Yeah, the um, the other incident which actually happened that morning was which uh, I kinda lost track of these guys what they were exactly doing while I was, I had a guy who had a seizure in the hotel um, and this all happened at the same time. The guy that seizured, the guy from the room called me up and said call 911 this guy is having a seizure. So I call 911 and the paramedics are here. Uh, so I had to actually run up there to let the guy...


Q.    Busy morning it sounds like?
A.    Yeah, I checked the guy, came down and the paramedics had showed up. And the next thing is this guy comes running down, oh like my Vets gone. So I was just so much happening that, I kinda lost track of what whatever was going on.


Q.    Okay. Well is there anything else you can recall about it? Like I said yo- you told me the last time at 3:00 or 3:30 in the morning that morning the Vet was still there?
A.    It was there.


Q.    Was there a lot of people that night staying here at your hotel?
A.    Yeah a good bit. The problem with Fridays and Saturdays is we're always booked up, every weekend we're booked up. We have a lot of people.


Q.    Is there a lot of...
A.    Problem is we have...


Q.    Is this a well lit area at night, this parking lot?
A.    Yeah, we have the whole car park is well lit. I'm surprised, it took a lot of guts to do that or I don't know I mean if...

Q.    Well let me ask you do you suspect maybe this gentleman had something to do with his Vet missing?

A.    I definitely think it was 'cause it was very suspicious at that.


Q.    Okay.  Well this will complete our statement.


TEXF/6596564B.321

This is Todd Smith interviewing Martin Long.  Today's date is March the 1st, actually March 2nd...

A.     March the 2nd.

Q.     Excuse me.  Today's date is March the 2nd and it is currently, this interview is taking place in Alabama and it's currently 9:25 A.M. Alabama time, 10:25 Georgia time.  This interview is taking place at our Montgomery Claims Office in Montgomery, Alabama.  Mr. Long is this recording being made with your full knowledge and consent?
A.     Yes, sir.

Q.     Could you please pronounce your full name and spell it for me?
A.     Martin M-A-R-T-I-N.

Q.     And your middle name?
A.     Oh, O'Neal O apostrophe N-E-A-L, Long L-O-N-G.

Q.     Now our records are showing a 1705 Deatsville Highway in Millbrook and you told me that is not the correct address, that's actually an address for is that your ex-wife is that correct?
A.     Yes, sir, but she's not my ex yet, that what I'm...

Q.     Okay.
A.     She just got that address a week ago and I don't understand how they...

Q.     Okay.
A.     It ended up there.

Q.     Well let me make a note then on this.  So the Deatsville Highway is, and what's your wife's name?
A.     Evelyn Beth Long E-V-E-L-Y-N.

Q.     G?
A.     Um hum.  Long L-O-N-G.

Q.     So that's her address?
A.     Yes, sir.

Q.     And that's been since when?
A.     Uh, she just got that address last Saturday.  The Saturday just past about three four days ago.

Q. And what's your address Mr. Long?
A. My address is 2752 Caroline Drive, Millbrook, Alabama, 36054.

Q. How long you lived at that address?
A. Um, since 19- uh, 99, since 1999.

Q. And how long have you been insured with State Farm®?
A. Uh, since I think since '99.

Q. And so the 1705 that is a current address change for your wife but not for you, you live there at the Caroline address...
A. All the time.

Q. Since you've been insured with State Farm?
A. Yes, sir.

Q. Okay. I've been speaking with you at a 334-290-0344 is that your home number?
A. Yes, sir.

Q. Okay. And have you had that home number since you've been at the Caroline address?
A. Yes.

Q. Do you also have a cell number that you use?
A. Yes.

Q. What's your cell number?
A. Uh, 334-202-9599.

Q. And who's that with what provider is that with?
A. Uh, Verizon.

Q. Verizon? And as of February of this year that was the correct cell number, in other words it hasn't changed recently?
A. No.

Q. Okay. What's your date of birth?
A. Uh, August 13, '68.

Q. You're 36 is that correct?
A. Right.

Long/State Farm
SF1  00316

Statement Of: Martin Long
Claim: 01-6596-564
Page 2

Q.    Only reason I know is I'm 37...
A.    Oh, yeah?

Q.    So I might be the same age with you.  What's your Social Security Number?
A.    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.

Q.    And we verified I think yesterday on the phone about your driver's license number being
      5415781...
A.    Um hum.

Q.    You said that was Alabama?
A.    Right.

Q.    Has your license ever been suspended or revoked?
A.    No, sir.

Q.    Have you ever had any traffic violations?
A.    Tickets?

Q.    Yeah.
A.    Yes.

Q.    Speeding?  When's the last time you had a speeding ticket?
A.    Probably in about I know it's been at least five years.

Q.    Was that here in Alabama or?
A.    I'm thinking it was in uh, I think it was South Carolina.

Q.    South Carolina.
A.    When I was uh, still in the military used to come from North Carolina to Huntsville.

Q.    What happened, how fast they get you going?
A.    Well I got set u- I was riding down I I had uh another Mustang and this cop had a
      unmarked Z28 and he kinda set me up and once I ran him he my radar detector went off
      and I'm lookin' around and and it's that dude.  He set me up and gave me a ticket.

Q.    Did, but nothing where your licensed was revoked or suspended?
A.    Oh, no, no.

Q.    Never had a DUI, reckless driving, nothing like that?

A.    No.

Q.    Have you ever been arrested before?
A.    No.

Q.    For anything?
A.    No I haven't.

Q.    Have you ever been involved in a lawsuit?
A.    Uh...

Q.    Where either, where you were either a party being sued or suing someone else?
A.    No I guess, ya know, I guess I don't know if this is considered a lawsuit here for compensation for my job.

Q.    What happened about your job?
A.    Well uh, I got uh, hurt my shoulder and I had to have two surgeries on it and...

Q.    Who was that with?
A.    Csx Transportation Railroad.

Q.    How long did you work with them?
A.    I worked with them since from '98 until 2003.  That's the last day I worked.

Q.    Was that when you were injured in 2003?
A.    Um hum, March of 2003.

Q.    So did you file a Worker's Comp claim with them?
A.    They don't have it.

Q.    They don't have Worker's Comp there?
A.    Huh uh.

Q.    So you you had to file a claim against them to obviously to pay for your surgeries and and pain and suffering and anything else is that correct?
A.    Right.  Well they, I guess their system is different.  I mean, once uh, you don't contact a lawyer they contact you.  It's like once you be off or so many days then it au- your name automatically goes on the um, FRE list...

Q.    Um hum.

A.    And then um, attorneys call you to find out what happened.  And then they, ya know, they be trying to get your case.


Q.    Okay.  So when did you settle the matter?
A.    In uh, January.  I think it was uh, Jan- January maybe January uh, this year the 5th.


Q.    January of this year?  And you got a copy can I see that right there...
A.    Yes.


Q.    Is that a copy of the it looks like a copy of the check made out to Martin O. Long for $150,100.92. is that correct?
A.    Yes which is was uh, more than that but I took out $25,000 t- to buy that car with.


Q.    Okay.
A.    So that that right there is a cashiers check that the Regions Bank cashed the original check and gave me two cashiers check, one for $150,000 uh, $192 and another one for $25,000 which I paid, that's what I bought the uh, the Vet with.


Q.    So you just had bought, pur- purchased the Vet then right?
A.    Yeah I had...


Q.    After your settlement?


Q.    Right, just bought it.


Q.    So how much was the total settlement, it was $100 and when I total that up...
A.    $175,000.


Q.    Right.  Okay.  Now out of that then did you have to pay your attorney or was your attorney...
A.    No the attorney already got his.


Q.    So in other words it was well into the...
A.    Okay, the total was $256,000.


Q.    $256.
A.    That's what the total was.


Q.    Who represented you in it?
A.    Uh, Burge and Burge Law Firm.

Q.    Is that B-U-R-G-E?
A.    Um hum.  Law firm out of Birmingham.  Use to be Burge and Wittamore(sp?).

Q.    Did it ever go to a trial or was it settled before it ever...
A.    Yeah it was...

Q.    You all filed suit though and then it was settled before you actually had to go in front of a jury or a judge?
A.    Right, um hum.

Q.    So since '03 what month, what month did you get hurt in '03?
A.    Um third.

Q.    Third month, so then March, '03?
A.    Yeah.  Three, it was March the 3rd, '03.

Q.    What happened?
A.    Well I was pullin' down tryin' to release the hand brake with uh, we got iron uh, uh, sticks they call brake release sticks and they got like a big hook on it and you can take it out far as you need an- and tighten it back up and pull up and ac- it it ya know how those those brakes like little they're...

Q.    Um hum.
A.    Round uh, iron steering wheels kinda...

Q.    Right.
A.    With a chain?  They all like was climbing the uh, ladder too much 'cause a lot of people just fell off and hurt theirself (sic) and they got those bars and if it's too high for us to to get it they like for us to kinda put pr- pressure and try to release the handbrake like that, and I messed up my arm.

Q.    Okay.  So since March of '03 have you worked anywhere or you been totally disabled since then?
A.    Huh uh.

Q.    You said you had two surgeries?
A.    Yeah.

Q.    Um, now out of the $256,000 obviously yo- your attorney got about what about 70 some thousand it looks like probably?
A.    Um, $64,000 something like that he got.

Q.    64? And do you have to pay out of that $175,000 that you received did you have to pay your medical bills out of that?
A.    Huh uh, no sir.

Q.    That was already taken care of also?
A.    Yeah.

Q.    Okay.
A.    Well I still got insurance with them 'til December of this year and then it after that that's it.

Q.    Okay. I'm going to get a copy of that before you leave right there.
A.    Okay.

Q.    But you said you purchased, where did you purchase your Corvette?
A.    In uh, Hoover, Alabama. Right out, I gu- I guess it's still inside of Birmingham it might not be inside the city limits but it's a place called City Auto Sales.

Q.    I went to college in Alabama so I I I know where Hoover is so, so it was City Auto Sales?
A.    Right, that's the name of it.

Q.    And that is in Hoover city limits?
A.    I'm thinkin' I I I'm not I'm not for sure. I just went up there to get the car. Well I went up there once lookin'...

Q.    How did how did you find the car?
A.    Internet.

Q.    Internet?
A.    Um hum. I went and looked at it one day and told the guy I wanted it.

Q.    What was the purchase date, what date did you buy it?
A.    Let me see, what's the day of this check? I bought it the same day I got this joker cashed, 02-04.

Q.    So it was in February?
A.    Um hum. That's the date that um...

Q.    February 4th, '05.
A.    Um hum.

Long/State Farm
SF1   00321

Statement Of: Martin Long
Claim: 01-6596-564
Page 7

Q.    So when you got your cashiers, you said it was 25 is that how much they charged you for the Vet, $25,000?

A.    Well it was a little bit more but I had I had to buy insurance and everything but the Vet itself yeah, it was $25,000, but I paid more than that 'cause I had to I had to um, get the insurance.

Q.    Did they give you a title at that time, did they sign that over to you?

A.    Well they gave me somethin' I guess it was somethin' like a a title, it was somethin', but I know it wasn't I don't think it was the original title though.

Q.    Okay. Where is it?

A.    I can't I can't remember but I know everything I got Lee got a copy of it, she can fax it to you.

Q.    Okay. And that's Lee at Mr. Deavers' (sp?) office?

A.    Right.

Q.    Now prior to the purchase of the Vet what vehicles did you own?

A.    Uh, I had a '92, no, '97 Ford Mustang Cobra. And that's it, my wife had a 2000 S70 Volvo, she still got that.

Q.    Volvo?

A.    Um hum. S70.

Q.    So you kept your, you still have your Cobra is that correct?

A.    Yeah, it's in the shop now on another claim, I don't know if you got that or not.

Q.    Yep, I've got that other claim that, let's talk about the other claim with the Cobra. What what took place there, what happened there?

A.    Well I was comin' from the VA one night one uh, I think it was a Saturday night and uh...

Q.    Was that this past month in February?

A.    Yeah, yeah that was this February.

Q.    Okay. So you're coming from the VA what was going on there?

A.    Well I went and got my got my knee looked at, because I'm getting um, Disability from the VA and I went to get it checked on and I was comin' back home and I got down uh, Main Street and this car pulled up behind me with his lights on bright and was messin' with me.

Q.    Where did this happen was this in Millbrook?

A.    Yeah, it's right in Millbrook.

Q.  And so what happened?  When the car started just coming up what was he flashing his lights at you or what?

A.  Well his lights was on bright.  And he pulled up behind me real got real close and I slowed down and once I slowed down on- then he pulled alongside me.  When he pulled alongside I co- I co- I knew his face.  I knew his la- last name was McBride and I know he uh, he had got in a altercation with one of my friends last year.  Which I let my friend um, borrow my pistol and they got in a shoot-out in...

Q.  Your friend got in a shoot out with this guy?

A.  Yes.

Q.  Who is your friend?

A.  Um, Jackson, Lester Jackson.

Q.  How do we get in touch with Lester Jackson, you have a cell number for him or a...

A.  I don't know why you need to call him about that?

Q.  Okay.  Well does he have any involvement in the Mustang you said obviously...

A.  No, no, no, no, no, I'm talking about see, my, the point of me saying that because that was the guy, the same guy that he got into it with.  Evidently he must have found that I go- let him borrow my pistol which police all already know all that anyway 'cause he didn't he didn't uh, ya know, I got picked up the same, wasn't arrested now, got picked up for questioning the same day and I told them the same thing, I let, I let the guy borrow my...

Q.  And this is in reference to you spoke with the police about it so there is a police report filed is it with the Millbook, Millbrook Police?

A.  Yes.

Q.  Okay.  Regarding the gun so when the guy comes up with his lights on bright, pulls up beside you, what happened?

A.  Well he pulled up behind me first and then I didn't know who it was, and then I slowed down and then once I slowed down he come from behind me, pulled up beside of me and then I looked out my side window and I saw his face and like I said I knew knew the guy by his face, not really from dealing with him.  So after he pulled up alongside of me, he took off.  He took off and then there's this this old store down there in Millbrook called Family Dollar.  He slammed on brakes right there, stopped, then I stopped.

Q.  What road is that on?

A.  Still Main Street.

Q.  Main Street?

A.    Yes. He stopped then I stopped. He got out of his car, I got out of my car. He was talking or mumblin' or whatever, then he got back in his car and I got back in mine. And I rode on down...

Q.    Did you all any, exchange any words or anything when you both stopped? You both got out of your cars but you didn't say nothing?
A.    Yeah, I mean it wasn't that close now. I mean I wasn't gonna get straight toes up on that dude. I when he stopped, I stopped. I wasn't fixin' to drive up on him.

Q.    Okay.
A.    So when he stopped, like I said I stopped. Then he was mumblin', I couldn't really understand what he was sayin' but he was mumblin'. So he got back in the car, I got back in my car. We started back drivin' down Main Street. I caught up with him, I passed him. I made a right going down by the police department same way I took to come to my house. I made that right right there. It was a lot of cops in the yard, I don't know if they was changin' shifts or whatever, but I I drove it on past, dude still behind me. Soon as we got past the Police Department he come alongside me and stomped the car again and shot past me again and went down almost to the end of that road, slammed on brakes again, blocked the road off, got out of his car. I stopped, I got out of my car. He had a gun. I guess I had a gun too. I guess you saw mine.

Q.    What type of gun did you have?
A.    I had a 45.

Q.    45?
A.    Not the one got stolen, I had another gun.

Q.    Okay.
A.    And um, he started walking toward me but I guess he saw I had my gun and he got back in his car. Once he got in his car he kept his light off and went down, he went on down to the stop sign. He made that right, ya know, like I told you I made a right going toward my house...

Q.    Um hum.
A.    He made that right right there so I started creeping to the stop sign 'cause I'm thinkin' he made that right and got out and hid behind them hedges or somethin' waitin' for me to come to the stop sign. So I started ridin' down there slow lookin' and he came back across went kinda up toward Sandtown Road so I stomped it, I stomped the Mustang and went down to the stop sign real quick to still watch him. I didn't know for sure if he was gonna get out right there or whatever. And then after that I didn't go toward my house 'cause I thought maybe somebody was put somebody out or whatever. I saw his car, he had stopped a little ways up the road a little bit so I turned toward him and I stopped. Then he got out of his car and I got out of my car and he started shooting at me and I started shooting back. And I to- and I told (inaudible) the same thing. This is what's so crazy man, I think it's it's gonna... (end of tape one, side one).

Q.   All right Mr. Long, I turned the tape over and we did not discuss anything regarding the claim as I was turning it over is that correct?

A.   Correct.

Q.   Okay.  Now you said that you thought that maybe the police might be involved or be a conspiracy somehow or another?

A.   Yes.

Q.   Okay.

A.   Simply because everything this dude do they don't never hold him.  This dude done had so many felonies, it was one case that I know my niece go- uh, son uh go-cart got stolen.  Her son daddy uh, somehow he found out dude had it, he went to dude, luckily the police came, dude had a gun...

Q.   And that's this same McBride guy?

A.   Same guy.  The police Millbrook Police got the gun from the guy.  The gun he had, serial number was scratched off.  That's an automatic felony.  He didn't do a thing.  And after that incident like I say him and my friend got into it.  He pulled a gun on my friend uh, last year, he reported it.  Police didn't do nothin'.  He shot my friend car, no he he shot my friend truck which was a Yukon.

Q.   Is that your buddy Lester Jackson?

A.   Yes.  After he did that then I he come to me, I let him use my gun which when ev- when all that happened, like I say when when um...

Q.   What gun did you let Mr. Jackson use?

A.   I let him use the 357.

Q.   Okay.

A.   And that's the same thing I told the uh, the cops up there.  And they uh, once once they shot it, I mean once the dude shot at Mr. Jackson, he was in Prattville city limits so he had to call Prattville then Prattville I guess they enforcement is a lot stronger than Millbrook I guess but they held it, Mr. Jackson down 'til Millbrook came and they met like uh, you know where that uh, uh, intake is?

Q.   No, I'm not familiar with that area.

A.   Okay, anyway they met right there, right there is like where the city divides.  So Millbrook got Millbrook Police got Mr. Jackson right then and took him over to see (inaudible) or whatever.  Then he filed a report after that.  They picked dude up, I think they hold him for like one or two days.  He got back out, after he shot at his car, I mean shot his truck.

Q.   Let me...

A.   Inside his truck.

Q.   Well let me ask you, at this particular th- the one involving you and the Mustang, after you all exchanged gunfire, wh- what all, any damage to your car?

A.   Yeah, I mean, well I shot my own car trying to shoot him. He didn't shoot I shot my own car.

Q.   Oh what happened there?

A.   Well after we, af- after h- he was already out of his car when I got out of my car. He went to shootin' so I got down and I got behind my car and I didn't even know I shot my car 'til the police had came up there. Because they they like drawed (sic) down on me. And I guess it was kinda my fault 'cause I still had my pistol in my hand, ya know, but they draw down, I put the gun down, ya know, they put me get in the car and searched me and all that. And I was tellin' 'em what happened and this one cop comin' from where this dude went he was like what kind of car was he in and I said he was in a maroon car. He said I just passed it. Yeah, you just passed it.

Q.   So did they arrest McBride for that?

A.   Yes they arrested him. But they only holded (sic) him, they only holded (sic) that dude for four minutes.

Q.   So let me get this straight.

A.   Yeah.

Q.   So after the little after the little little shoot out between you all, you said you shot, you accidentally shot your car. Now that would have been, where did you shoot your car (inaudible)?

A.   In the hood. I shot it, when I when I when I uh, evidently I shot too low and it hit the, it went through the hood, I'm sorry, the roof, it went through the roof, went through the rearview mirror, went into the dash and it uh, went through my window.

Q.   Okay. So it just like ricocheted inside of your car? So they went and found the guy, arrested McBride, did you file, did you have to file some type of formal complaint against him or anything?

A.   Yes but they said it was only a misdemeanor 'cause he didn't hit my car or nothing like that.

Q.   But you, but he's shooting at you trying to kill you?

A.   That's right. And see that's what I don't understand. I went and talked to the DA, I talked to all of 'em. So I I mean I don't understand what's happening, what's going on in that uh, with that case with that dude rather.

Q.   Okay.

A.   But it...

Q.    So why you think he got mad at you though, what'd you...
A.    I didn't do, I mean, see that's the thing, he he uh, I think he kinda off.  Because he can ride around...


Q.    I'd agree with that.
A.    He ride around and some days I mean I don't I don't see him a lot but I a lot of times he just, I guess he just be his self and every now and then he just he just clicks and just ya know he just he want to shoot people, kill people.  And they do- and they ain't doin' nothin' about it.  I went and talked to the DA about it.  He jump- well not the DA well I did talk talk went to talk to him but he wasn't there and I talked to some other guy, I don't know if it was the Assistant DA guy or whatever but...


Q.    Was this with Elmore County?
A.    Yes.  And he he like jumped down my throat.


Q.    What did you do?
A.    I didn't do nothin' I mean I went up there to ask them why is it that this dude is shootin' at people and I consider him a menace to society why they keep lettin' him on the street.  And what I was what I wanted to ask him which he he I mean he when he come out the door and asked me my name he was like just straight pissed off at me already.


Q.    And this is the the Assistant DA or somebody...
A.    This is one of the DA guys.  I know him if I see him.  I was gonna ask him does this guy have to shoot at a different race of people in order for them to consider him a menace to society?  But I didn't get a chance to ask him that because he jumped down my throat and he was like uh...


Q.    Well this McBride is he white or black?
A.    Black guy.  But he's shootin' at black guys.


Q.    Still he's shooting at you.
A.    That's what I'm sayin' I mean...


Q.    No matter color you are if your getting shot at.
A.    Right, that's what I wanted to ask him.  What what I mean does he have to shoot at different race of people for them to consider him a menace to society?  I mean I talked to (inaudible) I talked to the Sheriff about it.


Q.    So anyway you took your, where's your Mustang now, what shop?
A.    At Mooney's in Main Street.


Q.    Here in Montgomery?

A.    No, Millbrook.

Q.    Millbrook?  And we talked briefly yesterday about this, the check I noticed was mailed out on the 23rd which would have been last Wednesday and it was sent to the Caroline Drive, you said you haven't received that check yet?
A.    No.

Q.    Okay.  So is your car ready?
A.    Not yet, but he said it should be ready probably uh, he said it's gonna be ready hopefully by Friday, by Friday.

Q.    Okay.  Well we'll address that after the statement about the check and everything else.
A.    Okay.

Q.    But you said you mentioned earlier (inaudible) you was coming from the VA where's the VA located?
A.    Millbrook, I'm sorry, Montgomery.

Q.    Montgomery?
A.    Off the Harhar(sp?) Road.

Q.    So so you were in the military then?
A.    Yes, sir.

Q.    When were you in the military?
A.    From 1986 to 1997.

Q.    What what...
A.    Army.

Q.    Army?  Now were you a a full time enlisted during that period or were you just...
A.    Yes.

Q.    A Guard?
A.    Full time.

Q.    Okay.  So I know you said earlier that you went to work for the railroad from '98 so when you were released from the military then is when you went to work for the uh, Csx is that correct?
A.    Um hum, right.

Q.  What made you leave the army?
A.  My leg, I had broke my leg jumping airplanes and I couldn't uh, couldn't hang no more.

Q.  Hum.  Always heard of people that parachuted out of those planes it'd stunt, you know, and me being short already that when you hit it actually over time would stunt their growth many inches.
A.  What?

Q.  I'm serious, that's what I heard from from people in the military...
A.  Oh...

Q.  That...
A.  Well maybe I got lucky and unlucky 'cause I I broke my leg on my first jump.  But that's because they had us jump in full combat.

Q.  Yeah.
A.  Ya know, they supposed to do that close to our last jump.  We...

Q.  Which leg did you break?
A.  My left.

Q.  Your left?  And when did you do that, was that in '97?
A.  No, I did that in '92.

Q.  In '92?  But you remained on in the service though and okay...
A.  Yeah, tryin' to hang 'til I got to Fort Bragg.

Q.  Now what type of disability do you receive?  You said you're receiving disability from them, do you get a monthly check regardless?
A.  Um hum.

Q.  How much is that?
A.  $1,100.

Q.  Has that been your main source of income since you've been disabled from the the railroad?
A.  Um hum.

Q.  In other words they couldn't stop making payments act- through the VA or through the army could not stop making that payment to you even though you got employed with Csx?

A.    Oh, no.

Q.    You're going to continue to get that?
A.    I will 'til I die.

Q.    Okay.  Good.  You, let's talk about now you said earlier that you were separated with your wife have you all actually filed divorce (inaudible)?
A.    Yes.

Q.    Was that filed in Elmore County?
A.    Well they i- it hasn't been filed yet.  I mean, everything been wrote up, all she's got to do is just uh, once we sign it then that's it.  'Cause he said it'd take 30 days after the uh, paperwork was signed.

Q.    Who's your attorney for that?
A.    Oh, um, Steven, Patrick Steven Pullen(sp?).

Q.    I'm going to get a copy of that also, if you don't mind?  Now is there is there any dispute over the the divorce?  In other words are you all having any any problems over the...
A.    Only thing we havin' is that uh, with the mobile home we got.  When she...

Q.    Is that the one is it at Caroline...
A.    Yes.

Q.    Or it Deatsville?
A.    Huh uh, Caroline.  It's just that she want her name off of it.  Which I do too but they just they they gotta run a credit check on me to see if I can...

Q.    So she's co-named on the mortgage on that?
A.    Um hum.

Q.    How much you owe on the mobile home?
A.    Think I owe like uh, 39, 38 39.  But the payments only like $291 a month.

Q.    That's $38,000 or $39,000?
A.    Um hum.

Q.    And it's $291 a month?
A.    Um hum.

Q.     That's pretty reasonable.
A.     Yeah, that's good.

Q.     Do you own the property that it's sitting on or do you...
A.     Yes.

Q.     Is this in a is this in a mobile home park...
A.     No.

Q.     Or is it...
A.     This is heir property.

Q.     Air property?
A.     It's like it's like uh, it's like 40 acres but it's in my dad's name...

Q.     Oh...
A.     Ya know.  And long as you in the blood line all you gotta do is just.

Q.     Oh heir you're talking about h-e-i-r like you're an heir to this property?
A.     Yeah.

Q.     Okay.  I thought you was talking about air I thought I've never heard of air property.
A.     Huh uh.

Q.     So you just basically, is there any dispute like from a financial standpoint in other words is she trying to get alimony from you or anything?
A.     No sir, 'cause I, ya know, I I did a lot of good things for her.  I paid her student loan off and paid a car off for her.

Q.     Yeah...
A.     Only thing is it's just that uh, she's saying that uh, because her name isn't off the mor-mortgage, it will be once they do, run my credit check, she's sayin' that if she can't get her name off of it she wanted it to be sold.  And I told her I ain't gonna do that.

Q.     What about you all have any children together?
A.     No.

Q.     Okay.  Do you have any children?
A.     No.

Q.   Okay.  Does she have any children?
A.   Huh uh.

Q.   Do you have any, I know I saw something, bear with me for a second.  Who's Bobby
     Long?
A.   Oh, that's my old thief cousin.

Q.   What happened in that case?
A.   I let him borrow some money and he ain't and he tried to renege, don't want to pay me
     nothin'.  Took him to small claims court but they...

Q.   Now you understand a minute ago when I asked you if you had any cases in court or
     anything any lawsuits where you are a party whether you...
A.   Oh, okay, I forgot...

Q.   I need to have all of them, in other words when I'm asking about it so, so this case here
     Bobby Long, he's your cousin?
A.   Yes.  I forgot about that.

Q.   When did that happen?
A.   Close to two years ago but I'm I'm uh, I started the claim I think in last, I think last July.
     And I can't never get his Social Security...

Q.   Why did you loan him some money or something or what happened?
A.   Yeah.

Q.   Why how much did you loan him?
A.   $2,000.

Q.   And he never paid you back?  So where'd you file that is that in Montgomery?
A.   Elmore County.

Q.   Elmore County?  But it's nothing where he's filed suit against you or anything, what is it
     like with Magistrate Court in Elmore County?
A.   I guess that's what it is.  Some small claims court.  But they they take...

Q.   So what's what's going on with that right now?
A.   Well they can't get his Social Security Number so they say.

Q.   Where's your cousin live?

A.    I don't know where he live, but I gave 'em uh, his work address and number and they still said like they can't they say they can't pull up his Social Security Number. And he worked with the state. So I don't understand why they can't pull up his Social...

Q.    What's Department of Youth Services is that where he works?
A.    Yes. And uh, (inaudible). Yeah, that's what they told me, I mean, that's that's it- it- it's messed up.

Q.    So he works wi- with the State of Alabama then?
A.    Yes.

Q.    So sounds to me like they're protecting their own there again. So no children so you're not having to pay any as far as the divorce, did your wife, did she want some of the settlement from you for yo- your railroad?
A.    I gave her some settlement.

Q.    Okay, how much did you give your wife?
A.    I gave her $20,000.

Q.    So what all did you use the money on is it, did you deposit the majority of the money in your account or?
A.    Yeah, wh- which is her account but I did that to pay off most of the bills.

Q.    Were you having some financial problems or?
A.    Yeah, before I got that check, yeah.

Q.    Just basically because you hadn't been employed since '03 and...
A.    That's right.

Q.    What about the Mustang, is it paid off?
A.    No I got uh, insurance with my uh, with the bank and uh, they they payin' on that for me.

Q.    What do you mean?
A.    I had separate insurance if I get off, get hurt on the job and can't work, they'll pick up the uh, payment.

Q.    Okay. So...
A.    (Inaudible) behind.

Q.    You've got that on on the Mustang then?
A.    Um hum. But I had to pay for it.

Long/State Farm
SF1   00333

Statement Of: Martin Long
Claim: 01-6596-564
Page 19

Q. But how much money out of the settlement do you have now, today?
A. Myself I got about $6,000.

Q. About 60 or six?
A. Six, six.

Q. Where's all the money gone?
A. Bills. And then I bought that car. I have like uh, then I splurged a little bit too for like the (inaudible).

Q. What did you do?
A. I mean I just I just bought a lot of stuff. But I they uh, I know 50 I had like $50,000 in credit card debts. I paid all that off.

Q. Well that ought to help your credit out a ton right there...
A. Oh yeah.

Q. Just getting that taken care of.
A. Then I paid off um, paid off her student loan which is uh...

Q. Was that for your wife's student loan? How much was that?
A. Right at 43.

Q. $43,000?
A. Um hum.

Q. And your wife, an- and your wife's...
A. Yeah I know, that's the same thing that the lawyer's secretary said.

Q. And she's leaving you after you paid off all that for her credit card and everything and...
A. I mean but I, but we already talked about all that ya know. Just, I just I knew once I get the money what I was gonna do with it.

Q. Okay.
A. So I wouldn't I wouldn't that part wasn't bothering me it just how she's just tryin' to just trip out a little bit now.

Q. What about now? What you going to do for money now?
A. I'm gonna live off of that and then I'm gonna uh, get that uh, still get my disability from VA, I don't I don't have no bills left.

Long/State Farm
SF1  00334

Statement Of: Martin Long
Claim: 01-6596-564
Page 20

Q.   Okay.  Well you said you said your mortgage is only $200 some dollars...
A.   $291.


Q.   What other bills do you have like currently now?
A.   Just that and uh, ya know, water, utility, insurance.


Q.   How much you average, how much you average on your utilities?
A.   Like $80 some dollars but Monday, I mean, I'm sorry, January, February and March always be like the high of the month (end of tape one side two, interview continues on tape two).


Q.   Okay, Mr. Long, this will continue our statement.  I put in a new tape and we did not discuss anything regarding your claim while I was doing that is that correct?
A.   Correct.


Q.   Okay.  Now so the $1,100 that you'll be receiving monthly from the disability from the army that should be sufficient then to pay for your monthly bills?
A.   Oh yeah.


Q.   Okay.
A.   I mean...


Q.   So you said you had no, do you have any liens filed against you?
A.   Liens?


Q.   Liens, in other words where you owe someone like let's say on those credit cards where if you didn't pay them they might have filed a lien through the court to try to get you to pay them?
A.   No, 'cause I was still paying 'em, slowly.


Q.   Slowly?  So in other words you you hadn't got in bad standing with them or anything like that?
A.   No.  I fell behind a lot though but I was I would always give 'em somethin' to keep from doing that ya know, until uh...


Q.   Have you ever filed bankruptcy before?
A.   No.


Q.   Has your wife?
A.   No.

Q.  Was your wife working while you were dis- disabled?
A.  Yes.


Q.  Where was she working?
A.  Well she was going to school and she just started working at uh, DHR.  Sh- she had uh she had just got a Master's Degree last May I think.


Q.  Where's she going to school?
A.  She went to school at Princeton Tide.


Q.  Princeton Tide?  You're not an Auburn guy then, everybody else...
A.  Well yeah I'm an Auburn Tide, I mean I'm Auburn, I don't like Alabama.


Q.  I was going to say, everybody I know around here is a Auburn guy.  So I don't guess I need telling you I'm a Georgia fan (inaudible)...
A.  (Inaudible).


Q.  They, you don't you don't have no...
A.  Georgia ain't bad.


Q.  So so what's DHR?  Is that Department of Human Resources with the State of Alabama?
A.  Right, um hum.


Q.  Well let's talk about us and your Corvette.  After you purchased it and I know you said that Ms. Lee over at Agent Deavers' office that she's got all the paperwork regarding the purchase.  Did the company you bought it from were they applying for a title for you to the Corvette or who was supposed to do that?
A.  I guess they was doin' it.


Q.  Okay.
A.  I mean they had to do it because they didn't tell me to do it so I'm pretty sure they...


Q.  Have you received anything yet on that?
A.  No sir.


Q.  February 19th I think that would have been obviously a weekend or two ago, what were you doing over in the Atlanta area?
A.  Just relaxin'.


Q.  Okay.  Do you go to Atlanta a good bit?
A.  No.

Q.    Okay.
A.    I just went 'cause I was just a lot of stuff had happened, I just got away for a minute.

Q.    Who'd you go with?
A.    Just me.

Q.    When did you leave to go to Atlanta?
A.    I left uh, that Friday evening.

Q.    Did you meet somebody in Atlanta?
A.    No.

Q.    Okay.  So what was the, you said just to relax what did you go there to do, just to...
A.    Just relax.  Like I said th- the weekend before that's when I got into it with that dude.  I just I just got away, just relaxed for a minute.

Q.    Okay.  Had you ever been to Atlanta before?
A.    Yeah.

Q.    So you know your way around Atlanta then a pretty good bit?
A.    No, not really.  It's a big city.

Q.    Yeah.  So how did you end up over in Lithonia, Georgia?
A.    I just uh, got off the uh, exit and just went to that hotel and just relaxed, I mean just this area I went to, wasn't no certain area.

Q.    Okay.  Where'd you go?
A.    To uh, I can't remember the name of the hotel but the the uh, I had the address.

Q.    So how did you choose the hotel?
A.    I mean, I just just got it.

Q.    Off the interstate?
A.    Yeah.

Q.    Well how did you go from, how do you go from Millbrook to Atlanta?
A.    85 uh, north and I get off on the 20 east and I got off uh, got up east and just got that hotel.

Q.    Okay.  Was that, when did you get there Friday night?

Statement Of: Martin Long
Claim: 01-6596-564
Page 23

Long/State Farm
SF1  00337

A.   Um hum.

Q.   Okay.
A.   So that's the address right there. But once you pull up the address, you can pull up the name on the hotel, 5400 uh...

Q.   Country Hearth, does that sound correct?
A.   Yeah, that's it.

Q.   Okay. Had you ever stayed there before?
A.   Yeah.

Q.   You've stayed at that same hotel before?
A.   Yeah.

Q.   Okay. How long ago was it?
A.   Probably uh, maybe about five, maybe about four or five months ago.

Q.   So when you got there Friday night and stayed what was that date, that Friday night, do you know the date?
A.   Huh uh, I can't remember the date.

Q.   Looks like Saturday the 19th? So you would have been there that Friday night the 18th then is that correct?
A.   Um hum, yeah.

Q.   So where'd you park your car?
A.   Kinda like, it was in the it wasn't directly in front of the door it was like at an angle but the camera on the door was lookin' right at it. I parked like right the way the camera was uh, pointin'.

Q.   So you did notice a surveillance camera is that when you say camera is that what you're referring to?
A.   Right.

Q.   And did you lock your car up?
A.   Yeah, I locked it.

Q.   Do you have an alarm system on the car?
A.   Yeah.

Q.    Does it work?
A.    Yeah.


Q.    So what all did you have with you that weekend?
A.    In the car?


Q.    Yeah.
A.    I had uh, clothes, jewelry and I had uh, had a weapon.


Q.    What type of weapon did you have?
A.    Another 45.


Q.    What's br- the make?
A.    It was uh, it was a Taurus, a PT145.


Q.    Taurus TT?
A.    Huh uh, Taurus...


Q.    Is that your personal property inventory form?
A.    Um hum.


Q.    Okay.
A.    I need to, I still haven't put none of the places on there but I after I read the side they said only do numbers the circle that (inaudible) had to put in there.  I don't have receipts for everything, I just got a receipt for a few things.


Q.    Okay.  So when you got there that Friday what time did you get there that Friday night, what time did you check into the hotel?
A.    Uh, I don't know maybe uh, maybe 10:00 somethin' 10:00 or 11:00 somethin' I think.


Q.    Is that P.M. or A.M. that Friday?
A.    P., P.M.


Q.    When did you discover your vehicle missing?
A.    That Saturday morning when I got up.


Q.    What time?
A.    I guess it was about uh, maybe 7:00, 8:00 somethin' like that.


Q.    Is that Georgia time or Alabama time?

A.    Georgia time.

Q.    What'd you do when you discovered it missing?
A.    I went down to the desk and uh...

Q.    Do you remember who you talked to at the desk?
A.    No, but I know the guys name, I mean, if you go there all you gotta do, I know they got a a uh, uh, I'm just sayin' I guess they got a clock in thing so they'd know who was on duty or whatever.

Q.    Was it Ram(sp?) does that sound right?
A.    I don't know that cats name.

Q.    Rag, Rog, Ram some of that sound, I know they got a lot of different people that work. So you went there what did you tell them?
A.    I told 'em my car got stolen.

Q.    Yeah, what made you go outside?
A.    I mean, nothing, I mean it just I just went outside.

Q.    In other words were you planning to go somewhere or?
A.    Yeah.

Q.    Where were you headed?
A.    I don't remember, I probably I probably was goin' to get me somethin' to eat.

Q.    Okay.  So so all this stuff you got listed here on your personal property inventory form you got a black leather jacket, you didn't have your jacket with you inside that night?
A.    Huh uh.

Q.    45 hollow hand gun, you've got the number here...
A.    I had one with me but I had I had left that that one in the car.

Q.    Where was it in the car?
A.    Like under, naw it was either under the seat of between uh, the uh, thing inside the uh, the little consol thing between the two seats.

Q.    Sitting down in the consol?
A.    Yeah.  It was kind of a small 45, short barrel.

Q.    $5,000 cash in the car?  You didn't take that inside with you that morning?
A.    That night?


Q.    Yeah, when you got there?
A.    Huh uh.


Q.    Where was the cash?
A.    Between the seats.


Q.    In the consol?  You got three suits, two pair of pants...
A.    Two pant suits.


Q.    To pant suits?
A.    That's just a pair of slacks and a shirt.


Q.    And a shirt?  Four pairs of shoes, four bracelets, three rings, one DVD plug in player and
      then one watch.  You had all that and you left every bit of that in the car, you didn't take
      any of that inside with you?
A.    No man.


Q.    What di- what did you have inside with you then?
A.    Nothing.  I wasn't plannin' on my stuff gettin' ripped off (inaudible).


Q.    In other words but when you got there that night did you not have all those suits and stuff
      in a in a luggage?
A.    A tote bag.  I had a tote bag.


Q.    Did you not take all that in with you?
A.    Huh uh.


Q.    So you just left all that in the car?
A.    Yep.


Q.    Well as I told you and I got a copy of the police report, the police report when you when
      you called the police that morning did you use your cell phone to call them or did you use
      the hotel phone?
A.    Cell phone.


Q.    Did you call 911?
A.    Yeah.

Q.   And did they come out to the scene?
A.   Nope, that's what's weird, they didn't even come out.


Q.   So they took the report over the phone?
A.   That's right.


Q.   Did you tell them everything that was missing, all the personal property, all the the stuff you had in the car?
A.   I didn't tell 'em that day because I talked to this girl and I was telling what was go- wh-what all I had missin' and also I got a uh, I told her I said I got a 45 in there I said but I I don't know the serial number and she said well just wait and uh, wait 'til you get back home so you can think of everything you had in the car and you just call back and and then do a uh, additional information form and yeah.


Q.   And you say this girl was she with DE Kalb County?
A.   Yeah.


Q.   Now did you have anybody with you at all?
A.   Somebody, well there was a dude down in there that uh, I mean everybody was like kinda kinda got into it far as like when I said my car was gone a lot of it just uh, guests was just...


Q.   But you were by yourself you said, nobody was with you, you didn't have a female, didn't have another male, nobody else was with you that night?  Is that a yes or a no?
A.   Yes.


Q.   So nobody was with you?
A.   No.


Q.   Okay.  So you said that some other people there were getting into it in other words what do you mean by that were they...
A.   I mean just tryin' to find out what was goin' on, like what happened with with uh, who stole your car and stuff like that.


Q.   Did you see any glass or anything in the parking lot?
A.   Yeah, there was glass right where my spot the spot where my car was.


Q.   Okay.  Did it like maybe out of the window or something or maybe where they...
A.   Yeah it had to come out of the window I guess.


Q.   Okay.
A.   I mean is the glass broken in my car?

Q. Well the T tops were missing. Did you have glass T tops?

A. Naw, I had a hard top. And then another thing that's really weird the dude that was on duty his story was different from the manager as far as why the camera wasn't on 'cause I'm thinking the camera was on.

Q. Did you ask him about the camera if that was...

A. Yeah actually the dude that was on duty I asked him I sa- I was like uh, I was like hey man I said my car got stolen and I said ain't that camera goin' and he was like, we- he was like well I don't know if it's on or not he said my manager ya know he said he'll be in later on. Then I said well okay well call your manager and let him know that uh, my car got stolen and he needs to come in and pull the camera. I'm thinkin' everything's straight. So when this manager did come in I talked to his manager, that dude was gone, I says hey I said is that a...

Q. Was that a man or woman that you talked to?

A. Man. I asked him I said is is that camera on? He was like uh, well me and the whoever that guy was that was on duty that I talked to said he said that they had did something to the CD-ROM or somethin' and and the camera was not on. And I was like well the other dude he didn't say that I said he just said that he didn't know whether it was on or not, to get with you. And then once he said once that manager said that story then that other dude came back on duty I went back to him and I said man I said why you say that camera wasn't on? He was like uh, you see me and the manager had moved the CD-ROM. I told him I said man you're damned lying and I just left.

Q. Okay. So was that...

A. Which I told the police that too.

Q. On the phone?

A. Yeah, 'cause it I mean ev- ev- everything seemed like it was a set up.

Q. What do you think that guy there at the hotel had something to do with your car coming up missing?

A. Yeah man. I told the police that too on the phone. But they still, they wou- they wouldn't even send nobody out.

Q. So when you bought the car how many keys did you get?

A. I got two keys.

Q. And is that, there's one set where's the other set?

A. I don't know. I'm thinkin' I must have either left 'em in that car or somewhere. I don't know where the other set of keys at.

Q. Where was this set?

A.     That set was with me.

Q.     That's the set you had there that Saturday morning?
A.     Yeah.

Q.     You don't know what you did with your other set of keys?
A.     Huh uh.

Q.     No you can't you can't know, in other words you can't tell us anywhere where they might have been, like in other words did you lock them in your glove box or did you...
A.     I don't know I don't think I did. I mean, I could have I don't know, I don't know wh- where my other set of keys is.

Q.     Haven't you got a keyless entry to it?
A.     Um hum.

Q.     Is that correct?
A.     Yes.

Q.     How many miles were on the vehicle?
A.     When I bought it?

Q.     Right.
A.     I think it was 68. Like how it is on that pink one that that Lee guy...

Q.     68,000?
A.     Um hum.

Q.     Had any problems with the vehicle?
A.     Huh uh.

Q.     Since you bought it have you had it serviced? Did you ever have the oil changed or anything?
A.     Yeah, I've got the oil changed.

Q.     Who did that?
A.     Uh, Chevrolet in Prattville. And I bought some tires for it which I got them receipts right here.

Q.     Is that the Chevrolet dealership in Pratt?

A.    Um hum.

Q.    What was the name of that dealership?  You got your receipt there for that?
A.    No, not for the oil change.  I just got my receipt for my...

Q.    For your tires?
A.    For the tires and I had to something else to get the put something on to get the uh, alignment.

Q.    Did it have factory wheels and tires on it?
A.    Yes.

Q.    The (inaudible) alignment what they've got on this?
A.    Um, I'll give you a copy of what I've got, take a look.

Q.    Yeah, can I have one of the copies of that?
A.    Yeah you can have a copy of each one of 'em.

Q.    All right.
A.    Here's the green copy.

Q.    Okay.  So this shows some Firehawks?
A.    Rimflex.  Them suckers was high.

Q.    So that means you bought a total...
A.    Four I think.

Q.    You got four?  Looks like they're different invoices, looks like you got...
A.    No, just two for the back and two for the front.

Q.    Okay.  And there's a Chevrolet, what's the Chevrolet dealership in Prattville?
A.    I think it's uh, I thought I wrote down the name of that, I think it's Larry Puckett(sp?).

Q.    Okay.  Now is that where you bought it, you said you bought it from City Auto though?
A.    Yeah, that's whe- that's where I got the um, oil changed at.

Q.    Okay.  Did, any problems with the car?
A.    No.

Q.    Car run pretty good, seem like it was in pretty good shape?
A.    Yeah it was in good shape.  I wouldn't have bought it (end of tape two, side one).

Q.    Okay, Mr. Long, this will continue our statement.  I turned the tape over and we did not discuss anything regarding the claim when I turned the tape over is that correct?
A.    Correct.

Q.    Now per these invoices it's got mileage 70,000.  And then this invoice here for the thrust alignment says 70,804.  So and that's let's see the date, one's 2-18 and one's 2-10.  So as of February 18th, so basically that Friday this thing's dated, invoice date's February the 18th.  So Friday the 18th you had it aligned at Big Ten Tire and then yo- did you go from then you went to Atlanta?
A.    Yes.

Q.    (Inaudible).
A.    I cleaned it up first.

Q.    Okay.  And then you went to Atlanta?
A.    Yeah.

Q.    Okay.  Any, did you have any damage to the vehicle whatsoever?
A.    Huh uh.

Q.    Notice any scrapes, dents, dings, any problems?
A.    No (inaudible) was clean.

Q.    Car ran pretty good you said?
A.    Yeah.

Q.    Were the tires brand new or were they used tires that you bought?
A.    Brand new tires.

Q.    Brand new tires.  And you said they were the factory Corvette wheels on it?
A.    Yeah.  They were just chrome but they was the same they was Vet rims, they was just chrome Vet rims.

Q.    When did you find out that the vehicle was was recovered?
A.    Well I, when you left me a message and and uh...

Q.    So the police never even called you did they?
A.    Well they called that same day.  But once I got home they had a message on the phone.

Statement Of: Martin Long
Claim: 01-6596-564
Page 32

Q. Okay. And obviously you said you've contacted the police and to file a supplemental report. Is all the information you've got on your personal property inventory is that, did you tell the police all that?

A. Yeah.

Q. Okay. I want to show you a picture of your car.

A. No man, them ain't the rims on that. Oh they switched rims on it.

Q. Here's a close up you got of the rims. That's not the wheels you had on the wheels?

A. No. Them rims don't even come on these cars no more. That's them them rims there is like them them them uh, early '90 rims.

Q. Did you ever have a tag on the car?

A. Yeah.

Q. What, was it a Alabama tag or?

A. Yeah, it was this tag right here. I'll have to go get a copy of that, of my tags.

Q. Yeah.

A. There's a Desert Storm tag right there. I mean you can get...

Q. Yeah, I'm going to get a copy of that also. Here's a picture of the engine compartment. The, there's the interior of the vehicle. The I mean, the the front of the vehicle they took the hard top part off. It's missing. Battery, and they stole the seats. You can see there where the seats are gone out of the vehicle.

A. Damn. Well I guess...

Q. One thing I'm going to do and I need to get obviously need to get permission from you since you're the owner of the vehicle, we went ahead and we we've moved the vehicle and we've moved it as I told you before we started...

A. Yeah (inaudible) my car where I bought it from, City Auto Sales.

Q. City Auto?

A. Yeah.

Q. Okay. Well we've moved it to a a salvage yard called Verastar and I'm going to have someone look at your car to see how they would have driven the car to see if it's been, the ignition's been defeated in the vehicle. And I'm going to have that done hopefully in the next couple of days. Have you ever had any other prior vehicles stolen before?

A. Yeah.

Q. When was that?

A.   I had another car stolen out of my yard but they found it.

Q.   And was that something you filed with State Farm?
A.   Um hum.

Q.   Did you receive payment for that?
A.   Yeah, but it but it uh, but they didn't get nothing but the the rims and tires off that uh, off that car.

Q.   When was that?
A.   Um, it's been a few years ago.  I know they got copies of it it was since I've been living at the same address.

Q.   What kind of car?
A.   It was a Vet.  A '92 black Corvette.  My sister got it now.

Q.   So they got the wheels and tires off of it?
A.   Yeah.

Q.   Now did, you said you received, did they just pay you then for the wheels and tires is that what State Farm did?
A.   Yeah.

Q.   And then, but the car itself was okay?
A.   Um hum.

Q.   What about any other ever filed a, is your home your mobile home insured with State Farm?
A.   Yeah, everything.

Q.   Everything?  Your mobile home you ever had any break-ins or ever filed any other thefts claims regarding your mobile home?
A.   Huh uh.  On- only claim I've I've filed with them was uh, when the hail damage came.

Q.   Let me ask you, did you have anything to do with the disappearance of your Corvette?
A.   No.

Q.   What about the, now from apparently the previous claim reps that were involved in it spoke with someone at the hotel and they told that apparently it appeared you had some people with you?  Is that, no you didn't, once again you did not have any, in other words

they said that it looked like it appeared that you did have someone with you that morning?

A.    No.

Q.    Okay.  And you no specific reason why you were in Atlanta, you weren't going there shopping and you weren't going there to visit people?

A.    I was relaxin'.

Q.    Okay.  How did you get home?

A.    I got a rental car.

Q.    Who'd you get it with?

A.    With uh, Enterprise, same people that in- well the insurance got it for me.

Q.    Did you call, when did you call State Farm and report it?

A.    The same morning.  Well I called my niece and um, she had uh, called those people and I was on three-way.

Q.    Okay.  Did your niece call your agent's office or what?

A.    Well no, we called this 1-800 I'll show you the number that we called.  And they hooked me up with this um, rental company.  I think she must have called 'em.  Yeah, my niece did call 'em.  But then again that might be the number right there.  I got so many numbers on here, that 1-888-801-6609.  I'm not sure.

Q.    888-...

A.    801.

Q.    801-6609.  So yo- your niece called the rental company for you in Atlanta?

A.    No, she called the State Farm...

Q.    Okay.

A.    The State Farm people called the uh, rental people.

Q.    And when did you come back to Georgia?

A.    Hum?

Q.    When did you come back to I mean to Alabama, excuse me?

A.    Um, Sunday.

Q.    Did you stay in the motel again that Saturday night?

A.    Yeah, I stayed in it.

Q.  Where did you go while you was in town that weekend?
A.  Nowhere really.  Just went to get somethin' to eat and just I just chilled out.

Q.  'Cause obviously that's a long drive to go just to chill out, I mean you can go to Birmingham or somewhere a lot closer than that but...
A.  Yeah, but I didn't want to go to Birmingham.

Q.  So, the items that you've got on your personal property you filed a homeowners claim related to the theft of all these items is that correct?
A.  Yeah, well Mike Deavers did that for me 'cause I didn't I really didn't understand.  I didn't know that like for jewelry no matter what you had you only get $1,000.  For money no matter how much it is you only get $200.  I didn't know none of that so he went on explaining the other part to me and put that claim in for me.

Q.  What all receipts do you have on the items?  You got...
A.  I just got receipts for them uh, clothes.

Q.  Where's this from?
A.  Looking Good, a place downtown.  You can get a copy of that.

Q.  Yeah, let me get a copy.  I wa- and on that I'll need the top copy if you don't mind so and I can run off a copy today if you need it?
A.  Oh well I can go ahead and keep this.

Q.  Just (inaudible), no you can't because let me just run off a copy.  I can give this back to you...
A.  Okay.

Q.  I just want the top because it's stamped with the information right there.  What else you got there?
A.  I got this uh, pawn shop where I had paid for one of my bracelets.

Q.  When did you get this stuff from Looking Good?
A.  This month, sometime this month.  And this has got three suits?  Two pant suits and four shoes.

Q.  So you bought all that this month from them?
A.  Yeah.

Q.  What is this what is this for?
A.  This right here is the bracelet I bought.  One of the bracelets that got too.  You can call that right there.

Q.  Okay.  Which one...
A.  Anyway that's a copy I'm sayin' you can keep that copy.


Q.  Okay.  Good deal.  This is, looks like '03?
A.  Yeah I bought that in '03.


Q.  And what else?
A.  And that's the um, the 45 that I got.


Q.  Is this gun registered?
A.  Oh, yeah.  All my guns are registered.


Q.  Now you said in the first part when we first started the statement that you had a a 45 but it wasn't the one...
A.  Stolen.


Q.  You said was not stolen.  So you've got, you own two 45's then?
A.  I own three 45's.


Q.  Three 45's?  Less the one that was in the car?
A.  Yeah.


Q.  Do you have any receipts for the for the jewelry besides the...
A.  Nope that's it.


Q.  Where did you purchase all of this the rest of the items you got on here?  You got a...
A.  I bought lots of 'em off the street.


Q.  So th- you got the bracelet down but you said there's four bracelets, this is just for one bracelet correct?
A.  Yeah, um hum.


Q.  So you don't have a receipt for three of the bracelets?
A.  Huh uh.  I know one of the bracelets I bought when I was in uh, Ohio one time.


Q.  What about for the rings, have you got any receipts for the rings?
A.  No.


Q.  What about for the DVD player?
A.  Huh uh.

Q.    Was it just a plug in DVD player?
A.    To the cigarette lighter.  Yeah.

Q.    Okay.  Did you have it plugged at the time or was it unplugged?
A.    It was unplugged, wasn't plugged in.

Q.    And the watch, what about the receipt on the watch?
A.    Don't have that.

Q.    What type of watch was it?
A.    I don't know the name but I think it was it was uh, it was kinda silver but it it kinda matched this bracelet I had 'cause it had uh, little diamonds around the uh, around the band of it.

Q.    You don't know the make of it or anything?
A.    Huh uh.

Q.    In other words, in other words like it's a Fossel, and like the watch you got what what...
A.    Timex.  It's a Timex.

Q.    Okay.
A.    Can I get copies of this?

Q.    Huh?
A.    Can I get copies of these?

Q.    Huh uh you can have those.
A.    Oh, okay.

Q.    Let me see what all you got there 'cause I was going to, yeah that's that.  You want one of the wheels, you want that?
A.    Yeah I I'll keep that.  You can um...

Q.    And I'm going to get you a copy of the police report.  Now we got a copy of the re-recovery, do you have any friends or family or anybody in the Lithonia area where this took place?
A.    No.

Q.    No relatives, no friends, no family members?
A.    Huh uh.

Q.    Did you make any calls while you were there that evening?
A.    No.

Q.    That Friday night?  So when you got to the hotel you just went straight got your room, didn't go anywhere, didn't go out to eat, didn't go...
A.    Huh uh.

Q.    Do nothing like that?
A.    Let's see did I go get something to eat or not, yeah I think I went by Popeye's and got somethin' to eat.

Q.    Okay.  Did you charge your room on a credit card or?
A.    Huh uh, I paid cash...

Q.    Okay.
A.    I didn't charge nothing.

Q.    Have you got anything, did you get a copy of the receipt from the hotel?
A.    Huh uh.

Q.    You didn't get anything regarding that and regarding your stay?  Anything to so you wouldn't have made any calls in then that Friday evening or anything?
A.    Huh uh.

Q.    Okay.  We may need you to get us a copy, a detailed copy of your your call logs then to show that night.
A.    Oh, okay.

Q.    Is there anything, I know we've gone over a bunch of stuff Mr. Long, is there anything you want to add about the vehicle or the the condition of the car or anything that we haven't discussed?
A.    No.

Q.    Okay.  Are the remarks you've made in this recording true to the best of your knowledge?
A.    Yes.

Q.    And you're aware that we've recorded this conversation?
A.    Yes.  Okay.  This concludes our statement.

TEXF/6596564.321

Long/State Farm
SF1   00353

Statement Of: Martin Long
Claim: 01-6596-564
Page 39

 

Long/State Farm
SF1   00354

PRIOR CLAIM
01-6596-758

# ADDITIONAL VICTIMS

CASE NUMBER
05-023612

| VICTIMS NAME | RACE | SEX | AGE | RESIDENCE PHONE | BUSINESS PHONE |
|---|---|---|---|---|---|
| LONG, MARTIN | B | M | 36 | 334-290-0344 | 334-202-9599 |

ADDRESS
2752 CAROLINE DR                MILLBROOK        AL  36054-

CENSUS TRACT

EMPLOYER OR OCCUPATION
UNKNOWN OR NOT STATED

STUDENT?  [ ]YES  [X]NO    IF YES, NAME VICTIM'S SCHOOL

---

VICTIMS NAME

ADDRESS

RACE  SEX  AGE    RESIDENCE PHONE    BUSINESS PHONE

CENSUS TRACT    EMPLOYER OR OCCUPATION

STUDENT?  [ ]YES  [ ]NO    IF YES, NAME VICTIM'S SCHOOL

---

VICTIMS NAME

ADDRESS

RACE  SEX  AGE    RESIDENCE PHONE    BUSINESS PHONE

CENSUS TRACT    EMPLOYER OR OCCUPATION

STUDENT?  [ ]YES  [ ]NO    IF YES, NAME VICTIM'S SCHOOL

---

VICTIMS NAME

ADDRESS

RACE  SEX  AGE    RESIDENCE PHONE    BUSINESS PHONE

CENSUS TRACT    EMPLOYER OR OCCUPATION

STUDENT?  [ ]YES  [ ]NO    IF YES, NAME VICTIM'S SCHOOL

---

VICTIMS NAME

ADDRESS

RACE  SEX  AGE    RESIDENCE PHONE    BUSINESS PHONE

CENSUS TRACT    EMPLOYER OR OCCUPATION

STUDENT?  [ ]YES  [ ]NO    IF YES, NAME VICTIM'S SCHOOL

---

VICTIMS NAME

ADDRESS

RACE  SEX  AGE    RESIDENCE PHONE    BUSINESS PHONE

CENSUS TRACT    EMPLOYER OR OCCUPATION

STUDENT?  [ ]YES  [ ]NO    IF YES, NAME VICTIM'S SCHOOL

---

VICTIMS NAME

ADDRESS

RACE  SEX  AGE    RESIDENCE PHONE    BUSINESS PHONE

CENSUS TRACT    EMPLOYER OR OCCUPATION

STUDENT?  [ ]YES  [ ]NO    IF YES, NAME VICTIM'S SCHOOL

---

VICTIMS NAME

ADDRESS

RACE  SEX  AGE    RESIDENCE PHONE    BUSINESS PHONE

CENSUS TRACT    EMPLOYER OR OCCUPATION

STUDENT?  [ ]YES  [ ]NO    IF YES, NAME VICTIM'S SCHOOL

---

VICTIMS NAME

ADDRESS

RACE  SEX  AGE    RESIDENCE PHONE    BUSINESS PHONE

CENSUS TRACT    EMPLOYER OR OCCUPATION

STUDENT?  [ ]YES  [ ]NO    IF YES, NAME VICTIM'S SCHOOL

Long/State Farm
SF1   00370

ADDITIONAL VEHICLES

CASE NUMBER
05-023612

| | TAG NUMBER | STATE | YEAR | V.I.N. |
|---|---|---|---|---|
| STOLEN | | AL | | 1G1YY22G9Y5132554 |

| | YEAR | MAKE | MODEL | STYLE | COLOR |
|---|---|---|---|---|---|
| RECOVD | 2000 | CHEVROLET | CORVETTE | 2D | BLUE |
| SUSPECTS | | | | | |

MOTOR SIZE (CID)          AUTO   MAN
TRANS   □   □          INSURED BY

| | TAG NUMBER | STATE | YEAR | V.I.N. |
|---|---|---|---|---|
| STOLEN | | AL | | 1G1YY22G9Y5132564 |

| | YEAR | MAKE | MODEL | STYLE | COLOR |
|---|---|---|---|---|---|
| RECOVD | 2000 | CHEVROLET | CORVETTE | 2D | BLUE |
| SUSPECTS | | | | | |

MOTOR SIZE (CID)          AUTO   MAN
TRANS   □   □          INSURED BY

| | TAG NUMBER | STATE | YEAR | V.I.N. |
|---|---|---|---|---|
| STOLEN | | | | |

| | YEAR | MAKE | MODEL | STYLE | COLOR |
|---|---|---|---|---|---|
| RECOVD | | | | | |
| SUSPECTS | | | | | |

MOTOR SIZE (CID)          AUTO   MAN
TRANS   □   □          INSURED BY

| | TAG NUMBER | STATE | YEAR | V.I.N. |
|---|---|---|---|---|
| STOLEN | | | | |

| | YEAR | MAKE | MODEL | STYLE | COLOR |
|---|---|---|---|---|---|
| RECOVD | | | | | |
| SUSPECTS | | | | | |

MOTOR SIZE (CID)          AUTO   MAN
TRANS   □   □          INSURED BY

Long/State Farm
SF1   00371

OTHERS INVOLVED

CASE NUMBER
05-023812

| INVOLVEMENT TYPE | NAME | ADDRESS | PHONE NUMBER |
|---|---|---|---|
| COMPLAINANT | LONG, MARTIN | 2752 CAROLINE DR MILLBROOK AL 36054- | 334-290-0344 |
| COMPLAINANT | DKPDDKPD DEKALB COUNTY POLICE DEPARTMENT | 3630 CAMP CIR DECATUR GA 30032- | 678-937-6301 |
| COMPLAINANT | LONG, MARTIN | 2752 CAROLINE DR MILLBROOK AL 36054- | 334-290-0344 |

Long/State Farm
SF1   00372

## INCIDENT PROPERTY

CASE NUMBER
05-023612

| STATUS | CLASS | DESCRIPTION / MAKE / MODEL / SERIAL | QTY | VALUE | RELATED TO |
|--------|-------|-------------------------------------|-----|-------|------------|
| | A | VEHICLES, CHEVROLET<br>CORVETTE | 1 | $28,000.00 | VICTIM 1 LONG, MARTIN |
| | A | VEHICLE, CHEVROLET<br>CORVETTE, 1G1YY22G9Y5132554 | 1 | $10,000.00 | COMPLAINANT 1 DEKALB COUNTY POLIC |
| | E | 3/4-LENGTH BLACK LEATHER MENS JACKET | 1 | $250.00 | VICTIM 1 LONG, MARTIN |
| | E | 5 MENS SUITES/PANTS SUITES | 5 | $1,500.00 | VICTIM 1 LONG, MARTIN |
| | L | 4 PAIRS MENS SHOES | 4 | $1,190.00 | VICTIM 1 LONG, MARTIN |
| | B | CASH | 1 | $5,000.00 | VICTIM 1 LONG, MARTIN |
| | G | DVD PLAYER | 1 | $160.00 | VICTIM 1 LONG, MARTIN |
| | I | 45 CALIBUR PT145 TAURUS AUTOMATIC NWD52402, TAURUS 45<br>PT145, NWD52402 | 1 | $360.00 | VICTIM 1 LONG, MARTIN |
| | C | 4 GOLD MENS BRACELETS | 4 | $2,500.00 | VICTIM 1 LONG, MARTIN |
| | C | 3 GOLD MENS RINGS | 3 | $1,200.00 | VICTIM 1 LONG, MARTIN |
| | C | SILVER MENS WATCH W/DIAMONDS AROUND BAND | 1 | $1,500.00 | VICTIM 1 LONG, MARTIN |

Long/State Farm
SF1   00373

# INCIDENT REPORT

**CASE NUMBER:** 05-023612

**AGENCY ID (ORI):** GA GA0440300    **SA**

| INCIDENT TYPE | COUNTS | INCIDENT CODE |
|---|---|---|
| THEFT BY TAKING 16-1-2 | 1 | DKF D |
| STOLEN VEHICLE RECOVERED | 1 | NCNC |
| THEFT BY TAKING AUTO 16-8-2 | 1 | DKF D |

**PREMISE TYPE**
| 1 HIGHWAY | 5 SVC STATION |
| 2 CONVENIENCE STORE | 6 BANK |
| Y COMMERCIAL | 8 RESIDENCE |
| 7 SCHOOL CAMPUS | 9 ALL OTHER |

**INCIDENT LOCATION:** 8400 FAIRINGTON RD LITHONIA GA    **LOC CODE:** 481

**WEAPON TYPE**
| 1 GUN | 2 KNIFE/CUTTING TOOL |
| 3 HANDS/FIST, ECT. | 4 OTHER |

**INCIDENT DATE:** 02/19/2005  **TIME:** 08:30  **DATE:** To 02/19/2005  **TIME:** 09:30

**STRANGER TO STRANGER:** YES Y   NO □   UNK □

**COMPLAINANT:** LONG, MARTIN    **ADDRESS:** 2752 CAROLINE DR MILLBROOK AL 36054-    **PHONE NUMBER:** 334-290-0344

**VICTIMS NAME:** LONG, MARTIN    **RACE:** B  **SEX:** M  **AGE:** 38    **RESIDENCE PHONE:** 334-290-0344    **BUSINESS PHONE:** 334-202-9598

**ADDRESS:** 2752 CAROLINE DR MILLBROOK AL 36054-    **CENSUS TRACT:**    **EMPLOYER OR OCCUPATION:** UNKNOWN OR NOT STATED

**STUDENT?** □ YES  Y NO   IF YES, NAME VICTIM'S SCHOOL

**NAME:** UNKNOWN    **RACE:** **SEX:** **DATE OF BIRTH:** **AGE:**

**WANTED  ADDRESS:** GA    **CENSUS TRACT:**    **HEIGHT:** **WEIGHT:** **HAIR:**

**WARRANT  CHARGES:**    **COUNTS:** 1  **OFFENSE CODE:** DKPD    **OFFENSE/ARREST:** 2

| 1 CITY |
| 2 COUNTY |
| 3 STATE |
| 4 OUT ST. |
| 5 UNKNOWN |

**ARREST:**

**TOTAL NUMBER ARRESTED:** 0    **ARREST AT OR NEAR OFFENSE SCENE:** YES □  NO Y    **DATE OF OFFENSE:** 02/19/2005

**TAG NUMBER:**    **STATE:** AL  **YEAR:**    **V.I.N.:** 1G1YY22G9Y5132554

STOLEN
Y RECOVD  **YEAR:** 2000  **MAKE:** CHEVROLET  **MODEL:** CORVETTE  **STYLE:** 2D  **COLOR:** BLUE
SUSPECTS

**MOTOR SIZE (CID):**    **AUTO** TRANS  **MAN.**    **INSURED BY:**

**NAMES:**    **ADDRESS:**    **PHONE NUMBER:**

| | VEHICLES | CURRENCY, NOTES, ETC | JEWELRY, PREC. METALS | FURS |
|---|---|---|---|---|
| STOLEN | $18,000.00 | $5,000.00 | $4,700.00 | |
| RECOVERED | $10,000.00 | | | |

**PROPERTY RECOVERY INFO ONLY**
| 1 JURISDICTION |
| 2 CITY |
| 3 COUNTY |
| 4 STATE |
| 5 OUT ST. |
| 6 UNKNOWN |

**THEFT/RECOVERY:** 2   **DATE OF THEFT:** 02/19/2005

| | CLOTHING | OFFICE EQUIP. | TV, RADIO, ETC | HOUSEHOLD GOODS |
|---|---|---|---|---|
| STOLEN | $1,750.00 | | $180.00 | |
| RECOVERED | | | | |

| | FIREARMS | CONSUMABLE GOODS | LIVESTOCK | OTHER | TOTAL |
|---|---|---|---|---|---|
| STOLEN | $350.00 | | | $1,100.00 | $41,060.00 |
| RECOVERED | | | | | $10,000.00 |

**LOGIC ENTRY** □ WARRANT  □ MISSING PERSONS  □ VEHICLE  □ ARTICLE  □ BOAT  □ GUN  □ SECURITIES

VEHICLES

**DID INVESTIGATION INDICATE THAT THIS INCIDENT WAS DRUG-RELATED?** □ YES  Y NO
**IF YES PLEASE INDICATE THE TYPE OF DRUG(S) USED BY OFFENDER**
□ 1 - AMPHETAMINE  □ 2 - BARBITURATE  □ 4 - COCAINE  □ 4 - HALLUCINOGEN  □ 5 - HEROIN
□ 6 - MARIJUANA  □ 7 - METHAMPHETAMINE  □ 8 - OPIUM  □ 9 - SYNTHETIC NARCOTIC  □ U - UNKNOWN

**REQUIRED DATA FIELDS FOR CLEARANCE REPORT:** □ CLEARED BY ARREST  □ EXCEPTIONALLY CLEARED  □ UNFOUNDED

**REPORT DATE:** 02/19/2005

**DATE OF CLEARANCE:**    Y ADULT  □ JUVENILE

******************************************

**Narrative Title:** INITIAL REPORT
**Date Entered:** 2/19/2005 11:17:42 AM

Long/State Farm
SF1  00374

**REPORTING OFFICER:** C A WIMBERLY    **NUMBER:** 2978    **APPROVING OFFICER:**    **NUMBER:**

DEKALB COUNTY POLICE DEPARTMENT    **Narrative: Page 2**
GA0440200
Date / Time: 2/19/2005 9:30:18 AM
Case Number: 05-023612
Description: 7
Officer Name/ID: C A WIMBERLY/2378
By:
Time Printed: 3/4/2005 5:03:38 PM


SPOKE TO VICTIM MARTIN LONG WHO ADVISED AN UNKNOWN SUSPECT STOLE HIS 2000 CHEVROLET CORVETTE UNKNOWN ALABAMA TAG. MR LONG SAID HE PARKED HIS VEHICLE IN THE PARKING LOT OF COUNTRY HEART INN & SUITES EARLIER THIS DATE AND WHEN HE RETURNED HIS VEHICLE WAS GONE.
THE VEHICLE WAS NOT PLACED ON NCIC. MR LONG WAS ADVISED TO CONTACT US WHEN HE GET EITHER THE CORRECT REGISTRATION OR VEHICLE IDENTIFICATION NUMBER FOR THE VEHICLE.


***********************************
Narrative Title: INITIAL REPORT
Date Entered: 2/26/2005 1:37:05 AM


ON 02/25/2005 (FRIDAY) I RESPONDED TO CLIFTON SPRINGS MANOR AND JAYNES VALLEY DR IN REFERENCE TO AN ABANDONED VEHICLE. UPON ARRIVAL, I OBSERVED A GRAY CHEVROLET CORVETTE THAT WAS MISSING ITS T-TOP ROOF AND THE SEATS.
WHEN I RAN THE VIN, THE VEHICLE CAME BACK STOLEN OUT OF DEKALB COUNTY POLICE DEPARTMENT. THE VEHICLE WAS CONFIRMED BY OPERATOR CARRIE.
THE VEHICLE WAS IMPOUNDED TO TOP
BY...


***********************************
Narrative Title: SUPPLEMENTAL NARRATIVE
Date Entered: 3/2/2005 12:39:53 PM


VICTIM - MARTIN LONG ADDED INFORMATION TO 05 023612. ACCORDING TO MR. LONG THE FOLLOWING ITEMS WERE IN HIS VEHICLE WHEN IT WAS STOLEN. A 3/4-LENGTH MENS BLACK LEATHER JACKET VALUED AT $250.00, A DVD PLAYER VALUED AT $160.00, A 45 CALIBUR AUTOMATIC PT145 TAURUS FIREARM, SERIAL #NWD52402 VALUED AT $350.00, $5000.00 CASH (IN CENTER CONSOLE), 3 MENS SUITES AND 2 MENS PANTS SUITES VALUED AT $1500.00, 4 PAIRS MENS SHOES VALUED AT $1100.00, 4 GOLD MENS BRACELETS VALUED AT $2500.00, 3 GOLD MENS RINGS VALUED AT $1200.00, AND 1 SILVER MENS WATCH WITH DIAMONDS AROUND THE BAND VALUED AT $1000.00.


Long/State Farm
SF1   00375

# DEKALB COUNTY POLICE DEPARTMENT

# AUTO THEFT UNIT

PHONE NUMBER (404) 294-2036    FAX NUMBER (404) 294-2881

TO: _____TODD SMITH_____

FROM:_____DET. FITZPATRICK_____

Comments:

# AUTO THEFT, METRO ATLANTAS FAVORITE GROUP PARTICIPATION SPORT!!

Long/State Farm
SF1   00376

# INCIDENT REPORT

| SA | GA ga0440200 | | CASE NUMBER 05-023612 |
|---|---|---|---|

**EVENT**

INCIDENT TYPE: THEFT BY TAKING 16-8-2

COUNTS: 1

INCIDENT CODE: DKPDPALSDF

PREMISE TYPE:
- 1 HIGHWAY
- 2 CONVENIENCE STORE
- ■ COMMERCIAL
- 7 SCHOOL CAMPUS
- 3 SVC. STATION
- 4 BANK
- 5 RESIDENCE
- 8 ALL OTHER

INCIDENT LOCATION: 5400 FAIRINGTON ROAD 217 LITHONIA

LOC CODE: 481

INCIDENT DATE: 02/19/2005   TIME: 09:30   To   DATE: 02/19/2005   TIME: 09:30

STRANGER TO STRANGER: YES ■   NO   UNK

WEAPON TYPE:
- 1 GUN
- 2 HANDS/FIST, ECT.
- 3 KNIFE CUTTING TOOL
- 4 OTHER

COMPLAINANT: LONG, MARTIN

ADDRESS: 2752 CAROLINE DRIVE MILLBROOK AL 36054-

PHONE NUMBER: 334-290-0344

**VICTIM**

VICTIMS NAME: LONG, MARTIN

RACE: B   SEX: M   AGE: 36

RESIDENCE PHONE: 334-290-0344   BUSINESS PHONE: 334-202-9599

ADDRESS: 2752 CAROLINE DRIVE MILLBROOK AL 36054-

CENSUS TRACT:

EMPLOYER OR OCCUPATION: UNKNOWN OR NOT STATED

STUDENT?   YES   ■ NO   IF YES, NAME VICTIMS SCHOOL:

**OFFENDER**

NAME: UNKNOWN

RACE:   SEX:   DATE OF BIRTH:   AGE:

WANTED   ADDRESS: GA

CENSUS TRACT:   HEIGHT:   WEIGHT:   HAIR:   EYES:

CHARGES: THEFT BY TAKING 16-8-2

COUNTS: 1   OFFENSE CODE: DKPDPALSDF   OFFENSE/ARREST: 2

JURIS.:
- 1. CITY
- 2. COUNTY
- 3. STATE
- 4. OUT OF STATE
- 5. UNKNOWN

ARREST

TOTAL NUMBER ARRESTED: 0

ARREST AT OR NEAR OFFENSE SCENE:   YES   NO ■

DATE OF OFFENSE: 02/19/2005

**VEHICLE**

- ■ STOLEN
- RECOVD
- SUSPECTS

TAG NUMBER:   STATE: AL   YEAR:   V.I.N.: 1G1YY22G9Y5132554

YEAR: 2000   MAKE: CHEVROLET   MODEL: CORVETTE   STYLE: 2D   COLOR: BLUE

MOTOR SIZE (CID):   TRANS   AUTO   MAN.   INSURED BY:

**WITNESS**

NAMES:   ADDRESS:   PHONE NUMBER:

**PROPERTY**

| | VEHICLES | CURRENCY, NOTES, ETC | JEWELRY, PREC. METALS | FURS | |
|---|---|---|---|---|---|
| STOLEN | $28,000.00 | | | | PROPERTY RECOVERY INFO ONLY |
| RECOVERED | | | | | JURISDICTION CODES |
| | CLOTHING | OFFICE EQUIP. | TV, RADIO, ETC | HOUSEHOLD GOODS | THEFT/RECOVERY   1. CITY  2. COUNTY  3. STATE |
| STOLEN | | | | | |
| RECOVERED | | | | | DATE OF THEFT   4. OUT OF STATE  5. UNKNOWN |
| | FIREARMS | CONSUMABLE GOODS | LIVESTOCK | OTHER | TOTAL |
| STOLEN | | | | | $28,000.00 |
| RECOVERED | | | | | |

**ADM.**

GCIC ENTRY:   WARRANT   MISSING PERSONS   VEHICLE   ARTICLE   BOAT   GUN   SECURITIES

**DRUG**

DID INVESTIGATION INDICATE THAT THIS INCIDENT WAS DRUG-RELATED? IF YES, PLEASE INDICATE THE TYPE OF DRUG(S) USED BY OFFENDER   YES   NO ■
- 1 - AMPHETAMINE
- 8 - MARIJUANA
- 2 - BARBITURATE
- 7 - METHAMPHETAMINE
- 3 - COCAINE
- 5 - OPIUM
- 4 - HALLUCINOGEN
- 9 - SYNTHETIC NARCOTIC
- 5 - HEROIN
- U - UNKNOWN

**CLEAR**

REQUIRED DATA FIELDS FOR CLEARANCE REPORT   CLEARED BY ARREST   EXCEPTIONALLY CLEARED   UNFOUNDED   REPORT DATE: 02/19/2005

DATE OF CLEARANCE:   ■ ADULT   JUVENILE

Title: INITIAL REPORT

Date Entered: 2/19/2005 11:22:43 AM

**NARRATIVE**

I SPOKE TO VICTIM MARTIN LONG WHO ADVISED AN UNKNOWN SUSPECT STOLE HIS 2000 CHEVROLET CORVETTE UNKNOWN ALABAMA TAG. MR LONG SAID HE PARKED HIS VEHICLE IN THE

REPORTING OFFICER: C A WIMBERLY   NUMBER: 2378

APPROVING OFFICER: REILLER, W A   NUMBER: 1249

Page 1 of 3

GCIC-UCR-004 (5/92)

Long/State Farm
SF1   00377

Narrative 1 Continuation: Page 1 of 1
Agency: DEKALB COUNTY POLICE DEPARTMENT Jurisdiction: ga0440200
Report Date/Time: 02/19/2005 09:30:18 AM
Incident/Case Number: 05-023612 Case Description: 7
Primary Officer Name/ID: C A WIMBERLY/2378 Approved By: REILLER, W A
Date/Time Printed: 02/28/2005 03:21:18 PM

ARKING LOT OF COUNTRY HEART INN & SUITES EARLIER THIS DATE AND WHEN HE RETURNED HIS VEHICLE WAS
;ONE.
HE VEHICLE WAS NOT PLACED ON NCIC. MR LONG WAS ADVISED TO CONTACT US WHEN HE GET EITHER THE
:ORRECT REGISTRATION OR VEHICLE IDENTIFICATION NUMBER FOR THE VEHICLE.

Long/State Farm
SF1   00378

INCIDENT PROPERTY

CASE NUMBER
05-023612

| STATUS | CLASS | DESCRIPTION / MAKE / MODEL / SERIAL | QTY | VALUE | RELATED TO |
|--------|-------|-------------------------------------|-----|-------|------------|
| S | A | VEHICLES, CHEVROLET CORVETTE | 1 | $28,000.00 | VICTIM 1 LONG, MARTIN |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Long/State Farm
SF1   00379

OTHERS INVOLVED

CASE NUMBER
05-023612

| INVOLVEMENT TYPE | NAME | ADDRESS | PHONE NUMBER |
|---|---|---|---|
| COMPLAINANT | LONG, MARTIN | 2752 CAROLINE DRIVE MILLBROOK AL 36054- | 334-290-0344 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Long/State Farm
SF1   00380

**INCIDENT REPORT**

AGENCY OR ORI: SA | GA GA0440200

CASE NUMBER: 05-023612

| INCIDENT TYPE | COUNTS | INCIDENT CODE | PREMISE TYPE |
|---|---|---|---|
| STOLEN VEHICLE RECOVERED | 1 | NONCOD | |

PREMISE TYPE:
1 HIGHWAY | 3 SVC. STATION
2 CONVENIENCE STORE | 4 BANK
5 COMMERCIAL | 8 RESIDENCE
7 SCHOOL CAMPUS | 8 ALL OTHER

**EVENT**

INCIDENT LOCATION | LOC CODE

INCIDENT DATE | TIME | TO | DATE | TIME | STRANGER TO STRANGER: YES ☐ NO ☐ UNK ☐

WEAPON TYPE:
1 GUN | 2 KNIFE CUTTING TOOL
3 HANDS/FIST, ECT. | 4 OTHER

COMPLAINANT: DEKALB COUNTY POLICE DEPARTMENT
ADDRESS: 3630 CAMP CIR DECATUR GA 30034-
PHONE NUMBER: 404-286-7911

**VICTIM**

VICTIMS NAME | RACE | SEX | AGE | RESIDENCE PHONE | BUSINESS PHONE

ADDRESS | CENSUS TRACT | EMPLOYER OR OCCUPATION

STUDENT? YES ☐ NO ☐ IF YES, NAME VICTIM'S SCHOOL

**OFFENDER**

NAME | RACE | SEX | DATE OF BIRTH | AGE

WANTED ADDRESS | CENSUS TRACT | HEIGHT | WEIGHT | HAIR | EYES

WARRANT CHARGES | COUNTS | OFFENSE CODE | OFFENSE/ARREST | JURIS.

ARREST

JURIS:
1. CITY
2. COUNTY
3. STATE
4. OUT OF STATE
5. UNKNOWN

TOTAL NUMBER ARRESTED | ARREST AT OR NEAR OFFENSE SCENE: YES ☐ NO ☐ | DATE OF OFFENSE

**VEHICLE**

STOLEN ☐
RECOV'D ■
SUSPECTS ☐

TAG NUMBER | STATE | YEAR | V.I.N. 1G1YY22G9Y5132554

YEAR 2000 | MAKE CHEVROLET | MODEL CORVETTE | STYLE 2D | COLOR SILVER

MOTOR SIZE (CID) | TRANS AUTO ☐ MAN. ☐ | INSURED BY

**WITNESS**

NAMES | ADDRESS | PHONE NUMBER

**PROPERTY**

| | VEHICLES | CURRENCY, NOTES, ETC | JEWELRY, PREC. METALS | FURS | PROPERTY RECOVERY INFO ONLY |
|---|---|---|---|---|---|
| STOLEN | | | | | |
| RECOVERED | $10,000.00 | | | | |
| | CLOTHING | OFFICE EQUIP. | TV, RADIO, ETC | HOUSEHOLD GOODS | THEFT/RECOVERY 2 2 |
| STOLEN | | | | | DATE OF THEFT |
| RECOVERED | | | | | |
| | FIREARMS | CONSUMABLE GOODS | LIVESTOCK | OTHER | TOTAL |
| STOLEN | | | | | |
| RECOVERED | | | | | $10,000.00 |

JURISDICTION CODES:
1. CITY
2. COUNTY
3. STATE
4. OUT OF STATE
5. UNKNOWN

**ADM**

GCIC ENTRY ☐ WARRANT ☐ MISSING PERSONS ☐ VEHICLE ☐ ARTICLE ☐ BOAT ☐ GUN ☐ SECURITIES ☐

**DRUG**

DID INVESTIGATION INDICATE THAT THIS INCIDENT WAS DRUG-RELATED? IF YES, PLEASE INDICATE THE TYPE OF DRUG(S) USED BY OFFENDER: YES ☐ NO ☐

☐ 1 - AMPHETAMINE  ☐ 2 - BARBITURATE  ☐ 3 - COCAINE  ☐ 4 - HALLUCINOGEN  ☐ 5 - HEROIN
☐ 6 - MARIJUANA  ☐ 7 - METHAMPHETAMINE  ☐ 8 - OPIUM  ☐ 9 - SYNTHETIC NARCOTIC  ☐ U - UNKNOWN

**CLEAR**

REQUIRED DATA FIELDS FOR CLEARANCE REPORT | CLEARED BY ARREST ☐ | EXCEPTIONALLY CLEARED ☐ | UNFOUNDED ☐ | REPORT DATE

DATE OF CLEARANCE | ADULT ■ | JUVENILE ☐

**NARRATIVE**

Title: **INITIAL REPORT**

Date Entered: 02/26/2005 1:12:59 AM

ON 02/25/2005 (FRIDAY) I RESPONDED TO CLIFTON SPRINGS MANOR AND JAYNES VALLEY DR IN REFERENCE TO AN ABANDONED VEHICLE. UPON ARRIVAL, I OBSERVED A GRAY CHEVROLET

REPORTING OFFICER | NUMBER | APPROVING OFFICER MEDLIN, T C | NUMBER 1696

Long/State Farm
SF1  00381

GCIC-UCR-004 (5/92)

Narrative 1 Continuation: Page 1 of 1
Agency: DEKALB COUNTY POLICE DEPARTMENT Jurisdiction: GA0440200
Report Date/Time: 02/25/2005 07:23:58 PM
Incident/Case Number: 05-023612 Case Description:
Primary Officer Name/ID: / Approved By: MEDLIN, T C
Date/Time Printed: 02/28/2005 03:21:40 PM

ORVETTE THAT WAS MISSING ITS T-TOP ROOF AND THE SEATS.

WHEN I RAN THE VIN, THE VEHICLE CAME BACK STOLEN OUT OF DEKALB COUNTY POLICE DEPARTMENT.  THE EHICLE WAS CONFIRMED BY OPERATOR CARRIE.

THE VEHICLE WAS IMPOUNDED TO TOP CAT.

Long/State Farm
SF1   00382

INCIDENT PROPERTY

CASE NUMBER
05-023612

| STATUS | CLASS | DESCRIPTION / MAKE / MODEL / SERIAL | QTY | VALUE | RELATED TO |
|---|---|---|---|---|---|
| R | A | VEHICLE, CHEVROLET CORVETTE, 1G1YY22G9Y5132554 | 1 | $10,000.00 | COMPLAINANT 1 DEKALB COUNTY POLICE DEPARTMENT |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Long/State Farm
SF1   00383

OTHERS INVOLVED

CASE NUMBER
05-023612

| INVOLVEMENT TYPE | NAME | ADDRESS | PHONE NUMBER |
|---|---|---|---|
| COMPLAINANT | DEKALB COUNTY POLICE DEPARTMENT | 3630 CAMP CIR DECATUR GA 30034- | 404-286-7... |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Long/State Farm
SF1   00384

# Evidence Report

| AGENCY:<br>DEKALB COUNTY POLICE DEPA... | ORI #:<br>GA0440200 | REPORT DATE / TIME<br>02/25/2005 07:23:58 PM | INCIDENT NO.<br>05-023612 | EVIDENCE # |
|---|---|---|---|---|
| OFFICER ID:<br>2493 | OFFICER NAME<br>THOMPSON, RW 2493 | OFFENSE DESCRIPTION:<br>STOLEN VEHICLE RECOVERED | | |
| SUSPECT: | | | ASSOCIATED NUMBER | |
| VICTIM: | | | ASSOCIATED NUMBER | |

ADDRESS / LOCATION WHERE EVIDENCE RECOVERED:
**3235 JAYNES VALLEY DR DECATUR, GA 30034- / 3235 JAYNES VALLEY DR**
COMMENTS:

OWNER NAME INFORMATION (Name: First, Middle, Last, Suffix)

OWNER ADDRESS INFORMATION (Address, Apartment, City, State, Zip, Phone)

OTHER OWNER NAME INFORMATION (Name: First, Middle, Last, Suffix)

OTHER OWNER ADDRESS INFORMATION (Address, Apartment, City, State, Zip, Phone)

| ITEM # | SUB ITEM # | ITEM STATUS | TEMP. STORAGE LOCATION / DATE & TIME | |
|---|---|---|---|---|
| CLASSIFICATION | NCIC PROPERTY CODE | NCIC PROPERTY DESCRIPTION | | SERIAL NUMBER / VIN |
| MAKE | MODEL | MISC. DESCRIPTION | | |
| ITEM # | SUB ITEM # | ITEM STATUS | TEMP. STORAGE LOCATION / DATE & TIME | |
| CLASSIFICATION | NCIC PROPERTY CODE | NCIC PROPERTY DESCRIPTION | | SERIAL NUMBER / VIN |
| MAKE | MODEL | MISC. DESCRIPTION | | |
| ITEM # | SUB ITEM # | ITEM STATUS | TEMP. STORAGE LOCATION / DATE & TIME | |
| CLASSIFICATION | NCIC PROPERTY CODE | NCIC PROPERTY DESCRIPTION | | SERIAL NUMBER / VIN |
| MAKE | MODEL | MISC. DESCRIPTION | | |
| ITEM # | SUB ITEM # | ITEM STATUS | TEMP. STORAGE LOCATION / DATE & TIME | |
| CLASSIFICATION | NCIC PROPERTY CODE | NCIC PROPERTY DESCRIPTION | | SERIAL NUMBER / VIN |
| MAKE | MODEL | MISC. DESCRIPTION | | |
| ITEM # | SUB ITEM # | ITEM STATUS | TEMP. STORAGE LOCATION / DATE & TIME | |
| CLASSIFICATION | NCIC PROPERTY CODE | NCIC PROPERTY DESCRIPTION | | SERIAL NUMBER / VIN |
| MAKE | MODEL | MISC. DESCRIPTION | | |
| ITEM # | SUB ITEM # | ITEM STATUS | TEMP. STORAGE LOCATION / DATE & TIME | |
| CLASSIFICATION | NCIC PROPERTY CODE | NCIC PROPERTY DESCRIPTION | | SERIAL NUMBER / VIN |
| MAKE | MODEL | MISC. DESCRIPTION | | |
| ITEM # | SUB ITEM # | ITEM STATUS | TEMP. STORAGE LOCATION / DATE & TIME | |
| CLASSIFICATION | NCIC PROPERTY CODE | NCIC PROPERTY DESCRIPTION | | SERIAL NUMBER / VIN |
| MAKE | MODEL | MISC. DESCRIPTION | | |
| ITEM # | SUB ITEM # | ITEM STATUS | TEMP. STORAGE LOCATION / DATE & TIME | |
| CLASSIFICATION | NCIC PROPERTY CODE | NCIC PROPERTY DESCRIPTION | | SERIAL NUMBER / VIN |
| MAKE | MODEL | MISC. DESCRIPTION | | |

Long/State Farm
SF1  00385

route to: Todd Smith

STATE FARM FIRE AND CASUALTY COMPANY

# AUTO CLAIM SERVICE RECORD

claim number
**01-6596-758**
policy number
**0545-280-01**

car no.
**001**

date of loss
**02-13-05**

| | |
|---|---|
| primary claim rep: | Smith, Todd |
| phone: | 770-593-6570    primary unit: 41    primary office: ALMSSIU |

## NAMED INSURED

### Named Insured Driver

| | | | |
|---|---|---|---|
| name: | LONG, MARTIN | | |
| street: | 2752 CAROLINE DR | | age: |
| city: | MILLBROOK | state/prov: AL    zip/postal: 36054-4103 | dob: 08-13-1968 |
| phone: home: | 334-290-0344 ext: | work: | 334-290-0344 ext: |
| contact: | MARTIN LONG | contact: | MARTIN LONG |
| lang of choice: | Unknown | hearing impaired: | |
| ssn or tin: | 420154502 | occupation: | sex: M |
| deceased: | dod: | minor:    named ins child: | parent/guardn: |
| driver license: | 5415781 | | |

### Named Insured

| | | | |
|---|---|---|---|
| name: | LONG, EVELYN | | |
| street: | 2752 CAROLINE DR | | age: |
| city: | MILLBROOK | state/prov: AL    zip/postal: 36054-4103 | dob: 03-01-1968 |
| phone: home: | 334-290-0344 ext: | work: | ext: |
| contact: | | contact: | |
| lang of choice: | Unknown | hearing impaired: | |
| ssn or tin: | 419046024 | occupation: | sex: F |
| deceased: | dod: | minor:    named ins child: | parent/guardn: |
| driver license: | 5245769 | | |

## INSURED VEHICLE

| vehicle | year | make | model | body style |
|---|---|---|---|---|
| 01 | 1997 | Ford | Mustang Cobra | 2D Cpe |

| vehicle identification number | license number | state/prov | lienholder |
|---|---|---|---|
| 1FALP47V2VF133953 | 29B639P | AL | MAX FCU |

| | | |
|---|---|---|
| prior damage: N | | involved in loss: Y |
| occupant type: | | |
| principal damage: | BULLET HOLES-ROOF, W/SHIELD, INTER REARVIEW MIRROR, DASH | |
| driveable: Y | drive-in service: | drive-in office: |
| total loss: N | total loss type:    - | |
| vehicle location: RESIDENT | | |

Long/State Farm
SF1  00432

date: 03-04-05                                      page:       2

**AUTO**
**claim number**
**01-6596-758**

## CLAIMANT VEHICLE(S)

| vehicle | year | make | | model | | body style |
|---------|------|------|--|-------|--|------------|
| O2 | | | | | | |

vehicle identification number        license number        state/prov

occupant type:
principal damage:
          driveable:          drive-in service:            drive-in office:
         total loss:          total loss type:        --
    vehicle location:
          insurance:

### Claimant Owner-Driver

| | | | | |
|--|--|--|--|--|
| vehicle: | 02 | State Farm insured: | | State Farm claim no: |
| name: | MCBRIDE, CHRISTOPHER M | | | |
| street: | 4194 AIRPORT RD | | | age: |
| city: | COOSADA | state/prov: AL | zip/postal: 36020 | dob: |
| phone: home: | | ext: | work: | ext: |
| contact: | | | contact: | |
| ssn or tin: | | occupation: | | sex: |
| deceased: | dod: | minor: | | parent/guardn: |
| driver license: | | | | |

## FACTS

CLMNT PULLED UP BEHIND INSURED WITH BRIGHT LIGHTS, FOLLOWED INSURED THROUGH
TOWN, EVENTUALLY LEADING TO CLMNT STOPPING, SHOOTING GUN ON INSURED, THEN INSD
SHOT GUN AT CLMNT WHICH INSD'D BULLET WENT THROUGH INSD'S CAR, AND LODGED IN
THE DASHBOARD.  POLICE REPORT TO BE FAXED TO YOU.

| | | | |
|--|--|--|--|
| date and time of loss: | 02-13-05 12:30 AM | | |
| location of loss: | SANDTOWN ROAD | | |
| city: | MILLBROOK | state/prov: AL | zip/postal: |
| police report made: | Y | department reported: | MILLBROOK, AL PD |
| report number: | 050200300 | date/time reported: | |
| insured violation: | | violation type: | |
| claimant violation: | | violation type: | |
| theft recovered: | | date recovered: | |
| who recovered: | | where recovered: | |

## PARTIES TO LOSS

### Lease or Lienholder

| | | | |
|--|--|--|--|
| business: | MAX FCU | | |
| street: | PO BOX 660629 | | |
| city: | BIRMINGHAM | state/prov: AL | zip/postal: 35266-0629 |
| phone: home: | | ext: | work: | ext: |
| contact: | | | contact: |
| ssn or tin: | | tax state: | |
| loan no: | | file no: | |
| Other Insurance | | | Long/State Farm |
| claim no: | | policy no: | SF1  00433 |
| claim rep: | | | |

date: 03-04-05                                    page:        3

AUTO
claim number
01-6596-758

## PARTIES TO LOSS

### Service Provider

business: UNK - VEH WITH INSD
street:
city:                          state/prov:            zip/postal:
phone: home:              ext:              work:                  ext:
contact:                            contact:
ssn or tin:                    tax state:

loan no:                       file no:
Other Insurance
claim no:                      policy no:
claim rep:

## FILE/SUPPORTING INFORMATION

recording office/code: CLMCENTA 09-008
claim status/date: OPENED    02-16-05      date reported to agent: 02-16-05
maintain date:                             date/time recorded: 02-16-05 11:10 AM
suit status/date:                          subrogation status/date:
salvage status/date:                       conversion type: New Claim, Post Conversion
reporting agent: DEVERS                     st & agent: 01-1973  phone: 334-285-3662
agent of record: DEVERS, MIKE              agent: 1973   phone: 334-285-3662

## OWNING OFFICE

name: Alms Siu                   region: Al-Miss      fax:
address: N/A  N/A AL 00000
code: 09-305              referral status/date: OPEN       02-16-05
claim rep: Smith, Todd
phone: 770-593-6570        unit: 41      COL: 390
date/time assigned: 02-25-05 11:21 AM              date/time reviewed: 02-25-05 11:22 AM

## SERVICING OFFICE(S)

name: Montgomery                   region: Al-Miss     fax: 334-213-0078
address: P.O BOX 210159    MONTGOMERY AL 36121
code: 09-118              referral status/date: CLOSED      02-18-05
claim rep:
phone:                     unit:         COL: 390
date/time assigned:                                date/time reviewed:

## SERVICING OFFICE(S)

name: Clm Central-Auto             region: Al-Miss     fax: 888-529-1508
address: P.O. BOX 830852   BIRMINGHAM AL 352830852
code: 09-008              referral status/date: CLOSED      02-24-05
claim rep: Team 1, Processor
phone: 888-801-6609        unit: C1      COL:
date/time assigned: 02-17-05  3:13 PM              date/time reviewed: 02-18-05 10:59 AM

Long/State Farm
SF1  00434

**AUTO**
claim number
**01-6596-758**

date: 03-04-05                                                   page:        4

## ACTIVITY LOG

total activity log entries:    22

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-03-05 | 11:04 AM | Smith, Todd | GASCSIU | GA-SC | 37 |

Underwriting Review sent
Loss info -         Acc freq or severity      Other (see comments)
Comments -
See claim #'s 01-6596-564 & 01-Q177-057 all filed w/in the same month along w/
this claim.  Also, the insured admitted he shot his own vehicle, while attempt
ing to shoot at another individual.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-03-05 | 11:02 AM | Smith, Todd | GASCSIU | GA-SC | 36 |

On 3-2, I met w/ the insured in connection w/ clm # 01-6596-564 & authorized a
stop payment of the original draft issued that he has never rec'd & reissued
another draft to the insured.  During our discussion, the insured admitted he
shot his own vehicle, while attempting to shot at another individual; however,
he said it was an accident.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-01-05 | 01:31 PM | Coleman, Horace | CLMCENTA | Al-Miss | 35 |

C: Rcvd call from the insrd who stated he has not rcvd draft for the payment
and would like for SF to void draft and resend payment. advised insrd we
would do so. Noiticed SIU in the file... was advised by TM to have NI call
SIU. Called shop back who stated NI had just left. Called NI at home..
lmom to have him call SIU rep.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-24-05 | 12:48 PM | Walker, Lester | CLMCENTA | Al-Miss | 33 |

Moved to ALMSSIU  Al-Miss  09-305
Moving to SIU as per Pennie Green instruction

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-23-05 | 07:17 AM | Montgomery, Shirle | CLMCENTA | Al-Miss | 32 |

C;   RECD EST, ISSUED PYMT, MAILED W/LTR & EST.
T;   SUB PENDS
S;   YES

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-23-05 | 07:09 AM | Montgomery, Shirle | CLMCENTA | Al-Miss | 31 |

Estimate review completed
on Mitchell estimate
for vendor estimate key 01-6596-7580120050221140931
for 97 Ford Mustang Cobra 2D Cpe RED

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-22-05 | 01:14 PM | Montgomery, Shirle | CLMCENTA | Al-Miss | 28 |

ACCESSED BY CR PHILLIPS, SIU

Long/State Farm
SF1  00435

# COPY

1

1

2    STATE OF ALABAMA

3    MONTGOMERY COUNTY

**RECEIVED**

4    **APR 1 3 2005**

5    **SIU**

6

7    IN RE:    Martin O. Long
             Auto Policy No.:          0886-750-01

8             Auto Claim No.:           01-6596-564
             Homeowner's Policy No.:   81-PF-2500-3

9             Homeowner's Claim No.:    01-Q177-057
             Date of Loss:             February 19, 2005

10

11

12

13

14          * * * * * * * * * * * *

15

16    **EXAMINATION UNDER OATH OF MARTIN O. LONG**,

17    taken before Haley A. Phillips, Certified Shorthand

18    Reporter, and Commissioner for the State of Alabama

19    at Large, at the Law Offices of Beers, Anderson,

20    Jackson, Patty & Van Heest, 250 Commerce Street,

21    Montgomery, Alabama, on Thursday, March 31, 2005,

22    commencing at approximately 10:05 a.m.

Long/State Farm
SF1  00455

23          * * * * * * * * * * * *

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

2

1                              **APPEARANCES**

2


3      **ON BEHALF OF STATE FARM INSURANCE:**

4      Angela Taylor, Esq.
       Beers, Anderson, Jackson, Patty & Van Heest
5      Attorneys at Law
       250 Commerce Street, Suite 100
6      Montgomery, Alabama  36104

7      **ALSO PRESENT:**

8      Mr. Todd Smith

9

10

11
                    * * * * * * * * * * * *
12

13

                          **EXAMINATION INDEX**
14

15
          By Ms. Taylor . . . . . . . . . . . .   4
16

17                        **EXHIBIT INDEX**

18     1     Letter to Mr. Long from Mr. Davenport          7
             dated March 16, 2005
19
       2     Letter to Mr. Long from Ms. Taylor dated       7
20           March 23, 2005

21     3     Letter to Mr. Long from Mr. Burge dated        29
             March 23, 2005
22
       4     Letter to Mr. Long from Department of          30
23           Veterans Affairs dated December 29, 2004

Long/State Farm
SF1  00456

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

3

**EXHIBIT INDEX (continued)**

| | | | |
|---|---|---|---|
| 5 | Bank documents from AmSouth Bank dated March 5, 2004 | 31 |
| 6 | Bank documents from AmSouth Bank dated April 7, 2004 | 31 |
| 7 | Bank documents from AmSouth Bank | 31 |
| 8 | Bank documents from AmSouth Bank dated March 8, 2005 | 31 |
| 9 | Member Statement of Account from Max Federal Credit Union | 31 |
| 10 | Transaction Summary | 31 |
| 11 | Credit reports | 32 |
| 12 | Tax records from 2003 | 32 |
| 13 | Tax records from 2004 | 32 |
| 13-a | Incident report | 49 |
| 14 | Certificate of Title for a Vehicle | 49 |
| 15 | Verizon Wireless phone record | 58 |
| 16 | Document from Big 10 Tires | 65 |
| 17 | Personal property inventory form | 67 |
| 18 | Receipt from Looking Good | 74 |
| 19 | Receipt from Quik Pawn Shop | 77 |
| 20 | Receipt from Quik Pawn Shop | 69 |
| 21 | Sketch | 83 |
| 22 | Affidavit of Vehicle Theft | 91 |
| 23 | Settlement agreement | 112 |

Long/State Farm
SF1  00457

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

4

## MARTIN O. LONG

1
2      The witness, after having first been duly
3   sworn to speak the truth, the whole truth and
4   nothing but the truth testified as follows:
5                    **EXAMINATION**
6   **BY MS. TAYLOR:**
7   Q.    Could you, please, state your name for the
8         Record --
9   A.    Martin O'Neal Long.
10  Q.    -- Mr. Long, my name is Angela Taylor, and
11        I'm an attorney for State Farm.  And we're
12        here today to talk about an auto claim and
13        a homeowner's claim that you filed
14        regarding the theft of your vehicle.  Are
15        you under any medication today that would
16        prevent you from giving testimony under
17        oath?
18  A.    No.  I mean, I take medication, but no.
19  Q.    So you feel like you can give testimony
20        under oath today?
21  A.    Oh, yeah.
22  Q.    Okay.  Have you ever given a sworn
23        statement under oath before?

Long/State Farm
SF1  00458

5

1    A.    Yeah.  Yes.

2    Q.    Okay.  So you know that I'm going to ask

3          you some questions.  And if you can give me

4          a verbal response, because we do have a

5          court reporter here, and it's easy -- When

6          people talk, they nod their head on

7          affirmative answer or shake their head no,

8          but it's easier for the court reporter if

9          you give a verbal response so that she can

10         make sure that our conversation is recorded

11         correctly, okay.  Where do you currently

12         reside, Mr. Long?

13   A.    At 2752 Caroline Drive, Millbrook, Alabama.

14   Q.    And how long have you resided on Caroline

15         Drive?

16   A.    Since 1989.

17   Q.    Okay.

18   A.    I'm sorry.  1998.

19               (Exhibit 1 was marked for

20               identification.)

21   Q.    All right.  I'm going to show you what I

22         have marked as Exhibit Number 1 to your

23         examination under oath and ask you to

Long/State Farm
SF1  00459

6

1      review that document and see if you

2      recognize it, please.

3   A.   Yeah.

4   Q.   And you recall receiving that from Attorney

5        Davenport?

6   A.   Yes.

7   Q.   Okay.  And that is an examination under

8        oath letter which had attached to it a

9        request for production of documents.  Did

10       you receive that as well?

11  A.   Oh, yes, ma'am.

12              (Exhibit 2 was marked for

13              identification.)

14  Q.   Okay.  I'm going to show you what I've

15       marked as Exhibit Number 2 to your

16       examination under oath and see if you

17       recall that letter.

18  A.   Yes.

19  Q.   And you received my March 23, 2005 letter?

20  A.   Yes.  I've got both of them right there.

21  Q.   And attached to my letter I also included a

22       request for production of documents;

23       correct?

Long/State Farm
SF1  00460

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

7

```
 1    A.    Right.

 2    Q.    And you had an opportunity to review that?

 3    A.    Yes.

 4    Q.    And I see that you've brought some

 5          documents with you today.  Is that in

 6          response to that request for production?

 7    A.    Yes.

 8    Q.    If you wouldn't mind, just show me what you

 9          brought with you.

10    A.    Okay.  I've got the title.  The dude

11          finally sent me the title.  I had to call

12          my lawyer to get the settlement and all

13          that -- get all that stuff back.

14    Q.    When you say settlement ...

15    A.    To the railroad.

16    Q.    Okay.  And that would be --

17    A.    A railroad settlement.

18    Q.    -- where you were injured; correct?

19    A.    Right.  And I got the Verizon phone list.

20          Which I talked with Todd and he told me to

21          get the weekend of -- that I was down

22          there.  I got that.  Even though your -- He

23          said if you need me to get those four
```

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

8

```
 1          months which came on the stuff that you
 2          sent, then I have to go back and get it.
 3     Q.   All right.  Anything else that you brought
 4          with you?
 5     A.   Yes.  I got -- That's the divorce stuff
 6          right there.  It ain't signed or nothing,
 7          but that's the -- that's how it was written
 8          up.
 9     Q.   Okay.
10     A.   And this is stuff -- The VA stuff that I
11          get.  My money I get from the VA each
12          month, and it's got the different
13          disabilities and what I'm, you know,
14          getting paid for.
15     Q.   Okay.
16     A.   And I got my credit report which is --
17          which was $20.  Remember, I told you I had
18          got one of them but I had to go back and
19          get another one because I wanted to get a
20          score on this one.  And it was $20.  And I
21          got my score right there.
22     Q.   All right.
23     A.   And I got the bank statement printout from
```

Long/State Farm
SF1  00462

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

9

1        a year back from AmSouth, because I've got

2        a checking account with them.  And they

3        charged me $60 for that.

4    Q.   Okay.

5    A.   And the two accounts I got for Max, they

6        didn't charge.  I got -- I had a savings

7        account with them and I got -- I had a

8        checking account, which I had with me and

9        my wife.  But my name is off of that, but

10       they still gave it to me because my name

11       was on there the year prior.

12   Q.   Okay.

13   A.   So they gave me that printout.  And I got

14       my 2003, 2004 taxes.  I put something in

15       here to remind me.  Oh, yeah.  It was $10

16       just to get the 2003.  The 2004, he didn't

17       charge me nothing.

18   Q.   Okay.

19   A.   And all this stuff here like claims that I

20       gave Mr. Todd the first time we met,

21       receipts and all that stuff.

22   Q.   Okay.  Now, what I'll do is I'm going to

23       make -- Since some of these documents are

Long/State Farm
SF1  00463

10

1    originals, I'm going to make a copy of

2    them, and then we'll mark them as

3    exhibits.  And I will have someone here at

4    the office copy these while we continue on.

5                (Off-the-Record discussion.)

6    Q.   Mr. Long, do you go by any other name than

7         Martin Long?

8    A.   No.

9    Q.   Okay.  What is your social security number,

10        please?

11   A.   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.

12   Q.   And your date of birth?

13   A.   August 13, 1968.

14   Q.   Okay.  And are you currently married?

15   A.   Well, we're in the course of getting a

16        divorce.  It's like we live in separate

17        homes and all the paperwork has been

18        signed.  It just hasn't came back yet.  I

19        think the lawyer said it takes, like, 30

20        days for it to come back final.

21   Q.   What is your wife's name?

22   A.   Evelyn Long.

23   Q.   And you indicated that she lives at a

11

```
 1              separate address.  What is her address?

 2    A.    1705 Deatsville Highway.

 3    Q.    And, Mr. Long, do you have any children?

 4    A.    No.

 5    Q.    Does your wife have any children?

 6    A.    No.

 7    Q.    Have you ever been arrested other than a

 8          traffic violation?

 9    A.    No.

10    Q.    Have you ever been convicted of a crime.

11    A.    No.

12    Q.    The home that you live in on Caroline

13          Drive, do you own or rent that?

14    A.    Well, it's a mobile home.  I'm paying on

15          it.

16    Q.    And who is the mortgage company?

17    A.    They changed.  It used to be Countrywide,

18          but it changed to another name.

19    Q.    Okay.  All right.

20    A.    I can't remember the name.  I mean, I've

21          got it at home, though.

22    Q.    Are you currently employed?

23    A.    No.
```

Long/State Farm
SF1  00465

12

1    Q.    What was your last employment?

2    A.    The railroad.

3    Q.    And that -- Is that CSX?

4    A.    Yes.  Right.  CSX Railroad.

5    Q.    Okay.  At what point in time were you no

6        longer employed with CSX?

7    A.    Well, I haven't worked since March of '03,

8        but I'm still -- Well, I -- Okay.  I'm no

9        longer employed with them, but I got

10       medical coverage from them until December

11       of this year.

12   Q.    Of 2005?

13   A.    Right.

14   Q.    Were you injured on the job?

15   A.    Yes.

16   Q.    And when were you injured?

17   A.    March 3, 2003.

18   Q.    Now, do they have workmen's comp benefits?

19   A.    No.

20   Q.    So they handled it internally?

21   A.    Yeah.

22   Q.    And how were you injured on the job?

23   A.    By releasing a hand brake with a brake

Long/State Farm
SF1  00466

13

```
 1          stick.
 2    Q.    And how did that injure you?
 3    A.    They have brake sticks that kind of keep
 4          the workers from climbing those ladders
 5          releasing hand brakes because so many
 6          people slipped off the ladders.  And I
 7          pulled too hard on a brake stick and
 8          injured my shoulder.
 9    Q.    And did you have to have any surgery
10          related to that injury?
11    A.    Yes.
12    Q.    How many surgeries did you have to have?
13    A.    Two.
14    Q.    And you did have those surgeries?
15    A.    Right.
16    Q.    And at some point in time, did you settle
17          with CSX regarding your injury?
18    A.    Yes.
19    Q.    And how much was that settlement for?
20    A.    $256,000.
21    Q.    Okay.  And how much of that did you net?
22    A.    175.
23    Q.    And so they cut you a check for 175,000?
```

Long/State Farm
SF1  00467

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

14

1    A.   Yes.

2    Q.   Okay.  And do you recall when you received

3         that check?

4    A.   I know it was in -- I think around the

5         first week of -- I can show you.

6    Q.   And that may be some of the documents that

7         are being copied.

8    A.   I cashed the check on the 4th of February.

9    Q.   And is that of '05 or '04?

10   A.   '05.

11   Q.   Have you ever been in the military,

12        Mr. Long?

13   A.   Yes.

14   Q.   And what arm of the force -- what area of

15        the armed forces were you in?

16   A.   The Army.

17   Q.   And how long were you in the Army?

18   A.   Ten and a half years.

19   Q.   Ten and a half years?

20   A.   Yes.

21   Q.   Okay.  And what was your last rank?

22   A.   E5.

23   Q.   And what was your discharge status?

Long/State Farm
SF1  00468

15

```
 1    A.    Honorable.

 2    Q.    Was it medical related?

 3    A.    Yes.

 4    Q.    What type of injury did you sustain?

 5    A.    I broke my leg jumping out of an airplane.

 6    Q.    And when were you injured?

 7    A.    In June of 1992.

 8    Q.    And so you remained in the Army after you

 9          were injured?

10    A.    Yes.

11    Q.    Were you on disability status after your

12          injury?

13    A.    For a while, yes.  I was going through

14          rehab.

15    Q.    Okay.  Do you receive disability from the

16          Army?

17    A.    Yes.

18    Q.    And how much do you receive?

19    A.    $1140 a month.

20    Q.    Is that to end at some period of time, or

21          is that as long as you live?

22    A.    Till I die.

23    Q.    Okay.  Is your wife employed?
```

Long/State Farm
SF1  00469

16

1   A.   Yes.

2   Q.   And where is she employed?

3   A.   At DHR.

4   Q.   And that's Department of Human Resources?

5   A.   Yes.

6   Q.   Is that here in Montgomery?

7   A.   Yes.

8   Q.   And how long has she been employed with

9        DHR?

10  A.   A couple of -- It's been a few months.

11  Q.   Where was she employed prior to DHR?

12  A.   Well, she used to be a secretary at

13       Robinson Springs Elementary School in

14       Millbrook until she got a degree, master's

15       degree.

16  Q.   So she was going to school --

17  A.   Yes.

18  Q.   -- during that time?  Where did she go to

19       school?

20  A.   She went to school at Alabama State and

21       Alabama Crimson Tide.

22  Q.   And did she earn her master's degree in

23       2004?

Long/State Farm
SF1  00470

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

17

| | | |
|---|---|---|
| 1 | A. | Uh-huh (positive response).  Yes. |
| 2 | Q. | We're here today about a claim that you |
| 3 | | filed regarding your Corvette -- |
| 4 | A. | Right. |
| 5 | Q. | -- with State Farm.  And you've also filed |
| 6 | | a homeowner's claim on your homeowner's |
| 7 | | policy; is that correct? |
| 8 | A. | Yes. |
| 9 | Q. | Now, other than those two claims that we |
| 10 | | just identified related to the theft of |
| 11 | | your vehicle, have you ever filed a claim |
| 12 | | with State Farm before? |
| 13 | A. | Yes. |
| 14 | Q. | Tell me about those. |
| 15 | A. | I filed a claim with a Vette and a house |
| 16 | | with -- on my mobile home now.  They got -- |
| 17 | | it had hail damage. |
| 18 | Q. | Let's start with the Vette first.  When was |
| 19 | | that claim? |
| 20 | A. | That was about -- maybe about five or six |
| 21 | | years ago. |
| 22 | Q. | Okay.  Tell me what happened. |
| 23 | A. | Well, I just -- it was a lot of cars |

Long/State Farm
SF1  00471

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

18

1        getting stolen around the neighborhood, and

2        my car was one of them.

3  Q.    Okay.  So it was in your yard?  I mean, it

4        was it in your --

5  A.    Yes.

6  Q.    -- driveway?

7  A.    In my yard, yeah.

8  Q.    And it was stolen?

9  A.    Yes.

10  Q.    Okay.  Was it ever recovered?

11  A.    Yes.

12  Q.    Was it damaged?

13  A.    Well, the car itself wasn't damaged.  Just

14        the -- They took the rims and tires off of

15        it.

16  Q.    Okay.  How long did it take to recover the

17        vehicle, if you remember?

18  A.    It took them maybe three days.

19  Q.    Okay.  And you filed a claim related to

20        that theft with State Farm?

21  A.    Yes.

22  Q.    And how was that claim resolved with State

23        Farm?

Long/State Farm
SF1  00472

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

19

1    A.    They just got me more rims and tires.

2    Q.    Were you satisfied with that claim

3          adjustment?

4    A.    Yeah.

5    Q.    And you said that you've had a hail claim?

6    A.    Right.

7    Q.    And when was that claim?

8    A.    I think that was two years ago when it

9          hailed kind of bad.

10   Q.    And did State Farm pay that claim?

11   A.    Yes.

12   Q.    Were you satisfied with State Farm's claim

13         adjustment?

14   A.    Yes.

15   Q.    Other than the Corvette, have you had any

16         other theft claims?

17   A.    No.

18   Q.    And when I say any other theft claims, any

19         other theft claims with any insurance

20         company, not just with State Farm, with

21         any --

22   A.    Oh, I did have a theft claim.  Yes, I did.

23         Because I got some guns stolen one time.

Long/State Farm
SF1  00473

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

20

1   Q.   When was that?

2   A.   But I didn't report it on insurance.  I

3       just went and reported it to the police

4       department.  That was about a year and a

5       half ago.

6   Q.   And you said some guns were stolen?

7   A.   Yes.

8   Q.   Do you remember what type of guns were

9       stolen?

10   A.   It was a pistol and two assault -- well,

11       one assault rifle and one shotgun.

12   Q.   What kind of pistol?

13   A.   .357.

14   Q.   Did they ever recover that gun?

15   A.   They recovered the pistol.  They found out

16       a dude had it in Texas.

17   Q.   Okay.  So the assault rifle and the shotgun

18       were not recovered?

19   A.   No.

20   Q.   And you did not file an insurance claim?

21   A.   No.  I didn't really think about it.  I

22       guess I could have, huh?

23   Q.   At that time, did you have insurance with

Long/State Farm
SF1  00474

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

21

1         State Farm?

2   A.    Yes.

3   Q.    Any other claim or theft claim that you can

4         think of that you may have filed with an

5         insurance company?

6   A.    No.

7   Q.    Okay.  How much is your mortgage payment,

8         Mr. Long?

9   A.    291.

10  Q.    And on average your monthly utilities?

11        When I say utilities, I'm talking about

12        your water, your power, gas.

13  A.    The power usually be -- I know January,

14        February and March usually be the highest

15        months because the weather is so crazy, but

16        during that time it usually be, like,

17        180-something dollars.  But on average

18        other than that, it's, like, 150

19        something.  And my water bill be, like,

20        $24, but it's going to be cheaper now

21        because I had a little leak and I got it

22        fixed.

23  Q.    And do you have gas?

Long/State Farm
SF1  00475

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

22

1   A.   No.  I've got a utility bill.  That usually

2       be about 20-something dollars.  And garbage

3       bill, that comes, like, every quarter.

4   Q.   And how much is that?

5   A.   I think that's $34.

6   Q.   Do you have any car payments that you pay?

7   A.   No.  I had a -- Since I've been hurt, the

8       insurance that I got separate with my

9       credit, you know, that I got with my

10      Mustang, they're paying on my car, which

11      they've been paying on it since I've been

12      hurt.  Since -- They've been paying on it

13      for two years.

14   Q.   So is that a type of insurance policy if

15      you're disabled and unable to pay that

16      they'll pay the insurance on the --

17   A.   Well, that's -- it was a separate policy

18      saying that if you get hurt on the job that

19      they'll pay your car payments till you go

20      back to work.

21   Q.   So do you still have the Mustang?

22   A.   Yes.

23   Q.   Okay.  Do you know how much is being paid

Long/State Farm
SF1  00476

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

23

1           on that vehicle?

2    A.     Yes.  My car payment, 347.

3    Q.     And who is paying that?

4    A.     The Max Credit Union.

5    Q.     So that was a -- If I understand you

6           correctly, that was a separate policy that

7           you took out to insure that if you were

8           ever disabled and couldn't work that that

9           would --

10   A.     They would pay it off.

11   Q.     -- that policy would pay it off?

12   A.     Right.

13   Q.     Do you know how much is owed on --

14   A.     The Mustang?

15   Q.     -- the Mustang?  Yes, sir.

16   A.     Yeah.  I think it was, like, $3500 left.

17   Q.     And you indicated that you brought your

18          credit report with you?

19   A.     Uh-huh (positive response).

20   Q.     Okay.  We'll go over that once we get the

21          copy back.  And you've brought your

22          checking account and savings account

23          documents with you?

Long/State Farm
SF1  00477

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

24

1    A.    Right.

2    Q.    We'll review those when those copies come

3          back.

4                Other than the $1100 that you receive

5          for your military disability, do you

6          receive any income from any other source?

7    A.    No.

8    Q.    Now, I know that you brought with you some

9          documents regarding your settlement with

10         CSX.  And you've indicated that you

11         received 175,000; is that right?

12   A.    Right.

13   Q.    And that you received that in --

14   A.    February --

15   Q.    -- February?

16   A.    -- 4th is when I cashed the check.

17   Q.    Yeah.  2005?

18   A.    Right.

19   Q.    At the time this theft occurred of your

20         vehicle on February 19, 2005, how much of

21         that settlement check did you have?

22   A.    I probably had about 5,000 left after I

23         paid off all the bills and gave my wife her

Long/State Farm
SF1  00478

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

25

```
 1          half.
 2   Q.     All right.  Can you -- Can you go over that
 3          with me?  You said that --
 4   A.     Over what?
 5   Q.     You said that you paid off some bills.
 6   A.     Yes.
 7   Q.     Okay.  And on average how much do you
 8          recall paying off?
 9   A.     The bills?
10   Q.     Yes, sir.
11   A.     I paid probably about -- maybe about
12          $100,000 on bills.
13   Q.     And when you say bills --
14   A.     I had, like, $50,000 worth of credit card
15          bills, which I had been living off of since
16          I've been off.  And they just got
17          ridiculous.  I didn't really understand
18          credit cards till now.  But they're paid
19          off.  Then I paid off my wife's student
20          loan, which is 43,000.  And I paid off her
21          Volvo which is 12,000.  Then I bought me
22          that Vette, which I was going to buy that
23          regardless because I've been wanting one
```

Long/State Farm
SF1  00479

26

| | | |
|---|---|---|
| 1 | | since they came out.  And after I paid |
| 2 | | 25,000 for that car, we divided the rest of |
| 3 | | the money. |
| 4 | Q. | Okay.  So if I understand you, you paid |
| 5 | | about 50,000 on your bills, 43,000 for your |
| 6 | | wife's student loan, 12,000 for her car. |
| 7 | A. | Right. |
| 8 | Q. | And that paid that vehicle off? |
| 9 | A. | Right. |
| 10 | Q. | And then what was left, y'all split? |
| 11 | A. | Well, after I bought my Corvette.  I bought |
| 12 | | a Corvette for $25,000. |
| 13 | Q. | All right.  So at the time of the theft in |
| 14 | | February of '05, you had about $6,000?  Is |
| 15 | | that what you said -- or 5,000? |
| 16 | A. | I think I had about five. |
| 17 | Q. | Okay. |
| 18 | A. | Because I had been buying stuff and, you |
| 19 | | know, giving family members a little money |
| 20 | | here and there. |
| 21 | Q. | Okay.  And what year was the Vette that you |
| 22 | | purchased for 25,000? |
| 23 | A. | 2000. |

Long/State Farm
SF1  00480

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

27

1   Q.   And when did you purchase that Corvette?

2   A.   It was in February.  I think a couple weeks

3        before it got took.

4                  MS. TAYLOR:  Let's just go off for

5                       just a second and let me look

6                       at some of these documents.

7                  (Off-the-Record discussion.)

8   A.   Let's see.  I think I had it about two, two

9        and a half weeks before that.

10  Q.   Okay.

11  A.   No.  I know when it was.  Same day I cashed

12       that check.  That's when I went and bought

13       it.

14  Q.   And that was on February 4th?

15  A.   Yeah.  That was -- Yeah, February 4th.

16       Yeah.  Same day I went down there and got

17       the car.  Because I had already -- I had

18       been down there already and talked to the

19       dude, and I told him the situation.  I told

20       him once I cashed the check I was coming

21       back to get it.

22  Q.   And the lawyer that was handling your

23       settlement with CSX, did he tell you when

Long/State Farm
SF1  00481

28

1          the check was coming?

2    A.    Yes.  Well, at first when we first settled,

3          he said it would take about a month, and

4          then he called back later and said I would

5          get it within that week.

6    Q.    And did you get it within that week?

7    A.    Yes.

8    Q.    Okay.

9    A.    Oh, okay.  I said 56.  It was 65, 265,000.

10         Instead of 256, it's 65.

11   Q.    But the amount that you received was --

12   A.    Was the same, yeah.

13   Q.    -- was 175?

14                (Exhibit 3 was marked for

15                identification.)

16   Q.    Mr. Long, I'm going to show you what I've

17         marked as Exhibit Number 3 to your

18         examination under oath today.  And is that

19         one of the documents that you brought in

20         today which sets forth the settlement that

21         you received regarding your injury on the

22         job with CSX?

23   A.    Yes.

Long/State Farm
SF1  00482

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

29

1   Q.   And the settlement statement indicates that

2        the amount due the client, which would be

3        you, was one thousand -- I mean

4        $175,568.99.

5   A.   Yes.

6   Q.   Did you receive that amount, or did you

7        receive 175,000 even, if you recall?

8   A.   What did you say, now?

9   Q.   On this --

10  A.   Oh, yeah.  I got that $175,568.

11  Q.   And 99 cents?

12  A.   Yes.

13              (Exhibit 4 was marked for

14              identification.)

15  Q.   Okay.  Mr. Long, I'm going to show you what

16       I've marked as Exhibit Number 4 to your

17       examination under oath.  And if you can

18       confirm this is a statement dated December

19       29, 2004 from the Department of Veterans

20       Affairs which you've provided to me today

21       regarding your disability.          Long/State Farm
                                             SF1  00483
22  A.   Right.

23              (Exhibits 5, 6, 7, 8, 9 and 10 were

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

30

1              marked for identification.)

2    Q.    Mr. Long, I'm going to show you documents

3          that I have marked 5, 6, 7, 8, 9 and 10

4          which I believe encompass the bank records

5          that you provided to me this morning.  And

6          if you can confirm that for the Record.

7    A.    Yes.  AmSouth.  It's kind of thin, though.

8          That's all it was?

9    Q.    I think that there are a couple of the

10         stacks that are together, so if you could

11         look at all of those.

12   A.    Okay.  All this go together.

13   Q.    Okay.  It may have been when they copied it

14         they stapled it wrong.  If you'll just look

15         to make sure that the documents are

16         correct.

17   A.    Yeah.  All that goes together right there.

18         Yeah, that's correct.

19              (Plaintiff's Exhibit 11 was marked

20                 for identification.)

21   Q.    Okay.  Mr. Long, I'm going to show you what

22         I've marked as Exhibit Number 11 to your

23         examination under oath.  And if you could

Long/State Farm
SF1  00484

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

31

1       look at this document and confirm that that

2       is the credit report.

3   A.   Yeah.

4   Q.   And I believe it's more than one, and I

5       have stapled all of these documents

6       together --

7   A.   Right.

8   Q.   -- so it is one exhibit.  And that is the

9       credit report that you provided to me this

10      morning; correct?

11  A.   Uh-huh (positive response).  Right.

12            (Exhibit 12 and 13 were marked for

13            identification.)

14  Q.   I'm going to show you what I've marked as

15      Exhibit Numbers 12 and 13, which Exhibit

16      Number 12 is the income tax records that

17      you have provided for the year 2003, and

18      Exhibit Number 13 is the tax records that

19      you provided for the year -- tax year of

20      2004; is that correct?

21  A.   Correct.

22  Q.   Who did you purchase the Corvette from?

23  A.   A car lot called City Auto Sales.

Long/State Farm
SF1  00485

32

1  Q.    And do you know the salesman that you dealt

2        with?

3  A.    His name was Cheyenne.

4  Q.    Cheyenne?

5  A.    (Witness nods head.)

6  Q.    Have you ever dealt with City Auto

7        Sales before?

8  A.    No.

9  Q.    How did you come to find out about the

10       Vette at City Auto Sales?

11 A.    On the Internet.

12 Q.    On the Internet?

13 A.    Yes.

14 Q.    And I think I remember you saying earlier

15       that you went by and you spoke to Cheyenne

16       about the Vette before you purchased it?

17 A.    Yes.  A couple days earlier, so he could

18       hold it for me.  I took him $100, because

19       that's the car that I wanted.  I told him

20       to hold it for me.

21 Q.    When do you recall first seeing the Vette

22       advertised on the Internet for sale?

23 A.    About a week before I got it.

Long/State Farm
SF1  00486

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

33

1  Q.   And were you specifically looking for a

2       Vette?

3  A.   Oh, yeah.

4  Q.   Okay.  And did you look at any other Vettes

5       other than the one at City Auto Sales?

6  A.   No.  I mean, I looked at a lot of them on

7       the Internet.  I called a lot of people,

8       but that's the first one that I physically

9       went and looked at.

10  Q.   And you paid cash?

11  A.   Yes.

12  Q.   Did you pay cash or was it a cashier's

13       check?

14  A.   It was a cashier's check.

15  Q.   And where was the cashier's check from?

16  A.   Regions Bank.  No.  I'm sorry.  I'm sorry.

17       It was from Max Credit Union.

18  Q.   And did you obtain that check for 25,000

19       the same day you --

20  A.   Cashed it, yes.

21  Q.   Okay.  Now, the remaining balance of your

22       check from the CSX settlement, did you

23       deposit that in your account?

Long/State Farm
SF1  00487

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

34

1    A.    Yes.  Into the checking account.  That's

2          what we wrote all of the bills off of that

3          account.

4    Q.    Okay.  Mr. Long, when did the theft occur

5          of your 2000 Corvette?

6    A.    Well, I noticed it that Saturday morning.

7          I think it was the 19th.

8    Q.    Okay.  And where did the theft occur?

9    A.    In Lithonia, Georgia.

10   Q.    And where were you when the theft

11         occurred?

12   A.    In a hotel.

13   Q.    Okay.  Do you remember the name of that

14         hotel?

15             Let me do this.  Does the Country

16         Hearth Inn --

17   A.    Who?

18   Q.    Country Hearth --

19   A.    Yeah.

20   Q.    -- Hearth Inn.

21   A.    Yeah.

22   Q.    Does that sound correct?

23   A.    Right.

Long/State Farm
SF1  00488

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

35

1    Q.    When did you first arrive at the Country

2          Hearth Inn?

3    A.    That Friday night.

4    Q.    So that would have been February 18th?

5    A.    Yes.

6    Q.    Do you recall what time you arrived?

7    A.    I think it was between nine and ten o'clock

8          eastern time, Atlanta time.

9    Q.    When you checked in, did you pay cash or

10        did you use a credit card?

11    A.    Paid cash.

12    Q.    Did they give you a receipt to show what

13        time you checked in?

14    A.    If they did I throwed it away.

15    Q.    Okay.  Now, did you travel directly from

16        the Millbrook area to Lithonia, Georgia?

17    A.    Yes.

18    Q.    And what time did you leave the Millbrook

19        area to travel?

20    A.    I think I left about maybe six, between six

21        or 6:30.

22    Q.    Okay.  Did you travel from Millbrook to

23        Atlanta alone?

Long/State Farm
SF1  00489

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

36

1   A.   No.

2   Q.   Okay.  Who was with you?

3   A.   A girl.

4   Q.   Can you give me her name?

5   A.   Valerie.

6   Q.   Does Valerie have a last name?

7   A.   Yes.  But I don't know what her last name

8       is.

9   Q.   Is she from the Millbrook area?

10   A.   No.

11   Q.   Do you know where Valerie lives?

12   A.   Not -- I know she lives in Montgomery.  I

13       don't know exactly where she lives.

14   Q.   Do you have any contact information

15       regarding Valerie?

16   A.   I mean, I know where she work at.

17   Q.   Where does she work?

18   A.   At the lawyer office -- Well, the doctor

19       office that did my surgery.

20   Q.   And where was that?

21   A.   Off of Taylor Road.

22   Q.   Do you know the doctor's name?

23   A.   Yeah.  Dr. Chung.

Long/State Farm
SF1  00490

37

1   Q.   Chun?

2   A.   Chung.

3   Q.   Chong?

4   A.   C-H-U-N-G.

5   Q.   I think he did the surgery on my knees.

6   A.   Ty Chung.

7   Q.   Yeah.

8   A.   Yes.

9   Q.   So Valerie works with Dr. Chung?

10  A.   Yeah.  She's a secretary.

11  Q.   So she traveled with you from the Millbrook

12       area, or did you pick her up in

13       Montgomery?

14  A.   Yeah.  Picked her up from Montgomery.

15  Q.   And she traveled all the way with you to

16       Atlanta?

17  A.   Yes.

18  Q.   And what was the purpose of you going to

19       Lithonia, Georgia on the 18th?

20  A.   Just to relax, get away.

21  Q.   Had you planned this trip, or was it spur

22       of the moment?

23  A.   No.  We planned it.

Long/State Farm
SF1  00491

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

38

1    Q.    And were you going to stay the entire

2          weekend?

3    A.    We still stayed the entire weekend.

4    Q.    Okay.  And when did you return from

5          Lithonia?

6    A.    That Sunday.

7    Q.    Which would have been the 20th?

8    A.    Yeah.

9    Q.    Do you recall what time you left on the

10         20th?

11   A.    It was that evening, probably about three

12         o'clock maybe.

13   Q.    And did Valerie travel back to this area

14         with you?

15   A.    Yes.

16   Q.    Mr. Long, how did you come to know about

17         the theft of your vehicle?

18   A.    When I got up that morning and -- we went

19         to -- a couple of her brothers went down

20         there with us.  And his girlfriend knocked

21         on the door and asked me where was my car,

22         and I said it was out there.  And she was

23         like it ain't out there.  So when I went

Long/State Farm
SF1  00492

```
 1         out there and looked in the spot wasn't
 2         nothing there but glass.
 3    Q.   Okay.  Now, you indicated that some other
 4         individuals went with y'all?
 5    A.   Yeah.  Separate vehicles.
 6    Q.   And who were those individuals?
 7    A.   Her brothers.
 8    Q.   Valerie's brothers?
 9    A.   Yeah.
10    Q.   What are their names?
11    A.   One of them was named Ricky and one named
12         Sandy.
13    Q.   Do you know their last names?
14    A.   No.
15    Q.   Do they live in this area?
16    A.   Yes.  They live in Montgomery.
17    Q.   Do you know the area in which they live or
18         where they work, contact information?
19    A.   No.
20    Q.   Had you ever met Ricky and Sandy before
21         your trip on the 18th of February?
22    A.   Oh, yeah.
23    Q.   But you don't have a cell phone number or
```

40

```
 1              phone number where you can reach them?
 2     A.       Huh-uh (negative response).
 3     Q.       And who else accompanied y'all on this trip
 4              other than Valerie, Ricky and Sandy?
 5     A.       Well, they took some girls with them.
 6     Q.       Do you recall their names?
 7     A.       No.
 8     Q.       But they were their girlfriends?
 9     A.       Yeah.  Friends, or whatever.
10     Q.       Do you recall which girlfriend came and
11              asked you where your car was that morning?
12     A.       Yeah.  It was Ricky's friend.  Because she
13              got up kind of early.  I think she went to
14              Wal-Mart or something like that.
15     Q.       Do you recall what time she asked you where
16              your car was located?
17     A.       Oh, I think it was about -- I think she
18              came by there about seven.
19     Q.       Okay.  And she asked you where your car
20              was.
21     A.       Yeah.
22     Q.       And you indicated to her that it's parked
23              outside?
```

Long/State Farm
SF1  00494

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

41

1   A.   Yeah.

2   Q.   And what did she say in response to that?

3   A.   She said it ain't out there.  And that's

4        when I went out there.

5   Q.   And what did you find when you went out

6        there?

7   A.   Well, my car was gone.  Wasn't nothing in

8        its spot but glass.

9   Q.   Okay.  When was the last time that you

10       recall seeing your vehicle parked in that

11       spot in the parking lot at the hotel?

12  A.   That Friday night.

13  Q.   About what time?

14  A.   Maybe about -- I guess about nine or ten.

15  Q.   P.m.?

16  A.   Yes.

17  Q.   And after 9 or 10 p.m., you didn't go

18       anywhere in your vehicle until you noticed

19       it missing that next morning?

20  A.   Right.

21  Q.   And you indicated that you thought that she

22       said something to you about seven o'clock

23       that morning?

Long/State Farm
SF1  00495

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

42

1   A.   Right.

2   Q.   And did you go immediately down to see --

3   A.   Oh, yeah.

4   Q.   -- if your car was there?

5   A.   Uh-huh (positive response).

6   Q.   Once you noticed that your car was not in

7       the parking space where you left it, what

8       did you do next?

9   A.   I went and talked to that dude that was on

10      duty.

11   Q.   Okay.  At the hotel?

12   A.   Yeah.

13   Q.   Okay.  Do you remember what his name was?

14   A.   No, I don't remember his name.

15   Q.   And what did you say to him?

16   A.   I told him that my car was stolen, and I

17      told him to call his manager.  And then I

18      went and called the cops, but they wouldn't

19      even come out.

20   Q.   Okay.  Now, you said you called the cops.

21      So you called them from your cell phone or

22      did you call them from the hotel phone?

23   A.   I think -- I think her brother called the

43

1    police.  The first person I called, I

2    think, was -- Yeah, he called the cops and

3    gave me his phone.  And I was talking to my

4    niece at the same time.  Because I called

5    my insurance company.

6    Q.   Let me see if I get this straight.  Who

7         called the police?

8    A.   Sandy.

9    Q.   Okay.

10   A.   With his cell phone.

11   Q.   All right.  And while Sandy was talking to

12        the police, you called your niece?

13   A.   (Witness nods head.)

14   Q.   What's your niece's name?

15   A.   Jackie.

16   Q.   Jackie?

17   A.   Zeigler.  Yes.

18   Q.   Sorry.  Last name?

19   A.   Zeigler.

20   Q.   Zeigler.  Okay.  And where does Jackie

21        live?

22   A.   Millbrook.

23   Q.   And I assume you called her from your cell

Long/State Farm
SF1  00497

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

44

```
 1        phone?
 2   A.   Yeah.
 3   Q.   Okay.  And what was the purpose of calling
 4        your niece?
 5   A.   To let them know that my car had got stolen
 6        and for her to give me the insurance
 7        company, look it up in the phone book and
 8        give me the 800 number.
 9   Q.   And did she give you the 1-800 number?
10   A.   No.  She hooked me up.  I mean, all three
11        of us was on the phone at the same time.
12   Q.   So she had three-way calling?
13   A.   Uh-huh (positive response).
14   Q.   And so you called State Farm?
15   A.   Right.
16   Q.   And you reported that your car had been
17        stolen?
18   A.   Right.
19   Q.   And what information did you provide State
20        Farm at that time?
21   A.   Well, I really couldn't give them nothing,
22        because I didn't know my tag number; I
23        didn't know the VIN number.  But they
```

Long/State Farm
SF1  00498

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

45

1         looked all that up by my name.

2   Q.    Okay. Do you recall any other information

3         that you provided to State Farm in that

4         initial phone call?

5   A.    Well, they were just asking where I was at,

6         because they got me the rental car that I

7         got.

8   Q.    Once you had notified the gentleman at the

9         front desk at the hotel, did the manager

10        show up?

11   A.    No. The manager came in, like, later on

12        that evening.

13   Q.    Okay. So Sandy called the police. Did the

14        police ever show up?

15   A.    No. Well, they said they wasn't coming. I

16        had to do a report over the phone.

17   Q.    Okay. And at what point in time did you do

18        your report over the phone?

19   A.    During that same conversation.

20   Q.    Okay. So Sandy handed the phone to you?

21   A.    (Witness nods head.)

22   Q.    And you were able to speak to the police

23        department?

Long/State Farm
SF1  00499

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

46

```
 1   A.   Right.
 2   Q.   Do you know which police department that
 3        was in -- that had that --
 4   A.   I guess it was the De Kalb County.
 5   Q.   De Kalb?
 6   A.   De Kalb County.
 7   Q.   Okay.  And they took down information from
 8        you?
 9   A.   Yeah.
10   Q.   Do you recall what information you provided
11        to the De Kalb County Police Department?
12   A.   Yeah.  I gave them -- Well, I told them
13        what year it was.  Like I said, I didn't
14        know the VIN number or the tag number of
15        it, but I told them the year, the color and
16        I told them what I had in it.  But the
17        lady didn't -- evidently she didn't -- the
18        detective didn't put it in the report.  But
19        she acted like she was writing everything
20        down like I told her.  But when Todd --
21                  THE WITNESS:  Remember, you told
22                  me you got the report and
23                  wasn't none of that stuff on
```

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

47

1                              there.

2    A.    So I had to call them back and do another

3          report with another detective.

4    Q.    So the first time that you spoke with the

5          police department, you did give them a list

6          of the items that were in the vehicle?

7    A.    Yes.

8    Q.    Okay.  And at some point later in time, you

9          called back to make sure that they put that

10         on the list of items stolen?

11   A.    Well, after they faxed Todd the stuff and

12         he said it wasn't on there, then I had to

13         call them back and I had to redo it.

14   Q.    And did you get a copy of that inventory

15         from De Kalb County?

16   A.    Yes.  I've got a copy.

17                   (Exhibit 13-a was marked for

18                   identification.)

19   Q.    I'm going to show you what I've marked as

20         Exhibit Number 13-a to your examination

21         under oath and see if that's the report

22         that you received.

23   A.    Yes.                         Long/State Farm
                                        SF1  00501

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
              (334) 263-4455

48

Q.   Do you recall what time that you told the
     De Kalb County Police Department what time
     that you noticed your vehicle missing?

A.   Did I recall the time I told them?

Q.   Yes, sir.

A.   No.  I mean, I should have told them about
     seven o'clock.

Q.   Okay.  So on the incident report when it
     indicates that it occurred on February 19,
     2005 at 9:30 in the morning, would that be
     incorrect?

A.   I guess so, yeah.

         (Exhibit 14 was marked for
          identification.)

Q.   Okay.  I'm going to show you what I've
     marked as Exhibit Number 14.  Is that the
     title -- a copy of the title that you
     provided to me this morning?

A.   Yes.

Q.   And that is for the 2000 Corvette; correct?

A.   Right.

     My time might be wrong.  If that time
     said 9:30, it had to be 9:30.

Long/State Farm
SF1  00502

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

49

1    Q.    Excuse me?

2    A.    I said that time -- If they've got it wrote

3          down that I talked to them at 9:30, then I

4          talked to them at 9:30.

5    Q.    Okay.  I think this is an indication that

6          the theft occurred, though, at 9:30.  Do

7          you recall telling them that it happened or

8          that you noticed it was missing around

9          7 a.m. in the morning?

10   A.    Not really, but I could have.  But I know

11         whatever that -- that right there say, I

12         know that's right.

13   Q.    And the only reason why I'm asking, is it

14         indicates that the initial report was taken

15         on February 19, 2005 at 11:17 a.m.

16   A.    I didn't know it was that late.

17   Q.    So is it your testimony today that you

18         spoke to them prior to 11:17 in the

19         morning?

20   A.    I mean, I'm thinking I did.

21   Q.    Okay.  I'm just trying to determine if the

22         9:30 a.m. was provided by you to the

23         De Kalb County Police Department as the

Long/State Farm
SF1  00503

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

50

1      time when you noticed the theft or that you

2      noticed that the vehicle was missing?

3    A.    I mean, it had to be.  Why else would they

4      have that 9:30 on there?

5    Q.    Okay.  Well, I'm just trying to determine

6      what information you provided to them as to

7      when you noticed the theft.  Because this

8      police report indicates that it occurred at

9      9:30 in the morning on the 19th.

10   A.    Okay.

11   Q.    So I'm just trying to determine if that's

12     the information that you provided to them

13     when you spoke to them that morning.

14   A.    Had to be, yeah.

15   Q.    Okay.  Is there any other information or

16     discussions that you had with the gentleman

17     that worked at the hotel that morning

18     regarding your car missing that you

19     recall?

20   A.    Yeah.  Well, I talked to the dude on duty.

21     Then I talked to the manager too.

22   Q.    Okay.  And can you tell me about that

23     conversation?

Long/State Farm
SF1  00504

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

51

A.    Well, the guy that was on duty, I asked

him -- what I said, I said -- Because I had

parked kind -- right -- The way the camera

was, it was, like, right up -- It was like

I parked my car where the camera was, like,

right on it.  And then when I went to talk

to the dude, I was like, hey, man,

I said -- After I told him my car was

stolen, I asked him could he pull the

tape.  And he said that only his manager

could pull the tape.

      And I think I asked him is it on, and

he said he didn't know was it on or not.

He said he had to get with his manager.

And then that's when I told him to call his

manager.  Then he said his manager would be

in later on that day.  And then when I

talked to his manager -- By the time he got

to answering was the camera on, he said

that the camera was not on; him and that

dude had -- The same dude that told me he

didn't know whether it was on or not, the

manager said him and that dude had did

Long/State Farm
SF1  00505

52

1        something to the camera and it wasn't on.

2            And I told him that the dude that was

3        on duty he didn't tell me that.  And the

4        manager was like, well, that's what

5        happened.  So later on that night that dude

6        came back on duty, and I asked him about

7        it, what the manager said.  And I asked

8        him, I said, so what was up with the

9        camera.  He said -- Then he started saying

10       the same thing the manager said, so I

11       cussed him out.

12   Q.  And why did you cuss him out?

13   A.  Because he was lying.

14   Q.  Okay.  So the gentleman that was behind the

15       counter at the hotel when you first noticed

16       your car missing is the same individual

17       that you had words with that evening when

18       he came back on; is that correct?

19   A.  Yeah.  I talked to him -- Yeah.

20   Q.  Okay.  I just wanted to make sure I

21       understood you correctly.

22            Did you notice the -- And when you say

23       camera, I'm assuming that you're talking

Long/State Farm
SF1   00506

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

53

| | | |
|---|---|---|
| 1 | | about a surveillance camera -- |
| 2 | A. | Yeah. |
| 3 | Q. | -- that was there on the hotel property? |
| 4 | A. | Yeah.  Right above the door. |
| 5 | Q. | Did you specifically park in that spot |
| 6 | | because you saw that camera or -- |
| 7 | A. | Yes. |
| 8 | Q. | -- did you see it afterwards? |
| 9 | A. | No.  I parked there.  I would have gotten |
| 10 | | closer than that but all the parking was |
| 11 | | taken up.  But the area where I parked at, |
| 12 | | it was a lighted area.  There was a gas |
| 13 | | station right above the hill where my car |
| 14 | | was.  It be a lot of traffic through there. |
| 15 | | Like I said, it was a Super Wal-Mart right |
| 16 | | across the street. |
| 17 | Q. | Now, was your car parked close to the |
| 18 | | office area? |
| 19 | A. | Yeah.  Probably about -- Well, I guess |
| 20 | | maybe about 30 yards from the office area. |
| 21 | Q. | Okay. |
| 22 | A. | Have y'all went back and questioned those |
| 23 | | guys? |

Long/State Farm
SF1  00507

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

54

```
 1   Q.   I think initially that --
 2   A.   Because their stories -- They had two
 3        different lies.
 4   Q.   Tell me about -- I mean, what do you mean
 5        by that?
 6   A.   The dude on duty told me one reason why the
 7        camera wasn't on, but then the boss -- the
 8        manager said another reason.  Then when I
 9        went back to the other dude, he said the
10        same thing the manager said.
11   Q.   Why do you think -- What do you think the
12        reason is that they didn't tell you the
13        truth?
14   A.   Shit, I don't know.  What do you think?
15   Q.   Oh, no.  I'm just asking you.  You got
16        upset and I'm just trying --
17   A.   Yeah, I got upset.
18   Q.   Okay.  I'm just trying to figure out the
19        reason why you got so upset.
20   A.   I mean, why you think I got up -- Why would
21        you get upset if your car was stolen and
22        them folks told you two different lies?
23   Q.   Well, it wasn't my car.  That's why --
```

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

55

```
 1   A.   I'm just saying.

 2   Q.   I understand.  Okay.

 3        Have you ever stayed at the Country

 4        Hearth Inn prior to that weekend?

 5   A.   Yeah.

 6   Q.   When was that?

 7   A.   It was months prior.  I went down there in

 8        my Mustang.

 9   Q.   Any other time that you've been to the

10        Country Hearth Inn?

11   A.   No.

12   Q.   And when you went there a couple of months

13        prior, were you by yourself or was someone

14        with you?

15   A.   Same person.

16   Q.   Is there any particular reason why you went

17        to Lithonia, Georgia?  I mean, do you have

18        friends --

19   A.   Yeah.  She got --

20   Q.   -- in that area?

21   A.   No.  She's got a brother that stays there.

22   Q.   Other than Ricky and Sandy?

23   A.   Yeah.
```

Long/State Farm
SF1  00509

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

56

```
 1   Q.   Now, that weekend that you were there the

 2        18th, 19th and 20th, did you see her other

 3        brother?

 4   A.   Yeah.

 5   Q.   And what is his name?

 6   A.   Donald.

 7   Q.   Donald?

 8   A.   Uh-huh (positive response).

 9   Q.   Do you know his last name?

10   A.   Huh-uh (negative response).  The same as

11        the rest of them, I guess.  All of them

12        probably -- I'm pretty sure they got the

13        same last name.

14          Now, that might be her married name

15        right there.  But I, mean, I don't know.

16               (Plaintiff's Exhibit 15 was marked

17                  for identification.)

18   Q.   Okay.  I'm going to show you what I've

19        marked as Exhibit Number 15 to your

20        examination under oath.  And if you can

21        confirm that that's the cell phone record

22        that you provided to me this morning.

23   A.   Yes.
```

Long/State Farm
SF1  00510

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

57

1    Q.    Is this your cell phone record?

2    A.    Yes.  She got the cell phone for me.

3    Q.    And it shows the individual's name as

4          Valerie Ware.

5    A.    Okay.

6    Q.    So Ms. Ware -- Valerie Ware purchased this

7          phone for you?

8    A.    Yeah.

9    Q.    Do you recall when she purchased this phone

10         for you?

11   A.    I had the phone probably about -- I think

12         about five or six months.

13   Q.    Okay.  Have you had a chance to review this

14         cell phone record?

15   A.    No.

16   Q.    Do you know what your niece's telephone

17         number is, Jackie Zeigler in Millbrook?

18   A.    285-4620.

19   Q.    Do you know whose telephone number is

20         285-3488?

21   A.    My brother.

22   Q.    Do you recall calling him that morning?

23   A.    Yeah.

Long/State Farm
SF1  00511

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

58

1   Q.   And why did you call your brother?

2   A.   To let him know my car got stole.

3   Q.   And then you called your niece at 285-4620;

4       is that correct?

5   A.   Uh-huh (positive response).  Yes.

6   Q.   The call to your brother shows at 8:54, and

7       then the call to your niece at 8:58.  Can

8       you see that?  Can you see if I'm reading

9       that correctly on the 19th?

10  A.   Right.

11  Q.   And I'm wondering if that's --

12  A.   Well, it had to be close to around the time

13      my car got stolen.

14  Q.   And this is a local cell phone; correct?

15  A.   What do you mean local?  Like from

16      Montgomery?

17  Q.   From Montgomery.

18  A.   Yeah.

19  Q.   Do you know who called you at 9:05 that

20      morning from 202-9599?

21  A.   That's my number.

22  Q.   It shows an incoming call.  Do you know who

23      called you at 9:05 that morning?

Long/State Farm
SF1  00512

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

59

1    A.    Huh-uh (negative response).  I don't know

2          how to read that thing.  It should be up

3          there.

4    Q.    You also had a call at 9:09.  Do you recall

5          receiving calls from somebody that

6          morning?

7    A.    Huh-uh (negative response).  I can't

8          remember.  But if the number is up there, I

9          can know who the number is.

10   Q.    It doesn't.  It just shows your cell phone

11         has an incoming number.  It doesn't say the

12         number where it's coming in from.

13   A.    I can't remember.

14   Q.    Do you recall anybody that you called in

15         Atlanta?

16   A.    The only somebody I know to call is her

17         brother.  I don't think I -- I don't

18         remember -- I don't know if I called him or

19         not.

20   Q.    Did Valerie ever use your cell phone that

21         morning?

22   A.    She probably did, yeah.

23   Q.    We've got at 10 a.m. there was a call to

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

60

1          area code 404, 325-8833 in Atlanta,

2          Georgia.  Do you recognize that phone

3          number?

4     A.   No.  But I know I was calling rental people

5          a lot, though.  Let me see if I have their

6          number.

7     Q.   Now, when you called State Farm, you

8          indicated that State Farm made arrangements

9          or paid for a rental car --

10    A.   Right.

11    Q.   -- for you to return home?

12    A.   Uh-huh (positive response).

13    Q.   Now, when you spoke with State Farm, did

14         they give you the name and phone number --

15    A.   Yeah.

16    Q.   -- for a rental place to call?

17              Did you have to call more than one?

18    A.   Rental place?

19    Q.   Yes, sir.

20    A.   I think I did.

21    Q.   Who did you rent your car from?

22    A.   From Enterprise.

23    Q.   And did you have any problems in getting

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

61

1   the rental car?

2 A. Huh-uh (negative response).

3 Q. Do you know whose phone number is 285-3194?

4 A. My mama's.

5 Q. So you called your mom that morning?

6 A. Uh-huh (positive response).  Is it on

7   there?

8 Q. Yes, sir.

9 A. Yeah, I called her.  I can't remember

10   everybody I called that day.

11 Q. Okay.

12 A. I had another paper like this with more

13   information on it but I don't know where it

14   was.

15 Q. At some point in time, did you have to call

16   State Farm back that morning after the

17   three-way call with your niece Jackie?

18 A. I don't know.  I think -- I don't know.  I

19   could have.

20 Q. Do you have direct connect on your phone?

21 A. What's that?

22 Q. Where you're not really dialing the phone

23   number but you've got a -- it's like a

Long/State Farm
SF1  00515

62

| | | |
|---|---|---|
| 1 | | walkie-talkie. |
| 2 | A. | Oh, no.  You talking about that two-way |
| 3 | | call? |
| 4 | Q. | Yes, sir. |
| 5 | A. | No. |
| 6 | Q. | On the night of the 18th, it shows two |
| 7 | | phone calls for directory assistance.  I |
| 8 | | assume that is for directory assistance. |
| 9 | | Do you recall who you might have -- the |
| 10 | | number you might have been trying to |
| 11 | | reach? |
| 12 | A. | Huh-uh (negative response). |
| 13 | Q. | Because it shows at 11:31 p.m. on February |
| 14 | | 18th. |
| 15 | A. | No.  Unless I was trying to get an eating |
| 16 | | place or something.  I don't remember.  I |
| 17 | | can't remember. |
| 18 | Q. | Do you know whose phone number is 430-7386? |
| 19 | A. | Huh-uh (negative response.) |
| 20 | Q. | That call was made at 8:10 p.m. on the |
| 21 | | 18th. |
| 22 | A. | In Lithonia? |
| 23 | Q. | No.  It's a Montgomery number. |

Long/State Farm
SF1  00516

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

63

1    A.    I don't know whose number that is.

2    Q.    Did anybody else use your cell phone on the

3         18th?

4    A.    I mean, she used -- Valerie used it

5         sometime.

6    Q.    Do you recall her using it the night of the

7         18th?

8    A.    I can't recall her using it.  But she had

9         to use it, because I don't know that

10       number.

11    Q.    There was a Prattville number on the 18th,

12       361-9608.

13    A.    Prattville number?

14    Q.    Yes, sir.  On the 18th about 5:45 p.m.  It

15       shows a call was made to someone in

16       Prattville.

17    A.    That could have been where I was picking up

18       my car at.  Hold on.  I would say it's Big

19       10 Tires, but I don't know.

20    Q.    Okay.

21    A.    Oh, yeah.  What's that number?

22    Q.    It was -- I think we're looking at the same

23       thing.  It's 361 --

Long/State Farm
SF1  00517

64

1    A.    9608?

2    Q.    Yes, sir.

3    A.    Yeah.

4                    (Exhibit 16 was marked for

5                    identification.)

6    Q.    Okay.  I'm going to show you what I've

7          marked as Exhibit 16 and see if you

8          recognize those documents.

9    A.    Yeah.  It's where I bought my tires and got

10         me a wheel alignment.

11                   (Off-the-Record discussion.)

12                   MS. TAYLOR:  Let the Record

13                   reflect that Exhibit Number 16

14                   is the Big 10 Tire receipts.

15   Q.    Now, Exhibit Number 16 is three different

16         documents?

17   A.    Uh-huh (positive response).  Front tires,

18         back tires and a alignment.

19   Q.    So on the 18th prior to you leaving to go

20         toward Georgia to travel to Georgia, you

21         got your tires aligned?

22   A.    Well, I bought tires and got my car

23         aligned.

Long/State Farm
SF1  00518

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

65

| | | |
|---|---|---|
| 1 | Q. | Now, the invoice for the tires shows on |
| 2 | | February 10th and the alignment was on the |
| 3 | | 18th; is that correct? |
| 4 | A. | Yeah. |
| 5 | Q. | So you bought the tires from them.  They |
| 6 | | put them on the car and then you took it |
| 7 | | back on the 18th to get it aligned? |
| 8 | A. | Yeah. |
| 9 | Q. | Once you noticed your car was missing, were |
| 10 | | Ricky and Sandy downstairs with you or did |
| 11 | | you go back to the room to tell them to |
| 12 | | come down or -- |
| 13 | A. | No.  I guess the girl went and got them. |
| 14 | | Ricky's friend I think went and got them. |
| 15 | Q. | And did they come downstairs immediately? |
| 16 | A. | Yeah. |
| 17 | Q. | And what conversations, if any, did y'all |
| 18 | | have -- |
| 19 | A. | Nothing.  I mean -- |
| 20 | Q. | -- downstairs? |
| 21 | A. | -- they just were like, your car is gone |
| 22 | | for real?  I was like, yeah.  And that was |
| 23 | | it. |

Long/State Farm
SF1  00519

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

66

1    Q.    Do you recall having any conversations with

2          them about the contents of your car, what

3          was in your car?

4    A.    I can't remember.  I could have.  I can't

5          remember.

6                    (Exhibit 17 was marked for

7                    identification.)

8    Q.    Okay.  Mr. Long, I'm going to show you what

9          I've marked as Exhibit Number 17 to your

10         examination under oath and tell me if you

11         recognize that document.

12   A.    Yes.

13   Q.    And did you submit that to State Farm

14         regarding your homeowner's claim?

15   A.    Yeah.

16   Q.    And what is that document?

17   A.    It's saying everything I had in my car.

18   Q.    The first item that's listed on here is a

19         black leather three-quarter length jacket;

20         is that correct?

21   A.    Right.

22   Q.    And it indicates that you purchased that

23         jacket in April of 2003?                Long/State Farm
                                                    SF1  00520

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
                  (334) 263-4455

67

```
1    A.    Somewhere around there.  I know I got it
2          when my wife was at whatever the little
3          fair thing is in Birmingham.
4    Q.    The what, now?
5    A.    It's like a little fair thing.  You go --
6          They've got rides and then, like, further
7          down the street they've got, like, a little
8          place set up where they sell all kind of
9          clothes and shoes, socks, whatever.
10   Q.    Is that downtown Birmingham?
11   A.    No.  That ain't downtown.  That's -- I
12         think it's, like, going toward Tuscaloosa.
13   Q.    And you bought it from one of the vendors
14         there?
15   A.    Uh-huh (positive response).
16   Q.    Do you recall the name of the vendor that
17         you purchased it from?
18   A.    No.
19   Q.    And it shows $250.  Is that the amount that
20         you paid for it?
21   A.    Uh-huh (positive response).
22   Q.    Okay.  And do you have a receipt for that?
23   A.    No.
```

Long/State Farm
SF1   00521

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

68

1    Q.   Now, the next item is a .55 auto handgun,

2         and it's got the serial number.  And you

3         purchased that in Montgomery?

4    A.   Right.

5    Q.   And that says February of 2005?

6    A.   Yeah.

7                   (Exhibit 20 was marked for

8                   identification.)

9    Q.   I'm going to show you what I marked as

10        Exhibit Number 20 to your examination under

11        oath.  And do you recognize that document?

12   A.   Yes.

13   Q.   Is that a receipt for Quik Pawn Shop --

14   A.   Uh-huh (positive response).

15   Q.   -- that you provided to State Farm?

16   A.   Right.

17   Q.   Now, the items that you have listed on

18        Exhibit Number 17, is it your testimony

19        today that these were the items that were

20        located in your car when it was stolen?

21   A.   Right.

22   Q.   Now, the handgun, was there any other

23        accessories or any ammunition or anything

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

69

```
 1            that was --

 2   A.    Yeah.

 3   Q.    -- in the car with it?

 4   A.    Uh-huh (positive response).

 5   Q.    Okay.  Because on Exhibit Number 17, you've

 6         listed the price at $378.24 that you -- for

 7         the handgun.

 8   A.    Uh-huh (positive response).

 9   Q.    And the only reason why I'm asking is the

10         total of Exhibit Number 20 is the same

11         amount but it shows the handgun and I

12         believe a side holster and ammunition --

13   A.    Right.

14   Q.    -- for that total price --

15   A.    Oh, okay.

16   Q.    -- for the actual hand --

17   A.    You can knock it off.

18   Q.    Well, that's why I'm asking.  Was the

19         holster and the ammunition in the car --

20   A.    Yes.

21   Q.    -- when it was stolen?

22   A.    Yes.

23   Q.    Okay.
```

Long/State Farm
SF1   00523

70

1   A.   Not the whole ammunition.  I just had
2        enough in the clip
3   Q.   Did you have an extra clip?
4   A.   Huh-uh (negative response).
5   Q.   Or it was the clip that was in the
6        handgun?
7   A.   Right.
8   Q.   Was the handgun in the holster?
9   A.   Yes.
10  Q.   And where was the handgun located in your
11       vehicle?
12  A.   Between my seats.
13  Q.   Now, does the 2000 Vette have a console
14       that comes between the two seats?
15  A.   Yes.
16  Q.   And when you say it was in between the two
17       seats, is there --
18  A.   In the console.
19  Q.   There's a console compartment?
20  A.   Yeah.  That opens up.
21  Q.   And your gun with the holster was in there?
22  A.   Uh-huh (positive response).
23  Q.   Okay.

Long/State Farm
SF1  00524

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

71

| | | |
|---|---|---|
| 1 | A. | Yeah.  That gun there was kind of a small |
| 2 | | gun.  It's not as big as the usual .45. |
| 3 | Q. | To your knowledge, has any law enforcement |
| 4 | | recovered that gun? |
| 5 | A. | Huh-uh (negative response.)  Not to my |
| 6 | | knowledge. |
| 7 | Q. | Item number three on Exhibit 17 is $5,000 |
| 8 | | in cash.  Where was that located in the |
| 9 | | vehicle? |
| 10 | A. | In between the seat, same place where the |
| 11 | | gun was. |
| 12 | Q. | In the console? |
| 13 | A. | (Witness nods head.) |
| 14 | Q. | Is there any particular reason why you left |
| 15 | | $5,000 cash in your car? |
| 16 | A. | No particular reason. |
| 17 | Q. | Did you feel like it was safe in your car? |
| 18 | A. | Yeah.  I mean, it ain't like I knew my car |
| 19 | | was going to get stolen.  If I knew that, I |
| 20 | | wouldn't have put none of that stuff in |
| 21 | | there. |
| 22 | Q. | Now, that $5,000 cash, is that the |
| 23 | | remaining money that you had from the |

Long/State Farm
SF1  00525

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

72

```
 1          settlement?

 2   A.     Huh-uh (negative response).

 3   Q.     Okay.  Number four shows three suits.

 4   A.     Just pants and shirt.  Jacket, though.

 5          Because, see, those pantsuits are like

 6          slacks and a dress shirt.  But the suit is

 7          like slacks and a coat.

 8   Q.     Okay.  So number four where you've got

 9          three suits, they were pants and a jacket?

10   A.     Right.

11   Q.     And you've indicated that you purchased

12          those in Montgomery.  Do you recall what

13          store you purchased those from?

14   A.     Looking Good.

15   Q.     And it shows that you purchased those in

16          February of 2005; is that correct?

17   A.     Right.

18   Q.     And for $600?

19   A.     (Witness nods head.)

20                  (Exhibit 18 was marked for

21                  identification.)

22   Q.     And I'm going to show you what I've marked

23          as Exhibit 18 to your examination under
```

Long/State Farm
SF1  00526

1          oath and see if you recognize that

2          document.

3     A.   Yeah.

4     Q.   And what is this document?

5     A.   That's a receipt that I went down and got

6          from the guy that I bought it from.

7     Q.   Okay.  And when you say receipt that you

8          got from him, was this after the loss that

9          you obtained this receipt or was --

10    A.   Yeah.

11    Q.   -- this the receipt that you got when you

12         bought it?

13    A.   No.  No.  I had to go back and get that

14         receipt.

15    Q.   Now, when you went in -- R.D. Archie.

16         There's a business card that's copied on

17         here.  Is that the gentleman that you spoke

18         with?

19    A.   Yeah.  That's who owns the store.

20    Q.   When you went in, what did you tell him?

21    A.   I just told him my car got stole and the

22         stuff I bought from him was in there and I

23         needed the receipt to give my insurance.

Long/State Farm
SF1  00527

74

1   Q.   And did you provide to him the information;

2        three suits, two pantsuits, four shoes?

3   A.   (Witness nods head.)

4   Q.   And you told him that that's what was in

5        your vehicle?

6   A.   Yeah.

7   Q.   Okay.  And do you know how Mr. Archie came

8        up with the amounts?

9   A.   I mean, I know what I bought and he know

10       how he sells his clothes.

11  Q.   Okay.  Did you provide him with the amounts

12       for what you paid for the three pantsuits

13       for $600?  The -- I'm sorry.

14  A.   Yeah.  I knew pretty much about what I paid

15       for everything, and then he -- Yeah, he

16       wrote that down there.

17  Q.   When you were there with Mr. Archie, did he

18       go and look at any records that he might

19       have had to fill out this receipt or was

20       this based on the information that you gave

21       him as what you recall paying for it?

22  A.   Right.  Based on what I gave him.

23  Q.   So, to your knowledge, he didn't research

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

1          any records, sales receipts that he may

2          have had to document that those are the

3          amounts that you paid for these items?

4     A.   Huh-uh (negative response).  But I do a lot

5          of shopping there.  He know I pay -- I buy

6          decent stuff, and he pretty much knows how

7          he sells his clothes.

8     Q.   Okay.  So if I understand you correctly,

9          the three suits, the two pantsuits and the

10         four pairs of shoes were purchased in

11         February of 2005 from Looking Good?

12    A.   Uh-huh (positive response).

13    Q.   And, obviously, because you went to Looking

14         Good to get this receipt after the loss you

15         don't have the receipts for these actual

16         purchases; is that correct?

17    A.   Yeah, that's right.

18    Q.   Number seven and number eight on Exhibit

19         Number 17 indicates four bracelets that

20         were purchased in February 2005 for $2500

21         and then three rings.

22    A.   One bracelet I got before that, which is --

23         I bought from Quik Pawn Shop.  Oh, yeah,

76

1        that one.

2              (Exhibit 19 was marked for

3              identification.)

4  Q.   I'll show you what is Exhibit Number 19.

5       It's a receipt from Quik Pawn Shop.  Is

6       that what you're referring to?

7  A.   Uh-huh (positive response).

8  Q.   And this receipt indicates that you

9       purchased a 14 karat gold diamond link

10      bracelet in February of 2003; is that

11      correct?

12  A.   Yeah.

13  Q.   Is that one of the bracelets that was

14      located in your car?

15  A.   Yes.

16  Q.   Where were the bracelets and rings located

17      in your vehicle?

18  A.   In the back under my clothes.  In the hatch

19      part area.

20  Q.   Now, the clothes that you had, were they

21      in, like, a suitcase or were they just in

22      the back of your car?

23  A.   It wasn't no suitcase.  It was like a --

Long/State Farm
SF1  00530

1    like a little tote bag.  It wasn't no thick

2    one.  Just a -- It was like a -- You know

3    those thin tote bags that you get when you

4    buy suits.  Not no real big one that's got

5    pockets.  It ain't got no -- It didn't have

6    no pockets.

7    Q.   Okay.  Are you talking like a hanging bag?

8    A.   Yeah.  Something like that.

9    Q.   Okay.  And did you receive those when you

10    bought your suits?  Is it a zip up bag

11    or --

12    A.   Uh-huh (positive response).

13    Q.   And did you receive that from Looking Good

14    or another store when you purchased your

15    suits?

16    A.   Uh-huh (positive response).

17    Q.   So the three suits, the two pantsuits and

18    the four pair of shoes were in there?

19    A.   Yes.

20    Q.   And those were in the back of the Corvette;

21    correct?

22    A.   Right.

23    Q.   Now, were the bracelet and rings in

Long/State Farm
SF1   00531

78

1       something?  Were they in a container or

2       box?

3   A.  They were in something like a box.

4   Q.  And the bracelets and rings, are those

5       items that you normally wear on a daily

6       basis?

7   A.  No.  I just -- I mean, I wear those -- I

8       hardly ever wear them.  But, like, if I'm

9       going places, I get my stuff.

10  Q.  Do you wear all of them at the same time?

11  A.  Huh-uh (negative response).

12  Q.  And what was the purpose of you taking them

13      with you when you went that weekend?

14  A.  Because I was flossin.

15  Q.  Because you were what?

16  A.  I was flossin.

17  Q.  Flossing?

18  A.  Yeah.

19  Q.  I've never heard that before.  What does

20      that mean?

21  A.  That means I was just being proper, just

22      relaxing.

23  Q.  Okay.

Long/State Farm
SF1  00532

| | | |
|---|---|---|
| 1 | A. | Took the wrong time to floss, though. |
| 2 | | (Off-the-Record discussion.) |
| 3 | Q. | So the bracelets and the rings were in a |
| 4 | | container and they were in the hatch part |
| 5 | | or the -- |
| 6 | A. | Yeah.  In the back in the hatch. |
| 7 | Q. | Okay. |
| 8 | A. | The big area.  You know like where the |
| 9 | | glass come up at, that's where all the room |
| 10 | | is in the Vette in the back. |
| 11 | Q. | Is there any type of compartment in the |
| 12 | | back where you can pop up and put things? |
| 13 | A. | Uh-huh (positive response). |
| 14 | Q. | Or were they just laying flat on the -- |
| 15 | A. | They was laying flat.  But, yeah, they do |
| 16 | | got a compartment back there. |
| 17 | Q. | But the bracelets and the rings were not in |
| 18 | | that compartment.  They were just |
| 19 | | underneath -- |
| 20 | A. | My clothes. |
| 21 | Q. | -- the garment bag? |
| 22 | A. | Yeah.  Underneath my clothes. |
| 23 | Q. | Now, number nine on Exhibit Number 17 is a |

Long/State Farm
SF1  00533

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

80

1         DVD plug-in player.

2    A.   Uh-huh (positive response).

3    Q.   You indicated that you bought that in

4         January of 2005 --

5    A.   Uh-huh (positive response).

6    Q.   -- for $160.

7              Do you know where you purchased that

8         from?

9    A.   From -- Off the Eastern Boulevard at Big

10        Lots.  No, it ain't Big Lots.  Well, I

11        think it is Big Lots.

12   Q.   Okay.  And do you have a receipt for that?

13   A.   No.

14   Q.   Okay.  Other than Exhibit Number 19, which

15        is for one of the diamond bracelets, do you

16        have any other receipts regarding the three

17        other bracelets and the three rings that

18        are listed on the inventory form?

19   A.   No, I don't.

20   Q.   Where did you purchase the other bracelets?

21   A.   Off the street.

22   Q.   Okay.  Do you recall who you bought them

23        from?

Long/State Farm
SF1   00534

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

81

1   A.   Huh-uh (negative response).

2   Q.   And you paid cash for them?

3   A.   Yes.

4   Q.   Let me see if we can do this.  On Exhibit

5        Number 9, it shows a total of $663.95 for

6        one of the bracelets; is that correct?

7   A.   Uh-huh (positive response).

8   Q.   All right.  The other three bracelets -- Do

9        you recall how much you paid for the other

10       three individually?

11  A.   Well, I know it was a few hundred apiece.

12  Q.   Okay.  Can you describe the three bracelets

13       other than the one that we've talked about

14       in Exhibit Number 19?  But what did the

15       other three look like?

16  A.   One of them was like a rope.  Then another

17       one was -- It was like -- Well, I can kind

18       of show you.  I can draw it out for you.

19       One of them was, like, made like this, and

20       they had little bars that came across like

21       that.  I mean, the whole bracelet was made

22       like that.  And then another bracelet was

23       made like that and then it had, like, two

Long/State Farm
SF1  00535

82

1      little ones like that.  Like I said, the

2      other one was just like a regular rope

3      bracelet.

4               (Exhibit 21 was marked for

5               identification.)

6   Q.   I'm going to mark this as Number 21.

7   A.   And that was like -- This big part right

8        here was like -- I think it was, like, kind

9        of white gold and that stuff right there

10       was, like, kind of yellow gold that go

11       across.

12  Q.   Just so that we make sure that we can --

13       Because it's hard, because she can't type

14       down what you're drawing.  The first figure

15       that you've drawn, I'm going to put a

16       number one above it.

17  A.   Uh-huh (positive response).

18  Q.   And then the second one where you were

19       talking about there was white gold and

20       yellow gold, I'm going to put a number two

21       above it, okay?  Do you see that?

22            All right.  The first bracelet that you

23       drew on here as number one, was that gold?

Long/State Farm
SF1  00536

83

1    A.    Yes.

2    Q.    Was it two-tone gold or solid gold?

3    A.    It was two-tone.  It was -- pretty much had

4          the same color this got.  It just had a

5          different design.

6    Q.    Okay.  So it had white gold and yellow gold

7          in it?

8    A.    Uh-huh (positive response).

9    Q.    And that would also be true for number two;

10         correct?

11   A.    Uh-huh (positive response).

12   Q.    Now, the bracelet for number one, do you

13         recall how much you paid for it?

14   A.    I think I paid, like, three or 400 apiece.

15   Q.    For both of them?  Did you buy them at the

16         same time?

17   A.    Uh-huh (positive response).

18   Q.    From the same individual?

19   A.    Yeah.

20   Q.    And it was somebody off the street?

21   A.    Uh-huh (positive response).

22   Q.    Was that in Millbrook or Montgomery?

23   A.    Montgomery.

Long/State Farm
SF1  00537

84

1    Q.    Okay.  And you don't recall who you bought

2          it from?

3    A.    No.

4    Q.    And you indicated that the other bracelet

5          was a rope bracelet?

6    A.    Right.

7    Q.    Was it a gold bracelet?

8    A.    (Witness nods head.)

9    Q.    Do you know if it was 14 carat, 18 carat?

10   A.    I think it was 14.

11   Q.    And what about the two that you've drawn on

12         Exhibit Number 21?  Was it 14 karat gold,

13         18 karat gold, if you know?

14   A.    I'd say probably 14, but I don't know.

15   Q.    Okay.  Now, the three rings that you have

16         listed, can you describe those to me, each

17         individual one?

18   A.    One of them was, like, kind of -- it was

19         gold, but it had, like, white stuff in the

20         middle.  It looked like diamonds, but they

21         wasn't, like, real diamonds.  They was

22         like -- I don't know what you call it.  It

23         wasn't a real diamond.

Long/State Farm
SF1  00538

85

```
 1   Q.   Were they like zirconia, cubic zirconia
 2        that looks like diamonds?
 3   A.   Yeah.  Kind of shines like it.
 4   Q.   Okay.
 5   A.   Yeah.
 6   Q.   So it was a gold ring?
 7   A.   (Witness nods head.)
 8   Q.   And it had -- Did it have diamonds in it or
 9        they looked like diamonds?
10   A.   Looked like diamonds.
11   Q.   And do you recall how much you paid for
12        that one?
13   A.   Couple hundred dollars.
14   Q.   And where did you purchase that one from?
15   A.   Montgomery.
16   Q.   Did you buy it from --
17   A.   Not the same guy, no.
18   Q.   Did you buy it from a store or --
19   A.   No.
20   Q.   Was it off the street?
21   A.   (Witness nods head.)
22   Q.   But it was not the same guy that you
23        purchased the bracelets from?
```

Long/State Farm
SF1  00539

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

86

1    A.    No.

2    Q.    Do you know the person's name that you

3          bought it from?

4    A.    No.

5    Q.    And you didn't get a receipt?

6    A.    Huh-uh (negative response).

7    Q.    What about the next ring?

8    A.    The other two was nuggets.

9    Q.    Okay.  Gold nugget rings.

10   A.    (Witness nods head.)

11   Q.    Were they identical?

12   A.    Yeah.  Except one was -- One fit my little

13         finger and the other fit my big finger.

14   Q.    Okay.  And where did you purchase those two

15         rings from?

16   A.    Montgomery.

17   Q.    From a store?

18   A.    Huh-uh (negative response).

19   Q.    Same guy that you bought the first ring

20         that we talked about?

21   A.    Yeah.

22   Q.    And each individually, how much do you

23         recall paying for those, the two nugget

Long/State Farm
SF1  00540

1          rings?

2     A.   A couple hundred apiece.

3     Q.   And you bought those in February of 2005?

4     A.   (Witness nods head.)

5     Q.   Are those some of the things that you

6          purchased with your settlement check?

7     A.   Yeah.

8     Q.   So after you cashed your check, you bought

9          some jewelry?

10    A.   Yeah.

11    Q.   And number ten on Exhibit Number 17 is a

12         watch, and you've got $1,000 on it and that

13         you purchased it in January of 2005.

14    A.   Yeah.

15    Q.   Did you pay cash for that?

16    A.   I paid -- I got that watch right there from

17         my nephew.  I was paying kind of like

18         installments.

19    Q.   Did you have any type of written agreement

20         with your nephew?

21    A.   Huh-uh (negative response).

22    Q.   What kind of watch was it?

23    A.   It was, like, a gold watch.  It kind of

Long/State Farm
SF1  00541

88

1   went with that bracelet that I bought from

2   the pawnshop.  It was silver and the face,

3   it didn't have no numbers on it.  It was a

4   clear face.  But it had, like, little

5   diamonds around the band sort of like that

6   bracelet I bought from the pawnshop.

7   That's why I bought it.

8   Q.   And what's your nephew's name?

9   A.   Bailey.

10  Q.   Bailey?

11  A.   (Witness nods head.)

12  Q.   And what's his last name?

13  A.   Chancey.

14  Q.   And where does he live?

15  A.   Millbrook.

16  Q.   Do you have a phone number where we can

17       contact him?

18  A.   Yes.

19  Q.   What's that phone number?

20  A.   His phone number is 799-9701.

21  Q.   And you bought that from him in January

22       2005?

23  A.   (Witness nods head.)

Long/State Farm
SF1  00542

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

89

```
 1   Q.   And what were your installments to him,
 2        your payments?
 3   A.   I mean, it -- sometimes I pay anywhere from
 4        25 to, like, $50 a week.
 5   Q.   Okay.  Are you still paying on it?
 6   A.   No.
 7   Q.   Have you -- Did you pay it off?
 8   A.   Yeah.
 9   Q.   And when did you pay it off?
10   A.   When I got my money.
11   Q.   Do you have a receipt for that DVD player?
12   A.   No.
13   Q.   Were there any other items that were in
14        your vehicle that you can think of today
15        that's not included in Exhibit Number 17?
16   A.   Huh-uh (negative response).
17   Q.   And if you need to take a break at any
18        time, please let me know.
19   A.   I'm fine.
20             (Exhibit 22 was marked for
21             identification.)
22   Q.   I'm going to show you what I've marked as
23        Exhibit Number 22 to your examination under
```

Long/State Farm
SF1  00543

90

1       oath.  And, Mr. Long, if you could review

2       that document and see if you recognize it,

3       please.

4   A.  Yeah.  An affidavit that I filled out.

5   Q.  And you provided that to State Farm?

6   A.  Yes.

7   Q.  And this is an affidavit of vehicle theft;

8       is that correct?

9   A.  Right.

10  Q.  And this is the information that you

11      provided to State Farm regarding the theft

12      of your vehicle; correct?

13  A.  Correct.

14  Q.  Now, on page two of Exhibit 22, there's a

15      box in the -- in the middle of the document

16      that says list all items stolen, and you've

17      got check inventory sheet.  Is that Exhibit

18      Number 17 that we just went over?

19  A.  Oh, yes.

20  Q.  I just wanted to make sure that there

21      wasn't another list.

22  A.  Okay.

23  Q.  That's what you were referring to is

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

91

1        Exhibit Number 17; correct?

2  A.   Right.

3  Q.   And on this affidavit, you've indicated

4        that the date of theft was on February 19,

5        2005 and the time was at 7 a.m.

6          Was your car recovered, Mr. Long?

7  A.   Yes.

8  Q.   Do you know when it was recovered?

9  A.   Not exactly.  I can't remember the date

10       that it was recovered.

11  Q.   And how were you notified that it was

12       recovered?

13  A.   Well, Todd called me.  That day when I got

14       back home there was a message from the

15       police department.

16  Q.   Okay.  So Todd -- You're referring to Todd

17       Smith from State Farm?

18  A.   Yes.

19  Q.   Now, when you bought the Corvette, how many

20       sets of keys did you get with it?

21  A.   Two.

22  Q.   And did you have both sets of keys with you

23       when the car was stolen?

Long/State Farm
SF1  00545

```
 1   A.   No.

 2   Q.   So you had one set with you?

 3   A.   (Witness nods head.)

 4   Q.   Do you know where the other set was?

 5   A.   No.  I don't know what happened to my other

 6        set of keys.

 7   Q.   So you haven't been able to locate those

 8        keys?

 9   A.   No.

10   Q.   Have you tried looking for them?

11   A.   Yes.

12   Q.   Now, was it just a key or was it -- did you

13        have the --

14   A.   No.  I had two keys and --

15   Q.   Keyless entries?

16   A.   Yes.

17   Q.   And you don't recall what you did with the

18        second set of keys?

19   A.   No.

20   Q.   Do you have a recollection of ever giving

21        the keys to anyone?

22   A.   No.

23   Q.   Mr. Smith has just showed me a set of
```

Long/State Farm
SF1  00546

93

| | | |
|---|---|---|
| 1 | | keys.  Do you recognize those keys? |
| 2 | A. | Yes. |
| 3 | Q. | Are those the keys that you had on you when |
| 4 | | your car was stolen? |
| 5 | A. | Yes. |
| 6 | Q. | But you don't recall ever giving the second |
| 7 | | set of keys to anyone? |
| 8 | A. | Huh-uh (negative response). |
| 9 | Q. | From the time that you bought the Corvette, |
| 10 | | did you notice any mechanical problems with |
| 11 | | it? |
| 12 | A. | No.  That car, it would fly.  It was |
| 13 | | straight. |
| 14 | Q. | So you were pleased with the performance? |
| 15 | A. | Yeah. |
| 16 | Q. | Did the Corvette have a security system? |
| 17 | A. | Yes.  As far as I know, all of them have |
| 18 | | security systems. |
| 19 | Q. | Do you know the type of security system on |
| 20 | | that Corvette? |
| 21 | A. | No. |
| 22 | Q. | So you don't have an understanding of how |
| 23 | | the security system works? |

Long/State Farm
SF1  00547

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

94

1    A.    Huh-uh (negative response).

2    Q.    So you don't have any knowledge of whether

3          or not the security system prevents anyone

4          from driving the car unless they have a

5          key?

6    A.    Well, a lot of cars is supposed to do that.

7    Q.    Did you have an opportunity to see your

8          vehicle after it was recovered?

9    A.    Yes.  I saw the pictures.

10   Q.    And describe to me what damage, if any,

11         that was done to the vehicle that you

12         recall.

13   A.    Well, they took the rims and tires off.

14         The seats was missing and the top was out.

15   Q.    Did you have T-tops or ...

16   A.    No, it's not T-tops, but -- I forgot what

17         they call it.  But on Vettes all the tops

18         come off.

19   Q.    So it's a hardtop?

20   A.    Yeah, it was a removable hardtop.  Yeah.

21   Q.    And you put it back.  Does it have a cover

22         that you can slide in to put in the hatch

23         part of the back of the Corvette?

Long/State Farm
SF1  00548

95

1    A.    No.  It ain't got no cover, but they've got

2          a spot where you can put it.

3    Q.    So you can secure it in the back so it

4          won't move around?

5    A.    Uh-huh (positive response).

6    Q.    So the tires and the rims were missing?

7    A.    (Witness nods head.)

8    Q.    When you saw it, did it have tires on it?

9    A.    Yeah, it had tires and rims on it when I

10         saw the pictures.

11   Q.    So you were looking at pictures of it?  Did

12         you ever see the car -- I mean, did you

13         physically go to the car --

14   A.    No.

15   Q.    -- and observe it?  So you're looking at

16         photographs?

17   A.    Right.

18   Q.    Do you know who took those photographs?

19   A.    Todd.

20                THE WITNESS:  Didn't you take the

21             pictures?

22             MR. SMITH:  Yes.

23   Q.    So Mr. Smith showed you some pictures?

Long/State Farm
SF1  00549

96

1   A.   Right.

2   Q.   So you said the tires and rims --

3   A.   Was missing.  The ones that I had on.  But

4        it still had rims and tires on it.

5   Q.   But those were not the ones that you bought

6        and put on it?

7   A.   Huh-uh (negative response).

8   Q.   And you said the seats were missing?

9   A.   (Witness nods head.)

10  Q.   And the top?

11  A.   The top.

12  Q.   Notice anything else?

13  A.   Huh-uh (negative response).

14  Q.   Was there any physical damage to the car

15       that you could see?

16  A.   Huh-uh (negative response).

17  Q.   Did anyone tell you that the car sustained

18       physical damage?

19  A.   No.

20  Q.   Do you know if any of the contents of your

21       car were still in the car when they

22       recovered it?

23  A.   No, I don't.

Long/State Farm
SF1  00550

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

97

1    Q.   Is it your understanding that your personal

2         contents were not in the car when it was

3         recovered?

4    A.   Right.

5    Q.   Has any of your personal contents been

6         returned to you since the car has been

7         recovered?

8    A.   No.

9    Q.   Has anyone notified you that your -- some

10        of your personal contents had been

11        recovered and for you to come pick them up?

12   A.   No.

13   Q.   Now, I think you indicated earlier when we

14        were talking about when you first noticed

15        the car missing on the morning of the 19th

16        and I think you indicated that there was

17        some glass on the ground?

18   A.   Right.

19   Q.   Okay.  And was it your opinion that this

20        was glass from your vehicle?

21   A.   Yes.

22   Q.   Where did you notice the glass?  Was it on

23        the driver's side, the passenger's side,

Long/State Farm
SF1   00551

98

1         front, back?  Where did you notice --

2    A.   On the passenger's side.

3    Q.   So it would be on the right side of the

4         vehicle?

5    A.   Right.

6    Q.   Okay.

7    A.   As I was looking at the spot, it was on the

8         left side, which to me is on the

9         passenger's side.

10   Q.   Was it a lot of glass?

11   A.   Yeah.

12   Q.   And when you saw that glass on the ground,

13        what did you think?

14   A.   Well, I knew somebody took my car.

15   Q.   Okay.  Do you have any idea how someone

16        could have stolen your car?

17   A.   No.

18   Q.   Now, in those pictures that you saw that

19        Mr. Smith took, did it show the steering

20        column?

21   A.   Yes.

22   Q.   And what did you observe in those

23        pictures?

Long/State Farm
SF1  00552

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

99

1    A.    I mean, it looked normal to me.

2    Q.    Have you learned any information from law

3          enforcement of how your vehicle was

4          stolen?

5    A.    No.

6    Q.    Has anyone told you that the steering

7          column of the Corvette was tampered with?

8    A.    No.

9    Q.    Since your vehicle was taken from the

10         parking lot at the hotel, has anyone told

11         you that whoever took the vehicle had to

12         have the key?

13   A.    No.

14   Q.    Do you have any personal knowledge of how

15         your vehicle was taken from the parking lot

16         at the hotel?

17   A.    No.

18   Q.    If it's been determined that a key was used

19         to remove your car from the hotel lot --

20         parking lot, would you have any explanation

21         as to how that occurred?

22   A.    Huh-uh (negative response).

23   Q.    Do you have any personal knowledge of who

Long/State Farm
SF1  00553

1          took your Corvette from the parking lot of

2          the hotel on the 19th?

3     A.   Huh-uh (negative response).  I wish I did.

4     Q.   Mr. Long, did you participate in my way

5          with the reported theft of your Corvette?

6     A.   No.

7     Q.   Do you know of anyone that would have a

8          reason to steal your car?

9     A.   No.  Huh-uh (negative response).  Not

10         personally, no.

11    Q.   Who knew that you were going to Georgia

12         that weekend?

13    A.   Nobody.

14    Q.   So no one from here in Millbrook or

15         Montgomery knew you were going?

16    A.   Huh-uh (negative response).

17    Q.   Did your wife know that you were going out

18         of town?

19    A.   Huh-uh (negative response).  Oh, yeah, she

20         knew I was going out of town.  But she

21         didn't know where I was going.

22    Q.   Okay.  So you have no recollection of

23         anyone that would know where you were

Long/State Farm
SF1   00554

1   going, that you were going out of town and

2   you were going to the Country Hearth Inn?

3 A. No.

4 Q. Do you have any personal knowledge of

5   whether Ricky or Sandy had anything to do

6   with the theft of your vehicle?

7 A. No.  They didn't have nothing do with my

8   car.

9 Q. Do you have any personal knowledge of

10   whether or not Donald, Valerie's other

11   brother from the Atlanta area, had anything

12   to do with the theft of your vehicle?

13 A. No.

14 Q. After you noticed that your vehicle was

15   missing from the parking lot that morning,

16   you don't recall having a conversation with

17   Ricky and Sandy regarding the contents of

18   your vehicle?

19 A. Huh-uh (negative response).

20 Q. Would there be any reason why you would

21   discuss with them what the contents were of

22   your vehicle?

23 A. I mean, I could have told them what I had

Long/State Farm
SF1  00555

102

1    in there, but, I mean, that's about it. I

2    could have told them what I had in my car

3    after it got took.

4  Q.   That morning did you ever have a discussion

5       with Ricky or Sandy or Valerie regarding

6       what you were going to claim on your

7       insurance?

8  A.   Huh-uh (negative response).

9  Q.   If there was a witness that overheard you

10      speaking with Ricky and Sandy about what

11      you were going to claim or what you needed

12      to claim on your insurance claim, would you

13      have any information regarding that

14      conversation?

15 A.   Say what, now?

16 Q.   That was a bad question. I'm sorry. If

17      there was a witness that overheard you

18      speaking with Ricky and Sandy of what you

19      needed to claim on your insurance claim

20      regarding the theft of your vehicle and

21      your contents, would you dispute that?

22 A.   A witness saying what I was going to tell

23      them what I was going to claim?

Long/State Farm
SF1  00556

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

103

1    Q.    Yes, sir.  If someone -- If there was a

2          witness that overheard you speaking with

3          Ricky and Sandy of what you needed to claim

4          on your insurance.

5    A.    Yeah.  I mean, they -- they didn't tell

6          me -- They didn't know what all I had in my

7          car.

8    Q.    But if someone overheard a conversation

9          that you had with Ricky and/or Sandy that

10         morning about what you had in your vehicle

11         or what you needed to claim on your

12         insurance claim, would that be incorrect

13         that they overheard a conversation of what

14         you needed to claim on your insurance

15         claim?

16   A.    Yeah.

17                   MS. TAYLOR:  Let's take a break

18                        for just a minute.

19                   (Brief recess was taken.)

20   Q.    Mr. Long, on number -- Exhibit Number 17,

21         you've got a DVD player.  Where was that in

22         the car -- in your car?

23   A.    Up in the front.                    Long/State Farm
                                                SF1  00557

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
                (334) 263-4455

104

1    Q.    Was it plugged in?

2    A.    Huh-uh (negative response).  I unplugged

3          it.  But, yes, it was -- it's a plug-in DVD

4          player thing, but it wasn't plugged in.

5    Q.    So was it on the console?  Was it sitting

6          in that front area?

7    A.    Yeah.

8    Q.    So it was visible?  I mean, it --

9    A.    Oh, no.  When I got out, it was, like, on

10         the floor.  But it was sitting like as far

11         as like riding.

12   Q.    But it wasn't plugged in?

13   A.    Huh-uh (negative response).

14   Q.    Did you have a prior claim with your

15         Mustang?

16   A.    Yeah.  Yeah.

17   Q.    Can you tell me about that one?

18   A.    Well, I mean, I got in a shoot-out with a

19         dude, and I shot my car.

20   Q.    When do you recall that happening?

21   A.    The week before I went out of town.  It was

22         that Saturday prior to that.

23   Q.    Okay.  And you had a shoot-out?

Long/State Farm
SF1  00558

105

1    A.    Uh-huh (positive response).

2    Q.    Okay.  Can you kind of tell me what

3          happened or what occurred?  Who was it that

4          you had the shoot-out with?

5    A.    A dude named Christopher McBride.

6    Q.    Do you know Mr. McBride?

7    A.    No, I don't really know him.

8    Q.    Does he know who you are?

9    A.    He don't really know me.  But, yeah, he

10         knew my car.

11   Q.    Okay.  And y'all had a altercation or ...

12   A.    Uh-huh (positive response).

13   Q.    Do you know what it was about?

14   A.    Somewhat.  He had got into it with another

15         dude I knew, and I let the dude -- well, I

16         let the dude use a pistol.

17   Q.    Now, is that a friend of yours that you're

18         referring to?

19   A.    Uh-huh (positive response).

20   Q.    What is his name?

21   A.    Lester Jackson.

22   Q.    So you let him use a gun of yours?

23   A.    Yes.

Long/State Farm
SF1  00559

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

106

1   Q.   And Mr. McBride knew that?

2   A.   Well, he had -- I guess he got word of it.

3   Q.   Okay.

4   A.   But we told the cops, so I guess the cops

5        must have told him or whatever.  I don't

6        know.

7   Q.   And what was your claim on your Mustang

8        for?

9   A.   Well, the bullet had went through the roof

10       and went through the rearview mirror, the

11       dashboard and the windshield.

12  Q.   And was that from the shoot-out?

13  A.   Uh-huh (positive response).

14  Q.   Did Mr. McBride shoot your car?

15  A.   Huh-uh (negative response).  I shot my own

16       car.

17  Q.   And was that because he was shooting at

18       you?

19  A.   Uh-huh (positive response).

20  Q.   Do you recall who started shooting first?

21  A.   Yeah.  He did.

22  Q.   Now, Donald, Valerie's brother, does he

23       live in --

Long/State Farm
SF1  00560

107

1   A.   Lithonia.

2   Q.   -- Lithonia?

3   A.   Yes.

4   Q.   He does live in Lithonia?  Because my next

5        question is why Lithonia?

6   A.   I mean that's why.

7   Q.   Because Donald lives in that area?

8   A.   Yeah.

9   Q.   Okay.  So Ricky, Sandy, Valerie and

10       yourself were going to that area to see

11       Donald?

12  A.   (Witness nods head.)

13  Q.   Do you know where your vehicle was

14       recovered?

15  A.   No.

16  Q.   You don't know the area that they found it?

17  A.   Huh-uh (negative response).  I don't know

18       nothing about that place.

19  Q.   And I think you indicated this earlier, but

20       I just want to make sure I understand.

21       Were Ricky and Sandy staying at the same

22       hotel with you?

23  A.   (Witness nods head.)

Long/State Farm
SF1  00561

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

108

1   Q.   Did they check in at the same time?

2   A.   Yeah.

3   Q.   Because y'all arrived at the same time;

4       correct?

5   A.   Right.

6   Q.   Do you know if you have any photographs of

7       any of the items that are listed on Exhibit

8       Number 17?

9   A.   17.  Oh, okay.  No, I ain't got no

10       photographs.

11   Q.   I didn't know if you were at a party,

12       somebody's birthday party, a relative's

13       where you may have had one of the suits on

14       with the leather jacket or anything of that

15       nature.  Because sometimes people don't

16       recall that they might have photographs.

17   A.   Right.

18   Q.   So I was just wondering if you had any type

19       of photographs where you might have been

20       wearing those rings or bracelets that

21       somebody might have taken of you?

22   A.   No.

23   Q.   Okay.  Now, I know I've asked you about the

Long/State Farm
SF1  00562

```
 1        key earlier, but the reason why I'm asking

 2        is to see if you recall.  Do you know if

 3        you gave your wife the second set of keys

 4        to your Corvette?

 5   A.   Huh-uh (negative response).  I ain't give

 6        them -- Huh-uh (negative response).  If she

 7        took a set and threw them away, I couldn't

 8        tell you that.  But I ain't give her no

 9        set.

10   Q.   And you don't have any recollection of

11        setting them down at the house anywhere or

12        putting them on a -- You know, at my house

13        I've got some place where I put my keys.

14        I've got my keys, backdoor key, you know,

15        right there as I go out my garage at my

16        house.  Do y'all --

17   A.   Huh-uh (negative response).

18   Q.   Do you recall ever setting that second set

19        of keys somewhere at the house?

20   A.   Huh-uh (negative response).  I mean, that's

21        probably what I had to do with them,

22        though, put them in the house somewhere.  I

23        can't remember.
```

Long/State Farm
SF1  00563

110

1   Q.   And would that be at your house on

2        Caroline?

3   A.   Caroline.

4   Q.   Caroline.  Okay.

5        But you haven't been -- Have you looked

6        for them?

7   A.   Yes.

8   Q.   And you haven't been able to find them?

9   A.   Huh-uh (negative response.)

10   Q.   Is it a possibility that the second set of

11        keys was in the car?

12   A.   Huh-uh (negative response).

13              MR. SMITH:  Do you know where

14               Donald lives in Lithonia?

15   Q.   Oh, yeah.  I'm sorry.  Yeah.  Do you know

16        his address?

17   A.   No, I don't know his address.  But I know

18        it's not too far from the hotel.

19   Q.   And you don't have a contact number for

20        him?

21   A.   No.

22   Q.   Was Valerie the one that contacted Donald?

23   A.   What do you mean?

Long/State Farm
SF1  00564

111

1   Q.   Well, y'all obviously went there because he

2        lives in that area to see him.

3   A.   Oh, I mean, yeah, they talk.  All of them

4        talk.

5   Q.   Now, I know that on the cell phone records

6        it has Valerie Ware.  Do you know of any

7        other last name that she may go by other

8        than Ware?

9   A.   Huh-uh (negative response.)

10              (Plaintiff's Exhibit 23 was marked

11              for identification.)

12  Q.   I'm going to show you what I've marked as

13       Exhibit Number 23 to your examination under

14       oath, Mr. Long.  And is this the settlement

15       agreement in the divorce action that you

16       provided to me earlier this morning?

17  A.   Right.

18  Q.   And it indicates that you were the one that

19       filed for divorce against your wife?

20  A.   Yes.

21  Q.   And that you filed it in Elmore County; is

22       that correct?

23  A.   Uh-huh (positive response).          Long/State Farm
                                              SF1  00565

112

```
 1   Q.   Or that you're going to file it?

 2   A.   It's been filed.  It just ain't came back

 3        yet.

 4   Q.   And your wife has been notified that the

 5        documents have been filed?

 6   A.   Huh?

 7   Q.   I mean, did she sign the documents?

 8   A.   Uh-huh (positive response).

 9   Q.   So it was uncontested?

10   A.   Right.

11   Q.   Okay.

12              MS. TAYLOR:  Anything else?

13              MR. SMITH:  No.

14   Q.   All right.  Mr. Long, thank you so much.  I

15        appreciate you coming in today.

16   A.   I do have some questions.

17   Q.   Okay.  One other thing.  You have the right

18        to read your transcript from today, and if

19        you'd like the opportunity to read it, the

20        court reporter will send you a copy of your

21        transcript, and you'll have an opportunity

22        to read it.  She'll provide you with an

23        errata sheet, and if there's any mistake or
```

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

```
 1           correction that you'd like to make, you'll

 2           have an opportunity to make that.

 3   A.      I ain't worried about all that.  I'm trying

 4           to see when is this going to be over.

 5   Q.      Well, what we'll do is I'll need an

 6           opportunity to get the transcript back from

 7           the court reporter, and then if there's any

 8           type of investigation that State Farm needs

 9           to follow up on, they'll do that at that

10           time.  And they will make every effort to

11           continue their investigation and complete

12           it and then let you know their decision.

13   A.      I mean, that's what I'm saying.  How long

14           will that take?

15   Q.      I can't give you a time frame.  I mean,

16           we'll make every effort to do what State

17           Farm needs to do to resolve it and let you

18           know their decision.

19                    MR. SMITH:  Can you do me a

20                         favor?  Can you give me

21                         Donald's name and where he

22                         lives from Valerie?

23                    THE WITNESS:  Yeah.
```

Long/State Farm
SF1  00567

114

1      MR. SMITH:  Can you do that and

2          call me?

3      THE WITNESS:  Yeah.

4      MR. SMITH:  That will help me

5          out.

6      THE WITNESS:  Okay.

7      MR. SMITH:  And as I told you once

8          before, I'm going to keep you

9          in the rental car until we

10         make a decision.

11     THE WITNESS:  I'm tired to of the

12         rental car, man.

13     MR. SMITH:  I know.  I appreciate

14         your cooperation.

15     MS. TAYLOR:  Thank you, Mr. Long.

16     THE WITNESS:  Okay.

17     * * * * * * * * * * * *

18     FURTHER DEPONENT SAITH NOT

19     * * * * * * * * * * * *

20

21

22

23                                    Long/State Farm
                                      SF1  00568

115

1                    REPORTER'S CERTIFICATE

2    STATE OF ALABAMA:

3    ELMORE COUNTY:

4         I, Haley A. Phillips, Certified Shorthand

5    Reporter and Commissioner for the State of Alabama

6    at Large, do hereby certify that I reported the

7    deposition of:

8                    **MARTIN O. LONG**

9    who was first duly sworn by me to speak the truth,

10   the whole truth and nothing but the truth, in the

11   matter of:

12        Martin O. Long
          Auto Policy No.:         0886-750-01
13        Auto Claim No.:          01-6596-564
          Homeowner's Policy No.:  81-PF-2500-3
14        Homeowner's Claim No.:   01-Q177-057
          Date of Loss:            February 19, 2005
15

16   On Thursday, March 31, 2005.

17        The foregoing 114 computer printed pages

18   contain a true and correct transcript of the

19   examination of said witness by counsel for the

20   parties set out herein.  The reading and signing of

21   same is hereby not waived.

22        I further certify that I am neither of kin

23   nor of counsel to the parties to said cause nor in

Long/State Farm
SF1  00569

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

116

1    any manner interested in the results thereof.

2            This 8th day of April 2005.

3

4

5

6                        _____
                         Haley A. Phillips, Certified
7                        Shorthand Reporter and
                         Commissioner for the State
8                        of Alabama at Large

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Long/State Farm
SF1  00570

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

# 40 Alabama Individual Income Tax Return
## FULL YEAR AND PART-YEAR RESIDENTS

**2003**

For the year Jan. 1 - Dec. 31, 2003,
or other tax year:

Beginning: _____ Ending: _____

FN (For official use only)

Long/State Farm
SF1  00713

Your social security number ► 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

Spouse's SSN if joint return ► 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

Your first name and initial (if joint return, also give spouse's first name and initial)  Last name

MARTIN O & EVELYN LONG

Present home address (number and street or P.O. Box number)

2752 CAROLINE DR

City, town or post office, state, and ZIP code

MILLBROOK                        AL 36054

| Filing Status and Exemptions | | |
|---|---|---|
| Check only one box. | 1 | $1,500 Single |
| | 2 [X] | $3,000 Married filing joint return (even if only one spouse had income) |
| | 3 | $1,500 Married filing separate return. Complete line 5 with spouse's name & soc. sec. no. |
| | 4 | $3,000 Head of family (with qualifying person). (See page 7 of instr.) Complete line 5. |

5 Name _____
Soc. Sec. No. _____
Relationship _____

**Income and Adjustments**

6 Wages, salaries, tips, etc. (list each employer and address separately):

| | | A - Alabama tax withheld | | B - Income |
|---|---|---|---|---|
| a | CSX RAIL PAYROLL JACKSONVILLE 32202 | 6a 471 00 | 6a | 12,500 00 |
| b | WALMART ASSOCIAT BENTONVIILE 72716800 | 6b 40 00 | 6b | 1,420 00 |
| c | | 6c 00 | 6c | 00 |
| d | | 6d 00 | 6d | 00 |

7 Interest and dividend income (also attach Schedule B if over $1,500) · · · · · · · · · · · · · ► 7 | 00
8 Other income (from page 2, Part I, line 9) · · · · · · · · · · · · · · · · · · · · · · · · · ► 8 | 00
9 Total income. Add amounts in the income column for line 6a through line 8 · · · · · · · · · ► 9 | 00
10 Total adjustments to income (from page 2, Part II, line 8) · · · · · · · · · · · · · · · · · ► 10 | 00
11 Adjusted gross income. Subtract line 10 from line 9 · · · · · · · · · · · · · · · · · · · · ► 11 13,920 00

**Deductions**

You Must Attach page 2 of Federal Form 1040, Federal Form 1040A, page 1 of 1040EZ, or a copy of your Telefile Schedule if claiming a deduction on line 13.

12 Check box a, if you itemize deductions, and enter amount from Schedule A, line 26. · · · · · ► 11 13,920 00
Check box b, if you do not itemize deductions, and enter standard deduction (see instr.) Box a or b MUST be checked

► [X] a  Itemized Deductions   b [ ]  Standard Deduction
13 Federal tax liability deduction (complete Part V, page 2) · · · · · · · · · · · · · · · 12 3,028 00
DO NOT ENTER THE FEDERAL TAX WITHHELD FROM YOUR FORM W-2(S)
14 Personal exemption (from line 1, 2, 3, or 4) · · · · · · · · · · · · · · · · · · · · · 13 3,000 00
15 Dependent exemption (from page 2, Part III, line 2) · · · · · · · · · · · · · · · · · 14 300 00
16 Total deductions. Add lines 12, 13, 14, and 15 · · · · · · · · · · · · · · · · · · · · ► 15 00
17 Taxable income. Subtract line 16 from line 11 · · · · · · · · · · · · · · · · · · · · · · · 16 6,328 00

**Tax**

Staple Form(s) W-2, W-2G, and/or 1099 here.

18 Income Tax due. Enter here and check if from [X] Tax Table or [ ] Form NOL-85A · · · 17 7,592 00
19 Less credits from: [ ] Schedule CR and/or [ ] Schedule OC and/or [ ] Enterprise Zone Act (see instructions) 18 298 00
20a Net tax due Alabama. Subtract line 19 from line 18 · · · · · · · · · · · · · · · · · · · · 19 00
20b Consumer Use Tax (use worksheet on page 11) · · · · · · · · · · · · · · · · · · · · · · 20a 298 00
21 You may make a voluntary contribution to any of the following: Alabama Election Campaign Fund or the Neighbors Helping Neighbors Fund.
a Alabama Democratic Party $1 [ ] S2 [ ] [X] none 20b 00
b Alabama Republican Party $1 [ ] S2 [ ] [X] none 21a 00
c Neighbors Helping Neighbors $ 21b 00
22 Total tax liability and voluntary contribution. Add lines 20a, 20b, 21a, 21b, and 21c · · · 21c 00

**Payments**

23 Alabama income tax withheld (from Forms W-2, W-2G, and/or 1099) · · · · 23 511 00   22 298 00
24 Amount paid with extension (attach Form 4868A) · · · · · · · · · · · 24 00
25 2003 estimated tax payments (see instructions on page 11) · · · · · · 25 00
26 Total payments. Add lines 23 through 25 · · · · · · · · · · · · · · · · · · · · · · · · · · 26 511 00

**AMOUNT YOU OWE**

27 If line 22 is larger than line 26, subtract line 26 from line 22, and enter AMOUNT YOU OWE.
Place money order, along with Form 40V, loose in the mailing envelope. (FORM 40V MUST ACCOMPANY PAYMENT.)
If paying by credit card do not include Form 40V and check here [ ] CN 26 511 00

28 Estimated tax penalty. Also include on line 27 (see instructions page 11) ► 00

**OVERPAID**

29 If line 26 is larger than line 22, subtract line 22 from line 26, and enter amount  OVERPAID · · 28 00
30 Amount of line 29 to be applied to your 2004 estimated tax · · · · · · · · · · · · · · · · · 30 213 00
31 You may donate all or part of your overpayment. (Enter $1, $5, $10, $25, none, or other amount in the appropriate boxes.)

**Donation Check-offs**

| | | | |
|---|---|---|---|
| a Senior Services Trust Fund ► | 00 | f AL Indian Children's Scholarship Fund ► | 00 |
| b AL Arts Development Fund ► | 00 | g Penny Trust Fund · · · · · · | 00 |
| c AL Nongame Wildlife Fund ► | 00 | h Foster Care Trust Fund · · · | 00 |
| d Child Abuse Trust Fund ► | 00 | i Mental Health · · · · · · · · | 00 |
| e AL Veterans Program ► | 00 | j AL Breast & Cervical Cancer Program | 00 |
| | | k AL 4-H Club · · · · · · · · · | 00 |

32 Total. Add line 30 and lines 31a, b, c, d, e, f, g, h, i, j and k · · · · · · · · · · · · · · · · 32 00

**REFUND**

33 REFUNDED TO YOU. Subtract line 32 from line 29. (CAUTION: You must sign this return on page 2.) · · · · · · ► 33 00

213 00

**PLEASE**
- Verify your social security number
- Recheck your math
- Sign return on page 2
- Attach W-2 form(s)

Form **1040A**

Department of the Treasury - Internal Revenue Service

**U.S. Individual Income Tax Return** (99) **2004**

IRS Use Only - Do not write or staple in this space.

**Label** (See page 18.)

Use the IRS label. Otherwise, please print or type.

| L A B E L  H E R E | |
|---|---|
| Your first name and initial | Last name |
| MARTIN O | LONG |
| If a joint return, spouse's first name and initial | Last name |
| EVELYN | LONG |
| Home address (number and street). If you have a P.O. box, see page 18. | Apt. no. |
| 2752 CAROLINE DR | |
| City, town or post office, state, and ZIP code. If you have a foreign address, see page 18. | |
| MILLBROOK          AL    36054 | |

OMB No. 1545-0085

Your social security number
420~15-4502

Spouse's social security number
419~04-6024

▲ **Important!** ▲
You **must** enter your SSN(s) above.

**Presidential Election Campaign** (See page 18.)

Note. Checking "Yes" will not change your tax or reduce your refund.

Do you, or your spouse if filing a joint return, want $3 to go to this fund? . . . . . . . ▶

You ☐ Yes ☒ No    Spouse ☐ Yes ☒ No

**Filing status**

Check only one box.

1 ☐ Single
2 ☒ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4 ☐ Head of household (with qualifying person). (See page 19.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) with dependent child (see page 19)

**Exemptions**

6 a ☒ Yourself.    If someone can claim you as a dependent, **do not** check box 6a.

b ☒ Spouse

c Dependents:

If more than six dependents, see page 20.

| (1) First name    Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) Check if qual- ifying child for child tax credit (see pg. 21) |
|---|---|---|---|
| BEN          FRANKLIN | 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 | BROTHER | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

Boxes checked on 6a and 6b: **2**

No. of children on 6c who:
• lived with you: **1**
• did not live with you due to divorce or separation (see page 21)
• Dependents on 6c not entered above

d Total number of exemptions claimed.

Add numbers on lines above ▶ **3**

**Income**

Attach Form(s) W-2 here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see page 22.

Enclose, but do not attach, any payment.

| | | |
|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2. | 7    15,923 |
| 8 a | Taxable interest. Attach Schedule 1 if required. | 8a |
| b | Tax-exempt interest. **Do not** include on line 8a. | 8b |
| 9 a | Ordinary dividends. Attach Schedule 1 if required. | 9a |
| b | Qualified dividends (see page 23). | 9b |
| 10 | Capital gain distributions (see page 23). | 10 |
| 11a | IRA distributions.    11a | 11b Taxable amount (see page 23).    11b |
| 12a | Pensions and annuities.    12a | 12b Taxable amount (see page 24).    12b |
| 13 | Unemployment compensation and Alaska Permanent Fund dividends. | 13 |
| 14a | Social security benefits.    14a | 14b Taxable amount (see page 26).    14b |
| 15 | Add lines 7 through 14b (far right column). This is your **total income.** ▶ | 15    15,923 |

**Adjusted gross income**

| | | |
|---|---|---|
| 16 | Educator expenses (see page 26). | 16 |
| 17 | IRA deduction (see page 26). | 17 |
| 18 | Student loan interest deduction (see page 29). | 18 |
| 19 | Tuition and fees deduction (see page 29). | 19 |
| 20 | Add lines 16 through 19. These are your **total adjustments.** | 20 |
| 21 | Subtract line 20 from line 15. This is your **adjusted gross income.** ▶ | 21    15,923 |

Long/State Farm
SF1  00721

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 57.

EEA

Form **1040A** (2004)

AGENCY: DEKALB COUNTY POLICE DEPARTMENT
Jurisdiction: GA0440200
Report Date / Time: 2/19/2005 9:30:18 AM
Incident/Case Number: 05-023612
Case Description: 7
Primary Officer Name/ID: C A WIMBERLY/2378
Approved By:
Date/Time Printed: 3/4/2005 5:03:38 PM

# Narrative: Page 2

I SPOKE TO VICTIM MARTIN LONG WHO ADVISED AN UNKNOWN SUSPECT STOLE HIS 2000 CHEVROLET CORVETTE UNKNOWN ALABAMA TAG. MR LONG SAID HE PARKED HIS VEHICLE IN THE PARKING LOT OF COUNTRY HEART INN & SUITES EARLIER THIS DATE AND WHEN HE RETURNED HIS VEHICLE WAS GONE.
THE VEHICLE WAS NOT PLACED ON NCIC. MR LONG WAS ADVISED TO CONTACT US WHEN HE GET EITHER THE CORRECT REGISTRATION OR VEHICLE IDENTIFICATION NUMBER FOR THE VEHICLE.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Narrative Title: INITIAL REPORT
Date Entered: 2/26/2005 1:37:05 AM

ON 02/25/2005 (FRIDAY) I RESPONDED TO CLIFTON SPRINGS MANOR AND JAYNES VALLEY DR IN REFERENCE TO AN ABANDONED VEHICLE. UPON ARRIVAL, I OBSERVED A GRAY CHEVROLET CORVETTE THAT WAS MISSING ITS T-TOP ROOF AND THE SEATS.
WHEN I RAN THE VIN, THE VEHICLE CAME BACK STOLEN OUT OF DEKALB COUNTY POLICE DEPARTMENT. THE VEHICLE WAS CONFIRMED BY OPERATOR CARRIE.
THE VEHICLE WAS IMPOUNDED TO TOP CAT.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Narrative Title: SUPPLEMENTAL NARRATIVE
Date Entered: 3/2/2005 12:39:53 PM

VICTIM - MARTIN LONG ADDED INFORMATION TO 05 023612. ACCORDING TO MR. LONG THE FOLLOWING ITEMS WERE IN HIS VEHICLE WHEN IT WAS STOLEN. A 3/4-LENGTH MENS BLACK LEATHER JACKET VALUED AT $250.00, A DVD PLAYER VALUED AT $160.00, A 45 CALIBUR AUTOMATIC PT145 TAURUS FIREARM, SERIAL #NWD52402 VALUED AT $350.00, $5000.00 CASH (IN CENTER CONSOLE), 3 MENS SUITES AND 2 MENS PANTS SUITES VALUED AT $1500.00, 4 PAIRS MENS SHOES VALUED AT $1100.00, 4 GOLD MENS BRACELETS VALUED AT $2500.00, 3 GOLD MENS RINGS VALUED AT $1200.00, AND 1 SILVER MENS WATCH WITH DIAMONDS AROUND THE BAND VALUED AT $1000.00.

Long/State Farm
SF1  00733

RECEIVED

APR 0 7 2005

SIU

560-213.15  Rev. 06-1998  Printed in U.S.A.

*Please complete circled columns only. Make as many copies as needed! Thanks*

# Personal Property Inventory Form

Insured: See other side for instructions and example.
Claim Representative: Complete all shaded areas.

Claim Number: 01-Q177-057
Claim Unit: 46
Date of Loss: 2-19-05
Ded 500   CR SG
Claim Rep. SG =
JF =   BP =   FA =
MO: 206

Insured Room: **Long**

| No. | Item No. | Description of Property | Mfr/Brand Name and Serial/Model No. | Purchased or Obtained From | Date of Purchase or Age | Replacement or Repair or Restoration Cost | Today's Value/Actual Cash Value | % Tax | R/C | Depr. Or Discount Amount | Settlement | R/C Benefit Remaining (If applicable) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | Black leather Jacket | 34 French Conor Birmingham | | 2/2005 | 250 ⁰⁰ | | | | | | |
| 2 | 1 | .45 Auto Hand Gun | PT-145 NWD62402 | Montgomery | 2/2005 | 375 ³⁴ | | | | | | |
| 3 | 1 | 5,000 ⁰⁰ (Cash) | | Montgomery | 2/2005 | 5000 ⁰⁰ | | | | | | |
| 4 | 3 | Suits | | Montgomery | 2/2005 | 600 ⁰⁰ | | | | | | |
| 5 | 2 | Pant Suits | | Montgomery | 4/2005 | 180 ⁰⁰ | | | | | | |
| 6 | 4 | Dress Suits | | Montgomery | 4/2005 | 1100 ⁰⁰ | | | | | | |
| 7 | 4 | Bracelets | | | 9/2005 | 2500 ⁰⁰ | | | | | | |
| 8 | 3 | Rings | | | 9/2005 | 1200 ⁰⁰ | | | | | | |
| 9 | 1 | Big in DVD Player in car | DYNEX 5' LCD | | 1/2005 | 160 ⁰⁰ | | | | | | |
| 10 | 1 | Watch | | | 1/2005 | 1000 ⁰⁰ | | | | | | |

TO BE COMPLETED BY INSURED

TO BE COMPLETED BY CLAIM REPRESENTATIVE

Date Completed

TOTALS

DEDUCTIBLE
LESS RS ORDERS
SETTLEMENT

The above information is true to the best of my knowledge.

Home and Work Phone No.: ( ___ )

Prane

Long/State Farm
SF1   00752

PENGAD 800-631-6989

EXHIBIT
17

QUIK PAWN SHOP
855 BELL STREET, MONTGOMERY, AL  36104 (334) 264-4013

SALES RECEIPT

Customer: LONG, MARTIN G                           Date: 20030310

Description                    Ser # / TCW              Price@
14K DIA LINK BRACELET          APPR 1 CT               599.95

EXHIBIT
19

Sub Total          599.95
Tax                 15.00
Total Sale         613.95
Prcd By     FRAN           Amt Tendered
Sold By     FRAN           Change
Ticket #: 00806
Meth Of Pay:
  30 DAY WARRANTY ON ALL ITEMS EXCLUDING POWER TOOLS, GOLD CHAINS AND BRACELETS.
               1 YEAR WARRANTY ON ALL FIREARMS.
                    NO REFUNDS, EXCHANGE ONLY!

Long/State Farm
SF1   00754

QUIK PAWN SHOP
855 BELL STREET, MONTGOMERY, AL  36104 (334) 264-4013

SALES RECEIPT

Customer: LONG, MARTIN G

Date: 20050216

1Description                          Ser # / TGW              Price0
TAURUS SEMI AUTO HANDGUN             HWD52402                 319.95
UNCLE MIKE'S INSIDE HOLS                                       10.95
PMC 45 AUTO AMMO                     41SS901013               12.95



EXHIBIT

Prep By        FRAN
Sold By        FRAN
Ticket #: 11458
Meth Of Pay: Cash

Sub Total      343.85
Tax             34.39
Total Sale     378.24
Amt Tendered   400.00
Change          21.76

90 DAY WARRANTY ON ALL ITEMS EXCLUDING POWER TOOLS, GOLD CHAINS AND BRACELETS.
1 YEAR WARRANTY ON ALL FIREARMS.
NO REFUNDS, EXCHANGE ONLY!

Long/State Farm
SF1  00755

date: 08-25-06                                    page:        2

# FIRE
### claim number
## 01-Q177-057

## FACTS

INSD WAS IN ATLANTA STAYING HOTEL/MOTEL. CAR WAS STOLEN WITH NEWLY PURCHASED ITEMS IN IT.

| date and time of loss | probable cause | probable loss amt | severity |
|---|---|---|---|
| 02-19-05  12:00 PM | THEFT-ITEM | | |

| date reported to police | department | case number |
|---|---|---|
| 02-20-05 | | |

## PARTIES TO LOSS

### Additional Interest

business: CHASE HOME FINANCE LLC ITS SUCCESSORS AND/OR ASSIGNS
street: PO BOX 979069
city: MIAMI            state/prov: FL    zip/postal: 33197-9069
age:
dob:
phone:  home:                ext:                                    ext:
contact:                                        contact:
deceased:                minor:
ssn or tin:                    occupation:                        tax state:
other insurance:

loan no: 0301291142              addl int type: LIENHOLDER:
file no:                          other claim no:
other pol no:                     other clm rep:

### Company Attorney

business: BEERS, ANDERSON, JACKSON, HUGHES & PATTY
street: PO BOX 1988
city: Montgomery          state/prov: AL    zip/postal: 36104
age:
dob:
phone:  home:                ext:                                    ext:
contact:                                        contact:
deceased:                minor:
ssn or tin: 630980405            occupation:                        tax state: 01
other insurance:
comments: Attorney Angela Taylor                    •

loan no:                          addl int type:
file no:                          other claim no:
other pol no:                     other clm rep:

Long/State Farm
SF2  00003

**FIRE**

RBZ0003N
date: 08-25-06

page:     5

**claim number**
**01-Q177-057**

## ACTIVITY LOG

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 04-19-05 | 01:15 PM | Smith, Todd | GASCSIU | GA-SC | 15 |

Also, Mr. Chancey said our insured did not make payments for the watch & paid for it.  He said he wasn't aware of the claim or the vehicle theft.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| | | | GASCSIU | GA-SC | 14 |

On 4-18, spk w/ Valerie Ware & discussed the claim.  Sent a f/u letter re: our conversation under auto claim # 01-6596-564.
A few minutes ago, spk w/ Bailey Chancey at 334 799-9701 & he confirmed selling a watch to our n.i. for either $1,000.00 or $1,200.00.  He described the watch as silver w/ a black face with diamonds in the middle & no #'s on it.  He said it was not gold.  He said it was a Movado or something like that.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 04-08-05 | 08:50 AM | Nix, Tony | GASCSIU | GA-SC | 13 |

Reviewed file, Cr completing the investigation.

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 04-01-05 | 07:45 AM | Smith, Todd | GASCSIU | GA-SC | 12 |

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 03-03-05 | 10:53 AM | Smith, Todd | GASCSIU | GA-SC | 11 |

On 3-2, after meeting w/ the insured, I went by Looking Good at 71 Dexter Ave, Montgomery, AL & met w/ the manager, R.D. Archie.  He confirmed our insured is a customer there & has bought a lot of clothing and shoes over the past few years.  However, he did not have copies of any past receipts & said our insured came to him recently & asked him to make a receipt for him & that is the receipt he provided to us.  He confirmed the 3 suits, 2 Pant suits & 4 pair of shoes were not recently purchased, as our insured claimed.  However, he said our insured had probably purchased a lot more clothing, etc. than that over the years.

Long/State Farm
SF2  00006

date: 08-25-06                                                           page:        7

# FIRE
claim number
01-0177-057

## ACTIVITY LOG

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-21-05 | 02:27 PM | Harris, Pearlie | FCENTRAL | Al-Miss | 2 |

F:INSD WAS IN ATLANTA STAYING HOTEL/MOTEL. CAR WAS STOLEN WITH NEWLY PURCHASED
ITEMS IN IT.
manf home..per prop r/c..fung excl..500ded..
A:called home. lmtc. called cell and mr advised that he was in atlanta and
someone stole car from his hotel. items inside vehicle include: suits,
jewelry, dvd player, $5000 cash (from lawsuit stlmt), gun, shoes, etc. approx
amt loss-8000. cr took r/s. married..no dependants..mr occupation: not
employed (former engineer for 5 yrs)...mrs occupation-social worker..he was in
hotel in lithonia, ga. someone stole 2000 corvette. pol rpt filed w/
millbrook, al. case #05023612. officer name Ron Phills. cr questioned why pol
rpt not filed w/ GA pol dept. he advised that he did contact them but did not
have serial # to gun. cr questioned why cash and items in vehicle. reason for
all items in vehicle at time of loss, he just purchased. ins has some doc (
rcts). ins had prior theft approx 4 yrs ago. no suspects or arrests made. he
spoke to hotel as he parked under video camera. mgr advised that camera not
working. address: 5400 fairington road, lithonia, ga 30038. cr did address
search and found sleep inn on anywho.com (770-322-1400) that matched address.
cr explained 1000 jewelry..200 MO.. he understood. explained need for ppif,
doc and pol rpt. sent theft ltr w/ partially completed ppif. routing msg to
siu for rev. large loss...5000 cash in car...ins parked under camera but hotel
advised that camera not on.
cal 3/7..opened 54
:ins theft info
   siu rev
S:if RP apprehended or recovery made
!:pilr-8000

| date | time | entered by | office | region | no |
|------|------|-----------|--------|--------|-----|
| 02-21-05 | 11:50 AM | LC, | Agency | Al-Miss | 1 |

Agent's Remarks
INSD HAS FILED AUTO THEFT CLAIM ALSO.

## SYSTEM GENERATED LOG

total system log entries:        1

| date | time | | office | region | no |
|------|------|--|--------|--------|-----|
| 02-21-05 | 02:28 PM | | FCENTRAL | Al-Miss | 3 |

Initial agent acknowledgment sent for reporting agent
01-1973 DEVERS

Long/State Farm
SF2  00008

RB20003N

date: 08-25-06

page:    9

**FIRE**
claim number
**01-0177-057**

## POLICY INFORMATION

| forms | title |
|---|---|
| FE -5452- | MOTOR VEHICLE ENDORSEMENT |
| FE -5843- | AMEND SUBROGATION CONDITION |

## BOAT, MOTOR, TRAILER, MOBILE HOME LINE

| | mfg/model | | serial no. | yr | hp | type |
|---|---|---|---|---|---|---|
| MH | FLEETWOOD | | GAFLX35AB15716HL11 | 90 | | |

### POLICY NOTES

date: 12-09-04
PHOTOS REC'D & RISK LOOK GOOD.   0UA TO F/U PRIOR TO NEXT RENEWAL
FOR REPAIRS. 12/9/04

date: 11-09-04
REPLY FROM STAFF THAT INS SPENT $ HE REC'D TO MAKE THE REPAIRS TO
PAY BILLS & EXPECTED TO GO TO COURT 1/31/05 TO GET COMPENSATION
FOR INJURY REC'D ON HIS JOB.   SENT FOR CURRENT F&R PHOTOS FOR
RECONSIDERATION.  FS 11/9/04

date: 04-27-04
2ND REQ (SEE CRA SCREEN).  FH 4/22/04 REPLY FROM AGT THAT REPAIRS
HAVE NOT BEEN MADE.  INS TO MAKE THEM WHEN HE IS CAUGHT UP.  HAS B
EEN OUT ON DISABILITY SINCE MARCH OF  LAST YEAR & NOT SURE W/HE W/
B GOING BACK TO WORK.  ALREADY BILLED  & 0UR TO F/U PRIOR TO RENEWA
L.  IF REPAIRS NOT DONE ADV AGT WE   W/NON RENEW.  FH 4/27/04

date: 04-22-04
2ND REQ (SEE CRA SCREEN).  FH 4/22/04

te: 03-04-99
A-MLT FOR WOODSTOVE & MH REQUIREMENTS. 3/2/99 F/U 3/22 AGT STATES
WORK IS COMPLETED(SKIRTING ETC....)AND NO STOVE. WS05MAR99

Long/State Farm
SF2  00010

Q.  And what was this amount of cash the $5,000 doing in the car at the time of the loss?
A.  Well I left it in there. I mean I just got a lawsuit and I was so called splurging. I guess that's the words you can use.

Q.  Okay did you report this to the police?
A.  Yeah.

Q.  Who was the police department that you reported it to?
A.  Well I don't ah I don't know the name of the police department but I got the case number that they gave me. Which is the number, the case number I mean the report number is ah 05023612. And I got the number to the police department.

Q.  Was it with the police department or was it with Joe ah the Sheriff?
A.  I don't know because see the thing is they didn't even come out. They made me give it over the phone. And they and I didn't tell them what was in my car over the phone because the lady said that because I didn't have any serial number of the 45 I had to come back in and get it from. I bought it here she told me to call her back and I was trying to call her back this morning, I couldn't reach her and that's when I went to the police department here and ah gave them the items. Well I gave a copy of this items of everything I just told you I just had I gave a copy of that this morning.

Q.  Okay.
A.  And I got the I gave them a copy of the serial number to of the ah 45 that they took.

Q.  And the officer's name?
A.  Ah Officer Fields(sp?). Ron Fields in Millbrook.

Q.  Now did you file this police report in Atlanta or did you file it in, in, in on in your in your hometown?
A.  Well I filed it here in my hometown but I called them when it happened in Atlanta but like I said they, they didn't come out. I gave them the VIN number and everything and they gave me ah report number that they had filed it but they say they couldn't go into NCIC because I didn't know my tag number which I didn't because I only bought had the car a couple of weeks. But when I called the insurance company, they gave me the VIN number and I gave them the VIN number but they still they couldn't pull up the tag number. And I got a rental car when I was up there too.

Q.  So you did contact the, the Georgia Police Department?
A.  Yes I did.

Q.  And why, why were all of these items in the car at the time of the loss?
A.  I, I, I just bought most of it some of it I, I had anyway.

Q.   Okay.
A.   I mean it wasn't like I you know I mean I don't have an excuse for that.  They were just in the car.

Q.   Okay do you have any documentation for the items that are taken?
A.   Are you talking about receipts?

Q.   Um hum.
A.   I got some receipts.

Q.   Okay.
A.   But some of the receipts is in the car with the stuff.  I got some receipts from some of the stuff I bought here before I left.

Q.   Have you ever had a theft occur in the past whether an insured loss or not?
A.   Yeah I had a car stolen before right out of my yard.

Q.   And when, when did this happen?
A.   Ah it's in maybe, maybe four years ago maybe.

Q.   Do the police have any suspects or have any arrests been made?
A.   Not that I know of I mean I ain't I ain't heard nothing from those cats down there in Georgia (inaudible).

Q.   Do you have any suspects?
A.   No.

Q.   Did you talk to the, the hotel to see if they saw anything?
A.   Yeah like I was telling the dude B.F. Cooper the ah dude over the car.  I was letting them know that ah I parked the car in front of the ah video camera. They acted like it wasn't on. I mean when I when I talked to the dude that was on duty that night he said that he didn't know whether it was on or not because ah.  Can you hold well (inaudible).  He didn't know whether it was on or not because you need to talk with the Manager.  So I said okay then once the Manager came in I got with him.  Asked him well he had already heard that my car stolen.  And asked him about the camera and he was like well me and the me and the whatever the guy name that was there had to ah take some CD ROM out, out I had to do something to the machine he said the camera wasn't on.  And I said that the dude that was on duty he didn't say that I said he just say that he didn't know whether it was on or not and then ah he wanted me to talk with, with you which was the Manager I was talking to.  And then when the other guy came back on duty that night I asked him hey man I say ah I say ah didn't you say that you didn't know whether or not the camera was on you had to get with the a Manager? And he changed up well what happened me and the Manager had a took some CD ROM out of the camera.  I said well why didn't you



**EXHIBIT**

_tabbies_

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARTIN O. LONG,                    *

   Plaintiff,                    *

vs.                                *        Case Number: 2:06cv816-MHT

STATE FARM FIRE AND               *
CASUALTY COMPANY,
                                  *
   Defendant.

## DECLARATION OF MICHAEL E. BRESNOCK

I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.    My name is Michael E. Bresnock. I am a citizen of the State of Georgia, am over nineteen years of age, and have personal knowledge of the matters contained in this declaration.

2.    I am a consultant with Transportation Technology, located in Marietta, Georgia.

3.    Attached as Exhibit "1" to this declaration is a true and correct copy of my Curriculum Vitae, showing my qualifications as a vehicle investigator.

I am making this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 in Marietta, Georgia this _13th_ day of March, 2007.

_Michael E Bresnock_
MICHAEL E. BRESNOCK

1

EXHIBIT
B-1

**Consulting Service**

# Transportation Technology

*1184 Wind Hill Lane*
*Marietta, Ga. 30064*
Telephone / Fax (770) 426-6173
Fax: (770) 426-6477
*www.vehicleinvestigator.com*


# Michael E. Bresnock, BSEM, CFEI, CVFI, ASE

## *Education*

Bachelor Degree Engineering Management, Lacrosse University
Associate Degree Automotive Technology, Spring Garden Institute

## *Continuing Education*

Northwestern University Lamp Examination
Northwestern University Tire Examination
Chevrolet School Of Merchandising & Management
Greenville Technical College (fuel systems workshop)
General Motors Institute (Chevrolet Service College)
Dale Carnegie Course
Heavy Duty Truck Training (General Motors Corporation)
Allison Transmission Training
Electrical Training (AC Delco )
Detroit Diesel Training
Eight Day Electrical Training Program- GM Technical College
Chattahoochee Technical Institute (machine shop course 12 weeks)
Aamco Transmission Diagnostic Training Seminar
Auto Fraud & Fire Investigation Seminar
Georgia Fire Investigators Seminar
Cause & Origin of Fire & Explosion (Alabama Fire Investigators)
National Association Of Fire Investigators (NAFI certification test)
Private Detective Training Course-Chattahoochee Technical Institute
National Arson Investigation Training Seminar (40 Hours)
Kentucky University (Vehicle Fire, Arson & Explosion Investigation Seminar)
Eastern Kentucky University- Certified Vehicle Fire Investigator Test
International Association of Arson Investigators ( 5-day seminar August 2003)
ICAC National Arson Investigation Training Seminar (February 2004)
Locks & Security Systems- Ford Motor Company
Locks & Security Systems GM Training Center
Approximately 200 various auto training classes from 1975-1985 on brakes,
Steering, suspension, engines, transmissions, differential, engine controls,
Air conditioning, security systems, keys & locks, power brakes, anti-lock,
Supplemental air restraints, emissions, diesel, electrical, and accessories.


## *Registrations & Certification*

Master Certified Automotive Technician ASE ID #18632BRESN
Master Certified Truck Technician ASE ID #09774
National Association Of Fire Investigators- Certified Fire & Explosion
Investigator #6724-2340
Certified Vehicle Fire & Explosion Investigator- NAFI #6724-2340V

**Consulting Service**

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*Fax: (770) 426-6477*
***www.vehicleinvestigator.com***

Private Detective & Security Agency State Of Georgia License #PDE047147
Cobb County Business License (2005) #67742 Transportation Technology
Private Investigator State of South Carolina License #PDC2389

## Professional Associations

International Association Of Arson Investigators- Technical Committee- IAAI
Georgia Fire Investigators   GFIA
Metro Fire Investigators -MFIA
National Association Of Fire Investigators - NAFI
Center For Auto Safety- Technical Correspondent
National Highway Traffic Safety Administration- Auto Fires Discussion Group

## Automotive Career History

| | |
|---|---|
| 1967-68 Hilltop Chrysler Plymouth | Technician, service writer |
| 1969-74 Chevrolet Motor Division | Area Service Manager |
| 1974-86 General Motors Corporation | Instructor / Trainer |
| 1986-88 Timmers Chevrolet | Service Director / Consultant |
| 1986-88 BINC Torque Converters | Owner |
| 1988-Present Transportation Technology | Consultant |
| 1989-89 Gene Reed Chevrolet | Service Director / Consultant |
| 1990-91 Antilles Automotive | Service Director / Consultant |

## References

Upon Request

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MARTIN O. LONG, | * | |
| Plaintiff, | * | |
| vs. | * | Case Number:  2:06cv816-MHT |
| STATE FARM FIRE AND CASUALTY COMPANY, | * | |
| | * | |
| Defendant. | | |

EXHIBIT
C

## DECLARATION OF MICHAEL E. BRESNOCK

I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.    My name is Michael E. Bresnock.  I am a citizen of the State of Georgia, am over nineteen years of age, and have personal knowledge of the matters contained in this declaration.

2.    I am a consultant with Transportation Technology, located in Marietta, Georgia.

3.    Attached as Exhibit "1" to this declaration is a true and correct copy of the report of an inspection, including a re-inspection, performed by Transportation Technology on a 2000 Chevrolet Corvette, VIN # 1G1YY22G9Y5132554.

4.    I am familiar with how records and reports of inspections of vehicles are made and kept by Transportation Technology.  The report referred to in this declaration

1

was made at or near the time of the inspections by persons with knowledge of these matters. Copies of these reports are kept by Transportation Technology in the course of regularly conducted business and it is the regular practice of Transportation Technology to make these reports.

5.    The inspection was performed on March 8, 2005 and the re-inspection was performed on June 21, 2005.

I am making this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 in Marietta, Georgia this ___9___ day of March, 2007.

_Michael E. Bresnock_

MICHAEL E. BRESNOCK

#131643

2

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*



EXHIBIT
tabbies®
C-1

## CASE 25050 Addendum

## State Farm Case File: 01-6596-564

1.0 ASSIGNMENT

    1.1 Client

    1.2 Subject

    1.3 Location

    1.4 Purpose

    1.5 Date of Inspection

2.0 PARTICIPATING PERSONNEL

3.0 EXAMINATION OF VEHICLE

4.0 CONCLUSIONS

Long/State Farm
SF1   00227

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

## 1.0 ASSIGNMENT

**1.1 Client:**    State Farm Insurance Company

Todd Smith

**1.2 Subject:**    2000 Chevrolet Corvette

Ser# 1G1YY22G9Y5132554

Mileage: 71,064

**1.3 Location:**    Verastar South

Rex Road

Forest Park, Georgia

**1.4 Purpose:**    Reinspection

**1.5 Date of inspection:**    June 21, 2005

## 2.0 Participating Personnel

**2.1 Investigator:**    Michael E. Bresnock- Consultant

Transportation Technology

Long/State Farm
SF1   00228

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

## 3.0  EXAMINATION OF VEHICLE

3.1 At the request of State Farm insurance Company the above mentioned vehicle was re-examined while it was being retained at Verastar South in Forest Park, Georgia. State Farm Insurance Company had custody of the key and remote transmitter which was made available for this inspection.

3.2 As indicated in the original report this vehicle featured the General Motors Pass Key System. Tests conducted during the initial inspection and during this inspection indicated the pass-key system was functioning. The pellet reader had been pulled from the ignition key lock when this vehicle was initially examined. It was reinstalled in the proper position during the preliminary inspection. At the time of this inspection the pellet reader was removed from the key lock, the key was inserted into the key lock and then rotated to the "On" then "Crank" positions. The engine would not  crank or start. The pellet reader was then placed in its original factory installed mounting position on the ignition key lock. _The key was inserted through the pellet reader into the key lock and rotated clockwise to the "On" then "Crank" positions. The engine cranked and started._ The initial test that was performed on

Long/State Farm
SF1   00229

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

March 8, 2005 and this test (June 21, 2005) both produced the same results. "This vehicle will not start with a key that does not have the correct pellet". _The key lock would not rotate to "On" or "Start" position with a key that was incorrectly cut for the lock._

3.3 Several of the plastic close out dash panels were removed to access the ignition switch wiring (Photo #1). _None of the ignition switch wiring showed signs of temporary or permanent over-rides to enable the engine to start without the correct key cut and key pellet (Photo #2, #3)._

3.4 When this vehicle was manufactured the specifications called for an electronic steering lock which prevented the steering wheel from turning when the key was removed. Each time the ignition key was inserted into the key lock and rotated a buzzing noise was able to be heard.  A similar noise was heard each time the ignition key lock was turned to the "Off Lock" position and the key was withdrawn. With each insertion and removal of the ignition key, the steering column never locked or unlocked. An examination of the steering column wiring provided no evidence to indicate an alteration had been performed (Photo #4). It was later

Long/State Farm
SF1  00230

Consulting Service

# *Transportation Technology*

*1184 Wind Hill Lane*
*Marietta, Ga. 30064*
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

determined that this Corvette was part of recall #04V06000 which required the lock plate to be removed (Photocopy #1). This finding would account for the steering column's failure to lock and unlock when the key was inserted rotated and removed from the ignition key lock.

3.5 This vehicle was equipped with the UTD alarm system. The system was able to be armed (as indicated by the security lamp on the dash) but when the system was violated by operating the power door lock switch, parking lamp switch, opening doors or opening the hood, *the alarm failed to operate*. Tests conducted on the system enabled some electrical switches and components to be eliminated but the end result indicated *the UTD (Universal Theft Deterrent) system did not work as intended.*

3.6 During the initial inspection the transmission shift control lever could not be moved from the "P" Park position. During this inspection the plastic panels and covers were removed to access the mechanical portion of the transmission controls (Photo #5). It should be noted that Federal Motor Vehicle Safety Standards #102 and #114 apply to this vehicle's transmission shift control mechanism. In order to

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga.  30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

comply with the safety standards, the manufacturer chose to use a cable that extended from the   ignition key lock to the transmission shift control. After disconnecting the cable from the transmission linkage, it was possible to remove the transmission from the "P" Park position (Photo #6). While the engine was in operation the shift mechanism was moved into the "D" Drive and "R" Reverse positions. The vehicle's transmission responded by allowing the vehicle to move forward and rearward. There was considerable difficulty in moving the shift mechanism into the "P" Park position after conducting the above mentioned tests. It is likely that the linkage was  bent.


3.7 The vehicle was elevated for an undercarriage examination (Photo #7).  There were indications of undercarriage interference contact (Photos #8, #9). The message center on the instrument cluster indicated brake system and traction control system failures. The brake system problem was able to be verified when a brake application allowed the pedal to travel almost to the floor board. The traction control system problem could not be verified or diagnosed because it required an undercarriage inspection. Undercarriage inspections are routinely denied because of safety concerns at all Verastar salvage lots.

Long/State Farm
SF1  00232

Consulting Service

# *Transportation Technology*

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

3.8 While the engine was in operation the oil pressure gauge was in a full travel position. Additional tests indicated the gauge was not functioning properly. The gauge moved to the full travel position and remained in that position even when the engine was not in operation.

## 4.0 CONCLUSIONS

4.1 Numerous tests were conducted on this vehicle's alarm and theft deterrent systems. *The General Motors Pass Key System was not defeated in a manner which enabled the engine to be operated without a key having the correct cut and correct resistor pellet.* The UTD (Universal Theft Deterrent System) was not functioning at the time the vehicle was inspected. The UTD system is an alert which sounds the horn and temporarily inhibits starting. *The General Motors Pass Key is still required to start the engine.* The other malfunctioning equipment (shifter, brakes and traction control, etc.) have no bearing on the actual starting of the engine and driving the vehicle. *The results of an incorrect ignition key cut or incorrect key pellet can be shown, demonstrated and tested.*

Case 2:06-cv-00816-MHT-CSC    Document 26-8    Filed 05/15/2007    Page 10 of 49

## eering Column Lock: Recalls

### ecall 04V060000: Steering Column Lock Defect

FECT: On certain passenger vehicles equipped with electronic column lock systems (ECL), when the ignition switch is turned to "lock," CL prevents turning of the steering wheel. When the vehicle is started, the ECL unlocks the steering column. The vehicle is designed so t if the column fails to unlock when the vehicle is started and the customer tries to drive away, the fuel supply will be shut off stopping the gine. This prevents the vehicle from being driven when it cannot be steered. However, if voltage at the Powertrain Control Module is low interrupted, the fuel shut off may not occur and the vehicle can be driven while the steering column is locked. If this occurs, a crash could cur.

MEDY: On vehicles equipped with an automatic transmission, the dealer will disable the steering column lock by removing the column k plate. When the ignition key is removed, the transmission shifter will lock, but the steering column will not lock. On vehicles equipped th a manual transmission, the dealer will reprogram the powertrain control module. The steering column on these vehicles will continue to k when the key is removed. The manufacturer has reported that owner notification is expected to begin during the second quarter of 2004. vners may contact Chevrolet at 1-800-630-2438.



Long/State Farm
SF1  00234

Consulting Service

# Transportation Technology

### 1184 Wind Hill Lane
### Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: #1              Transportation Technology : 25050.ADD
Date Taken: June 21, 2005
Description of Subject: 2000 Corvette Interior

Note: Panels removed to access ignition switch wiring.

Long/State Farm
SF1   00235

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
## Marietta, Ga. 30064
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*



Photograph: **#2**                    Transportation Technology : **25050.ADD**
Date Taken: **June 21, 2005**
Description of Subject: **Ignition Switch Wiring**

Note: No wire penetrations, damaged or altered wiring.

Long/State Farm
SF1   00236

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: #3                    Transportation Technology : *25050.ADD*
Date Taken: June 21, 2005
Description of Subject: Ignition Switch Wiring

Note: No damaged wire insulation. No jumpered wires.

Long/State Farm
SF1   00237

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



**Photograph: #4**          **Transportation Technology :** *25050.ADD*
**Date Taken:** June 21, 2005
**Description of Subject:** Dash & Steering Column

**Note: Panels removed to access wiring.**

Long/State Farm
SF1   00238

**Consulting Service**

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*



Photograph: #5          Transportation Technology : *25050.ADD*
Date Taken: June 21, 2005
Description of Subject: Transmission Shift Control Assembly

Note: Cover removed to access the mechanical components.

Long/State Farm
SF1   00239

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: #6          Transportation Technology : *25050.ADD*
Date Taken: June 21, 2005
Description of Subject: Shift Lock Out Cable

Note: Removed from shifter to enable the transmission to be shifted from "P" Park.

Long/State Farm
SF1   00240

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**



Photograph: **#7**            Transportation Technology : **25050.ADD**
Date Taken: **June 21, 2005**
Description of Subject: **2000 Corvette**

**Elevated for an undercarriage inspection.**

Long/State Farm
SF1  00241

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*



Photograph: #8          Transportation Technology : *25050.ADD*
Date Taken: June 21, 2005
Description of Subject: Undercarriage

Note: Contact marks.

Long/State Farm
SF1   00242

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*



Photograph: **#9**          Transportation Technology :  *25050.ADD*
Date Taken: June 21, 2005
Description of Subject:  Undercarriage

Note: Contact marks.

Long/State Farm
SF1   00243

FROM (Company)

STATE FARM INS

Street Address

5301 SNAPFINGER PARK DR

City

DECATUR

State GA   ZIP CODE (Required) 30035

Phone (Required) 770-593-6508

Sent by (Name/Dept)

Todd Smith

**PLEASE PRINT NEATLY**

TO (Company)

State Farm Ins.

Street Address

2309 E. Oakland Ave

City

Bloomington   State IL   ZIP CODE 61701

Attention: (Name/Dept)

Earl Hyser   Phone (Required) 309 766 0643

Description

Claim info.   cont # 103700

Sender's Signature   Todd Smith   Date 6/16/05

www.airborne.com

Airborne Signature

Preprint Format No. 1 30522298A

Payment

AT   Airbill Number   2717691760
Acco (Required if 3rd Party)

**Service Type** — One box must be checked.

X  Express (Letter - 150 lbs)

X  Next Afternoon (Letter - 5 lbs)

X  Second Day (Letter - 5 lbs)

**AIRBORNE EXPRESS.**

PC BOX 662, SEATTLE, WA 98111-0662
1-800-247-2676

SENDER'S COPY

Office Code   Region: 05
Date of theft: 02-19-05

VEHICLE INFORMATION

        Year: 00   Make: CHEV   VIN/HIN: 1G1YY22G9Y5132554

RECOVERY INFORMATION

        Date recovered: 02-25-05
        Recovering LEA: DEKALB CO POLICE DEPARTMENT
                City: DECATUR                    State: GA

        Vehicle location:                    Phone: (404)294-2650
        Reference number:

MESSAGE:    THE CAPTIONED VEHICLE WAS CLEARED FROM THE NATIONAL
        POLICE COMPUTER ON 02/25/05 FOR UNKNOWN REASON(S).

Long/State Farm
SF1  00244

RECEIVED
APR 0 4 2005

SIU

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
***www.vehicleinvestigator.com***


June 1, 2005

Todd Smith
State Farm Insurance Company
P.O. Box 370568
Decatur, GA 30037


Re:      Post Theft Inspection
         Transportation Technology No. :      25050
         Claim No#                  01-6596-564
         Owner:                   Long


Dear Mr. Smith:

Enclosed is the addendum we recently discussed. Please contact me if you have any questions or need further assistance.

Thank you again for the opportunity to assist you.


Sincerely,

Michael E. Bresnock


Michael E. Bresnock

Long/State Farm
SF1   00245

### *Addendum to file: 25050*

This 2000 Chevrolet Corvette was equipped with *UTD* (Universal Theft Deterrent System) in addition to the *Pass Key* theft deterrent system. The *UTD and Pass Key* security systems were standard equipment for the 2000 Chevrolet Corvette. The *UTD* system monitors the following through the *BCM* (Body Control Module) :

    **Driver Door Ajar Switch**
    **Passenger Door Ajar Switch**
    **Courtesy Switch**
    **Ignition Switch (for an incorrect key)**
    **Hood Ajar Switch**
    **Parking Headlamp Switch**
    **Power Door Lock Switch**

If the *BCM* senses an intrusion in any of the above , it enters the alarm mode. The horn sounds, the lights flash, and cranking and fuel are disabled. The alarm mode is active for 2 minutes. The fuel and cranking system are disabled for an additional 3 minutes (alarm system violation). If no intrusions are detected after the time out, the horn is kept off. The alarm system must be disarmed or the intrusion must be eliminated after the time out for the system to exit the alarm mode.

Long/State Farm
SFI    00246

Consulting Service

# Transportation Technology

**1184 Wind Hill Lane**
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*

RECEIVED

MAR 1 8 2005

SIU

March 17, 2005

Todd Smith
State Farm Insurance Company
P.O. Box 370568
Decatur, GA 30037

Re:       Fire Loss
          Transportation Technology No. :       25050
          Claim No#                              01-6596-564
          Owner:                                 Long

Dear Mr. Smith:

Enclosed are the report and invoice for subject investigation. Please contact me if you have any questions or need further assistance.

Thank you again for the opportunity to assist you.

Sincerely,

Michael E. Bresnock

Long/State Farm
SF1   00248

Consulting Service

# *Transportation Technology*

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
***www.vehicleinvestigator.com***

CASE 25050

## TABLE OF CONTENTS

**1.0 ASSIGNMENT**

   **1.1 Client**

   **1.2 Subject**

   **1.3 Location**

   **1.4 Purpose**

   **1.5 Date of Inspection**

**2.0 PARTICIPATING PERSONNEL**

**3.0 EXAMINATION OF VEHICLE**

**4.0 CONCLUSIONS**

**5.0  PHOTOGRAPHS**

Long/State Farm
SF1   00249

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

## 1.0 ASSIGNMENT

**1.1 Client:**          State Farm Insurance Company

                     Todd Smith

**1.2 Subject:**         2000 Chevrolet Corvette

                     Ser# 1G1YY22G9Y5132554

                     Mileage: 71,064

**1.3 Location:**        Verastar South

                     Rex Road

                     Forest Park, Georgia

**1.4 Purpose:**         Post theft inspection.

**1.5 Date of inspection:**   March 8, 2005

## 2.0 Participating Personnel

**2.1 Investigator:**      Michael E. Bresnock- Consultant

                      Transportation Technology

Long/State Farm
SF1   00250

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

## 3.0 EXAMINATION OF VEHICLE

3.1 At the request of State Farm Insurance Company, the above mentioned vehicle was inspected while it was being retained at Verastar South in Forest Park, Georgia. Information obtained from the insurance company indicated this vehicle was reported stolen and at some later date it was recovered and eventually made its way to Verastar South in Forest Park, Georgia. A key along with the electronic remote control were provided by State Farm to assist in the investigation. The key was able to function satisfactorily on the driver's side door lock, enabling it to open and lock the door with no irregularities. All four of the vehicle's original wheels had been removed and replaced by some aftermarket type (Photo #1, #2). You will note that the wheels were secured by a loosely fastened wheel lug nuts.

3.2 The vehicle was equipped with the corvette 5.7liter fuel injected engine (Photo #3). It was noted that the brake master cylinder reservoir was empty (Photo #4). The engine oil level was within a safe operating range (Photo #5). There were no personal belongings found in the interior of the vehicle (Photo #6). It was also noted that both front seats were missing (Photo #7, #8). The initial attempt to start the vehicle using the keys provided by State Farm Insurance Company was

Long/State Farm
SF1   00251

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*

unsuccessful because the key pellet reader had been mis-positioned.    After loosening the retaining screws and repositioning the center console, it was possible to remove the pellet reader for inspection (Photo #9, #10, #11, #12). It is our position that the pellet reader was simply mis-positioned, thereby preventing the ignition key from rotating the ignition cylinder to the start position.  The theft deterrent relay was located on the passenger's side vertical floor surface as indicated on photocopy #1. A visual inspection of the theft deterrent relay provided no evidence to indicate that it had been altered in any way to enable the engine to be started without the correct key (Photo #13).  The key was inserted through the pellet reader and into the ignition key lock and then rotated to the crank and start positions.  When the pellet reader was properly positioned, the engine was able to start and run.  While the engine was in operation (as indicated by the tachometer), several messages appeared in the operator information center (Photo #14, #15, #16, #17, #18).  After completing the ignition system and theft deterrent system test, it was our opinion that this vehicle had not been started and operated without the correct ignition key.  There were some marks on the rubber sections of the passenger's side window weather strip and on the weather strip for the roof panel.  These areas may have been subjected to a sharp object which enabled access to the interior.  The roof panel was missing

Long/State Farm
SF1   00252

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

at the time of this investigation and some of the door glasses were broken. The engine was allowed to operated for approximately twenty minutes. During that period of time temperature and oil pressure was monitored (Photo #19). There were no operational irregularities. It was not possible to move the shift lever from the park position after the engine was in operation. This may have been caused by the low brake fluid as the system requires the brake pedal to be depressed before switching from the park position.


4.0 CONCLUSIONS

4.1 This vehicle was equipped with the General Motors Pass Key System, which is a subsystem of the body control module. The body control module provides all of the logic to operate the pass key system. The body computer uses input information from other systems and components to determine the status of the pass key. The body computer controls its output functions based on the status of the pass key. The pass key fuel enable function is provided by the power control module. When the correct pass key is inserted into the ignition key lock, the key reader transfer the pellet information to the body computer. The body computer in turn signals the power train control module to enable or disable fuel injection in order for the engine

Long/State Farm
SF1  00253

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*

to run. The ignition cylinder and key used by the pass key system is supplemented by a pellet reader to determine if the correct key is being used to start the vehicle. When the ignition is first turned on, the body control module measures the value of the key through the sensing contacts located on the pellet reader. The theft deterrent relay is part of the pass key system and can disable engine cranking through the theft deterrent relay. When the body control module detects the correct pass key, the body computer allows the engine to be cranked and simultaneously instructs the power train control module to enable fuel injection. Inspections and tests conducted on this vehicle provided no evidence to indicated that any of these systems had been by-passed to enable the vehicle to be started and driven without the use of the correct ignition key. In consideration of the tests and inspections along with the summary of this vehicle's theft control system it is our opinion that this vehicle was not operated without the correct ignition key.

Investigator: _Michael E Bresnock_

Michael E. Bresnock

Long/State Farm
SF1  00254

Case 2:06-cv-00816-MHT-CSC    Document 26-8    Filed 09/15/2007    Page 30 of 49

# ntitheft Relay: Locations



**Legend**

(1)  Theft Deterrent Relay
(2)  Instrument Panel Electrical Center
(3)  Blower Motor Relay
(4)  Starr Connector 2
(5)  Body Control Module C3

(6)  Body Control Module C1
(7)  Starr Connector 1
(8)  Body Control Module C2
(9)  Steering Column Lock Relay

**Locations View**

H footwell, mounted to the toe board, above the body control module.

Photocopy #1

Long/State Farm
SF1    00255

**Consulting Service**

# Transportation Technology

*1184 Wind Hill Lane*
*Marietta, Ga.  30064*
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*

RECEIVED
MAR 1 8 2005
SIU



Photograph: **#1**          Transportation Technology : **25050**
Date Taken: **March 8, 2005**
Description of Subject:  **2000 Chevrolet Corvette**

Note: Alternate brand wheels installed on passengers side of vehicle.

Long/State Farm
SF1   00256

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
**www.vehicleinvestigator.com**



Photograph: <u>#2</u>              **Transportation Technology :** <u>*25050*</u>
Date Taken: <u>March 8, 2005</u>
Description of Subject:  <u>Wheel (passenger's side front)</u>

<u>Note: Missing and loose wheel lug nuts.</u>

Long/State Farm
SF1  00257

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
**www.vehicleinvestigator.com**



Photograph: **#3**          Transportation Technology : **25050**
Date Taken: **March 8, 2005**
Description of Subject: **Engine Compartment**

Note: **5.7L fuel injected engine.**

Long/State Farm
SF1   00258

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



**Photograph: #4**          **Transportation Technology : _25050_**
**Date Taken: March 8, 2005**
**Description of Subject: Brake Master Cylinder Reservoir**

**Note: Empty reservoir.**

Long/State Farm
SF1   00259

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
*Marietta, Ga. 30064*
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*



**Photograph: #5**          **Transportation Technology : 25050**
**Date Taken: March 8, 2005**
**Description of Subject: Engine Oil Level Dip Stick**

**Note: Oil level was in a safe operating range.**

Long/State Farm
SF1   00260

**Consulting Service**

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*



Photograph: <u>#6</u>          Transportation Technology : <u>*25050*</u>
Date Taken: <u>March 8, 2005</u>
Description of Subject:  <u>Interior (rear storage area)</u>

<u>Note: No personal belongings.</u>

Long/State Farm
SF1   00261

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*



Photograph: **#7**              Transportation Technology : _25050_
Date Taken: _March 8, 2005_
Description of Subject:  _Interior_

Note: Missing driver's side front seat.

Long/State Farm
SF1   00262

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: **#8**                    Transportation Technology : **25050**
Date Taken: **March 8, 2005**
Description of Subject: **Interior**

**Note: Missing passenger's side front seat.**

Long/State Farm
SF1  00263

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga.  30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



**Photograph: #9**            **Transportation Technology :  _25050_**
Date Taken: March 8, 2005
Description of Subject:  Interior

Note: Console retaining fasteners were removed.

Long/State Farm
SF1   00264

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
**www.vehicleinvestigator.com**



**Photograph: #10**          **Transportation Technology : 25050**
**Date Taken: March 8, 2005**
**Description of Subject: Reader Pellet**

**Note: Removed for inspection.**

Long/State Farm
SF1   00265

**Consulting Service**

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
**www.vehicleinvestigator.com**



Photograph: <u>#11</u>                **Transportation Technology :** <u>*25050*</u>
Date Taken: <u>March 8, 2005</u>
Description of Subject:  <u>Ignition Key Lock (with pellet reader removed)</u>

<u>Note: No Physical damage to the ignition key lock.</u>

Long/State Farm
SF1    00266

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: #12                    Transportation Technology : 25050
Date Taken: March 8, 2005
Description of Subject: Reader Pellet

Note: No physical damage to the electrical components.

Long/State Farm
SF1  00267

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: #13                    Transportation Technology : 25050
Date Taken: March 8, 2005
Description of Subject: Passenger's Side Front Angled section Of the Floor Pan

Note: Relay wires had not been altered.

Long/State Farm
SF1   00268

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*



Photograph: **#14**          Transportation Technology : **25050**
Date Taken: **March 8, 2005**
Description of Subject: **Instrument Cluster**

Note: **Low brake fluid message.**

Long/State Farm
SF1   00269

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
**www.vehicleinvestigator.com**



**Photograph: #15**              **Transportation Technology :** _25050_
**Date Taken: March 8, 2005**
**Description of Subject: Instrument Cluster**

**Note: Service traction system symbol and message.**

Long/State Farm
SF1  00270

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



**Photograph: #16**          **Transportation Technology : 25050**
**Date Taken: March 8, 2005**
**Description of Subject: Instrument Cluster**

**Note: Service active handling message.**

Long/State Farm
SF1   00271

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
**www.vehicleinvestigator.com**



**Photograph: #17**          **Transportation Technology : 25050**
**Date Taken: March 8, 2005**
**Description of Subject: Instrument Cluster**

**Note: Brake before shift message.**

Long/State Farm
SF1   00272

**Consulting Service**

# Transportation Technology

*1184 Wind Hill Lane*
*Marietta, Ga. 30064*
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*



**Photograph: #18**          **Transportation Technology :** _25050_
**Date Taken:** March 8, 2005
**Description of Subject:** Instrument Cluster

**Note: tachometer which indicated engine was in operation.**

Long/State Farm
SF1   00273

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*



**Photograph: #19**                    Transportation Technology : _25050_
**Date Taken: March 8, 2005**
**Description of Subject: Instrument Cluster**

**Note: Temperature and oil pressure were monitored while the engine was in operation.**

Long/State Farm
SF1  00274

# State Farm Insurance Companies®





**CERTIFICATE**

Birmingham Operations Center
100 State Farm Parkway
P.O. Box 2661
Birmingham, Alabama 35297-0001

I, the undersigned, do hereby certify that I am custodian of the records pertaining to the issuance of policies by the Alabama Division of State Farm Fire and Casualty Company of Bloomington, Illinois.

I further certify that the attached policy, number 88 6750-B04-01, is a copy of the policy issued to MARTIN O LONG of 2752 CAROLINE DR MILLBROOK AL 36054-4103 based on our available records.

The policy was in effect on the loss date of February 19, 2005.

_Kecia Streeter_

Kecia Streeter
Underwriting Team Manager

State of Alabama

County of Jefferson

Subscribed and sworn to before me this _15th_ day of September 2006.

_Kathry H. Harnage_

Notary Public

My Commission Expires:

_February 26, 2007_

**State Farm Fire and Casualty Company**
PO Box 2661
Birmingham AL 35297

NAMED INSURED                    01-1973-443Y

LONG, MARTIN O
2752 CAROLINE DR
MILLBROOK AL  36054-4103

||ıdl.ı||ıdl.ıɑdI.ıdı.dı.dı.dı.dıllııɑdI.ıdı.ıdl.ıll

POLICY NUMBER    88 6750-B04-01
POLICY PERIOD FEB 04 2005 to AUG 04 2005

STATE FARM PAYMENT PLAN NUMBER
1021767709

AGENT

MIKE DEVERS INS AGENCY INC
100 DEATSVILLE HIGHWAY
MILLBROOK, AL 36054-1828

PHONE: (334)285-3662

**DO NOT PAY PREMIUMS SHOWN ON THIS PAGE.
SEPARATE STATEMENT ENCLOSED IF AMOUNT DUE.**

| YEAR | MAKE | MODEL | BODY STYLE | VEHICLE ID. NUMBER | CLASS |
|------|------|-------|-----------|--------------------|-------|
| 2000 | CHEVROLET | CORVETTE | 2DR | 1G1YY22G9Y5132554 | 1A30N182 |

| SYMBOLS | COVERAGES | PREMIUMS |
|---------|-----------|----------|
| | | 2000 CHEVROLET |
| | See policy for coverage details. | |
| A | Bodily Injury/Property Damage Liability | $167.65 |
| | Limits of Liability-Coverage A-Bodily Injury | |
| | Each Person,  Each Accident | |
| | $100,000    $300,000 | |
| | Limits of Liability-Coverage A-Property Damage | |
| | Each Accident | |
| | $50,000 | |
| C | Medical Payments | $18.48 |
| | Limit of Liability-Coverage C | |
| | Each Person | |
| | $5,000 | |
| D500 | $500 Deductible Comprehensive | $88.21 |
| G500 | $500 Deductible Collision | $315.18 |
| H | Emergency Road Service | $5.30 |
| U | Uninsured Motor Vehicle | $42.50 |
| | Limits of Liability-U | |
| | Each Person,  Each Accident | |
| | $20,000    $40,000 | |

| Total premium for this policy period FEB 04 2005 to AUG 04 2005. | $637.32 | This is not a bill. |
|---|---|---|

**IMPORTANT MESSAGES**

ur policy consists of this declarations page, the policy booklet - form 9901.6, and any endorsements that apply, including
se issued to you with any subsequent renewal notice.

placed policy number 0545279-01A001.

**XCEPTIONS AND ENDORSEMENTS  (See individual endorsement for details.)**

)1.1    AMENDMENT OF DEFINED WORDS, COVERAGE AND CONDITIONS..

ate Countersigned _____

_____

Agent:    MIKE DEVERS INS AGENCY INC

Telephone: (334)285-3662

PLEASE READ YOUR POLICY CAREFULLY. IF YOU HAVE AN ACCIDENT, CONTACT YOUR STATE FARM AGENT OR ONE OF OUR CLAIM OFFICES AT ONCE. (SEE "REPORTING A CLAIM-INSURED'S DUTIES" IN THIS POLICY.)

Authorized Representative



State Farm Fire and Casualty Company
Home Office, One State Farm Plaza, Bloomington, Illinois 61710-0001
Alabama-Mississippi Office   ●   100 State Farm Parkway   ●   P.O. Box 2661   ●   Birmingham, Alabama 35297-0001

# YOUR
# STATE FARM
# CAR
# POLICY

Alabama
Policy Form 9901.6

# STATE FARM FIRE AND CASUALTY COMPANY
## BLOOMINGTON, ILLINOIS
### A STOCK COMPANY

## DEFINED WORDS
## WHICH ARE USED IN SEVERAL PARTS OF THE POLICY

We define some words to shorten the policy. This makes it easier to read and understand. Defined words are printed in boldface italics. **You** can pick them out easily.

***Bodily Injury*** – means bodily injury to a ***person*** and sickness, disease or death which results from it.

***Car*** – means a land motor vehicle with four or more wheels, which is designed for use mainly on public roads. It does not include:

1. any vehicle while located for use as a dwelling or other premises; or

2. a truck-tractor designed to pull a trailer or semitrailer.

***Car Business*** – means a business or job where the purpose is to sell, lease, repair, service, transport, store or park land motor vehicles or trailers.

***Insured*** – means the ***person, persons*** or organization defined as ***insureds*** in the specific coverage. If the information ***you*** have provided State Farm is incorrect or incomplete, or changes during the policy period, State Farm may decrease or increase the premium during the policy period as set out in the provision titled **Premium** of the Conditions section of this policy.

***Loss*** – defined in Sections IV and V.

***Newly Acquired Car*** – means a ***replacement car*** or an ***additional car.***

> ***Replacement Car*** – means a ***car*** newly owned by or newly leased to ***you*** or ***your spouse*** that replaces ***your car.*** This policy will only provide coverage for the ***replacement car*** if ***you*** or ***your spouse:***
>
> 1. tell us about it within 30 days after its delivery to ***you*** or ***your spouse;*** and
>
> 2. pay us any added amount due.
>
> ***Additional Car*** – means an added ***car*** newly owned by or newly leased to ***you*** or ***your spouse.*** This policy will only provide coverage for the ***additional car*** if:
>
> 1. it is a ***private passenger car*** and we insure all other ***private passenger cars;*** or
>
> 2. it is other than a ***private passenger car*** and we insure all ***cars***

owned by or leased to ***you*** or ***your spouse*** on the date of its delivery to ***you*** or ***your spouse.***

This policy provides coverage for the ***additional car*** only until the earlier of:

1. 12:01 A.M. Standard Time at the address shown on the declarations page on the 31st day after the delivery of the ***car*** to ***you*** or ***your spouse;*** or

2. the effective date and time of a policy issued by us or any other company that describes the ***car*** on its declarations page.

***You*** or ***your spouse*** may apply for a policy that will provide coverage beyond the 30th day for the ***additional car.*** Such policy will be issued only if both the applicant and the vehicle are eligible for coverage at the time of application.

If a ***newly acquired car*** is not otherwise afforded comprehensive or collision coverage by this or any other policy, this policy will provide the comprehensive or collision coverage not otherwise provided for the ***newly acquired car.*** If such coverage is provided by this paragraph, it will apply only until 12:01 A. M. Standard Time at the address shown on the declarations page on the sixth day after the delivery of the ***car*** to ***you*** or ***your spouse.*** Any comprehensive or collision coverage provided by this paragraph is subject to a deductible of $500.

***Non-Owned Car*** – means a ***car*** not owned by, registered to or leased to:

1. ***you, your spouse;***

2. any ***relative*** unless at the time of the accident or ***loss:***

   a. the ***car*** currently is or has within the last 30 days been insured for liability coverage; and

   b. the driver is an ***insured*** who does not own or lease the ***car;***

3. any other ***person*** residing in the same household as ***you, your spouse*** or any ***relative;*** or

4. an employer of ***you, your spouse*** or any ***relative.***

2
9901.6

*Non-owned car* does not include a:

1. rented *car* while it is used in connection with the *insured's* employment or business; or

2. *car* which has been operated or rented by or in the possession of an *insured* during any part of each of the last 21 or more consecutive days. If the *insured* is an *insured* under one or more other car policies issued by us, the 21 day limit is increased by an additional 21 days for each such additional policy.

A *non-owned car* must be a *car* in the lawful possession of the *person* operating it.

*Occupying* – means in, on, entering or alighting from.

*Person* – means a human being.

*Private Passenger Car* – means a *car:*

1. with four wheels;

2. of the private passenger or station wagon type; and

3. designed solely to carry *persons* and their luggage.

*Relative* – means a *person* related to *you* or *your spouse* by blood, marriage or adoption who lives primarily with *you*. It includes *your* unmarried and unemancipated child away at school.

*Spouse* – means *your* husband or wife while living with *you*.

*Temporary Substitute Car* – means a *car* not owned by or leased to *you* or *your spouse*, if it replaces *your car* for a short time. Its use has to be with the consent of the owner. *Your car* has to be out of use due to its breakdown, repair, servicing, damage or loss. A *temporary substitute car* is not considered a *non-owned car.*

*Utility Vehicle* – means a motor vehicle with:

1. a pickup, panel or van body; and

2. a Gross Vehicle Weight of 10,000 pounds or less.

*You* or *Your* – means the named insured or named insureds shown on the declarations page.

*Your Car* – means the *car* or the vehicle described on the declarations page.

## DECLARATIONS CONTINUED

We, the State Farm Fire and Casualty Company, agree to insure *you* according to the terms of this policy based:

1. on *your* payment of premium for the coverages *you* chose; and

2. in reliance on *your* statements in these declarations.

*You* agree, by acceptance of this policy that:

1. the statements in these declarations are *your* statements and are true; and

2. we insure *you* on the basis *your* statements are true; and

3. this policy contains all of the agreements between *you* and us or any of our agents.

Unless otherwise stated in the exceptions space on the declarations page, *your* statements are:

1. Ownership. *You* are the sole owner of *your car.*

2. Insurance and License History. Neither *you* nor any member of *your* household within the past three years has had:

   a. vehicle insurance canceled by an insurer; or

   b. a license to drive or vehicle registration suspended, revoked or refused.

3. Use. *Your car* is used for pleasure and business.

3
9901.6

# WHEN AND WHERE COVERAGE APPLIES

### When Coverage Applies

The coverages *you* chose apply to accidents and *losses* that take place during the policy period.

The policy period is shown under "Policy Period" on the declarations page and is for successive periods of six months each for which *you* pay the renewal premium. Payments must be made on or before the end of the current policy period. The policy period begins and ends at 12:01 A.M. Standard Time at the address shown on the declarations page.

### Where Coverage Applies

The coverages *you* chose apply:

1. in the United States of America, its territories and possessions or Canada; or

2. while the insured vehicle is being shipped between their ports.

The liability, medical payments and physical damage coverages also apply in Mexico within 50 miles of the United States border. A physical damage coverage *loss* in Mexico is determined on the basis of cost at the nearest United States point.

Death, dismemberment and loss of sight and loss of earnings coverages apply anywhere in the world.

# FINANCED VEHICLES

If a creditor is shown in the declarations, we may pay any comprehensive or collision *loss* to:

1. *you* and, if unpaid, the repairer; or

2. *you* and such creditor, as its interest may appear, when we find it is not practical to repair *your car*; or

3. the creditor, as to its interest, if *your car* has been repossessed.

When we pay the creditor for *loss* for which *you* are not covered, we are entitled to the creditor's right of recovery against *you* to the extent of our payment. Our right of recovery shall not impair the creditor's right to recover the full amount of its claim.

The coverage for the creditor's interest only is valid until we terminate it. We will not terminate such coverage because of:

1. any act or negligence of the owner or borrower; or

2. a change in the ownership or interest unknown to us, unless the creditor knew of it and failed to tell us within 10 days; or

3. an error in the description of the vehicle.

The date of termination of the creditor's interest will be at least 10 days after the date we mail or electronically transmit the termination notice.

# REPORTING A CLAIM — INSURED'S DUTIES

1. **Notice to Us of an Accident or Loss**

   The *insured* must give us or one of our agents written notice of the accident or *loss* as soon as reasonably possible. The notice must give us:

   a. *your* name; and

   b. the names and addresses of all *persons* involved; and

   c. the hour, date, place and facts of the accident or *loss*; and

   d. the names and addresses of witnesses.

2. **Notice to Us of Claim or Suit**

   If a claim or suit is made against an *insured,* that *insured* must at once send us every demand, notice or claim made and every summons or legal process received.

3. **Other Duties Under the Physical Damage Coverages**

   When there is a *loss, you* or the owner of the property also shall:

   a. make a prompt report to the police when the *loss* is the result of theft or larceny.

4
9901.6

b. protect the damaged vehicle. We will pay any reasonable expense incurred to do so.

c. show us the damage, when we ask.

d. provide all records, receipts and invoices, or certified copies of them. We may make copies.

e. answer questions under oath when asked by anyone we name, as often as we reasonably ask, and sign copies of the answers.

**4. Other Duties Under Medical Payments, Uninsured Motor Vehicle, Death, Dismemberment and Loss of Sight, and Loss of Earnings Coverages**

Any *person* who suffers a *bodily injury* which results in a medical payments coverage claim must notify us of the claim in writing as soon as reasonably possible after the *person's* first examination or treatment resulting from the *bodily injury*. Another *person* may give us the required notice on behalf of the injured *person*.

The *person* making claim also shall:

a. under the medical payments, uninsured motor vehicle, death, dismemberment and loss of sight, and loss of earnings coverages:

(1) give us all the details about the death, injury, treatment and other information we need to determine the amount payable.

(2) be examined by physicians chosen and paid by us as often as we reasonably may require. A copy of the report will be sent to the *person* upon written request. The *person*, or his or her legal representative if the *person* is dead or unable to act,

shall authorize us to obtain all medical reports and records.

(3) answer questions under oath when asked by anyone we name, as often as we reasonably ask, and sign copies of the answers.

b. under the uninsured motor vehicle coverage:

(1) report a "hit-and-run" accident to the police within 24 hours and to us within 30 days.

(2) let us see the insured *car* the *person occupied* in the accident.

(3) send us at once a copy of all suit papers if the *person* sues the party liable for the accident for damages.

c. under the death, dismemberment and loss of sight, and loss of earnings coverages, give us proof of claim on forms we furnish.

**5. Insured's Duty to Cooperate With Us**

a. The *insured* shall cooperate with us and, when asked, assist us in:

(1) making settlements;

(2) securing and giving evidence;

(3) attending, and getting witnesses to attend, hearings and trials.

b. The *insured* shall not, except at his or her own cost, voluntarily:

(1) make any payment or assume any obligation to others; or

(2) incur any expense, other than for first aid to others.

## SECTION I — LIABILITY — COVERAGE A

*You* have this coverage if "A" appears in the "Coverages" space on the declarations page.

We will:

1. pay damages which an *insured* becomes legally liable to pay because of:

   a. *bodily injury* to others, and

   b. damage to or destruction of property including loss of its use,

   caused by accident resulting from the ownership, maintenance or use of *your car;* and

2. defend any suit against an *insured* for such damages with attorneys hired and paid by us. We will not defend any suit after we have paid the applicable limit of our liability for the accident which is the basis of the lawsuit.

In addition to the limits of liability, we will pay for an *insured* any costs listed below resulting from such accident.

1. Court costs of any suit for damages that we defend.

2. Interest on damages owed by the *insured* due to a judgment and accruing:

   a. after the judgment, and until we pay, offer or deposit in court the amount due under this coverage; or

   b. before the judgment, where owed by law, and until we pay, offer or deposit in court the amount due under this coverage, but only on that part of the judgment we pay.

3. Premiums or costs of bonds:

   a. to secure the release of an *insured's* property attached under a court order;

   b. required to appeal a decision in a suit for damages if we have not paid our limit of liability that applies to the suit; and

   c. up to $250 for each bail bond needed because of an accident or related traffic law violation.

   We have no duty to furnish or apply for any bonds. The amount of any bond we pay for shall not be more than our limit of liability.

4. Expenses incurred by an *insured:*

   a. for loss of wages or salary up to $100 per day if we ask the *insured* to attend the trial of a civil suit.

   b. for first aid to others at the time of the accident.

   c. at our request.

We have the right to investigate, negotiate and settle any claim or suit.

**Coverage for the Use of Other Cars**

The liability coverage extends to the use, by an *insured,* of a *newly acquired car,* a *temporary substitute car* or a *non-owned car.*

**Who Is an Insured**

When we refer to *your car,* a *newly acquired car* or a *temporary substitute car, insured* means:

1. *you;*

2. *your spouse;*

3. the *relatives* of the first *person* named in the declarations;

4. any other *person* while using such a *car* if its use is within the scope of consent of *you* or *your spouse;* and

5. any other *person* or organization liable for the use of such a *car* by one of the above *insureds.*

When we refer to a *non-owned car, insured* means:

1. the first *person* named in the declarations;

2. his or her *spouse;*

3. their *relatives;* and

4. any *person* or organization which does not own or hire the *car* but is liable for its use by one of the above *persons.*

THERE IS NO COVERAGE FOR *NON-OWNED CARS:*

1. IF THE DECLARATIONS STATE THE "USE" OF *YOUR CAR* IS OTHER THAN "PLEASURE AND BUSINESS"; OR

2. WHILE:

   a. BEING REPAIRED, SERVICED OR USED BY ANY *PERSON* WHILE THAT *PERSON* IS WORKING IN ANY *CAR BUSINESS;* OR

   b. USED IN ANY OTHER BUSINESS OR OCCUPATION. This does not apply to a *private passenger car* driven

6

or *occupied* by the first *person* named in the declarations, his or her *spouse* or their *relatives*.

## Trailer Coverage

The liability coverage extends to the ownership, maintenance or use, by an *insured*, of:

1. trailers designed to be pulled by a *private passenger car* or a *utility vehicle*, except those trailers in 2.a. below.

   Farm implements and farm wagons are considered trailers while pulled on public roads by a *car* we insure for liability.

   These trailers are not described in the declarations and no extra premium is charged.

2. the following trailers only if they are described on the declarations page and extra premium is paid:

   a. trailers designed to be pulled by a *private passenger car* or a *utility vehicle*:

      (1) if designed to carry *persons*; or

      (2) while used with a motor vehicle whose use is shown as "commercial" on the declarations page (trailers used only for pleasure use are covered even if not described and no extra premium paid); or

      (3) while used as premises for office, store or display purposes; or

   b. trailers not designed to be pulled by a *private passenger car* or a *utility vehicle*.

When we refer to trailer coverage, *insured* means:

1. *you*;

2. *your spouse;*

3. the *relatives* of the first *person* named in the declarations;

4. any other *person* while using *your car*, a *newly acquired car* or a *temporary substitute car*, if its use is within the scope of consent of *you* or *your spouse;* and

5. any other *person* or organization liable for the use of a covered trailer by one of the above *insureds*.

THERE IS NO COVERAGE WHEN A TRAILER IS USED WITH A MOTOR VEHICLE THAT IS NOT COVERED UNDER THE LIABILITY COVERAGE OF THIS POLICY.

## Limits of Liability

The amount of bodily injury liability coverage is shown on the declarations page under "Limits of Liability – Coverage A – Bodily Injury, Each Person, Each Accident". Under "Each Person" is the amount of coverage for all damages due to *bodily injury* to one *person*. "*Bodily injury* to one *person*" includes all injury and damages to others resulting from this *bodily injury*. Under "Each Accident" is the total amount of coverage, subject to the amount shown under "Each Person", for all damages due to *bodily injury* to two or more *persons* in the same accident.

The amount of property damage liability coverage is shown on the declarations page under "Limits of Liability – Coverage A – Property Damage, Each Accident".

We will pay damages for which an *insured* is legally liable up to these amounts.

The limits of liability are not increased because more than one *person* or organization may be an *insured*.

A motor vehicle and attached trailer are one vehicle. Therefore, the limits are not increased.

The liability coverage shall be excess over and shall not pay again any medical expenses paid under the medical payments coverage.

## When Coverage A Does Not Apply

In addition to the limitations of coverage in **Who Is an Insured** and **Trailer Coverage:**

THERE IS NO COVERAGE:

1. WHILE ANY VEHICLE INSURED UNDER THIS SECTION IS:

   a. RENTED OR LEASED TO OTHERS.

   b. USED TO CARRY *PERSONS* FOR A CHARGE. This does not apply to the use on a share expense basis of:

      (1) a *private passenger car*; or

      (2) a *utility vehicle*, if all passengers are riding in that area of the vehicle designed by the manufacturer of the vehicle for carrying passengers.

   c. BEING REPAIRED, SERVICED OR USED BY ANY *PERSON* EMPLOYED OR ENGAGED IN ANY WAY IN A *CAR BUSINESS.* This does not apply to:

      (1) *you* or *your spouse;*

      (2) any *relative;*

      (3) any resident of *your* household; or

(4) any agent, employee or partner of *you, your spouse,* any *relative* or such resident.

This coverage is excess for (3) and (4) above.

2. FOR ANY *BODILY INJURY* TO:

a. A FELLOW EMPLOYEE WHILE ON THE JOB AND ARISING FROM THE MAINTENANCE OR USE OF A VEHICLE BY ANOTHER EMPLOYEE IN THE EMPLOYER'S BUSINESS. *You* and *your spouse* are covered for such injury to a fellow employee.

b. ANY EMPLOYEE OF AN *INSURED* ARISING OUT OF HIS OR HER EMPLOYMENT. This does not apply to a household employee who is neither covered nor required to be covered under any workers' compensation insurance.

c. ANY *INSURED* OR ANY MEMBER OF AN *INSURED'S* FAMILY RESIDING IN THE *INSURED'S* HOUSEHOLD.

3. FOR:

a. THE UNITED STATES OF AMERICA OR ANY OF ITS AGENCIES; OR

b. ANY *PERSON* WHO IS AN EMPLOYEE OF THE UNITED STATES OF AMERICA OR ANY OF ITS AGENCIES, IF THE PROVISIONS OF THE FEDERAL TORT CLAIMS ACT APPLY.

4. FOR ANY DAMAGES TO PROPERTY OWNED BY, RENTED TO, IN THE CHARGE OF OR TRANSPORTED BY AN *INSURED*. But coverage applies to a rented:

a. residence; or

b. private garage

damaged by a *car* we insure.

5. FOR ANY OBLIGATION OF AN *INSURED*, OR HIS OR HER INSURER, UNDER ANY TYPE OF WORKERS' COMPENSATION OR DISABILITY OR SIMILAR LAW.

6. FOR LIABILITY ASSUMED BY THE *INSURED* UNDER ANY CONTRACT OR AGREEMENT.

**If There Is Other Liability Coverage**

1. **Policies Issued by Us to You, Your Spouse, or Any Relative**

If two or more vehicle liability policies issued by us to *you, your spouse,* or any *relative* apply

to the same accident, the total limits of liability under all such policies shall not exceed that of the policy with the highest limit of liability.

2. **Other Liability Coverage Available From Other Sources**

Subject to item 1, if other vehicle liability coverage applies, we are liable only for our share of the damages. Our share is the percent that the limit of liability of this policy bears to the total of all vehicle liability coverage applicable to the accident.

3. **Temporary Substitute Car, Non-Owned Car, Trailer**

Subject to items 1 and 2, if a *temporary substitute car,* a *non-owned car* or a trailer designed for use with a *private passenger car* or *utility vehicle:*

a. has other vehicle liability coverage on it; or

b. is self-insured under any motor vehicle financial responsibility law, a motor carrier law or any similar law,

then this coverage is excess over such insurance or self-insurance.

4. **Newly Acquired Car**

THIS COVERAGE DOES NOT APPLY IF THERE IS OTHER VEHICLE LIABILITY COVERAGE ON A *NEWLY ACQUIRED CAR.*

**Motor Vehicle Compulsory Insurance Law or Financial Responsibility Law**

1. **Out-of-State Coverage**

If an *insured* under the liability coverage is in another state or Canada and, as a nonresident, becomes subject to its motor vehicle compulsory insurance, financial responsibility or similar law:

a. the policy will be interpreted to give the coverage required by the law; and

b. the coverage so given replaces any coverage in this policy to the extent required by the law for the *insured's* operation, maintenance or use of a *car* insured under this policy.

Any coverage so extended shall be reduced to the extent other coverage applies to the accident. In no event shall a *person* collect more than once.

2. **Financial Responsibility Law**

When certified under any law as proof of future financial responsibility, and while required

8

9901.6

during the policy period, this policy shall comply with such law to the extent required. The *insured* agrees to repay us for

any payment we would not have had to make under the terms of this policy except for this agreement.

## SECTION II — MEDICAL PAYMENTS — COVERAGE C

*You* have this coverage if "C" appears in the "Coverages" space on the declarations page.

**Medical Expenses**

We will pay reasonable medical expenses incurred, for *bodily injury* caused by accident, for services furnished within three years of the date of the accident. These expenses are for necessary medical, surgical, X-ray, dental, ambulance, hospital, professional nursing and funeral services, eyeglasses, hearing aids and prosthetic devices.

REASONABLE MEDICAL EXPENSES DO NOT INCLUDE EXPENSES:

1. FOR TREATMENT, SERVICES, PRODUCTS OR PROCEDURES THAT ARE:

   a. EXPERIMENTAL IN NATURE, FOR RESEARCH, OR NOT PRIMARILY DESIGNED TO SERVE A MEDICAL PURPOSE; OR

   b. NOT COMMONLY AND CUSTOMARILY RECOGNIZED THROUGHOUT THE MEDICAL PROFESSION AND WITHIN THE UNITED STATES AS APPROPRIATE FOR THE TREATMENT OF THE *BODILY INJURY*; OR

2. INCURRED FOR:

   a. THE USE OF THERMOGRAPHY OR OTHER RELATED PROCEDURES OF A SIMILAR NATURE; OR

   b. THE PURCHASE OR RENTAL OF EQUIPMENT NOT PRIMARILY DESIGNED TO SERVE A MEDICAL PURPOSE.

Expenses are reasonable only if they are consistent with the usual fees charged by the majority of similar medical providers in the geographical area in which the expenses were incurred for the specific medical service.

Services are necessary only if the services are rendered by a medical provider within the legally authorized scope of the provider's practice and are essential in achieving maximum medical improvement for the *bodily injury* sustained in the accident.

We have the right to make or obtain a utilization review of the medical expenses and services to determine if they are reasonable and necessary for the *bodily injury* sustained.

The *bodily injury* must be discovered and treated within one year of the date of the accident.

**Persons for Whom Medical Expenses Are Payable**

We will pay medical expenses for *bodily injury* sustained by:

1. a. the first *person* named in the declarations;

   b. his or her *spouse*; and

   c. their *relatives*.

   These *persons* have to sustain the *bodily injury*:

   a. while they operate or *occupy* a vehicle covered under the liability section; or

   b. through being struck as a *pedestrian* by a motor vehicle or trailer.

   A *pedestrian* means a *person* not an occupant of a motor vehicle or trailer.

2. any other *person* while *occupying*:

   a. a vehicle covered under the liability coverage, except a *non-owned car*. Such vehicle has to be used by a *person* who is insured under the liability coverage; or

   b. a *non-owned car*. The *bodily injury* has to result from such *car's* operation or *occupancy* by the first *person* named in the declarations, his or her *spouse* or their *relatives*.

**Payment of Medical Expenses**

We may pay the injured *person* or any *person* or organization performing the services.

9
9901.6

## Limit of Liability

The amount of coverage for medical expenses, including funeral services, is shown on the declarations page under "Limit of Liability – Coverage C – Each Person". If the amount shown is $3,000 or more, the most we pay for funeral services is $3,000 per *person.*

A motor vehicle and attached trailer are one vehicle as respects limits.

## If There Are Other Medical Payments Coverages

1. **Non-Duplication**

   No *person* for whom medical expenses are payable under this coverage shall recover more than once for the same medical expense under this or similar vehicle insurance.

2. **Policies Issued by Us to You, Your Spouse or Relatives**

   If two or more policies issued by us to *you, your spouse* or *your relatives* provide vehicle medical payments coverage and apply to the same *bodily injury,* the total limits of liability under all such policies shall not exceed that of the policy with the highest limit of liability.

3. Subject to items 1 and 2 above:

   a. if a *temporary substitute car,* a *non-owned car* or a trailer has other vehicle medical payments coverage on it, or

   b. if other vehicle medical payments coverage applies to *bodily injury* sustained by a *pedestrian*

   this coverage is excess.

4. THIS COVERAGE DOES NOT APPLY IF THERE IS OTHER VEHICLE MEDICAL PAYMENTS COVERAGE ON A *NEWLY ACQUIRED CAR.*

## What Is Not Covered

THERE IS NO COVERAGE:

1. WHILE A *NON-OWNED CAR* IS USED:

   a. BY ANY *PERSON* EMPLOYED OR ENGAGED IN ANY WAY IN A *CAR BUSINESS*; OR

   b. IN ANY OTHER BUSINESS OR JOB. This does not apply when the first *person* named in the declarations, his or her *spouse* or any *relative* is operating or *occupying* a *private passenger car.*

2. WHILE *OCCUPYING* OR THROUGH BEING STRUCK BY ANY MOTOR VEHICLE OR TRAILER:

   a. DESIGNED MAINLY FOR USE OFF PUBLIC ROADS WHILE OFF PUBLIC ROADS; OR

   b. LOCATED FOR USE AS A RESIDENCE OR PREMISES; OR

   c. THAT RUNS ON RAILS OR CRAWLER-TREADS.

3. FOR *BODILY INJURY* DUE TO WAR OF ANY KIND.

4. FOR MEDICAL EXPENSES FOR *BODILY INJURY*:

   a. SUSTAINED WHILE *OCCUPYING* OR THROUGH BEING STRUCK BY A VEHICLE OWNED BY OR LEASED TO *YOU, YOUR SPOUSE,* OR ANY *RELATIVE,* WHICH IS NOT INSURED UNDER THIS COVERAGE; OR

   b. TO THE EXTENT WORKERS' COMPENSATION BENEFITS ARE REQUIRED TO BE PAYABLE; OR

   c. SUSTAINED BY ANY *PERSON,* other than the first *person* named in the declarations, his or her *spouse* or their *relatives,* WHILE *OCCUPYING* A VEHICLE:

      (1) RENTED OR LEASED TO OTHERS; OR

      (2) USED TO CARRY *PERSONS* FOR A CHARGE. This does not apply to a *private passenger car* used on a share expense basis.

## SECTION III — UNINSURED MOTOR VEHICLE — COVERAGE U

*You* have this coverage if "U" appears in the "Coverages" space on the declarations page.

We will pay damages for *bodily injury* an *insured* is legally entitled to collect from the owner or driver of an *uninsured motor vehicle*. The *bodily injury* must be sustained by an *insured* and caused by accident arising out of the operation, maintenance or use of an *uninsured motor vehicle*.

*Uninsured Motor Vehicle* – means:

1. a land motor vehicle, the ownership, maintenance or use of which is:

   a. not insured or bonded for bodily injury liability at the time of the accident; or

   b. insured or bonded for bodily injury liability at the time of the accident; but

      (1) the limits of liability are less than required by the financial responsibility act of the state where *your car* is mainly garaged; or

      (2) the insuring company denies coverage or is or becomes insolvent; or

      (3) the sum of the limits of liability under all bonds and policies that apply are less than the damages the *insured* is legally entitled to recover; or

2. a land motor vehicle whose owner and operator remain unidentified but independent corroborative evidence exists to prove that the *bodily injury* was proximately caused by the unidentified operator of the land motor vehicle. The testimony of an *insured* seeking recovery shall not constitute independent corroborative evidence, unless the testimony is supported by additional evidence.

An *uninsured motor vehicle* does not include a land motor vehicle:

1. insured under the liability coverage of this policy;

2. owned or operated by a self-insurer under any motor vehicle financial responsibility law, a motor carrier law or any similar law;

3. designed for use mainly off public roads except while on public roads; or

4. while located for use as premises.

### Who Is an Insured

*Insured* – means the *person* or *persons* covered by uninsured motor vehicle coverage.

This is:

1. the first *person* named in the declarations;

2. his or her *spouse*;

3. their *relatives*; and

4. any other *person* while *occupying*:

   a. *your car*, a *temporary substitute car*, a *newly acquired car* or a trailer attached to such a *car*. Such vehicle has to be used within the scope of the consent of *you* or *your spouse;* or

   b. a *car* not owned by or leased to *you, your spouse* or any *relative*, or a trailer attached to such a *car*. It has to be driven by the first *person* named in the declarations or that *person's spouse* and within the scope of the owner's consent.

   Such other *person occupying* a vehicle used to carry *persons* for a charge is not an *insured*.

5. any *person* entitled to recover damages because of *bodily injury* to an *insured* under 1 through 4 above.

### Notice of Suit

If we do not receive reasonable notice of a lawsuit brought by the *insured* against the owner or driver of the *uninsured motor vehicle,* we are not bound by any resulting judgment.

### Payment of Any Amount Due

We will pay any amount due:

1. to the *insured*;

2. to a parent or guardian if the *insured* is a minor or an incompetent *person*;

3. to the surviving *spouse*; or

4. at our option, to a *person* authorized by law to receive such payment.

11
9901.6

## Limits of Liability

1. The amount of coverage is shown on the declarations page under "Limits of Liability – U – Each Person, Each Accident". Under "Each Person" is the amount of coverage for all damages due to *bodily injury* to one *person*. *"Bodily injury* to one *person"* includes all injury and damages to others resulting from this *bodily injury.* Under "Each Accident" is the total amount of coverage, subject to the amount shown under "Each Person", for all damages due to *bodily injury* to two or more *persons* in the same accident.

2. Subject to item 1 above, the most we will pay any one *insured* is the difference between the amount of the *insured's* damages for *bodily injury* caused by accident arising out of the operation, maintenance, or use of an *uninsured motor vehicle* and the sum of the limits of liability under all applicable bodily injury liability bonds and insurance policies available to the *insured* after the accident.

3. Any payment made to a *person* under this coverage shall reduce any amount payable to that *person* under the bodily injury liability coverage.

4. This coverage is excess over, but shall not duplicate, any amount paid to or for the *insured* by or for any *person* or organization who is or may be held legally liable for the *bodily injury* to the *insured*.

5. The limits of liability are not increased because more than one *person* is insured at the time of the accident.

## When Coverage U Does Not Apply

THERE IS NO COVERAGE:

1. FOR ANY *INSURED* WHO, WITHOUT OUR WRITTEN CONSENT, SETTLES WITH:

   a. THE OWNER OR OPERATOR OF AN *UNINSURED MOTOR VEHICLE,* OR

   b. ANY *PERSON* OR ORGANIZATION WHO MAY BE OBLIGATED ON BEHALF OF SUCH OWNER OR OPERATOR

   AND THEREBY IMPAIRS OUR RIGHT TO RECOVER OUR PAYMENTS.

2. TO THE EXTENT IT BENEFITS:

   a. ANY WORKERS' COMPENSATION OR DISABILITY BENEFITS INSURANCE COMPANY.

   b. A SELF-INSURER UNDER ANY WORKERS' COMPENSATION, OR DISABILITY BENEFITS OR SIMILAR LAW.

   c. ANY GOVERNMENTAL BODY OR AGENCY.

## If There Is Other Coverage

1. If more than one vehicle is described in the declarations, the recovery of the *insured* shall be limited to the primary coverage plus such additional coverage as may be provided for additional vehicles, but not to exceed two additional coverages within the policy.

2. Subject to item 1 above, if uninsured motor vehicle coverage for *bodily injury* is available to an *insured* from more than one policy provided by us or any other insurer, any coverage applicable under this policy shall apply:

   a. On a primary basis if the *insured* sustains *bodily injury* while *occupying your car,* or while not *occupying* a motor vehicle or trailer.

   b. On an excess basis if the *insured* sustains *bodily injury* while *occupying* a vehicle other than *your car.*

3. Subject to items 1 and 2 above, if this policy and one or more other policies provide coverage for *bodily injury*:

   a. On a primary basis, we are liable only for our share. Our share is that percent of the damages payable on a primary basis that the limit of liability of this policy bears to the total of all applicable uninsured motor vehicle coverage provided on a primary basis.

   b. On an excess basis, we are liable only for our share. Our share is that percent of the damages payable on an excess basis that the limit of liability of this policy bears to the total of all applicable uninsured motor vehicle coverage provided on an excess basis.

4. THIS COVERAGE DOES NOT APPLY IF THERE IS OTHER UNINSURED MOTOR VEHICLE COVERAGE ON A *NEWLY ACQUIRED CAR.*

# SECTION IV — PHYSICAL DAMAGE COVERAGES

*Loss* – means, when used in this section, each direct and accidental loss of or damage to:

1. *your car*;
2. its equipment which is common to the use of *your car* as a vehicle;
3. clothes and luggage insured; and
4. a detachable living quarters attached or removed from *your car* for storage. Detachable living quarters includes its body and items securely fixed in place as a permanent part of the body. *You* must have told us about the living quarters before the *loss* and paid any extra premium needed.

**COMPREHENSIVE – COVERAGE D.** *You* have this coverage if "D" appears in the "Coverages" space on the declarations page. If a deductible applies, the amount is shown by the number beside "D".

1. Loss to Your Car. We will pay for *loss* to *your car* EXCEPT *LOSS BY COLLISION* but only for the amount of each such *loss* in excess of the deductible amount, if any. If we offer to pay for the repair of damaged windshield glass instead of the replacement of the windshield and *you* agree to have such repair made, we will pay the full cost of repairing the windshield glass regardless of *your* deductible.

   Breakage of glass, or *loss* caused by missiles, falling objects, fire, theft, larceny, explosion, earthquake, windstorm, hail, water, flood, malicious mischief or vandalism, riot or civil commotion, is payable under this coverage. *Loss* due to hitting or being hit by a bird or an animal is payable under this coverage.

2. We will repay *you* for transportation costs if *your car* is stolen. We will pay up to $16 per day for the period that begins 48 hours after *you* tell us of the theft. The period ends when we offer to pay for *loss*.

**COLLISION – COVERAGE G.** *You* have this coverage if "G" appears in the "Coverages" space on the declarations page. The deductible amount is shown by the number beside "G".

We will pay for *loss* to *your car* caused by *collision* but only for the amount of each such *loss* in excess of the deductible amount. If we offer to pay for the repair of damaged windshield glass instead of the replacement of the windshield and *you* agree to have such repair made, we will pay the full cost of

repairing the windshield glass regardless of *your* deductible. If the *collision* is with another motor vehicle insured with us, *you* do not pay *your* deductible if it is $100 or less as we pay it.

If *your loss* is payable as damages under the liability coverage of another policy issued by us, we will pay for such damage or *loss* only once, either under *your* policy or the liability coverage of the other policy.

*Collision* – means *your car* upset or hit or was hit by a vehicle or other object.

**Clothes and Luggage – Comprehensive and Collision Coverages**

We will pay for *loss* to clothes and luggage owned by the first *person* named in the declarations, his or her *spouse*, and their *relatives*. These items have to be in or on *your car*. *Your car* has to be covered under this policy for:

1. Comprehensive, and the *loss* caused by fire, lightning, flood, falling objects, explosion, earthquake or theft. If the *loss* is due to theft, *YOUR* ENTIRE *CAR* MUST HAVE BEEN STOLEN; or
2. Collision, and the *loss* caused by *collision*.

We will pay up to $200 for *loss* to clothes and luggage in excess of any deductible amount shown for comprehensive or collision. $200 is the most we will pay in any one occurrence even though more than one *person* has a *loss*. This coverage is excess over any other coverage.

**Limit of Liability – Comprehensive and Collision Coverages**

The limit of our liability for *loss* to property or any part of it is the lower of:

1. the actual cash value; or
2. the cost of repair or replacement.

Actual cash value is determined by the market value, age and condition at the time the *loss* occurred. Any deductible amount that applies is then subtracted.

The cost of repair or replacement is based upon one of the following:

1. the cost of repair or replacement agreed upon by *you* and us;
2. a competitive bid approved by us; or

13

3. an estimate written based upon the prevailing competitive price. The prevailing competitive price means prices charged by a majority of the repair market in the area where the *car* is to be repaired as determined by a survey made by us. If *you* ask, we will identify some facilities that will perform the repairs at the prevailing competitive price. We will include in the estimate parts sufficient to restore the vehicle to its pre-loss condition. *You* agree with us that such parts may include either parts furnished by the vehicle's manufacturer or parts from other sources including non-original equipment manufacturers.

Any deductible amount that applies is then subtracted.

### Settlement of Loss – Comprehensive and Collision Coverages

We have the right to settle a *loss* with *you* or the owner of the property in one of the following ways:

1. pay the agreed upon actual cash value of the property at the time of the *loss* in exchange for the damaged property. If the owner keeps the damaged property, we will deduct its value after the *loss* from our payment. The damaged property cannot be abandoned to us;

2. pay to:

   a. repair the damaged property or part, or

   b. replace the property or part.

   If the repair or replacement results in betterment, *you* must pay for the amount of betterment; or

3. return the stolen property and pay for any damage due to the theft.

If *you* give us *your* consent, we may move the damaged property, at our expense, to reduce storage costs. If *you* do not give us *your* consent, we will pay only the storage costs which would have resulted if we had moved the damaged property.

The **Settlement of Loss** provision for comprehensive and collision coverages incorporates the **Limit of Liability** provision of those coverages.

If we can pay the *loss* under either comprehensive or collision, we will pay under the coverage where *you* collect the most.

When there is *loss* to *your car*, clothes and luggage in the same occurrence, any deductible will be applied first to the *loss* to *your car*. *You* pay only one deductible.

### EMERGENCY ROAD SERVICE – COVERAGE H. *You* have this coverage if "H" appears in the "Coverages" space on the declarations page.

We will pay the fair cost *you* incur for *your car* for:

1. mechanical labor up to one hour at the place of its breakdown;

2. towing to the nearest place where the necessary repairs can be made during regular business hours if it will not run;

3. towing it out if it is stuck on or immediately next to a public highway;

4. delivery of gas, oil, battery or tire. WE DO NOT PAY THE COST OF THE GAS, OIL, BATTERY OR TIRE;

5. locksmith services, up to one hour, to open *your car* if *your* key is lost, stolen or locked inside *your car*. We will pay only the cost of labor.

### CAR RENTAL EXPENSE - COVERAGE R. *You* have this coverage if "R" appears in the "Coverages" space on the declarations page.

We will repay *you* up to $10 per day when *you* rent a *car* from a car rental agency or garage due to a *loss* to *your car* which would be payable under coverage D or G, starting:

1. when it cannot run due to the *loss*; or

2. if it can run, when *you* leave it at the shop for agreed repairs;

and ending when:

1. it has been repaired or replaced, or

2. we offer to pay for the *loss*, or

3. *you* incur 30 days rent,

whichever comes first.

ANY CAR RENT PAYABLE UNDER COVERAGE R is REDUCED TO THE EXTENT IT IS PAYABLE UNDER COMPREHENSIVE.

### CAR RENTAL AND TRAVEL EXPENSES – COVERAGE R1. *You* have this coverage if "R1" appears in the "Coverages" space on the declarations page.

1. **Car Rental Expense.**

   a. If:

      (1) a dollar amount is shown under "Limits of Liability – Car Rental Expense, Each Day" on the declarations page, we will pay *you* the daily rental charge up to that dollar amount; or

      (2) a percentage amount is shown under "Limits of Liability – Car Rental Expense, Each Day" on the declarations page, we will pay *you* that percentage of the daily rental charge

when *you* rent a *car* from a car rental agency or *car business.* "Daily rental charge" means the daily rental rate plus charges for mileage and related taxes.

If *you* choose not to rent a *car,* we will pay *you* $10 for each complete 24 hour period that *your car* is not drivable. *You* must report to us the period of time that *your car* was not drivable.

We will pay only if *your car* is not drivable because of a *loss* which would be payable under coverage D or G.

b.  Payment will be made for a period that:

   (1)  starts:

      (a)  when *your car* is not drivable due to the *loss;* or

      (b)  if *your car* is drivable, when *you* leave it at the shop for agreed repairs; and

   (2)  ends:

      (a)  when *your car* has been repaired or replaced; or

      (b)  when we offer to pay for the *loss,* if *your car* is repairable but *you* choose to delay repairs; or

      (c)  five days after we offer to pay for the *loss* if:

         (i)  *your car* was stolen and not recovered; or

         (ii)  we declare that *your car* is a total *loss;*

      whichever comes first.

ANY CAR RENTAL EXPENSE PAYABLE UNDER THIS COVERAGE IS REDUCED TO THE EXTENT IT IS PAYABLE UNDER COMPRE-HENSIVE COVERAGE.

2.  **Travel Expenses.** If *your car* is not drivable due to a *loss* which occurs more than 50 miles from home and which would be payable under coverage D or G, we will pay *you* for expenses incurred by *you, your spouse* and any *relative* for:

   a.  commercial transportation fares to continue to *your* destination or home;

   b.  extra meals and lodging needed when the *loss* to *your car* causes a delay enroute. The expenses must be incurred between the time of the *loss* and *your* arrival at *your* destination

or home or by the end of the fifth day, whichever occurs first; and

   c.  meals, lodging and commercial transportation fares incurred by *you* or a *person you* choose to drive *your car* from the place of repair to *your* destination or home.

3.  **Rental Car – Repayment of Deductible Amount Expense.** We will pay the expense of any deductible amount *you* are required to pay the owner under comprehensive or collision coverage in effect on a substitute *car* rented from a car rental agency or *car business.*

**Total Amount of Expenses Payable – Coverage R1**

1.  The most we will pay for **Car Rental Expense** incurred in any one occurrence is shown on the declarations page under "Limits of Liability – Car Rental Expense, Each Occurrence".

2.  The most we will pay for **Travel Expenses** incurred by all *persons* in any one occurrence is $400.

3.  The most we will pay for **Rental Car – Repayment of Deductible Amount Expense** incurred in any one occurrence is $400.

**Trailer Coverage**

1.  **Owned Trailer**

   *Your* trailer is covered:

   a.  when it is described on the declarations page of the policy; and

   b.  for the coverages shown as applying to it.

2.  **Non-Owned Trailer or Detachable Living Quarters**

   Any physical damage coverage in force on *your car* applies to a non-owned:

   a.  trailer, if it is designed for use with a *private passenger car;* or

   b.  detachable living quarters unit

   used by the first *person* named in the declarations, his or her *spouse* or their *relatives.*

   The most we will pay under the comprehensive or collision coverage for a *loss* to such non-owned trailer or unit is $500.

   A non-owned trailer or detachable living quarters unit is one that:

   a.  is not owned by or registered in the name of:

      (1)  *you, your spouse,* any *relative;*

      (2)  any other *person* residing in the same household as *you, your spouse* or any *relative;* or

(3) an employer of *you, your spouse* or any *relative*; and

b. has not been used or rented by or in the possession of *you, your spouse* or any *relative* during any part of each of the last 21 or more consecutive days. If *you* are insured by one or more other car policies issued by us, the 21 day limit is increased by an additional 21 days for each such additional policy; and

c. is not rented and used in connection with the employment or business of *you, your spouse* or any *relative*.

**Coverage for the Use of Other Cars**

The coverages in this section *you* have on *your car* extend to a *loss* to a *newly acquired car*, a *temporary substitute car* or a *non-owned car*. These coverages extend to a *non-owned car* while it is driven by or in the custody of an *insured*.

*Insured* – as used in this provision means:

1. the first *person* named in the declarations;
2. his or her *spouse;* or
3. their *relatives*.

**When the Physical Damage Coverages Do Not Apply**

THERE IS NO COVERAGE FOR:

1. A *NON-OWNED CAR:*

   a. IF THE DECLARATIONS STATE THE "USE" OF *YOUR CAR* IS OTHER THAN "PLEASURE AND BUSINESS";

   b. WHILE BEING REPAIRED, SERVICED OR USED BY ANY *PERSON* WHILE THAT *PERSON* IS WORKING IN ANY *CAR BUSINESS*; OR

   c. WHILE USED IN ANY OTHER BUSINESS OR OCCUPATION. This does not apply to a *private passenger car* driven or *occupied* by the first *person* named in the declarations, his or her *spouse* or their *relatives*.

2. ANY VEHICLE WHILE:

   a. RENTED OR LEASED TO OTHERS; OR

   b. USED TO CARRY *PERSONS* FOR A CHARGE. This does not apply to the use on a share expense basis.

3. *LOSS* TO ANY VEHICLE DUE TO:

   a. TAKING BY ANY GOVERNMENTAL AUTHORITY;

b. WAR OF ANY KIND;

c. AND LIMITED TO WEAR AND TEAR, FREEZING, MECHANICAL OR ELECTRICAL BREAKDOWN OR FAILURE. This does not apply when the *loss* is the result of a theft covered by this policy. Nor does it apply to emergency road service; OR

d. CONVERSION, EMBEZZLEMENT OR SECRETION BY ANY *PERSON* WHO HAS THE VEHICLE DUE TO ANY LIEN, RENTAL, LEASE OR SALES AGREEMENT.

4. TIRES unless:

   a. stolen, or damaged by fire or vandalism; or

   b. other *loss* covered by this section happens at the same time.

5. TAPES OR DISCS FOR RECORDING OR REPRODUCING SOUND.

6. ANY LASER OR RADAR DETECTOR.

7. *YOUR CAR* WHILE SUBJECT TO ANY LIEN, LEASE OR SALES AGREEMENT NOT SHOWN IN THE DECLARATIONS.

**If There Is Other Coverage**

1. **Policies Issued by Us to You, Your Spouse or Any Relative**

   If two or more vehicle policies issued by us to *you, your spouse* or any *relative* apply to the same *loss* or occurrence, we will pay under the policy with the highest limit.

2. **Coverage Available From Other Sources**

   Subject to item 1, if other coverage applies to the *loss* or expenses, we will pay only our share. Our share is that percent the limit of liability of this policy bears to the total of all coverage that applies.

3. **Temporary Substitute Car, Non-Owned Car or Trailer**

   Subject to items 1 and 2, if a *temporary substitute car*, a *non-owned car* or trailer designed for use with a *private passenger car* has other coverage on it, then this coverage is excess.

4. **Newly Acquired Car**

   THIS INSURANCE DOES NOT APPLY IF THERE IS SIMILAR COVERAGE ON A *NEWLY ACQUIRED CAR*.

**No Benefit to Bailee**

These coverages shall not benefit any carrier or other bailee for hire liable for *loss*.

16
9901.6

## SECTION V — DEATH, DISMEMBERMENT AND LOSS OF SIGHT — COVERAGE S, AND LOSS OF EARNINGS — COVERAGE Z

### DEATH, DISMEMBERMENT AND LOSS OF SIGHT – COVERAGE S

If "S" is shown in the "Coverages" space on the declarations page each *insured* has the coverage.

We will pay the amount shown in the schedule that applies for death, or *loss,* caused by accident. The *insured* has to be *occupying* or be struck by a land motor vehicle or trailer. The death or *loss* must be the direct result of the accident and not due to any other cause. The death or *loss* must occur within 90 days of the accident.

*Insured* – means a *person* listed under "Persons Insured – Coverage S" on the declarations page.

*Loss* – means the loss of:

1. the foot or hand, cut off through or above the ankle or wrist; or
2. the whole thumb or finger; or
3. all sight.

### The Most We Pay

The most we will pay because of the death of, or *loss* to, the *insured,* except as provided below, is shown under "Amount" next to his or her name on the declarations page.

The amount shown in the schedule for death or *loss* is doubled for an *insured* who, at the time of the accident, is using the vehicle's complete restraint system as recommended by the vehicle's manufacturer.

If the *insured* dies as a result of this accident, any payment made or due for *loss* reduces the amount of the death payment.

### SCHEDULE

If amount under S in the declarations is:

|  | $5,000 | $ 10,000 |
|---|---|---|
| Death | $5,000 | $10,000 |
| *Loss* of: | | |
| hands; feet; sight of eyes; one hand & one foot; or one hand or one foot & sight of one eye | 5,000 | 10,000 |
| one hand or one foot; or sight of one eye | 2,500 | 5,000 |
| thumb & finger on one hand; or three fingers | 1,500 | 3,000 |
| any two fingers | 1,000 | 2,000 |

### Payment of Any Amount Due

We will pay any amount due:

1. to the *insured;*
2. to a parent or guardian if the *insured* is a minor or an incompetent *person;*
3. to the surviving *spouse;* or
4. at our option, to any *person* or organization authorized by law to receive such payment.

Any payment made is to its extent a complete discharge of our obligations. We are not responsible for the way the money is used.

### Autopsy

We have the right to have an autopsy made where it is not forbidden by law.

### LOSS OF EARNINGS – COVERAGE Z

If "Z" is shown in the "Coverages" space on the declarations page each *insured* has the coverage.

We will pay the *insured* 85% of his or her loss of *weekly earnings.* The loss has to be due to continuous *total disability* that is:

1. the direct result of *bodily injury* caused by accident; and
2. sustained while *occupying* or through being struck by a land motor vehicle or trailer.

### When Total Disability Applies

The *insured's total disability* must be for a period of at least 30 consecutive days starting within 20 days after the accident. We will not pay for the first seven days of the 30 day period.

Payments owed will be paid every two weeks. Proof of continued *total disability* must be given to us when we ask for it.

### Limits of Liability

We will pay up to $250 for each full work week of *total disability* and pro rata for less than a week. Subject to the limit per week, we will pay up to $15,000 total for all loss of earnings due to any one accident.

*Insured* – means a *person* shown under "Persons Insured – Coverage Z" on the declarations page.

*Total Disability* – under coverage Z means the *insured,* while living, is not able to do the usual work

17

9901.6

or any other work for which he or she is reasonably fitted by education, training or experience.

*Weekly Earnings* – means all earnings for the *insured's* services before any deductions. When *weekly earnings* cannot be determined on a weekly basis an average will be used. The average is the total earnings for the 52 weeks just prior to the accident divided by 52.

**When Coverages S and Z Do Not Apply**

THESE COVERAGES DO NOT APPLY TO:

1. AN *INSURED* WHILE ON THE JOB, OPERATING, *OCCUPYING,* LOADING OR UNLOADING:

   a. AN EMERGENCY VEHICLE; OR

   b. A VEHICLE USED IN THE *INSURED'S* BUSINESS OR JOB.

   But 1.b. does not apply if the vehicle is:

   (1) a *private passenger car* or school bus; or

   (2) of the pickup or van type, with a Gross Vehicle Weight of 10,000 pounds or less, while not used for delivery.

2. AN *INSURED* WHILE:

   a. ON THE JOB IN ANY *CAR BUSINESS;* OR

   b. *OCCUPYING* ANY:

      (1) VEHICLE      WHILE      BEING USED IN A RACE; OR

      (2) MILITARY VEHICLE.

3. AN *INSURED* WHILE *OCCUPYING* OR THROUGH BEING STRUCK BY A MOTOR VEHICLE OR TRAILER:

   a. THAT RUNS ON RAILS OR CRAWLER-TREADS;

   b. DESIGNED FOR USE MAINLY OFF PUBLIC ROADS WHILE OFF PUBLIC ROADS; OR

   c. LOCATED FOR USE AS PREMISES.

4. THE DEATH OF, *LOSS* TO OR *TOTAL DISABILITY* OF AN *INSURED* DUE TO:

   a. DISEASE except pus forming infection due to *bodily injury* received in the accident; or

   b. SUICIDE OR ATTEMPTED SUICIDE WHILE SANE OR INSANE; OR

   c. WAR OF ANY KIND.

## CONDITIONS

1. **Policy Changes**

   a. **Policy Terms.** The terms of this policy may be changed or waived only by:

      (1) an endorsement issued by us; or

      (2) the revision of this policy form to give broader coverage without an extra charge. If any coverage *you* carry is changed to give broader coverage, we will give *you* the broader coverage without the issuance of a new policy as of the date we make the change effective.

   b. **Change of Interest.** No change of interest in this policy is effective unless we consent in writing. However, if *you* die, we will protect as named insured, except under death, dismemberment and loss of sight, and loss of earnings coverages:

      (1) *your* surviving *spouse*;

      (2) any *person* with proper custody of *your car,* a *newly acquired car* or a *temporary substitute car* until a legal representative is qualified; and then

      (3) the legal representative while acting within the scope of his or her duties.

   Policy notice requirements are met by mailing the notice to the address shown on the declarations page.

   c. **Consent of Beneficiary.** Consent of the beneficiary under death, dismemberment and loss of sight coverage is not needed to cancel or change the policy.

   d. **Joint and Individual Interests.** When there are two or more named insureds, each acts for all to cancel or change the policy. .

2. **Suit Against Us**

   There is no right of action against us:

18
9901.6

a. until all the terms of this policy have been met; and

b. under the liability coverage, until the amount of damages an *insured* is legally liable to pay has been finally determined by:

   (1) judgment after actual trial, and appeal if any; or

   (2) agreement between the *insured,* the claimant and us.

   Bankruptcy or insolvency of the *insured* or his or her estate shall not relieve us of our obligations.

c. under uninsured motor vehicle, medical payments, any physical damage, death, dismemberment and loss of sight, and loss of earnings coverages, until 30 days after we get the *insured's* notice of accident or *loss.*

## 3. Our Right to Recover Our Payments

a. Death, dismemberment and loss of sight, and loss of earnings coverage payments are not recoverable by us.

b. Under medical payments coverage:

   (1) we are subrogated to the extent of our payments to the proceeds of any settlement or judgment the injured *person* recovers from any party liable for the *bodily injury.*

   (2) if the *person* to or for whom we have made payment has not recovered from any party liable for the *bodily injury,* he or she shall:

      (a) take no action prejudicing our rights under this contract;

      (b) keep these rights in trust for us;

      (c) execute any legal papers we need; and

      (d) when we ask, take action through our representative to recover our payments.

   (3) if the *person* to or for whom we make payment recovers from any party liable for the *bodily injury,* that *person* shall hold in trust for us the proceeds of the recovery, and reimburse us to the extent of our payment.

c. Under uninsured motor vehicle coverage:

   (1) if the damages are caused by an *uninsured motor vehicle* as defined in item 1.b.(3) of the definition of *uninsured motor vehicle:*

      (a) we are entitled to the proceeds of any settlement made by the *insured* after we pay under this coverage; and

      (b) the *insured* shall:

         i. keep these rights in trust for us;

         ii. execute any legal papers we need; and

         iii. when we ask, take action through our representative to recover the amount of our payments.

   (2) if the damages are caused by any other *uninsured motor vehicle:*

      (a) we are subrogated to the proceeds of any settlement the injured *person* recovers from any party liable for the *bodily injury* or *property damage;* and

      (b) if the *person* to or for whom we have made payment has not recovered from the party at fault, he or she shall:

         i. keep these rights in trust for us;

         ii. execute any legal papers we need; and

         iii. when we ask, take action through our representative to recover our payments.

   We are entitled to be repaid the lesser of:

      (a) what we have paid plus costs and fees of collection; or

      (b) the amount by which the sum of the *insured's* total recovery and what we have paid exceeds the total amount of damages the *insured* incurred.

d. Under all other coverages the right of recovery of any party we pay passes to us. Such party shall:

   (1) not hurt our rights to recover; and

   (2) help us get our money back.

## 4. Cancellation

**How You May Cancel. You** may cancel *your* policy by notifying us in writing of the date to cancel, which must be later than the date *you* mail or deliver it to us. We may waive these

requirements by confirming the date and time of cancellation to *you* in writing.

**How and When We May Cancel.** We may cancel *your* policy by written notice, mailed or delivered to the address shown on the declarations page. The notice shall give the date cancellation is effective.

If we mail or deliver a notice of cancellation to *you* during the first 59 days following the policy effective date, the cancellation notice will be mailed or delivered to *you* at least 10 days before the cancellation effective date.

After the policy has been in force for more than 59 days, any notice of cancellation will be mailed or delivered to *you* at least:

a.  10 days before the cancellation effective date if the cancellation is because *you* did not pay the premium; or

b.  20 days before the cancellation effective date if the cancellation is because of any other reason.

The mailing of the notice shall be sufficient proof of notice.

Unless we mail or deliver a notice of cancellation to *you* within 59 days of the policy effective date, we will not cancel *your* policy before the end of the current policy period unless:

a.  *you* fail to pay the premium when due; or

b.  *you, your spouse,* any *relative* or any other *person* who usually drives *your car* has:

   (1) had his or her driver's license under suspension or revocation, or

   (2) been convicted of driving without having a valid driver's license

   during the 180 days just before the effective date of the policy or during the policy period.

**Return of Unearned Premium.** If *you* cancel, premium may be earned on a short rate basis. If we cancel, premium will be earned on a pro-rata basis. Any unearned premium may be returned at the time we cancel or within a reasonable time thereafter. Delay in the return of unearned premium does not affect the cancellation.

**5.  Renewal**

Unless we mail or deliver to *you* a notice of cancellation or a notice of our intention not to renew the policy, we agree to renew the policy for the next policy period upon *your* payment of the renewal premium when due. It is agreed that the renewal premium will be based upon the rates in effect, the coverages carried, the applicable limits of liability, deductibles and other elements that affect the premium that apply at the time of renewal.

Other elements that may affect *your* premium include, but are not limited to:

a.  drivers of *your car* and their ages and marital status;

b.  *your car* and its use;

c.  eligibility for discounts or other premium credits;

d.  applicability of a surcharge based either on accident history, or on other factors.

A notice of our intention to not renew will be mailed or delivered to the address shown on the declarations page at least 30 days before the end of the current policy period. The mailing of it shall be sufficient proof of notice.

**6.  Terms of Policy Conformed to Statute**

If any terms of this policy are in conflict with the statutes of Alabama, they are amended to conform to these statutes.

**7.  Premium**

The premium for this policy may vary based upon the purchase of other insurance from one of the State Farm affiliated companies.

The premium for this policy is based on information State Farm has received from *you* or other sources. If the information is incorrect or incomplete, or changes during the policy period, *you* must inform State Farm of any changes regarding the following:

a.  *your car,* or its use, including annual mileage;

b.  the *persons* who regularly drive *your car,* including newly licensed family members;

c.  *your* marital status; or

d.  the location where *your car* is principally garaged.

*You* agree that if this information or any other information used to determine the premium is incorrect or incomplete, or changes during the policy period, we may decrease or increase the premium during the policy period based upon

20
9901.6

the corrected, completed or changed information. *You* agree that if the premium is decreased or increased during the policy period, State Farm will refund or credit to *you* any decrease in premium and *you* will pay for any increase in premium.

**8. Concealment or Fraud**

There is no coverage under this policy if *you* or any other *person* insured under this policy has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy.

**9. Participating Policy**

*You* are entitled to participate in a distribution of the earnings of the company as determined by our Board of Directors in accordance with the company's Articles of Incorporation.

In Witness Whereof, the State Farm Fire and Casualty Company has caused this policy to be signed by its President and Secretary at Bloomington, Illinois, and countersigned on the declarations page by a duly authorized representative of the Company.

*Kim M. Brunner*

SECRETARY

*Edward B Rust Jr*

PRESIDENT

## PAGE NO.     WHAT IT IS AND WHERE YOU CAN FIND IT — THE INDEX

4     Reporting a Claim — Insured's Duties — What to do if *you* have an accident, claim or are sued.

2     Defined Words

3     Declarations Continued

4     When and Where Your Coverage Applies

4     Financed Vehicles – Coverage for Creditor

**Coverages**

6     **A — Liability** — When there is damage to others.

9     **C — Medical Payments** — When there are medical and funeral expenses.

11     **U — Uninsured Motor Vehicle** — When the other car or driver is not insured or is underinsured.

13     **D — Comprehensive** — When *your car* is damaged except by collision or upset. Any deductible amount is shown by the number beside "D" on the declarations page.

13     **G — Collision** — When *your car* is damaged by collision or upset. The deductible is shown by the number beside "G" on the declarations page.

14     **H — Emergency Road Service** — When *your car* breaks down or needs a tow.

14     **R — Car Rental Expense** — When *you* need to rent a car because of damage to *your car.*

14     **R1 — Car Rental and Travel Expenses** — When *you* need to rent a *car* and pay extra travel expenses because of damage to *your car.*

17     **S — Death, Dismemberment and Loss of Sight** — Pays for death of or certain injuries to *persons* named.

17     **Z — Loss of Earnings** — Pays loss of *weekly earnings* to *persons* named.

**Conditions**

18     1.     Policy Changes

18     2.     Suit Against Us

19     3.     Our Right To Recover Our Payments

19     4.     Cancellation

20     5.     Renewal

20     6.     Terms of Policy Conformed to Statute

20     7.     Premium

21     8.     Concealment or Fraud

21     9.     Participating Policy

# 6901.1 AMENDATORY ENDORSEMENT

This endorsement is a part of *your* policy. Except for the changes it makes, all other terms of the policy remain the same and apply to this endorsement. It is effective at the same time as *your* policy unless a different effective date is specified by us in writing.

In consideration of the premium charged, it is agreed that *your* policy is changed as follows:

1. **DEFINED WORDS**

   a. The following definition is added:

   *Fungi* – means any type or form of fungus or fungi and includes:

   1. mold;

   2. mildew; and

   3. any of the following that are produced or released by fungi:

      a. mycotoxins;

      b. spores;

      c. scents; or

      d. byproducts.

   b. The following provision under the definition of *non-owned car* is deleted:

   *Non-owned car* does not include a:

   1. rented *car* while it is used in connection with the *insured's* employment or business; or

2. **SECTION I — LIABILITY — COVERAGE A**

   Under the paragraph that reads "In addition to the limits of liability, we will pay for an *insured* any costs listed below resulting from such accident":

   a. item 3.c. is deleted.

   b. item 4. is changed to read:

      4. The following costs and expenses if related to and incurred after a civil lawsuit has been filed against an *insured* for damages for which liability coverage is provided by this policy:

      a. loss of wages or salary, but not other income, up to $100 for each day an *insured* attends at our request:

         (1) an arbitration;

         (2) a mediation; or

         (3) a trial of a civil suit.

   b. reasonable expenses incurred by an *insured* at our request, other than loss of wages, salary, or other income.

   The amount of any of the costs or expenses listed above that are incurred by an *insured* must be reported to us before we will pay.

3. **SECTION II — MEDICAL PAYMENTS — COVERAGE C**

   The following is added to **What Is Not Covered**:

   a. THERE IS NO COVERAGE FOR *BODILY INJURY* THAT RESULTS FROM EXPOSURE TO *FUNGI*.

   b. THERE IS NO COVERAGE FOR *BODILY INJURY* THAT RESULTS FROM:

      (1) NUCLEAR REACTION;

      (2) RADIATION OR RADIOACTIVE CONTAMINATION FROM ANY SOURCE; OR

      (3) THE ACCIDENTAL OR INTENTIONAL DETONATION OF, OR RELEASE OF RADIATION FROM, ANY NUCLEAR OR RADIOACTIVE DEVICE.

4. **SECTION III — UNINSURED MOTOR VEHICLE — COVERAGE U**

   Item 2. under *Uninsured Motor Vehicle* is changed to read:

   2. a "hit-and-run" land motor vehicle whose owner and driver remains unknown and which was the proximate cause of *bodily injury* to an *insured*.

5. **SECTION IV — PHYSICAL DAMAGE COVERAGES**

   a. The following is added to the definition of *Loss*:

   *Loss* does not include any reduction in the value of any vehicle or detachable living quarters after it has been repaired, as compared to its value before it was damaged.

b.  Item 2. under **COMPREHENSIVE – COVERAGE D** is changed to read:

> 2.  We will repay *you* for transportation costs incurred if *your car* is stolen. We will pay up to $25 per day beginning when *you* tell us of the theft and ending when we offer to pay for the *loss*.
>
> If the daily incurred transportation costs are payable under both Comprehensive Coverage and Car Rental and Travel Expenses Coverage, we will pay only under the one coverage where *you* collect the most. If payments have been made under Car Rental and Travel Expenses Coverage and such payments have either exhausted the total amount payable under Car Rental Expense or reduced the total amount payable under Car Rental Expense to less than $25, then we will pay under Comprehensive Coverage.

c.  The first paragraph of **Limit of Liability – Comprehensive and Collision Coverages** is changed to read:

> The limit of our liability for *loss* to property or any part of it is the lower of:
>
> 1.  the actual cash value; or
> 2.  the cost of repair or replacement. The cost of repair or replacement does not include any reduction in the value of the property after it has been repaired, as compared to its value before it was damaged.

d.  **CAR RENTAL EXPENSE – COVERAGE R**

The paragraph that reads:

> ANY CAR RENT PAYABLE UNDER COVERAGE R is REDUCED TO THE EXTENT IT IS PAYABLE UNDER COMPREHENSIVE.

is changed to read:

> If the incurred daily rental charge is payable under both Comprehensive Coverage and Car Rental Expense Coverage, we will pay only under the one coverage where *you* collect the most.

e.  **CAR RENTAL AND TRAVEL EXPENSES – COVERAGE R1**

The paragraph that reads:

> ANY CAR RENTAL EXPENSE PAYABLE UNDER THIS COVERAGE IS REDUCED TO THE EXTENT IT IS PAYABLE UNDER COMPREHENSIVE COVERAGE.

is changed to read:

> If the incurred daily rental charge is payable under both Comprehensive Coverage and Car Rental and Travel Expenses Coverage, we will pay only under the one coverage where *you* collect the most.

f.  **Trailer Coverage**

The second paragraph under item 2. is changed to read:

> The most we will pay under the comprehensive or collision coverage for a *loss* to such non-owned trailer or unit is $2500.

g.  **Trailer Coverage**

The following provision under **2. Non-Owned Trailer or Detachable Living Quarters** is deleted:

> A non-owned trailer or detachable living quarters unit is one that:
>
> c.  is not rented and used in connection with the employment or business of *you, your spouse* or any *relative*.

h.  The following is added to **When The Physical Damage Coverages Do Not Apply**:

> THERE IS NO COVERAGE FOR *LOSS* TO ANY VEHICLE DUE TO *FUNGI*. THIS APPLIES REGARDLESS OF WHETHER OR NOT THE *FUNGI* RESULT FROM A *LOSS* THAT IS PAYABLE UNDER ANY OF THE PHYSICAL DAMAGE COVERAGES. WE WILL ALSO NOT PAY FOR ANY TESTING OR REMEDIATION OF *FUNGI*, OR ANY ADDITIONAL COSTS REQUIRED TO REPAIR ANY VEHICLE THAT ARE DUE TO THE EXISTENCE OF *FUNGI*.

i.  The following is added to **When The Physical Damage Coverages Do Not Apply**:

> THERE IS NO COVERAGE FOR *LOSS* TO ANY VEHICLE THAT RESULTS FROM:
>
> 1.  NUCLEAR REACTION;

6901.1

2.  RADIATION OR RADIO-ACTIVE CONTAMINATION FROM ANY SOURCE; OR

3.  THE ACCIDENTAL OR INTENTIONAL DETONA-TION OF, OR RELEASE OF RADIATION FROM, ANY NUCLEAR OR RADIOAC-TIVE DEVICE.

**6.  CONDITIONS**

a.  Item c.(2) under **3. Our Right to Recover Our Payments** is changed to read:

(2)  if the damages are caused by any other *uninsured motor vehicle*:

(a)  we are subrogated to the extent of our payments to the proceeds of any settlement the injured *person* recovers from any party liable for the *bodily injury*.

(b)  if the *person* to or for whom we have made payment has not recovered from the party at fault, he or she shall:

i.  keep these rights in trust for us;

ii.  execute any legal papers we need; and

iii.  when we ask, take action through our representative to recover our payments.

We are to be repaid our payments, costs and fees of collection out of any recovery.

b.  The first paragraph of the provision titled **How and When We May Cancel**, under the **Cancellation** condition is changed to read:

We may cancel *your* policy by written notice, mailed or delivered to *your* last known address. The notice shall give the date cancellation is effective.

c.  The last paragraph of the **Renewal** condition is changed to read:

A notice of our intention to not renew will be mailed or delivered to *your* last known address at least 30 days before the end of the current policy period. The mailing of it shall be sufficient proof of notice.

6901.1



**ANSWER:**

On the first page of its Answer, Defendant State Farm admits that it issued an automobile policy covering the Plaintiff's car, that the Plaintiff submitted a claim under the policy and that Defendant State Farm denied the claim.

2.    You have alleged in your Complaint that you "enhanced" your insured vehicle (2000 Chevrolet Corvette):

      a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

      b.    Please produce any and all documents relating to the information requested in this interrogatory.

**ANSWER:**

The Plaintiff enhanced his car from the time he bought it until it was stolen in the following ways:  replacing all tire rims, replacing all tires, aligning the wheels, replacing a tie rod, adding a Corvette logo accessory and ordering louvers for the tail lights.  The Plaintiff, the employees at Big Ten Tire in Prattville, the employees where he bought the rims in Birmingham, Donald Long, Victor Long and Walter Crosby may have knowledge or information about these enhancements.  The receipts for the $1,572.14 the Plaintiff paid to  Big Ten Tire are attached.

2



EXHIBIT
F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARTIN O. LONG,                    *

    Plaintiff,                     *

vs.                                *           Case Number:  2:06cv816-MHT

STATE FARM FIRE AND                *
CASUALTY COMPANY,
                                   *
    Defendant.

## DECLARATION OF TONY NIX

I declare under penalty of perjury under the laws of the United States of America

that the following is true and correct:

1.    My name is Tony Nix. I am a citizen of the State of Georgia, am over

nineteen years of age, and have personal knowledge of the matters contained in this

declaration.

2.    I am a Claim Team Manager with the Special Investigations Unit of State

Farm Fire and Casualty Company.

3.    I am familiar with how State Farm's records, including claim files, are

made and kept by State Farm.

4.    Attached as Exhibit "1" to this declaration are true and correct copies of

excerpts of the State Farm claim files for Claim No. 01-6596-564 and Claim No. 01-

Q177-057. Both claims were made by Martin Long and involved the alleged theft of his

2000 Chevrolet Corvette.

1

5.    The excerpts referred to above were made at or near the time of the occurrence of the subjects of the excerpts by persons with knowledge of these matters. These records are kept by State Farm in the course of regularly conducted business and it is the regular practice of State Farm to make these records.

I am making this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 in Decatur, Georgia this _____ day of March, 2007.

_____
TONY NIX

#131651

2

EXHIBIT

F-1

June 29, 2005

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
**PERSONAL AND CONFIDENTIAL**

Attorney F. Tucker Burge
Burge & Burge
850 Park Pl Tower
Birmingham, AL  35203

RE:  Claim Number:  01-Q177-057
      Policy Number:  01-CW-7517-0
      Date of Loss:  February 19, 2005

Dear Mr. Burge:

This letter is being sent to you as legal representative of Martin Long.  State Farm Fire and Casualty Company has completed its investigation into the reported incident of February 19, 2005, involving the above mentioned policy.

We must advise you that our investigation has established material misrepresentation in the presentation of your client's claim.  Your client's State Farm policy states the following:

*SECTION I AND SECTION II – CONDITIONS*

2.  *Concealment or Fraud. This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.*

Because of these findings, we will be unable to make any payments under the policy and the policy is considered void, as of February 19, 2005.

By providing the above information, State Farm Fire and Casualty Company does not waive any of its rights, but rather, specifically reserves it rights to deny coverage and defend any action based on all information now known or which may become known to State Farm.

Sincerely,

Tony D. Nix, CPCU, CIFI
Team Manager
State Farm Fire and Casualty Company

TN/pg

bcc:  Attorney Angela Taylor/Mike Beers
       Todd Smith

Long/State Farm
SF2  00046

June 29, 2005

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
**PERSONAL AND CONFIDENTIAL**

Attorney F. Tucker Burge
Burge & Burge
850 Park Pl Tower
Birmingham, AL  35203

RE:  Claim Number:  01-6596-564
     Policy Number:  0886-750-01
     Vehicle:  2000 Chevrolet Corvette
     VIN:  1G1YY22G9Y5132554

Dear Mr. Burge:

This letter is being sent to you as legal representative of Martin Long.

State Farm Fire and Casualty Company has made a comprehensive investigation into the reported incident of February 19, 2005, involving the above mentioned vehicle and policy.

Based on the investigation, we must advise you a "loss" as defined in the policy has not occurred as the destruction of the insured vehicle was by or at the direction of an insured. We must additionally advise you that our investigation has established that your client misrepresented material facts in the presentation of his claim.  Because of these findings, we will be unable to make any payments under the policy.

By providing the above information, State Farm Fire and Casualty Company does not waive any of its rights, but rather, specifically reserves it rights to deny coverage and defend any action based on all information now known or which may become known to State Farm.

Sincerely,

Tony D. Nix, CPCU, CIFI
Team Manager
State Farm Fire and Casualty Company

TN/pg

bcc:  Attorney Angela Taylor/Mike Beers
      Todd Smith

Long/State Farm
SF1  00132



**State Farm Fire and Casualty Company**

Home Office, Bloomington, Illinois 61710



**Birmingham Operations Center**
100 State Farm Parkway
P.O. Box 2661
Birmingham, Alabama 35297-0001

# CERTIFICATE

I, the undersigned, do hereby certify that I am custodian of the records pertaining to the issuance of policies issued by the Personal Lines Division of State Farm Fire & Casualty Company.

Based on our available records, I further certify that the attached coverage summary dated DEC 23, 2004 represents a true copy of the policy provisions and coverages as of FEB 07, 2005 for policy 01-CW-7517-0 issued to  LONG, MARTIN & EVELYN
                    2752 CAROLINE DR
                    MILLBROOK, AL   36054-4103

*Bill Lovell*

Bill Lovell
Underwriting Section Manager
State Farm Fire & Casualty Company
Birmingham Operation Center
Birmingham AL   35297-0001

Long/State Farm
SF-H 001



State Farm Fire and Casualty Company
100 State Farm Parkway
Birmingham, AL 35297-0001

B-1973-F285  F T

**RENEWAL CERTIFICATE**
Manufactured Home Special Form Policy
FEB 07 2005 to FEB 07 2006

| DATE DUE | PLEASE PAY THIS AMOUN |
|---|---|
| BILLED THROUGH SFPP | |

LONG, MARTIN & EVELYN
2752 CAROLINE DRIVE
MILLBROOK AL  36054-4103

‖ı║ıؕılⅡⅡ‖ıⅡ‖‖ıⅡ‖ⅡⅡ‖ıⅡ‖ıⅡ‖ıⅡ‖ıؕıⅡ

**Coverages and Limits**
**Section I**
| | | |
|---|---|---|
| A  Dwelling | | $43,000 |
| Dwelling Extension | | 4,300 |
| B  Personal Property | | 50,400 |
| C  Loss of Use | | Actual Loss Sustained |

**Deductibles - Section I**
| | |
|---|---|
| All Losses | 500 |

Location:  Same as Mailing Address

SFPP No: 0372226009

Lienholder:  CHASE MANHATTAN MORTGAGE CORP
ITS SUCCESSORS AND/OR ASSIGNS

Loan No: 0301291142

**Section II**
| | | |
|---|---|---|
| L  Personal Liability | | $100,000 |
| Damage to Property of Others | | 500 |
| M  Medical Payments to Others (Each Person) | | 1,000 |

**Forms, Options, and Endorsements**
| | |
|---|---|
| Manufactured Home Policy | FP-7933.1 |
| Amendatory Endorsement | FE-7281.1 |
| Personal Prop Replacement Cost | FE-5705 |
| Flood Amendatory Endorsement | FE-7377.1 |
| Fungus "Including Mold" Excl | FE-5901 |
| Motor Vehicle Endorsement | FE-5452 |
| Amend Subrogation Condition | FE-5843 |

| | |
|---|---|
| **Annual Premium** | $890. |

**Premium Reductions**
Your premium has already been reduced
by the following:
| | |
|---|---|
| Home Alert Discount | 42. |
| Renewal Discount | 158. |
| Stability Discount | Includ |

Cov B Inflation Cov Index    191.0

Description:  FLEETWOOD       Serial No:  GAFLX35AB15716HL11

*Thanks for letting us serve you.  We appreciate our long term customers.*

Agent
MIKE DEVERS INS AGENCY INC
Telephone
(334) 285-3662

Prepared  DEC 23 2004

➤ 38 3262 4238

*See reverse side for important information.
Please keep this part for your record.*

**NOTE: DO NOT PAY - PREMIUM BILLED
THROUGH STATE FARM PAYMENT PLAN**

| INSURED | LONG, MARTIN & EVELYN | | |
|---|---|---|---|
| POLICY NUMBER | 01-CW-7517-0 | **MANF HOME - 3** | |

| DATE DUE | PLEASE PAY THIS AMOUN |
|---|---|

**THIS IS FOR INFORMATION ONLY**

Please contact your State Farm
Agent to make any policy
changes.

Loan No: 0301291142

0909503095
State Farm Insurance Companies

Long/State Farm
SF-H 002

500506800000000    50111333751700150000

**CONTINUED FROM FRONT**

Long/State Farm
SF-H 003

OTICE TO POLICYHOLDER:

r a comprehensive description of coverages and forms, please refer to your policy.

licy changes requested before the "Date Prepared", which appear on this notice, are effective on the Renewal Date of this
licy unless otherwise indicated by a separate endorsement, binder, or amended declarations. Any coverage forms attached
this notice are also effective on the Renewal Date of this policy.

licy changes requested after the "Date Prepared" will be sent to you as an amended declarations or as an endorsement to
ur policy. Billing for any additional premium for such changes will be mailed at a later date.

during the past year, you've acquired any valuable property items, made any improvements to insured property, or have any
estions about your insurance coverage, contact your State Farm agent.

ease keep this with your policy.

f008qf) Rev. 10-2003

**IF YOU HAVE MOVED, PLEASE CONTACT YOUR AGENT. IF THIS IS NOT CONVENIENT, PLEASE COMPLETE THE FOLLOWING.**

| or R.R. | | | | Residence Phone No. |
| | State/Province | ZIP/Postal Code | | Business Phone No. |
| | | ☐ Inside City Limits | ☐ Outside City Limits | |
| ship | County | | | |
| nge:  ☐ Permanent  ☐ Temporary | If temporary, how many months? _____ | | Do you plan to return to your previous address?  ☐ Yes  ☐ No |
| Mailing address change only  ☐ Location change  (Please see your State Farm agent) | | | |
| Policyholders Only) | | | Check box if change applies to ALL State Farm policies in household.  ☐ |
| vehicle driven to and from work/school?  ☐ Yes  ☐ No | | | |
| answer is "yes", what is the average weekly mileage for such use? _____ | | | |

(c1f008qf)

FP-7933.1
(11/93)



# YOUR
# STATE FARM
# MANUFACTURED HOME
# POLICY


PRINTED
IN
U.S.A.

FP-7933.1
(11/93)

Long/State Farm
SF-H 004

# TABLE OF CONTENTS

## DECLARATIONS
Your Name
Location of Your Residence
Description of Your Manufactured Home
Policy Period
Coverages
Limits of Liability
Deductibles

| | Begins on Page |
|---|---|
| **DECLARATIONS CONTINUED** | 1 |
| **DEFINITIONS** | 1 |
| **SECTION I - YOUR PROPERTY** | |
| COVERAGES | 3 |
| Coverage A - Dwelling | 3 |
| Coverage B - Personal Property | 3 |
| Coverage C - Loss of Use | 5 |
| Additional Coverages | 5 |
| LOSSES INSURED | 7 |
| LOSSES NOT INSURED | 9 |
| CONDITIONS | 11 |
| **SECTION II - YOUR LIABILITY** | |
| COVERAGES | 13 |
| Coverage L - Personal Liability | 13 |
| Coverage M - Medical Payments to Others | 14 |
| Additional Coverages | 14 |
| EXCLUSIONS | 15 |
| CONDITIONS | 17 |
| **SECTION I AND SECTION II - CONDITIONS** | 18 |
| **OPTIONAL POLICY PROVISIONS** | 19 |

Includes copyrighted material of State Farm Fire and Casualty Company.
Copyright, State Farm Fire and Casualty Company, 1983.

FP-7933.1
(11/93)

Printed in U.S.A.

## MANUFACTURED HOME POLICY - SPECIAL FORM 3
### DECLARATIONS CONTINUED

We agree to provide the insurance described in this policy:

1. based on your payment of premium for the coverages you chose;

2. based on your compliance with all applicable provisions of this policy; and

3. in reliance on your statements in these **Declarations**.

You agree, by acceptance of this policy, that:

1. you will pay premiums when due and comply with the provisions of this policy;

2. the statements in these **Declarations** are your statements and are true;

3. we insure you on the basis your statements are true; and

4. this policy contains all of the agreements between you and us and any of our agents.

Unless otherwise indicated in the application, you state that during the three years preceding the time of your application for this insurance your Loss History and Insurance History are as follows:

1. Loss History: you and the members of your household have not had any insured losses, whether paid or not, that would have been covered under the terms of this or a similar policy; and

2. Insurance History: no insurance company has cancelled or refused to renew your homeowners or fire insurance.

## DEFINITIONS

"You" and "your" mean the "named insured" shown in the **Declarations**. Your spouse is included if a resident of your household. "We", "us" and "our" mean the Company shown in the **Declarations**.

Certain words and phrases are defined as follows:

1. "**bodily injury**" means physical injury, sickness or disease to a person. This includes required care, loss of services and death resulting therefrom.

   **Bodily injury** does not include:

   a. any of the following which are communicable: disease, bacteria, parasite, virus, or other organism, any of which are transmitted by any **insured** to any other person;

   b. the exposure to any such disease, bacteria, parasite, virus, or other organism by any **insured** to any other person; or

   c. emotional distress, mental anguish, humiliation, mental distress, mental injury, or any similar injury unless it arises out of actual physical injury to some person.

2. "**business**" means a trade, profession or occupation. This includes farming.

3. "**Declarations**" means the policy **Declarations**, any amended **Declarations**, the most recent renewal notice or certificate, an Evidence of Insurance form, or any endorsement changing any of these.

4. "**insured**" means you and, if residents of your household:

   a. your relatives; and

   b. any other person under the age of 21 who is in the care of a person described above.

   Under Section II, "**insured**" also means:

   c. with respect to animals or watercraft to which this policy applies, the person or organization legally responsible for them. However, the animal or watercraft must be owned by you or a person included in 4.a. or 4.b. A person or organization using or having custody of these animals or watercraft in the course of a **business**, or without permission of the owner, is not an **insured**; and

FP-7933.1
(11/93)

1

Printed in U.S.A.

Long/State Farm
SF-H 006

d. with respect to any vehicle to which this policy applies, any person while engaged in your employment or the employment of a person included in 4.a. or 4.b.

5. "insured location" means:

a. the residence premises;

b. the part of any other premises, other structures and grounds used by you as a residence. This includes premises, structures and grounds you acquire while this policy is in effect for your use as a residence;

c. any premises used by you in connection with the premises included in 5.a. or 5.b.;

d. any part of a premises not owned by an insured but where an insured is temporarily residing;

e. vacant land owned by or rented to an insured. This does not include farm land;

f. land owned by or rented to an insured on which a one or two family dwelling is being constructed as a residence for an insured;

g. individual or family cemetery plots or burial vaults of an insured;

h. any part of a premises occasionally rented to an insured for other than business purposes; and

i. 500 acres or less of farm land (without buildings) rented to others.

6. "in transit" means the period of time during which the leveling jacks or blocks are removed or all utilities are disconnected for the purpose of transporting the dwelling from one location to another. This applies whether or not the dwelling is momentarily in motion and whether on a public roadway or otherwise. The dwelling will not be considered in transit if it is being moved as an emergency measure to protect it from an impending loss from a Loss Insured.

7. "motor vehicle", when used in Section II of this policy, means:

a. a motorized land vehicle designed for travel on public roads or subject to motor vehicle registration. A motorized land vehicle in dead storage on an insured location is not a motor vehicle;

b. a trailer or semi-trailer designed for travel on public roads and subject to motor vehicle registration. A boat, camp, home or utility trailer not being towed by or carried on a vehicle included in 7.a. is not a motor vehicle;

c. a motorized golf cart, snowmobile, or other motorized land vehicle owned by an insured and designed for recreational use off public roads, while off an insured location. A motorized golf cart while used for golfing purposes is not a motor vehicle;

d. a motorized bicycle, tricycle or similar type of equipment owned by an insured while off an insured location; and

e. any vehicle while being towed by or carried on a vehicle included in 7.a., 7.b., 7.c. or 7.d.

8. "occurrence", when used in Section II of this policy, means an accident, including exposure to conditions, which results in:

a. bodily injury; or

b. property damage;

during the policy period. Repeated or continuous exposure to the same general conditions is considered to be one occurrence.

9. "property damage" means physical damage to or destruction of tangible property, including loss of use of this property. Theft or conversion of property by an insured is not property damage.

10. "residence employee" means an employee of an insured who performs duties, including household or domestic services, in connection with the maintenance or use of the residence premises. This includes employees who perform similar duties elsewhere for you. This does not include employees while performing duties in connection with the business of an insured.

11. "residence premises" means your dwelling, other structures, and grounds where you reside and which is shown in the Declarations.

2

# SECTION I - COVERAGES

**COVERAGE A - DWELLING**

1. We cover:

   a. the dwelling used principally as a private residence on the **residence premises** shown in the **Declarations**. This includes structures attached to the dwelling;

   b. materials and supplies located on or adjacent to the **residence premises** for use in the construction, alteration or repair of the dwelling or other structures on the **residence premises**;

   c. wall-to-wall carpeting attached to the dwelling on the **residence premises**;

   d. outdoor antennas;

   e. parts, equipment, furniture and accessories which are originally built into and form a permanent part of the dwelling;

   f. permanently attached carports or garages, awnings, skirting, porches, tie-down equipment; and

   g. dwelling structure equipment.

   We do not cover the dwelling while it is rented. However, it is permissible to rent a portion of the dwelling which is occupied by an **insured** to not more than two roomers or boarders.

2. **Dwelling Extension**. We cover other structures on the **residence premises**, separated from the dwelling by clear space. Structures connected to the dwelling by only a fence, utility line, or similar connection are considered to be other structures.

   We do not cover other structures:

   a. not permanently attached to or otherwise forming a part of the realty;

   b. used in whole or in part for **business** purposes; or

   c. rented or held for rental to a person not a tenant of the dwelling, unless used solely as a private garage.

3. We do not cover land, including the land necessary to support any Coverage A property. We do not cover any

costs required to replace, rebuild, stabilize or otherwise restore the land, nor do we cover the costs of repair techniques designed to compensate for or prevent land instability.

**COVERAGE B - PERSONAL PROPERTY**

1. We cover personal property owned or used by an **insured** while it is anywhere in the world. This includes structures not permanently attached to or otherwise forming a part of the realty. At your request, we will cover personal property owned by others while the property is on the part of the **residence premises** occupied exclusively by an **insured**. At your request, we will also cover personal property owned by a guest or a **residence employee**, while the property is in any other residence occupied by an **insured**.

   We cover personal property usually situated at an **insured's** residence, other than the **residence premises**, for up to $1,000 or 10% of the Coverage B limit, whichever is greater. This limitation does not apply to personal property in a newly acquired principal residence for the first 30 days after you start moving the property there. If the **residence premises** is a newly acquired principal residence, personal property in your immediate past principal residence is not subject to this limitation for the first 30 days after the inception of this policy.

   **Special Limits of Liability**. These limits do not increase the Coverage B limit. The special limit for each of the following categories is the total limit for each loss for all property in that category:

   a. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals;

   b. $1,000 on property used or intended for use in a **business**, including merchandise held as samples or for sale or for delivery after sale, while on the **residence premises**. This coverage is limited to $250 on such property away from the **residence premises**.

      Electronic data processing equipment or the recording or storage media used with that equipment is not included under this coverage;

3

Long/State Farm
SF-H 008

c.  $1,000 on securities, checks, cashier's checks, traveler's checks, money orders and other negotiable instruments, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets and stamps;

d.  $1,000 on watercraft of all types and outboard motors, including their trailers, furnishings and equipment;

e.  $1,000 on trailers not used with watercraft;

f.  $1,000 for loss by theft of jewelry, watches, fur garments and garments trimmed with fur, precious and semi-precious stones;

g.  $2,500 for loss by theft of firearms;

h.  $2,500 for loss by theft of silverware and goldware;

i.  $5,000 on electronic data processing equipment and the recording or storage media used with that equipment. There is no coverage for said equipment or media while located away from the **residence premises** except when said equipment or media are removed from the **residence premises** for the purpose of repair, servicing or temporary use. An **insured** student's equipment and media are covered while at a residence away from home; and

j.  $5,000 on any one article and $10,000 in the aggregate for loss by theft of any rug, carpet (except wall-to-wall carpet), tapestry, wall-hanging or other similar article.

2.  **Property Not Covered.** We do not cover:

a.  articles separately described and specifically insured in this or any other insurance;

b.  animals, birds or fish;

c.  any engine or motor propelled vehicle or machine, including the parts, designed for movement on land. We do cover those not licensed for use on public highways which are:

(1)  used solely to service the **insured location**; or

(2)  designed for assisting the handicapped;

d.  devices or instruments for the recording or reproduction of sound permanently installed in an engine or motor propelled vehicle. We do not cover tapes, wires, records or other mediums that may be used with these devices or instruments while in the vehicle;

e.  aircraft and parts;

f.  property of roomers, boarders, tenants and other residents not related to an **insured**. We do cover property of roomers, boarders and other residents related to an **insured**;

g.  property regularly rented or held for rental to others by an **insured**. This exclusion does not apply to property of an **insured** in a sleeping room rented to others by an **insured**;

h.  property rented or held for rental to others away from the **residence premises**;

i.  any citizens band radios, radio telephones, radio transceivers, radio transmitters, radar detectors, antennas and other similar equipment. This exclusion applies only while the property is **located in** or upon an engine or motor propelled vehicle, whether attached or not;

j.  books of account, abstracts, drawings, card index systems and other records. This exclusion does not apply to film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing. We will cover the cost of blank books, cards or other blank material plus the cost of labor you incur for transcribing or copying such records;

k.  recording or storage media for electronic data processing that cannot be replaced with other of like kind and quality on the current retail market;

l.  appliances, equipment and accessories which are originally built into and form a permanent part of the dwelling; or

m.  tires and wheels detached from the dwelling and while away from the **residence premises**.

4

## COVERAGE C - LOSS OF USE

1. **Additional Living Expense.** If a Loss Insured causes the **residence premises** to become uninhabitable, we cover the necessary increase in cost to maintain your standard of living. Payment is for the shortest time required (a) to repair or replace the premises or (b) for your household to settle elsewhere, but not to exceed 12 months. This period of time is not limited by expiration of this policy.

2. **Fair Rental Value.** If a Loss Insured causes that part of the **residence premises** rented to others or held for rental by you to become uninhabitable, we cover its fair rental value. Payment shall be for the shortest time required to repair or replace the part of the premises rented or held for rental, but not to exceed 12 months. This period of time is not limited by expiration of this policy. Fair rental value shall not include any expense that does not continue while that part of the **residence premises** rented or held for rental is uninhabitable.

3. **Prohibited Use.** If a civil authority prohibits your use of the **residence premises** because of direct damage to a neighboring premises caused by a Loss Insured, we cover any resulting Additional Living Expense and Fair Rental Value. Coverage is for a period not exceeding two weeks while use is prohibited.

   We do not cover loss or expense due to cancellation of a lease or agreement.

## SECTION I - ADDITIONAL COVERAGES

1. **Debris Removal.** We will pay the reasonable expenses you incur in the removal of debris of covered property damaged by a Loss Insured. This expense is included in the limit applying to the damaged property.

   We will pay up to $500 in the aggregate for each loss to cover the reasonable expenses you incur in the removal of tree debris from the **residence premises** when the tree has damaged property covered under Coverage A.

   When the amount payable for the property damage plus the debris removal exceeds the limit for the damaged property, an additional 5% of that limit is available for debris removal expense.

2. **Temporary Repairs.** If damage is caused by a Loss Insured, we will pay the reasonable and necessary cost you incur for temporary repairs to covered property to protect the property from further immediate damage or loss. This coverage does not increase the limit applying to the property being repaired.

3. **Trees, Shrubs and Other Plants.** We cover outdoor trees, shrubs, plants or lawns, on the **residence premises**, for loss caused by the following: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the **residence premises**, Vandalism or malicious mischief or Theft. The limit for this coverage, including the removal of debris, shall not exceed 5% of the limit applying to the dwelling. We will not pay more than $500 for any one outdoor tree, shrub or plant, including debris removal expense. This coverage may increase the limit otherwise applicable. We do not cover property grown for **business** purposes.

4. **Fire Department Service Charge.** We will pay up to $500 for your liability assumed by contract or agreement for fire department charges. This means charges incurred when the fire department is called to save or protect covered property from a Loss Insured. No deductible applies to this coverage. This coverage may increase the limit otherwise applicable.

5. **Property Removed.** Covered property, while being removed from a premises endangered by a Loss Insured, is covered for any accidental direct physical loss. This coverage also applies to the property for up to 30 days while removed. We will also pay for reasonable expenses incurred by you for the removal and return of the covered property. This coverage does not increase the limit applying to the property being removed.

6. **Credit Card, Bank Fund Transfer Card, Forgery and Counterfeit Money.**

   a. We will pay up to $1,000 for:

      (1) the legal obligation of an **insured** to pay because of the theft or unauthorized use of credit cards and bank fund transfer cards issued to or registered in an **insured's** name. If an **insured** has not complied with all terms and conditions under

5

which the cards are issued, we do not cover use by an **insured** or anyone else;

(2) loss to an **insured** caused by forgery or alteration of any check or negotiable instrument; and

(3) loss to an **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency.

No deductible applies to this coverage.

We will not pay more than the limit stated above for forgery or alteration committed by any one person. This limit applies when the forgery or alteration involves one or more instruments in the same loss.

b. We do not cover loss arising out of **business** pursuits or dishonesty of an **insured**.

c. Defense:

(1) We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation to defend claims or suits ends when the amount we pay for the loss equals our limit of liability.

(2) If claim is made or a suit is brought against an **insured** for liability under the Credit Card or Bank Fund Transfer Card coverage, we will provide a defense. This defense is at our expense by counsel of our choice.

(3) We have the option to defend at our expense an **insured** or an **insured's** bank against any suit for the enforcement of payment under the Forgery coverage.

7. **Power Interruption.** We cover accidental direct physical loss caused directly or indirectly by a change of temperature which results from power interruption that takes place on the **residence premises**. The power interruption must be caused by a Loss Insured occurring on the **residence premises**. The power lines off the **residence premises** must remain energized. This coverage does not increase the limit applying to the damaged property.

8. **Refrigerated Products.** Coverage B is extended to cover the contents of deep freeze or refrigerated units on

the **residence premises** for loss due to power failure or mechanical failure. If mechanical failure or power failure is known to you, all reasonable means must be used to protect the property insured from further damage or this coverage is void. Power failure or mechanical failure shall not include:

a. removal of a plug from an electrical outlet; or

b. turning off an electrical switch unless caused by a Loss Insured.

This coverage does not increase the limit applying to the damaged property.

9. **Arson Reward.** We will pay $1,000 for information which leads to an arson conviction in connection with a fire loss to property covered by this policy. This coverage may increase the limit otherwise applicable. However, the $1,000 limit shall not be increased regardless of the number of persons providing information.

10. **Volcanic Action.** We cover direct physical loss to a covered building or covered property contained in a building resulting from the eruption of a volcano when the loss is directly and immediately caused by:

a. volcanic blast or airborne shock waves;

b. ash, dust or particulate matter; or

c. lava flow.

We will also pay for the removal of that ash, dust or particulate matter which has caused direct physical loss to a covered building or covered property contained in a building.

One or more volcanic eruptions that occur within a 72-hour period shall be considered one volcanic eruption.

This coverage does not increase the limits applying to the damaged property.

11. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a. perils described in SECTION I - LOSSES INSURED, COVERAGE B - PERSONAL PROPERTY. These

6

perils apply to covered building and personal property for loss insured by this Additional Coverage;

b. hidden decay;

c. hidden insect or vermin damage;

d. weight of contents, equipment, animals or people;

e. weight of ice, snow, sleet or rain which collects on a roof; or

f. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b., c., d., e. and f. unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit applying to the damaged property.

12. **Locks.** We will pay the reasonable expenses you incur to re-key locks on exterior doors of the dwelling located on the **residence premises,** when the keys to those locks are a part of a covered theft loss.

No deductible applies to this coverage.

13. **Temporary Living Expense Allowance.** If the **residence premises** becomes uninhabitable because of a loss caused by earthquake, landslide, or volcanic explosion, or if civil authority prohibits your use of the **residence premises** because an earthquake, landslide or volcanic explosion has occurred, we will pay up to $2,000 to cover the necessary increase in cost which you incur to maintain your standard of living.

The **SECTION I - LOSSES NOT INSURED** references to earthquake, landslide and volcanic explosion do not apply to this Additional Coverage.

This coverage is excess over any other valid and collectible insurance which is in force at the time of the loss.

No deductible applies to this coverage.

## SECTION I - LOSSES INSURED

### COVERAGE A - DWELLING

We insure for accidental direct physical loss to the property described in Coverage A, except as provided in **SECTION I - LOSSES NOT INSURED.**

### COVERAGE B - PERSONAL PROPERTY

We insure for accidental direct physical loss to property described in Coverage B caused by the following perils, except as provided in **SECTION I - LOSSES NOT INSURED:**

1. **Fire or lightning.**

2. **Windstorm or hail.** This peril does not include loss to property contained in a structure caused by rain, snow, sleet, sand or dust. This limitation does not apply when the direct force of wind or hail damages the structure causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

This peril includes loss to watercraft of all types, their trailers, furnishings, equipment, and outboard motors, only while inside a fully enclosed building.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles.**

7. **Smoke,** meaning sudden and accidental damage from smoke.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

7

Long/State Farm
SF-H 012

8. **Vandalism or malicious mischief**, meaning only willful and malicious damage to or destruction of property.

9. **Theft**, including attempted theft and loss of property from a known location when it is probable that the property has been stolen.

This peril does not include:

a. loss of a precious or semi-precious stone from its setting;

b. loss caused by theft:

    (1) committed by an **insured** or by any other person regularly residing on the **insured location**. Property of a student who is an **insured** is covered while located at a residence away from home, if the theft is committed by a person who is not an **insured**;

    (2) in or to a dwelling under construction or of materials and supplies for use in the construction until the dwelling is completed and occupied; or

    (3) from the part of a **residence premises** rented to others:

        (a) caused by a tenant, members of the tenant's household, or the tenant's employees;

        (b) of money, bank notes, bullion, gold, goldware, silver, silverware, pewterware, platinum, coins and medals;

        (c) of securities, checks, cashier's checks, traveler's checks, money orders and other negotiable instruments, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets and stamps; or

        (d) of jewelry, watches, fur garments and garments trimmed with fur, precious and semi-precious stones;

c. loss caused by theft that occurs away from the **residence premises** of:

    (1) property while at any other residence owned, rented to, or occupied by an **insured**, except while an **insured** is temporarily residing there. Property of a student who is an **insured** is covered while at a residence away from home;

    (2) watercraft of all types, including their furnishings, equipment and outboard motors; or

    (3) trailers and campers designed to be pulled by or carried on a vehicle.

If the **residence premises** is a newly acquired principal residence, property in the immediate past principal residence shall not be considered property away from the **residence premises** for the first 30 days after the inception of this policy.

10. **Falling objects**. This peril does not include loss to property contained in a structure unless the roof or an exterior wall of the structure is first damaged by a falling object. Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a structure.

12. **Sudden and accidental discharge or overflow** of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or from within a household appliance.

This peril does not include loss:

a. to the system or appliance from which the water or steam escaped;

b. caused by or resulting from freezing;

c. caused by or resulting from water from outside the plumbing system that enters through sewers or drains, or water which enters into and overflows from within a sump pump, sump pump well or other type system designed to remove subsurface water which is drained from the foundation area; or

d. caused by or resulting from continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, corrosion, rust, mold, or wet or dry rot.

13. **Sudden and accidental tearing asunder, cracking, burning or bulging** of a steam or hot water heating

8

system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

This peril does not include loss:

a. caused by or resulting from freezing; or

b. caused by or resulting from continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, corrosion, rust, mold, or wet or dry rot.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the **residence premises** while the dwelling is vacant, unoccupied or being constructed, unless you have used reasonable care to:

a. maintain heat in the structure; or

b. shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage** to electrical appliances, devices, fixtures and wiring from an increase or decrease of artificially generated electrical current. We will pay up to $1,000 under this peril for each damaged item described above.

16. **Breakage of glass**, meaning damage to personal property caused by breakage of glass which is a part of a structure on the **residence premises**. There is no coverage for loss or damage to the glass.

17. **Flood**, surface water, waves, tidal water, or overflow of a body of water, or spray from any of these, whether or not driven by wind.

## SECTION I - LOSSES NOT INSURED

1. We do not insure for any loss to the property described in Coverage A which consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through n. below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

a. collapse, except as specifically provided in **SECTION I - ADDITIONAL COVERAGES, Collapse;**

b. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion only applies while the dwelling is vacant, unoccupied or being constructed. This exclusion does not apply if you have used reasonable care to:

(1) maintain heat in the dwelling; or

(2) shut off the water supply and drain the system and appliances of water;

c. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a fence, pavement,

patio, swimming pool, foundation, retaining wall, bulkhead, pier, wharf or dock;

d. theft in or to a dwelling under construction, or of materials and supplies for use in the construction, until the dwelling is completed and occupied;

e. vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

f. continuous or repeated seepage or leakage of water or steam from a:

(1) heating, air conditioning or automatic fire protective sprinkler system;

(2) household appliance; or

(3) plumbing system, including from, within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings or floors;

which occurs over a period of time and results in deterioration, corrosion, rust, mold, or wet or dry rot. If loss to covered property is caused by water or

9

steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the structure necessary to repair the system or appliance. We do not cover loss to the system or appliance from which the water or steam escaped;

g. wear, tear, marring, scratching, deterioration, inherent vice, latent defect and mechanical breakdown;

h. corrosion, electrolysis, or rust;

i. mold, or wet or dry rot;

j. contamination;

k. smog, smoke from agricultural smudging or industrial operations;

l. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundation, walls, floors, roofs or ceilings;

m. birds, vermin, rodents, insects, or domestic animals. We do cover the breakage of glass or safety glazing material which is a part of a structure, when caused by birds, vermin, rodents, insects or domestic animals; or

n. seizure by a governmental authority.

However, we do insure for any resulting loss from items a. through n. unless the resulting loss is itself a Loss Not Insured by this Section.

2. We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

a. **Ordinance or Law**, meaning enforcement of any ordinance or law regulating the construction, repair, demolition, sale, occupancy or placement of a dwelling or other structure, unless specifically provided under this policy.

b. **Earth Movement**, meaning the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to earthquake, landslide, mudflow, sinkhole, subsidence and erosion. Earth movement also includes volcanic explosion or lava flow, except as specifically provided in **SECTION I - ADDITIONAL COVERAGES, Volcanic Action.**

We do insure for any direct loss by fire, explosion other than explosion of a volcano, theft, or breakage of glass or safety glazing materials which are part of the dwelling resulting from earth movement, provided the resulting loss is itself a Loss Insured.

c. **Water Damage**, meaning:

(1) water from outside the plumbing system that enters through sewers or drains, or water which enters into and overflows from within a sump pump, sump pump well or any other system designed to remove subsurface water which is drained from the foundation area; or

(2) natural water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

However, we do insure for any direct loss by fire, explosion or theft resulting from water damage, provided the resulting loss is itself a Loss Insured.

d. **Neglect**, meaning neglect of the **insured** to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered.

e. **War**, including any undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon shall be deemed a warlike act even if accidental.

f. **Nuclear Hazard**, meaning any nuclear reaction, radiation, or radioactive contamination, all whether con-

10

Long/State Farm
SF-H 015

trolled or uncontrolled or however caused, or any consequence of any of these. Loss caused by the nuclear hazard shall not be considered loss caused by fire, explosion or smoke. However, we do insure for direct loss by fire resulting from the nuclear hazard.

g. **Conversion, Embezzlement or Secretion** by the selling dealer or by any person in lawful possession or custody of the insured property.

h. Any Loss Insured other than fire while the dwelling is **in transit.**

i. Any Loss Insured while the dwelling is at any location not described in this policy. This exclusion does not apply if you or someone on your behalf has notified us or our agent of the move within 60 days from the start of the move.

3. We do not insure under any coverage for any loss consisting of one or more of the items below. Further, we do not insure for loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:

a. conduct, act, failure to act, or decision of any person, group, organization or governmental body whether intentional, wrongful, negligent, or without fault; or

b. defect, weakness, inadequacy, fault or unsoundness in:

   (1) planning, zoning, development, surveying, siting;

   (2) design, specifications, workmanship, construction, grading, compaction;

   (3) materials used in construction or repair; or

   (4) maintenance;

   of any property (including land, structures, or improvements of any kind) whether on or off the **residence premises**.

However, we do insure for any resulting loss from items a. and b. unless the resulting loss is itself a Loss Not Insured by this Section.

## SECTION I - CONDITIONS

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we shall not be liable:

a. to the **insured** for an amount greater than the **insured's** interest; or

b. for more than the applicable limit of liability.

2. **Your Duties After Loss.** After a loss to which this insurance may apply, you shall see that the following duties are performed:

a. give immediate notice to us or our agent. Also notify the police if the loss is caused by theft. Also notify the credit card company or bank if the loss involves a credit card or bank fund transfer card;

b. protect the property from further damage or loss, make reasonable and necessary temporary repairs required to protect the property, keep an accurate record of repair expenditures;

c. prepare an inventory of damaged or stolen personal property. Show in detail the quantity, description, actual cash value and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;

d. as often as we reasonably require:

   (1) exhibit the damaged property;

   (2) provide us with records and documents we request and permit us to make copies;

   (3) submit to and subscribe, while not in the presence of any other **insured**:

      (a) statements; and

      (b) examinations under oath; and

   (4) produce employees, members of the **insured's** household or others for examination under oath

11

Long/State Farm
SF-H 016

to the extent it is within the **insured's** power to do so; and

e.  submit to us, within 60 days after the loss, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

(1) the time and cause of loss;

(2) interest of the **insured** and all others in the property involved and all encumbrances on the property;

(3) other insurance which may cover the loss;

(4) changes in title or occupancy of the property during the term of this policy;

(5) specifications of any damaged structure and detailed estimates for repair of the damage;

(6) an inventory of damaged or stolen personal property described in 2.c.;

(7) receipts for additional living expenses incurred and records supporting the fair rental value loss;

(8) evidence or affidavit supporting a claim under the Credit Card, Bank Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.** Covered property losses are settled at actual cash value at the time of loss. This means there may be deduction for depreciation.

   We will not pay an amount exceeding:

   a. that necessary to repair or replace;

   b. any special limit of liability described in the policy; or

   c. any applicable Coverage A or Coverage B limit of liability.

4. **Loss to a Pair or Set.** In case of loss to a pair or set, we may elect to:

a.  repair or replace any part to restore the pair or set to its value before the loss; or

b.  pay the difference between actual cash value of the property before and after the loss.

5. **Glass Replacement.** Loss for damage to glass caused by a Loss Insured shall be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

6. **Appraisal.** If you and we fail to agree on the amount of loss, either one can demand that the amount of the loss be set by appraisal. If either makes a written demand for appraisal, each shall select a competent, independent appraiser. Each shall notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers shall then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, you or we can ask a judge of a court of record in the state where the **residence premises** is located to select an umpire. The appraisers shall then set the amount of the loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of the loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement signed by any two of these three shall set the amount of the loss. Each appraiser shall be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire shall be paid equally by you and us.

7. **Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only our share of the loss. Our share is the proportion of the loss that the applicable limit under this policy bears to the total amount of insurance covering the loss.

8. **Suit Against Us.** No action shall be brought unless there has been compliance with the policy provisions. The action must be started within one year after the date of loss or damage.

9. **Our Option.** We may repair or replace any part of the property damaged or stolen with equivalent property. Any property we pay for or replace becomes our property.

12

Long/State Farm
SF-H 017

10. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

a. reach agreement with you;

b. there is an entry of a final judgment; or

c. there is a filing of an appraisal award with us.

11. **Abandonment of Property.** We need not accept any property abandoned by an **insured**.

12. **Lienholder Clause.** The word "lienholder" includes trustee.

a. If a lienholder is named in this policy, any loss payable under Coverage A shall be paid to the lienholder and you, as interests appear. If more than one lienholder is named, the order of payment shall be the same as the order of precedence of the liens.

b. If we deny your claim, that denial shall not apply to a valid claim of the lienholder, if the lienholder:

(1) notifies us of any change in ownership, occupancy or substantial change in risk of which the lienholder is aware, provided that conversion, embezzlement or secretion by an **insured** having possession of the dwelling is not covered under Section I of this policy;

(2) pays any premium due under this policy on demand if you have neglected to pay the premium; or

(3) submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the lienholder.

c. If this policy is cancelled by us, the lienholder shall be notified at least 10 days before the date cancellation takes effect.

d. If we pay the lienholder for any loss and deny payment to you:

(1) we are subrogated to all the rights of the lienholder granted under the lien on the property; or

(2) at our option, we may pay to the lienholder the whole principal on the lien plus any accrued interest. In this event, we shall receive a full assignment and transfer of the lien and all securities held as collateral to the lien debt.

e. Subrogation shall not impair the right of the lienholder to recover the full amount of the lienholder's claim.

13. **No Benefit to Bailee.** We will not recognize an assignment or grant coverage for the benefit of a person or organization holding, storing or transporting property for a fee. This applies regardless of any other provision of this policy.

14. **Intentional Acts.** If you or any person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits, then this policy is void and we will not pay you or any other **insured** for this loss.

15. **Replacement of Dwelling.** If you replace your dwelling, we will provide coverage on the replacement. This condition applies only if you notify us within 60 days after delivery of the replacement and pay any additional premium required.

16. **Protection of Insured Property.** When insured property is endangered by a Loss Insured, you shall use all reasonable means to protect the property from loss or further loss.

## SECTION II - LIABILITY COVERAGES

### COVERAGE L - PERSONAL LIABILITY

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** to which this coverage applies, caused by an **occurrence**, we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable; and

2. provide a defense at our expense by counsel of our choice. We may make any investigation and settle any claim or suit that we decide is appropriate. Our obligation

13

to defend any claim or suit ends when the amount we pay for damages, to effect settlement or satisfy a judgment resulting from the **occurrence**, equals our limit of liability.

## COVERAGE M - MEDICAL PAYMENTS TO OTHERS

We will pay the necessary medical expenses incurred or medically ascertained within three years from the date of an accident causing **bodily injury**. Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage applies only:

1. to a person on the **insured location** with the permission of an **insured**;

2. to a person off the **insured location**, if the **bodily injury**:

   a. arises out of a condition on the **insured location** or the ways immediately adjoining;

   b. is caused by the activities of an **insured**;

   c. is caused by a **residence employee** in the course of the **residence employee's** employment by an **insured**; or

   d. is caused by an animal owned by or in the care of an **insured**; or

3. to a **residence employee** if the **occurrence** causing **bodily injury** occurs off the **insured location** and arises out of or in the course of the **residence employee's** employment by an **insured**.

## SECTION II - ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses**. We pay:

   a. expenses we incur and costs taxed against an **insured** in suits we defend;

   b. premiums on bonds required in suits we defend, but not for bond amounts greater than the Coverage L limit. We are not obligated to apply for or furnish any bond;

   c. reasonable expenses an **insured** incurs at our request. This includes actual loss of earnings (but not loss of other income) up to $100 per day for aiding us in the investigation or defense of claims or suits;

   d. prejudgment interest awarded against the **insured** on that part of the judgment we pay; and

   e. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2. **First Aid Expenses**. We will pay expenses for first aid to others incurred by an **insured** for **bodily injury** covered under this policy. We will not pay for first aid to you or any other **insured**.

3. **Damage to Property of Others**.

   a. We will pay for **property damage** to property of others caused by an **insured**.

   b. Losses will be settled at actual cash value at the time of loss. This means there may be deduction for depreciation.

   We will not pay an amount exceeding:

   (1) that necessary to repair or replace the damaged or lost property; or

   (2) $500 in any one **occurrence**.

   c. We will not pay for **property damage**:

   (1) if insurance is otherwise provided in this policy;

   (2) caused intentionally by an **insured** who is 13 years of age or older;

   (3) to property, other than a rented golf cart, owned by or rented to an **insured**, a tenant of an **insured**, or a resident in your household; or

   (4) arising out of:

      (a) **business** pursuits;

      (b) any act or omission in connection with a premises an **insured** owns, rents or controls, other than the **insured location**; or

      (c) the ownership, maintenance, or use of a **motor vehicle**, aircraft, or watercraft, including airboat, air cushion, personal watercraft, sailboard or similar type watercraft.

14

Long/State Farm
SF-H 019

# SECTION II - EXCLUSIONS

1. Coverage L and Coverage M do not apply to:

a. **bodily injury** or **property damage**:

(1) which is either expected or intended by an **insured**; or

(2) to any person or property which is the result of willful and malicious acts of an **insured**;

b. **bodily injury** or **property damage** arising out of **business** pursuits of any **insured** or the rental or holding for rental of any part of any premises by any **insured**. This exclusion does not apply:

(1) to activities which are ordinarily incident to non-**business** pursuits;

(2) with respect to Coverage L to the occasional or part-time **business** pursuits of an **insured** who is under 19 years of age;

(3) to the rental or holding for rental of a residence of yours:

(a) on an occasional basis for the exclusive use as a residence;

(b) in part, unless intended for use as a residence by more than two roomers or boarders; or

(c) in part, as an office, school, studio or private garage; or

(4) to farm land (without buildings) not in excess of 500 acres, rented or held for rental to others;

c. **bodily injury** or **property damage** arising out of the rendering or failing to render professional services;

d. **bodily injury** or **property damage** arising out of any premises owned or rented to any **insured** which is not an **insured location**. This exclusion does not apply to **bodily injury** to a residence employee arising out of and in the course of the **residence employee's** employment by an insured;

e. **bodily injury** or **property damage** arising out of the ownership, maintenance, use, loading or unloading of:

(1) an aircraft;

(2) a **motor vehicle** owned or operated by or rented or loaned to any **insured**; or

(3) a watercraft:

(a) owned by or rented to any **insured** if it has inboard or inboard-outdrive motor power of more than 50 horsepower;

(b) owned by or rented to any **insured** if it is a sailing vessel, with or without auxiliary power, 26 feet or more in overall length;

(c) powered by one or more outboard motors with more than 25 total horsepower owned by any **insured**;

(d) designated as an airboat, air cushion, or similar type of craft; or

(e) owned by any **insured** which is a personal watercraft using a water jet pump powered by an internal combustion engine as the primary source of propulsion.

This exclusion does not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured**. Exclusion e.(3) does not apply while the watercraft is on the **residence premises**;

f. **bodily injury** or **property damage** arising out of:

(1) the entrustment by any **insured** to any person;

(2) the supervision by any **insured** of any person;

(3) any liability statutorily imposed on any **insured**; or

(4) any liability assumed through an unwritten or written agreement by any **insured**;

with regard to the ownership, maintenance or use of any aircraft, watercraft, or **motor vehicle** (or any

15

Long/State Farm
SF-H 020

other motorized land conveyance) which is not covered under Section II of this policy;

g. **bodily injury** or **property damage** caused directly or indirectly by war, including undeclared war, or any warlike act including destruction or seizure or use for a military purpose, or any consequence of these. Discharge of a nuclear weapon shall be deemed a warlike act even if accidental;

h. **bodily injury** to you or any **insured** within the meaning of part a. or b. of the definition of **insured**.

This exclusion also applies to any claim made or suit brought against any **insured** to share damages with or repay someone else who may be obligated to pay damages because of the **bodily injury**;

i. any claim made or suit brought against any **insured** by:

(1) any person who is in the care of any **insured** because of child care services provided by or at the direction of:

(a) any **insured**;

(b) any employee of any **insured**; or

(c) any other person actually or apparently acting on behalf of any **insured**; or

(2) any person who makes a claim because of **bodily injury** to any person who is in the care of any **insured** because of child care services provided by or at the direction of:

(a) any **insured**;

(b) any employee of any **insured**; or

(c) any other person actually or apparently acting on behalf of any **insured**.

This exclusion does not apply to the occasional child care services provided by any **insured**, or to the part-time child care services provided by any **insured** who is under 19 years of age; or

j. **bodily injury** or **property damage** arising out of an **insured's** participation in, or preparation or practice for any prearranged or organized race, speed or

demolition contest, or similar competition involving a motorized land vehicle or motorized watercraft. This exclusion does not apply to a sailing vessel less than 26 feet in overall length with or without auxiliary power.

2. Coverage L does not apply to:

a. liability:

(1) for your share of any loss assessment charged against all members of an association of property owners; or

(2) assumed under any unwritten contract or agreement, or by contract or agreement in connection with a **business** of the **insured**;

b. **property damage** to property owned by any **insured**;

c. **property damage** to property rented to, occupied or used by or in the care of any **insured**. This exclusion does not apply to **property damage** caused by fire, smoke or explosion;

d. **bodily injury** to a person eligible to receive any benefits required to be provided or voluntarily provided by an **insured** under a workers' compensation, non-occupational disability, or occupational disease law;

e. **bodily injury** or **property damage** for which an insured under this policy is also an insured under a nuclear energy liability policy or would be an insured but for its termination upon exhaustion of its limit of liability. A nuclear energy liability policy is a policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors.

3. Coverage M does not apply to **bodily injury**:

a. to a **residence employee** if it occurs off the **insured location** and does not arise out of or in the course of the **residence employee's** employment by an **insured**;

16

Long/State Farm
SF-H 021

b. to a person eligible to receive any benefits required to be provided or voluntarily provided under any workers' compensation, non-occupational disability or occupational disease law;

c. from nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or

however caused, or any consequence of any of these;

d. to a person other than a **residence employee** of an **insured**, regularly residing on any part of the **insured location**.

## SECTION II - CONDITIONS

1. **Limit of Liability**. The Coverage L limit is shown in the **Declarations**. This is our limit for all damages from each **occurrence** regardless of the number of **insureds**, claims made or persons injured.

   The Coverage M limit is shown in the **Declarations**. This is our limit for all medical expense for **bodily injury** to one person as the result of one accident.

2. **Severability of Insurance**. This insurance applies separately to each **insured**. This condition shall not increase our limit of liability for any one **occurrence**.

3. **Duties After Loss**. In case of an accident or **occurrence**, the **insured** shall perform the following duties that apply. You shall cooperate with us in seeing that these duties are performed:

   a. give written notice to us or our agent as soon as practicable, which sets forth:

      (1) the identity of this policy and **insured**;

      (2) reasonably available information on the time, place and circumstances of the accident or **occurrence**; and

      (3) names and addresses of any claimants and available witnesses;

   b. immediately forward to us every notice, demand, summons or other process relating to the accident or **occurrence**;

   c. at our request, assist in:

      (1) making settlement;

      (2) the enforcement of any right of contribution or indemnity against a person or organization who may be liable to an **insured**;

      (3) the conduct of suits and attend hearings and trials; and

      (4) securing and giving evidence and obtaining the attendance of witnesses;

   d. under the coverage - **Damage to Property of Others**:

      (1) submit a sworn statement of loss to us within 60 days after the loss; and

      (2) exhibit the damaged property if within the **insured's** control; and

   e. the **insured** shall not, except at the **insured's** own cost, voluntarily make payments, **assume** obligations or incur expenses. This does not apply to expense for first aid to others at the time of the **bodily injury**.

4. **Duties of an Injured Person - Coverage M**. The injured person, or, when appropriate, someone acting on behalf of that person, shall:

   a. give us written proof of claim, under oath if required, as soon as practicable;

   b. execute authorization to allow us to obtain copies of medical reports and records; and

   c. submit to physical examination by a physician selected by us when and as often as we reasonably require.

5. **Payment of Claim - Coverage M**. Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us**. No action shall be brought against us unless there has been compliance with the policy provisions.

17

Long/State Farm
SF-H 022

No one shall have the right to join us as a party to an action against an **insured**. Further, no action with respect to Coverage L shall be brought against us until the obligation of the **insured** has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured**. Bankruptcy or insolvency of an **insured** shall not relieve us of our obligation under this policy.

8. **Other Insurance - Coverage L**. This insurance is excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTION I AND SECTION II - CONDITIONS

1. **Policy Period**. This policy applies only to loss under Section I, or **bodily injury** or **property damage** under Section II which occurs during the period this policy is in effect.

2. **Concealment or Fraud**. This policy is void as to you and any other **insured**, if you or any other **insured** under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

3. **Liberalization Clause**. If we adopt any revision which would broaden coverage under this policy without additional premium, within 60 days prior to or during the period this policy is in effect, the broadened coverage will immediately apply to this policy.

4. **Waiver or Change of Policy Provisions**. A waiver or change of any provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination shall not waive any of our rights.

5. **Cancellation**.

   a.  You may cancel this policy at any time by notifying us in writing of the date cancellation is to take effect. We may waive the requirement that the notice be in writing by confirming the date and time of cancellation to you in writing.

   b.  We may cancel this policy only for the reasons stated in this condition. We will notify you in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the **Declarations**. Proof of mailing shall be sufficient proof of notice:

(1) When you have not paid the premium, we may cancel at any time by notifying you at least 10 days before the date cancellation takes effect. This condition applies whether the premium is payable to us or our agent or under any finance or credit plan.

(2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason. We may cancel by notifying you at least 10 days before the date cancellation takes effect.

(3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

   (a) if there has been a material misrepresentation of fact which, if known to us, would have caused us not to issue this policy; or

   (b) if the risk has changed substantially since the policy was issued.

We may cancel this policy by notifying you at least 30 days before the date cancellation takes effect.

(4) When this policy is written for a period longer than one year, we may cancel for any reason at anniversary. We may cancel by notifying you at least 30 days before the date cancellation takes effect.

   c.  When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded. When you request cancellation, the return premium will be based on our rules for such cancellation. The return premium may be less

18

than a full pro rata refund. When we cancel, the return premium will be pro rata.

d. The return premium may not be refunded with the notice of cancellation or when the policy is returned to us. In such cases, we will refund it within a reasonable time after the date cancellation takes effect.

6. **Nonrenewal.** We may elect not to renew this policy. If we elect not to renew, a written notice will be delivered to you, or mailed to you at your mailing address shown in the **Declarations**. The notice will be mailed or delivered at least 30 days before the expiration date of this policy. Proof of mailing shall be sufficient proof of notice.

7. **Assignment.** Assignment of this policy shall not be valid unless we give our written consent.

8. **Subrogation.** An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an **insured** shall:

a. sign and deliver all related papers;

b. cooperate with us in a reasonable manner; and

c. do nothing after a loss to prejudice such rights.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If any person named in the **Declarations** or the spouse, if a resident of the same household, dies:

a. we insure the legal representative of the deceased. This condition applies only with respect to the premises and property of the deceased covered under this policy at the time of death;

b. **insured** includes:

(1) any member of your household who is an **insured** at the time of your death, but only while a resident of the **residence premises**; and

(2) with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

10. **Conformity to State Law.** When a policy provision is in conflict with the applicable law of the State in which this policy is issued, the law of the State will apply.

## OPTIONAL POLICY PROVISIONS

The following Optional Policy Provisions are subject to all the terms and provisions of this policy, unless otherwise indicated in the terms of the option.

Each Optional Policy Provision applies only as indicated in the **Declarations**.

**Option AI - Additional Insured.** The definition of **insured** is extended to include the person or organization named in the **Declarations** as an Additional Insured or whose name is on file with us. Coverage is with respect to:

1. Section I - Coverage A; or

2. Section II - Coverages L and M but only with respect to the **residence premises**. This coverage does not apply to **bodily injury** to an employee arising out of or in the course of the employee's employment by the person or organization.

This option applies only with respect to the location shown in the **Declarations**.

**Option BP - Business Property.**

**COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability**, item b. is changed as follows:

The $1,000 limit is replaced with the amount shown in the **Declarations** for this option.

**Option BU - Business Pursuits.**

Section II - Exclusion 1.b. is modified as follows:

1. Section II coverage applies to the **business** pursuits of an **insured** who is a:

a. clerical office employee, salesperson, collector, messenger; or

19

b. teacher (except college, university and professional athletic coaches), school principal or school administrator;

while acting within the scope of the above listed occupations.

2. However, no coverage is provided:

   a. for **bodily injury** or **property damage** arising out of a **business** owned or financially controlled by the **insured** or by a partnership of which the **insured** is a partner or member;

   b. for **bodily injury** or **property damage** arising out of the rendering of or failure to render professional services of any nature (other than teaching or school administration). This exclusion includes but is not limited to:

      (1) architectural, engineering or industrial design services;

      (2) medical, surgical, dental or other services or treatment conducive to the health of persons or animals; and

      (3) beauty or barber services or treatment;

   c. for **bodily injury** to a fellow employee of the **insured** injured in the course of employment; or

   d. when the **insured** is a member of the faculty or teaching staff of a school or college:

      (1) for **bodily injury** or **property damage** arising out of the maintenance, use, loading or unloading of:

         (a) draft or saddle animals, including vehicles for use with them; or

         (b) aircraft, **motor vehicles**, recreational motor vehicles or watercraft, airboats, air cushions or personal watercraft which use a water jet pump powered by an internal combustion engine as the primary source of propulsion;

      owned or operated, or hired by or for the **insured** or employer of the **insured**, or used

by the **insured** for the purpose of instruction in the use thereof; or

      (2) under Coverage M for **bodily injury** to a pupil arising out of corporal punishment administered by or at the direction of the **insured**.

**Option EM - Earth Movement.** Section I of this policy is extended to insure against direct loss caused by Earth Movement. Earth Movement includes, but is not limited to, earthquake; volcanic eruption; landslide; mudflow; earth sinking, rising or shifting.

1. One or more earthquake shocks that occur within a 72-hour period shall constitute a single earthquake.

2. One or more volcanic eruptions that occur within a 72-hour period shall constitute a single volcanic eruption.

**Option FA - Firearms.** Firearms are insured for accidental direct physical loss or damage.

The limits for this option are shown in the **Declarations**. The first amount is the limit for any one article; the second amount is the aggregate limit for each loss.

The following additional provisions apply:

1. we do not insure for any loss to the property described in this option either consisting of, or directly and immediately caused by, one or more of the following:

   a. mechanical breakdown, wear and tear, gradual deterioration;

   b. insects or vermin;

   c. any process of refinishing, renovating, or repairing;

   d. dampness of atmosphere or extremes of temperatures;

   e. inherent defect or faulty manufacture;

   f. rust, fouling or explosion of firearms;

   g. breakage, marring, scratching, tearing or denting unless caused by fire, thieves or accidents to conveyances; or

   h. infidelity of an **insured's** employees or persons to whom the insured property may be entrusted or rented;

20

2. our limit for loss by any Coverage B peril except theft is the limit shown in the **Declarations** for Coverage B, plus the aggregate limit;

3. our limits for loss by theft are those shown in the **Declarations** for this option. These limits apply in lieu of the Coverage B theft limit; and

4. our limits for loss by any covered peril except those in items 2. and 3. are those shown in the **Declarations**.

**Option HC - Home Computer.** The Section I - Special Limits of Liability for electronic data processing equipment and the recording or storage media used with that equipment is increased to be the amount shown on the **Declarations** for this option.

**Option IO - Incidental Business.** The coverage provided by this option applies only to that incidental **business** occupancy on file with us.

1. Section I: COVERAGE B - PERSONAL PROPERTY is extended to include equipment, supplies and furnishings usual and incidental to this **business** occupancy. This Optional Policy Provision does not include electronic data processing equipment or the recording or storage media used with that equipment or merchandise held as samples or for sale or for delivery after sale.

   The Option IO limits are shown in the **Declarations**. The first limit applies to property on the **residence premises**. The second limit applies to property while off the **residence premises**. These limits are in addition to the Section I, **COVERAGE B - PERSONAL PROPERTY, Special Limits of Liability** on property used or intended for use in a **business**.

2. Section II: The **residence premises** is not considered **business** property because an **insured** occupies a part of it as an incidental **business**.

3. Section II: Exclusion 1.b. of Coverage L and Coverage M is replaced with the following:

   b. **bodily injury** or **property damage** arising out of **business** pursuits of an **insured** or the rental or holding for rental of any part of any premises by an **insured**. This exclusion does not apply:

(1) to activities which are ordinarily incidental to non-**business** pursuits or to **business** pursuits of an **insured** which are necessary or incidental to the use of the **residence premises** as an incidental **business**;

(2) with respect to Coverage L to the occasional or part-time **business** pursuits of an **insured** who is under 19 years of age;

(3) to, the rental or holding for rental of a residence of yours:

   (a) on an occasional basis for exclusive use as a residence;

   (b) in part, unless intended for use as a residence by more than two roomers or boarders; or

   (c) in part, as an incidental **business** or private garage;

(4) to farm land (without buildings) not in excess of 500 acres, rented or held for rental to others.

4. This insurance does not apply to:

   a. **bodily injury** to an employee of an **insured** arising out of the **residence premises** as an incidental **business** other than to a **residence employee** while engaged in the employee's employment by an **insured**;

   b. **bodily injury** to a pupil arising out of corporal punishment administered by or at the direction of the **insured**;

   c. liability arising out of any acts, errors or omissions of an **insured**, or any other person for whose acts an **insured** is liable, resulting from the preparation or approval of data, plans, designs, opinions, reports, programs, specifications, supervisory inspections or engineering services in the conduct of an **insured's** incidental **business** involving data processing, computer consulting or computer programming; or

   d. any claim made or suit brought against any **insured** by:

21

Long/State Farm
SF-H 026

(1) any person who is in the care of any **insured** because of child care services provided by or at the direction of:

   (a) any **insured**;

   (b) any employee of any **insured**; or

   (c) any other person actually or apparently acting on behalf of any **insured**; or

(2) any person who makes a claim because of **bodily injury** to any person who is in the care of any **insured** because of child care services provided by or at the direction of:

   (a) any **insured**;

   (b) any employee of any **insured**; or

   (c) any other person actually or apparently acting on behalf of any **insured**.

Coverage M does not apply to any person indicated in (1) and (2) above.

This exclusion does not apply to the occasional child care services provided by any **insured**, or to the part-time child care services provided by any **insured** who is under 19 years of age.

**Option JF - Jewelry and Furs.** Jewelry, watches, fur garments and garments trimmed with fur, precious and semi-precious stones, gold other than goldware, silver other than silverware and platinum are insured for accidental direct physical loss or damage.

The limits for this option are shown in the **Declarations**. The first amount is the limit for any one article; the second amount is the aggregate limit for each loss.

The following additional provisions apply:

1. we do not insure for any loss to the property described in this option either consisting of, or directly and immediately caused by, one or more of the following:

   a. mechanical breakdown; wear and tear; gradual deterioration;

   b. insects or vermin;

   c. inherent vice; or

   d. seizure or destruction under quarantine or customs regulations;

2. our limit for loss by any Coverage B peril except theft is the limit shown in the **Declarations** for Coverage B, plus the aggregate limit;

3. our limits for loss by theft are those shown in the **Declarations** for this option. These limits apply in lieu of the Coverage B theft limit; and

4. our limits for loss by any covered peril except those in items 2. and 3. are those shown in the **Declarations**.

**Option SG - Silverware and Goldware Theft.** The theft limit on silverware and goldware is increased to be the amount shown in the **Declarations** for this option.

IN WITNESS WHEREOF, this Company has executed and attested these presents; but this policy shall not be valid unless countersigned by the duly authorized Agent of this Company at the agency hereinbefore mentioned.

*Laura P. Sullivan*

        Secretary

*Edward B Rust Jr*

        President

The Board of Directors, in accordance with Article VI(c) of this Company's Articles of Incorporation, may from time to time distribute equitably to the holders of the participating policies issued by said Company such sums out of its earnings as in its judgment are proper.

22

# AMENDATORY ENDORSEMENT
## (Alabama)

**SECTION I - CONDITIONS**

Suit Against Us: Reference to "one year" is changed to "six years".

All other policy provisions apply.

FE-7281.1
(1/04)

FE-7281.1
(1/04)

Printed in U.S.A.

Long/State Farm
SF-H 028

# PERSONAL PROPERTY INFLATION AND REPLACEMENT COST ENDORSEMENT

FE-5705
(3/98)

**SECTION I - COVERAGES:** The following is added:

## INFLATION COVERAGE: PERSONAL PROPERTY

The limit of liability shown in the **Declarations** for Coverage B will be increased at the same rate as the increase in the Inflation Coverage Index shown in the **Declarations.**

To find the limit on a given date:

1. divide the Index on that date by the Index as of the effective date of this Inflation Coverage provision; then

2. multiply the resulting factor by the limit of liability for Coverage B.

The limit of liability will not be reduced to less than the amount shown in the **Declarations.**

If during the term of this policy the Coverage B limit of liability is changed at your request, the effective date of this Inflation Coverage provision is changed to coincide with the effective date of such change.

**SECTION I - CONDITIONS,** item 3. **Loss Settlement** is replaced with the following:

## 3. Loss Settlement.

a. We will pay actual cash value at the time of loss for:

  (1) fences;

  (2) antiques, fine arts, paintings, statuary and similar articles which by their inher-

ent nature cannot be replaced with new articles;

  (3) articles whose age or history contribute substantially to their value including, but not limited to memorabilia, souvenirs and collectors items; and

  (4) property not useful for its intended purpose.

However, we will not pay an amount exceeding the applicable limit of liability or an amount exceeding that necessary to repair or replace the property.

b. We will pay the cost to repair or replace:

  (1) other personal property and other structures (except fences) that are not buildings under **Dwelling Extension;** and

  (2) carpeting, domestic appliances, awnings and outdoor antennas, whether or not attached to buildings; subject to the following:

    (a) loss to property not repaired or replaced within one year after the loss will be settled on an actual cash value basis; and

FE-5705
(3/98)

(CONTINUED ON REVERSE SIDE)

Printed in U.S.A.

Long/State Farm
SF-H 029

FE-5901

# FUNGUS (INCLUDING MOLD) EXCLUSION ENDORSEMENT

**DEFINITIONS**

The following definition is added:

"**fungus**" means any type or form of fungi, including mold or mildew, and any mycotoxins, spores, scents or byproducts produced or released by fungi.

**SECTION I - LOSSES INSURED**

Item 12.d. is replaced by the following:

    d. caused by or resulting from continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, corrosion, rust, or wet or dry rot.

Item 13.b. is replaced by the following:

    b. caused by or resulting from continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, corrosion, rust, or wet or dry rot.

**SECTION I - LOSSES NOT INSURED**

Item 1.i. is replaced by the following:

    i. wet or dry rot;

In item 2., the following is added as item j.:

    j. Fungus, including the growth, proliferation, spread or presence of **fungus**, and including:

(1) any loss of use or delay in rebuilding, repairing or replacing covered property, including any associated cost or expense, due to interference at the described premises or location of the rebuilding, repair or replacement of that property, by **fungus**;

(2) any remediation of **fungus**, including the cost or expense to:

    (a) remove or clean the **fungus** from covered property or to repair, restore or replace that property;

    (b) tear out and replace any part of the building or other property as needed to gain access to the **fungus**;

    (c) contain, treat, detoxify, neutralize or dispose of or in any way respond to or assess the effects of the **fungus**; or

    (d) remove any property to protect it from the presence of or exposure to **fungus**:

(3) the cost of any testing or monitoring of air or property to confirm the type, absence, presence or level of **fungus**, whether performed prior to, during or after removal, repair, restoration or replacement of covered property.

All other policy provisions apply.

FE-5901

Long/State Farm
SF-H 031

# MOTOR VEHICLE ENDORSEMENT

## DEFINITIONS

The definition of "motor vehicle" is replaced by the following:

"motor vehicle", when used in Section II of this policy, means:

a. a land motor vehicle designed for travel on public roads or subject to motor vehicle registration;

b. a trailer or semi-trailer designed for travel on public roads and subject to motor vehicle registration;

c. a "recreational vehicle" while off an insured location. "Recreational vehicle", means a motorized vehicle designed for recreation principally off public roads that is owned or leased by an insured. This includes, but is not limited to, a motorized all terrain vehicle, amphibious vehicle, dune buggy, go-cart, golf cart, snowmobile, trailbike, minibike and personal assistive mobility device;

d. a "locomotive" while off an insured location. "Locomotive" means a self-propelled vehicle for pulling or pushing freight or passenger cars on tracks that is large enough to carry a person and is owned or leased by an insured;

e. a bulldozer, track loader, backhoe, high-hoe, trencher, grader, crane, self-propelled scraper, excavator, pipe-layer, cherry picker, telehandler, logging vehicle, mining vehicle or road building vehicle that is owned or leased by an insured while off an insured location;

f. any vehicle while being towed or pushed by or carried on a vehicle included in a., b., c., d. or e.;

g. the following are not motor vehicles:

(1) a motorized land vehicle in dead storage on an insured location;

(2) a boat, camp, home or utility trailer not being towed or pushed by or carried on a vehicle included in a., b., c., d. or e.;

(3) a motorized golf cart while used for golfing purposes;

(4) a motorized vehicle or trailer designed to assist the handicapped that is not designed for travel on public roads or subject to motor vehicle registration;

h. "leased" does not include temporary rental.

All other policy provisions apply.

Long/State Farm
SF-H 032

## AMENDATORY SUBROGATION CONDITION ENDORSEMENT

**SECTION I AND SECTION II - CONDITIONS**

**Subrogation** is replaced with the following:

a.   If any **insured** to or for whom we make payment under this policy has rights to recover damages from another, those rights are automatically transferred to us to the extent of our payment. We are subrogated to the full extent of our payment and our rights are not dependent on whether that **insured** is fully compensated for their loss or is made whole. The application of a deductible under this policy shall not prevent any **insured** from being considered fully compensated or made whole.

b.   If any **insured** to or for whom we have made payment has not recovered from any party liable for the damages, that **insured** shall:

   1)   take no action after a loss prejudicing our rights under this contract;

   2)   keep these rights in trust for us;

FE-5843

   3)   sign and deliver any legal papers we need;

   4)   when we ask, take action through our representative to recover our payments;

   5)   cooperate with us in a reasonable manner.

c.   If any **insured** to or for whom we have made payment recovers from any other party liable for the damages:

   1)   that **insured** shall hold in trust for us the proceeds of the recovery; and

   2)   that **insured** shall reimburse us to the extent of our payment.

d.   Any **insured** may waive in writing before a loss all rights of recovery against any person.

**Subrogation does not apply under SECTION II to MEDICAL PAYMENTS TO OTHERS or Damage to Property of Others.**

Long/State Farm
SF-H 033

FE-7377.1
(11/86)

## FLOOD AMENDATORY ENDORSEMENT

For the additional premium, this policy is amended as follows:

A. In the event of a total loss by flood to the dwelling covered by this policy while a loan is secured by such dwelling as defined in this policy, the amount of our liability shall be the Outstanding Principal Balance of the Loan or the amount which would be recoverable under this policy in the absence of this endorsement, whichever is greater, less any applicable deductibles.

For the purpose of this endorsement the "Outstanding Principal Balance of the Loan" is the amount of the interest of the Lienholder named in this policy, measured by your unpaid balance not past due less

   a. unearned interest, insurance finance and other carrying charges computed pro-rata as of the Effective Date of Claim, and

   b. the full amount of any penalties or other charges of any nature which may have been added to such unpaid balance after the operation of the loan instrument.

This endorsement does not prejudice our option to replace with equivalent property.

B. Items 5.b.(1) and (2) under SECTION I AND SECTION II - CONDITIONS are deleted and replaced with the following:

   (1) When you have not paid the premium, we may cancel at any time by notifying you at least 30 days before the date cancellation takes effect. This condition applies whether the premium is payable to us or to our agent or under any finance or credit plan.

   (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason. We may cancel by notifying you at least 30 days before the date cancellation takes effect.

All other provisions of this policy apply.

Long/State Farm
SF-H 034

**MARTIN O. LONG**

EXHIBIT

H

1

1         IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3             NORTHERN DIVISION

4  CASE NO.: 2:06cv816-MHT      ORIGINAL

5

6  MARTIN O. LONG,

7         Plaintiff,

8           V.

9  STATE FARM FIRE AND CASUALTY COMPANY,

10       Defendants.

11

12

13         S T I P U L A T I O N S

14

15

16       IT IS STIPULATED AND AGREED by and

17  between the parties, through their respective

18  counsel, that the deposition of MARTIN O. LONG

19  may be taken before STACEY L. JOHNSON,

20  Commissioner, at the Offices of Beers, Anderson,

21  Jackson, Patty, Van Heest & Fawal, 250 Commerce

22  Street, Suite 100, Montgomery, Alabama, on the

23  27th day of March, 2007.

## MARTIN O. LONG

1    IT IS FURTHER STIPULATED AND AGREED

2  that the signature to and the reading of the

3  deposition by the witness is hereby waived, the

4  deposition to have the same force and effect as

5  if full compliance had been had with all laws

6  and rules of Court relating to the taking of

7  depositions.

8    IT IS FURTHER STIPULATED AND AGREED

9  that it shall not be necessary for any

10  objections to be made by counsel to any

11  questions except as to form or leading

12  questions, and that counsel for the parties may

13  make objections and assign grounds at the time

14  of trial, or at the time said deposition is

15  offered in evidence, or prior thereto.

16    IT IS FURTHER STIPULATED AND AGREED

17  that the notice of filing of the deposition by

18  the Commissioner is waived.

19

20

21

22

23

**MARTIN O. LONG**

1                          INDEX

2   EXAMINATION BY:                        PAGE NUMBER:

3   Mr. Newman................................7-185

4   Mr. Burge.................................185-199

5   Mr. Newman................................199-200

6   Mr. Burge.................................200-201

7   Mr. Newman................................201

8

9   EXHIBITS:

10  Defendant's Exhibit 0.........................7

11      (notice)

12  Defendant's Exhibit 1.........................7

13      (Plaintiff's initial disclosures)

14  Defendant's Exhibit 2.........................7

15      (Answers to Interrogatories)

16  Defendant's Exhibit 3.........................7

17      (03-4-2005 letter from State Farm)

18  Defendant's Exhibit 4.........................7

19      (photocopy of keys and key fob)

20  Defendant's Exhibit 5.........................7

21      (photocopies of various receipts and titles)

22  Defendant's Exhibit 6.........................7

23      (affidavit)

**MARTIN O. LONG**

1    Defendant's Exhibit 7.........................7

2        (tag receipt)

3    Defendant's Exhibit 8.........................7

4        (Big 10 Tires receipt)

5    Defendant's Exhibit 9.........................7

6        (Incident Property)

7    Defendant's Exhibit 10........................7

8        (Examination Under Oath transcript)

9    Defendant's Exhibit 11........................7

10        (manufactured home policy)

11    Defendant's Exhibit 12........................7

12        (Alabama Uniform Incident/Offense Report)

13    Defendant's Exhibit 13.......................53

14        (telephone interview transcript)

15    Defendant's Exhibit 14.......................86

16        (sketch)

17    Defendant's Exhibit 15......................134

18        (06-29-2005 letter to Tucker Burge from

19        State Farm)

20    Defendant's Exhibit 16......................134

21        (06-29-2005 letter to Tucker Burge from

22        State Farm)

23

**MARTIN O. LONG**

1    Defendant's Exhibit 17.....................151

2         (U-Haul Equipment Contract)

3    Defendant's Exhibit 18.....................154

4         (manufactured home policy)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**MARTIN O. LONG**

1              A P P E A R A N C E S
2    FOR THE PLAINTIFF, MARTIN O. LONG:
3         BURGE & BURGE
3         F. Tucker Burge
4         2001 Park Place North
4         Suite 850
5         Birmingham, Alabama  35203
5
6
7    FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY
8    COMPANY:
9         HELMSING, LEACH, HERLONG, NEWMAN & ROUSE
9         James B. Newman
10        (NEWMJ8049)
10        jbn@helmsinglaw.com
11        150 Government Street
11        Suite 2000
12        Mobile, Alabama  36602
12        (251) 432-5521
13
14
15
16
17
18
19
20
21
22
23

## MARTIN O. LONG

1    I, STACEY L. JOHNSON, a CSR of Montgomery,

2  Alabama, and Notary Public for the State of

3  Alabama at Large, acting as Commissioner,

4  certify that on this date, as provided by the

5  Federal Rules of Civil Procedure and the

6  foregoing stipulation of counsel, there came

7  before me at 250 Commerce Street, Suite 100,

8  Montgomery, Alabama, beginning at 9:57 a.m.,

9  MARTIN O. LONG, witness in the above cause, for

10  oral examination, whereupon the following

11  proceedings were had:

12

13    (Whereupon, Defendant's Exhibit

14  Numbers 1 through 12 were marked for

15  identification and copies of same are

16  attached hereto.)

17

18              MARTIN O. LONG,

19  the witness, after having been first duly sworn

20  to speak the truth, the whole truth, and nothing

21  but the truth, testified as follows:

22              EXAMINATION

23  BY MR. NEWMAN:

**MARTIN O. LONG**

1    Q    Would you state your name, please?

2    A    Martin O'Neal Long.

3    Q    Your address, Mr. Long?

4    A    2752 Caroline Drive, Millbrook, Alabama

5    36054.

6    Q    And how long have you lived at that

7    address?

8    A    Since '98.

9    Q    Are you employed?

10    A    No.

11    Q    How long has it been since you've been

12    employed?

13    A    Since 2003.

14    Q    And who was your last employer?

15    A    CSX.

16    Q    Let me show you what's been marked as

17    Defendant's Exhibit 0 to the deposition, and

18    that's the Notice of Deposition.

19        MR. NEWMAN:    And, Tucker, you've

20    confirmed that the things that are attached as

21    the duces tecum part of the notice have all been

22    produced; correct?

23        MR. BURGE:    Yeah.    I mean, as far as

**MARTIN O. LONG**

1   What was your financial situation like just
2   prior to the time that you got in the $175,000?
3       A     Oh, it was rough.
4       Q     It was rough?
5       A     (Witness nods head.)
6       Q     Why?
7       A     Because we didn't have no income coming
8   in.  You know, the bills keep rolling.  It was
9   hard, but, hey, we made it through it.
10      Q     And that's why the credit card bills
11  were so high, I suppose?
12      A     Partly.  Right.  Because, you know, we
13  really couldn't afford to pay too much.  And
14  every time you don't pay it, they get higher and
15  then they add that money to the principal.  It's
16  a rip off.
17      Q     And then you also had the debt on the
18  school loan and the Volvo as well; right?
19      A     Right.  No.  The student loan, she
20  didn't have to pay nothing.
21      Q     She didn't have to pay that back yet,
22  did she?
23      A     Right.  You didn't have to pay the

**MARTIN O. LONG**

1    in a separate car with Felicia; right?

2        A     Yeah.

3        Q     How did Sandy get over there?  Was he

4    with Ricky?

5        A     No.  He was in his own vehicle.

6        Q     Okay.  And why did y'all go over there?

7        A     See their brother.

8        Q     What is his name?

9        A     Donald.

10       Q     And that's Ware?

11       A     Yes.

12       Q     W-A-R-E?

13       A     Uh-huh.

14       Q     And had you ever been over to Atlanta

15   to see Mr. Ware, Donald Ware, before?

16       A     Yes.

17       Q     And did you go with Valerie on that

18   occasion?

19       A     Yes.

20       Q     Did you go with Ricky on that occasion?

21       A     Yes.

22       Q     Felicia went?

23       A     Yes.

**MARTIN O. LONG**

1     Q     And Sandy?

2     A     Right.

3     Q     So same group?

4     A     Right.

5     Q     How long before had y'all gone over

6     there?

7     A     I think it was months before then.

8     Q     Well, this was February the 19th when

9     this incident with the 2000 Corvette occurred.

10    So how much before then?  A couple of months?

11    A     Right.  Yes, about a couple of months.

12    Q     Okay.  When you had gone over there

13    before a couple of months before, had you stayed

14    at the same place?

15    A     No.  I think we -- we stayed with him.

16    Q     Stayed with him that time?

17    A     Right.

18    Q     Did he live in Lithonia, Georgia?

19    A     Yes.

20    Q     Or close to there?

21    A     Right.  He lived in Lithonia.

22    Q     He lived in Lithonia?

23    A     Right.

**MARTIN O. LONG**

1  ten.

2    Q    Okay.  Is Valerie married?

3    A    Yes.

4    Q    Was she at the time?

5    A    Yes.

6    Q    How would you get in touch with her?

7    A    Call her on her cell phone or either

8  call the job.

9    Q    Call her cell phone?

10    A    Yes.

11    Q    From your cell phone?

12    A    Yes.

13    Q    Or else just call the office?

14    A    Right.

15    Q    What would y'all do the first time that

16  you went over to see her brother?  I mean, did

17  you just go over and sit around the house and

18  visit, or did you go out and do something?

19    A    Well, he showed us around town a little

20  bit, and I think we went out then.  I think we

21  barbequed.

22    Q    At his house?

23    A    Yes.

**MARTIN O. LONG**

1      Q    And then y'all spent the night there at

2   his house?

3      A    Yes.

4      Q    Did you come back the next day?  Did

5   you stay over there one night?

6      A    Yeah, I think we stayed there one

7   night.

8      Q    What car did you drive over there the

9   first time?

10     A    I drove my Mustang the first time.

11     Q    And at that time was it still just you

12  and Valerie in the car?

13     A    Yes.

14     Q    The second time that you went you

15  stayed in the motel.  Any reason you stayed in

16  the motel other than staying with Donald Ware?

17     A    No.

18     Q    What did you do -- you were over there

19  that time two nights; right?

20     A    Yes.

21     Q    Okay.

22     A    That was like a weekend thing.  We had

23  planned it.

**MARTIN O. LONG**

1    Q   You thought there was a possibility

2 that somebody might steal something?

3    A   No, it wasn't no possibility but things

4 happen.

5    Q   I understand that.  I'm asking you if

6 things happen is that why you parked in front of

7 the camera because you thought there was a

8 possibility that someone might steal something?

9    A   Yeah.

10    Q   So you tried to park it under the

11 camera where the camera would see it?

12    A   Yes, I did park it there.

13    Q   You did park it under the camera?

14    A   Right.

15    Q   All right.  And how far was that place

16 that you parked from the front of the -- where

17 you walked into the hotel or motel?

18    A   Maybe 25, 30 yards.

19    Q   Okay.

20    A   And I parked like right up under some

21 light, too.  Because right above the hill was

22 this gas station from where I parked it.

23    Q   So you intentionally parked it under

**MARTIN O. LONG**

1     Q   And then can you look at the date on

2  the bracelet and see when you bought it?

3     A   I had the bracelet a couple of years.

4  I bought that March the 10th of '03.

5     Q   How come you'd have the receipt for the

6  bracelet if you bought it all the way back in

7  '03?

8     A   Because it was in my car.  I had to go

9  get everything, all the receipts.

10     Q   I know.  How come you'd still have the

11  receipt on the bracelet?

12     A   Oh, I didn't.  I went to the pawn shop

13  and got it.

14     Q   The pawn shop had a record of it?

15     A   Yes.  I don't keep no receipts.

16     Q   Okay.  Looking back at your list now of

17  the personal property.  Now, the next thing you

18  say is $5,000 cash; right?

19     A   Right.

20     Q   And where physically in the auto was

21  that $5,000 cash?

22     A   Between my seats.

23     Q   Was it in an envelope, or was it in a

**MARTIN O. LONG**

1  rubber band?  Or how did you have that cash?

2       A     In the envelope.  In the middle of the

3  seats.

4       Q     Was it inside a console?

5       A     Yeah.

6       Q     And was the gun inside a console, too,

7  the handgun?

8       A     I think my gun was in the back.

9       Q     Under the hatchback?

10      A     (Witness nods head.)  Yes.

11      Q     Now, this $5,000 cash, under this date

12  of purchase here, you've got 2-2005.  What does

13  that mean?  You didn't purchase that cash, did

14  you?

15      A     No.  I withdrew it sometime before I

16  left.

17      Q     Would you have withdrawn that cash

18  before you left for your trip?

19      A     Yeah.

20      Q     Would you have withdrawn it from one of

21  the credit unions?

22      A     Yes.

23      Q     Max?

**MARTIN O. LONG**

1    A    Yes.

2    Q    Would it have been from your savings?

3    A    I believe so.

4    Q    And you left -- was it exactly $5,000?

5    A    I think it was in increments.

6    Q    Tell me what you mean by that.

7    A    Well, I think I got like 2500 one day

8    and I think I got maybe 2500 another day.

9    Q    All right.  Now, so you got a total of

10   $5,000 cash.  Did you have any cash in your

11   wallet?

12   A    No.  I don't carry no wallet.

13   Q    Do you carry a money clip?

14   A    No.

15   Q    How do you carry your money around?

16   A    I mean, I don't usually carry money

17   like that.  I had it.  When I do carry it, I

18   just carry the money in my front pocket.

19   Q    Front.  Well, now, why didn't you take

20   this cash inside with you?

21   A    I just didn't.

22   Q    I mean, you parked your car underneath

23   the camera because you're worried about

**MARTIN O. LONG**

1    something happening to it and you leave your

2    cash and your gun in the car?

3        A    Yeah.

4        Q    All right.  The next thing it says

5    three suits.  Are these suits that have the

6    matching pants and coats?

7        A    Yeah.

8        Q    And down here you've got that you

9    purchased them in February of 2005 for $600?

10       A    Yeah.

11       Q    I guess that would be $200 apiece;

12   right?

13       A    Uh-huh.

14       Q    Is that a yes?

15       A    Oh, I mean, I've got them on here, but

16   I ain't purchased them in February.

17       Q    When did you purchase them?

18       A    I had them for a minute.

19       Q    What do you mean a minute?  How long is

20   a minute?

21       A    I hadn't really bought nothing from

22   that store in over a year.

23       Q    Over a year?

**MARTIN O. LONG**

1     A     (Witness nods head.)

2     Q     Is that right?

3     A     Right.

4     Q     Now, when you gave your statement

5   before, this examination under oath, you told

6   them you had bought them that same month, didn't

7   you?

8     A     Yeah, I did.

9     Q     Why did you lie about it?

10    A     Because I was pissed off at the

11  insurance.

12    Q     Why would that make a difference?

13    A     It would make a lot of difference.  I

14  was trying to -- whatever I could say I had in

15  that car I was going to say I had it in there.

16    Q     Well, did you have the suits in there?

17    A     No.

18    Q     So you didn't have the suits in there?

19    A     No.  I mean, yeah, I had them in there,

20  but I didn't buy them when I say I bought them.

21    Q     When did you buy them?

22    A     I had them for a while.

23    Q     You had them for about year, you said?

**MARTIN O. LONG**

1      A      Or more.

2      Q      A year or more?

3      A      Yeah.

4      Q      How much more?

5      A      Maybe a year or two years.

6      Q      Okay.  Do you know how much you paid

7   for them a couple of years ago?

8      A      I know it wasn't no $600.

9      Q      Why did you put $600 down there?

10     A      I just told you.  I was mad at the

11  insurance.

12     Q      You were trying to get something that

13  you weren't entitled to?

14     A      Yeah.  Same way they trying to do me.

15  That's why I was pissed off at them.

16     Q      So you wrote down something that you

17  weren't -- you wrote down the date of purchase

18  February 2005 and that was wrong; right?

19     A      Right.

20     Q      And you wrote down $600 and that was

21  wrong?

22     A      Right.

23     Q      And then when you were sworn under oath

**MARTIN O. LONG**

1    on this examination under oath you said that

2    they did cost $600 and that you did buy them in

3    February 2005; right?

4         A    Right.

5         Q    And the only reason you can tell me

6    that you did that was because you were pissed

7    off at the insurance company?

8         A    Because that is why I did it.

9         Q    Okay.  Because you're trying to get

10   something that you're not entitled to?

11        A    Not really get something I'm not

12   entitled to.  I was just pissed off at them for

13   putting me through what they put me through.

14   Saying I stole my own car.

15        Q    So you put down -- on your personal

16   property claim, you put down more than what you

17   said you were -- more than what you really had;

18   right?

19        A    Right.

20        Q    All right.  And you were pissed off at

21   them why?  Because they told you you stole your

22   own car?

23        A    Right.

**MARTIN O. LONG**

1     Q     When did they tell you that?

2     A     They didn't up and just straight --

3    well, it's like this.  The dude kept jiving me

4    around.  I had to pretty much make them tell me

5    that.  You know, he kept saying give me 30 more,

6    blah, blah, blah.  And then I just finally asked

7    him.  I said, man, y'all think I stole my car.

8    And he said yeah.

9     Q     How far into the deal was that?  How

10   long after February the 19th was it that you

11   finally told him, hey, dude, do you think I

12   stole my car and he said yeah?

13    A     It was a couple of weeks or either the

14   same week that I called my lawyer.  Once I

15   confronted him -- because he never would say

16   what he was doing.  But, like I say, once I

17   asked him that question and he said yeah,

18   within -- sometime within that time frame,

19   that's when I called Mr. Tucker.

20    Q     Was it after he got that statement from

21   you?  Do you remember when you got that recorded

22   statement?  Was it after that time that you

23   confronted him and said, hey, man --

## MARTIN O. LONG

1       A     Oh, after this time here?

2       Q     No, sir.  Just listen to what I'm

3  asking you, now.  What I'm trying to do is to

4  find out the time that you confronted him and

5  got mad at him and said, hey, man, are you

6  saying I stole my car and he said yeah.  When

7  was that?

8       A     I don't know.

9             THE WITNESS:  Can I...

10      Q     You can ask him.  I don't --

11            MR. BURGE:  If you don't know the

12  answer, tell him you don't know the answer.

13      A     I don't know the answer.

14      Q     Do you remember the time that he took a

15  recorded statement from you?

16      A     Yeah.  That was --

17      Q     And that was the time that you remember

18  you told him you were going over there by

19  yourself and then after you finished the

20  recorded statement you told him, you said, well,

21  now, wait a minute, I was over there with a

22  woman that night?

23      A     Right.

**MARTIN O. LONG**

1      Q      It was after that that you confronted

2  him, wasn't it?

3      A      Yeah.

4      Q      Well, not right after that, but it was

5  after that in point of time that you confronted

6  him?

7      A      Right.

8      Q      How many weeks after that, giving that

9  statement, was it?

10      A      I don't know.  It probably was a month

11  and a half or maybe two months.  Because after

12  that, I had another question and answer with --

13  you know, with him and another lady.

14      Q      Okay.  Yeah.  That's the one we're

15  talking about here.

16      A      Yeah.  See, I had all that before.

17      Q      I know.  First of all, you gave him a

18  recorded statement, and then after you gave him

19  the recorded statement, then you came in -- as a

20  matter of fact, you came into this office and a

21  lady took this recorded statement that's Exhibit

22  10 from you under oath and you gave those

23  answers; right?

MARTIN O. LONG

1    A    Right.

2    Q    Okay.  Now, that statement was taken

3  March 31, 2005?

4    A    That one?

5    Q    Yes, sir.  Exhibit 10.

6    A    The other one was before that.

7    Q    The other one was before that?

8    A    You know, the very first one.

9    Q    Now, when you got mad at him and said,

10  hey, man, are you saying I stole my car, was it

11  before or after the time that you gave this

12  statement, Exhibit 10, that I'm holding up in my

13  hand?

14    A    It was after that.

15    Q    After Exhibit 10?

16    A    Because I had did everything he told me

17  to do.

18    Q    So you had done everything he told you

19  to do.  You'd given him a recorded statement,

20  you had given him -- you had come in and brought

21  all these documents with you; right?

22    A    Right.

23    Q    You'd told him everything in this

**MARTIN O. LONG**

1  statement here that's Defendant's Exhibit 10,

2  answered all those questions; right?

3      A    Right.

4      Q    Ordered a credit report?

5      A    Right.

6      Q    So after doing all that and you still

7  hadn't gotten paid, that's when you confronted

8  him and you said, hey, man, you're jiving me

9  around; do you think I stole my car?

10      A    Right.

11      Q    And it was then that he said yes and it

12  was then you got mad?

13      A    Right.

14      Q    Okay.  So it was -- at least in point

15  of time, one thing we know is that that happened

16  sometime after March 31, 2005, which is the date

17  of Exhibit 10; right?

18      A    Right.

19      Q    Okay.  Now, let's keep going.  We

20  talked about the suits.  Now, let's talk about

21  the pantsuits.  What's a pantsuit?  Is that like

22  just pants and a shirt or something that match?

23      A    Yeah.

**MARTIN O. LONG**

1    Q    Okay.  And on that one, again, you say

2  you bought it in February 2005 in Montgomery for

3  $180, and you're going to tell me now that

4  that's not correct?

5    A    Right.

6    Q    But in this statement that you gave

7  that's Exhibit 10, you said it was correct;

8  right?

9    A    Right.

10    Q    All right.  And then we've got four

11  pairs of shoes bought in Montgomery in February

12  of 2005 for $1,100, and you're going to tell me

13  now -- and in your statement that's Exhibit 10,

14  you said that was when you bought them and

15  that's what they cost; right?

16    A    Right.  But I only had two pairs of

17  shoes and I bought them before February.

18    Q    So really there weren't four pairs of

19  shoes in the car, there were only two; right?

20    A    Right.

21    Q    The second thing you're telling me is

22  that you bought them before February of 2005?

23    A    Right.

MARTIN O. LONG

1      Q    All right.  And all of these things

2  here, these three items -- the three suits, the

3  two pantsuits, and the -- what you had is the

4  four pairs of shoes, but you're now saying two

5  pairs of shoes -- the cost of them are not

6  correct and in addition you didn't buy them in

7  February of 2005; right?

8      A    Right.

9      Q    Again, why did you put those down?

10  Because you were mad at the insurance company?

11     A    Yes.

12     Q    Okay.  Because you felt like they were

13  jacking you around?

14     A    Well, they accused me of something I

15  didn't do.

16     Q    Now, we go on to the next one, which is

17  four bracelets.  Did you really buy the

18  bracelets?

19     A    Yes.

20     Q    You did really buy the bracelets?

21     A    Yes.

22     Q    Did you really buy the bracelets in --

23  is that 2-2005 again?

**MARTIN O. LONG**

1      A      Some of them.  Like I said, the receipt

2   on the one I bought, I bought that back in '03.

3      Q      Okay.

4      A      From the pawn shop.

5      Q      You brought the receipt for that one?

6      A      (Witness nods head.)

7      Q      How much was that?  Look on that

8   receipt there, how much you paid for it.  It was

9   $500?

10     A      599.

11     Q      Okay.  So that's 600.  That leaves us

12   with almost $2,000 worth of bracelets.  So you

13   had -- in addition to that one you brought the

14   receipt in on, you had three more bracelets;

15   right?

16     A      Yeah.

17     Q      And were those all in the car that

18   night?

19     A      Yes.

20     Q      And did you pay $1900 for them?

21     A      Yes.  I bought them off the street.

22     Q      You don't have receipts for any of

23   them?

**MARTIN O. LONG**

```
1        A     No, I don't.

2        Q     How do you know you paid $1900 for

3   them?

4        A     I know what I gave for them.

5        Q     You do?

6        A     Yeah.

7        Q     How do you know that?

8        A     I bought them.

9        Q     Did you buy them in cash?

10       A     Yeah.

11       Q     So you bought them on the street?

12       A     Yes.

13       Q     Where?

14       A     Montgomery.

15       Q     Where?

16       A     Down off of that street down there by

17   the pawn shop.  You know, the back way of

18   Maxwell, the street the pawn shop is on.

19       Q     Okay.

20             MR. BURGE:  He's from Mobile.

21       Q     I don't know where Quick Pawn is, but

22   it might be on that receipt you've got there.

23   It might tell us where the Quick Pawn is.
```

**MARTIN O. LONG**

1   A  Yeah. It's on Bell Street. Yeah, Bell

2 Street.

3   Q  Okay. Now, did you just walk up to

4 somebody on the street and say, hey, man, you

5 got any bracelets for sale?

6   A  They came to me.

7   Q  They walked up to you and said, hey,

8 man, you want to buy some bracelets?

9   A  Yeah.

10   Q  What were you doing down there anyway?

11   A  Coming out of the pawn shop.

12   Q  In February of '05?  Is this February

13 of '05 we're talking about?

14   A  Yeah.

15   Q  So you bought all three of the

16 remaining bracelets in February of '05?

17   A  Yes.

18   Q  Coming out of the pawn shop?

19   A  (Witness nods head.)

20   Q  And that's a yes?

21   A  Yes.

22   Q  What were you doing in the pawn shop in

23 February of '05?

**MARTIN O. LONG**

1    C-H-A-U-N-C-E-Y, or maybe neither one of them?

2         A     I think it's C-H-A-N-C-E-Y, I think.

3         Q     Okay.  All right.  So now what you're

4    telling me is that you did have -- on this

5    Exhibit 17 to your examination under oath, you

6    did have the jacket in there, the auto handgun,

7    you had $5,000 cash, you had four bracelets, you

8    had three rings, you had the DVD player, and you

9    had the watch.  You had three suits, but you say

10   your suits, you didn't purchase them in February

11   and they didn't cost $600.  You had two

12   pantsuits, but, again, you didn't purchase them

13   in February of 2005 and they didn't cost $180.

14   And instead of having four pairs of shoes, you

15   had two pairs of shoes and you didn't buy them

16   in February of 2005, and I guess they didn't

17   cost $1,100; right?

18        A     Right.

19        Q     And the reason you say that you put

20   down the inflated figures -- you understand what

21   inflated means.  It means more than you really

22   should have put down; right?

23        A     Right.

**MARTIN O. LONG**

1      Q      The reason you put that down is because
2   you were mad at Todd Smith and mad at the
3   insurance company?
4      A      Right.
5      Q      And you were mad at them because you
6   had said are you saying I stole my car and he
7   said yeah and you got mad at him?
8      A      Yeah.  Accused me of something I didn't
9   do.  Why am I going to steal my own car for?
10     Q      So you decided as a result of that you
11  would write down some things that were higher
12  than what they really were?
13     A      Right.
14     Q      Let's go on.  We got through that one.
15  Is your trailer still insured with State Farm?
16     A      No.  They dropped me on everything.
17     Q      Okay.
18     A      I ain't had no insurance since the
19  first year the hurricane and stuff came through.
20     Q      Did you try to go anywhere else?
21     A      Yeah.  Wouldn't nobody do it during
22  that time.  I had to wait until hurricane season
23  was over.

**MARTIN O. LONG**

1      Q      Would that have been the most recent
2  purchase out of the things that were in the car?
3      A      Yeah.
4      Q      You had bought the rings and the
5  bracelets before then?
6      A      Yes.
7      Q      Before you bought the gun?
8      A      I think so.
9      Q      Okay.
10      A      I'm not for sure.
11      Q      You didn't get any receipts for the
12  rings or the bracelets when you bought them on
13  the street, did you?
14      A      No.
15      Q      They wouldn't have given you those?
16  That's not the way that business would be done?
17      A      Right.
18      Q      Okay.  There wasn't any kind of receipt
19  from the watch from your nephew, was it?
20      A      No.
21      Q      Was the cash in your car left over from
22  the settlement of the lawsuit?  I mean, was it
23  part of the lawsuit settlement money or not?

**MARTIN O. LONG**

1    A    Yeah.

2    Q    It was?

3    A    Yeah.

4    Q    Now, when you gave this statement,

5  Exhibit 10, we talked about, you said it was not

6  left over from the lawsuit.  Which one was it?

7  I just want to make sure.

8    A    Yeah, it is.

9        MR. BURGE:  Object to the form.

10    Q    Let's see if I can find that and make

11  sure we're straight.

12        All right.  Now, in the statement, it

13  appears that you said that it was not left over

14  from the settlement, but regardless of what it

15  says in this statement, what you're telling me

16  now is that it was left over from the

17  settlement?

18        MR. BURGE:  Object to the form.

19    A    Yes.

20    Q    Okay.  What color was the watch, the

21  watch that was --

22    A    Gold.

23    Q    Okay.

**MARTIN O. LONG**

1

2   STATE OF ALABAMA       )

3

4   COUNTY OF MONTGOMERY )

5

6

7        I hereby certify that the above and

8   foregoing deposition was taken down by me in

9   stenotype, and the questions and answers thereto

10   were transcribed by means of computer-aided

11   transcription, and that the foregoing represents

12   a true and accurate transcript of the testimony

13   given by said witness upon said hearing.

14        I further certify that I am neither of

15   counsel, nor kin to the parties to the action,

16   nor am I in anywise interested in the result of

17   said cause.

18

19

20      *Stacey Johnson*

20      ------------------------------
       STACEY L. JOHNSON, Certified

21      Shorthand Reporter and

21      Commissioner for the State of

22      Alabama at Large.

22

# COPY

1

1

2   STATE OF ALABAMA

3   MONTGOMERY COUNTY                    **RECEIVED**

·4                                      APR 1 3 2005

5                                          **SIU**

6

7   IN RE:   Martin O. Long
            Auto Policy No.:           0886-750-01
8           Auto Claim No.:            01-6596-564
            Homeowner's Policy No.:    81-PF-2500-3
            Homeowner's Claim No.:     01-Q177-057
9           Date of Loss:              February 19, 2005

10

11

12                                    **DEFENDANT'S EXHIBIT**

13                                           10

14             *  *  *  *  *  *  *  *  *  *  *  *

15

16             **EXAMINATION UNDER OATH OF MARTIN O. LONG,**

17   taken before Haley A. Phillips, Certified Shorthand

18   Reporter, and Commissioner for the State of Alabama

19   at Large, at the Law Offices of Beers, Anderson,

20   Jackson, Patty & Van Heest, 250 Commerce Street,

21   Montgomery, Alabama, on Thursday, March 31, 2005,

22   commencing at approximately 10:05 a.m.

                                      Long/State Farm
23                                    SF1  00455

               *  *  *  *  *  *  *  *  *  *  *  *

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

2

1                               **APPEARANCES**

2

3       **ON BEHALF OF STATE FARM INSURANCE:**

4       Angela Taylor, Esq.
        Beers, Anderson, Jackson, Patty & Van Heest
5       Attorneys at Law
        250 Commerce Street, Suite 100
6       Montgomery, Alabama  36104

7       **ALSO PRESENT:**

8       Mr. Todd Smith

9

10

11

                        * * * * * * * * * * * *
12

13

                        **EXAMINATION INDEX**
14

15

            By Ms. Taylor . . . . . . . . . . . .  4
16

17                        **EXHIBIT INDEX**

18      1    Letter to Mr. Long from Mr. Davenport        7
             dated March 16, 2005
19

20      2    Letter to Mr. Long from Ms. Taylor dated     7
             March 23, 2005

21      3    Letter to Mr. Long from Mr. Burge dated      29
             March 23, 2005
22

        4    Letter to Mr. Long from Department of        30
23           Veterans Affairs dated December 29, 2004

Long/State Farm
SF1 00456

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

**DEFENDANT'S EXHIBIT**

10    3

1          **EXHIBIT INDEX (continued)**

2    5    Bank documents from AmSouth Bank dated    31
          March 5, 2004

3

4    6    Bank documents from AmSouth Bank dated    31
          April 7, 2004

5    7    Bank documents from AmSouth Bank    31

6    8    Bank documents from AmSouth Bank dated    31
          March 8, 2005

7

8    9    Member Statement of Account from Max    31
          Federal Credit Union

9    10   Transaction Summary    31

10   11   Credit reports    32

11   12   Tax records from 2003    32

12   13   Tax records from 2004    32

13   13-a Incident report    49

14   14   Certificate of Title for a Vehicle    49

15   15   Verizon Wireless phone record    58

16   16   Document from Big 10 Tires    65

17   17   Personal property inventory form    67

18   18   Receipt from Looking Good    74

19   19   Receipt from Quik Pawn Shop    77

20   20   Receipt from Quik Pawn Shop    69

21   21   Sketch    83

22   22   Affidavit of Vehicle Theft    91

23   23   Settlement agreement    112

Long/State Farm
SF1  00457

4

1            **MARTIN O. LONG**

2       The witness, after having first been duly

3    sworn to speak the truth, the whole truth and

4    nothing but the truth testified as follows:

5                **EXAMINATION**

6    BY MS. TAYLOR:

7    Q.    Could you, please, state your name for the

8          Record --

9    A.    Martin O'Neal Long.

10   Q.    -- Mr. Long, my name is Angela Taylor, and

11         I'm an attorney for State Farm.  And we're

12         here today to talk about an auto claim and

13         a homeowner's claim that you filed

14         regarding the theft of your vehicle.  Are

15         you under any medication today that would

16         prevent you from giving testimony under

17         oath?

18   A.    No.  I mean, I take medication, but no.

19   Q.    So you feel like you can give testimony

20         under oath today?

21   A.    Oh, yeah.

22   Q.    Okay.  Have you ever given a sworn

23         statement under oath before?

Long/State Farm
SF1  00458

**VALERIE WARE TEMPLE**

EXHIBIT

1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4    CASE NO.:  2:06cv816-MHT

5                                    ORIGINAL

6    MARTIN O. LONG,

7            Plaintiff,

8               V.

9    STATE FARM FIRE AND CASUALTY COMPANY,

10           Defendants.

11

12

13        S T I P U L A T I O N S

14

15

16        IT IS STIPULATED AND AGREED by and

17   between the parties, through their respective

18   counsel, that the deposition of VALERIE WARE

19   TEMPLE may be taken before STACEY L. JOHNSON,

20   Commissioner, at the Offices of Beers, Anderson,

21   Jackson, Patty, Van Heest & Fawal, 250 Commerce

22   Street, Suite 100, Montgomery, Alabama, on the

23   27th day of March, 2007.

**VALERIE WARE TEMPLE**

1    IT IS FURTHER STIPULATED AND AGREED

2  that the signature to and the reading of the

3  deposition by the witness is hereby waived, the

4  deposition to have the same force and effect as

5  if full compliance had been had with all laws

6  and rules of Court relating to the taking of

7  depositions.

8    IT IS FURTHER STIPULATED AND AGREED

9  that it shall not be necessary for any

10 objections to be made by counsel to any

11 questions except as to form or leading

12 questions, and that counsel for the parties may

13 make objections and assign grounds at the time

14 of trial, or at the time said deposition is

15 offered in evidence, or prior thereto.

16    IT IS FURTHER STIPULATED AND AGREED

17 that the notice of filing of the deposition by

18 the Commissioner is waived.

19

20

21

22

23                    INDEX

**VALERIE WARE TEMPLE**

```
 1    EXAMINATION BY:                        PAGE NUMBER:

 2    Mr. Newman................................5-47

 3    Mr. Burge................................47-48

 4

 5    EXHIBITS:

 6    Defendant's Exhibit 19.......................11

 7         (letter to Valerie Ware Temple from State

 8         Farm)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

**VALERIE WARE TEMPLE**

```
 1                A P P E A R A N C E S
 2      FOR THE PLAINTIFF, MARTIN O. LONG:
 3           BURGE & BURGE
 3           F. Tucker Burge
 4           2001 Park Place North
 4           Suite 850
 5           Birmingham, Alabama  35203
 5
 6
 7      FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY
 8      COMPANY:
 9           HELMSING, LEACH, HERLONG, NEWMAN & ROUSE
 9           James B. Newman
10           (NEWMJ8049)
10           jbn@helmsinglaw.com
11           150 Government Street
11           Suite 2000
12           Mobile, Alabama  36602
12           (251) 432-5521
13
13
14
14      ALSO PRESENT:
15
15      MR. MARTIN O. LONG
16
16
17
17
18
18
19
19
20
20
21
21
22
22
23
```

## VALERIE WARE TEMPLE

1      I, STACEY L. JOHNSON, a CSR of Montgomery,

2   Alabama, and Notary Public for the State of

3   Alabama at Large, acting as Commissioner,

4   certify that on this date, as provided by the

5   Federal Rules of Civil Procedure and the

6   foregoing stipulation of counsel, there came

7   before me at 250 Commerce Street, Suite 100,

8   Montgomery, Alabama, beginning at 2:14 p.m.,

9   VALERIE WARE TEMPLE, witness in the above cause,

10  for oral examination, whereupon the following

11  proceedings were had:

12                  VALERIE WARE TEMPLE,

13  the witness, after having been first duly sworn

14  to speak the truth, the whole truth, and nothing

15  but the truth, testified as follows:

16                  EXAMINATION

17  BY MR. NEWMAN:

18      Q     You go by Ms. Ware?  Ms. Ware Temple?

19      A     Ware Temple.

20      Q     Ware Temple is the way you say it?

21      A     Yes.

22      Q     Ms. Ware Temple, my name is Jim Newman,

23  and I'll be asking you some questions today.

VALERIE WARE TEMPLE

1    of those three?

2        A    Exactly.

3        Q    Okay.  Do you know how many times you

4    had been out with him before going over to

5    Atlanta in February of 2005?

6        A    Several times.

7        Q    Just so you and I are on the same

8    wavelength, February 2005 is the time you go

9    over there and the Corvette is gone.

10       A    Uh-huh.

11       Q    All right.  Had you been over to

12   Atlanta before?

13       A    Yes.

14       Q    Okay.  With Mr. Long?

15       A    No, not with Mr. Long.

16       Q    Never had been to Atlanta with Mr. Long

17   before?

18       A    No, not before that time.

19       Q    Had you ever gone over to see Donald

20   Ware?

21       A    Yes.

22       Q    Did you ever go over there to see your

23   brother, Donald Ware, with Mr. Long?

**VALERIE WARE TEMPLE**

1    A    No.

2    Q    Okay.

3    A    Not before that incident.

4    Q    Huh?

5    A    Not before that incident.

6    Q    That's what I'm saying, before February

7  of 2005?

8    A    No.

9    Q    Never had done that?

10    A    No.

11    Q    And had you ever gone over there with

12  your -- to Atlanta or Lithonia or anywhere in

13  that area with Mr. Long prior to -- that's

14  before -- February of 2005?

15    A    No.

16    Q    Is that a no?

17    A    No.

18    Q    On the occasion of February of 2005 --

19  and, again, that's the time that the Corvette is

20  gone. Okay. That's the time -- who went to

21  Atlanta on that weekend?

22    A    It was myself, Martin, and my two

23  brothers and Felicia.

**VALERIE WARE TEMPLE**

1    A    Well, he took some clothes out and some

2  shoes, and some of the stuff we left in there

3  because I left some stuff in the car.

4    Q    Okay.  What did you leave in there?

5    A    I left a portable DVD player, some

6  clothes and shoes.  We got what we could carry

7  up and then we said we'd come down the next

8  morning.

9    Q    The portable DVD player is it one of

10  those ones that plugs into the cigarette lighter

11  and then it's got a frequency that runs the --

12  is it a DVD, or is it a CD player?

13    A    It's a portable DVD, TV.  It plays CDs

14  and DVDs.

15    Q    Is it set up to work through a car?  Is

16  it one where you plug into the cigarette

17  lighter?

18    A    Yes.

19    Q    Where did you get that?

20    A    Circuit -- I don't know.

21    Q    Best Buy?

22    A    Best Buy.  Yes, Best Buy.

23    Q    How much did you pay for it?

**VALERIE WARE TEMPLE**

1    A    It was -- I don't know.  Two -- I don't

2  know exactly how much it was.

3    Q    How long had you had it?

4    A    Not long.  Not long.

5    Q    A couple of months?

6    A    Yes.

7    Q    Did he have a portable DVD player in

8  there as well, or was yours the only one in the

9  car?

10    A    I don't know what he had in there as

11  far as that, but I just know I seen some clothes

12  and shoes and jewelry and money.

13    Q    No.  I'm talking about the DVD player.

14  Was it the only DVD player in the car?

15    A    I don't know.  I know I had mine in

16  there.

17    Q    Okay.  Where was yours?  In the front

18  seat?

19    A    I didn't play it, so I left it in the

20  back, in the back of the car.

21    Q    In the hatchback part?

22    A    Yeah.  Because only two people could

23  get in the car actually.  You know, it's like

**VALERIE WARE TEMPLE**

1   what he told you, but what you actually saw?

2       A    I actually seen clothes, jewelry,

3   money, shoes.

4       Q    Okay.  Clothes, jewelry, money, and

5   shoes?

6       A    Yes.

7       Q    Okay.  And do you know how many clothes

8   he had?

9       A    No.  But he brought quite a few, but I

10  don't know exactly what was -- how much he had

11  left.

12      Q    How about the jewelry?

13      A    He had like rings, bracelets.  I

14  couldn't tell you how many because it was just

15  like sitting down in the...

16      Q    Where were the rings and the bracelets

17  located?

18      A    Sitting down in the little, not an

19  ashtray, but I guess a little thing -- a

20  compartment in the car.

21      Q    You know between the driver and the

22  passenger there's a little thing they call a

23  console?

**VALERIE WARE TEMPLE**

1      A      Uh-huh.

2      Q      Is that where the rings and the

3    bracelets were?

4      A      No.  I seen it.  It was like sitting

5    open so you could see.  It was all sitting

6    there, not in the console.

7      Q      Was it between the driver and

8    passenger?

9      A      Yes.

10     Q      Okay.  On the flat part of the console?

11     A      I think it had a little compartment

12   that I remember, like a little -- like something

13   like a cup holder, like a section down --

14   something like that.

15     Q      Okay.  But it was the device, if you

16   will, that divides the passenger and the driver

17   seat?

18     A      Uh-huh.

19     Q      Okay?  You agree with that?  That's

20   where the rings were?

21     A      It was in between.  It was in between.

22     Q      In between the two -- the passenger and

23   the driver seat?

**VALERIE WARE TEMPLE**

1    A    Yes.

2    Q    Okay.  And that's where the jewelry

3    was?

4    A    Yes.

5    Q    What about the money?

6    A    It was sitting like folded -- I guess

7    it was sitting like folded beside the jewelry

8    that was --

9    Q    Was it out where you could see it?

10    A    Not so much.  I knew he had some there,

11    but not like just laying out so you could see

12    it.  But it was like folded.  How much he had, I

13    couldn't tell you.

14    Q    You don't know how much he had with

15    him.

16    A    No.

17    Q    Like if I looked in the car from the

18    outside, could I see the jewelry?

19    A    No, I don't think you could.  I don't

20    think so.

21    Q    Could I see the money?

22    A    No, I don't think so.

23    Q    Now, do you know he also had a gun in

**VALERIE WARE TEMPLE**

1    there?

2         A     He told me he had a gun.

3         Q     Did you know it at the time?

4         A     Not that I recall.  Not that I recall.

5         Q     Do you know where he kept the gun?

6         A     Well, normally when I ride with him

7    before then, I knew he kept it like underneath

8    him.

9         Q     Under the seat?

10        A     I don't know if it was exactly under

11   the seat or just sitting down on the floor.  I'm

12   assuming that's where he had it.  I'm not for

13   sure.  But I know he mentioned that he had one.

14        Q     What was the money in?  Was it just

15   loose, or was it in something?

16        A     It was like folded.

17        Q     Well, folded in half?  The money folded

18   in half?

19        A     Folded like more than half.

20        Q     Like rolled up?

21        A     Not in a roll.  More like a fold, so

22   you can take it and just stick it down.

23        Q     Was it inside anything, the money?

**VALERIE WARE TEMPLE**

1      A     No.

2      Q     Like a wallet?

3      A     No.

4      Q     And envelope?

5      A     No.  Not that I recall, no.

6      Q     So as you recall, the money was out in

7 the open?  It wasn't in anything?

8      A     Not that I recall.

9      Q     Okay.  Did Mr. Long tell you where he

10 had gotten that jewelry, the bracelets and the

11 rings?

12     A     No.  I'm assuming he had it -- already

13 had it.

14     Q     No.  I mean, did he tell you where he

15 bought it?

16     A     No.

17     Q     Okay.

18     A     No.

19     Q     Now, you told me earlier that you don't

20 recall talking to anyone about this.  And, as I

21 understand it, you're not saying you didn't talk

22 to someone, but you're saying the conversation

23 that you remember is the one that you had with

**VALERIE WARE TEMPLE**

1          C E R T I F I C A T E

2

3    STATE OF ALABAMA        )

4

5    COUNTY OF MONTGOMERY )

6

7

8          I hereby certify that the above and

9    foregoing deposition was taken down by me in

10   stenotype, and the questions and answers thereto

11   were transcribed by means of computer-aided

12   transcription, and that the foregoing represents

13   a true and accurate transcript of the testimony

14   given by said witness upon said hearing.

15          I further certify that I am neither of

16   counsel, nor kin to the parties to the action,

17   nor am I in anywise interested in the result of

18   said cause.

19

20

21

21          STACEY L. JOHNSON, Certified

22          Shorthand Reporter and

22          Commissioner for the State of

23          Alabama at Large.

23

**RICKY WARE**

EXHIBIT

J

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE MIDDLE DISTRICT OF ALABAMA

3          NORTHERN DIVISION

4     CASE NO.:  2:06cv816-MHT

5

6     MARTIN O. LONG,                    ORIGINAL

7          Plaintiff,

8               V.

9     STATE FARM FIRE AND CASUALTY COMPANY,

10          Defendants.

11

12

13          S T I P U L A T I O N S

14

15

16          IT IS STIPULATED AND AGREED by and

17     between the parties, through their respective

18     counsel, that the deposition of RICKY WARE may

19     be taken before STACEY L. JOHNSON, Commissioner,

20     at the Offices of Beers, Anderson, Jackson,

21     Patty, Van Heest & Fawal, 250 Commerce Street,

22     Suite 100, Montgomery, Alabama, on the 27th day

23     of March, 2007.

**RICKY WARE**

1    IT IS FURTHER STIPULATED AND AGREED

2   that the signature to and the reading of the

3   deposition by the witness is hereby waived, the

4   deposition to have the same force and effect as

5   if full compliance had been had with all laws

6   and rules of Court relating to the taking of

7   depositions.

8    IT IS FURTHER STIPULATED AND AGREED

9   that it shall not be necessary for any

10  objections to be made by counsel to any

11  questions except as to form or leading

12  questions, and that counsel for the parties may

13  make objections and assign grounds at the time

14  of trial, or at the time said deposition is

15  offered in evidence, or prior thereto.

16    IT IS FURTHER STIPULATED AND AGREED

17  that the notice of filing of the deposition by

18  the Commissioner is waived.

19

20

21

22

23    INDEX

**RICKY WARE**

1  EXAMINATION BY:                          PAGE NUMBER:

2  Mr. Newman...................................5-24

3  Mr. Burge...................................25-26

4  Mr. Newman....................................26

5

6  EXHIBITS:

7  There were no exhibits marked to this

8  deposition.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

4

**RICKY WARE**

1           A P P E A R A N C E S
2     FOR THE PLAINTIFF, MARTIN O. LONG:
3          BURGE & BURGE
3          F. Tucker Burge
4          2001 Park Place North
4          Suite 850
5          Birmingham, Alabama   35203
5
6
7     FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY
8     COMPANY:
9          HELMSING, LEACH, HERLONG, NEWMAN & ROUSE
9          James B. Newman
10          (NEWMJ8049)
10          jbn@helmsinglaw.com
11          150 Government Street
11          Suite 2000
12          Mobile, Alabama   36602
12          (251) 432-5521
13
14     ALSO PRESENT:
15     MR. MARTIN O. LONG
16
17
18
19
20
21
22
23

### RICKY WARE

1      I, STACEY L. JOHNSON, a CSR of Montgomery,

2   Alabama, and Notary Public for the State of

3   Alabama at Large, acting as Commissioner,

4   certify that on this date, as provided by the

5   Federal Rules of Civil Procedure and the

6   foregoing stipulation of counsel, there came

7   before me at 250 Commerce Street, Suite 100,

8   Montgomery, Alabama, beginning at 3:09 p.m.,

9   RICKY WARE, witness in the above cause, for oral

10   examination, whereupon the following proceedings

11   were had:

12                    RICKY WARE,

13   the witness, after having been first duly sworn

14   to speak the truth, the whole truth, and nothing

15   but the truth, testified as follows:

16                    EXAMINATION

17   BY MR. NEWMAN:

18      Q    You are Ricky Ware; right?

19      A    Yes.

20      Q    And, Ricky, my name is Jim Newman, and

21   I'll be asking you some questions today.  It

22   shouldn't be long.

23      A    Okay.

**RICKY WARE**

1    time to time.

2         Q      Okay.

3         A      You know, I think I met him like once

4    or twice.

5         Q      Were you aware whether Martin and

6    Valerie had ever gone to the Atlanta area before

7    to visit Donald?

8         A      No, I don't think so.  I don't think

9    so.

10        Q      You don't know one way or another?

11        A      No.

12        Q      You don't know?

13        A      I don't think so.  I don't think they

14   ever went over there.

15        Q      Had you ever gone over --

16        A      Right.

17        Q      -- to Atlanta with Valerie and Martin

18   to visit Donald?

19        A      I think this was --

20        Q      Before this one time?

21        A      No.  I think it was our first time.

22   Was it our first time?  I think it was our first

23   time.  It was our first time going.  It was our

**RICKY WARE**

1   first time.  Right.

2       Q     Okay.  You don't remember ever going

3   over there before and staying at Donald's house?

4       A     Not with Martin.  Me and Felicia stayed

5   at my brother's house several times.

6       Q     How about with Martin and --

7       A     No.

8       Q     -- Valerie?

9       A     No.

10      Q     Okay.  So your recollection is that you

11  and Martin had never been in the Atlanta area

12  together with Donald before?

13      A     Correct.

14      Q     Okay.  This was the only time?

15      A     Only time.  I had to think about it for

16  a minute.

17      Q     Okay.  But you and Felicia had been

18  over there?

19      A     Right.  Several times.

20      Q     And stayed with Donald?

21      A     Stayed with Donald, hotel room.

22  Several times.

23      Q     Now, on this particular occasion, y'all

**RICKY WARE**

1               C E R T I F I C A T E

2

3    STATE OF ALABAMA        )

4

5    COUNTY OF MONTGOMERY )

6

7

8         I hereby certify that the above and

9    foregoing deposition was taken down by me in

10   stenotype, and the questions and answers thereto

11   were transcribed by means of computer-aided

12   transcription, and that the foregoing represents

13   a true and accurate transcript of the testimony

14   given by said witness upon said hearing.

15        I further certify that I am neither of

16   counsel, nor kin to the parties to the action,

17   nor am I in anywise interested in the result of

18   said cause.

19

20

21        _____

21        STACEY L. JOHNSON, Certified

22        Shorthand Reporter and

22        Commissioner for the State of

23        Alabama at Large.

**FELICIA FLOWERS**

EXHIBIT
tabbies
K

1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE MIDDLE DISTRICT OF ALABAMA

3   NORTHERN DIVISION

4   CASE NO.: 2:06cv816-MHT

5

6   MARTIN O. LONG,                    ORIGINAL

7           Plaintiff,

8               V.

9   STATE FARM FIRE AND CASUALTY COMPANY,

10          Defendants.

11

12

13   S T I P U L A T I O N S

14

15

16      IT IS STIPULATED AND AGREED by and

17   between the parties, through their respective

18   counsel, that the deposition of FELICIA FLOWERS

19   may be taken before STACEY L. JOHNSON,

20   Commissioner, at the Offices of Beers, Anderson,

21   Jackson, Patty, Van Heest & Fawal, 250 Commerce

22   Street, Suite 100, Montgomery, Alabama, on the

23   27th day of March, 2007.

2

**FELICIA FLOWERS**

1    IT IS FURTHER STIPULATED AND AGREED

2  that the signature to and the reading of the

3  deposition by the witness is hereby waived, the

4  deposition to have the same force and effect as

5  if full compliance had been had with all laws

6  and rules of Court relating to the taking of

7  depositions.

8    IT IS FURTHER STIPULATED AND AGREED

9  that it shall not be necessary for any

10  objections to be made by counsel to any

11  questions except as to form or leading

12  questions, and that counsel for the parties may

13  make objections and assign grounds at the time

14  of trial, or at the time said deposition is

15  offered in evidence, or prior thereto.

16    IT IS FURTHER STIPULATED AND AGREED

17  that the notice of filing of the deposition by

18  the Commissioner is waived.

19

20

21

22

23

3

**FELICIA FLOWERS**

1                        INDEX

2   EXAMINATION BY:                    PAGE NUMBER:

3   Mr. Newman................................5-34

4

5   EXHIBITS:

6   There were no exhibits marked to this

7   deposition.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

4

**FELICIA FLOWERS**

```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF, MARTIN O. LONG:
 3        BURGE & BURGE
 3        F. Tucker Burge
 4        2001 Park Place North
 4        Suite 850
 5        Birmingham, Alabama   35203
 5
 6
 7   FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY
 8   COMPANY:
 9        HELMSING, LEACH, HERLONG, NEWMAN & ROUSE
 9        James B. Newman
10        (NEWMJ8049)
10        jbn@helmsinglaw.com
11        150 Government Street
11        Suite 2000
12        Mobile, Alabama   36602
12        (251) 432-5521
13
14
15
16
17
18
19
20
21
22
23
```

**FELICIA FLOWERS**

1    I, STACEY L. JOHNSON, a CSR of Montgomery,

2  Alabama, and Notary Public for the State of

3  Alabama at Large, acting as Commissioner,

4  certify that on this date, as provided by the

5  Federal Rules of Civil Procedure and the

6  foregoing stipulation of counsel, there came

7  before me at 250 Commerce Street, Suite 100,

8  Montgomery, Alabama, beginning at 9:57 a.m.,

9  FELICIA FLOWERS, witness in the above cause, for

10  oral examination, whereupon the following

11  proceedings were had:

12                FELICIA FLOWERS,

13  the witness, after having been first duly sworn

14  to speak the truth, the whole truth, and nothing

15  but the truth, testified as follows:

16                EXAMINATION

17  BY MR. NEWMAN:

18    Q    Ms. Flowers, my name is Jim Newman, and

19  I represent the insurance company.  Mr. Burge

20  represents Martin Long.  And I'm going to be

21  asking you some questions today, and if you

22  don't understand my question, stop me and ask me

23  to rephrase any questions you don't understand.

**FELICIA FLOWERS**

1  apartments before then.  We stayed there

2  sometimes.  It wasn't until we all took the trip

3  together that we stayed in the hotel.

4      Q    Okay.

5      A    So that was really our first time

6  staying in a hotel.

7      Q    Had you ever been to see Donald with

8  Martin and Valerie?

9      A    No.

10     Q    This was the first time?

11     A    Yes.

12     Q    Never done it before?

13     A    Never.

14     Q    Okay.  How long in advance had y'all

15  planned to go over there?

16     A    Maybe a month.  I mean, I really --

17  it's -- to be honest with you, it's been some

18  time ago, so I can't really give you an accurate

19  time.

20     Q    When you went over there, did you take

21  three cars?

22     A    Yes.

23     Q    And you were in the car with Ricky?

35

**FELICIA FLOWERS**

1                    C E R T I F I C A T E

2

3   STATE OF ALABAMA        )

4

5   COUNTY OF MONTGOMERY )

6

7

8           I hereby certify that the above and

9   foregoing deposition was taken down by me in

10  stenotype, and the questions and answers thereto

11  were transcribed by means of computer-aided

12  transcription, and that the foregoing represents

13  a true and accurate transcript of the testimony

14  given by said witness upon said hearing.

15          I further certify that I am neither of

16  counsel, nor kin to the parties to the action,

17  nor am I in anywise interested in the result of

18  said cause.

19

20

21  ------------------------------------

21           STACEY L. JOHNSON, Certified

22           Shorthand Reporter and

22           Commissioner for the State of

23           Alabama at Large.

EXHIBIT

L

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4    CASE NO.: 2:06cv816-MHT

5                                    **ORIGINAL**

6    MARTIN O. LONG,

7         Plaintiff,

8         V.

9    STATE FARM FIRE AND CASUALTY COMPANY,

10        Defendants.

11

12

13    S T I P U L A T I O N S

14

15

16         IT IS STIPULATED AND AGREED by and

17    between the parties, through their respective

18    counsel, that the deposition of SANDY WARE may

19    be taken before STACEY L. JOHNSON, Commissioner,

20    at the Offices of Beers, Anderson, Jackson,

21    Patty, Van Heest & Fawal, 250 Commerce Street,

22    Suite 100, Montgomery, Alabama, on the 27th day

23    of March, 2007.

**SANDY WARE**

1    IT IS FURTHER STIPULATED AND AGREED

2  that the signature to and the reading of the

3  deposition by the witness is hereby waived, the

4  deposition to have the same force and effect as

5  if full compliance had been had with all laws

6  and rules of Court relating to the taking of

7  depositions.

8    IT IS FURTHER STIPULATED AND AGREED

9  that it shall not be necessary for any

10  objections to be made by counsel to any

11  questions except as to form or leading

12  questions, and that counsel for the parties may

13  make objections and assign grounds at the time

14  of trial, or at the time said deposition is

15  offered in evidence, or prior thereto.

16    IT IS FURTHER STIPULATED AND AGREED

17  that the notice of filing of the deposition by

18  the Commissioner is waived.

19

20

21

22

23

**SANDY WARE**

```
1                        INDEX

2    EXAMINATION BY:                    PAGE NUMBER:

3    Mr. Newman.................................5-30

4    Mr. Burge...................................30

5

6    EXHIBITS:

7    There were no exhibits marked to this

8    deposition.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

**SANDY WARE**

```
1              A P P E A R A N C E S
2   FOR THE PLAINTIFF, MARTIN O. LONG:
3        BURGE & BURGE
3        F. Tucker Burge
4        2001 Park Place North
4        Suite 850
5        Birmingham, Alabama   35203
5
6
7   FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY
8   COMPANY:
9        HELMSING, LEACH, HERLONG, NEWMAN & ROUSE
9        James B. Newman
10       (NEWMJ8049)
10       jbn@helmsinglaw.com
11       150 Government Street
11       Suite 2000
12       Mobile, Alabama   36602
12       (251) 432-5521
13
14
15
16
17
18
19
20
21
22
23
```

**SANDY WARE**

1      I, STACEY L. JOHNSON, a CSR of Montgomery,

2  Alabama, and Notary Public for the State of

3  Alabama at Large, acting as Commissioner,

4  certify that on this date, as provided by the

5  Federal Rules of Civil Procedure and the

6  foregoing stipulation of counsel, there came

7  before me at 250 Commerce Street, Suite 100,

8  Montgomery, Alabama, beginning at 3:56 p.m.,

9  SANDY WARE, witness in the above cause, for oral

10  examination, whereupon the following proceedings

11  were had:

12          SANDY WARE,

13  the witness, after having been first duly sworn

14  to speak the truth, the whole truth, and nothing

15  but the truth, testified as follows:

16          EXAMINATION

17  BY MR. NEWMAN:

18      Q    State your name, please.

19      A    Sandy Maurice Ware.

20      Q    And are you married?

21      A    No, I'm not.

22      Q    How old are you?

23      A    34.

**SANDY WARE**

1      A    No.  I worked with Haynes and also I

2    worked with Care.  I was working two ambulance

3    services in Montgomery.

4      Q    Haynes is an ambulance service?

5      A    Yes.  Haynes Ambulance Service and also

6    Care Ambulance Service.

7      Q    Okay.  And they're both private?

8      A    Private owned.

9      Q    Okay.  All right.  Let me see if we can

10   get back.  February 2005 is when this incident

11   occurred when the Corvette -- with the Corvette

12   and Martin Long in Lithonia, Georgia.

13     A    Okay.

14     Q    That was February 19th, 20th, and

15   21st.

16     A    Okay.

17     Q    Friday, Saturday, and Sunday.

18     A    Okay.

19     Q    And I'm going to ask you some questions

20   about that weekend.  All right.  I want to start

21   by asking you before that weekend did you

22   ever -- had you ever met Martin Long.

23     A    Yes.

**SANDY WARE**

1    Q    Had you ever gone anywhere with him?

2    A    I don't think we went anywhere.  I

3    can't remember.  I don't think I ever went

4    anywhere.

5    Q    How did you know him?

6    A    I met him through my sister.

7    Q    Okay.  And had you actually talked to

8    him face to face or was it over the telephone

9    that you talked?

10   A    I talked to him face to face.

11   Q    Where?

12   A    I want to say at my sister's job.

13   Q    Okay.

14   A    I was up there visiting her and he came

15   and brought her lunch or something.

16   Q    Were you aware at the time that y'all

17   went over to Lithonia, Georgia that he had just

18   had a large settlement from an injury that he

19   had had?

20   A    Not at the time, I didn't.

21   Q    At the time, you did not?

22   A    Not at the time.

23   Q    Do you recall how long -- this may be

**SANDY WARE**

1                C E R T I F I C A T E

2

3    STATE OF ALABAMA        )

4

5    COUNTY OF MONTGOMERY )

6

7

8         I hereby certify that the above and

9    foregoing deposition was taken down by me in

10   stenotype, and the questions and answers thereto

11   were transcribed by means of computer-aided

12   transcription, and that the foregoing represents

13   a true and accurate transcript of the testimony

14   given by said witness upon said hearing.

15        I further certify that I am neither of

16   counsel, nor kin to the parties to the action,

17   nor am I in anywise interested in the result of

18   said cause.

19

20

21   ----------------------------------------

21        STACEY L. JOHNSON, Certified

22        Shorthand Reporter and

22        Commissioner for the State of

23        Alabama at Large.



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MARTIN O. LONG, | * | |
| Plaintiff, | * | |
| vs. | * | Case Number:  2:06cv816-MHT |
| STATE FARM FIRE AND CASUALTY COMPANY, | * | |
| | * | |
| Defendant. | | |

## DECLARATION OF TONY NIX

I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.      My name is Tony Nix.  I am a citizen of the State of Georgia, am over nineteen years of age, and have personal knowledge of the matters contained in this declaration.

2.      I am a Claim Team Manager with the Special Investigations Unit of State Farm Fire and Casualty Company.

3.      I am familiar with how State Farm's records, including claim files, are made and kept by State Farm.

4.      Attached as Exhibit "1" to this declaration are true and correct copies of excerpts of the State Farm claim files for Claim No. 01-6596-564 and Claim No. 01-Q177-057.  Both claims were made by Martin Long and involved the alleged theft of his 2000 Chevrolet Corvette.

1

5.     The excerpts referred to above were made at or near the time of the occurrence of the subjects of the excerpts by persons with knowledge of these matters. These records are kept by State Farm in the course of regularly conducted business and it is the regular practice of State Farm to make these records.

I am making this declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 in Decatur, Georgia this _____ day of March, 2007.

TONY NIX

#131651

2

date: 08-25-06                                                    page:   1

STATE FARM FIRE AND CASUALTY COMPANY

# AUTO CLAIM SERVICE RECORD - FULL

EXHIBIT M·1

date of loss
02-19-05

claim number
01-6596-564

policy number                          car no.
0886-750-01                            001

| primary claim rep: | Smith, Todd | | |
| phone: 770-593-6570 | primary unit: 41 | primary office: ALMSSIUA |

## NAMED INSURED

Named Insured

| name: | LONG, MARTIN | | |
| street: | 2752 Caroline Dr. | | age: 36 |
| city: | Millbrook | state/prov: AL   zip/postal: 36054 | dob: 08-13-1968 |
| phone: home: | 334-290-0344 ext: | cell: 334-202-9599 | ext: |
| contact: | | contact: | |
| lang of choice: | Unknown | hearing impaired: | |
| ssn or tin: | 420154502 | occupation: | sex: M |
| deceased: | dod: | minor: N   named ins child: | parent/guardn: |
| driver license: | 5415781 | | |

## INSURED VEHICLE

| vehicle | year | make | | model | | body style |
| 01 | 2000 | CHEVROLET | | CORVETTE | | 2DR |

| vehicle identification number | license number | state/prov | lienholder |
| 1YY22G9Y5132554 | | AL | |

| prior damage: | | involved in loss: Y |

occupant type: PARKED & UNOCCPD
principal damage: Seats,T-tops & ctr caps missing, ignition & col damaged

| driveable: N | drive-in service: N | drive-in office: |
| total loss: N | total loss type: | - |

vehicle location: Verastar South, Conf # 10503619

## FACTS

V1 WAS STOLEN FROM THE HOTEL DURING THE NIGHT OR EARLY THIS MORNING. POWER
CALL: INSURED IS 200 MILES AWAY FROM HOME AND WILL NEED A RENTAL.

| date and time of loss: | 02-19-05 08:15 AM | | |
| location of loss: | Country Hearth, 5400 Fairington Rd | | |
| city: | LITHONIA | state/prov: GA | zip/postal: |

| police report made: Y | department reported: Dekalb County PD |
| report number: 05-023612 | date/time reported: 02-19-05 |
| insured violation: | violation type: |
| claimant violation: | violation type: |
| theft recovered: | date recovered: |
| who recovered: | where recovered: |

Long/State Farm
SF1 00002

# AUTO CLAIM COMMITTEE REPORT

| | |
|---|---|
| Preparer's State Code: 01 | Rehearing  ☐ Yes  X No |
| Prepared by: Tony Nix | Rehearing Number: |
| Claim #: 01-6596-564     Pol #1: | Date of Last Hearing: |
| Claim #:     Pol #2: | |
| Claim #:     Pol #3: | |
| Named Insured: Martin Long | |
| Address: 2752 Caroline Dr. | |
| City: Millbrook | |
| State/Zip: AL, 36054 | Agent: Mike Devers     Code: 01-1973 |

**Policy #1**

Policy No: 0886-750-01
Coverage and Limits
A 100/300/50, C 5,000, D500, G500, H, U 20/40

Policy Form No: 9811A

Appl. Endors. Numbers: 6082 AJ.1
Coverage Involved: D500 (331)
Present Reserve: 27,500.00
Prior Reserve: 5,000.00

Date Set: 05-11-05
Date Set: 02-19-05

**SECTION MANAGER'S RECOMMENDATION:**

I.    Questions:

Has the insured failed to cooperate with us by virtue of providing false and conflicting information, has there been direct and accidental loss of or Damage to property covered as defined in Section IV – Physical Damage Coverages, and has the insured concealed and misrepresented information material to the claim?

II.    Issues:

Our investigation has revealed that a loss as defined in Section IV - Physical Damage Coverages of the policy has not occurred and the insured concealed and misrepresented information material to the claim.

III.    Recommendation:

Deny the claim to the insured as the damage was not caused by a loss as defined in Section IV – Physical Damage Coverages and due to material misrepresentations made during the presentation of the claim.

Date of Decision: June 22, 2005
Present: Jeff Crow, David Fisher,
Jon Hatch, Tony Nix, Lloyd Renfrow, Logan Smith,
Nancy Stevens, Brett Suiter

Return file copy? ☐ Yes  ☒ No
Chairperson (E-Mail alias): David Thomas (BLVB)
Chairperson Phone #: 770-418-5936

Long/State Farm
SF1  00059

## STATEMENT OF FACTS

Date of Loss: February 19, 2005                    Time: Approximately 7:00 a.m.

Location of Loss: Country Hearth Inn, 5400 Fairington Rd, Lithonia, GA.

Include the following information:

A)   Described vehicle for each policy involved.
     2000 Chevrolet Corvette, VIN 1G1YY22G9Y5132554.

B)   Vehicle involved in loss.
     As described above.

C)   Driver of vehicle involved.
     Unknown.

D)   Brief statement of facts of loss.
     According to Mr. Long, on Friday, February 18, 2005, he drove the insured vehicle to Lithonia, GA in order to relax for the weekend. He stayed at a Country Hearth Inn located off I-20 in Lithonia, GA. On Saturday morning, February 19, 2005, at approximately 7:00 a.m., the insured discovered his vehicle missing from the parking lot. He called the Dekalb County Police Department and reported the theft of his vehicle.

     On February 25, 2005, the insured vehicle was recovered, partially stripped and abandoned near an apartment complex in Decatur, GA.

## DESCRIPTION OF CLAIMS

List separately EACH Insured involved in the loss and provide all available information regardless of the status of that claim. Include as a minimum on Injury Claims:

A)   Identifying information on the insured (Age, employment, marital status, position in vehicle).
     Martin O. Long was born August 13, 1968 and is thirty six (36) years old. He has been unemployed since he was injured on the job at CSX Transportation in March 2003. A settlement in the amount of $256,000.00 was reached with CSX Transportation in January 2005. Mr. Long received $175,568.99 after attorney fees and expenses. Mr. Long was previously in the Army for approximately ten and a half (10 ½ ) years. In 1992, at a rank of E5, Mr. Long received an honorable discharge from the Army due to an injury he received parachuting out of a plane. He currently receives $1,140.00 a month in disability benefits from the Army.

     Mr. Long is currently separated from his wife, Evelyn Long, who resides at 1705 Deatsville Hwy, Millbrook, AL. Mrs. Long is employed with the State of Alabama in the Department of Human Resources. Mr. Long and Mrs. Long confirmed they have filed for divorce, but the agreement has not been finalized.

     Mr. Long has no children and/or dependents.

B)   Detailed description of injuries and treatment.
     N/A.

C)   Discussion of impairment.
     N/A.

D)   Description and analysis of all damages.

Long/State Farm
SF1   00060

The insured vehicle was recovered with the following damages and/or parts missing: The front bumper cover was damaged; the removable top and/or roof panel was missing; the front seats were missing; the wheels and tires were removed and replaced with another set; the passenger side window had been knocked out; scratches and minor damage to the interior upholstery; all over exterior scratches to the body; the exterior portion of the ignition lock cylinder was damaged; the cover around the column was loose; and finally, while sitting at the recovering wrecker service, the vehicle sat through a snow and ice storm completely soaking the interior. As a result, the vehicle was determined to be a total loss. CR Todd Smith requested an NADA valuation on the described vehicle and it reflects a base value of $24,900.00. When considering tax and fees, the actual cash value of the insured vehicle is $25,789.50 less the $500.00 deductible.

Mr. Long purchased the insured vehicle on February 4, 2005, for approximately $25,000.00 cash; therefore, there is no lien on the insured vehicle. A copy of the certificate of title was secured from the insured.

Mr. Long secured a rental vehicle from Enterprise RAC in Georgia the weekend of the alleged theft. He currently remains in the rental.

E)   Current demand and offers (specify if a time limit demand is involved).
      Affidavit of Vehicle Theft submitted by the insured indicates that he is making claim for $25,000.00."

F)   Current evaluation and range of values.
      The actual cash value of the insured vehicle less the applicable deductible is $25,289.50.

1.   Any convictions or pleas?
      None.

2.   If claim in suit, when and where filed? Trial Date? Does Excess Assurance Protection (EAP) apply? ☐Yes  x No
      Date EAP Letter Sent?

3.   Other car insured? ☐Yes ☐No    Limits           Company

4.   Is there an umbrella policy or excess policy in existence? (**Note: Both the Agent and the Insured must be contacted**.) ☐Yes  x No
      If so, list name of carrier and advise date they were notified.

5.   Name of insured's attorney.
      On May 24, 2005, we received notice of representation from attorney  F. Tucker Burge with Burge and Burge in Birmingham, AL.

7.   Name of our claim representative and recommendation.
      SIU CR Todd Smith recommends we deny the insured's claim.

8.   Recommendation of Claim Team Manager.
      Tony Nix recommends we deny the insured's claim.

9.   Unusual conditions affecting trial or verdict.
      N/A.

10.  Non-Waiver obtained? ☐Yes  X No

11.  Reservation of Rights Letter Sent? X Yes  ☐No

12.  From whom, or to whom? Date? Reason?

Long/State Farm
SF1  00061

A Reservation of Rights letter was mailed to Mr. Long on March 4, 2005 with the following reason noted:

"It is questionable whether there has been direct and accidental loss of or Damage to property covered by the Physical Damage Coverages of the policy."

13. Issues (if needed to determine coverage, attach application file and coverage record, and copies of any pertinent endorsements.) When applicable, the following sub-headings should be covered:

A) Question

1. Has the insured failed to cooperate with us by providing false and conflicting information?

2. Has there been direct and accidental loss of or damage to property covered as defined in Section IV – Physical Damage Coverages?

3. Has the insured misrepresented information material to the claim?

B) Policy Language.

### REPORTING A CLAIM – INSURED'S DUTIES

…

5. **Insured's Duty to Cooperate with Us**

b. The **insured** shall cooperate with us and , when asked, assist us in:
…

(2) securing and giving evidence;

…

### SECTION IV – PHYSICAL DAMAGE COVERAGES

**Loss** – means, when used in this section, each direct and accidental loss of or damage to:

1. **your car**;
…

### CONDITIONS

…

9. **Concealment or Fraud**

There is no coverage under this policy if **you** or any other **person** insured under this policy has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy.

Long/State Farm
SF1   00062

C) Evidence.

Prior to the referral to SIU, the following indicators and/or questions were recognized by the line unit:

- In February 2005, the insured filed a claim under number 01-6596-758 where he was involved in an exchange of gunfire with another person. This claim was referred to SIU.
- Insured is unemployed.
- Insured claimed a large amount of expensive items stolen from his vehicle. Specifically, he filed a homeowner's claim under number 01-Q177-057, which was also referred to SIU.
- Insured has had a high frequency of claims.
- Insured is currently disabled.
- Insured vehicle was recently purchased.
- Loss on New Business (policy inception date was February 4, 2005).
- Insured has recent or current marital problems.
- Line unit indicated there was a delay and/or no report made to the police.

Upon referral to SIU, CR Todd Smith researched NICB On-line and found the insured vehicle was entered on NCIC as an active, stolen vehicle contrary to what the original referral to SIU indicated. On February 28, 2005, Todd spoke with a Detective in the Dekalb County Police Department's Auto Theft Unit and confirmed the vehicle was reported stolen on the date of loss. While discussing the case, the detective indicated the vehicle was recovered on Friday, February 25, 2005 abandoned in Decatur, GA. CR Smith called the insured and notified him of the recovery.

On February 28, 2005, Todd secured copies of the initial theft and recovery reports. Upon review, it was noted that the insured vehicle was recovered near an apartment complex less than ten (10) miles from the theft site. Also, the initial theft report failed to document any personal items stolen along with the described vehicle.

On March 1, CR Smith inspected the insured vehicle at Top Cat Towing in Lithonia, GA. At that time, he observed the damages as previously documented in this report. Even though there was minor damage to the column and exterior damage to the ignition lock cylinder, the steering wheel was in the locked position. He verified that the insured called Top Cat and gave them permission for State Farm to secure his vehicle. After the initial vehicle inspection, CR Smith spoke briefly with Mr. Long regarding the vehicle recovery and condition. Mr. Long advised Mr. Smith that he did not want the vehicle back after it had been stolen.

CR Smith conducted data research and secured documentation supporting Mr. Long's recent workers compensation case filed against CSX Transportation Railroad. Also, he secured documentation supporting a separate civil case Mr. Long filed against a man named Bobby Long in 2004.

Todd Smith met with Mr. Long in Montgomery, AL and secured his recorded statement regarding this claim. At that time, CR Smith gave Mr. Long an Affidavit of Vehicle Theft for his completion. As for the facts of the loss, Mr. Long stated he went to the Atlanta area Friday evening February 18, 2005, in order to get away and relax. He said he stayed at the same hotel four or five months ago. He could not recall the exact time he checked into the hotel, but thought it was possibly 10:00 or 11:00 a.m. Mr. Long claimed he went to the Atlanta area alone and just stopped off the interstate and got a room. CR Smith specifically asked him who he went with and he replied "just me." CR Smith questioned if a female was with him and he continued to claim he was by himself. He said he parked the insured vehicle directly in front of a door and/or entrance to the hotel with a surveillance camera nearby. He indicated he locked his vehicle and did not leave any keys inside the passenger compartment. On Saturday morning, February 19, 2005, at approximately 7:00 a.m., he discovered his vehicle missing. When asked why he was leaving the hotel at this time in the morning and he replied, "probably to get something to eat." Mr. Long observed glass in the parking lot next to where his vehicle was parked. After the discovery of his missing vehicle, he asked the hotel manager to review the camera and was told that it was not on. The insured called the local police and reported the theft. Mr. Long indicated the theft seemed like it was a set up and he believed the hotel manager had something to do with

it. Mr. Long admitted he cussed out the hotel manager during the course of their conversation regarding the fact that the surveillance camera was not on.

As for the keys to the insured vehicle, Mr. Long confirmed receiving two (2) sets of keys when he purchased it on February 4, 2005. He gave CR Smith one set but indicated that he did not know where the second set was located. Specifically, he said "I'm thinking I must have either left them in the car or somewhere. I don't know where the other set of keys are at." He confirmed the set of keys he provided State Farm was in his possession at the time of the alleged theft.

Mr. Long claimed he had a large amount of personal items in the vehicle at the time of the alleged theft. These items included the following: a 45 caliber handgun; a black leather jacket; $5,000.00 cash; three (3) suits and two (2) pant suits; four (4) pairs of shoes; four (4) bracelets; three (3) rings; one (1) portable DVD player; and, a watch. CR Smith asked Mr. Long if he told the police about everything in his vehicle when he reported the theft and he admitted he did not. However, he indicated that a lady with the police department told him to wait and call back with everything in the vehicle and complete an additional information form. A supplemental narrative was added to the original theft report on March 2, 2005. At that time, the insured listed the personal items allegedly stolen from his vehicle. Mr. Long filed a separate claim under his homeowner's policy for the items reported as stolen.

During Mr. Long's recorded statement, CR Smith questioned him regarding his financial situation. Mr. Long admitted he recently settled a worker's compensation claim against CSX Transportation Railroad for $256,000.00, of which he received approximately $175,000.00. Also, he indicated that he currently receives approximately $1,100.00 per month in disability benefits from the Army and these payments are his main source of income. Mr. Long acknowledged that he was having financial problems before he settled his worker's compensation claim. Upon receiving the settlement, he used a majority of the money to pay bills. These bills included approximately $50,000.00 in credit card debt, $43,000.00 for his wife's student loan and $25,000.00 was used to purchase the insured vehicle. He stated that he only had $5,000.00 left out of his settlement proceeds.

In addition to the described vehicle, the insured owns a Ford Mustang. As result of the insured being declared disabled from his employment with CSX Transportation Railroad, a disability benefit included in the finance agreement pays the remaining monthly payments on the vehicle. Thus, the insured is no longer obligated to make that monthly note.

Mr. Long previously filed a catastrophe hail claim in April 2003 regarding damage sustained to his home. As a result, he received payment in the amount of $2,873.41. The policy notes on the Claim Service Record under claim number 01-Q177-057 reflect that the repairs were not made to the insured's home as he needed the money to pay his bills. Also, it states that he was expecting to go to court on January 31, 2005 to get compensation for an injury he received on the job. As of December 2004, no repairs had been made to the home. This information reflects that Mr. Long was having financial problems prior to the theft alleged theft.

Mr. Long was questioned about his recent auto claim which was filed February 13, 2005, under claim number 01-6596-758. He indicated that he was involved in an exchange of gun fire while driving his Ford Mustang in Millbrook, AL. Mr. Long admitted he accidentally shot his own vehicle after another person started shooting at him. As a result, State Farm paid $3,363.80 for the damages. A copy of the incident report referencing this claim was secured from the Millbrook, AL Police Department. In addition, Mr. Long acknowledged that he had another Chevrolet Corvette stolen from his residence five (5) or six (6) years ago. As a part of this investigation, CR Smith researched frequency tracking, NICB data base, ISO data base, and interviewed the State Farm Agent. He could not locate any record of a previous claim involving a corvette.

On March 8, 2005, Mike Bresnock with Transportation Technology inspected the insured vehicle at Verastar South in Forest Park, GA. CR Smith met Mr. Bresnock at Verastar and gave him the key and keyless remote provided by our insured in order to assist with his inspection. The key functioned satisfactorily on the driver's side door lock, enabling it to open and lock with no irregularities. Mr. Bresnock's first attempt to start the vehicle using the key provided by Mr. Long was unsuccessful. After inspecting the pellet reader, Mr.

Long/State Farm
SF1   00064

Bresnock was of the opinion that the pellet reader was simply mis-positioned which prevented the ignition key from rotating the ignition cylinder to the start position. When the pellet reader was properly positioned, the engine was able to start and run. While the engine was in operation the following messages appeared: low brake fluid, service traction sys, service active hndlg, and, brake before shift. The odometer reflected that the mileage on the insured vehicle was 71,064.

Mr. Bresnock then located the theft deterrent relay located on the passenger side floor surface. A visual inspection of the relay provided no evidence to indicate that it had been altered in anyway to enable the engine to be started without the correct key. After completing the ignition system and theft deterrent system test, it was Mr. Bresnock's opinion that the vehicle had not been started and operated without the correct ignition key. Also, Mr. Bresnock noted some marks on the rubber sections of the passenger side window weather stripping and the roof panel weather stripping. These areas may have been subjected to a sharp object which enabled access to the interior. Mr. Bresnock noted the glass breakage and missing parts as previously indicated in this report.

On June 22, 2005, Mr. Bresnock re-inspected the vehicle to conduct follow-up tests. He advised that the results of that testing did not change the opinion that had been previously communicated to State Farm.

In conclusion, Mr. Bresnock noted "the insured vehicle was equipped with the General Motors Pass Key System, which is a subsystem of the body control module. The body control module provides all of the logic to operate the pass key system. The body computer uses input information from other systems and components to determine the status of the pass key. The body computer controls its output functions based on the status of the pass key. The pass key fuel enable function is provided by the power control module. When the correct pass key is inserted into the ignition key lock, the key reader transfers the pellet information to the body computer. The body computer in turn signals the power train control module to enable or disable fuel injection in order for the engine to run. The ignition cylinder and key used by the pass key system is supplemented by a pellet reader to determine if the correct key is being used to start the vehicle. When the ignition is first turned on, the body control module measures the value of the key through the sensing contacts located on the pellet reader. The theft deterrent relay is part of the pass key system and can disable engine cranking through the theft deterrent relay. When the body control module detects the correct pass key, the body computer allows the engine to be cranked and simultaneously instructs the power train control module to enable fuel injection. Inspections and tests conducted on this vehicle provided no evidence to indicate that any of these systems had been by-passed to enable the vehicle to be started and driven without the use of the correct ignition key. In consideration of the tests and inspections along with the summary of this vehicle's theft control system it is Mr. Bresnock's opinion that this vehicle was not operated without the correct ignition key.

Mr. Long claimed his vehicle was equipped with a factory alarm system. He testified that his vehicle was locked and the alarm system was engaged. Mr. Bresnock completed an addendum to his original report addressing the alarm system on the insured vehicle. He indicated the 2000 Chevrolet Corvette was equipped with UTD (Universal Theft Deterrent System) in addition to the Pass Key theft deterrent system. The UTD and Pass Key security systems were standard equipment for the 2000 Chevrolet Corvette. The UTD system monitors the following through the BCM (Body Control Module): Driver & Passenger door ajar switches, courtesy switch, ignition switch (for an incorrect key), hood ajar switch, parking headlamp switch and power door lock switches. If the BCM senses an intrusion in any of the above, it enters the alarm mode, which consists of the horn sounding, the lights flashing, and the cranking and fuel are disabled.

Mr. Long testified that he received two (2) sets of keys when he purchased the vehicle only two (2) weeks before the alleged theft. At the time of the alleged loss, he only had one (1) set of keys with him. He provided this set to CR Todd Smith. He also identified this set of keys at his EUO and testified he recognized them as his key. Mr. Long testified that he does not know the location of the second set of keys. After Mr. Bresnock's inspection on March 8, 2005, Mr. Smith spoke with Mr. Long and discussed the key issue. Specifically, he addressed Mr. Long's inability to account for the second set of keys. At that time, Mr. Long got very angry. Once again, during Mr. Long's recorded statement, he could not explain where the other set of keys were located. He suggested they may have been left in the insured vehicle or somewhere? However, in his EUO, he testified that he did not give the second set of keys to anyone and

that they were not in the insured vehicle on the date of loss. Mr. Long testified that he had tried to look for the keys but was unable to locate them.

On March 4, 2005, Todd Smith met with Ram Naidu, shift manager at the Country Hearth Inn in Lithonia, and secured his recorded statement. He confirmed working Friday night, February 18, 2005 until Saturday morning, February 19, 2005. He said his shift did not start until after 8:00 p.m. and Mr. Long had already checked in prior to his shift starting. On Saturday morning, at approximately 7:00 a.m., he recalled Mr. Long came down into the lobby, walked outside and came back inside to report his vehicle stolen. Mr. Naidu confirmed sitting in the lobby with a friend that night and he recalled last seeing the insured vehicle between 2:30 a.m. and 3:00 a.m. He said Mr. Long asked him about the surveillance camera; however, he did not want to tell him that it was not working. Specifically, he indicated their computer that controlled the camera crashed a week before the alleged loss. He provided Mr. Long with the hotel manager's business card and recommended he follow up with his supervisor. Mr. Naidu said the insured made a couple of calls and approximately 15 to 20 minutes later, two of his friend's showed up in the lobby area. In addition to the two men, he said Mr. Long was accompanied by a woman. He overheard the two men and Mr. Long having a conversation. One of the men told Mr. Long to say that he had a suitcase in the car. Mr. Naidu understood the conversation to mean that Mr. Long should make up items which were in the car when the theft occurred in order to claim these on insurance. He also confirmed seeing glass in the parking lot and thought it was strange that the alarm did not go off if someone smashed the glass. He added he was sure he would have heard the alarm if it went off. Mr. Naidu indicated that the parking lot was well lit and he was surprised that the car was stolen. Mr. Naidu had no knowledge of any other vehicles being stolen from their location.

Based on the indicators present and the questions raised during the course of our investigation, we referred the matter to Attorney Angela Taylor to secure Mr. Long's EUO. On March 31, 2005, Mr. Long submitted to an EUO and provided all the requested documents in connection with the matter. During his testimony, he changed his story regarding the alleged facts of the loss. He testified that he and a lady friend named Valerie went to the Atlanta area the weekend of the alleged theft. He initially testified that he did not know Valerie's last name and he thought she lived somewhere in the Montgomery, AL area. We later learned she worked at the Doctor's office in Montgomery, AL that treated Mr. Long after his injury at CSX. Upon review of his cellular phone records, we noticed his account was actually under the name of Valerie Ware. Mr. Long confirmed Valerie purchased the phone for him, but he continued to act as if he wasn't sure of her last name. He testified that two of Valerie's brother's named Ricky and Sandy and two of their girlfriends followed them to the Atlanta area that weekend. He indicated the purpose of their trip was to relax. He said they arrived at the hotel in Lithonia on Friday, February 18, 2005 around 9:00 or 10:00 p.m. and this was the last time he saw his vehicle. The next morning, around 7:00 a.m., Ricky's girlfriend knocked on his door and asked about his vehicle. He claims she had gone to the Wal-Mart, which is located across the street earlier that morning and noticed the vehicle was gone when she returned. At that time, Mr. Long went downstairs and discovered his vehicle missing. He observed glass in the parking lot next to where his vehicle was originally parked. In Mr. Long's recorded statement, he said that he called the police and reported the theft. However, in his EUO, he testified that Valerie's brother, Sandy, actually called the police to report the theft while he called his niece in Millbrook, AL to get a phone number to call State Farm and file the claim. He testified that the police never came to the hotel to complete the report.

Mr. Long was asked if he recalled having any conversation with Ricky or Sandy regarding the contents in the insured vehicle. He testified that he could not recall any conversations he had with them about the contents. However, the shift manager at the Country Hearth Inn overheard the two men advising Mr. Long to claim his suitcase was stolen with the vehicle.

CR Smith identified a phone number for a Dr. Chung's office in Montgomery, AL. Afterwards, he confirmed they had a secretary at their office named Valerie. He spoke with Valerie and confirmed she knew Mr. Long. Specifically, she identified herself as Valerie Ware-Temple and she confirmed being with Mr. Long the weekend of the alleged theft. She confirmed her two brothers Ricky Ware and Sandy Ware and two of their lady friends also went with them to Atlanta that weekend. She said they went to visit her older brother, Donald Ware, who resides in the area. During Mr. Long's recorded statement, he said he did not go anywhere that weekend. During his EUO testimony, he failed to discuss going to Donald's home that Friday night.

Long/State Farm
SF1  00066

CR Smith spoke with Donald Ware and confirmed that the insured had visited him on Friday evening. After leaving Donald's residence, Valerie said they arrived at the hotel around 10:00 p.m. She stated that Mr. Long parked his vehicle in the parking lot near an area supposedly monitored by surveillance cameras and this was the last time she saw his vehicle. On Saturday morning, at approximately 7:00 a.m., she said one of the girls named Felicia called their room and advised them the vehicle was missing. However, Mr. Long testified that the girl knocked on their door to discuss the vehicle missing. She acknowledged that there was glass in the parking lot and that Mr. Long confronted the shift manager about the camera. She advised that her brother Sandy reported the theft to the police. After returning to Alabama, Valerie confirmed having a conversation with Mr. Long regarding the keys to his vehicle. Specifically, she said Mr. Long told her he had a second set of keys that may have been left in the vehicle. However, she only confirmed seeing one set that weekend.

The insured claimed several expensive personal items were stolen from the insured vehicle. He filed a homeowner's claim under number 01-Q177-057, which was also investigated in connection with this matter. Misrepresentations were noted in the presentation of that claim and are addressed in a separate Recommendation for Claim Resolution.

On May 12, 2005, Mr. Long advised he was seeking legal council and requested a certified copy of his policy. On May 24, 2005, CR Smith spoke with Attorney F. Tucker Burge with Burge and Burge out of Birmingham, AL and confirmed his representation of our insured. Afterwards, CR Smith secured a faxed letter of representation. On May 26, 2005, a certified copy of Mr. Long's policy was mailed via certified mail return receipt requested to Attorney Burge.

D)    Statutory and Case Law.

**GENERAL LAW ON MISREPRESENTATION**

Section 27-14-28, *Code of Alabama*, (1975) states:

> "No misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy unless such misrepresentation is made with actual intent to deceive as to a matter material to the insured's rights under the policy."

In *American Fire & Cas. Co., Inc. v. Archie*, 409 So.2d 854 (Ala. Civ. App, 1981), the court stated:

> "After a loss, a misrepresentation need only be made with the actual intent to deceive and be related to a matter which is material."

E)    Discussion/Recommendation

To recap the issues at hand, we know the following:

- This is a loss on new business. Mr. Long purchased the insured vehicle on February 4, 2005, which was also the policy inception date. The alleged theft occurred approximately two (2) weeks later.
- Mr. Long is on a limited income due to his disabilities.
- Mr. Long has admitted he was experiencing financial problems prior to his injury settlement with the railroad.
- He spent approximately $170,000.00 of his $175,000.00 settlement proceeds within a two week period. Specifically, he testified that he only had approximately $5,000.00 left out of his settlement money.
- Mr. Long is currently going thru a divorce.
- The insured misrepresented material information related to the facts of the loss. Specifically, in his recorded statement, he claimed he was alone the weekend of the loss. After his statement and off the record, he admitted a female was with him; however, he refused to give us any of her contact information. He later testified that

Long/State Farm
SF1   00067

there were four other people with him and his lady friend named Valerie.

- An inspection of the insured vehicle by expert Mike Bresnock revealed it was not operated without the correct ignition key.
- The insured indicated that when he exited the car at the hotel it was locked with the alarm system activated.
- The insured has been unable to provide us with the second set of keys to his vehicle and he is unable to explain their whereabouts. In his recorded statement, he said the second set of keys may have been in the insured vehicle. At a later date, while discussing Mr. Long's inability to account for the other set of keys, he got very mad and demanded payment. In his EUO, Mr. Long testified that the other set of keys were not left in his vehicle.
- A witness overheard two of the men with our insured advising him to claim his suitcase was stolen along with the vehicle. However, the insured testified that he could not recall any conversation he had with Valerie's two brothers.
- As for the reporting of the alleged theft to the police, Mr. Long claimed he called the police in his recorded statement. However, in his EUO, he testified that one of Valerie's brothers called the police.
- The insured claimed several expensive, personal items were stolen along with his vehicle. Inconsistencies were revealed in the investigation of the homeowner's claim filed in connection with this matter.
- The insured admitted he has had a prior vehicle theft involving the same type of vehicle.. In addition, he has recently filed another claim whereas he accidentally shot his own vehicle while exchanging gun fire with another person.

Based on our investigation, it would appear that there is sufficient evidence that Mr. Long had a financial motive to procure this vehicle theft.

We have revealed discrepancies and inconsistencies in the insured's recorded statements versus his sworn statement that support he misrepresented information material to the claim.

In summary, there is sufficient circumstantial evidence to support our insured's involvement in the alleged theft of his vehicle.

As a result of the above, it is my recommendation that we deny the insured's claim based on the fact that it does not meet the definition of a loss as defined in Section IV - Physical Damage Coverages and based on the Concealment or Fraud provision of the policy.

Long/State Farm
SFI  00068

RBZ0003N
date: 08-25-06

route to: Pennie Green

STATE FARM FIRE AND CASUALTY COMPANY

# FIRE CLAIM SERVICE RECORD - FULL

claim number
01-Q177-057

policy number
01-CW-7517-0

date of loss
02-19-05

| | |
|---|---|
| claim rep: | Smith, Todd |
| phone: | 770-593-6570 |

| | | | | | |
|---|---|---|---|---|---|
| reporting agent: | DEVERS | | st & agent: 01-1973 | phone: | 334-285-3662 |
| servicing agent: | MIKE DEVERS INS AG | | agent: | phone: | 334-285-3662 |

## NAMED INSURED

| | | | | | |
|---|---|---|---|---|---|
| name: | LONG, MARTIN | | | | |
| street: | 2752 CAROLINE DR | | | | age: |
| city: | MILLBROOK | state/prov: AL | zip/postal: 36054-4103 | | dob: |
| phone: home: | 334-290-0344 ext: | | cell: 334-202-9599 | | ext: |
| contact: | | | contact: | | |
| cell: | 334-202-9599 ext: | | pager: | | ext: |
| lang of choice: | Unknown | | hearing impaired: | | |
| deceased: | dod: | | sex: FEMALE | minor: | parent/guardian: |
| ssn or tin: | | occupation: | | | tax state: |

Other information
| | |
|---|---|
| street: | 2752 CAROLINE DRIVE |
| city: | MILLBROOK    state/prov: AL    zip/postal: 36054-4103 |
| reason: | Verify if temporary |
| other insurance: | CAR STOLEN ALSO |
| comments: | |

| | | | | | |
|---|---|---|---|---|---|
| name: | LONG, EVELYN | | | | |
| street: | 1705 DEATSVILLE HWY | | | | age: |
| city: | MILLBROOK | state/prov: AL | zip/postal: 36054-5041 | | dob: 03-01-1968 |
| phone: home: | 334-290-1807 ext: | | work: | | ext: |
| contact: | | | contact: | | |
| lang of choice: | Unknown | | hearing impaired: | | |
| deceased: | dod: | | sex: FEMALE | minor: | parent/guardian: |
| ssn or tin: | 419046024 | occupation: | | | tax state: |

other insurance
| | |
|---|---|
| comments: | |

insured location
| | |
|---|---|
| street: | |
| city: | state/prov: | zip/postal: |

occurrence location
| | |
|---|---|
| street: | |
| city: | ATLANTA    state/prov: GA    zip/postal: |

Long/State Farm
SF2  00002

<u>*Recommendation for Claim Resolution*</u>
<u>*May 25, 2005*</u>

**TO:**    **David Thomas**
       **Section Manager SIU**

**FROM:**  **Tony Nix**
       **Team Manager SIU**

**RE:**    **Insured: Martin Long**
       **Claim Number: 01-Q177-057**
       **Date of Loss: February 19, 2005**
       **Policy Number: 01-CW-7517-0**
       **Applicable Coverage: 54/001**


**I.   <u>Brief Facts of Loss:</u>**

According to Mr. Long, on Friday, February 18, 2005, he drove his 2000 Chevrolet
Corvette to Lithonia, GA in order to relax for the weekend. He stayed at a Country
Hearth Inn located off I-20 in Lithonia, GA. On Saturday morning, February 19,
2005, at approximately 7:00 a.m., Mr. Long discovered his vehicle missing from the
parking lot. He called the DeKalb County Police Department and reported the theft.
He filed a claim for the theft of his vehicle to State Farm later the same day.

On Monday, February 21, 2005, Mr. Long filed a homeowner's claim for the
alleged theft of the contents contained in his vehicle when it was stolen. On the
same day, Mr. Long filed an incident report with the Millbrook Alabama Police
Department under case number 0200534 alleging his 45 Caliber Taurus pistol was
stolen in Atlanta over the weekend.

On February 25, 2005, Mr. Lung's vehicle was recovered, partially stripped and
abandoned in Decatur, GA. No personal items were recovered with the vehicle.

On Wednesday, March 2, 2005, Mr. Long filed a supplemental report with the
DeKalb County Police Department claiming a large amount of personal items were
stolen along with his vehicle.

**II.   <u>Damages:</u>**

On March 2, 2005, Mr. Long submitted a Personal Property Inventory Form in
connection with his claim. The following is a summary of the items claimed stolen
by Mr. Long:

Long/State Farm
SF2  00019

- Black leather jacket, purchased April 2003 for $250.00
- 45 Caliber Taurus Semi-Automatic Hand Gun, purchased February 16, 2005 for $378.24, which included a holster and ammunition
- $5,000.00 cash.
- Three suits, purchased February 2005 for $600.00.
- Two pant suits, purchased February 2005 for $180.00.
- Four pairs of shoes purchased February 2005 for $1,100.00.
- Four Bracelets purchased February 2005 for $2,500.00.
- Three Rings purchased February 2005 for $1,200.00.
- Portable Dynex 5' LCD DVD player purchased January 2005 for $160.00.
- Watch purchased January 2005 for $1,000.00.

The total cost of the contents per the insured's PPIF is $12,368.24.

Mr. Long provided two original receipts for the purchase of the listed items. The receipts were both from the Quick Pawn Shop in Montgomery, AL. One receipt was for the 45 Taurus Semi-Automatic pistol purchased on February 16, 2005. The price of the pistol was $319.95, the holster was $10.95 and the ammunition was $12.95 for a total of $378.24. Mr. Long claimed the pistol was in the holster with ammunition in the clip and was located in the center console between the front seats of his Chevrolet Corvette. Mr. Long admitted during his EUO testimony that all the ammunition was not in the car at the time of the alleged theft. The second receipt was for a 14k diamond link bracelet purchased on March 10, 2003, in the amount of $663.95.

Mr. Long provided a third handwritten receipt from Looking Good clothing store in Montgomery, AL for the alleged purchase of three suits, two pant suits and four pairs of shoes in the amount of $2,068.00. Mr. Long indicated that he purchased all these items in February 2005 and confirmed this fact on his Personal Property Inventory Form dated March 2, 2005.

Mr. Long's policy provides the following language:

### SECTION I - COVERAGES

Long/State Farm
SF2 00020

**** 

### COVERAGE B – PERSONAL PROPERTY

****

**Special Limits of Liability**. These limits do not increase the Coverage B limit. The special limit for each of the following categories is the total limit for each loss for all property in that category:

2

a.  $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals;

f.  $1,000 for loss by theft of jewelry, watches, fur garments and garments trimmed with fur, precious and semi-precious stones;

g.  $2,500 for loss by theft of firearms;

2.  **Property Not Covered**.  We do not cover:

   i.  Any citizen band radios, radiotelephones, radio receivers, radio transmitters, radar detectors, antennas and other similar equipment. This exclusion applies only while the property is located in or upon an engine or motor propelled vehicle, whether attached or not;

These above mentioned limits would reduce the amount for which the insured is making claim to $3,708.24 without consideration for any applicable depreciation.

III.  **Issues (Questions & Evidence):**

State Farm FCC received the claim on February 21, 2005 and began the initial investigation. On February 21, 2005, a recorded statement was secured from Mr. Long regarding the claim. The insured indicated he was in the Atlanta area, specifically, Lithonia, GA staying at a hotel when someone stole his 2000 Corvette along with numerous items of personal property. At that time, the insured estimated the loss at approximately $8,000.00.

During his statement, questions developed regarding the claim.  Specifically, Mr. Long indicated he reported the theft to the Millbrook, AL police when the loss actually occurred in Georgia. Mr. Long claimed at the time of the alleged theft, he called the police in Georgia to report the incident but they did not come to the scene. He did not report the personal items stolen along with the car because he did not have the serial number to his 45 Caliber pistol.

In the insured's initial recorded statement, the insured stated that the items were in the vehicle because he had just purchased them. At the time the insured discovered the theft; he spoke with the hotel manager regarding their surveillance cameras and was told the cameras were not working at the time of the loss. Mr. Long acknowledged that he had another Corvette stolen approximately four years ago.

The FCC CR contacted the hotel manager and discussed the claim.  The manager confirmed the fact that the surveillance cameras were not working on the weekend of the alleged theft and that our insured was angry after he found out there were no tapes. He added our insured was staying with a female and two other men.

Long/State Farm
SF2  00021

3

The manager overheard these men and Mr. Long talking. He said the two men told our insured to tell the police there was a suit case full of clothes in the car so he could make an insurance claim.

The file was referred to SIU on February 23, 2005, along with the associated automobile theft loss under claim number 01-6596-564. At the time of the referral, the following indicators and/or questions were recognized:

- In February 2005, the insured filed an automobile claim with State Farm under number 01-6596-758 where he was involved in an exchange of gun fire with another person. That claim was referred to SIU.
- Insured is unemployed.
- Insured claimed a large amount of expensive items were stolen from his vehicle.
- Insured has had a high frequency of claims.
- Insured is currently disabled.
- Insured vehicle involved in the theft was recently purchased.
- Loss on New Business regarding the newly purchased vehicle involved in the loss.
- Insured has recent or current marital problems.
- Delay or no report made to the police.

On February 28, 2005, SIU CR Todd Smith spoke with a Detective from the DeKalb County Police Department's Auto Theft Unit and confirmed the vehicle was reported stolen on February 19, 2005. Mr. Long originally told the CR in FCC that he filed a report with the Millbrook Alabama Police Department under case number of 05023612. However, the DeKalb County Police Detective indicated that was their case number. During the conversation, the Detective said the vehicle was recovered, abandoned on Friday, February 25, 2005 in Decatur, Georgia. Afterwards, Todd secured copies of the initial theft and recovery reports. Upon review of the initial theft report, he noted that it failed to document any personal items stolen along with the insured vehicle.

On March 1, 2005, CR Smith inspected the insured vehicle at Top Cat Towing in Lithonia, GA and verified that no personal items were recovered along with the vehicle.

Todd conducted data research and secured documentation supporting Mr. Long's statements regarding a recent worker's compensation case filed against CSX Transportation Railroad. Also, he secured documentation supporting a separate civil case Mr. Long filed against a man named Bobby Long in 2004.

Long/State Farm
SF2   00022

4

Mr. Long claimed a large amount of personal items were stolen with his vehicle. However, he admitted he did not initially tell the police about the personal property in the vehicle. He stated that a lady with the police department told him to wait and call back to report the items missing by completing an additional information form. A supplemental narrative was added to the original theft report on March 2, 2005. At that time, he listed the personal items as documented in the "Damages" section of this report.

During Mr. Long's recorded statement, CR Smith questioned him regarding his financial situation. Mr. Long admitted he recently settled a worker's compensation claim against CSX Transportation Railroad for $256,000.00, of which he received approximately $175,000.00. Also, he indicated that he receives approximately $1,100.00 per month in disability benefits from the Army and these funds are his main source of income.

Mr. Long advised that he was having financial problems before he settled his worker's compensation claim. After the settlement, he said the majority of the money was paid towards bills, which included approximately $50,000.00 in credit card debt, $43,000.00 for his wife's student loan and $25,000.00 was used to purchase the insured vehicle. He stated that he only had $6,000.00 left out of his settlement proceeds.

Mr. Long previously filed a homeowner's claim in April 2003 for damage sustained to his home. As a result, he received a payment in the amount of $2,873.41. The Claim Service Record reflects that the repairs were not made to the insured dwelling because Mr. Long needed the money to pay his bills. This information reflects that the insured was possibly having financial problems prior to the alleged theft.

In addition to his PPIF, the insured provided a handwritten receipt in the amount of $2,068.00 for the purchase of clothing from a store named Looking Good in Montgomery, AL. He claimed that he had just purchased the clothing in February 2005. CR Smith went to Looking Good and met with the manager, R.D. Archie. Mr. Archie said he did not have any receipts to support Mr. Long's previous purchases. He indicated Mr. Long recently came to their store and asked him to write out a receipt for the purchase of clothing. He confirmed Mr. Long had purchased clothing from them in the past but did not purchase any clothing in February 2005 as he claimed.

CR Todd Smith met with Ram Naidu, shift manager at the Country Hearth Inn in Lithonia, GA and secured his recorded statement. He confirmed working the night of the alleged vehicle theft. On Saturday morning, February 19, 2005, he recalled that Mr. Long came down into the lobby, walked outside and came back inside to report his vehicle stolen. After he reported the alleged theft, he stated that Mr. Long questioned him about the surveillance camera. Mr. Naidu said Mr. Long made a couple of calls and approximately 10 to 20 minutes later, two of his friends arrived in the lobby area. He overheard the two men having a conversation with Mr. Long.

Long/State Farm
SF2  00023

One of the men told Mr. Long to say that he had a suitcase in the car. Mr. Naidu understood the conversation to mean that Mr. Long should make up items which were in the car when the theft occurred in order to claim these on insurance.

On March 14, 2005, we mailed Mr. Long a Reservation of Rights letter with the following question noted:

> *"There is a question if an insured under this policy has intentionally concealed or misrepresented any material fact or circumstances relating to this insurance, whether before or after a loss."*

Based on the indicators present and the questions raised during the course of our investigation of this claim and the companion automobile claim, we referred the matter to Attorney Angela Taylor to secure Mr. Long's EUO. On March 31, 2005, Mr. Long submitted to an EUO and provided all the requested documents in connection with the matter.

During the EUO, he changed his story regarding the facts of the loss. He testified that he and a lady friend named Valerie went to the Atlanta area the weekend of the alleged theft. Initially he testified that he did not know Valerie's last name and he thought she lived somewhere in the Montgomery, AL area. We later learned that she worked at a doctor's office in Montgomery, AL. Upon review of the insured's cellular phone records, we noticed Mr. Long's account was in the name of Valerie Ware. Mr. Long confirmed Valerie purchased the phone for him, but he continued to act as if he wasn't sure of her last name. He testified that two of Valerie's brothers, Ricky and Sandy, and their two girlfriend's followed them to the Atlanta area on the weekend of the alleged loss.

As for inconsistencies noted, Mr. Long changed his story regarding the people he was with the weekend of the alleged theft. He initially advised State Farm that he called the police and reported the theft. However, in his EUO, he testified that Valerie's brother, Sandy, actually called the police to report the theft of the vehicle.

Mr. Long was asked if he recalled having any conversation with Ricky or Sandy regarding the contents in the insured vehicle. He testified that he could not recall any conversations he had with them about the contents. However, the shift manager at the Country Hearth Inn overhead the two men advising Mr. Long him to claim his suitcase was stolen with the vehicle. As for the clothing in the vehicle, Mr. Long admitted he asked the manager at Looking Good to write out a receipt for the purchase of clothing but continued to contend that he purchased the items in February 2005. This directly contradicts the information provided by the manager.

After Mr. Long's EUO, CR Smith located a phone number for the doctor's office where Valerie works in Montgomery, AL. He spoke with Valerie who acknowledged that she knew Mr. Long. Specifically, she identified herself as

Valerie Ware-Temple and she confirmed being with Mr. Long the weekend of the alleged theft along with her two brothers and two of their friends.

Valerie indicated they went to visit another one of her brothers named Donald when they arrived in the Lithonia area. However, Mr. Long never indicated he went to visit her brother in either his recorded statement or his EUO testimony. CR Smith later spoke with Valerie's brother Donald and he advised that the group did visit him on Friday, February 18, 2005.

As previously indicated in the "Damages" section of this report, Mr. Long was only able to provide a receipt for his pistol and one diamond link bracelet. He claimed he purchased a watch from his nephew, Bailey Chancey, in January 2005. He testified that he made installment payments of $25.00 to $50.00 a week on the watch until he got his settlement check at which time he paid the balance due. Mr. Long initially described the watch was gold and then said it was silver.

CR Todd Smith contacted Mr. Chancey and confirmed he sold Mr. Long a watch, but he denied receiving installment payments. He said Mr. Long paid him between $1,000.00 and $1,200.00 for the watch. He described the watch as silver.

During Mr. Long's recorded statement to FCC, he claimed that he reported the theft to the Millbrook, AL Police Department under case number 05023612. CR Smith contacted the Millbrook Alabama Police Department to request a copy of the report. They said the report number provided by our insured was inaccurate. They researched their records and only found the record under case number 50200534 which relates to the theft of the 45 Automatic Taurus PT 145 while the insured was in Atlanta.

The insured filed a companion automobile claim under number 01-6596-564 which was investigated in connection with this matter. Our investigation of that claim revealed sufficient evidence that a loss as defined in Section IV – Physical Damage Coverages of the policy did not occur as that whoever last drove the vehicle did so with a valid key.

On May 24, 2005, CR Todd Smith spoke with Attorney F. Tucker Burge with Burge and Burge in Birmingham, AL and confirmed his representation of the insured. Afterwards, Todd secured a faxed letter of representation.

IV.  **Applicable Policy Language**:

The named insured's policy is a Manufactured Home Policy Form FP-7933-1 with $50,400.00 limits and a $500.00 deductible.

Long/State Farm
SF2  00025

## SECTION I - CONDITIONS

**\*\*\*\***

14. **Intentional Acts.** If you or any person insured under this policy causes or procures a loss to property covered under this policy for the purpose of obtaining insurance benefits, then this policy is voice and we will not pay you or any other insured for this loss.

## SECTION I AND SECTION II – CONDITIONS

**\*\*\*\***

2. **Concealment or Fraud**. This policy is void as to you or any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

## V. <u>Recommendation:</u>

Our investigation has revealed discrepancies and inconsistencies in the insured's recorded statements versus his sworn statement that support he misrepresented information material to the claim.

Mr. Long's initial police report with the DeKalb County Police failed to document any personal items stolen along with the vehicle. A subsequent report filed with the Millbrook Alabama Police only listed his pistol as stolen. A supplemental report was filed with the DeKalb County Police approximately two weeks later listing all the items alleged to have been stolen with the vehicle.

He initially advised FCC that the approximate amount of the loss was $8,000.00; however, that figure increased to over $12,000.00, to include $5,000.00 cash he allegedly left in the vehicle.

Mr. Long testified that he purchased over $2,000.00 in clothing and shoes in February 2005. Our investigation determined that fact to be not true.

Also, the investigation of Mr. Long's automobile theft claim revealed sufficient evidence that a loss as defined in Section IV – Physical Damage Coverages of his policy did not occur.

Long/State Farm
SF2  00026

8

Therefore, we recommend a denial of the claim based on the concealment and fraud provision contained in the policy.

Long/State Farm
SF2   00027