**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **MARTIN O. LONG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:06CV816-MHT** |
| | ) | |
| **STATE FARM FIRE AND CASUALTY** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO**
**DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

This action for breach of contract and bad faith arises out of State Farm Fire & Casualty

Company's refusal to pay insurance benefits for the theft of Plaintiff's car.  Plaintiff did not steal

his own car or have it stolen.  He had no motive to do so.  State Farm had no reasonably

legitimate, arguable or debatable reason for its refusal to pay this claim.  State Farm's Motions

for Summary Judgment[1] is due to be denied.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  Under Rule 56, the party seeking summary judgment must

inform the court of the basis for the motion, and then the burden shifts to the non-moving party

---

[1]State Farm has filed two motions for summary judgment, one in March and the other in
May.  The motions and briefs are virtually identical.

1

to demonstrate why summary judgment would not be proper.  <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); see also <u>Fitzpatrick v. City of Atlanta</u>, 2

F.3d 1112, 1115-17 (11ᵗʰ Cir. 1993)(discussing burden-shifting under Rule 56).  The non-moving

party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest

upon the mere allegations or denials in the pleadings.  Fed. R. Civ. P. 56(e).

     The Court's role at the summary judgment stage is not to weigh the evidence or to

determine the truth of the matter, rather to determine only whether a genuine issue exists for trial.

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202

(1986).  In doing so, the Court must view the evidence in the light most favorable to the non-

moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus.</u>

<u>Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II.  <u>STATEMENT OF MATERIAL FACTS</u>

**1.     Martin Long Purchases a Corvette.**

     Plaintiff Martin Long purchased a 2000 Chevrolet Corvette from City Auto Sales of

Hueytown on February 4, 2005.  (SF1 00287)².  Long paid the $25,000.00 purchase price in full

from a personal injury settlement that he received the same day.  (Affidavit of Martin Long).  His

share of the settlement proceeds were $175,568.99.  (SF1 00620).

     Martin Long had a longstanding desire to own such a Corvette and spent hours searching

for just the right one.  (Plaintiff's Answers to Interrogatories, p. 13).  He began enhancing the car

from the day that he bought it.  (Id., p. 2).  He replaced the rims and tires.  He had the wheels

---

     ²"SF1" denotes State Farm's Bates stamp numbers for its claim file pertaining to Claim
No. 01-6596-564.  Tony Nix's declaration submitted with State Farm's Motion for Summary
Judgment authenticates the claim file is true and accurate.

aligned and a tie-rod replaced. (Id.). He ordered tail light louvers and other accessories. (Id.).

Receipts from Big 10 Tire in Prattville verify that Long spent at least $1,572.14 improving the

Corvette and that he continued to enhance his car up to February 18, 2005, the last day he saw his

car in one piece. (SF1 00749-751).

### 2.     Martin Long Insures the Corvette.

Martin Long insured his 2000 Corvette with State Farm Fire & Casualty Company.

(Long depo. pp. 185-198). Long and State Farm were not strangers. (Id.). Long already had

State Farm car policies covering two other automobiles and a State Farm manufactured home

policy covering his residence. (Id.).

State Farm did not hesitate to insure Long's 2000 Chevrolet Corvette. (Id.). In exchange

for Long's premium payment of $637.32, State Farm issued policy number 88 6750-B04-01

which provided full coverage on the Corvette during the policy period of February 4 to August 4,

2005. (SF1 00146). The State Farm representative who sold Martin Long this automobile policy

was aware that he had just purchased the car.

### 3.     Martin Long's Corvette Is Stolen and Stripped.

On February 18, 2005, Long drove his Corvette from Montgomery to Lithonia, Georgia,

to spend a lovers' weekend at the Country Inn Suites with Valarie Ware Temple. (Long

Affidavit). Long was in the process of divorcing from Evelyn Long at the time of this trip, and

Valarie Ware Temple was married to someone else as well. (Valarie Temple depo. p. 9). Long

and Valarie had been out together several times. (Id., p. 16). They made their plans for this

weekend trip together a month or a month and a half earlier. (Id., p. 46). Joining Long and Ms.

Temple on this trip were her two brothers, Sandy and Ricky Ware, and Felicia Flowers. (SF1

00167-168; Felicia Flowers depo., pp. 9-11).

After eating dinner that night, Long returned to the hotel with Valarie. (Temple depo., pp. 20-21). They parked the car near the hotel entrance, in plain view of the hotel security camera. (Id., pp. 23-25; Long affidavit). Long and Valarie went to their room and spent the night together. (Temple depo., p. 47). Long never left Valarie's presence after they retired to the room. (Id.). The following morning, February 19, 2005, Felicia Flowers noticed Long's Corvette was not in the hotel parking lot. (Flowers depo., p. 19). She called Valarie to ask where she and Long had gone. (Id., p. 23). When Valarie responded that she and Long were still in their hotel room, Flowers told Valarie that the Corvette was gone from the parking lot. (Temple depo., pp. 25-28). Long and Valarie then went outside to the space where they had parked the night before and confirmed that the Corvette was gone. (Long depo., p. 62). Broken glass littered the ground beside where they had parked the car. (Id.).

Following his discovery of the theft, Long notified the hotel's management, the Dekalb County Police Department and State Farm. (Id., pp. 61-67). The hotel staff advised Long that the security camera pointing toward his car was out of order. (Id., p. 63). The Dekalb County Police Department created an incident report for the "theft by taking" of Long's Corvette. (SF1 000374-76). State Farm opened a claims file for the theft of the Corvette and arranged for Long to obtain a rental car. (SF1 00002-33).

The police found the car on February 25, 2005, in a badly damaged condition. (SF1 000375). The T-top roof was missing. (Id.). The seats were gone. (Id.). The passenger window was broken. (SF1 00061). The new tires and rims that Long had put on the car had been replaced with cheaper, alternate brand tires and rims. (Id.). Wheel lug nuts were missing and

4

others were loose. (SF1 00251 and 257). The brake fluid had been drained and brake system components were missing or disabled; consequently, the car had no brakes. (SF1 00251 and 00232; Long Affidavit). The front bumper was damaged. (Long affidavit; SF1 00061). Air conditioner vents were missing and parts of the dash and console had been removed. (Long Affidavit). The undercarriage had "interference contact" indications. (SF1 00232). The transmission was damaged such that there was considerable difficulty shifting the car into gear, indicating the likelihood that the transmission linkage was bent. (SF1 00232 and 00253). No personal items were still in the car or trunk. (Plaintiff's Answers to Interrogatories, p. 5). In summary, the car had been expertly stripped.

    **4.**    **Martin Long Claims Insurance for the Fair Market Value of the Corvette.**

    Martin Long made a claim under State Farm Policy 88 6750-B04-01 to recover the fair market value of his stolen Corvette. (See, SF1 00002-33). State Farm assigned Claim No. 01-6596-564 to this claim. (Id.). To prove his loss of the Corvette, Long filed an Affidavit of Vehicle Theft. (SF1 00757). To the question "[a]mount for which you making claim", Long responded "paid $25,000.00". (Id.). State Farm ultimately concluded that the actual cash value of the Corvette was $789.50 more than Long claimed. (SF1 00061). Long made a separate claim for the loss of his personal property that was inside the Corvette when it was stolen under his manufactured homeowner's policy State Farm assigned a separate claim number to that claim and maintained a separate file for that claim. (SF1 00002). As State Farm's brief acknowledges, this lawsuit relates only to State Farm's refusal to pay insurance benefits for the theft of the car under the automobile policy and this lawsuit includes no claim for the personal property that Long lost inside the car when it was stolen.

**5.      State Farm Denies Martin Long's Claim.**

In a letter to Long's lawyer dated June 29, 2005, State Farm advised that it was denying Claim No. 01-6596-564.  (SF1 00132).  State Farm's stated reasons for denying the claim were as follows:

> Based on the investigation, we must advise you a "loss" as defined in the policy has not occurred as the destruction of the insured's vehicle was by or at the direction of an insured.  We must additionally advise you that our investigation has established that your client misrepresented material facts in the presentation of his claim.  Because of these findings, we will be unable to make any payments under the policy.  (Id.).

Long's lawyer requested that State Farm provide a written statement outlining Long's alleged material misrepresentations upon which it based its denial of Claim No. 01-6596-564, but State Farm failed to do so.  (SF1 00133).

After this lawsuit was filed, Plaintiff's counsel again asked State Farm to outline its rationale for denying Long's claim.  State Farm's response told Long's counsel to look for the answers in the Claims Committee Report.  (State Farm Answers to Interrogatories).

State Farm's Auto Claim Committee Report reflects that State Farm decided to deny Claim No. 01-6596-564 on June 22, 2005.  (SF1 00059).  The Claim Committee states the following as State Farm's rationale for denying Long's claim:

> Based on our investigation, it would appear that there is sufficient evidence that Mr. Long had a **financial motive** to procure this vehicle theft.
>
> We have revealed discrepancies and inconsistencies in the insured's recorded statement versus his sworn statement that support his **misrepresented information material to the claim**.
>
> In summary, there is sufficient circumstantial evidence to support

6

our **insured's involvement in the alleged theft** of his vehicle.

(Emphasis added.) (SF1 00068).

### 6.     Martin Long Was Financially Secure.

When State Farm denied Claim No. 01-6596-564 based on its conclusion that Long had a financial motive to steal his car, State Farm knew that Long was virtually debt free. (Smith depo., p. 141). From the proceeds he received from his personal injury settlement, Long paid off all of his credit card bills, the entirety of his wife's car loan and the entirety of his wife's student loans. (Long affidavit). State Farm claims personnel acknowledge that Long acted responsibly by paying off all of his credit card bills. (Smith depo., p. 141). Long owned the Corvette free and clear of any liens. (Long Affidavit). Long could have easily sold the Corvette if he wanted money. (Id.). Long received a monthly disability check that was more than adequate to pay his modest living expenses. (Id.). Long had a Fair/Good credit score of 651. (SF1 00689). In its Auto Claim Committee Report, State Farm acknowledges that Long's financial problems were "prior to his injury settlement with the railroad". (SF1 00067).

### 7.     The "Misrepresentations" Identified by State Farm.

On the subject of misrepresentations relied upon to deny Long's claim for his Corvette, State Farm describes them as follows in the Auto Committee Report:

> •     The insured misrepresented material information related to the facts of the loss. Specifically, in his recorded statement, he claimed he was alone the weekend of the loss. After his statement and off the record, he admitted a female was with him; however, he refused to give us any of her contact information. He later testified that there were four other people with him and his lady friend named Valarie.

> . . .

7

- As for the reporting of the alleged theft to the police, Mr. Long claimed he called the police in his recorded statement. However, in his EUO, he testified that one of Valarie's brothers called the police.

. . .

- The insured claims several expensive, personal items were stolen along with his vehicle. Inconsistencies were revealed in the investigation of the homeowner's claim filed in connection with this matter. (SF1 00067-68).

At the time that State Farm denied Long's claim for the stolen Corvette, it knew that he was with Valarie Ware Temple during the night that the Corvette was stolen from the hotel parking lot. (SF1 00124; SF1 00167-68). Although Mr. Long was reluctant to mention his companion for the weekend until the State Farm claim representative turned the tape recorder off, he did provide State Farm with her identity and State Farm interviewed Valarie over two months before it denied this claim. (SF1 00124). The claim representative confirmed the details of his interview with Valarie in a letter to her dated April 18, 2005. (SF1 00167-68). Valarie confirmed Long's description of the discovery of the theft and confirmed that she was with him all night, such that he lacked the opportunity to steal his own car. (Id.). As for the claim made by Long for the loss of personal items under his homeowner's coverage, Valarie confirmed seeing some suits, shoes, jewelry, cash and a gun. (Id.). In addition, she provided contact information for her brothers, Ricky and Sandy Ware. (Id.). The State Farm activity log relating to this claim reveals that no statement was obtained from Sandy Ware prior to the denial of the claim and the details of a statement that was allegedly obtained from Ricky Ware on June 17, 2005, are not disclosed. (SF1 00002-33). In his deposition, Ricky Ware denied ever speaking to anyone from State Farm. (Ricky Ware depo., p. 19).

8.     **State Farm's Claim Handling Principles.**

State Farm maintains an Auto Claim Manual and operation guidelines for the handling of claims for benefits under automobile policies made by its insureds. (Smith depo., pp. 30-37). In these documents, State Farm acknowledges basic principles and standards that must be followed in the adjustment of claims. (Id.). These basic principles and standards include the following:

> STATE FARM'S CLAIM PHILOSOPHY IS TO PAY WHAT WE OWE– promptly, courteously and efficiently. To accomplish this each claim, large or small, should be handled only on its own merits, in accordance with the facts of the law, the law, and applicable coverage–not on the basis of a person's race, age, religion, sex, national origin, or any other irrelevant consideration. Our commitment to policyholders, claimants, and others with whom we do business, as well as our internal communications, should clearly and consistently demonstrate this claim philosophy. State Farm's claim department has an obligation to its insureds to fairly and promptly investigate and then appropriately negotiate, settle or defend covered claims for damages. (SF1 0001-2-P).

In its statement of "Commitment to Our Policyholders", State Farm says:

> "It is the responsibility of the State Farm claims staff to implement Company philosophy with respect to claim handling. Our commitment to our policyholders is to treat them like a good neighbor. We should:

> • Listen, be fair, be open, and carry out our part of the bargain under the contract in good faith.

> • Be familiar and in compliance with those laws and regulations that impact claims in the appropriate state, and treat policyholders consistent with requirements of the law.

> • Explain all relevant coverages under the policy. Encourage policyholders to report all losses and avail themselves of all benefits under their coverages.

9

- Diligently investigate the claims to determine if a claim is valid. Reasonably evaluate the claim, and act promptly in resolving the claim. If it is necessary to reject a claim for coverage or damages, it should be done promptly and courteously, with an explanation for the decision.

- Make an objective evaluation of the facts and circumstances supporting our policyholders' claims. Doing so helps insure our policyholders obtain all benefits available provided by the insurance policy.

- Give insureds a reasonable opportunity to comply with their responsibilities under the policy. If a claim is rejected, be willing to listen to subsequent input from the insured. Complete any necessary follow-up in a timely fashion, giving due consideration to any additional findings.

- Communicate with and be responsive to inquiries from insureds and their attorneys by promptly answering letters and phone calls.

- In addition to our obligation to deal fairly with each policyholder, we also have an obligation to pay only covered claims in the proper amount. Payment of those claims not covered, or fraudulent claims, unnecessarily increases insurance costs for all policyholders.

In summary, we are committed to paying what we owe, promptly, courteously, and efficiently." (SF1 0004-P).

State Farm's claim representatives acknowledge other basic principles of claim handling practices that were applicable to State Farm's handling of these claims. These basic principles include the following:

- An insurer cannot enter a claim investigation with a biased viewpoint either toward paying the claim or denying the claim. (Smith depo., p. 33).

10

- A claim investigation is supposed to look only at facts. (Id.).

- A claims decision may not be based upon speculation or guesswork.  (Id., p. 34; Nix depo., p. 48).

- An insurer must objectively evaluate the facts supporting the policyholder's claim.  (Smith depo., p. 34).  The insurer must not deny a claim based on insufficient information. (Nix depo., p. 48).   An insurer must not deny a claim based on biased information.  (Smith depo., p. 34).

- Statements obtained during the claims process must be unbiased collections of facts.  (Smith depo., p. 34).

**9.     State Farm's Treatment of Claim No. 01-6596-564.**

State Farm's investigation did not yield any direct evidence that Long was involved in the theft of his car.  The entire claim file mentions no witness who claims to have seen him take the car (SF1 00002-33); to the contrary, Valarie confirmed that he was with her all night.  The entire claim file mentions no witnesses claiming to have heard Long "orchestrate" the theft of the car. (Id.).  Yet from the outset, State Farm suspected Long of wrongdoing in connection with the loss of his car.

State Farm assigned Long's claim for his stolen Corvette to its Special Investigation Unit (SIU) on February 23, 2004.  State Farm noted three reasons for doing so:

> The insured is not employed.
>
> The hotel night manager overheard the insured and friends talking about adding items to the items taken in the vehicle.
>
> Claim history.  (SF1 00193-195).

A week after referring this claim to SIU, State Farm was still searching for reasons to justify the referral.  A SIU claim representative expanded the reasons justifying the referral from three

denied reasons in his Property Loss Preliminary Report dated March 4, 2005. (SF1 00122-124). As additional reasons for subjecting Long's claim for his Corvette to special scrutiny, State Farm included: Long being disabled from the Army; Long recently settling his personal injury lawsuit; Long's recent purchase of the Corvette; Long making a claim under his homeowner's policy for expensive items stolen from the Corvette; Long divorcing from his wife; Long being unable to produce but one set of keys; and an assertion that Long delayed in reporting the theft to the police. (Id.). In this preliminary report the SIU claim representative openly expresses his belief that Long was involved in the theft of his Corvette: "It is questionable whether there has been direct and accidental loss of or damage to property covered by the physical damages coverage of the policy." (Id.).

State Farm suggested that Long must have been at fault in the theft of his car because he could only produce one set of keys. (SF1 00068). When State Farm denied Long's claim based on this speculation, it was aware of sound reasons why he may not have had a second set of keys. The dealer who sold Martin Long the car told State Farm's SIU claims representative that he believed that only one set of keys came with the car. (SF1 00017). Also, State Farm's claims file contains numerous reports confirming that Long believed that any second set of keys may have been in the car at the time that it was stolen and ransacked. (SF1 00344; SF1 00311; SF1 00167).

State Farm postulates that the car was driven out of the parking lot without considering other, more plausible methods of theft that did not support its conjecture that keys were used to drive the car away. The claim file does not reflect that State Farm ever considered that the car could have been stolen in any other manner. At the time that State Farm denied Long's claim, it

had substantial evidence suggesting that the car was being towed rather than driven.  The brake

system on the Corvette was inoperable when the car was recovered.  (SF1 00251 and 00232).

The car could not be shifted out of park when the car was recovered.  (SF1 00232 and 00253).

Lug nuts were missing and were loose on the tires when the car was recovered.  (SF1 00251 and

00257).  The front bumper was scratched and there were contact interference marks on the

undercarriage of the car.  (SF1 00232; Long Affidavit).

After this lawsuit was filed, State Farm claim personnel with no expertise in towing have

questioned the viability of the Corvette being towed from the hotel parking lot.   State Farm

claim personnel began by theorizing that a tow truck could not have positioned itself to pull a car

out of the part of the lot where the Corvette was parked (Nix depo., p. 25), yet measurements

reveal that a tow truck would have had least 24 feet of room between the end of the car and the

curb in which to maneuver.  (Long affidavit).  Don O'Shaughnessy, who has repossessed cars

with a tow truck for 18 years, reviewed these measurements and photographs of the parking lot,

and he testified that there is more than enough room for a tow truck to pull a Corvette out of the

place where it was parked in this lot.  (O'Shaughnessy depo.).[3]  He also observed that under a

worse case scenario, five minutes is the longest amount of time that it would take to tow the car

out of that lot.  (Id.).  State Farm claim personnel offer the breaking of the car window as a

second reason to doubt that it was towed (Nix depo. p. 23), but O'Shaughnessy explains that

several reasons make it necessary for someone taking a car with a tow truck to get into the car

before towing it away:  to release the parking brake; to force the transmission into neutral; to tie

---

[3]The court reporter has not yet transcribed O'Shaughnessy's deposition.  It will be filed
when received.

down the steering wheel.  (O'Shaughnessy depo.).  Next, the State Farm claims personnel speculate that the Corvette would not be towed away because it would not be visible from the street (Nix depo. p. 24); however, photographs of the parking lot from across the street show the view to be unobstructed.  (Long affidavit).  Finally, the State Farm claims personnel presume that towing would have left skid marks (Smith depo., pp. 89, 91), but O'Shaughnessy explains that this supposition is not true.  (O'Shaughnessy depo.).  He tows cars away without leaving skid marks.  (Id.).  In summary, a towing expert refuted all of State Farm's post-denial speculations against towing.

In addition to explaining the viability of towing the Corvette away from this lot, O'Shaughnessy testified that locksmiths have the capacity to make car keys on site.  (Id.). Moreover, locksmiths can program with pellet readers on site.  (Id.).  State Farm never addressed the possibility that a key was made in its claim file.

State Farm notes on the final page of the auto Claim Committee Report in which it denied Long's claim that "[t]he insured indicated that when he exited the car at the hotel it was locked with the alarm system activated."  (SF1 00068).  Elsewhere in that report, State Farm noted:

> Mr. Long claimed his vehicle was equipped with a factor alarm system.  He testified that his vehicle was locked and the alarm was engaged.  Mr. Bresnock completed an addendum to his original report addressing the alarm system on the insured vehicle.  he indicated the 2000 Chevrolet Corvette was equipped with UTD (Universal Theft Deterrent System) in addition to the Pass Key theft deterrent system.  The UTD and Pass Key security system were standard equipment for the 2000 Chevrolet Corvette.  The UTD system monitors the following through the BCM (Body Control Module):  Driver and passenger door ajar switches, courtesy switch, ignition switch (for an incorrect key), hood ajar switch, parking headlamp switch and power door lock switches.  If the BCM senses an intrusion in any of the above, it enters the

14

> alarm mode, which consists of the horn sounding, the lights
> flashing, and the cranking and fuel are disabled. (SF1 00065).

State Farm does not mention the results of Mr. Bresnock's alarm system inspection. The alarm system failed to operate. (SF1 00231). Mr. Bresnock employed several measures that would have activated the alarm if it were working properly but the alarm system never worked. (Id.). Long never heard the car's alarm go off during the two weeks he owned it. (Long Affidavit).

At the time that State Farm denied this claim, it was aware that auto theft was prevalent in the community where Long's Corvette was stolen. Ram Naider, the hotel clerk, told the State Farm claim representative that another car was broken into the week after Long's was stolen and that he told the police that there was a serious problem so that more patrolling at night was needed. (SF1 00312). The Dekalb County Police Department maintains an Auto Theft Unit. Detective Fitzpatrick of that unit provided reports to State Farm pertaining to the theft of Long's car. (SF1 00370-376). The first page of the materials he provided contains the following statement concerning the magnitude of the community's auto theft problem: "AUTO THEFT, METRO ATLANTAS FAVORITE PARTICIPATION SPORT." (SF1 00376).

### III. ARGUMENT AND CITATION OF AUTHORITIES

The facts of this case support both Martin Long's claim for breach of contract and his claim for bad faith refusal to pay insurance benefits.

**1.    State Farm's Breach of Contract.**

A valid contract existed between Martin Long and State Farm. Martin Long paid State Farm $634.32 to insure his Corvette from February 4 to August 4, 2005. State Farm accepted Long's premium payment and issued automobile policy number 88 6750-B04-01. On February

19, 2005, Long made a claim under this policy for the loss of his car. State Farm denied this claim. State Farm has never disputed that a valid insurance contract existed, that Long made a claim under the policy for the fair market value of his Corvette or that it denied this claim. (See St. Farm's Answer).

The facts before the Court clearly show that State Farm breached its contract by refusing to pay this claim. Martin Long denies stealing his own car or having it stolen. Valarie Ware Temple confirms that Long was in a hotel room with her all night so that he lacked the opportunity to remove the car himself. No witness saw who took the car or how they did so.

State Farm's contention that certain misrepresentations by Long justify its refusal to pay the claim as a matter of law is wrong. In Dempsey v. Auto Owners Ins. Co., 717 F.2d 556 (11th Cir. 1983), the Court of Appeals rejected the same misrepresentation argument that State Farm makes in this case. That case concerns an insurance claim for an unoccupied house that was destroyed by fire. Dempsey lied about his whereabouts at the time of the fire when first interviewed by insurance company representatives. He claimed that he was staying at a male friend's house but actually spent the night with a woman other than his wife. Dempsey later revealed the truth "off the record" to Auto Owners Insurance investigator. Auto Owners took the position that Dempsey's false statement voided the policy as a matter of law under its misrepresentations provisions. The District Court found Dempsey's false statement as to his whereabouts on the night of the fire to be immaterial. The jury found no material misrepresentation. The Eleventh Circuit affirmed. The same reasoning controls in this case for Long's waiting until the recorder was off to admit he was with a woman.

The Alabama law on post loss misrepresentations is in accord with the Dempsey decision.

16

Ala. Code, 1975, § 27-14-28 provides:

> No misrepresentation in any proof of loss under any insurance
> policy shall defeat or void the policy unless such misrepresentation
> is made with actual intent to deceive as to a matter material to the
> insured's right under the policy.

In this case Long made no misrepresentations material to State Farm's rights under this automobile policy.  Long's claim under the policy was for the fair market value of the Corvette. Long did not misrepresent the value of the Corvette.  In fact, State Farm determined that the fair market value of the Corvette was more than Long claimed in his affidavit of theft.

State Farm's argument that misrepresentations by Long concerning the value of personal property made in a proof of loss under a separate policy for which he paid a separate premium is repugnant to § 22-14-28 and accepted insurance claims practices.  The Alabama Code does not state that a policy may be voided based on misrepresentations made with the intent to deceive as to a material matter to the insured's rights under *another* policy.  The statute states that the misrepresentation must affect the insured's rights in *the* policy at issue.  The policy at issue in this case is the automobile policy on the Corvette, not the manufactured home policy in which Mr. Long claimed suits to be newer than they were and an extra pair of shoes.  Whether Long was with a female companion, what he had in his car and who dialed the phone to notify the police are simply immaterial to Long's claim for the full value of his Corvette.

### 2.      State Farm's Bad Faith.

Every insurance policy contains a duty implied by law of good faith and fair dealing. Chavers v. National Security Fire & Casualty Co., 405 So.2d 1, 4 (Ala. 1981).  Bad faith is the intentional failure by the insurer to perform this duty implied by law.  (Id. at 5).  In a bad faith

refusal to pay case, the plaintiff has the burden of proving:

(a)     an insurance contract between the parties and a breach thereof by the

defendant;

(b)     an intentional refusal to pay the insured's claim;

(c)     the absence of any reasonably legitimate or arguable reason for the refusal

(the absence of a debatable reason);

(d)     the insurer's actual knowledge of the absence of any legitimate or arguable

reason;

(e)     if the intentional failure to determine the existence of a lawful basis

is relied upon, the plaintiff must prove the insurer's intentional

failure to determine whether there is a legitimate or arguable

reason to refuse to pay the claim.

Dempsey, 717 F.2d at 560 (quoting Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d

916, 924 (Ala. 1981).

The facts presented in this case strongly support the Plaintiff's bad faith claim.  State

Farm concedes that its obligation to Long prohibited it from:  (1) handling this case with a biased

viewpoint toward denying his claim; (2) basing a claim decision upon speculation or guesswork

rather than facts; (3) failing to objectively evaluate facts supporting his claim; or (4) denying a

claim based on insufficient or biased information.  However, a reasonable jury could easily find

that State Far grossly violated each of these duties.

State Farm speculated that the car was driven from the lot without considering that it may

have been towed.  Towing the car does not fit State Farm's theory that Long orchestrated the

18

theft.[4]  State Farm chose not to develop evidence that proved that the car did not need to be driven from the lot.

State Farm's speculation as to what happened is not reasonable in view of all the evidence.  This trip was planned before he bought the Corvette.  Is it reasonable to think that Long bought a car, insured it and fixed it up just so that he could arrange to have it stolen?  Is it reasonable to think that he arranged a theft while on a lovers' weekend so that he could go through the headache of reporting the theft to the police and insurance company?

State Farm's alleged financial motive is not reasonable.  All of the evidence shows that Long was debt free.

Robert Sharp is an expert in the area of insurance claim handling practice.  It is his expert opinion that State Farm lacked any reasonably legitimate reason to deny Long's claim under the facts developed during its claim investigation.  (Sharp Affidavit).  He bases his opinion on a thorough analysis of the entire claims file.

Because a jury cannot base its verdict on speculation or guesswork, the Plaintiff submits that he is entitled to a judgment as a matter of law on his directed verdict claim.  However, a directed verdict on the breach of contract claim is not a prerequisite to recovering for bad faith. As Justice Jones noted in a concurring opinion in SafeCo Ins. Co. of America v. Sims, 435 So.2d 1219, 1224 (Ala. 1983):

> This 'directed verdict on the contract' test is not to be read as
> requiring in every case and under all circumstances, that the tort
> claim be barred unless the trial court has literally granted plaintiff's
> motion for a directed verdict on the contract . . . rather, this test is
> intended as an objective standard by which to measure plaintiff's

---

[4]Of course if it was an "inside job", Long could have gotten his second set of keys back.

compliance with his burden of proving that defendant's denial of
payment was without any reasonable basis either in fact or law . . .

Exceptions to the 'directed verdict' rule will undoubtedly arise . . .
merely because [an] insurer may be able to withstand a directed
verdict motion . . . would not, as a matter of law, bar plaintiff's tort
claim.

In <u>Dempsey</u>, supra, the Eleventh Circuit approved the district court submitting both the

insured's breach of contract claim and his bad faith refusal to pay claim to the jury.

## **CONCLUSION**

Martin Long did not have a motive, financial or otherwise, to have his car stolen.  He

lacked the opportunity to steal his car himself.  In terms of his automobile policy, he had

everything to lose and nothing to gain by his car being taken.  State Farm had no reasonable basis

to deny his claim, and its Motions for Summary Judgment are due to be denied.

Respectfully submitted,

s/F. Tucker Burge
F. TUCKER BURGE
BURGE & BURGE
2001 Park Place #850
Birmingham, AL   35203
(205)251-9000
(205)323-0512 (Facsimile)


## **CERTIFICATE OF SERVICE**

I hereby certify that I have this 31st  day of  May, 2007, electronically filed the above and
foregoing document with the Clerk of Court using the CM/ECF system which will send
notification of such filing to James B. Newman, Esq., Helmsing, Leach, Herlong, Newman &
Rouse, Post Office Box 2767, Mobile, AL 36652.

s/ F. TUCKER BURGE
OF COUNSEL