**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **MARTIN O. LONG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:06CV816-MHT** |
| | ) | |
| **STATE FARM FIRE AND CASUALTY COMPANY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**EVIDENTIARY SUBMISSION IN SUPPORT OF
PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTIONS FOR SUMMARY JUDGMENT**

Comes now the Plaintiff in the above-styled cause and files the following evidentiary documents in support of his Brief in Opposition to Defendant's Motions for Summary Judgment:

1.  Affidavit of Martin Long.

2.  Excerpts of State Farm's Claim File and Claim Manuals Produced in this case: SF1 00002-33; SF1 00059-68; SF1 00122-124;  SF1 00132; SF1 00133; SF1 00146-147; SF1 00167-168; SF1 00193-195; SF1 00231; SF1 00227-233; SF1 00248-254 and 00257;  SF1 00287; SF1 00307 and 00311; SF1 00344; SF1 000374-76; SF1 00620; SF1 00689; SF1 00749-751; SF1 00757-759; SF1 0001-4-P

3.  Plaintiff's Answers to Interrogatories

4.  Miniscript of deposition of Valarie Temple

5.  Miniscript of deposition of Felicia Flowers

1

6.      Miniscript of deposition of Martin Long

7.      Miniscript of deposition of Todd Smith

8.      Miniscript of deposition of Ricky Ware

9.      Miniscript of deposition of Tony Nix

10.     Affidavit of Robert Sharp (unsigned)

11.     Miniscript of deposition of Donal O'Shaughnessy (will be provided when received from court reporter)

12.     Answer of State Farm

Respectfully submitted,

s/F. Tucker Burge
F. TUCKER BURGE
BURGE & BURGE
2001 Park Place #850
Birmingham, AL   35203
(205)251-9000
(205)323-0512 (Facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that I have this 31st day of May, 2007, electronically filed the above and foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to James B. Newman, Esq., Helmsing, Leach, Herlong, Newman & Rouse, Post Office Box 2767, Mobile, AL 36652.

s/ F. TUCKER BURGE
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MARTIN O. LONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CASE NO. 2:06CV816-MHT** |
| | ) | |
| STATE FARM FIRE AND CASUALTY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

STATE OF ALABAMA

JEFFERSON COUNTY

### AFFIDAVIT OF MARTIN LONG

Before me, the undersigned for said County and in said State, personally appeared Martin Long, who is known to me and who, after first being duly sworn, deposes and says:

My name is Martin Long. I am over the age of 21 and have personal knowledge of the facts contained in this affidavit. I am the Plaintiff in the above-styled action and understand that this affidavit is being submitted to the Court in opposition to State Farm's Motion for Summary Judgment.

On February 4, 2005, I purchased a 2000 Chevrolet Corvette from City Auto Sales in Hueytown, Alabama. I paid for the car in full. The purchase price I paid was $25,000.00.

I arranged for insurance coverage on the Corvette from State Farm Fire & Casualty Insurance Company. In exchange for my payment of a $637.32 premium, State Farm issued an automobile policy to me bearing policy number 88 6750-B04-01. This policy provided full coverage on the Corvette for a policy period of February 4 to August 4, 2005.

I had a longstanding desire to own a Corvette like the one I bought from City Auto Sales and insured with State Farm. I spent hours on the internet searching for just the right one.

1

On February 18, 2005, I drove my Corvette from Montgomery to Lithonia, Georgia, to spend the weekend at the Country Inn Suites with Valarie Ware Temple. I parked the Corvette near the hotel entrance that night, in plain view of a hotel security camera. The Corvette was not in the parking lot the next morning. I do not know who took my car. I had no involvement in the theft of my car. I did not want to lose my car. I had wanted a Corvette for a long time and in fact have gotten another once since losing this one to theft.

I made a claim to State Farm in which I sought to recover for the fair market value of my car under my automobile policy. State Farm assigned Claim No. 01-6596-564 to my claim for the fair market value of my Corvette. I did not make any claims under my automobile policy for any personal property that was in the car at the time that it was stolen; instead, I made those claims under a manufacturer's homeowner's policy for which I paid a separate premium to State Farm. I made my claim for the personal property items under the manufacturer's home policy at the direction of State Farm employees.

My car was in good working order before it was stolen. The brakes worked perfectly. The transmission shifted smoothly and without any difficulty. Before I actually saw the damage to my Corvette, a State Farm claim representative had called me and described the extensive damage to me. When I first saw my car after it was stolen, the top was missing, the seats were gone, the passenger window was broken, the tires and rims that I had on the car had been replaced with cheaper, alternate brand tires and rims, the wheel lug nuts were missing and others were loose, air conditioner vents were broken and parts of the dash and console had been removed. The car had no brakes and was not driveable in the condition that it was in after it was recovered.

I do not know whether the alarm system on the car ever worked. I never tested the alarm system before it was stolen.

I have taken measurements of the parking lot where my car was stolen. There was over 24 feet of room between the parking spaces and the planter curb line. This distance and the tape measure verifying this measurement are reflected in the photographs attached to this affidavit. In addition, I am attaching photographs that show that the cars in the parking lot are clearly visible from the street.

I was essentially debt free at the time my car was stolen. From the proceeds I received from the personal injury settlement, I had paid off all of my credit card bills, my wife's car loan and her student loans. I owned the Corvette free and clear of any liens. I could have sold it easily if I wanted money but I did not want to sell the car and did not need to sell the car. I had already been awarded a monthly disability that paid me more than my living expenses. I receive $4,200.00 per month for my disability. Before State Farm denied my claim, I had provided it with documentation showing that I was debt free and had a fair/good credit score.

2

I have never been convicted of a crime. I have never been involved in the theft of a car. I do not know who stole my Corvette from the hotel parking lot, the precise time when it was taken or how it was taken. I just know that I had no part in the theft and had no reason to want my car stolen.

_Martin O. Long_

MARTIN LONG

Sworn to and subscribed before me this

_30th_ day of May, 2007.

_Jane H. Blalock_

Notary Public

My Commission Expires: _5/11/2010_

3













# Preface

**ACM**
**January 5, 2005**

The purpose of the Auto Claim Manual is to communicate claim policy and outline guidelines involving claim practices and procedures for use by the State Farm Mutual Automobile Insurance Company claim organization. The manual is for the sole use of State Farm® claim employees in the performance of their duties. Distribution or copying of any part of this manual without the express permission of State Farm is prohibited.

As preparation of an auto claim manual for each individual state is not practicable, this claim manual is intended to provide guidelines for use in all states and Canada. However, some of the information and guidelines may not be applicable in each state because of variations in interpretation of policy language and/or local law.

State Farm requires that all claims be handled in compliance with the various laws and regulations of each state. This manual is not intended to abrogate any specific state requirement.

The Auto Claim Manual is intended to provide consistency in the claim handling process. However, as it is not possible to describe or anticipate every conceivable factual circumstance involved in automobile bodily injury and property damage claims, every claim must be handled on an individual basis.

STATE FARM'S CLAIM PHILOSOPHY IS TO PAY WHAT WE OWE — promptly, courteously, and efficiently. To accomplish this, each claim, large or small, should be handled only on its own merits, in accordance with the facts of the loss, the law, and applicable coverage — not on the basis of a person's race, age, religion, sex, national origin, or any other irrelevant consideration. Our communications to policyholders, claimants, and others with whom we do business, as well as our internal communications, should clearly and consistently demonstrate this claim philosophy.

State Farm's claim department has an obligation to its insureds to fairly and promptly investigate and then appropriately negotiate, settle, or defend covered claims for damages.

This manual shall be made available to all State Farm claim handlers and management engaged in the disposition of claims involving the automobile policy contract. Any claim handler questions that arise in the application of these guidelines and procedures to individual claims should be discussed with the employee's immediate supervisor.

© 1999, 2000, 2001, 2002, 2003, 2004, 2005 State Farm Mutual Automobile Insurance Company. All Rights Reserved.

This copyrighted manual contains valuable trade secrets and other proprietary information belonging to State Farm Mutual Automobile Insurance Company. None of the material contained within may be copied, duplicated, distributed, or disclosed to third parties without the express, written permission of State Farm Mutual Automobile Insurance Company. This manual is the property of State Farm Mutual Automobile Insurance Company.

ClaimsNet|Auto Claims|CA&P|Catastrophe|C.R.A.S.H.|Estimatics|Fire Claims|Glass Central MMG|P&C Claims|Replacement Service|S. I. U.|Subrogation|Subrogation|T.I.P.P.|Work Comp

For internal use only. Nothing contained in this site
shall be disclosed outside State Farm unless proper authorization is obtained.

Z 249 1532



LONG/STATE FARM
SF1 0001 -P

LONG, MARTIN O. V. SFFCC

LONGM00000001PROD

Case 2:06-cv-00816-MHT-CSC    Document 35-3    Filed 05/31/2007    Page 2 of 4

# Preface

**ACM**
**January 11, 2006**

The purpose of the Auto Claim Manual (ACM) is to communicate claim policy and outline guidelines involving claim practices and procedures for use by the State Farm Mutual Automobile Insurance Company claim organization. The manual is for the sole use of State Farm® claim employees in the performance of their duties. Distribution or copying of any part of this manual without the express permission of State Farm is prohibited.

As preparation of an auto claim manual for each individual state is not practicable, this claim manual is intended to provide guidelines for use in all states and Canada. However, some of the information and guidelines may not be applicable in each state because of variations in interpretation of policy language and/or local law.

State Farm requires that all claims be handled in compliance with the various laws and regulations of each state. This manual is not intended to abrogate any specific state requirement.

The ACM is intended to provide consistency in the claim handling process. However, as it is not possible to describe or anticipate every conceivable factual circumstance involved in automobile bodily injury and property damage claims, every claim must be handled on an individual basis.

STATE FARM'S CLAIM PHILOSOPHY IS TO PAY WHAT WE OWE -- promptly, courteously, and efficiently. To accomplish this, each claim, large or small, should be handled only on its own merits, in accordance with the facts of the loss, the law, and applicable coverage -- not on the basis of a person's race, age, religion, sex, national origin, or any other irrelevant consideration. Our communications to policyholders, claimants, and others with whom we do business, as well as our internal communications, should clearly and consistently demonstrate this claim philosophy.

State Farm's claim department has an obligation to its insureds to fairly and promptly investigate and then appropriately negotiate, settle, or defend covered claims for damages.

This manual shall be made available to all State Farm claim handlers and management engaged in the disposition of claims involving the automobile policy contract. Any claim handler questions that arise in the application of these guidelines and procedures to individual claims should be discussed with the employee's immediate supervisor.

© 2000, 2001, 2002, 2003, 2004, 2005, 2006 State Farm Mutual Automobile Insurance Company. All Rights Reserved.

This copyrighted manual contains valuable trade secrets and other proprietary information belonging to State Farm Mutual Automobile Insurance Company. None of the material contained within may be copied, duplicated, distributed, or disclosed to third parties without the express, written permission of State Farm Mutual Automobile Insurance Company. This manual is the property of State Farm Mutual Automobile Insurance Company.

For internal use only. Nothing contained in this site
shall be disclosed outside State Farm unless proper authorization is obtained.

Our Commitment to
Our Policyholders

Z 041  00200

LONG/STATE FARM
SFI 0003 -P

LONG, MARTIN O. V. SFFCC

LONGM00000003PROD

# Our Commitment to Our Policyholders

*It is the responsibility of the State Farm claim staff to implement Company philosophy with respect to claim handling. Our commitment to our policyholders is to treat them like a good neighbor. We should:*

- Listen, be fair, be open, and carry out our part of the bargain under the contract in good faith.

- Be familiar and in compliance with those laws and regulations that impact claims in the appropriate state, and treat policyholders consistent with requirements of the law.

- Explain all relevant coverages under the policy. Encourage policyholders to report all losses and avail themselves of all benefits under their coverages.

- Diligently investigate the facts to determine if a claim is valid, reasonably evalute the claim, and act promptly in resolving the claim. If it is necessary to reject a claim for coverage or damages, it should be done promptly and courteously, with an explanation for the decision.

- Make an objective evaluation of the facts and circumstances supporting our policyholders' claims. Doing so helps ensure our policyholders obtain all benefits available provided by the insurance policy.

- Give insureds a reasonable opportunity to comply with their responsibilities under the policy. If a claim is rejected, be willing to listen to subsequent input from the insured. Complete any necessary follow-up in a timely fashion, giving due consideration to any additional findings.

- Communicate with and be responsive to inquiries from insureds and their attorneys by promptly answering letters and phone calls.

In addition to our obligation to deal fairly with each policyholder, we also have an obligation to pay only covered claims in the proper amount. Payment of those claims not covered, or fraudulent claims, unnecessarily increases insurance costs for all policyholders.

In summary, we are committed to paying what we owe, promptly, courteously, and efficiently.

###

| April 1999 | Auto Claim Manual | **1** |
| | General Information | LONG/STATE FARM |
| Z  041   00201 | Our Commitment to Our Policyholders | SF1  0004  -P |

LONG,  MARTIN  O.  V.  SFFCC

LONGM00000004 PROD

# AUTO CLAIM COMMITTEE REPORT

| | |
|---|---|
| Preparer's State Code: 01 <br><br> Prepared by: Tony Nix <br><br> Claim #: 01-6596-564    Pol #1: <br> Claim #:    Pol #2: <br> Claim #:    Pol #3: <br> Named Insured: Martin Long <br> Address: 2752 Caroline Dr. <br> City: Millbrook <br> State/Zip: AL, 36054 | Rehearing   ☐Yes X No <br><br> Rehearing Number: <br><br> Date of Last Hearing: <br><br><br><br><br> Agent: Mike Devers      Code: 01-1973 |

**Policy #1**

Policy No: 0886-750-01
Coverage and Limits
A 100/300/50, C 5,000, D500, G500, H, U 20/40      Policy Form No: 9811A

Appl. Endors. Numbers: 6082 AJ.1
Coverage Involved: D500 (331)
Present Reserve: 27,500.00      Date Set: 05-11-05
Prior Reserve: 5,000.00      Date Set: 02-19-05

## SECTION MANAGER'S RECOMMENDATION:

I.   Questions:

Has the insured failed to cooperate with us by virtue of providing false and conflicting information, has there been direct and accidental loss of or Damage to property covered as defined in Section IV – Physical Damage Coverages, and has the insured concealed and misrepresented information material to the claim?

II.   Issues:

Our investigation has revealed that a loss as defined in Section IV - Physical Damage Coverages of the policy has not occurred and the insured concealed and misrepresented information material to the claim.

III.   Recommendation:

Deny the claim to the insured as the damage was not caused by a loss as defined in Section IV – Physical Damage Coverages and due to material misrepresentations made during the presentation of the claim.

Date of Decision: June 22, 2005
Present: Jeff Crow, David Fisher,
Jon Hatch, Tony Nix, Lloyd Renfrow, Logan Smith,
Nancy Stevens, Brett Suiter

Return file copy? ☐Yes ☒No
Chairperson (E-Mail alias): David Thomas (BLVB)
Chairperson Phone #: 770-418-5936

PLAINTIFF'S EXHIBIT
21

104699.2   Rev. 03-      **Page 1 of 10**

Long/State Farm
SF1   00059

## STATEMENT OF FACTS

Date of Loss: February 19, 2005                    Time: Approximately 7:00 a.m.

Location of Loss: Country Hearth Inn, 5400 Fairington Rd, Lithonia, GA.

Include the following information:

A)  Described vehicle for each policy involved.
    2000 Chevrolet Corvette, VIN 1G1YY22G9Y5132554.

B)  Vehicle involved in loss.
    As described above.

C)  Driver of vehicle involved.
    Unknown.

D)  Brief statement of facts of loss.
    According to Mr. Long, on Friday, February 18, 2005, he drove the insured vehicle to Lithonia, GA in order to relax for the weekend.  He stayed at a Country Hearth Inn located off I-20 in Lithonia, GA.  On Saturday morning, February 19, 2005, at approximately 7:00 a.m., the insured discovered his vehicle missing from the parking lot.  He called the Dekalb County Police Department and reported the theft of his vehicle.

    On February 25, 2005, the insured vehicle was recovered, partially stripped and abandoned near an apartment complex in Decatur, GA.

## DESCRIPTION OF CLAIMS

List separately EACH Insured involved in the loss and provide all available information regardless of the status of that claim. Include as a minimum on Injury Claims:

A)  Identifying information on the insured (Age, employment, marital status, position in vehicle).
    Martin O. Long was born August 13, 1968 and is thirty six (36) years old.  He has been unemployed since he was injured on the job at CSX Transportation in March 2003.  A settlement in the amount of $256,000.00 was reached with CSX Transportation in January 2005.  Mr. Long received $175,568.99 after attorney fees and expenses. Mr. Long was previously in the Army for approximately ten and a half (10 ½ ) years. In 1992, at a rank of E5, Mr. Long received an honorable discharge from the Army due to an injury he received parachuting out of a plane.  He currently receives $1,140.00 a month in disability benefits from the Army.

    Mr. Long is currently separated from his wife, Evelyn Long, who resides at 1705 Deatsville Hwy, Millbrook, AL.  Mrs. Long is employed with the State of Alabama in the Department of Human Resources.  Mr. Long and Mrs. Long confirmed they have filed for divorce, but the agreement has not been finalized.

    Mr. Long has no children and/or dependents.

B)  Detailed description of injuries and treatment.
    N/A.

C)  Discussion of impairment.
    N/A.

D)  Description and analysis of all damages.

Long/State Farm
SF1   00060

The insured vehicle was recovered with the following damages and/or parts missing: The front bumper cover was damaged; the removable top and/or roof panel was missing; the front seats were missing; the wheels and tires were removed and replaced with another set; the passenger side window had been knocked out; scratches and minor damage to the interior upholstery; all over exterior scratches to the body; the exterior portion of the ignition lock cylinder was damaged; the cover around the column was loose; and finally, while sitting at the recovering wrecker service, the vehicle sat through a snow and ice storm completely soaking the interior. As a result, the vehicle was determined to be a total loss. CR Todd Smith requested an NADA valuation on the described vehicle and it reflects a base value of $24,900.00. When considering tax and fees, the actual cash value of the insured vehicle is $25,789.50 less the $500.00 deductible.

Mr. Long purchased the insured vehicle on February 4, 2005, for approximately $25,000.00 cash; therefore, there is no lien on the insured vehicle. A copy of the certificate of title was secured from the insured.

Mr. Long secured a rental vehicle from Enterprise RAC in Georgia the weekend of the alleged theft. He currently remains in the rental.

E)  Current demand and offers (specify if a time limit demand is involved).
    Affidavit of Vehicle Theft submitted by the insured indicates that he is making claim for $25,000.00."

F)  Current evaluation and range of values.
    The actual cash value of the insured vehicle less the applicable deductible is $25,289.50.

1.  Any convictions or pleas?
    None.

2.  If claim in suit, when and where filed? Trial Date? Does Excess Assurance Protection (EAP) apply? ☐Yes x No
    Date EAP Letter Sent?

3.  Other car insured? ☐Yes ☐No    Limits            Company

4.  Is there an umbrella policy or excess policy in existence? (Note: Both the Agent and the Insured must be contacted.) ☐Yes  x No
    If so, list name of carrier and advise date they were notified.

5.  Name of insured's attorney.
    On May 24, 2005, we received notice of representation from attorney F. Tucker Burge with Burge and Burge in Birmingham, AL.

7.  Name of our claim representative and recommendation.
    SIU CR Todd Smith recommends we deny the insured's claim.

8.  Recommendation of Claim Team Manager.
    Tony Nix recommends we deny the insured's claim.

9.  Unusual conditions affecting trial or verdict.
    N/A.

10. Non-Waiver obtained? ☐Yes  X No

11. Reservation of Rights Letter Sent? X Yes ☐No

12. From whom, or to whom? Date? Reason?

Long/State Farm
SF1  00061

A Reservation of Rights letter was mailed to Mr. Long on March 4, 2005 with the following reason noted:

"It is questionable whether there has been direct and accidental loss of or Damage to property covered by the Physical Damage Coverages of the policy."

13.  Issues (if needed to determine coverage, attach application file and coverage record, and copies of any pertinent endorsements.) When applicable, the following sub-headings should be covered:

A)  Question

    1.  Has the insured failed to cooperate with us by providing false and conflicting information?

    2.  Has there been direct and accidental loss of or damage to property covered as defined in Section IV – Physical Damage Coverages?

    3.  Has the insured misrepresented information material to the claim?

B)  Policy Language.

## REPORTING A CLAIM – INSURED'S DUTIES

    ...

    5.  **Insured's Duty to Cooperate with Us**

        b.  The **insured** shall cooperate with us and , when asked, assist us in:
        ...

        (2)  securing and giving evidence;

    ...

## SECTION IV – PHYSICAL DAMAGE COVERAGES

**Loss** – means, when used in this section, each direct and accidental loss of or damage to:

    1.  **your car**;
    ...

## CONDITIONS

    ...

    9.  **Concealment or Fraud**

        There is no coverage under this policy if  **you** or any other **person** insured under this policy has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy.

Long/State Farm
SF1  00062

C) Evidence.

Prior to the referral to SIU, the following indicators and/or questions were recognized by the line unit:

- In February 2005, the insured filed a claim under number 01-6596-758 where he was involved in an exchange of gunfire with another person. This claim was referred to SIU.
- Insured is unemployed.
- Insured claimed a large amount of expensive items stolen from his vehicle. Specifically, he filed a homeowner's claim under number 01-Q177-057, which was also referred to SIU.
- Insured has had a high frequency of claims.
- Insured is currently disabled.
- Insured vehicle was recently purchased.
- Loss on New Business (policy inception date was February 4, 2005).
- Insured has recent or current marital problems.
- Line unit indicated there was a delay and/or no report made to the police.

Upon referral to SIU, CR Todd Smith researched NICB On-line and found the insured vehicle was entered on NCIC as an active, stolen vehicle contrary to what the original referral to SIU indicated. On February 28, 2005, Todd spoke with a Detective in the Dekalb County Police Department's Auto Theft Unit and confirmed the vehicle was reported stolen on the date of loss. While discussing the case, the detective indicated the vehicle was recovered on Friday, February 25, 2005 abandoned in Decatur, GA. CR Smith called the insured and notified him of the recovery.

On February 28, 2005, Todd secured copies of the initial theft and recovery reports. Upon review, it was noted that the insured vehicle was recovered near an apartment complex less than ten (10) miles from the theft site. Also, the initial theft report failed to document any personal items stolen along with the described vehicle.

On March 1, CR Smith inspected the insured vehicle at Top Cat Towing in Lithonia, GA. At that time, he observed the damages as previously documented in this report. Even though there was minor damage to the column and exterior damage to the ignition lock cylinder, the steering wheel was in the locked position. He verified that the insured called Top Cat and gave them permission for State Farm to secure his vehicle. After the initial vehicle inspection, CR Smith spoke briefly with Mr. Long regarding the vehicle recovery and condition. Mr. Long advised Mr. Smith that he did not want the vehicle back after it had been stolen.

CR Smith conducted data research and secured documentation supporting Mr. Long's recent workers compensation case filed against CSX Transportation Railroad. Also, he secured documentation supporting a separate civil case Mr. Long filed against a man named Bobby Long in 2004.

Todd Smith met with Mr. Long in Montgomery, AL and secured his recorded statement regarding this claim. At that time, CR Smith gave Mr. Long an Affidavit of Vehicle Theft for his completion. As for the facts of the loss, Mr. Long stated he went to the Atlanta area Friday evening February 18, 2005, in order to get away and relax. He said he stayed at the same hotel four or five months ago. He could not recall the exact time he checked into the hotel, but thought it was possibly 10:00 or 11:00 a.m. Mr. Long claimed he went to the Atlanta area alone and just stopped off the interstate and got a room. CR Smith specifically asked him who he went with and he replied "just me." CR Smith questioned if a female was with him and he continued to claim he was by himself. He said he parked the insured vehicle directly in front of a door and/or entrance to the hotel with a surveillance camera nearby. He indicated he locked his vehicle and did not leave any keys inside the passenger compartment. On Saturday morning, February 19, 2005, at approximately 7:00 a.m., he discovered his vehicle missing. When asked why he was leaving the hotel at this time in the morning and he replied, "probably to get something to eat." Mr. Long observed glass in the parking lot next to where his vehicle was parked. After the discovery of his missing vehicle, he asked the hotel manager to review the camera and was told that it was not on. The insured called the local police and reported the theft. Mr. Long indicated the theft seemed like it was a set up and he believed the hotel manager had something to do with

Long/State Farm
SF1  00063

it. Mr. Long admitted he cussed out the hotel manager during the course of their conversation regarding the fact that the surveillance camera was not on.

As for the keys to the insured vehicle, Mr. Long confirmed receiving two (2) sets of keys when he purchased it on February 4, 2005. He gave CR Smith one set but indicated that he did not know where the second set was located. Specifically, he said "I'm thinking I must have either left them in the car or somewhere. I don't know where the other set of keys are at." He confirmed the set of keys he provided State Farm was in his possession at the time of the alleged theft.

Mr. Long claimed he had a large amount of personal items in the vehicle at the time of the alleged theft. These items included the following: a 45 caliber handgun; a black leather jacket; $5,000.00 cash; three (3) suits and two (2) pant suits; four (4) pairs of shoes; four (4) bracelets; three (3) rings; one (1) portable DVD player; and, a watch. CR Smith asked Mr. Long if he told the police about everything in his vehicle when he reported the theft and he admitted he did not. However, he indicated that a lady with the police department told him to wait and call back with everything in the vehicle and complete an additional information form. A supplemental narrative was added to the original theft report on March 2, 2005. At that time, the insured listed the personal items allegedly stolen from his vehicle. Mr. Long filed a separate claim under his homeowner's policy for the items reported as stolen.

During Mr. Long's recorded statement, CR Smith questioned him regarding his financial situation. Mr. Long admitted he recently settled a worker's compensation claim against CSX Transportation Railroad for $256,000.00, of which he received approximately $175,000.00. Also, he indicated that he currently receives approximately $1,100.00 per month in disability benefits from the Army and these payments are his main source of income. Mr. Long acknowledged that he was having financial problems before he settled his worker's compensation claim. Upon receiving the settlement, he used a majority of the money to pay bills. These bills included approximately $50,000.00 in credit card debt, $43,000.00 for his wife's student loan and $25,000.00 was used to purchase the insured vehicle. He stated that he only had $5,000.00 left out of his settlement proceeds.

In addition to the described vehicle, the insured owns a Ford Mustang. As result of the insured being declared disabled from his employment with CSX Transportation Railroad, a disability benefit included in the finance agreement pays the remaining monthly payments on the vehicle. Thus, the insured is no longer obligated to make that monthly note.

Mr. Long previously filed a catastrophe hail claim in April 2003 regarding damage sustained to his home. As a result, he received payment in the amount of $2,873.41. The policy notes on the Claim Service Record under claim number 01-Q177-057 reflect that the repairs were not made to the insured's home as he needed the money to pay his bills. Also, it states that he was expecting to go to court on January 31, 2005 to get compensation for an injury he received on the job. As of December 2004, no repairs had been made to the home. This information reflects that Mr. Long was having financial problems prior to the theft alleged theft.

Mr. Long was questioned about his recent auto claim which was filed February 13, 2005, under claim number 01-6596-758. He indicated that he was involved in an exchange of gun fire while driving his Ford Mustang in Millbrook, AL. Mr. Long admitted he accidentally shot his own vehicle after another person started shooting at him. As a result, State Farm paid $3,363.80 for the damages. A copy of the incident report referencing this claim was secured from the Millbrook, AL Police Department. In addition, Mr. Long acknowledged that he had another Chevrolet Corvette stolen from his residence five (5) or six (6) years ago. As a part of this investigation, CR Smith researched frequency tracking, NICB data base, ISO data base, and interviewed the State Farm Agent. He could not locate any record of a previous claim involving a corvette.

On March 8, 2005, Mike Bresnock with Transportation Technology inspected the insured vehicle at Verastar South in Forest Park, GA. CR Smith met Mr. Bresnock at Verastar and gave him the key and keyless remote provided by our insured in order to assist with his inspection. The key functioned satisfactorily on the driver's side door lock, enabling it to open and lock with no irregularities. Mr. Bresnock's first attempt to start the vehicle using the key provided by Mr. Long was unsuccessful. After inspecting the pellet reader, Mr.

Long/State Farm
SF1  00064

Bresnock was of the opinion that the pellet reader was simply mis-positioned which prevented the ignition key from rotating the ignition cylinder to the start position. When the pellet reader was properly positioned, the engine was able to start and run. While the engine was in operation the following messages appeared: low brake fluid, service traction sys, service active hndlg, and, brake before shift. The odometer reflected that the mileage on the insured vehicle was 71,064.

Mr. Bresnock then located the theft deterrent relay located on the passenger side floor surface. A visual inspection of the relay provided no evidence to indicate that it had been altered in anyway to enable the engine to be started without the correct key. After completing the ignition system and theft deterrent test, it was Mr. Bresnock's opinion that the vehicle had not been started and operated without the correct ignition key. Also, Mr. Bresnock noted some marks on the rubber sections of the passenger side window weather stripping and the roof panel weather stripping. These areas may have been subjected to a sharp object which enabled access to the interior. Mr. Bresnock noted the glass breakage and missing parts as previously indicated in this report.

On June 22, 2005, Mr. Bresnock re-inspected the vehicle to conduct follow-up tests. He advised that the results of that testing did not change the opinion that had been previously communicated to State Farm.

In conclusion, Mr. Bresnock noted "the insured vehicle was equipped with the General Motors Pass Key System, which is a subsystem of the body control module. The body control module provides all of the logic to operate the pass key system. The body computer uses input information from other systems and components to determine the status of the pass key. The body computer controls its output functions based on the status of the pass key. The pass key fuel enable function is provided by the power control module. When the correct pass key is inserted into the ignition key lock, the key reader transfers the pellet information to the body computer. The body computer in turn signals the power train control module to enable or disable fuel injection in order for the engine to run. The ignition cylinder and key used by the pass key system is supplemented by a pellet reader to determine if the correct key is being used to start the vehicle. When the ignition is first turned on, the body control module measures the value of the key through the sensing contacts located on the pellet reader. The theft deterrent relay is part of the pass key system and can disable engine cranking through the theft deterrent relay. When the body control module detects the correct pass key, the body computer allows the engine to be cranked and simultaneously instructs the power train control module to enable fuel injection. Inspections and tests conducted on this vehicle provided no evidence to indicate that any of these systems had been by-passed to enable the vehicle to be started and driven without the use of the correct ignition key. In consideration of the tests and inspections along with the summary of this vehicle's theft control system it is Mr. Bresnock's opinion that this vehicle was not operated without the correct ignition key.

Mr. Long claimed his vehicle was equipped with a factory alarm system. He testified that his vehicle was locked and the alarm system was engaged. Mr. Bresnock completed an addendum to his original report addressing the alarm system on the insured vehicle. He indicated the 2000 Chevrolet Corvette was equipped with UTD (Universal Theft Deterrent System) in addition to the Pass Key theft deterrent system. The UTD and Pass Key security systems were standard equipment for the 2000 Chevrolet Corvette. The UTD system monitors the following through the BCM (Body Control Module): Driver & Passenger door ajar switches, courtesy switch, ignition switch (for an incorrect key), hood ajar switch, parking headlamp switch and power door lock switches. If the BCM senses an intrusion in any of the above, it enters the alarm mode, which consists of the horn sounding, the lights flashing, and the cranking and fuel are disabled.

Mr. Long testified that he received two (2) sets of keys when he purchased the vehicle only two (2) weeks before the alleged theft. At the time of the alleged loss, he only had one (1) set of keys with him. He provided this set to CR Todd Smith. He also identified this set of keys at his EUO and testified he recognized them as his key. Mr. Long testified that he does not know the location of the second set of keys. After Mr. Bresnock's inspection on March 8, 2005, Mr. Smith spoke with Mr. Long and discussed the key issue. Specifically, he addressed Mr. Long's inability to account for the second set of keys. At that time, Mr. Long got very angry. Once again, during Mr. Long's recorded statement, he could not explain where the other set of keys were located. He suggested they may have been left in the insured vehicle or somewhere? However, in his EUO, he testified that he did not give the second set of keys to anyone and

that they were not in the insured vehicle on the date of loss. Mr. Long testified that he had tried to look for the keys but was unable to locate them.

On March 4, 2005, Todd Smith met with Ram Naidu, shift manager at the Country Hearth Inn in Lithonia, and secured his recorded statement. He confirmed working Friday night, February 18, 2005 until Saturday morning, February 19, 2005. He said his shift did not start until after 8:00 p.m. and Mr. Long had already checked in prior to his shift starting. On Saturday morning, at approximately 7:00 a.m., he recalled Mr. Long came down into the lobby, walked outside and came back inside to report his vehicle stolen. Mr. Naidu confirmed sitting in the lobby with a friend that night and he recalled last seeing the insured vehicle between 2:30 a.m. and 3:00 a.m. He said Mr. Long asked him about the surveillance camera; however, he did not want to tell him that it was not working. Specifically, he indicated their computer that controlled the camera crashed a week before the alleged loss. He provided Mr. Long with the hotel manager's business card and recommended he follow up with his supervisor. Mr. Naidu said the insured made a couple of calls and approximately 15 to 20 minutes later, two of his friend's showed up in the lobby area. In addition to the two men, he said Mr. Long was accompanied by a woman. He overheard the two men and Mr. Long having a conversation. One of the men told Mr. Long to say that he had a suitcase in the car. Mr. Naidu understood the conversation to mean that Mr. Long should make up items which were in the car when the theft occurred in order to claim these on insurance. He also confirmed seeing glass in the parking lot and thought it was strange that the alarm did not go off if someone smashed the glass. He added he was sure he would have heard the alarm if it went off. Mr. Naidu indicated that the parking lot was well lit and he was surprised that the car was stolen. Mr. Naidu had no knowledge of any other vehicles being stolen from their location.

Based on the indicators present and the questions raised during the course of our investigation, we referred the matter to Attorney Angela Taylor to secure Mr. Long's EUO. On March 31, 2005, Mr. Long submitted to an EUO and provided all the requested documents in connection with the matter. During his testimony, he changed his story regarding the alleged facts of the loss. He testified that he and a lady friend named Valerie went to the Atlanta area the weekend of the alleged theft. He initially testified that he did not know Valerie's last name and he thought she lived somewhere in the Montgomery, AL area. We later learned she worked at the Doctor's office in Montgomery, AL that treated Mr. Long after his injury at CSX. Upon review of his cellular phone records, we noticed his account was actually under the name of Valerie Ware. Mr. Long confirmed Valerie purchased the phone for him, but he continued to act as if he wasn't sure of her last name. He testified that two of Valerie's brother's named Ricky and Sandy and two of their girlfriends followed them to the Atlanta area that weekend. He indicated the purpose of their trip was to relax. He said they arrived at the hotel in Lithonia on Friday, February 18, 2005 around 9:00 or 10:00 p.m. and this was the last time he saw his vehicle. The next morning, around 7:00 a.m., Ricky's girlfriend knocked on his door and asked about his vehicle. He claims she had gone to the Wal-Mart, which is located across the street earlier that morning and noticed the vehicle was gone when she returned. At that time, Mr. Long went downstairs and discovered his vehicle missing. He observed glass in the parking lot next to where his vehicle was originally parked. In Mr. Long's recorded statement, he said that he called the police and reported the theft. However, in his EUO, he testified that Valerie's brother, Sandy, actually called the police to report the theft while he called his niece in Millbrook, AL to get a phone number to call State Farm and file the claim. He testified that the police never came to the hotel to complete the report.

Mr. Long was asked if he recalled having any conversation with Ricky or Sandy regarding the contents in the insured vehicle. He testified that he could not recall any conversations he had with them about the contents. However, the shift manager at the Country Hearth Inn overheard the two men advising Mr. Long to claim his suitcase was stolen with the vehicle.

CR Smith identified a phone number for a Dr. Chung's office in Montgomery, AL. Afterwards, he confirmed they had a secretary at their office named Valerie. He spoke with Valerie and confirmed she knew Mr. Long. Specifically, she identified herself as Valerie Ware-Temple and she confirmed being with Mr. Long the weekend of the alleged theft. She confirmed her two brothers Ricky Ware and Sandy Ware and two of their lady friends also went with them to Atlanta that weekend. She said they went to visit their older brother, Donald Ware, who resides in the area. During Mr. Long's recorded statement, he said he did not go anywhere that weekend. During his EUO testimony, he failed to discuss going to Donald's home that Friday night.

Long/State Farm
SF1  00066

CR Smith spoke with Donald Ware and confirmed that the insured had visited him on Friday evening. After leaving Donald's residence, Valerie said they arrived at the hotel around 10:00 p.m. She stated that Mr. Long parked his vehicle in the parking lot near an area supposedly monitored by surveillance cameras and this was the last time she saw his vehicle. On Saturday morning, at approximately 7:00 a.m., she said one of the girls named Felicia called their room and advised them the vehicle was missing. However, Mr. Long testified that the girl knocked on their door to discuss the vehicle missing. She acknowledged that there was glass in the parking lot and that Mr. Long confronted the shift manager about the camera. She advised that her brother Sandy reported the theft to the police. After returning to Alabama, Valerie confirmed having a conversation with Mr. Long regarding the keys to his vehicle. Specifically, she said Mr. Long told her he had a second set of keys that may have been left in the vehicle. However, she only confirmed seeing one set that weekend.

The insured claimed several expensive personal items were stolen from the insured vehicle. He filed a homeowner's claim under number 01-Q177-057, which was also investigated in connection with this matter. Misrepresentations were noted in the presentation of that claim and are addressed in a separate Recommendation for Claim Resolution.

On May 12, 2005, Mr. Long advised he was seeking legal council and requested a certified copy of his policy. On May 24, 2005, CR Smith spoke with Attorney F. Tucker Burge with Burge and Burge out of Birmingham, AL and confirmed his representation of our insured. Afterwards, CR Smith secured a faxed letter of representation. On May 26, 2005, a certified copy of Mr. Long's policy was mailed via certified mail return receipt requested to Attorney Burge.

D)    Statutory and Case Law.

## GENERAL LAW ON MISREPRESENTATION

Section 27-14-28, *Code of Alabama*, (1975) states:

> "No misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy unless such misrepresentation is made with actual intent to deceive as to a matter material to the insured's rights under the policy."

In *American Fire & Cas. Co., Inc. v. Archie*, 409 So.2d 854 (Ala. Civ. App, 1981), the court stated:

> "After a loss, a misrepresentation need only be made with the actual intent to deceive and be related to a matter which is material."

E)    Discussion/Recommendation

To recap the issues at hand, we know the following:

- This is a loss on new business. Mr. Long purchased the insured vehicle on February 4, 2005, which was also the policy inception date. The alleged theft occurred approximately two (2) weeks later.
- Mr. Long is on a limited income due to his disabilities.
- Mr. Long has admitted he was experiencing financial problems prior to his injury settlement with the railroad.
- He spent approximately $170,000.00 of his $175,000.00 settlement proceeds within a two week period. Specifically, he testified that he only had approximately $5,000.00 left out of his settlement money.
- Mr. Long is currently going thru a divorce.
- The insured misrepresented material information related to the facts of the loss. Specifically, in his recorded statement, he claimed he was alone the weekend of the loss. After his statement and off the record, he admitted a female was with him; however, he refused to give us any of her contact information. He later testified that

Long/State Farm
SF1  00067

there were four other people with him and his lady friend named Valerie.
- An inspection of the insured vehicle by expert Mike Bresnock revealed it was not operated without the correct ignition key.
- The insured indicated that when he exited the car at the hotel it was locked with the alarm system activated.
- The insured has been unable to provide us with the second set of keys to his vehicle and he is unable to explain their whereabouts. In his recorded statement, he said the second set of keys may have been in the insured vehicle. At a later date, while discussing Mr. Long's inability to account for the other set of keys, he got very mad and demanded payment. In his EUO, Mr. Long testified that the other set of keys were not left in his vehicle.
- A witness overheard two of the men with our insured advising him to claim his suitcase was stolen along with the vehicle. However, the insured testified that he could not recall any conversation he had with Valerie's two brothers.
- As for the reporting of the alleged theft to the police, Mr. Long claimed he called the police in his recorded statement. However, in his EUO, he testified that one of Valerie's brothers called the police.
- The insured claimed several expensive, personal items were stolen along with his vehicle. Inconsistencies were revealed in the investigation of the homeowner's claim filed in connection with this matter.
- The insured admitted he has had a prior vehicle theft involving the same type of vehicle.. In addition, he has recently filed another claim whereas he accidentally shot his own vehicle while exchanging gun fire with another person.

Based on our investigation, it would appear that there is sufficient evidence that Mr. Long had a financial motive to procure this vehicle theft.

We have revealed discrepancies and inconsistencies in the insured's recorded statements versus his sworn statement that support he misrepresented information material to the claim.

In summary, there is sufficient circumstantial evidence to support our insured's involvement in the alleged theft of his vehicle.

As a result of the above, it is my recommendation that we deny the insured's claim based on the fact that it does not meet the definition of a loss as defined in Section IV - Physical Damage Coverages and based on the Concealment or Fraud provision of the policy.

Long/State Farm
SFI   00068

# PROPERTY LOSS PRELIMINARY REPORT

| | |
|---|---|
| Claim Number: 01-6596-564 | Policy #: 0886-750-01 |
| Named Insured: Martin Long | Date: 03-04-05 |
| Address: 2752 Caroline Dr., Millbrook, AL 36054 | DOL: 02-19-05 |
| Insured Vehicle or Loss Location: 2000 Chevrolet Corvette | VIN #: 1G1YY22G9Y5132554 |
| Date Reported To: Agent: 02-19-05 | Claim Office: 02-19-05 |
| Date 1st contact by Claim Rep: 02-19-05 | Date Inspected: N/A |
| Date 1st contact by SIU: 02-25-05 | Date SIU Inspected: 03-01-05 |
| Line Unit Mgr. Advised? Yes | |
| Coverage Question?  Yes | Non-Waiver/Reservation of Rights? Earlier today, we completed a Reservation of Rights letter to be sent to our insured. |

Nature of Question/s: "It is questionable whether there has been direct and accidental loss of or damage to property covered by the Physical Damage Coverages of the policy."

| | |
|---|---|
| Applicable Coverages: 331 | |
| Rental Involved? Yes | Details: Prior to the referral to SIU, the insured secured a rental vehicle from Enterprise. Actually, on the date of loss, Claims Central in AL set up a rental vehicle in GA in order for the insured to get home. |

Reason SIU Involved/NICB Indicators:

1) Prior to this claim, the insured recently filed a claim under number 01-6596-758 whereas he was involved in an exchange of gun fire with another person. This allegedly occurred on February 13, 2005 or approximately a week before the theft of his vehicle. This claim was referred to SIU as well.
2) The insured is unemployed.
3) The insured claims a lot of expensive items stolen from his vehicle. More specifically, he has filed a homeowner's claim under number 01-Q177-057. This claim has also been referred to SIU and assigned to me.
4) Therefore, the insured has had a high frequency of claims recently.
5) The insured is disabled from the Army and recently settled a workers compensation claim against the railroad.
6) The insured vehicle was recently purchased; therefore, we have loss of new business.



PLAINTIFF'S EXHIBIT
20

Policy inception date was February 4, 2005.
7) Insured has recent marital problems.
8) The insured was unable to provide all the keys to his vehicle.
9) Claim Central indicated there was a delay in reporting the matter to the police.

Suggested Investigative Activities:

- Upon referral to SIU, I researched NICB On-line and frequency tracking. As previously indicated, the referral form to SIU indicated there was a delay in reporting the matter to the police. Actually, it indicated no report had been made to the police. However, when I researched NICB On-line, I noticed the vehicle was entered on NCIC as an active stolen vehicle.
- I went to the alleged theft site at the Country Hearth Inn, 5400 Fairington Dr., Lithonia, GA and left my business card with a request for the shift manager that was on duty that morning to call me to discuss the matter. While there, I secured photos of the theft site.
- On February 28, I spoke with a Detective Fitzpatrick with the Dekalb County Police and confirmed the vehicle was reported stolen to their agency. Actually, while speaking with him, I learned the vehicle had already been recovered. He faxed me a copy of the initial theft report and the recovery report. I verified the vehicle location at TopCat Towing in Lithonia and also called the insured and left him a detailed message regarding the vehicle recovery.
- On March 1, I inspected the insured vehicle at TopCat and secured photos. The top, seats and center caps were missing. Also, there appeared to be damage to the column and ignition. Unfortunately, the vehicle had sat out in the rain and sleet over the weekend and the interior was damaged as a result. While at TopCat, I verified the insured called and ok'd the release of his vehicle to State Farm. Afterwards, I called Verastar South and requested the insured vehicle pickup.
- I made the initial referral to the TC regarding the total loss.
- With the assistance of a CR in AL, we researched an on-line jurisdiction site for AL and secured a copy of the workers compensation case our insured filed against the railroad and another case he's recently filed against a relative of his.
- On March 2, I met with the insured in Montgomery and secured his statement regarding the claim, one key and keyless remote to his vehicle, receipts from recent purchase of tires for the vehicle and an alignment, his completed Affidavit of Vehicle Theft. Note, the insured said he had two (2) sets of keys to his vehicle when he recently purchased it; however, he could only provide us with one (1) set. I showed the insured photos of the recovered vehicle and he claimed the wheels and tires were stolen as well. Interestingly enough, the insured was very adamant he did not want the vehicle back regardless of the condition, claiming he did not want any vehicle after it had been stolen.
- Earlier today, I met with the Ram Naidu, the shift manager on duty at the Country Hearth Inn the morning the alleged theft was discovered. He confirmed our insured checked in on February 18th and checked out on February 20th. He stayed in room 217. He gave me a recorded statement regarding his involvement and knowledge of the matter.
- As for future handling, I'm scheduled to meet Mike Bresnock on Tuesday, March 8, 2005 at Verastar South so he can inspect the insured vehicle to see if the

ignition and column were defeated. I secured verbal permission from the insured to inspect his vehicle. After his inspection, we should have a better idea how we should proceed in this matter. In the meantime, I've faxed the request to inspect the insured vehicle to Mike.

- The insured admitted he and his wife recently separated and they are planning on filing for divorce. I will attempt to contact her to discuss this claim, their marital status, the insured's financial status, etc.

- Also, I feel like we should request our insured's cell phone records. Note, the shift manager at Country Hearth Inn said our insured called someone via his cell phone after discovering the theft. Then, shortly there after, two men of Jamaican decent arrived and met the insured. He even said these 2 men went to our insured's room with him. However, our insured claimed he was not there with anyone and did not have any friends there. Also, the insured initially said he was not even there with a woman. However, off the record, he admitted he met a woman there, but he did not want this information to get out and would not give me her name. It would appear our insured is not telling us the truth relating to the events from that morning.

- I will plan on contacting the dealer in Hueytown, AL that recently sold the vehicle to our insured to discuss the vehicle condition, etc.

- I will secure a valuation on the insured vehicle to determine the ACV.

- We may want to consider an EUO based on the indicators present and the initial questions raised thus far in our handling.

| Reserves Adequate? At this time, yes | Salvage Involved? Yes | |
|---|---|---|
| Open In Register? Unknown. I will follow up with Pennie to make sure it's opened in the register. | Jacket Marked? No | |
| Claim Rep: Todd Smith | Office: Carrollton | Date: 03-04-05 |
| Attachments enclosed? | Yes - See claim file | No |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Supervisory Comments:**
Continue as outlined above. Advise if an EUO is warranted. A&E is waived.

| Team Manager: Tony Nix | Date: 3/4/05 | Next Diary Date: 4/4/05 Type of Report: Progress |
|---|---|---|

Enclosures:

Long/State Farm
SF1  00124

# Burge
# & Burge
# Trial Lawyers

June 29, 2005

850 Park Place Tower
2001 Park Place North
Birmingham, AL 35203
Telephone: (800) 633-3733
                    (205) 251-9000
Facsimile: (205) 323-0512
www.burge-law.com

Frank O. Burge, Jr.
F. Tucker Burge
Courtney B. Brown
Claire B. Morgan

Mr. Todd Smith
State Farm Insurance Companies
11350 Johns Creek Parkway
Duluth, GA  30198-0001

Re:    Martin Long
       Claim Number: 01-6596-564
       Date of Loss: February 19, 2005

Dear Mr. Smith:

I am writing in follow up to your June 28, 2005, conversation with my secretary, Jane Blalock, in which you informed her that State Farm was denying Mr. Martin Long's claim on the grounds that his claim did not meet the qualifications as a loss under his insurance policies and on the grounds that he made material misrepresentations. Please provide my office with State Farm's written statement outlining Mr. Long's alleged material misrepresentations.

Sincerely,

F. Tucker Burge

F. Tucker Burge

FTB/jb



Long/State Farm
SF1  00133

State Farm Fire and Casualty Company
PO Box 2661
Birmingham, AL 35287

R 35797-4-Y                FIRE    OVL

DECLARATIONS PAGE

NAMED INSURED                          01-1973-443Y

LONG, MARTIN O
2752 CAROLINE DR
MILLBROOK AL  36054-4103

ıllıllılıllıulılılılılılılllıuılılılıullıll

DO NOT PAY PREMIUMS SHOWN ON THIS PAGE.
SEPARATE STATEMENT ENCLOSED IF AMOUNT DUE.

POLICY NUMBER  88 6750-B04-01

POLICY PERIOD FEB 04 2005 to AUG 04 2005

STATE FARM PAYMENT PLAN NUMBER
1021767709

AGENT

MIKE DEVERS INS AGENCY INC
100 DEATSVILLE HIGHWAY
MILLBROOK, AL 36054-1828

PHONE: (334)285-3662

| YEAR | MAKE | MODEL | BODY STYLE | VEHICLE ID NUMBER | CLASS |
|------|------|-------|------------|-------------------|-------|
| 2000 | CHEVROLET | CORVETTE | 2DR | 1G1YY22G9Y5132554 | 1A30N182 |

| SYMBOLS | COVERAGES | PREMIUMS |
|---------|-----------|----------|
| | See policy for coverage details. | 2000 CHEVROLET |
| A | Bodily Injury/Property Damage Liability | $167.65 |
| | Limits of Liability-Coverage A-Bodily Injury | |
| | Each Person, Each Accident | |
| | $100,000    $300,000 | |
| | Limits of Liability-Coverage A-Property Damage | |
| | Each Accident | |
| | $50,000 | |
| C | Medical Payments | $18.48 |
| | Limit of Liability-Coverage C | |
| | Each Person | |
| | $5,000 | |
| D500 | $500 Deductible Comprehensive | $88.21 |
| G500 | $500 Deductible Collision | $315.18 |
| H | Emergency Road Service | $5.30 |
| U | Uninsured Motor Vehicle | $42.50 |
| | Limits of Liability-U | |
| | Each Person, Each Accident | |
| | $20,000    $40,000 | |

Total premium for this policy period FEB 04 2005 to AUG 04 2005.   $637.32   This is not a bill

IMPORTANT MESSAGES

Your policy consists of this declarations page, the policy booklet - form 9901.6, and any endorsements that apply, including those issued to you with any subsequent renewal notice.

Replaced policy number 0545279-01A001.

OPTIONS AND ENDORSEMENTS (See individual endorsement for details.)

9901.1    AMENDMENT OF DEFINED WORDS, COVERAGE AND CONDITIONS..

PLAINTIFF'S
EXHIBIT
15

Long/State Farm
SF1  00146

| YEAR | MAKE | MODEL | BODY STYLE | VEHICLE ID NUMBER | CLASS |
|------|------|-------|------------|-------------------|-------|
| 2000 | CHEVROLET | CORVETTE | 2DR | 1G1YY22G9Y5132554 | 1A30N182 |

| SYMBOLS | COVERAGES | PREMIUMS |
|---------|-----------|----------|
| | See policy for coverage details. | 2000 CHEVROLET |
| A | Bodily Injury/Property Damage Liability | $167.65 |
| | Limits of Liability-Coverage A-Bodily Injury | |
| | Each Person    Each Accident | |
| | $100,000    $300,000 | |
| | Limits of Liability-Coverage A-Property Damage | |
| | Each Accident | |
| | $50,000 | |
| C | Medical Payments | $18.48 |
| | Limit of Liability-Coverage C | |
| | Each Person | |
| | $5,000 | |
| D500 | $500 Deductible Comprehensive | $88.21 |
| G500 | $500 Deductible Collision | $316.18 |
| H | Emergency Road Service | $5.30 |
| U | Uninsured Motor Vehicle | $42.50 |
| | Limits of Liability-U | |
| | Each Person    Each Accident | |
| | $20,000    $40,000 | |

Total premium for this policy period FEB 04 2005 to AUG 04 2005    $637.32    This is not a

**IMPORTANT MESSAGES**

Your policy consists of this declarations page, the policy booklet - form 9901.6, and any endorsements that apply, including those issued to you with any subsequent renewal notice.

Replaced policy number 0545279-01A001.

**EXCEPTIONS AND ENDORSEMENTS (See individual endorsement for details.)**

6901.1    AMENDMENT OF DEFINED WORDS, COVERAGE AND CONDITIONS..

Long/State Farm
SF1   00147

Date Countersigned _____

By _____

02609/01916
155-3666.1  03-2002  [o1a025hb]o1a0254b]  (e1a0255a)

Agent:    MIKE DEVERS INS AGENCY INC
Telephone: (334)285-3662
Prepared  FEB 09 2005    1973-285

# State Farm Fire and Casualty Company



Todd Smith
Claim Representative
Special Investigative Unit

Office 770-593-6570
Fax 770-593-6496

April 18, 2005

Valerie Ware-Temple
6936 Winton Blount Blvd
Montgomery, AL 36117

RE: Claim Number: 01-6596-564
    Insured:    Martin Long
    Date of Loss:    February 19, 2005

Dear Ms. Ware-Temple:

First and foremost, thank you for taking the time to discuss the above-referenced claim with me earlier today. This letter will serve to confirm our brief conversation.

As discussed, you confirmed working at Dr. Chung's office in Montgomery, AL and you indicated this was the best address and number to contact you. As for Mr. Long, you confirmed being friends with him. More specifically, you confirmed accompanying him to the Atlanta and/or Decatur, Lithonia, GA area the weekend of February 19, 2005. You confirmed your two (2) brother's Ricky Ware at cellular # 334 451-0045 and Sandy Ware at cellular # 334 294-2113 as well as two lady friends of theirs named Felecia Powell and Latoya accompanied you and Mr. Long that weekend. You confirmed staying at the Country Hearth Inn at I-20 and Panola Road. That Friday night, you confirmed visiting your other brother, Donald Ware, who resides in an apartment and/or condo in the Decatur, Lithonia, GA area. As for Donald, you confirmed his cellular # is 678 887-1851. Also, you confirmed recently speaking with Mr. Long, as he contacted you and secured a phone number to contact your brother Donald in order to give this information to State Farm. After visiting your brother, you went to the Country Hearth Inn and arrived there around 10:00 p.m. Georgia time. You indicated Mr. Long parked his 2000 Chevrolet Corvette near an area supposedly monitored by a surveillance camera and this was the last time you saw the vehicle.

As for the keys to Mr. Long's vehicle, you indicated Mr. Long had one (1) set of keys with him that weekend. However, you confirmed having a conversation with Mr. Long after the reported theft regarding the number of keys he had. Specifically, you said Mr. Long told you he had a second (2nd) set of keys and they may have been left in the vehicle. However, you only confirmed seeing one (1) set that weekend.



PLAINTIFF'S
EXHIBIT
29

Long/State Farm
SF1  00167

April 18, 2005
Page -2-

On Saturday morning, at approximately 7:00 a.m., you confirmed receiving a call from Felecia indicating Mr. Long's vehicle was missing and there was glass in the parking lot. As for Felicia, you indicated that Saturday morning, she had apparently gone to WalMart, which is located across the street from the Country Hearth Inn, and discovered the missing vehicle when she returned.

After receiving the call from Felecia, you confirmed you, Mr. Long and your brothers all went downstairs to the lobby. After discovering the vehicle missing and noticing the glass in the parking lot, you indicated Mr. Long asked the shift manager about the surveillance camera and the manager gave conflicting information about the video. As for the report, you indicated Mr. Long attempted to report the theft to the police; however, your brother Sandy ended up calling them a second time to report the matter. You did not recall any conversation between your brothers and Mr. Long regarding the items he had in his vehicle and/or items he needed to claim stolen from his vehicle. You also indicated after the theft was discovered, Mr. Long called his niece in AL to secure a phone number to report the matter to State Farm. Also, you confirmed Mr. Long secured a rental vehicle in order to return home from Georgia.

You confirmed Mr. Long had the following items in his vehicle at the time of the alleged theft: some suits, shoes, jewelry, some cash, a gun, CD's and a CD changer. You confirmed Mr. Long had removed some of his luggage upon your arrival at the Inn.

In addition, you confirmed securing a cellular phone for Mr. Long under your account. However, as you were traveling to Georgia that weekend, you did not use Mr. Long's cellular phone to call anyone, as you had your own phone to use.

If I have misstated any information discussed in our conversation, please make the appropriate changes on this letter and return it to my attention. In the absence of the receipt of any changes, the information contained in this letter will stand as affirmed. Once again, thanks for your time and attention to this matter.

Sincerely,

Todd Smith
Claim Representative
(770) 593-6570

*COPY*

PLAINTIFF'S
EXHIBIT
18

## Pennie Green

**From:** Tony D Nix
**Sent:** Thursday, February 24, 2005 8:51 AM
**To:** Lester A Walker
**Cc:** Kelly M Phillips; Todd Smith; Pennie Green
**Subject:** Auto/Fire Claim Referral to SIU

# Auto/Fire Claim Referral to SIU

| SFF Form Routing Information |
| --- |
| To Forward or Edit, use the Forward/Edit button included above. |
| Kelly M Phillips ⟶ Claim Team Manager |

To: Lester A Walker (CWKA)

cc: Kelly M Phillips (BNMU); Todd Smith (CZHV); Pennie Green (BJXR)

27

**To:** Tony Nix , SIU Team Manager

**From:** Lester Walker, Unit Team Manager

**Office:** ACC

Team manager phone #: (205)916-6935

*Bill Cooper*

**Insured:** Martin Long

**Claim #:** 01-6596-564

**Claim #:** _

**Loss type:** Auto

**Date of loss:** 02/19/05

Insrd's present location: 2752 CAROLINE DR

Insrd's phone #s:
**Home:** (205)290-0344

**Work #1:** 0- ext.

**Work #2:** 0- ext.

**Other:** 0-

Long/State Farm
SF1   00193

**Brief facts:** This loss occurred on February 19, 2005 in Lithonia, GA, (right outside of Atlanta). The insured's vehicle was parked in a hotel

parking lot. The vehicle and its contents were stolen from that parking lot The insured advised he tried to report the theft to the Lithonia Police, however they would not fill out a report as the insured did not have the serial number for the gun taken.

The insured reported he parked the vehicle right under a video camera in the parking lot. Further, he reported the camera was not functioning that night. I spoke with Rag, the hotel manager, 404-384-8100. He advised there are four surveillance cameras located at the hotel. There is a camera at the back door, in the lobby, over the cash register and one pointed outside to the customer drop off area. According to Rag, the cameras were not working that night, however, there were no cameras pointed in the parking are (where the insured's vehicle was parked).

I spoke with Ram, 404-412-9464. He was the manager on duty on the night of the theft. He left at 9 AM the next morning. He advised the insured told him the car had been stolen. The insured asked for the video tape of the parking lot. Ram asked him why he wanted to video tape prior to calling the police. The insured told him to call 911. He called and the insured spoke with the police. He does not know what was said. Ram told the insured the cameras were not working the night of the theft. The insured became very angry there were no tapes. The insured had a female companion with him at the time. She was staying at the hotel with him. Additionally, there were two men who described themselves as friend's of the insured. They were not staying at the hotel. They just appeared shortly after the insured advised of the stolen car.

The insured's friends are described by Ram as Jamaican men with Jamaican accents. The men told the insured just to tell them there was a suit case full of clothes in the car so they could make a claim for them. When Ram left at 9 AM, the police had not arrived. He is not sure who came in after him. It would have been Alfredo or Judith. Ram has a friend who works at the Wal-Mart across the street. His friend told him even with 24/7 security they continue to have cars stolen from their parking lot.

Ram also told me the Paramedics were on the scene shortly before the insured found the car missing. They were there responding to a man having a seizure. They may have seen what happened.

The insured reported the theft to the Millbrook police. The field claim representative asked the insured to report it to the Lithonia Police Department. I ran an NICB. It shows no police reporting agency has been made aware of the theft.

| NICB (IBC Canada) indicators/ reason(s) for referring: | The insured is not employed. The hotel night manager overheard the insured and friends |

Long/State Farm
SF1  00194

talking about adding items to the items taken in the vehicle.
Claim history.

**To be Completed by SIU Team Manager Only:**

Accepted:   Yes

Comments:   Thanks for the referral. Todd Smith will be assigned to this loss.
Please move to us on the system and forward the master file if
there is one to our attention.

Created by Kelly M Phillips (BNMU) on 02/23/2005 at 12:01 PM using version 1.06 of Form ID 102187
Updated by Tony D Nix (AQF9) on 02/24/2005 at 07:48 AM using version 1.06 of Form ID 102187

For internal use only. This form and all information contained herein constitute proprietary information which shall not be
disclosed without appropriate State Farm authorization.

Long/State Farm
SF1   00195

2/24/2005

Consulting Service

# *Transportation Technology*

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

## CASE 25050 Addendum

## State Farm Case File: 01-6596-564

## 1.0 ASSIGNMENT

### 1.1 Client

### 1.2 Subject

### 1.3 Location

### 1.4 Purpose

### 1.5 Date of Inspection

## 2.0 PARTICIPATING PERSONNEL

## 3.0 EXAMINATION OF VEHICLE

## 4.0 CONCLUSIONS

Long/State Farm
SF1   00227

PLAINTIFF'S
EXHIBIT
50

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
*Marietta, Ga. 30064*
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

## 1.0 ASSIGNMENT

**1.1 Client:**          State Farm Insurance Company

Todd Smith

**1.2 Subject:**          2000 Chevrolet Corvette

Ser# 1G1YY22G9Y5132554

Mileage: 71,064

**1.3 Location:**          Verastar South

Rex Road

Forest Park, Georgia

**1.4 Purpose:**          Reinspection

**1.5 Date of inspection:**          June 21, 2005

## 2.0 Participating Personnel

**2.1 Investigator:**          Michael E. Bresnock- Consultant

Transportation Technology

Long/State Farm
SF1   00228

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

## 3.0 EXAMINATION OF VEHICLE

3.1 At the request of State Farm Insurance Company the above mentioned vehicle was re-examined while it was being retained at Verastar South in Forest Park, Georgia. State Farm Insurance Company had custody of the key and remote transmitter which was made available for this inspection.

3.2 As indicated in the original report this vehicle featured the General Motors Pass Key System. Tests conducted during the initial inspection and during this inspection indicated the pass-key system was functioning. The pellet reader had been pulled from the ignition key lock when this vehicle was initially examined. It was reinstalled in the proper position during the preliminary inspection. At the time of this inspection the pellet reader was removed from the key lock, the key was inserted into the key lock and then rotated to the "On" then "Crank" positions. The engine would not crank or start. The pellet reader was then placed in its original factory installed mounting position on the ignition key lock. _The key was inserted through the pellet reader into the key lock and rotated clockwise to the "On" then "Crank" positions. The engine cranked and started._ The initial test that was performed on

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

March 8, 2005 and this test (June 21, 2005) both produced the same results. "This vehicle will not start with a key that does not have the correct pellet". _The key lock would not rotate to "On" or "Start" position with a key that was incorrectly cut for the lock._

3.3 Several of the plastic close out dash panels were removed to access the ignition switch wiring (Photo #1). _None of the ignition switch wiring showed signs of temporary or permanent over-rides to enable the engine to start without the correct key cut and key pellet (Photo #2, #3)._

3.4 When this vehicle was manufactured the specifications called for an electronic steering lock which prevented the steering wheel from turning when the key was removed. Each time the ignition key was inserted into the key lock and rotated a buzzing noise was able to be heard.  A similar noise was heard each time the ignition key lock was turned to the "Off Lock" position and the key was withdrawn. With each insertion and removal of the ignition key, the steering column never locked or unlocked. An examination of the steering column wiring provided no evidence to indicate an alteration had been performed (Photo #4). It was later

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
*Marietta, Ga. 30064*
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

determined that this Corvette was part of recall #04V06000 which required the lock plate to be removed (Photocopy #1). This finding would account for the steering column's failure to lock and unlock when the key was inserted rotated and removed from the ignition key lock.


3.5 This vehicle was equipped with the UTD alarm system. The system was able to be armed (as indicated by the security lamp on the dash) but when the system was violated by operating the power door lock switch, parking lamp switch, opening doors or opening the hood, *the alarm failed to operate*. Tests conducted on the system enabled some electrical switches and components to be eliminated but the end result indicated *the UTD (Universal Theft Deterrent ) system did not work as intended.*


3.6 During the initial inspection the transmission shift control lever could not be moved from the "P" Park position. During this inspection the plastic panels and covers were removed to access the mechanical portion of the transmission controls (Photo #5). It should be noted that Federal Motor Vehicle Safety Standards #102 and #114 apply to this vehicle's transmission shift control mechanism. In order to

Long/State Farm
SF1   00231

Consulting Service

# *Transportation Technology*

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

comply with the safety standards, the manufacturer chose to use a cable that extended from the ignition key lock to the transmission shift control. After disconnecting the cable from the transmission linkage, it was possible to remove the transmission from the "P" Park position (Photo #6). While the engine was in operation the shift mechanism was moved into the "D" Drive and "R" Reverse positions. The vehicle's transmission responded by allowing the vehicle to move forward and rearward. There was considerable difficulty in moving the shift mechanism into the "P" Park position after conducting the above mentioned tests. It is likely that the linkage was bent.

3.7 The vehicle was elevated for an undercarriage examination (Photo #7). There were indications of undercarriage interference contact (Photos #8, #9). The message center on the instrument cluster indicated brake system and traction control system failures. The brake system problem was able to be verified when a brake application allowed the pedal to travel almost to the floor board. The traction control system problem could not be verified or diagnosed because it required an undercarriage inspection. Undercarriage inspections are routinely denied because of safety concerns at all Verastar salvage lots.

Long/State Farm
SF1  00232

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
*Marietta, Ga. 30064*
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

3.8 While the engine was in operation the oil pressure gauge was in a full travel position. Additional tests indicated the gauge was not functioning properly. The gauge moved to the full travel position and remained in that position even when the engine was not in operation.

## 4.0 CONCLUSIONS

4.1 Numerous tests were conducted on this vehicle's alarm and theft deterrent systems. *The General Motors Pass Key System was not defeated in a manner which enabled the engine to be operated without a key having the correct cut and correct resistor pellet.* The UTD (Universal Theft Deterrent System) was not functioning at the time the vehicle was inspected. The UTD system is an alert which sounds the horn and temporarily inhibits starting. *The General Motors Pass Key is still required to start the engine.* The other malfunctioning equipment (shifter, brakes and traction control, etc.) have no bearing on the actual starting of the engine and driving the vehicle. *The results of an incorrect ignition key cut or incorrect key pellet can be shown, demonstrated and tested.*

Long/State Farm
SF1   00233

Consulting Service

# *Transportation Technology*

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

RECEIVED

MAR 1 8 2005

SIU

March 17, 2005

Todd Smith
State Farm Insurance Company
P.O. Box 370568
Decatur, GA 30037

| Re: | | |
|---|---|---|
| | Fire Loss | |
| | Transportation Technology No. : | 25050 |
| | Claim No# | 01-6596-564 |
| | Owner: | Long |

Dear Mr. Smith:

Enclosed are the report and invoice for subject investigation. Please contact me if you have any questions or need further assistance.

Thank you again for the opportunity to assist you.

Sincerely,

*Michael E. Bresnock*

Michael E. Bresnock

PLAINTIFF'S
EXHIBIT

47

Long/State Farm
SF1  00248

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*

CASE 25050

TABLE OF CONTENTS

1.0 ASSIGNMENT

    1.1 Client

    1.2 Subject

    1.3 Location

    1.4 Purpose

    1.5 Date of Inspection

2.0 PARTICIPATING PERSONNEL

3.0 EXAMINATION OF VEHICLE

4.0 CONCLUSIONS

5.0 PHOTOGRAPHS

Long/State Farm
SF1   00249

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*

## 1.0 ASSIGNMENT

1.1 Client:              State Farm Insurance Company

                         Todd Smith

1.2 Subject:             2000 Chevrolet Corvette

                         Ser# 1G1YY22G9Y5132554

                         Mileage: 71,064

1.3 Location:            Verastar South

                         Rex Road

                         Forest Park, Georgia

1.4 Purpose:             Post theft inspection.

1.5 Date of inspection:  March 8, 2005

## 2.0 Participating Personnel

2.1 Investigator:        Michael E. Bresnock- Consultant

                         Transportation Technology

Long/State Farm
SF1   00250

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
*www.vehicleinvestigator.com*

## 3.0 EXAMINATION OF VEHICLE

3.1 At the request of State Farm Insurance Company, the above mentioned vehicle was inspected while it was being retained at Verastar South in Forest Park, Georgia. Information obtained from the insurance company indicated this vehicle was reported stolen and at some later date it was recovered and eventually made its way to Verastar South in Forest Park, Georgia. A key along with the electronic remote control were provided by State Farm to assist in the investigation. The key was able to function satisfactorily on the driver's side door lock, enabling it to open and lock the door with no irregularities. All four of the vehicle's original wheels had been removed and replaced by some aftermarket type (Photo #1, #2). You will note that the wheels were secured by a loosely fastened wheel lug nuts.

3.2 The vehicle was equipped with the corvette 5.7liter fuel injected engine (Photo #3). It was noted that the brake master cylinder reservoir was empty (Photo #4). The engine oil level was within a safe operating range (Photo #5). There were no personal belongings found in the interior of the vehicle (Photo #6). It was also noted that both front seats were missing (Photo #7, #8). The initial attempt to start the vehicle using the keys provided by State Farm Insurance Company was

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
**Marietta, Ga. 30064**
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

unsuccessful because the key pellet reader had been mis-positioned.    After loosening the retaining screws and repositioning the center console, it was possible to remove the pellet reader for inspection (Photo #9, #10, #11, #12). It is our position that the pellet reader was simply mis-positioned, thereby preventing the ignition key from rotating the ignition cylinder to the start position.  The theft deterrent relay was located on the passenger's side vertical floor surface as indicated on photocopy #1. A visual inspection of the theft deterrent relay provided no evidence to indicate that it had been altered in any way to enable the engine to be started without the correct key (Photo #13).  The key was inserted through the pellet reader and into the ignition key lock and then rotated to the crank and start positions.  When the pellet reader was properly positioned, the engine was able to start and run.  While the engine was in operation (as indicated by the tachometer), several messages appeared in the operator information center (Photo #14, #15, #16, #17, #18).  After completing the ignition system and theft deterrent system test, it was our opinion that this vehicle had not been started and operated without the correct ignition key.  There were some marks on the rubber sections of the passenger's side window weather strip and on the weather strip for the roof panel.  These areas may have been subjected to a sharp object which enabled access to the interior.  The roof panel was missing

Long/State Farm
SF1   00252

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com

at the time of this investigation and some of the door glasses were broken. The engine was allowed to operated for approximately twenty minutes. During that period of time temperature and oil pressure was monitored (Photo #19). There were no operational irregularities. It was not possible to move the shift lever from the park position after the engine was in operation. This may have been caused by the low brake fluid as the system requires the brake pedal to be depressed before switching from the park position.

## 4.0 CONCLUSIONS

4.1 This vehicle was equipped with the General Motors Pass Key System, which is a subsystem of the body control module. The body control module provides all of the logic to operate the pass key system. The body computer uses input information from other systems and components to determine the status of the pass key. The body computer controls its output functions based on the status of the pass key. The pass key fuel enable function is provided by the power control module. When the correct pass key is inserted into the ignition key lock, the key reader transfer the pellet information to the body computer. The body computer in turn signals the power train control module to enable or disable fuel injection in order for the engine

Long/State Farm
SFI  00253

Consulting Service

# Transportation Technology

*1184 Wind Hill Lane*
**Marietta, Ga. 30064**
*Telephone / Fax (770) 426-6173*
*or Toll Free (877) 328-3385*
*www.vehicleinvestigator.com*

to run. The ignition cylinder and key used by the pass key system is supplemented by a pellet reader to determine if the correct key is being used to start the vehicle. When the ignition is first turned on, the body control module measures the value of the key through the sensing contacts located on the pellet reader. The theft deterrent relay is part of the pass key system and can disable engine cranking through the theft deterrent relay. When the body control module detects the correct pass key, the body computer allows the engine to be cranked and simultaneously instructs the power train control module to enable fuel injection. Inspections and tests conducted on this vehicle provided no evidence to indicated that any of these systems had been by-passed to enable the vehicle to be started and driven without the use of the correct ignition key. In consideration of the tests and inspections along with the summary of this vehicle's theft control system it is our opinion that this vehicle was not operated without the correct ignition key.

Investigator: *Michael E. Bresnock*

Michael E. Bresnock

Long/State Farm
SF1   00254

Consulting Service

# Transportation Technology

1184 Wind Hill Lane
Marietta, Ga. 30064
Telephone / Fax (770) 426-6173
or Toll Free (877) 328-3385
www.vehicleinvestigator.com



Photograph: **#2**                    Transportation Technology : **25050**
Date Taken: **March 8, 2005**
Description of Subject:  **Wheel (passenger's side front)**

Note: **Missing and loose wheel lug nuts.**

Long/State Farm
SF1   00257

This is Todd Smith interviewing Ram. Today's date is March the 4th, the year 2005, and it's currently 8:30 A.M. This is concerning a claim filed by Martin Long regarding the theft of his 2000 Chevrolet Corvette. This interview is taking place at the Country Hearth Inn off of Berington(sp?) Drive in Lithonia, Ga.

Q.    Ram could you please pronounce your name and spell it for me?
A.    Uh, first name is uh, Ram R-A-M, the last name is Naidu N-A-I-D-U.

Q.    Now you're a Manager here at the Country Hearth Inn is that correct?
A.    Uh, well...

Q.    Shift Manager is that...
A.    Shift Manager you could say not the Manager.

Q.    Okay. Are you aware of the gentleman that we're discussing Martin Long?
A.    Um hum, yes.

Q.    Okay. How do you know, did he stay here at your hotel?
A.    Uh, yes I believe so, he did.

Q.    Do do you remember the night that he came in to stay?
A.    Uh, I don't exactly remember checking him in. He probably checked in before I got on the shift 'cause I didn't start 'til um, I think a little after 8:00 that night, so he'd already checked in.

Q.    Okay.
A.    Um...

Q.    Would that have been on a Friday night, does that sound correct?
A.    Friday night, that's right.

Q.    Okay. And then so you were on shift then all through Friday night and then Saturday morning were y- you still on the shift?
A.    Um hum.

Q.    What happened Saturday morning?
A.    Uh, Saturday morning uh, been close to just after 7:00 uh, uh, this gentleman came down and uh, he walked right out turned around and came back and said his car was stolen. Uh, didn't look, really look like he was going out for a drive the way he was dressed.

Q.    What was he dressed as at the time?

PLAINTIFF'S
EXHIBIT
24

Long/State Farm
SF1   00307

A.    Yeah. Well the other two guys who came in, oh they were they were having a lot of conversation out there in in the front. Uh, they they were particularly concerned about that camera on top of the building. Didn't realize that camera actually looks right there on that side. And uh, then they stood back there. Spoke for again some time. Went up to the room, came back down.

Q.    Did the guys go up in the room with him?
A.    Um hum. Yep. Then they came back down and um, they wanted to gain um, get hold of the surveillance cameras.

Q.    Did they ever have any conversation with him di- or did you ever overhear any conversation about what he should claim was stolen in the vehicle?
A.    Um hum.

Q.    What happened there?
A.    Well one of the guys was suggesting that he just say that a suitcase was in there with some belongings.

Q.    Did he ever mention what was in the car?
A.    No.

Q.    He never mentioned it? Did he have do you ever recall...
A.    He did say that he had a bunch of keys in there he said.

Q.    A bunch of keys in the car?
A.    Um hum.

Q.    Did he mention anything about having any personal items like clothing in the car?
A.    Nope. But he did, the other guy did say to him to say that you had a suitcase in the car with some stuff in it. I I do...

Q.    In other words he was telling him you need to make up like and just say that you had some, even though it might not have been in there?
A.    I would say that was fairly the intent and I, and that's what I perceived it was.

Q.    Did you see any glass or any evidence that, in the parking lot?
A.    Yes, there was there was a fair amount of glass out there.

Q.    Right beside where the car would have been parked?
A.    Um hum. The the funniest thing is I mean as far as I know uh, to his car if you smash the glass and the alarm doesn't go off it's very shocking. I'm sure if the alarm went off there I would definitely hear it.

This is Todd Smith interviewing Martin Long. Today's date is March the 1st, actually March 2nd...

A.    March the 2nd.

Q.    Excuse me. Today's date is March the 2nd and it is currently, this interview is taking place in Alabama and it's currently 9:25 A.M. Alabama time, 10:25 Georgia time. This interview is taking place at our Montgomery Claims Office in Montgomery, Alabama. Mr. Long is this recording being made with your full knowledge and consent?
A.    Yes, sir.

Q.    Could you please pronounce your full name and spell it for me?
A.    Martin M-A-R-T-I-N.

Q.    And your middle name?
A.    Oh, O'Neal O apostrophe N-E-A-L, Long L-O-N-G.

Q.    Now our records are showing a 1705 Deatsville Highway in Millbrook and you told me that is not the correct address, that's actually an address for is that your ex-wife is that correct?
A.    Yes, sir, but she's not my ex yet, that what I'm...

Q.    Okay.
A.    She just got that address a week ago and I don't understand how they...

Q.    Okay.
A.    It ended up there.

Q.    Well let me make a note then on this. So the Deatsville Highway is, and what's your wife's name?
A.    Evelyn Beth Long E-V-E-L-Y-N.

Q.    G?
A.    Um hum. Long L-O-N-G.

Q.    So that's her address?
A.    Yes, sir.

Q.    And that's been since when?
A.    Uh, she just got that address last Saturday. The Saturday just past about three four days ago.

PLAINTIFF'S EXHIBIT
25

Long/State Farm
SF1  00315

Statement Of: Martin Long
Claim: 01-6596-564
Page 1

A.  That set was with me.

Q.  That's the set you had there that Saturday morning?
A.  Yeah.

Q.  You don't know what you did with your other set of keys?
A.  Huh uh.

Q.  No you can't you can't know, in other words you can't tell us anywhere where they might have been, like in other words did you lock them in your glove box or did you...
A.  I don't know I don't think I did.  I mean, I could have I don't know, I don't know wh- where my other set of keys is.

Q.  Haven't you got a keyless entry to it?
A.  Um hum.

Q.  Is that correct?
A.  Yes.

Q.  How many miles were on the vehicle?
A.  When I bought it?

Q.  Right.
A.  I think it was 68.  Like how it is on that pink one that that Lee guy...

Q.  68,000?
A.  Um hum.

Q.  Had any problems with the vehicle?
A.  Huh uh.

Q.  Since you bought it have you had it serviced?  Did you ever have the oil changed or anything?
A.  Yeah, I've got the oil changed.

Q.  Who did that?
A.  Uh, Chevrolet in Prattville.  And I bought some tires for it which I got them receipts right here.

Q.  Is that the Chevrolet dealership in Pratt?

# DEKALB COUNTY POLICE DEPARTMENT

# AUTO THEFT UNIT

PHONE NUMBER (404) 294-2036    FAX NUMBER (404) 294-2881

TO: _____ TODD SMITH _____

FROM: _____ DET. FITZPATRICK _____

Comments:

# AUTO THEFT, METRO ATLANTAS FAVORITE
# GROUP PARTICIPATION SPORT!!

PLAINTIFF'S
EXHIBIT
26

Long/State Farm
SF1   00376

# INCIDENT REPORT

| | AGENCY (ORI) | | CASE NUMBER |
|---|---|---|---|
| 5A | GA GA0440200 | | 05-023612 |

| INCIDENT TYPE | COUNTS | INCIDENT CODE | PREMISE TYPE | | |
|---|---|---|---|---|---|
| THEFT BY TAKING 16-8-2 | 1 | DKF D | 1 HIGHWAY | 5 SVC STATION |
| STOLEN VEHICLE RECOVERED | 1 | NONC | 3 CONVENIENCE STORE | 6 BANK |
| THEFT BY TAKING AUTO 16-8-2 | 1 | DKF D | 4 COMMERCIAL | 8 RESIDENCE |
| | | | 7 SCHOOL/CAMPUS | 9 ALL OTHER |

| INCIDENT LOCATION | LOC CODE | WEAPON TYPE |
|---|---|---|
| 8400 FAIRINGTON RD LITHONIA GA | 481 | |

| INCIDENT DATE | TIME | DATE | TIME | STRANGER TO STRANGER | 1 GUN | 2 KNIFE/CUTTING TOOL |
|---|---|---|---|---|---|---|
| 02/19/2005 | 09:30 | To 02/19/2005 | 09:30 | YES Y  NO  UNK | 3 HANDS/FIST, ECT. | 4 OTHER |

| COMPLANANT | ADDRESS | PHONE NUMBER |
|---|---|---|
| LONG, MARTIN | 2752 CAROLINE DR MILLBROOK AL 36054 | 334-290-0344 |

| VICTIM'S NAME | RACE | SEX | AGE | RESIDENCE PHONE | BUSINESS PHONE |
|---|---|---|---|---|---|
| LONG, MARTIN | B | M | 38 | 334-290-0344 | 334-202-0598 |

| ADDRESS | CENSUS TRACT | EMPLOYER OR OCCUPATION |
|---|---|---|
| 2752 CAROLINE DR MILLBROOK AL 36054 | | UNKNOWN OR NOT STATED |

| STUDENT?  YES  Y NO | IF YES, NAME VICTIM'S SCHOOL | |
|---|---|---|

| NAME | RACE | SEX | DATE OF BIRTH | AGE |
|---|---|---|---|---|
| UNKNOWN | | | | |

| WANTED | ADDRESS | CENSUS TRACT | HEIGHT | WEIGHT | HAIR |
|---|---|---|---|---|---|
| | GA | | | | |

| WARRANT | CHARGES | COUNTS | OFFENSE CODE | OFFENSE/ARREST | JURIS |
|---|---|---|---|---|---|
| | | 1 | DKPD | 2 | |
| ARREST | | | | | 1 COUNT |

| TOTAL NUMBER ARRESTED | ARREST AT OR NEAR OFFENSE SCENE | DATE OF OFFENSE |
|---|---|---|
| 0 | YES  NO Y | 02/19/2005 |

| | TAG NUMBER | STATE | YEAR | V.I.N. |
|---|---|---|---|---|
| STOLEN | | AL | | 1G1YY22G0Y5132554 |
| V RECOVD | YEAR | MAKE | MODEL | STYLE | COLOR |
| SUSPECTS | 2000 | CHEVROLET | CORVETTE | 2D | BLUE |

| MOTOR SIZE (CID) | TRANS AUTO  MAN. | INSURED BY |
|---|---|---|
| | | |

| NAMES | ADDRESS | PHONE NUMBER |
|---|---|---|
| | | |

| | VEHICLES | CURRENCY, NOTES, ETC | JEWELRY, PREC. METALS | FURS | PROPERTY RECOVERY INFO ONLY |
|---|---|---|---|---|---|
| STOLEN | $8,000.00 | $5,000.00 | $4,700.00 | | JURISDICTION |
| RECOVERED | $10,000.00 | | | | CITY |
| | CLOTHING | OFFICE EQUIP. | TV, RADIO, ETC | HOUSEHOLD GOODS | THEFT/RECOVERY |
| STOLEN | $1,750.00 | | $160.00 | | 2 |
| RECOVERED | | | | | DATE OF THEFT |
| | FIREARMS | CONSUMABLE GOODS | LIVESTOCK | OTHER | TOTAL | 02/19/2005 |
| STOLEN | $850.00 | | | $1,100.00 | $11,060.00 | |
| RECOVERED | | | | | $10,000.00 | |

| IGCIC ENTRY  WARRANT |  MISSING PERSONS |  VEHICLE |  ARTICLE |  BOAT |  GUN |  SECURITIES |
|---|---|---|---|---|---|---|
| | | | | | VEHICLES | |

| DID INVESTIGATION INDICATE THAT THIS INCIDENT WAS DRUG-RELATED?  YES  NO | | |
|---|---|---|
| IF YES PLEASE INDICATE THE TYPE OF DRUG(S) USED BY OFFENDER | | |
|  1 - AMPHETAMINE  2 - BARBITURATE  3 - COCAINE  4 - HALLUCINOGEN  5 - HEROIN | | |
|  B - MARIJUANA  7 - METHAMPHETAMINE  8 - OPIUM  9 - SYNTHETIC NARCOTIC  U - UNKNOWN | | |

| REQUIRED DATA FIELDS FOR CLEARANCE REPORT |  CLEARED BY ARREST |  EXCEPTIONALLY CLEARED |  UNFOUNDED | REPORT DATE |
|---|---|---|---|---|
| DATE OF CLEARANCE | | Y ADULT  JUVENILE | | 02/19/2005 |

```
*********************************
Narrative Title: INITIAL REPORT
Date Entered: 2/19/2005 11:17:42 AM
```

Long/State Farm
SF1  00374

| REPORTING OFFICER | NUMBER | APPROVING OFFICER | NUMBER |
|---|---|---|---|
| C A WIMBERLY | 2978 | | |

NCY: DEKALB COUNTY POLICE DEPARTMENT
GA0440200
Date / Time: 2/19/2005 9:30:18 AM
e Number: 05-023512
ption: 7
Officer Name/ID: C A WIMBERLY/2378
ed By:
Time Printed: 3/4/2005 5:03:38 PM

# Narrative: Page 2

POKE TO VICTIM MARTIN LONG WHO ADVISED AN UNKNOWN SUSPECT STOLE HIS 2000
EVROLET CORVETTE UNKNOWN ALABAMA TAG. MR LONG SAID HE PARKED HIS VEHICLE IN
E PARKING LOT OF COUNTRY HEART INN & SUITES EARLIER THIS DATE AND WHEN HE
URNED HIS VEHICLE WAS GONE.
E VEHICLE WAS NOT PLACED ON NCIC. MR LONG WAS ADVISED TO CONTACT US WHEN HE
T EITHER THE CORRECT REGISTRATION OR VEHICLE IDENTIFICATION NUMBER FOR THE
HICLE.

*********************************

rrative Title: INITIAL REPORT
te Entered: 2/26/2005 1:37:05 AM

25/2005 (FRIDAY) I RESPONDED TO CLIFTON SPRINGS MANOR AND JAYNES VALLEY DR IN
ENCE TO AN ABANDONED VEHICLE. UPON ARRIVAL, I OBSERVED A GRAY CHEVROLET
VETTE THAT WAS MISSING ITS T-TOP ROOF AND THE SEATS
EN I RAN THE VIN, THE VEHICLE CAME BACK STOLEN OUT OF DEKALB COUNTY POLICE
ERARTMENT. THE VEHICLE WAS CONFIRMED BY OPERATOR CARRIE.
HE VEHICLE WAS IMPOUNDED TO TOP

*********************************

rrative Title: SUPPLEMENTAL NARRATIVE
te Entered: 3/2/2005 12:39:53 PM

CTIM - MARTIN LONG ADDED INFORMATION TO 05 023612. ACCORDING TO MR. LONG THE
LLOWING ITEMS WERE IN HIS VEHICLE WHEN IT WAS STOLEN A 3/4-LENGTH MENS BLACK
ATHER JACKET VALUED AT $250.00, A DVD PLAYER VALUED AT $160.00, A 45 CALIBUR
TOMATIC PT145 TAURUS FIREARM, SERIAL #NWD52402 VALUED AT $350.00, $5000.00 CASH
CENTER CONSOLE), 3 MENS SUITES AND 2 MENS PANTS SUITES VALUED AT $1500.00, 4
IRS MENS SHOES VALUED AT $1100.00, 4 GOLD MENS BRACELETS VALUED AT $2500.00, 3
OLD MENS RINGS VALUED AT $1200.00, AND 1 SILVER MENS WATCH WITH DIAMONDS
ROUND THE BAND VALUED AT $1000.00.

Long/State Farm
SF1  00375

MARTIN O. LONG

Plaintiff

v.

CSX TRANSPORTATION INC

Defendant

February 3, 2005
File No. 8566

# SETTLEMENT STATEMENT

| | | |
|---|---|---:|
| Total Amount of Settlement | | $ 265,000.00 |
| | | |
| Less Attorney's Fees $ 66,250.00 | | |
| (25.00000%) | | |
| Client Share of Settlement | | $ 198,750.00 |
| | | |
| Distribution of Client's Share of Settlement: | | $ 198,750.00 |
| 1 LESS RRB LIEN FOR SICKNESS BENEFITS | | $ 16,942.00 |
| 2 LOAN FROM AMSOUTH BANK OF ALABAMA | | $ 6,239.01 |
| Amount Due Client | | $ 175,568.99 |

Long/State Farm
SF1  00620

PLAINTIFF'S
EXHIBIT
36

Premier Data Citation Center 6 Credit Score Report    Case 2:06-cv-00816-MHT-CSC    Document 35-17    Filed 05/31/2007    Page 1 of 1

Page 1 of 4

# CreditXpert Score Analysis

Credit Score Report For: LONG, MARTIN ONEAL

Report Date: 2005/03/28

This report is based on a Credit Report obtained from Experian



Glossary of Terms

## Score Summary

On a scale of 350 to 850 your Score is **651**

Your credit score is considered **Fair/Good**

Percentile: Your credit score is better than **30%** of US Consumers

## Score Analysis

### Background

Your credit scores are based on the information in your credit bureau reports. The majority of CreditXpert Credit Scores(tm) are between 350 and 850. The higher your credit scores, the better. With a higher credit score, you are more likely to be eligible for the best credit card and loan offers, including terms and conditions, such as interest, fees, and benefits. Keep in mind that when lenders evaluate a credit application, credit scores are not the only factor they use in making their decision. They usually ask for additional information (such as income and monthly payments) to determine your ability to repay the loan.

### Summary

Currently, your credit score will make it difficult for you to get the best offers from lenders, especially for credit cards. Be prepared to pay higher fees and interest rates and/or to make a deposit or down payment. Also, you may not be able to get high credit limits and loan amounts.

### Explanation

There are both positive and negative factors that influence your credit score. The most important factors of each kind are listed below, in their order of importance. Remember, these factors vary in how strongly they impact your credit score. For example, if you have a very high credit score, the negative factors in your analysis are likely to have a small impact. The same is true for positive factors if you have a very low credit score.

### Negative Factors: Here are the top factors that lower your score:

Long/State Farm
SF1  00689

### Payment history

Summary: You were late with your payments or were derogatory on at least one account in the past 12 months.

Explanation:This lowers your score. Any history of late payments (including missed

# BIG 10 TIRES
& Automotive Center

APR 0 7 2005

SIU

Prr     d method of payment: CASH ___ CHECK ___ CREDIT CARD ___

Shc   Big 10 Tires save replaced parts for your inspection or possession? Yes ___ No ___

Storage charges start accruing 3 working days after notice of completion of work.

Daily storage charge is $15.00. Date of notification: _____

Name and phone number of person who may authorize repair work if so designated by customer.

Name _____ Phone # _____

Big 10 Tires is not responsible for loss by fire or theft or any other cause beyond our control.

Date work to be completed: _____

| Mileage | Mos. | Mileage | Mos. |
|---------|------|---------|------|
| 6,000   | 6    | 55,000  | 55   |
| 12,000  | 12   | 60,000  | 60   |
| 24,000  | 24   | 65,000  | 65   |
| 35,000  | 35   | 70,000  | 70   |
| 40,000  | 40   | 75,000  | 75   |
| 45,000  | 45   | 80,000  | 80   |
| 50,000  | 50   |         |      |

*This charge represents costs and profits to the motor vehicle repair facility for miscellaneous shop supplies or waste disposal. [s. 559.904(4)]

The State of Florida requires a $1.00 fee to be collected for each new tire sold in the state [s. 403.718], and a $1.50 fee to be collected for each new or remanufactured battery sold in the state [s. 403.7185].

---

```
BIG 10 TIRE #81                    INVOICE #:    5026903
1749 EAST MAIN STREET
                                   PAGE:         1
PRATTVILLE, AL
          36066
334/361-9608                       TIME CLOSED:  15:29:15
CUSTOMER:   LONG,MARTIN
            1
      1
          MILLBROOK, AL
                  36054
HOME:   334/290-0344   0 VEHICLE:  2000 CHEVY VETTE
SALESMAN: 09792        LICENSE:  AL        AL MILEAGE:   70804
INVOICE DATE:  02/18/05        DUE: 02/18/05
------------------------------------------------------------
PRODUCT     LCT  DESCRIPTION        QUANTITY  PRICE EXTENSION
------------------------------------------------------------
AL...        0 THRUST ANGLE ALIGNMENT   1      89.99    89.99
  MECH#:  6744
202-9599
CP3RD        0 TIE ROD END / RIGHT OUTER - NEW 1  103.13  103.13
CL3          0 TIE ROD END LABOR       1      58.50    58.50
  MECH#:  6744
SHOPFEE      0 SHOP MATERIALS FEE *            10.06    10.06

                           MERCHANDISE:         103.13
                                 LABOR:         148.49
                                 OTHER:          10.06
                             SALES TAX:           8.77
                         INVOICE TOTAL:         270.45
              *****THIS IS A REPRINTED INVOICE*****

              CASH                               270.45
```

Long/State Farm
SF1  00749

PLAINTIFF'S
EXHIBIT
44
tabbies

---

PLEASE READ CAREFULLY. CHECK ONE OF THE STATEMENTS BELOW AND SIGN.
I UNDERSTAND THAT UNDER STATE LAW I AM ENTITLED TO A WRITTEN ESTIMATE IF MY BILL EXCEEDS $100.00.
☐ I REQUEST A WRITTEN ESTIMATE.
☐ I DO NOT REQUEST A WRITTEN ESTIMATE AS LONG AS THE REPAIR COSTS DO NOT EXCEED $ _____
THE SHOP MAY NOT EXCEED THIS AMOUNT WITHOUT MY WRITTEN OR ORAL APPROVAL.
☐ I DO NOT REQUEST A WRITTEN ESTIMATE.   SIGNED _____ DATE _____

☐ reby authorize the above service to be performed, including the sublet work, with the necessary materials. I also grant
   mission to operate equipment for testing and inspection. Big 10 Tires uses flat and hourly rates to calculate charges. An
express mechanic's lien is acknowledged to secure the amount of repairs. I understand that lug nuts must be re-torqued after 50
miles and checked periodically thereafter.

*Thanks for shopping Big 10*   SIGNED _____ DATE

# BIG 10 TIRES
### & Automotive Center

| Mileage | Mos. | Mileage | Mos. |
|---------|------|---------|------|
| 6,000 | 6 | 55,000 | 55 |
| 12,000 | 12 | 60,000 | 60 |
| 24,000 | 24 | 65,000 | 65 |
| 35,000 | 35 | 70,000 | 70 |
| 40,000 | 40 | 75,000 | 75 |
| 45,000 | 45 | 80,000 | 80 |
| 50,000 | 50 | | |

ro        method of payment: CASH ___ CHECK ___ CREDIT CARD ___

oulo Big 10 Tires save replaced parts for your inspection or possession? Yes ___ No ___
rage charges start accruing 3 working days after notice of completion of work.

aily storage charge is $15.00. Date of notification: _____

lame and phone number of person who may authorize repair work if so designated by customer.

lame _____ Phone # _____

ig 10 Tires is not responsible for loss by fire or theft or any other cause beyond our control.

ate work to be completed: _____

*This charge represents costs and profits to the motor vehicle repair facility for miscellaneous shop supplies or waste disposal. [s. 559.904(4)]

The State of Florida requires a $1.00 fee to be collected for each new tire sold [s. 403.718], and a $1.50 fee to be collected for each new or remanufactured battery sold in the state [s. 403.7185].

```
BIG 10 TIRE #81                           INVOICE #:    5013190
1749 EAST MAIN STREET
                                             PAGE:    1
PRATTVILLE, AL
           36066                          TIME CLOSED:  15:59:02
334/361-9608
CUSTOMER:  LONG,MARTIN
           1

     1
           MILLBROOK, AL
                36054
HOME:   334/290-0344    0 VEHICLE:  2000 CHEVY VETTE
SALESMAN:  07547          LICENSE:  AL        AL MILEAGE:  70000
INVOICE DATE:  02/10/05       DUE: 02/10/05
```

| PRODUCT | LCT | DESCRIPTION | QUANTITY | PRICE | EXTENSION |
|---------|-----|-------------|----------|-------|-----------|
| ISCTIRE | 0 | 275 40 18 FIREHAWK SZ50EP RF | 2 | 320.00 | 640.00 |
| ADF | 0 | ALABAMA TIRE DISPOSAL TAX | 2 | 1.00 | 2.00 |
| VLVSTM | 0 | VALVE STEM-EACH  NEW | 2 | 2.99 | 5.98 |
| TB2 | 0 | LIFETIME WHEEL BALANCE | 2 | 11.99 | 23.98 |
| STD | 0 | SCRAP TIRE DISPOSAL CHARGE | 2 | 1.50 | 3.00 |

```
Registration: Serial# NOMOUNTED    Quantity   1 Warranty Period      0
Registration: Serial# NOMOUNTED    Quantity   1 Warranty Period      0

                              MERCHANDISE:    645.98
                                   LABOR:     23.98
                                   OTHER:      5.00
                               SALES TAX:     55.08
                            INVOICE TOTAL:   730.04
                     ******THIS IS A REPRINTED INVOICE******

            CASH                              730.04
```

Long/State Farm
SF1  00750

PLEASE READ CAREFULLY. CHECK ONE OF THE STATEMENTS BELOW AND SIGN.
  I UNDERSTAND THAT UNDER STATE LAW I AM ENTITLED TO A WRITTEN ESTIMATE IF MY BILL EXCEEDS $100.00.
  ☐ I REQUEST A WRITTEN ESTIMATE.
  ☐ I DO NOT REQUEST A WRITTEN ESTIMATE AS LONG AS THE REPAIR COSTS DO NOT EXCEED $_____.
  THE SHOP MAY NOT EXCEED THIS AMOUNT WITHOUT MY WRITTEN OR ORAL APPROVAL.
  I DO NOT REQUEST A WRITTEN ESTIMATE.  SIGNED _____ DATE ____

ereby authorize the above service to be performed, including the sublet work, with the necessary materials. I also grant
ermission to operate equipment for testing and inspection. Big 10 Tires uses flat and hourly rates to calculate charges. An
express mechanic's lien is acknowledged to secure the amount of repairs. I understand that lug nuts must be re-torqued after 50
miles and checked periodically thereafter.

*Thanks for shopping Big 10*    SIGNED _____ DATE ____

# BIG 10 TIRES
## & Automotive Center

| Mileage | Mos. | Mileage | Mos. |
|---------|------|---------|------|
| 6,000 | 6 | 55,000 | 55 |
| 12,000 | 12 | 60,000 | 60 |
| 24,000 | 24 | 65,000 | 65 |
| 35,000 | 35 | 70,000 | 70 |
| 40,000 | 40 | 75,000 | 75 |
| 45,000 | 45 | 80,000 | 80 |
| 50,000 | 50 | | |

Pr  ed method of payment: CASH ___ CHECK ___ CREDIT CARD ___

Sh   3ig 10 Tires save replaced parts for your inspection or possession? Yes ___ No ___

 orage charges start accruing 3 working days after notice of completion of work.

aily storage charge is $15.00. Date of notification: _____

Name and phone number of person who may authorize repair work if so designated by customer.

Name _____ Phone # _____

Big 10 Tires is not responsible for loss by fire or theft or any other cause beyond our control.

Date work to be completed: _____

*This charge represents costs and profits to the motor vehicle repair facility for miscellaneous shop supplies or waste disposal. [s. 559.904(4)]

The State of Florida requires a $1.00 fee to be collected for each new tire sold in the state [s. 403.718], and a $1.50 fee to be collected for each new or remanufactured battery sold in the state [s. 403.7185].

```
BIG 10 TIRE #81                          INVOICE #:   5013219
1749 EAST MAIN STREET
                                         PAGE:        1
PRATTVILLE, AL
          36066
334/361-9608                             TIME CLOSED: 16:08:41

CUSTOMER:   LONG,MARTIN
               1

        1
            MILLBROOK, AL
                    36054
HOME:   334/290-0344   0 VEHICLE:  2000 CHEVY VETTE
SALESMAN:  07547           LICENSE: AL      AL MILEAGE:  70000
INVOICE DATE:  02/10/05    DUE: 02/10/05
```

| PRODUCT | LCT | DESCRIPTION | QUANTITY | PRICE | EXTENSION |
|---------|-----|-------------|----------|-------|-----------|
| M.   RE | 0 | 245 45 17 FIREHAWK EZ50EP RF | 2 | 250.00 | 500.00 |
| DF | 0 | ALABAMA TIRE DISPOSAL TAX | 2 | 1.00 | 2.00 |
| TB2 | 0 | LIFETIME WHEEL BALANCE | 2 | 11.99 | 23.98 |
| STD | 0 | SCRAP TIRE DISPOSAL CHARGE | 2 | 1.50 | 3.00 |
| Registration: Serial# NOMOUNTED | | Quantity | 1 Warranty Period | 0 | |
| Registration: Serial# NOMOUNTED | | Quantity | 1 Warranty Period | 0 | |

```
                                    MERCHANDISE:    500.00
                                         LABOR:      23.98
                                         OTHER:       5.00
                                     SALES TAX:      42.67
                                  INVOICE TOTAL:    571.65
                    ******THIS IS A REPRINTED INVOICE******

              CASH                                 571.65
```

Long/State Farm
SF1  00751

PLEASE READ CAREFULLY. CHECK ONE OF THE STATEMENTS BELOW AND SIGN.

I UNDERSTAND THAT UNDER STATE LAW I AM ENTITLED TO A WRITTEN ESTIMATE IF MY BILL EXCEEDS $100.00.

☐ I REQUEST A WRITTEN ESTIMATE.

☐ I DO NOT REQUEST A WRITTEN ESTIMATE AS LONG AS THE REPAIR COSTS DO NOT EXCEED $_____
THE SHOP MAY NOT EXCEED THIS AMOUNT WITHOUT MY WRITTEN OR ORAL APPROVAL.

☐ DO NOT REQUEST A WRITTEN ESTIMATE.  SIGNED _____ DATE _____

 ereby authorize the above service to be performed, including the sublet work, with the necessary materials. I also grant  mission to operate equipment for testing and inspection. Big 10 Tires uses flat and hourly rates to calculate charges. An xpress mechanic's lien is acknowledged to secure the amount of repairs. I understand that lug nuts must be re-torqued after 50 miles and checked periodically thereafter.

*Thanks for shopping Big 10*   SIGNED _____ DATE _____

☐ State Farm Mutual Automobile Insurance Company
☐ State Farm Fire and Casualty Company
☐ State Farm County Mutual Insurance Company of Texas
☐ State Farm Indemnity Company

**RECEIVED**

**APR 0 7 2005**

Barcode Only

**SIU**

Claim Number ___01-6596-564___

### AFFIDAVIT OF VEHICLE THEFT

1. Name of Insured ___Martin O'Long___    Name of Owner ___Martin O' Long___

   Address ___2752 Caroline Dr.___    Home Phone ___(334) 290-0344___

   Date of Birth ___8/13/68___    Marital Status: ☑ Married ☐ Single  No. of Dependents _____

   Social Security No. _____  Driver's License No. ___5415781___
   (Optional)

   Occupation ___Unemployed___

   Employer's Name _____

   Address _____    Phone _____

2. Date of Theft ___2/19/05___    Time ___7:00___    ☑ A.M. ☐ P.M.

   Make of Vehicle ___Chevrolet___ Year ___2000___ Model ___Corvette___ Body Type ___Coupe___  Color ___Silver___

   Vehicle ID # ___1G1YY22G9Y5132554___  License Plate # ___B18D5___    State ___Al___

   Certificate of Title # _____    If none, why? _____

   Number of cylinders ___8___    H.P. or C.I. or Liter _____  Odometer reading _____

   Vas vehicle locked? ☑ Yes ☐ No    Were keys left in vehicle? ☐ Yes ☑ No

   Was vehicle equipped with anti-theft device? ☑ Yes ☐ No

   Amount for which you are making claim $ ~~25~~ Paid 25,000 ⁰⁰

   Specific location from which vehicle was taken ___5400 Fairington Rd. Lithina GA___

   Reason vehicle was left at this location ___Relaxing / Sleeping___

   Name and address of person who left auto at this location ___Martin O' Long  2752 Caroline Dr___
   ___Millbrook, Al (36054)___    Their driver's license no. ___5415781___

   When did you last see your vehicle? Date ___2/18/05___    Time ___9:00___    ☐ A.M. ☑ P.M.

   Name and address of others who were present _____

   When was the theft discovered? Date ___2/19/05___    Time ___7:00___    ☑ A.M. ☐ P.M.

   Who made the discovery? ___Martin O' Long___

   When was theft reported to police? Date ___2/19/05___    Time ___7:00___    ☑ A.M. ☐ P.M.

   Name and Location of Police Station ___# 404-274-2512 / 2000___

Long/State Farm
SF1  00757

PLAINTIFF'S
EXHIBIT
23

EXHIBIT
22

05351.1  Rev. 07-19-2004    Page 1 of 3

Police Officer's name and badge # __C. A. Wimberly    #2078__

Police Case # __05-02.36/2__  Did police make any arrest or have any suspects? __I. Don't Know__

Has vehicle been recovered? ☒ Yes ☐ No  Where? __ATLANTA GA__  When? _____

Who recovered the vehicle? __DeCabb County__  Condition _____

Has vehicle been damaged during the past three years? ☐ Yes ☒ No  If so, give location _____

type of damage _____, amount of damage $ _____, and date _____

Were repairs made? ☐ Yes ☐ No ☐ Partial  If so, were they completed? ☐ Yes ☐ No

Who made the repairs? _____

Name and address of insurance company who paid claim damages, if any: _____

Any other claims in the last three years on this or any other vehicle? ☒ Yes ☐ No

Any other vehicles in your household? ☒ Yes ☐ No

Name of insurance company and agent on other vehicles  (__SAME INSURANCE C,.__)

Your prior insurance company and agent _____

Any homeowners claims within the past 6 months with State Farm? ☒ Yes ☐ No

With any other carrier? __No__

List all items stolen: _____

| BRAND NAME | MODEL | SERIAL # | DATE OF PURCHASE | PURCHASE PRICE | NAME & ADDRESS OF SELLER |
|---|---|---|---|---|---|
|  |  | CHECK | INVENTORY | SHEET |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

* If original equipment, so state and omit serial numbers.  If not original equipment, furnish receipts of all items stolen.

3. Vehicle Equipment (Check if vehicle had any of the following)

☒ Radio AM    ☒ Power Steering    ☐ Vinyl Roof    ☒ Cruise Control    Tires:    Transmission:

☒ AM/FM    ☒ Power Brakes    ☒ Tinted Glass    ☒ Tilt Wheel    ☐ WW    ☒ Automatic

☒ Stereo    ☒ Power Locks    ☐ Mag Wheels    ☒ Sun/Moon Roof    ☐ Radial    ☐ Standard

☐ Tape Deck    ☒ Power Windows    ☐ T-Tops    ☒ Special    ☐ Auto Stick

☒ Compact Disk    ☒ Power Seats    ☐ Air Conditioning    ☐ Console

☐ Other: _____

☐ CB Radio    Type _____    Cost $ _____    Date Installed _____

☐ Purchased From: _____

4. Vehicle Condition

Paint    ☐ Fair    ☐ Good    ☒ Excellent    Other distinguishing features: (dents, decals, trailer hitch, interior, etc.)

Transmission    ☐ Fair    ☐ Good    ☒ Excellent    _____

Engine    ☐ Fair    ☐ Good    ☒ Excellent    _____

Body    ☐ Fair    ☐ Good    ☒ Excellent    _____

Long/State Farm
SF1  00758

5.  Name and address of service station/garage: _____ N/A _____

Who performs routine maintenance service? _____ N/A _____

Date last serviced _____ N/A _____

Who performs State MV inspection? _____ N/A _____

Date last inspected _____ N/A _____

6.  Date car purchased _2/04/15_    ☐ New  ☒ Used       ✗Purchase price $ _____

Trade-in _____    Allowance $ _____

Seller Dealer/Individual Name and Address _(CITY AUTO SALES) BIRMINGHAM, AL_

How did you learn the car was for sale? _____ INTERNET _____

How was the car paid for? ☒ Cash  ☐ Check

If financed, name and address of finance company _____

Account # _____ Balance Due $ _____ Loan Terms _____ Months _____

Date of last loan payment made _____

Is account past due?        ☐ Yes ☒ No        How long? _____

Are keys in your possession?  ☒ Yes ☐ No    Ignition key # _____ Trunk key# _____

Do you have other theft insurance? ☐ Yes ☒ No    Policy # _____

Name of insurance company _____ STATE FARM _____

Was this a rebuilt wreck? ☐ Yes ☒ No    If yes, name of rebuilder _____

Was it a recovered theft? ☐ Yes ☐ No    If yes, date of theft _____

7.  Are the answers you have given true to the best of your knowledge and belief?  ☒ Yes ☐ No

Witness _____

Address _____

Policyholder _Alante O'Long_
(Signature)

SUBSCRIBED AND SWORN TO BEFORE ME this _____ day of _____ , (Year) _____

In _____ County, _____

Notary Public _____    My commission expires: _____

Long/State Farm
SF1  00759

**VALERIE WARE TEMPLE**

| | |
|---|---|
| 1  IN THE UNITED STATES DISTRICT COURT | 1  EXAMINATION BY:          PAGE NUMBER: |
| 2  FOR THE MIDDLE DISTRICT OF ALABAMA | 2  Mr. Newman...............................5-47 |
| 3  NORTHERN DIVISION | 3  Mr. Burge................................47-48 |
| 4  CASE NO.: 2:06cv816-MHT | 4 |
| 5 | 5  EXHIBITS: |
| 6  MARTIN O. LONG, | 6  Defendant's Exhibit 19.......................11 |
| 7  Plaintiff, | 7  (letter to Valerie Ware Temple from State |
| 8  V. | 8  Farm) |
| 9  STATE FARM FIRE AND CASUALTY COMPANY, | 9 |
| 10  Defendants. | 10 |
| 11 | 11 |
| 12 | 12 |
| 13  STIPULATIONS | 13 |
| 14 | 14 |
| 15 | 15 |
| 16  IT IS STIPULATED AND AGREED by and | 16 |
| 17  between the parties, through their respective | 17 |
| 18  counsel, that the deposition of VALERIE WARE | 18 |
| 19  TEMPLE may be taken before STACEY L. JOHNSON, | 19 |
| 20  Commissioner, at the Offices of Beers, Anderson, | 20 |
| 21  Jackson, Patty, Van Heest & Fawal, 250 Commerce | 21 |
| 22  Street, Suite 100, Montgomery, Alabama, on the | 22 |
| 23  27th day of March, 2007. | 23 |
| Page 1 | Page 3 |

| | |
|---|---|
| 1  IT IS FURTHER STIPULATED AND AGREED | 1          APPEARANCES |
| 2  that the signature to and the reading of the | 2  FOR THE PLAINTIFF, MARTIN O. LONG: |
| 3  deposition by the witness is hereby waived, the | 3  BURGE & BURGE |
| 4  deposition to have the same force and effect as | 3  F. Tucker Burge |
| 5  if full compliance had been had with all laws | 4  2001 Park Place North |
| 6  and rules of Court relating to the taking of | 4  Suite 850 |
| 7  depositions. | 5  Birmingham, Alabama 35203 |
| 8  IT IS FURTHER STIPULATED AND AGREED | 6 |
| 9  that it shall not be necessary for any | 7  FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY |
| 10  objections to be made by counsel to any | 8  COMPANY: |
| 11  questions except as to form or leading | 9  HELMSING, LEACH, HERLONG, NEWMAN & ROUSE |
| 12  questions, and that counsel for the parties may | 9  James B. Newman |
| 13  make objections and assign grounds at the time | 10  (NEWMJ8049) |
| 14  of trial, or at the time said deposition is | 10  jbn@helmsinglaw.com |
| 15  offered in evidence, or prior thereto. | 11  150 Government Street |
| 16  IT IS FURTHER STIPULATED AND AGREED | 11  Suite 2000 |
| 17  that the notice of filing of the deposition by | 12  Mobile, Alabama 36602 |
| 18  the Commissioner is waived. | 12  (251) 432-5521 |
| 19 | 13 |
| 20 | 14  ALSO PRESENT: |
| 21 | 15  MR. MARTIN O. LONG |
| 22 | 16 |
| 23  INDEX | 17 |
| Page 2 | Page 4 |

1 (Pages 1 to 4)

1    I, STACEY L. JOHNSON, a CSR of Montgomery,
2  Alabama, and Notary Public for the State of
3  Alabama at Large, acting as Commissioner,
4  certify that on this date, as provided by the
5  Federal Rules of Civil Procedure and the
6  foregoing stipulation of counsel, there came
7  before me at 250 Commerce Street, Suite 100,
8  Montgomery, Alabama, beginning at 2:14 p.m.,
9  VALERIE WARE TEMPLE, witness in the above cause,
10  for oral examination, whereupon the following
11  proceedings were had:
12        VALERIE WARE TEMPLE,
13  the witness, after having been first duly sworn
14  to speak the truth, the whole truth, and nothing
15  but the truth, testified as follows:
16        EXAMINATION
17  BY MR. NEWMAN:
18    Q    You go by Ms. Ware?  Ms. Ware Temple?
19    A    Ware Temple.
20    Q    Ware Temple is the way you say it?
21    A    Yes.
22    Q    Ms. Ware Temple, my name is Jim Newman,
23  and I'll be asking you some questions today.

Page 5

1    A    Yes.
2    Q    All right.  Would you state your name,
3  please?
4    A    Valley Ware Temple.
5    Q    And how are you employed?
6    A    With Dr. Chung, Tai Chung, orthopedic
7  surgeon.
8    Q    And you've been with him for sometime,
9  haven't you?
10    A    Yes.  Seven years.
11    Q    And do you live here in Montgomery?
12    A    Yes.
13    Q    And how long have you lived here?
14    A    All my life.
15    Q    What's your home address?
16    A    Why do I need that?  Why do I need to
17  use that address?
18    Q    Well, let me ask you, is it 6936 Winton
19  Blount Boulevard?
20    A    No.
21    Q    Is that your office address?
22    A    Yes, it is.
23    Q    Well, the reason that I ask you is so

Page 7

1  This relates to a case between State Farm Mutual
2  Automobile Insurance Company and Mr. Martin
3  Long.  You know Mr. Martin Long; correct?
4    A    Yes.
5    Q    And what I'll do is I'll ask you the
6  questions, and then you can answer them.  If I
7  ask something that you don't understand or if
8  it's confusing, what I want you to do is make
9  sure we keep everything straight is stop me and
10  say ask it again.  Okay?
11    A    Okay.
12    Q    If you answer it, I'm going to assume
13  that you answered what I asked.  Is that fair
14  enough?
15    A    Yes
16        MR. BURGE:  Object to the form.
17    Q    And you're doing a good job, and
18  I'll -- just one other I'll ask you is if you'll
19  help me -- and I'll try to work on it, too -- is
20  lots of times, we all have a habit of saying
21  uh-huh and huh-uh instead of yes and no.  And
22  it's hard for her to take down an uh-huh and an
23  huh-uh.  So we'll work on that together.

Page 6

1  I'll be able to identify you and make sure that
2  you're the person who lives at that address.
3    A    Okay.  Would you be calling that
4  address?  Would you be contacting me -- I want
5  to be contacted at that address.
6    Q    I understand that.
7    A    Okay.
8    Q    All right.  What's your address?
9    A    13100 Edna, E-D-N-A, Brake, B-R-A-K-E,
10  Lucas Drive, Montgomery 36117.
11    Q    And I know that you have a cell phone.
12  What is the number on that cell phone?
13    A    (334) 318-8482.
14    Q    Okay.  And who is that service with?
15    A    Verizon Wireless.
16    Q    Have you always had Verizon service?
17    A    I've been having it for several years.
18  Whenever I started out, it was like maybe -- I
19  don't know how many years -- but I started off
20  with Alltel.  And that's been 16, 17 years ago.
21  Something like that.
22    Q    Okay.  When you went to Atlanta with
23  Mr. Long, were you using Verizon then?

Page 8

2 (Pages 5 to 8)

**VALERIE WARE TEMPLE**

1    A   Yes.  Same number.
2    Q   Okay.  And there was a time when you
3    helped Mr. Long get a cell telephone, or he got
4    it under your name?
5    A   Exactly.
6    Q   Why did you do that?
7    A   Because we could talk.  The reason for
8    that is because I was married then.  I'm married
9    now.  And so that I could contact him easily and
10   it would be cheap for me to do it.
11   Q   I mean, why did you get him a cell
12   phone as opposed to him getting his own cell
13   phone?
14   A   Because I could easily get it under my
15   account.  I don't know if he couldn't get one at
16   the time.  But I could easily get one under my
17   account.
18   Q   Okay.  So it was easy for you to get
19   one?
20   A   Yes.  Just to put -- say I want the
21   phone from them and they would give him a phone
22   and a number.
23   Q   Okay.  So you went and -- who paid for

Page 9

1    the cell phone bills for that telephone bill?
2    A   He did.
3    Q   Okay.
4    A   I initially told him that's what I
5    wanted to do.
6    Q   So how did he pay for them?  Did he pay
7    directly the phone company, or did he pay you
8    and then you paid the phone company?
9    A   He paid me and then he started -- he
10   started paying me first.  Then initially he went
11   to paying Verizon, and that was in, I think,
12   Prattville.  I'm not for sure.
13   Q   When he paid you, did he pay you in
14   cash or did he pay you in check?
15   A   Cash.
16   Q   Okay.  Now, have you been contacted by
17   anyone from State Farm concerning Mr. Long's
18   Corvette?  I think there's a letter that --
19   A   I don't know -- I spoke with someone.
20   I don't know if it was Attorney Tucker.
21   Q   Mr. Burge?
22   A   Yeah.  Or someone else.  I know I was
23   contacted.

Page 10

1    Q   Did you receive -- let me show you this
2    letter that we'll mark as Defendant's Exhibit
3    19.  And that was sent to your -- I think the
4    office address there.
5
6    (Whereupon, Defendant's Exhibit
7    Number 19 was marked for identification
8    and copy of same is attached hereto.)
9
10   Q   Did you receive a copy of that at
11   sometime?
12   A   No.
13   Q   You never got that?
14   A   No.
15   Q   So you've never seen that before?
16   A   No.
17   Q   And you say you think that you were
18   contacted by someone?
19   A   Yes.
20   Q   Do you know how long after the time
21   y'all were in Atlanta that this happened, that
22   you were contacted?
23   A   No, I don't know.

Page 11

1    Q   Was it within a matter of weeks, or was
2    it within a matter of months?
3    A   I don't know.  I mean, I don't want to
4    say anything concrete, but I know I was
5    contacted.
6    Q   Okay.  But you don't remember who you
7    talked to?
8    A   No.  I know I talked to this attorney,
9    but anyone else, I can't remember.
10   Q   Well, did you talk to this attorney
11   soon after this happened or was it sometime
12   after this happened?
13   A   It was -- I want to say it was shortly
14   after it had happened, but I couldn't tell you
15   how long.
16   Q   Okay.  Did he come and see you --
17   A   No.
18   Q   -- or did you talk on the phone?
19   A   No.  I spoke on the phone with him.
20   Q   So except for Mr. Burge, who you spoke
21   to on the phone and who apparently -- did he
22   identify himself on the phone to you?
23   A   Yes.

Page 12

3 (Pages 9 to 12)

**VALERIE WARE TEMPLE**

1    Q   Except for Mr. Burge, you don't recall
2  talking to anyone else?
3    A   Not that I can remember, no.
4    Q   And you say you did not get the letter
5  that I've marked here as Exhibit 19?
6    A   No.
7    Q   All right. And that letter is
8  addressed to Valerie Ware Temple, 6936 Winton
9  Blount Boulevard, Montgomery, Alabama 36117. Is
10  that the correct address for you?
11    A   Yes.
12    Q   Okay. How long have you known Martin
13  Long?
14    A   He was a patient of Dr. Chung's. I
15  don't know what year. But I've been knowing him
16  for a few years. I can't tell you exactly how
17  many years.
18    Q   How did you get to know him?
19    A   He was a patient of Dr. Chung's. He
20  come into the office.
21    Q   Okay. Are you still seeing Mr. Long?
22    A   No, not seeing him like having a
23  relationship with him. I talk to him on the

Page 13

1  phone occasionally.
2    Q   When was the last time that y'all
3  ceased your relationship, or when did you cease
4  your relationship, other than just as -- talking
5  on the phone as friends?
6    A   I want to say around, I guess, about
7  last year sometime.
8    Q   Okay. This incident with the Corvette
9  happened in February of 2005.
10    A   Okay.
11    Q   Can you put it in perspective how long
12  after that it was?
13    A   It was -- I know it was sometime in
14  2006.
15    Q   Okay.
16    A   I couldn't tell you what month.
17    Q   Okay. Did he know you were married?
18    A   Yes.
19        MR. BURGE: Object to the form.
20    Q   Did he know who you were married to?
21    A   He didn't know him, but he knew his
22  name. I guess he knew his name. I mentioned
23  it.

Page 14

1    Q   Did he know his last name?
2    A   Yeah, because he knew my last name.
3    Q   How do you know he knew your last name?
4    A   Because I would mention it. I mean, I
5  used Ware or Temple.
6    Q   You used either one?
7    A   Yes. At my workplace, I use Ware
8  because of -- actually, I hadn't got it changed
9  over to my Social Security card. So I just use
10  both. And on my driver's license, I have Ware
11  Temple on it.
12    Q   Okay. But you're sure that he knew
13  your name?
14    A   Yes.
15    Q   Last name?
16    A   Yes.
17    Q   Okay.
18    A   I'll put it like this. He knew one of
19  them.
20    Q   Okay. When you went over to Atlanta in
21  February of '05, he knew that you were -- he
22  knew your name was either Valerie Ware or
23  Valerie Temple or else Valerie Ware Temple, one

Page 15

1  of those three?
2    A   Exactly.
3    Q   Okay. Do you know how many times you
4  had been out with him before going over to
5  Atlanta in February of 2005?
6    A   Several times.
7    Q   Just so you and I are on the same
8  wavelength, February 2005 is the time you go
9  over there and the Corvette is gone.
10    A   Uh-huh.
11    Q   All right. Had you been over to
12  Atlanta before?
13    A   Yes.
14    Q   Okay. With Mr. Long?
15    A   No, not with Mr. Long.
16    Q   Never had been to Atlanta with Mr. Long
17  before?
18    A   No, not before that time.
19    Q   Had you ever gone over to see Donald
20  Ware?
21    A   Yes.
22    Q   Did you ever go over there to see your
23  brother, Donald Ware, with Mr. Long?

Page 16

4 (Pages 13 to 16)

1    A    No.
2    Q    Okay.
3    A    Not before that incident.
4    Q    Huh?
5    A    Not before that incident.
6    Q    That's what I'm saying, before February
7    of 2005?
8    A    No.
9    Q    Never had done that?
10    A    No.
11    Q    And had you ever gone over there with
12    your -- to Atlanta or Lithonia or anywhere in
13    that area with Mr. Long prior to -- that's
14    before -- February of 2005?
15    A    No.
16    Q    Is that a no?
17    A    No.
18    Q    On the occasion of February of 2005 --
19    and, again, that's the time that the Corvette is
20    gone. Okay. That's the time -- who went to
21    Atlanta on that weekend?
22    A    It was myself, Martin, and my two
23    brothers and Felicia.

Page 17

1    A    Just to visit my brother, but I used
2    the excuse that I was -- to my husband that I
3    was going to a hair show. But we just went just
4    to -- just to go.
5    Q    You went over there to see your brother
6    Donald Ware?
7    A    Yes.
8    Q    He lives in Lithonia, Georgia?
9    A    Yes.
10    Q    And, again, you told your husband that
11    you were going over there for another reason, a
12    hair show?
13    A    Exactly.
14    Q    Now, are you a hair dresser or anything
15    like that?
16    A    Yes.
17    Q    Do you do that on the weekend or
18    something?
19    A    I just do it part-time. I don't do
20    it -- I used to do it. I don't do it anymore.
21    Q    Okay. What vehicle did you ride
22    over -- were there three cars that went over to
23    Atlanta?

Page 19

1    Q    Okay. What about LaToya?
2    A    She was a girl that my brother had met.
3    Q    Did she go that weekend?
4    A    No.
5    Q    So on that weekend, it was just you,
6    your brother Ricky?
7    A    Yes. Sandy.
8    Q    Your brother Sandy?
9    A    Yes.
10    Q    Felicia?
11    A    Yes.
12    Q    Which one was she with?
13    A    She was with Ricky.
14    Q    Felicia?
15    A    Uh-huh.
16    Q    You and Martin?
17    A    Yes.
18    Q    And what was the purpose of y'all going
19    to -- I guess you went to Lithonia really, the
20    Atlanta area?
21    A    Yes.
22    Q    What was the purpose of going over
23    there?

Page 18

1    A    Yes.
2    Q    And you rode over there with Mr. Long?
3    A    Yes.
4    Q    And then anybody else in the car with
5    y'all?
6    A    No.
7    Q    And then Ricky rode over there. Was
8    there anybody in car with him?
9    A    Felicia.
10    Q    And then Sandy rode over there. He had
11    his own car. Was there anybody with him?
12    A    No.
13    Q    Did y'all caravan, stay together?
14    A    Yes, going up there we did.
15    Q    And when you got over there, what did
16    you do?
17    A    When we first got there, we had went to
18    my brother's -- well, we went to the motel to
19    check in, and then we left -- once we checked
20    in, we left there and went to my brother
21    Donald's house.
22    Q    Okay.
23    A    And we went from there to eat. We all

Page 20

5 (Pages 17 to 20)

1  went. And then we went back to his house and
2  left from there back to the motel.
3      Q   Did you and Martin leave Donald's house
4  and go back to the motel without the rest of
5  them?
6      A   Yes.
7      Q   Okay. Where did they go?
8      A   I think they went out. I don't know
9  where -- what place they went to, but they went
10  out to a club.
11      Q   About what time did you get back to the
12  hotel? About nine or ten? Is that safe, or is
13  that...
14      A   Yeah. I'm not concrete on it, but it
15  was that night after eating. So I don't know
16  exactly what time.
17      Q   Okay. And whose -- can you tell me the
18  cell -- do you know Ricky's cell phone number?
19      A   Yes.
20      Q   What is it?
21      A   541-0045.
22      Q   And how about Sandy? Do you know his?
23      A   538 -- I think it's 6529.

Page 21

1      Q   And then how about Donald? Do you know
2  his?
3      A   No. He's gotten it changed since
4  then. I don't know it by heart.
5      Q   Do you know a cell phone that's
6  294-2113?
7      A   Not that I can recall.
8      Q   Okay. Did Mr. Long -- after this
9  happened, after this weekend in February of
10  2005, did Mr. Long call you to ask you for
11  Donald's telephone number so that he could call
12  Donald? Do you remember that?
13      A   No, I don't remember.
14      Q   Don't remember that?
15      A   No.
16      Q   All right. When you went back to the
17  motel after leaving Donald's house, did you see
18  anybody that night? Did you see either Ricky,
19  Sandy, or Felicia again that night?
20      A   No.
21      Q   So after y'all come back to the motel,
22  y'all go to bed, you don't see anybody else that
23  night?

Page 22

1      A   No.
2      Q   Okay. And do you recall where Mr. Long
3  parked his car?
4      A   Yes.
5      Q   Okay. Where?
6      A   He parked it right outside the motel
7  going up in the motel. It was kind of off to
8  the, I guess you'd say, left-hand side. After
9  we found out the car was stolen, we realized
10  that he was parked under a camera.
11      Q   Right. Did he say anything that night
12  before y'all went to bed about being parked
13  underneath the camera?
14      A   No, not that I can remember.
15      Q   Do you remember that being something
16  that y'all became aware of after the car was
17  stolen?
18      A   No, no. The reason for that is because
19  I told him to pull the tape to see who might
20  have stole the car.
21      Q   You told who that?
22      A   The guys at the front counter. I don't
23  know any names. But I was like, well, just pull

Page 23

1  the camera, just pull the tape on it. So I
2  wasn't aware that the camera was right -- facing
3  the car, aiming toward the car.
4      Q   You didn't know that -- when did you
5  tell the people at the front desk to pull the
6  tape?
7      A   That morning. That morning.
8      Q   Were you the first one to tell them
9  that?
10      A   No. I don't think so. I'm not for
11  sure. But we all -- after realizing we all was
12  talking about it. And he got upset about it
13  because they said -- first they said initially
14  something about they got to wait on the manager
15  or supervisor, whoever was over the complex.
16  Then they was saying he called -- I don't know
17  what time it was -- that it wasn't working or
18  the -- I don't know. Something. It was all
19  kind of stories that conflicting.
20      Q   When did you first become aware that
21  there was a camera outside?
22      A   After --
23      Q   That morning?

Page 24

6 (Pages 21 to 24)

1    A   That morning, yes.
2    Q   Do you know when Mr. Long became aware
3  of that?
4    A   The same -- I don't know if he knew or
5  not. I can't say. But I know we was all
6  talking about it that morning after the car was
7  stolen.
8    Q   Okay. Y'all didn't talk about the
9  camera that night, did you? The night before?
10   A   No. Not that I can remember, no.
11   Q   Okay. Do you remember how many sets of
12 car keys Mr. Long had with him that weekend?
13   A   No. I know he had one set because, of
14 course, he was driving with it, but that's it.
15   Q   Did he ever say anything to you about
16 another set of keys?
17   A   No, not to my knowledge he didn't.
18   Q   How did you find out that the car was
19 missing?
20   A   That morning sometime -- it was
21 early -- Felicia called me on my cell phone and
22 she was like, where are y'all. I was like, in
23 the room asleep. She was like, no, you're not.

Page 25

1    A   My brother Ricky, Felicia, and Sandy.
2  They had went out that night, so I'm pretty sure
3  they might have seen where it was parked at.
4    Q   You think they saw when they pulled
5  back in?
6    A   I guess. I'm pretty sure they did.
7    Q   Did she tell you that?
8    A   No, she did not say. She just told me
9  that the car was gone and glass was...
10   Q   Okay. And you don't know whether she
11 had gone to the Wal-Mart and come back or
12 whether she was just...
13   A   Well, she called me and she said she
14 was at the Wal-Mart.
15   Q   At the Wal-Mart?
16   A   Yes, she said she was at the Wal-Mart,
17 which was just right across the street.
18   Q   And then you went down to -- downstairs
19 with Mr. Long and your two brothers?
20   A   Yes.
21   Q   Is that right?
22   A   Yes.
23   Q   Okay. And you say that you remember

Page 27

1  I said, yes, we are. She said, well, the car is
2  gone. I was like what. And she said, the car
3  is gone. And that's at the time I woke Martin
4  Long up. And I was like, Felicia said the car
5  is gone, and she said she see glass on the
6  ground where the car was parked. And we woke up
7  and we all went -- well, Felicia was over at the
8  Wal-Mart. She said she had left and went to the
9  Wal-Mart. So my brother Ricky and Sandy and
10 Martin, we all went downstairs.
11   Q   Okay. And so she apparently had gotten
12 up early to go to the Wal-Mart?
13   A   Yes.
14   Q   Had she gone and come back?
15   A   She called me -- I can't remember if
16 she had came -- I knew she had came --
17 eventually came back over there, but at what
18 time, I don't know.
19   Q   Okay. How did she know where the car
20 had been parked?
21   A   Well, they had went out that night,
22 so...
23   Q   Who had?

Page 26

1  asking the shift manager or the desk clerk about
2  the surveillance camera?
3    A   Yes.
4    Q   About the film?
5    A   After finding out it was one there.
6    Q   Yeah. After you saw that there was one
7  there, you then asked him about it?
8    A   Yes.
9    Q   And this would have been how long after
10 the time that Felicia called you that morning?
11   A   Less than minutes, I guess. It's like
12 ten minutes. Nothing -- run downstairs and
13 everybody's looking and, you know, just
14 wondering and everything like that. And that's
15 when it was asked.
16   Q   Okay. And what did -- you say he
17 initially told you what about the surveillance
18 camera? That's you'd have to wait on the
19 manager?
20   A   He initially said you'll have to wait
21 before we can pull the tape, I guess. And then
22 it came back the story that he wouldn't be in.
23 It was so many stories. Then they said it

Page 28

7 (Pages 25 to 28)

**VALERIE WARE TEMPLE**

1 wasn't anything in it, a tape in it. And then I
2 heard it was not working. It was like so many
3 stories.
4     Q    Several stories about the camera?
5     A    Yes.
6     Q    Did you ever talk to the manager -- I'm
7 not talking about the desk clerk -- but the
8 manager about the camera?
9     A    No.
10     Q    Do you know whether anyone else did?
11     A    No. Martin wanted to speak -- at that
12 time, he wanted to speak with him. And I'm not
13 sure if he even came to the -- came over. Yeah,
14 he wanted to speak to him. He was real upset.
15 He was upset with him because he was like, you
16 know, how can y'all have a camera with no thing
17 in it, with no tape.
18     Q    No film?
19     A    Yeah, exactly. So he was -- he was
20 pissed off at him.
21     Q    Do you remember who -- was it reported
22 to the police?
23     A    Yes.

Page 29

1     Q    Do you remember who did that?
2     A    My -- Martin -- I don't know who called
3 first. I'm pretty sure it was Martin had called
4 the police station, because he was like, I got a
5 gun in that car and I want to make sure all that
6 stuff gets reported. And then it was taking so
7 long, and my brother Sandy had called. And then
8 I think that's when we found out that the police
9 don't -- or the police don't come out to stuff
10 like that. You just have to call and report it.
11     Q    Now, tell me, so who made the initial
12 call to the police it's your understanding?
13     A    I'm not for sure, but I think it was
14 Martin.
15     Q    You think it was Martin?
16     A    Yes.
17     Q    And then you think Sandy talked to them
18 as well at some point?
19     A    Yes, because it was taking so long for
20 them to come out.
21     Q    Okay. Now, do you know what Martin
22 had -- what did he take into the room that night
23 before the car was missing?

Page 30

1     A    Well, he took some clothes out and some
2 shoes, and some of the stuff we left in there
3 because I left some stuff in the car.
4     Q    Okay. What did you leave in there?
5     A    I left a portable DVD player, some
6 clothes and shoes. We got what we could carry
7 up and then we said we'd come down the next
8 morning.
9     Q    The portable DVD player is it one of
10 those ones that plugs into the cigarette lighter
11 and then it's got a frequency that runs the --
12 is it a DVD, or is it a CD player?
13     A    It's a portable DVD, TV. It plays CDs
14 and DVDs.
15     Q    Is it set up to work through a car? Is
16 it one where you plug into the cigarette
17 lighter?
18     A    Yes.
19     Q    Where did you get that?
20     A    Circuit -- I don't know.
21     Q    Best Buy?
22     A    Best Buy. Yes, Best Buy.
23     Q    How much did you pay for it?

Page 31

1     A    It was -- I don't know. Two -- I don't
2 know exactly how much it was.
3     Q    How long had you had it?
4     A    Not long. Not long.
5     Q    A couple of months?
6     A    Yes.
7     Q    Did he have a portable DVD player in
8 there as well, or was yours the only one in the
9 car?
10     A    I don't know what he had in there as
11 far as that, but I just know I seen some clothes
12 and shoes and jewelry and money.
13     Q    No. I'm talking about the DVD player.
14 Was it the only DVD player in the car?
15     A    I don't know. I know I had mine in
16 there.
17     Q    Okay. Where was yours? In the front
18 seat?
19     A    I didn't play it, so I left it in the
20 back, in the back of the car.
21     Q    In the hatchback part?
22     A    Yeah. Because only two people could
23 get in the car actually. You know, it's like

Page 32

8 (Pages 29 to 32)

**VALERIE WARE TEMPLE**

1    right -- I could reach it, but it was like right
2    in the back but -- the center, like right here
3    (indicating).
4        Q    Okay. And so you lost what, now?
5    Clothes -- some clothes, some shoes, and a
6    portable DVD player?
7        A    Yes.
8        Q    And it plays CDs and DVDs?
9        A    Yes.
10       Q    Is it one of those where you can fix it
11   where it will play the CDs through the radio
12   speakers?
13       A    No.
14       Q    It won't do that?
15       A    I don't think it will do that. Because
16   I ended up purchasing another one. But I don't
17   think that one -- I didn't have it but so long.
18   Really I got it for work just to watch movies
19   when I was at work and didn't have anything to
20   do.
21       Q    Okay. What do you know that
22   Mr. Long -- what did you see that belonged to
23   Mr. Long that he left in the car that night, not

Page 33

1    what he told you, but what you actually saw?
2        A    I actually seen clothes, jewelry,
3    money, shoes.
4        Q    Okay. Clothes, jewelry, money, and
5    shoes?
6        A    Yes.
7        Q    Okay. And do you know how many clothes
8    he had?
9        A    No. But he brought quite a few, but I
10   don't know exactly what was -- how much he had
11   left.
12       Q    How about the jewelry?
13       A    He had like rings, bracelets. I
14   couldn't tell you how many because it was just
15   like sitting down in the...
16       Q    Where were the rings and the bracelets
17   located?
18       A    Sitting down in the little, not an
19   ashtray, but I guess a little thing -- a
20   compartment in the car.
21       Q    You know between the driver and the
22   passenger there's a little thing they call a
23   console?

Page 34

1        A    Uh-huh.
2        Q    Is that where the rings and the
3    bracelets were?
4        A    No. I seen it. It was like sitting
5    open so you could see. It was all sitting
6    there, not in the console.
7        Q    Was it between the driver and
8    passenger?
9        A    Yes.
10       Q    Okay. On the flat part of the console?
11       A    I think it had a little compartment
12   that I remember, like a little -- like something
13   like a cup holder, like a section down --
14   something like that.
15       Q    Okay. But it was the device, if you
16   will, that divides the passenger and the driver
17   seat?
18       A    Uh-huh.
19       Q    Okay? You agree with that? That's
20   where the rings were?
21       A    It was in between. It was in between.
22       Q    In between the two -- the passenger and
23   the driver seat?

Page 35

1        A    Yes.
2        Q    Okay. And that's where the jewelry
3    was?
4        A    Yes.
5        Q    What about the money?
6        A    It was sitting like folded -- I guess
7    it was sitting like folded beside the jewelry
8    that was --
9        Q    Was it out where you could see it?
10       A    Not so much. I knew he had some there,
11   but not like just laying out so you could see
12   it. But it was like folded. How much he had, I
13   couldn't tell you.
14       Q    You don't know how much he had with
15   him.
16       A    No.
17       Q    Like if I looked in the car from the
18   outside, could I see the jewelry?
19       A    No, I don't think you could. I don't
20   think so.
21       Q    Could I see the money?
22       A    No, I don't think so.
23       Q    Now, do you know he also had a gun in

Page 36

9 (Pages 33 to 36)

1  there?
2    A   He told me he had a gun.
3    Q   Did you know it at the time?
4    A   Not that I recall.  Not that I recall.
5    Q   Do you know where he kept the gun?
6    A   Well, normally when I ride with him
7  before then, I knew he kept it like underneath
8  him.
9    Q   Under the seat?
10   A   I don't know if it was exactly under
11  the seat or just sitting down on the floor.  I'm
12  assuming that's where he had it.  I'm not for
13  sure.  But I know he mentioned that he had one.
14   Q   What was the money in?  Was it just
15  loose, or was it in something?
16   A   It was like folded.
17   Q   Well, folded in half?  The money folded
18  in half?
19   A   Folded like more than half.
20   Q   Like rolled up?
21   A   Not in a roll.  More like a fold, so
22  you can take it and just stick it down.
23   Q   Was it inside anything, the money?

Page 37

1    A   No.
2    Q   Like a wallet?
3    A   No.
4    Q   And envelope?
5    A   No.  Not that I recall, no.
6    Q   So as you recall, the money was out in
7  the open?  It wasn't in anything?
8    A   Not that I recall.
9    Q   Okay.  Did Mr. Long tell you where he
10  had gotten that jewelry, the bracelets and the
11  rings?
12   A   No.  I'm assuming he had it -- already
13  had it.
14   Q   No.  I mean, did he tell you where he
15  bought it?
16   A   No.
17   Q   Okay.
18   A   No.
19   Q   Now, you told me earlier that you don't
20  recall talking to anyone about this.  And, as I
21  understand it, you're not saying you didn't talk
22  to someone, but you're saying the conversation
23  that you remember is the one that you had with

Page 38

1  Mr. Burge; is that correct?
2    A   Yes.
3    Q   Okay.  When did that conversation take
4  place?
5    A   It was at my workplace.  At my
6  workplace.  I don't know how long after we had
7  gotten back and started back to work.  I don't
8  know how long it was.
9    Q   Was it within the first six or seven
10  months, you think?
11   A   Oh, of course.
12   Q   Okay.  And what did y'all talk about?
13   A   Basically what had happened.
14   Q   What did you tell him?
15   A   The same story, what time we got down
16  there and what did we do.
17   Q   Did you tell him anything different
18  than what you've told me today?
19   A   No.  Not to my knowledge, no.
20   Q   Okay.  How many times have you talked
21  to Mr. Burge?  Just that once?
22   A   I think only just that one time that I
23  remember.

Page 39

1    Q   Okay.  Now, before this deposition was
2  given, did you talk to anyone?  Before today,
3  have you talked to anyone about -- other than
4  Mr. Burge about what happened in Atlanta?  Let
5  me be a little bit better with that question.  I
6  could tell that was kind of puzzling you, so let
7  me go back.  Have you ever talked to either of
8  your brothers about what happened there in
9  Atlanta?
10   A   We talked about it.  It's like -- like
11  unbelief.  Like we can't believe that the car
12  was stolen.  More like that.  Not like specific,
13  like we went down there and this, that, and the
14  other.  We didn't talk anything like that.  We
15  just talked about we can't believe that it
16  happened, somebody stole the car.
17   Q   And that would be all three brothers
18  that you've talked to like that?
19   A   Yes.  Not in like -- not like in a
20  group.  Just like, you know, maybe he called me
21  whenever I can talk because at the time I was
22  married.  We might just like -- we couldn't
23  believe that the car was stolen.

Page 40

10 (Pages 37 to 40)

**VALERIE WARE TEMPLE**

1    Q   So other than that type of
2   conversation, have you talked to your brothers
3   about specifics, like when the things happened,
4   who called the police, when it was discovered
5   that the car was gone, who notified who, when
6   the calls were made, what was in the car?
7   Anything like that?
8       A   No, no.  No more than that morning of.
9   My brother was like -- asked Martin what did you
10  have in the car.  So he was like -- and I know
11  he mentioned the gun.  He was like make sure you
12  report that.  He was like, yeah, I got to report
13  that because he didn't...
14      Q   Tell me what you remember about
15  conversations that morning that it happened.
16      A   I know it was a lot of cussing going
17  on.  I remember Martin was real upset.  He was
18  upset about it.  And I think I might have been
19  the one that told him make sure you call your
20  insurance company.  And after we did that, we
21  went to purchase -- well, not to purchase, but
22  to the rental place to get a car so we could
23  ride in.  But basically we just couldn't -- we
Page 41

1   for sure -- I think he might have had to call
2   home to get the insurance company's number.
3       Q   Okay.
4       A   And at the time he was like -- I know
5   he was positioned -- leaning across the bed, and
6   he was on the phone talking to the insurance
7   company, and my brother was like in the door --
8   in the room close by the door.  We was all
9   standing there.
10      Q   Do you remember about when that was?
11      A   That morning after we went down and we
12  came back up to the room.
13      Q   Were the police called first, or was
14  the insurance company called first?
15      A   I'm pretty sure the police was called
16  first.
17      Q   And how long a period of time was it
18  before -- between the time that you were told by
19  Felicia that the car was missing and the time
20  that Martin was talking to the insurance
21  company?  How long upstairs on the bed leaning
22  over -- how long a period of time was that?
23      A   Okay.  I don't know how long, but
Page 43

1   was just outdone about the car was stolen.
2       Q   Do you remember conversations between
3   either of your brothers and Martin about what
4   was in the car?  You said you remember talking
5   about the car.
6       A   I don't know which brother it was.  He
7   was like, well, what did you have in the car.
8   And that's when he -- I think I remember him
9   telling some stuff at that time -- that morning
10  that he had like left clothes, shoes.  And I was
11  like, yeah, I left some clothes and my DVD
12  player in there, also.  And money.  He -- like I
13  said, he mentioned the gun that was in the car.
14      Q   Okay.  Do you remember them ever saying
15  anything to Martin about making sure he claimed
16  that on his insurance or anything like that?
17      A   No, no.
18      Q   Okay.  Do you remember him calling
19  about his -- calling the insurance company?
20      A   Yes, I remember.  He -- I want to say I
21  had told him -- I remember saying -- telling him
22  to call the insurance company.  And I think --
23  at that time, I think he might have -- I'm not
Page 42

1   enough time for Felicia to call me, jump up, put
2   clothes on, didn't brush teeth, didn't wash
3   face, anything.  Ran downstairs, knocked on my
4   brothers' -- told them the car was gone -- or
5   stolen because the window was broke out.  We
6   went downstairs, talked -- look around, talked
7   to the guys, and they was going on about
8   everything.  Come back to the room.  And I think
9   at the time that's when he called the police.
10      Q   Do you know how long that took?  You
11  told me --
12      A   I don't know.  It didn't take no time
13  at all.  It wasn't like it was a long -- like
14  hours or an hour.  You know, it wasn't -- it
15  could have been like less maybe -- less than I
16  can say 15 or 30 minutes.  Less than that.
17      Q   Okay.  Have you ever been in any
18  lawsuits yourself before?
19      A   No.
20      Q   And how about crimes?  Have you ever
21  been convicted of a crime?
22      A   No.
23      Q   Did you ever discuss with Martin his
Page 44

11 (Pages 41 to 44)

1  financial situation before he got the
2  settlement? You're aware, of course, he got a
3  settlement for an injury?
4    A   I was aware of it. Never discussed
5  any...
6    Q   Did you ever talk about his financial
7  situation before then?
8    A   No.
9    Q   Okay. And you were aware that he was
10 married as well?
11   A   Yes.
12   Q   Again, what's your cell phone number?
13   A   (334) 318-8482.
14   Q   8482?
15   A   Yes.
16   Q   When you were in Lithonia that weekend,
17 did you call anybody about anything?
18   A   Not that I remember.
19   Q   Did you make any telephone calls?
20   A   Not that I can remember.
21   Q   Did you call one of your girlfriends?
22   A   I don't know if I called one of my
23 girlfriends and told them that the car was

Page 45

1    Q   You just figured it was fine in the
2  car?
3    A   Yeah. I mean, I never mentioned
4  anything about it, no.
5    Q   Okay. Did you leave any jewelry in the
6  car?
7    A   No, not that I recall leaving any
8  jewelry in the car.
9    Q   Did you leave any money in the car?
10   A   No, I didn't leave any money.
11       MR. NEWMAN: That's all I have. Thank
12 you, ma'am.
13       EXAMINATION
14 BY MR. BURGE:
15   Q   Were you with Mr. Long when he parked
16 the car in the hotel parking lot that night?
17   A   Yes.
18   Q   Were you with him when the car was
19 discovered to be gone the following morning?
20   A   Yes.
21   Q   Were you with him the whole time
22 between those two points in time?
23   A   Yes.

Page 47

1  missing or not. I could have, but I -- I'm not
2  sure.
3    Q   You don't recall?
4    A   I probably could have called them, but
5  I'm not for sure.
6    Q   How long ahead of time had y'all
7  planned this trip?
8    A   I don't know because I was the one that
9  initiated the trip. And I used -- like I said,
10 I used the hair show for going up there and my
11 brothers for an alibi.
12   Q   Yes, I understand that.
13   A   But I don't know how long.
14   Q   How long ahead of time that you had
15 planned to go?
16   A   I guess it could have been like a month
17 or a month and a half. I'm not for sure.
18   Q   Did you ever talk to the police about
19 this, you yourself?
20   A   No.
21   Q   Did you ever tell Mr. Long that he
22 ought to take the money inside that night?
23   A   No.

Page 46

1       MR. BURGE: Okay. Thank you.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23 FURTHER DEPONENT SAITH NOT

Page 48

12 (Pages 45 to 48)

**VALERIE WARE TEMPLE**

1         CERTIFICATE
2
3  STATE OF ALABAMA   )
4
5  COUNTY OF MONTGOMERY )
6
7
8       I hereby certify that the above and
9  foregoing deposition was taken down by me in
10 stenotype, and the questions and answers thereto
11 were transcribed by means of computer-aided
12 transcription, and that the foregoing represents
13 a true and accurate transcript of the testimony
14 given by said witness upon said hearing.
15      I further certify that I am neither of
16 counsel, nor kin to the parties to the action,
17 nor am I in anywise interested in the result of
18 said cause.
19
20
21     ---------------------------
21       STACEY L. JOHNSON, Certified
22       Shorthand Reporter and
22       Commissioner for the State of
23       Alabama at Large.
23

                              Page 49

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

| | | |
|---|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT | |
| 2 | FOR THE MIDDLE DISTRICT OF ALABAMA | |
| 3 | NORTHERN DIVISION | |
| 4 | CASE NO.: 2:06cv816-MHT | |

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3        NORTHERN DIVISION
4   CASE NO.: 2:06cv816-MHT
5
6   MARTIN O. LONG,
7        Plaintiff,
8        V.
9   STATE FARM FIRE AND CASUALTY COMPANY,
10       Defendants.
11
12
13       S T I P U L A T I O N S
14
15
16       IT IS STIPULATED AND AGREED by and
17   between the parties, through their respective
18   counsel, that the deposition of FELICIA FLOWERS
19   may be taken before STACEY L. JOHNSON,
20   Commissioner, at the Offices of Beers, Anderson,
21   Jackson, Patty, Van Heest & Fawal, 250 Commerce
22   Street, Suite 100, Montgomery, Alabama, on the
23   27th day of March, 2007.

Page 1

1       IT IS FURTHER STIPULATED AND AGREED
2   that the signature to and the reading of the
3   deposition by the witness is hereby waived, the
4   deposition to have the same force and effect as
5   if full compliance had been had with all laws
6   and rules of Court relating to the taking of
7   depositions.
8       IT IS FURTHER STIPULATED AND AGREED
9   that it shall not be necessary for any
10  objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties may
13  make objections and assign grounds at the time
14  of trial, or at the time said deposition is
15  offered in evidence, or prior thereto.
16      IT IS FURTHER STIPULATED AND AGREED
17  that the notice of filing of the deposition by
18  the Commissioner is waived.
19
20
21
22
23

Page 2

1                    INDEX
2   EXAMINATION BY:              PAGE NUMBER:
3   Mr. Newman.................................5-34
4
5   EXHIBITS:
6   There were no exhibits marked to this
7   deposition.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 3

1            A P P E A R A N C E S
2   FOR THE PLAINTIFF, MARTIN O. LONG:
3       BURGE & BURGE
3       F. Tucker Burge
4       2001 Park Place North
4       Suite 850
5       Birmingham, Alabama 35203
5
6
7   FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY
8   COMPANY:
9       HELMSING, LEACH, HERLONG, NEWMAN & ROUSE
9       James B. Newman
10      (NEWMJ8049)
10      jbn@helmsinglaw.com
11      150 Government Street
11      Suite 2000
12      Mobile, Alabama 36602
12      (251) 432-5521
13
14
15
16
17
18
19
20
21
22
23

Page 4

1 (Pages 1 to 4)

1    I, STACEY L. JOHNSON, a CSR of Montgomery,
2  Alabama, and Notary Public for the State of
3  Alabama at Large, acting as Commissioner,
4  certify that on this date, as provided by the
5  Federal Rules of Civil Procedure and the
6  foregoing stipulation of counsel, there came
7  before me at 250 Commerce Street, Suite 100,
8  Montgomery, Alabama, beginning at 9:57 a.m.,
9  FELICIA FLOWERS, witness in the above cause, for
10  oral examination, whereupon the following
11  proceedings were had:
12        FELICIA FLOWERS,
13  the witness, after having been first duly sworn
14  to speak the truth, the whole truth, and nothing
15  but the truth, testified as follows:
16        EXAMINATION
17  BY MR. NEWMAN:
18    Q   Ms. Flowers, my name is Jim Newman, and
19  I represent the insurance company. Mr. Burge
20  represents Martin Long. And I'm going to be
21  asking you some questions today, and if you
22  don't understand my question, stop me and ask me
23  to rephrase any questions you don't understand.

Page 5

1    Q   And how old are you?
2    A   I'm 30.
3    Q   Okay. Did you go to high school here
4  in Montgomery?
5    A   No. Well, actually, I went to Lanier
6  High School. And then my father is a sheriff in
7  Colorado. So like my senior year, I was a
8  little bad girl so my mom booted me to my dad.
9    Q   Went out to Colorado?
10    A   Yes.
11    Q   And then you came back after a year in
12  Colorado?
13    A   Yes. I graduated in Colorado and I
14  came back.
15    Q   Have you ever any -- gone to school any
16  schooling after high school?
17    A   No.
18    Q   Tell me -- run through with me what
19  your job history has been. I'm not looking for
20  details, just what you did from the time you
21  graduated from high school up until the
22  present.
23    A   Well, actually, I was married for four

Page 7

1    A   Okay.
2    Q   I'd ask you to try to say your answers
3  out loud and try to not say uh-huh and huh-uh so
4  we can make sure it's either a yes or a no.
5    A   Okay.
6    Q   Okay. Okay is fine.
7    A   Okay.
8    Q   Or right or correct or anything like
9  that. And if you do answer the questions, I'll
10  assume that you understood them and you answered
11  what I asked; fair enough?
12    A   Yes.
13    Q   Would you state your name, please?
14    A   Felicia Shantell Flowers.
15    Q   And are you employed?
16    A   I am.
17    Q   Where?
18    A   Vintage Point Apartments.
19    Q   What do you do there?
20    A   I'm a leasing consultant.
21    Q   Okay. How long have you been doing
22  that?
23    A   For a year.

Page 6

1  years and really didn't have to work.
2    Q   Didn't work while you were married?
3    A   No. Worked off and on at Lowe's, on
4  base. That was pretty much it. And didn't work
5  for a while. I was taking care of my kids. I
6  have three. I'm a single mother. I was going
7  through my little divorce and everything. And I
8  started working at the post office. At the
9  time, I had two kids. I didn't have three. And
10  that's where I met Ricky Ware. And then after I
11  stopped working at the post office, then I think
12  I worked like for Glovis trying to -- these
13  little temporary jobs. And then I finally got
14  stable and I was with Vintage Point.
15    Q   And that's where you are now?
16    A   Uh-huh.
17    Q   And what's the name of it again?
18    A   Vintage Point Apartments.
19    Q   And how long did you work at the post
20  office?
21    A   I was a casual, so it was like
22  seasonal. Probably no more than about six
23  months, six or seven months.

Page 8

FELICIA FLOWERS

1    Q   Casual means you kind of work
2  part-time?
3    A   Seasonal.
4    Q   When it's a rush time?
5    A   Yeah, like Christmas help. That type
6  thing.
7    Q   And you've got three children?
8    A   Yes.
9    Q   And how old are they?
10   A   Ten, six, and three.
11   Q   And was your husband's name Flowers, or
12  have you taken your maiden name back?
13   A   I have always carried my maiden name.
14   Q   What is your ex-husband's name?
15   A   Phillip Hartwell.
16   Q   Is he still in the Montgomery area?
17   A   He is.
18   Q   Do you know what he's doing?
19   A   Dead beat.
20   Q   Is he paying the child support?
21   A   No.
22   Q   Okay. Felicia, what I want to first of
23  all ask you is, we're going to be talking about

Page 9

1  that weekend, which was February the 19th, 20th,
2  and 21st of 2005, Friday, Saturday, and Sunday
3  of 2005. Before I ask you about that, though, I
4  want to ask you about going over to Lithonia
5  where Donald Ware was in the Atlanta area. Had
6  you gone over there before that weekend?
7    A   Me and Ricky have.
8    Q   You and Ricky?
9    A   Yeah. We've made trips back and forth
10  to Atlanta.
11   Q   About how many times before February
12  19th do you think you had been over there? I'm
13  not looking for exact numbers.
14   A   Okay. Around four or five. We go up
15  there often.
16   Q   Okay. Do you still do that?
17   A   Uh-huh.
18   Q   Okay. And when you go over there, do
19  you always stay in a motel or sometimes do you
20  stay with Mr. Donald Ware?
21   A   Well, at first, Donald had moved -- he
22  just moved into -- not too long ago been in that
23  house that he's in. But he was in like some

Page 10

1  apartments before then. We stayed there
2  sometimes. It wasn't until we all took the trip
3  together that we stayed in the hotel.
4    Q   Okay.
5    A   So that was really our first time
6  staying in a hotel.
7    Q   Had you ever been to see Donald with
8  Martin and Valerie?
9    A   No.
10   Q   This was the first time?
11   A   Yes.
12   Q   Never done it before?
13   A   Never.
14   Q   Okay. How long in advance had y'all
15  planned to go over there?
16   A   Maybe a month. I mean, I really --
17  it's -- to be honest with you, it's been some
18  time ago, so I can't really give you an accurate
19  time.
20   Q   When you went over there, did you take
21  three cars?
22   A   Yes.
23   Q   And you were in the car with Ricky?

Page 11

1    A   Yes.
2    Q   And y'all were trailing each other or
3  caravaning right, the three cars were?
4    A   Yes.
5    Q   And y'all got to the hotel about the
6  same time?
7    A   Yes. Well, we actually didn't go to
8  the hotel when we first got there. If I can
9  remember correctly, we went to his brother's
10  house, you know, to see his brother. Then we
11  went to go get something to eat.
12   Q   And you didn't check in then?
13   A   Honestly, I don't remember how it
14  actually went. I think we went and got
15  something to eat, we went to go check in, and
16  then we went to go see his brother. I'm not
17  really sure how the events really actually
18  went. But I know that I remember going to go
19  something eat and I remember us checking in and
20  going to see his brother.
21   Q   Did you go out to eat with his brother?
22   A   Yeah, we did.
23   Q   Was that when you went out to eat, or

Page 12

3 (Pages 9 to 12)

1 did you go out to eat twice? Did you go out to
2 eat when you got there and you went out to eat
3 again with his brother?
4     A   No. When we got there, we went to go
5 get something to eat. And I believe -- I
6 remember because his brother was there. And I
7 remember -- it's funny because there was like a
8 flying roach in the place and we were just all
9 freaking out. So I remember we all were
10 together.
11     Q   Now, after you ate, you said you went
12 back to his brother's house?
13     A   Yes.
14     Q   And then did you stay together, or did
15 Valerie and Martin go back to the -- go to the
16 hotel and y'all went out?
17     A   Okay. The initial plan was we were
18 going to go out.
19     Q   Everybody?
20     A   Yes. We were going to go out, but
21 Marty and Val, they left. They said they were
22 going to go back to the room. And so that's
23 when me and Ricky and his brother, we went out.
Page 13

1     Q   Where did y'all go?
2     A   I can't remember the name of the club.
3 It was a club.
4     Q   And your best recollection now is that
5 y'all had not checked in at the hotel at that
6 time?
7     A   I know -- we had.
8     Q   You had?
9     A   We had.
10     Q   You're just not sure whether it
11 happened before or after you went to his
12 brother's house?
13     A   I'm not sure. I can't -- honestly, I
14 just can't remember.
15     Q   About what time did you get in Saturday
16 morning?
17     A   From the club?
18     Q   Yeah.
19     A   I want to say maybe around three or
20 four o'clock in the morning.
21     Q   Pretty late?
22     A   Uh-huh.
23     Q   And you don't remember checking in
Page 14

1 then, I guess, which is why you think maybe --
2     A   We had already -- we had already
3 checked in.
4     Q   Okay. All right. When you came back
5 at three or four -- did you see either Martin or
6 Valerie any time between the time they left
7 Donald's and the next morning?
8     A   No.
9     Q   All right. When y'all came in at three
10 or four o'clock, did you see Martin's car at
11 that time?
12     A   You know, honestly I didn't even --
13     Q   One way or another?
14     A   I didn't really ever look for it.
15     Q   Didn't look for it?
16     A   No. We were just trying to get up to
17 the room because we all had been drinking.
18     Q   So you didn't really notice one way or
19 another?
20     A   No.
21     Q   Do you remember today where y'all
22 parked when you came in?
23     A   I do. The -- okay. This is the hotel
Page 15

1 (indicating). It's facing me. The front door
2 is right here (indicating). They've got parking
3 right there to the side to the right of it. You
4 know, facing the front of the hotel to the right
5 of it. We parked right there.
6     Q   We've got this little diagram of --
7 which was marked as 14, I think, to -- here we
8 go. Looking at this diagram, which is 14, and
9 you see where it says hotel here and then over
10 here it says, you know, to the -- as you face
11 the hotel to the right of it, it says parking
12 lot?
13     A   Uh-huh.
14     Q   Is that where y'all would have been
15 parked?
16     A   The entrance is right here; correct?
17     Q   Yeah.
18     A   Yes. And then there's -- is this the
19 street that leads you out of the --
20     Q   Gee, I don't know. I know this is
21 supposed to be the main drag over here
22 (indicating) and the Wal-Mart is over here
23 (indicating).
Page 16

4 (Pages 13 to 16)

FELICIA FLOWERS

1   A   Yeah, I know where the Wal-Mart's at.
2   If this is the front door (indicating) and
3   there's -- I mean, like time you come out,
4   there's like a little sidewalk and then there's
5   parking right there.  If you're coming out the
6   front door it's right directly to your left.
7       Q   Well, that would be where that is.
8   Okay.  So your best recollection is that y'all
9   would have parked just out of the front door and
10  to the left?
11      A   Uh-huh.
12      Q   Can you just put an X above where you
13  think the -- where y'all parked?
14      A   I know it was...
15      Q   You think it was about the middle
16  spaces?
17      A   Yeah.
18      Q   And how about Sandy?  Do you know where
19  Sandy parked?
20      A   I have no idea.
21      Q   You just know where y'all parked?
22      A   Yes.
23      Q   Okay.  All right.  Now, you got up

Page 17

1   early the next morning?
2       A   I did.
3       Q   Or did you even go to sleep that night?
4       A   I did.  I went to sleep.  But I'm --
5   honestly, I'm not used to going to sleep next to
6   a man.
7       Q   Yeah.  Ricky said when he -- he was
8   still sleep when you got up?
9       A   Yeah, he was.
10      Q   And you went got up and did what?
11      A   I went to Wal-Mart.
12      Q   What did you do over there?
13      A   Went shopping.
14      Q   Did you buy anything?
15      A   I did.  I did.  I think I bought -- I
16  know I bought some outfits, a couple of
17  outfits.  And I want to say I -- yeah, I charged
18  them on my credit card, so I remember -- I
19  remember all of that.
20      Q   Did you walk back?  Did you walk over
21  to Wal-Mart?
22      A   No.  I drove.
23      Q   You drove Ricky's car?

Page 18

1       A   I did.
2       Q   And so that's why you know where it was
3   parked, I guess?
4       A   Uh-huh.  I drove from the club.
5       Q   You say yes.  That's how you know where
6   it was parked; right?
7       A   Yes, yes.
8       Q   And then you were also the person who
9   had driven it back from the club?
10      A   I did.
11      Q   And you drove it to Wal-Mart and then
12  you drove it back?
13      A   I did.
14      Q   Okay.  And when did you become aware
15  that Martin's car was not there?
16      A   Well, because when I got ready to
17  leave, I didn't see the car.
18      Q   When you left?
19      A   Yes.  When I got ready to go to
20  Wal-Mart.  I was looking in the parking lot and
21  I didn't see the car, so I called his sister and
22  I was like where are y'all at.  Because I just
23  assumed that they had -- I'm a breakfast

Page 19

1   person.  I assumed that they went to breakfast.
2   She was like, we are in the room.
3       Q   You called Valerie?
4       A   Yeah, I did.  She was like -- I said,
5   you're in the room.  I said, the car is not out
6   there.  I didn't see the car.  I was like, you
7   know, did Marty go somewhere.  She said, no.
8   She said, he's here in the bed with me.  I said,
9   I didn't see his car out there.  And so she was
10  like, stop playing.  I was like, I'm for real; I
11  didn't see the car.  That's whenever she said
12  she'll call me back.  And they went, I guess --
13  I don't know what happened.
14      Q   Did you tell them that the car had been
15  stolen?
16      A   No, I didn't tell them that.
17      Q   Did you tell them that you had found a
18  place where there was broken glass on the --
19      A   I saw -- when I got back, I saw the
20  broken glass.
21      Q   Did you tell them that on the
22  telephone?
23      A   Huh-uh.

Page 20

5 (Pages 17 to 20)

FELICIA FLOWERS

1    Q   Okay. Is that a no?
2    A   No.
3    Q   So all you told them in the telephone
4    call was that you didn't see his car out there?
5    A   I didn't see it.
6    Q   You didn't ever say it's been stolen?
7    A   No.
8    Q   You didn't ever say I saw some broken
9    glass?
10   A   No.
11   Q   You didn't ever say I know where it was
12   parked and it's not there anymore?
13   A   No. I mean, when we -- like I said,
14   when we initially checked in, like I said, I
15   don't know event for event, like was it before
16   or after we went to Donald's house, but I know
17   that he had -- when he parked, it was like to
18   the left. That's all I remember him backing
19   up. It was to the left. That's all I
20   remember.
21   Q   But that was before y'all went to
22   Donald's; right?
23   A   Right.

Page 21

1    Q   So you don't know where he was parked
2    on this particular occasion?
3    A   I don't.
4    Q   Did you find out later where he said he
5    had been parked?
6    A   Yeah.
7    Q   And where was that?
8    A   It was to the left.
9    Q   Here we go. It's 14 again.
10   A   See, I'm not understanding -- well,
11   okay. Yeah. Well, it was right there.
12   Q   He said it was over here on the right,
13   and you said you were over here on the left.
14   A   But I thought that the parking was kind
15   of catty-cornered but maybe it was straight. I
16   can't really remember. But, yeah, it was parked
17   that way.
18   Q   But it looks like his car where he's
19   got it parked on 14 is on the other side of the
20   hotel from where yours was?
21   A   Yeah. Correct.
22   Q   Okay. Now, after you told Valerie that
23   you didn't see the car out there and the

Page 22

1    reason -- let me get this straight -- the reason
2    that you called was not to report the missing
3    car, but you called because you were looking for
4    them because you didn't see the car?
5    A   Exactly.
6    Q   You thought they were out to eat
7    somewhere?
8    A   Yeah. Eating breakfast.
9        MR. BURGE: Without you.
10       THE WITNESS: Without me. Because I'm
11   a breakfast person.
12   Q   So you called to find out. And then
13   what happened next? Did they come down into the
14   desk area, or did you go up to the room?
15   A   I have no idea what happened because I
16   was still at Wal-Mart. I didn't come back right
17   away. I finished my shopping, and I talked to
18   Ricky.
19   Q   Where did this telephone call take
20   place? Were you at Wal-Mart, or was this when
21   you came back?
22   A   Which telephone call?
23   Q   When you called Valerie to say where

Page 23

1    are y'all, were you --
2    A   Where did it take place? I was in the
3    truck.
4    Q   You were in the truck?
5    A   Uh-huh.
6    Q   At Wal-Mart?
7    A   On my way to Wal-Mart.
8    Q   That's when you first called?
9    A   Uh-huh.
10   Q   Okay. I got it. All right. And you
11   went on to Wal-Mart and shopped?
12   A   Yeah, I did.
13   Q   And then came back?
14   A   Yes.
15   Q   And where were they when you came back?
16   A   When I -- I believe -- honestly, I
17   can't really remember. I believe that they were
18   down there in the front where the front desk is
19   talking to the Arab people.
20   Q   The desk clerk?
21   A   Yes.
22   Q   And he was Middle Eastern somehow?
23   A   Something like that.

Page 24

6 (Pages 21 to 24)

FELICIA FLOWERS

1    Q   Okay. Were you part of those
2  conversations, or did you just look --
3    A   No.
4    Q   You just knew they were going on?
5    A   Yeah. But I want to add if I can --
6    Q   Sure.
7    A   -- when I was in Wal-Mart, I was
8  calling Ricky to let him know the car was -- you
9  know, your sister is saying they were in the
10 room and that I was telling her that the car
11 wasn't there. He was on the other hand telling
12 me that his sister ran across the hall to him to
13 tell him that the car wasn't outside, I guess,
14 after he realized it was gone.
15   Q   Let's go over that again. Let's see if
16 we can get that in sequence and explain that to
17 me again. So you're on the phone -- you got on
18 the phone in Wal-Mart. The first person you
19 call in Valerie; right?
20   A   Exactly.
21   Q   And you ask her where they are?
22   A   Exactly.
23   Q   And tell her, well, I know you're not

Page 25

1  there because your car is not there?
2    A   Exactly.
3    Q   Was there anything more in that
4  conversation?
5    A   No. Other than she thought that I was
6  playing when I told her I didn't see the car.
7  She was like -- I said, the car, I didn't see
8  it. I said, are you all there. She said, yeah,
9  we're here. I said, is Marty there. She said,
10 yeah, he's next to me; he's here. And I was
11 like, well, I didn't see the car. And then
12 that's whenever she -- we got off the phone. I
13 guess they went to go see whatever whatever. In
14 then the meantime, I called Ricky.
15   Q   Now, you're at Wal-Mart now?
16   A   I'm at Wal-Mart. I called Ricky and I
17 was like, you know, your sister's car -- well,
18 Marty's car wasn't out there. I said, you know,
19 your sister's there in the hotel, but the car
20 wasn't out there. And then that's whenever he
21 said Baby -- well, he calls her Baby Sister. He
22 said, Baby Sister says that somebody done took
23 the car. And he said he'll call me back. And

Page 26

1  then that's all I remember until I got back, and
2  then that's whenever I believe that they were --
3  I remember them being downstairs.
4    Q   I think you brought me up to date. I
5  wanted to ask you did he say how he knew that
6  Baby Sister had said that someone had taken the
7  car?
8    A   He said that she told him that.
9    Q   Did he say when?
10   A   No, he didn't say when. I mean, it had
11 to be after me and her hanging up the phone and
12 then by me calling him.
13   Q   How soon after you hung up the phone
14 with her was it that you called him?
15   A   Maybe five minutes, three minutes. It
16 wasn't -- it wasn't...
17   Q   Did you use your cell phone?
18   A   I did.
19   Q   And what's the number on it?
20   A   My old number was 538-2339.
21   Q   That was the one that you had when
22 you --
23   A   I still have the same line, but that

Page 27

1  was my number at the time. I changed my number
2  since then. I'm still with Sprint.
3    Q   It was a Sprint number.
4    A   Exactly.
5    Q   And at the time, you were 538-2339?
6    A   Uh-huh.
7    Q   And what are you now?
8    A   819-0727.
9    Q   How long have you been 819-0727?
10   A   Not even a month.
11   Q   Very recent, then?
12   A   Uh-huh.
13   Q   But it's still a Sprint phone?
14   A   It's still the same account.
15   Q   Okay. All right. So when you come
16 back and they're talking to the desk clerk --
17 and you really aren't part of those
18 conversations?
19   A   No.
20   Q   What happens next?
21   A   I know I remember there was a lot of
22 waiting. I don't really remember. I just
23 remember it was a lot of waiting. And I

Page 28

7 (Pages 25 to 28)

FELICIA FLOWERS

1 remember them saying -- we went back to Donald's
2 house, still waiting. And then Donald showed
3 us, I think, where the rental car place was. He
4 had to go pick a -- I think it was a Grand Am or
5 Grand Prix or something.
6     Q   Pick up a rental car?
7     A   Yeah. And after that we pretty much --
8 the day was pretty much gone. And we went -- we
9 went to the fish market and got some fish and
10 then we went back to Donald's house and cooked
11 out.
12    Q   Okay. And then you stayed there -- did
13 y'all go out Saturday night after you cooked
14 out?
15    A   God, I really don't remember.
16    Q   Don't remember?
17    A   I don't remember.
18    Q   But y'all did go back to Montgomery and
19 come back to Montgomery on Sunday?
20    A   Sunday.
21    Q   Okay. Do you remember any calls to the
22 police?
23    A   I don't remember seeing any police.
Page 29

1 I'm assuming -- yeah, I remember them saying
2 that they -- I think Marty called the police and
3 then I want to say Sandy called because the --
4 like I said, it was a lot of waiting.
5     Q   Okay. Do you remember the calls, or
6 you remember them talking about the calls?
7     A   Them saying -- them talking about the
8 calls.
9     Q   You didn't hear any of those calls?
10    A   I didn't, no.
11    Q   Do you remember anything about calling
12 an insurance company?
13    A   The insurance company -- I believe he
14 was on the phone with the insurance company
15 during the process of him getting the rental
16 car, so, yes, I remember that.
17    Q   Okay.
18    A   Because Marty and Val had to ride with
19 us to the rental car place.
20    Q   Do you remember the phone call, the
21 actual phone call to the insurance company, or
22 do you just remember that there was a call?
23    A   I remember there was a call.
Page 30

1     Q   All right. Do you live at the
2 apartments that you are the rental agent for?
3     A   No.
4     Q   You don't?
5     A   No.
6     Q   Isn't it usually the case that the
7 rental agent lives there, or is that not the
8 case?
9     A   It's -- we only get a -- every property
10 is not the same, but we only get a percentage
11 off of our rent.
12    Q   I see. Do you remember any talk -- any
13 conversations or overhearing any conversations
14 where what was in the car was discussed, like
15 personal property?
16    A   The only thing I remember is him saying
17 something about a gun. That's all I remember.
18 That's all I really remember.
19    Q   Do you remember when you heard that?
20    A   Whenever they were talking to the --
21 well, I'm not sure if they were talking to the
22 receptionist or whatever the guy at the hotel --
23 in the lobby area, the Arab guy. But I remember
Page 31

1 him saying some of the things that he had in
2 there, and I remember hearing a gun. I know
3 there was more than that, but I just remember
4 hearing a gun.
5     Q   Okay. Since that time, have you talked
6 to Martin or Val or anyone else about what the
7 property was that was in the car?
8     A   No.
9     Q   Okay. So since that time, that
10 weekend, February '05, have you talked to anyone
11 other than that group about what happened?
12    A   No.
13    Q   And when you've talked to the group
14 about what happened, I guess y'all may have
15 talked about the fact that the -- what happened
16 to the car; correct?
17    A   No.
18    Q   Or have you just not talked about it?
19    A   Actually, the first time I've heard
20 since then about this was whenever I got the
21 paperwork, and that's whenever I was like I
22 can't really remember, you know, accurate time.
23    Q   So it really hasn't been much of a
Page 32

8 (Pages 29 to 32)

1    topic of conversation?
2      A   No, it hasn't.  Now, I've seen Val
3    since then, but, like I said, we haven't talked
4    about it.
5      Q   And you and Ricky haven't talked about
6    it?
7      A   No.
8      Q   Do you still see Ricky from time to
9    time?
10     A   I do.
11     Q   Okay.  Had you met Martin before this
12   trip?
13     A   Never.
14     Q   This was the first time?
15     A   First time.
16     Q   So you didn't know much about him?
17     A   No.
18     Q   Did you know Val?
19     A   Yes.
20     Q   Had you ever talked to Val about
21   Martin?
22     A   Never.
23         MR. NEWMAN:  That's all I have.  Thank
                                              Page 33

1    you very much.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23         FURTHER DEPONENT SAITH NOT
                                              Page 34

1                  C E R T I F I C A T E
2
3    STATE OF ALABAMA     )
4
5    COUNTY OF MONTGOMERY )
6
7
8          I hereby certify that the above and
9    foregoing deposition was taken down by me in
10   stenotype, and the questions and answers thereto
11   were transcribed by means of computer-aided
12   transcription, and that the foregoing represents
13   a true and accurate transcript of the testimony
14   given by said witness upon said hearing.
15         I further certify that I am neither of
16   counsel, nor kin to the parties to the action,
17   nor am I in anywise interested in the result of
18   said cause.
19
20
21   ---------------------------
21         STACEY L. JOHNSON, Certified
22         Shorthand Reporter and
22         Commissioner for the State of
23         Alabama at Large.
                                              Page 35

# MARTIN O. LONG

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 | CASE NO.: 2:06cv816-MHT |
| 5 | |
| 6 | MARTIN O. LONG, |
| 7 | Plaintiff, |
| 8 | V. |
| 9 | STATE FARM FIRE AND CASUALTY COMPANY, |
| 10 | Defendants. |
| 11 | |
| 12 | |
| 13 | S T I P U L A T I O N S |
| 14 | |
| 15 | |
| 16 | IT IS STIPULATED AND AGREED by and |
| 17 | between the parties, through their respective |
| 18 | counsel, that the deposition of MARTIN O. LONG |
| 19 | may be taken before STACEY L. JOHNSON, |
| 20 | Commissioner, at the Offices of Beers, Anderson, |
| 21 | Jackson, Patty, Van Heest & Fawal, 250 Commerce |
| 22 | Street, Suite 100, Montgomery, Alabama, on the |
| 23 | 27th day of March, 2007. |

Page 1

| | |
|---|---|
| 1 | IT IS FURTHER STIPULATED AND AGREED |
| 2 | that the signature to and the reading of the |
| 3 | deposition by the witness is hereby waived, the |
| 4 | deposition to have the same force and effect as |
| 5 | if full compliance had been had with all laws |
| 6 | and rules of Court relating to the taking of |
| 7 | depositions. |
| 8 | IT IS FURTHER STIPULATED AND AGREED |
| 9 | that it shall not be necessary for any |
| 10 | objections to be made by counsel to any |
| 11 | questions except as to form or leading |
| 12 | questions, and that counsel for the parties may |
| 13 | make objections and assign grounds at the time |
| 14 | of trial, or at the time said deposition is |
| 15 | offered in evidence, or prior thereto. |
| 16 | IT IS FURTHER STIPULATED AND AGREED |
| 17 | that the notice of filing of the deposition by |
| 18 | the Commissioner is waived. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

Page 2

| | |
|---|---|
| 1 | INDEX |
| 2 | EXAMINATION BY:                    PAGE NUMBER: |
| 3 | Mr. Newman...............................7-185 |
| 4 | Mr. Burge................................185-199 |
| 5 | Mr. Newman...............................199-200 |
| 6 | Mr. Burge................................200-201 |
| 7 | Mr. Newman...............................201 |
| 8 | |
| 9 | EXHIBITS: |
| 10 | Defendant's Exhibit 0.........................7 |
| 11 | (notice) |
| 12 | Defendant's Exhibit 1.........................7 |
| 13 | (Plaintiff's initial disclosures) |
| 14 | Defendant's Exhibit 2.........................7 |
| 15 | (Answers to Interrogatories) |
| 16 | Defendant's Exhibit 3.........................7 |
| 17 | (03-4-2005 letter from State Farm) |
| 18 | Defendant's Exhibit 4.........................7 |
| 19 | (photocopy of keys and key fob) |
| 20 | Defendant's Exhibit 5.........................7 |
| 21 | (photocopies of various receipts and titles) |
| 22 | Defendant's Exhibit 6.........................7 |
| 23 | (affidavit) |

Page 3

| | |
|---|---|
| 1 | Defendant's Exhibit 7.........................7 |
| 2 | (tag receipt) |
| 3 | Defendant's Exhibit 8.........................7 |
| 4 | (Big 10 Tires receipt) |
| 5 | Defendant's Exhibit 9.........................7 |
| 6 | (Incident Property) |
| 7 | Defendant's Exhibit 10........................7 |
| 8 | (Examination Under Oath transcript) |
| 9 | Defendant's Exhibit 11........................7 |
| 10 | (manufactured home policy) |
| 11 | Defendant's Exhibit 12........................7 |
| 12 | (Alabama Uniform Incident/Offense Report) |
| 13 | Defendant's Exhibit 13.......................53 |
| 14 | (telephone interview transcript) |
| 15 | Defendant's Exhibit 14.......................86 |
| 16 | (sketch) |
| 17 | Defendant's Exhibit 15......................134 |
| 18 | (06-29-2005 letter to Tucker Burge from |
| 19 | State Farm) |
| 20 | Defendant's Exhibit 16......................134 |
| 21 | (06-29-2005 letter to Tucker Burge from |
| 22 | State Farm) |
| 23 | |

Page 4

1 (Pages 1 to 4)

1    Defendant's Exhibit 17......................151
2      (U-Haul Equipment Contract)
3    Defendant's Exhibit 18......................154
4      (manufactured home policy)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 5

1                    A P P E A R A N C E S
2    FOR THE PLAINTIFF, MARTIN O. LONG:
3       BURGE & BURGE
3       F. Tucker Burge
4       2001 Park Place North
4       Suite 850
5       Birmingham, Alabama  35203
5
6
7    FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY
8    COMPANY:
9       HELMSING, LEACH, HERLONG, NEWMAN & ROUSE
9       James B. Newman
10      (NEWMJ8049)
10      jbn@helmsinglaw.com
11      150 Government Street
11      Suite 2000
12      Mobile, Alabama  36602
12      (251) 432-5521
13
14
15
16
17
18
19
20
21
22
23

Page 6

1    I, STACEY L. JOHNSON, a CSR of Montgomery,
2    Alabama, and Notary Public for the State of
3    Alabama at Large, acting as Commissioner,
4    certify that on this date, as provided by the
5    Federal Rules of Civil Procedure and the
6    foregoing stipulation of counsel, there came
7    before me at 250 Commerce Street, Suite 100,
8    Montgomery, Alabama, beginning at 9:57 a.m.,
9    MARTIN O. LONG, witness in the above cause, for
10   oral examination, whereupon the following
11   proceedings were had:
12
13      (Whereupon, Defendant's Exhibit
14   Numbers 1 through 12 were marked for
15   identification and copies of same are
16   attached hereto.)
17
18           MARTIN O. LONG,
19   the witness, after having been first duly sworn
20   to speak the truth, the whole truth, and nothing
21   but the truth, testified as follows:
22           EXAMINATION
23   BY MR. NEWMAN:

Page 7

1    **Q   Would you state your name, please?**
2    A    Martin O'Neal Long.
3    **Q   Your address, Mr. Long?**
4    A    2752 Caroline Drive, Millbrook, Alabama
5    36054.
6    **Q   And how long have you lived at that**
7    **address?**
8    A    Since '98.
9    **Q   Are you employed?**
10   A    No.
11   **Q   How long has it been since you've been**
12   **employed?**
13   A    Since 2003.
14   **Q   And who was your last employer?**
15   A    CSX.
16   **Q   Let me show you what's been marked as**
17   **Defendant's Exhibit 0 to the deposition, and**
18   **that's the Notice of Deposition.**
19      MR. NEWMAN:  And, Tucker, you've
20   confirmed that the things that are attached as
21   the duces tecum part of the notice have all been
22   produced; correct?
23      MR. BURGE:  Yeah.  I mean, as far as

Page 8

2 (Pages 5 to 8)

**MARTIN O. LONG**

1   the documents relating to the allegations. He's
2   already given State Farm during the claims
3   process all of the documents that he had
4   relating to the purchase of his car and the
5   theft of his car. The claims file, which I
6   brought with me, I mean, it has stuff in there
7   about the police report having -- that he
8   reported it and so forth. I don't know of any
9   documents relating to our allegations that are
10  not contained in there or any communications
11  between him and State Farm that are not
12  contained in there or any documents that he has
13  concerning the values of his losses that aren't
14  contained in there.
15      MR. NEWMAN: So what you're saying is
16  that all of those documents we asked for have
17  all been produced?
18      MR. BURGE: I think they've already
19  been produced.
20      MR. NEWMAN: All right. Fine.
21  **Q   Mr. Long, are you married?**
22  A   No.
23  **Q   Okay. Are you divorced?**

Page 9

1   A   Yes.
2   **Q   How many times have you been married?**
3   A   One.
4   **Q   What is your ex-wife's name?**
5   A   Evelyn Long. I'm sorry. Evelyn
6   Gilder.
7   **Q   It was Long, of course, when she was**
8   **married to you?**
9   A   Uh-huh.
10  **Q   How long have you been divorced?**
11  A   We got divorced in, I think, 2005.
12  **Q   Okay. I'm going to be asking you some**
13  **questions today. If you don't understand any of**
14  **my questions, stop me and ask me to rephrase**
15  **them. Okay?**
16  A   Okay.
17  **Q   If you answer them, I'm going to assume**
18  **that you answered what I asked. Fair enough?**
19      MR. BURGE: Object to the form.
20  **Q   And if you don't understand, it would**
21  **help us and it will help us speed this up if**
22  **when you answer a question you say yes or no,**
23  **instead of uh-huh and huh-uh.**

Page 10

1   A   Okay.
2   **Q   And I do it, too. It's something we do**
3   **in conversation. But we'll try to work on it.**
4   **All right?**
5   A   All right.
6   **Q   Okay. What was the occasion of your**
7   **leaving the employment of CSX?**
8   A   I got hurt on the job.
9   **Q   And that injury was to what part of**
10  **your body?**
11  A   My right shoulder.
12  **Q   And as a result of that -- you were**
13  **working for the railroad; correct?**
14  A   Yes.
15  **Q   And so you made a claim under FELA?**
16      MR. BURGE: Do you know what the law
17  was that we pursued your claim under?
18      THE WITNESS: No.
19  **Q   You made a claim against the railroad**
20  **company CSX; is that right?**
21  A   Yes.
22  **Q   You were represented by Mr. Burge in**
23  **that claim?**

Page 11

1   A   Yes.
2   **Q   And you settled that claim out of**
3   **court; right?**
4   A   Yes.
5   **Q   The settlement of that claim was it in**
6   **the approximate amount of $250,000?**
7   A   Yes.
8   **Q   And out of that $250,000, how much did**
9   **you receive? That's after paying Mr. Burge's**
10  **fees and expenses and that type of thing.**
11  A   175.
12  **Q   $175,000. Do you remember the date**
13  **that you received the money?**
14  A   Nope.
15  **Q   Was it in February of 2005? You don't**
16  **remember that?**
17      MR. BURGE: I have that information if
18  that's something that you need.
19      MR. NEWMAN: I've got it, too. I can
20  either -- I mean, you can find it or I can find
21  it, either one.
22      MR. BURGE: Okay. 12-14-05, that's the
23  date on the check.

Page 12

3 (Pages 9 to 12)

**MARTIN O. LONG**

1    MR. NEWMAN: I think it was about that.
2    MR. BURGE: The settlement statement
3  was around the day before.
4    MR. NEWMAN: Did you find it, Tucker?
5  I'm still looking for it.
6    MR. BURGE: It's February the 4th. And
7  February the 3rd is the date of the expense
8  check. February the 3rd apparently is the date
9  of the signed release, and I think February the
10 4th is the date of the trust account check.
11   MR. NEWMAN: Good deal. Thank you.
12   Q  Mr. Long, Mr. Burge has been kind
13 enough to let me know that his records show that
14 the time of the settlement was in early February
15 of 2005. Does that sound reasonable to you?
16   A  Yes.
17   Q  And did you cash the check when it came
18 to you?
19   A  No. What I did, I took it to Regions
20 Bank and I got a $25,000 -- some kind of check.
21 That's what I went and got the car with.
22 Traveler's.
23   MR. BURGE: Cashier's.

Page 13

1    A  Cashier's check in that amount. And
2  then the rest of the check I entered into a Max
3  account that I had. But Max wouldn't cash the
4  check because it was too much. So I went and
5  took it to Regions and Regions cashed it and
6  gave me a cashier's check for $25,000 and the
7  rest of it I took to Max.
8    Q  Did Regions give you the balance of it
9  back in another cashier's check?
10   A  Yes.
11   Q  And who was Max?
12   A  Max Federal Credit Union.
13   Q  Max, M-A-X?
14   A  Right.
15   Q  And is that where you had your account
16 at the time?
17   A  Yes.
18   Q  And then did you take that $25,000 and
19 buy the Corvette --
20   A  Right.
21   Q  -- that's the subject of the insurance
22 policy that this lawsuit is about?
23   A  Right. Yes.

Page 14

1    Q  All right. And what day did you buy
2  that Corvette on? Do you remember?
3    A  It was either -- it was in that same
4  week because I had already looked it up on the
5  Internet and I had already talked to the guy and
6  let him know I was going through a settlement.
7  And I had already talked to State Farm Insurance
8  and got everything straight so once I did go get
9  the car I would have insurance when I brought it
10 back.
11   Q  So it was very soon -- within a day or
12 so -- after you got the check that you took the
13 cashier's check from Regions and went over and
14 gave it to the people for the Corvette?
15   A  Right.
16   Q  Who did you buy the Corvette from?
17   A  From City Auto Sales in Hueytown.
18   Q  And you had already arranged with
19 someone at State Farm for insurance?
20   A  Right. I talked with Leigh. A lady
21 named Leigh in the office.
22   Q  Whose office was that in?
23   A  Mike Devers.

Page 15

1    Q  Had you used Mr. Devers before?
2    A  Yes, that's who all I dealt with.
3    Q  And you also -- did you own a trailer,
4  a manufactured home, that was on some property
5  in Millbrook?
6    A  Yes.
7    Q  Who owned the property that the trailer
8  was on?
9    A  My dad.
10   Q  Okay. And it was your trailer?
11   A  Right.
12   Q  And it was insured through State Farm
13 as well?
14   A  Yes.
15   Q  And Mr. Devers had written that policy?
16   A  Yes.
17   Q  Had Mr. Devers written auto policies
18 for you in the past as well?
19   A  Yes, sir.
20   Q  One of those was for -- didn't you have
21 a previous Corvette that --
22   A  Yes, I had a 2000. No. I'm sorry. I
23 had a 1992 Corvette.

Page 16

4 (Pages 13 to 16)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

**MARTIN O. LONG**

1  Q   What happened to it?
2  A   It had got stolen at one time.
3  Q   Was it ever recovered?
4  A   Yes.
5  Q   Did you get the car back, or was it
6  totaled when it was recovered?
7  A   No. I got the car back.
8  Q   And was anything missing from that car
9  when it was returned?
10 A   Yes. Just the tires and the rims.
11 Q   At the time you purchased the Corvette,
12 didn't you have another vehicle that you had
13 insured with State Farm?
14 A   Yes. I had a '97 Mustang Cobra and a
15 2000 S70 Volvo, which was my ex-wife's at that
16 time.
17 Q   She drove the Volvo?
18 A   Right.
19 Q   Now, the Mustang Cobra, is that the
20 Mustang Cobra that was later involved with the
21 shooting incident?
22 A   Yes.
23 Q   But the shooting incident occurred
                                              Page 17

1  Q   So Christopher then comes after you;
2  right?
3  A   (Witness nods head.)
4  Q   Is that a yes?
5  A   Yes.
6  Q   And he has a gun?
7  A   Yes.
8  Q   He shoots at you?
9  A   Right. We shoot at each other.
10 Q   Does he shoot first?
11 A   Yes.
12 Q   And then you shoot back at him?
13 A   Yes.
14 Q   And then in the process, you shoot a
15 hole through your car?
16 A   Yes.
17 Q   Were you inside or outside your car
18 when you shot the hole through it?
19 A   I was outside.
20 Q   Did you ever have any more run-ins with
21 Christopher after that?
22 A   No.
23 Q   What gun were you shooting at the time,
                                              Page 19

1  after the time that the Corvette was found
2  missing in Atlanta; right?
3  A   No. That was before.
4  Q   The shooting incident was before?
5  A   Right.
6  Q   Tell me about the shooting incident,
7  then.
8  A   Well, I was just coming from the
9  regional office one night around -- I guess it
10 was around midnight. And the dude that I got
11 into it with had got into it with one of my
12 friends prior, you know. And I had loaned my
13 friend a weapon, which, you know, the police
14 already know and they said that was fine or
15 whatever. And after that, like I say, he come
16 after me.
17 Q   The person that you had -- were trying
18 to help your friend with, what was his name?
19 What was your friend's name first?
20 A   Lester Jackson.
21 Q   And what's the other fellow's name?
22 A   All I know is Christopher. I don't
23 know what his last name is.
                                              Page 18

1  handgun? Was it a handgun?
2  A   .45 automatic.
3  Q   Is that the same .45 automatic that was
4  lost in the car?
5  A   No.
6  Q   The Corvette?
7  A   No.
8  Q   Okay. How did you use the remaining
9  money of the $175,000 that you received? We're
10 down to 150; right?
11 A   Right.
12 Q   How did you use the rest of the 150?
13 A   I gave -- I paid off $43,000 to my
14 ex-wife's student loan.
15 Q   Okay.
16 A   I paid $12,000 to pay off the S70
17 Volvo.
18 Q   Okay.
19 A   And we had accumulated bills amongst
20 each other. I think it was close to like
21 $50,000.
22 Q   Credit-card-type bills?
23 A   Yes. And then I gave her an additional
                                              Page 20

5 (Pages 17 to 20)

**MARTIN O. LONG**

1 $20,000 to go in her pocket, and I kept 20.
2　Q　Okay.
3　A　That should be about all of it.
4　Q　I think it sounds like it should be.
5　I'm going to total it up real quick.
6　　Yeah, that totals about $170,000, and
7　that's pretty close. There's another $5,000
8　somewhere.
9　　When you paid the credit card bills,
10　did you pay them by a check from Max?
11　A　Right. Yes.
12　Q　Okay. And when you paid the student
13　loan, did you pay it with a check from Max?
14　A　Yes. She paid all that because, you
15　know, the account was in both our names but she
16　was writing all the checks.
17　Q　But a check was written to pay the
18　credit card bills? The $50,000 worth, that was
19　written from Max?
20　A　Yes, yes. Everything was written from
21　Max Federal Credit Union.
22　Q　And the 12,000 on the Volvo was written
23　from Max?

Page 21

1　Q　So, as I understand it, then, at Max,
2　you both had a joint checking account; right?
3　A　Right.
4　Q　And then you had an individual savings
5　account; is that right?
6　A　Yes.
7　Q　Okay. Where is Max Federal Credit
8　Union?
9　A　In Prattville. But, you know, I gave
10　them all them records because they wanted to see
11　all that.
12　Q　Yeah.
13　　MR. BURGE: There will be some
14　repetition today, so just be ready for that.
15　　MR. NEWMAN: I'm sorry, Tucker. What?
16　　MR. BURGE: He said I've already given
17　y'all that, and I said there's going to be some
18　repetition today.
19　Q　Yeah, there will be some repetition
20　today.
21　　Did State Farm pay for the damage to
22　the Mustang Cobra?
23　A　Yes.

Page 23

1　A　Yes.
2　Q　And the 43 on the student loans was
3　written from Max?
4　A　Yes.
5　Q　And then how did you go about dividing
6　the remaining money? Did she put it in a
7　separate account, or did you put yours in a
8　separate account? What happened then? You said
9　you divided the remaining money between the two
10　of you.
11　A　I think I took my money out of the
12　account. Either I left it in that account or I
13　put it in my savings account. I think I put it
14　in my savings account. But her 20, I'm pretty
15　sure she left her 20 in the account.
16　Q　Okay. And where was your savings
17　account?
18　A　At Max.
19　Q　Okay. So was that just under your
20　name, or was it under both of your names?
21　A　Just mine.
22　Q　Just yours?
23　A　Right.

Page 22

1　Q　Had you had any previous claims through
2　State Farm? I guess we're talking about before
3　the Cobra?
4　A　Yes. I had a hail damage claim.
5　Q　That would be on your trailer?
6　A　Yes.
7　Q　Okay. And did they pay for that?
8　A　Yes.
9　Q　All right. Any other claims?
10　A　No. That's it.
11　Q　How about that Corvette that got
12　stolen? Did you make a claim against State Farm
13　for it?
14　A　Oh, yes. You had already asked about
15　that.
16　Q　No. I'm talking about the '92
17　Corvette.
18　A　That's what I'm saying. Yes.
19　Q　So you did make a claim on it?
20　A　Right.
21　Q　That one, you said, basically, they
22　took the rims off of it?
23　A　Right.

Page 24

6 (Pages 21 to 24)

1  Q   Okay. And so, then, we've got the
2  Cobra on the gunshot, we've got the '92
3  Corvette, and we've got the hail claim and then
4  we've got this Corvette claim; right?
5  A   Right.
6  Q   Then out of the Corvette claim, you
7  also had a claim for personal property that was
8  in the Corvette that was in Atlanta when it went
9  missing; right?
10  A   Yes.
11  Q   Okay. Have you ever been convicted of
12  a crime?
13  A   No.
14  Q   Okay. Have you ever been in any
15  lawsuits before?
16  A   No.
17       MR. BURGE: Other than --
18  A   Oh, other than the railroad.
19  Q   Okay. How many handguns do you now
20  own?
21  A   I've got two .45s, one .40 cal, one .9
22  millimeter, and one .38.
23  Q   Are they all automatics, or are there
                                              Page 25

1  some revolvers in there?
2  A   Everything's automatic except for the
3  .38. The .38 is a revolver.
4  Q   What makes are the .45s?
5  A   All my guns are a Taurus. That's all I
6  buy.
7  Q   And the gun that was in the Corvette,
8  was it a Taurus as well?
9  A   Yes.
10  Q   It was a .45 automatic?
11  A   Yes.
12  Q   Is it the same model as the two .45s
13  that you still have?
14  A   No.
15  Q   Different model?
16  A   Yes.
17  Q   Explain the difference to me.
18  A   I don't know it by number, but this .45
19  here it was shorter. It was like a shorter gun
20  and the grip was shorter. It could be more
21  concealed. It was smaller than the other .45s
22  I've got, but it was still made by Taurus.
23  Q   Did the clip hold the same number of
                                              Page 26

1  bullets?
2  A   Yes.
3  Q   At the time that you went to Atlanta --
4  well, let me go back. You've also had some guns
5  stolen from your house -- your trailer -- in
6  Millbrook; correct?
7  A   Correct.
8  Q   What's been stolen there in the way of
9  guns, firearms?
10  A   There was a shotgun, an AK47, and a
11  .357.
12  Q   One handgun, two long guns. One of
13  which was a shotgun and one of which was a
14  rifle?
15  A   Assault rifle.
16  Q   Did you report those thefts to the
17  police?
18  A   Yes.
19  Q   Were any of them ever recovered?
20  A   I think they recovered the .357. The
21  Millbrook Police Department called me a couple
22  of years ago and said they had it, but they
23  never called back. I never got neither one of
                                              Page 27

1  the guns back.
2  Q   I was wondering if you ever got -- they
3  told you they found the .357. Did you ever get
4  it back?
5  A   No.
6  Q   Was it a revolver or automatic?
7  A   Revolver.
8  Q   And it wasn't a Taurus, was it? .357?
9  A   I think it was.
10  Q   It was? I didn't know they made one.
11  A   I used to have a Sig, .357 Sig made by
12  Taurus, but I can't remember. I'm pretty sure
13  it is because that's all I buy.
14  Q   Okay. Now, when the incident
15  occurred -- and when I say the incident, I'm
16  talking about the incident when your Corvette
17  turned up missing outside of the County Hearth
18  Hotel in Lithonia, Georgia. Okay?
19  A   Okay.
20  Q   When that occurred, do you know how
21  long that was after the time that you purchased
22  the Corvette?
23  A   I think I had probably had that car
                                              Page 28

7 (Pages 25 to 28)

1  maybe two weeks. You know, I had just did a few
2  modifications to it and, you know, just hit the
3  town.
4    **Q  What had you had done to it?**
5    A  I put some new rims and tires on it and
6  a couple of those Corvette decals. I had one
7  that goes between the seat and the -- you know
8  where the gear stick is?
9    **Q  Yes, sir.**
10    A  The decal is just the same way as the
11  ones on the front, the circle with the two
12  flags. I had one to go right there. And then I
13  put some light louvers on the back of it. They
14  like the same size the light is but they plastic
15  and they got lines across it. I put that on all
16  four of the taillights. And I put some tape
17  that you can cut out, which is the word
18  Corvette, and it changes the color of it. I did
19  that in the front and in the back.
20    **Q  Where did you get the work done? I**
21  **know you got the tires and rims at Big 10 Tires,**
22  **didn't you?**
23    A  Yes. Well, I got the rims --

Page 29

1    **Q  You got the rims somewhere else?**
2    A  -- in Birmingham. The same day I
3  bought the car, I went to this other place not
4  too far where you give them your rims, which was
5  not chrome, and give them $900 and they give you
6  chrome rims. The same kind of rims you give
7  them go back on the car. Then I had got four
8  new tires from Big 10 Tires in Prattville,
9  Alabama.
10    **Q  Then what about the louvers and the**
11  **decals?**
12    I ordered that from this Corvette
13  book. I think it's called Echers?
14    **Q  This came in the mail?**
15    A  Right.
16    **Q  And you installed it yourself?**
17    A  Yes.
18    **Q  What year was the Corvette that you**
19  **purchased for $25,000?**
20    A  2000.
21    **Q  Let me show you what's been marked here**
22  **as Defendant's Exhibit 10.**
23    MR. NEWMAN: This is his EUO with all

Page 30

1  the exhibits attached to it.
2    **Q  Have you seen that before?**
3    A  March 31st. I did two of these
4  things. Which one was this?
5    MR. BURGE: The question was whether
6  you've seen it.
7    **Q  Have you seen this transcript, the**
8  **typed out version of this? Have you seen that**
9  **before?**
10    A  No.
11    **Q  So you never got something like that in**
12  **the mail from a court reporter?**
13    A  Well, I think I did get something like
14  this from...
15    **Q  Or maybe from Mr. Burge?**
16    A  No. I think I got something -- I think
17  that adjustor sent me something like that,
18  insurance adjustor.
19    **Q  Did you read it when you got it?**
20    A  Yeah.
21    **Q  You see attached to this, Mr. Long, are**
22  **some of the things that you brought to that**
23  **examination under oath?**

Page 31

1    A  Uh-huh.
2    **Q  You know, your tire receipts, your cell**
3  **phone records, your banking documents, your tax**
4  **returns, your settlement on your wife's**
5  **divorce. Those are some of the things that are**
6  **attached to it.**
7    A  Right.
8    **Q  What my question is, are the questions**
9  **in there -- are your answers to those questions**
10  **in there are they true and correct?**
11    A  Yeah. To the best of my ability, yeah.
12    **Q  I mean, you've looked at this before**
13  **and you've reviewed it to see whether or not**
14  **it's correct?**
15    A  I don't understand the question.
16    **Q  Have you reviewed this before to see**
17  **whether or not what was written down in there is**
18  **correct?**
19    A  Oh, yes.
20    **Q  And correctly states the answers to the**
21  **questions that were asked of you?**
22    A  Yes.
23    **Q  Okay. So you don't have any quarrel**

Page 32

8 (Pages 29 to 32)

### MARTIN O. LONG

1 with the questions and answers in Exhibit 10;
2 correct?
3    A    Correct.
4    Q    Okay. I mean, you can look through it
5 all. It's --
6    A    No. I was just looking at the
7 pictures.
8    Q    Do you remember where you did get
9 Exhibit 10, this transcript -- transcript
10 meaning what you stated -- whether you got it
11 from a court reporter or from Mr. Burge or from
12 the insurance adjustor?
13    A    I think I got it from the insurance
14 adjustor.
15    Q    Okay. Have you still got it at home?
16    A    No. I think I sent it back to him.
17    Q    Okay. What was your -- well, let me go
18 back. You've been in the Army?
19    A    Yes.
20    Q    For ten years?
21    A    Ten and a half.
22    Q    A second class petty officer; right?
23 E5?

Page 33

1    Q    And you were honorably discharged?
2    A    Yes, sir.
3    Q    And after you were discharged, did you
4 go immediately to work for CSX?
5    A    No. I started -- well, I drove trucks
6 for a minute because I got my CDL. And I drove
7 trucks for a minute, and I didn't really like
8 it.
9    Q    About how long did you drive a truck?
10    A    I drove trucks from -- let me see. I
11 got out in May. I think I drove trucks for
12 maybe -- around June until probably close to, I
13 guess, April of '98, because in May of -- that's
14 when I went to Georgia for the railroad school.
15    Q    Okay. So just a few months for the
16 trucks, then?
17    A    Yes.
18    Q    Now, what did you do for the railroad?
19    A    Well, I was a conductor, engineer, and
20 a remote control operator.
21    Q    What were you doing -- what was your
22 job when you were injured?
23    A    I was conductor that night.

Page 35

1    A    Right.
2    Q    What was your job in the Army? What
3 was your rate?
4    A    My rate?
5    Q    What did you do?
6    A    Logistics.
7    Q    And where were you stationed?
8    A    I was stationed in Germany, I went to
9 Korea, then I went to Southwest Asia back in
10 '91, and I went to -- let me see -- Ft. Bragg
11 and Red Stone Arsenal.
12    Q    And why did you leave the Army?
13    A    Because I had messed up my legs jumping
14 out of planes and they medically boarded me out.
15    Q    Parachuting out of an airplane?
16    A    Yes.
17    Q    Trying to get qualified for a jump?
18    A    Yes.
19    Q    Is that the first jump that you did?
20    A    Yes. First and last.
21    Q    Okay. When were you discharged? What
22 year?
23    A    '97. May of '97.

Page 34

1    Q    What does the conductor do? What's a
2 conductor's job?
3    A    Well -- no, I wasn't conducting.
4    Q    You were an engineer that night,
5 weren't you?
6    A    No, I wasn't an engineer. I was in the
7 yard working with remote controls. So I guess I
8 was a remote control operator that night.
9    Q    And how did you hurt your shoulder?
10    A    Trying to release a hand brake from the
11 shop.
12    Q    Just pulling on it or pushing on it?
13    A    Pulling on it with a brake stick.
14    Q    And strained something or pulled
15 something when you did that?
16    A    Yes.
17    Q    Do you know what the nature of your
18 injury was?
19    A    Yeah. I had surgery on my right
20 shoulder. I had two surgeries. The first
21 surgery shaved the bone down. The second one
22 they had to go in and take some ligaments out
23 and I got a thread in my arm.

Page 36

9 (Pages 33 to 36)

**MARTIN O. LONG**

| | |
|---|---|
| 1   Q   And you've been off work ever since | 1   Q   Do you know how much you were getting |
| 2  then; right? | 2  from the railroad then? |
| 3   A   Right. | 3       MR. BURGE: It's not the railroad. |
| 4   Q   Okay. When were you and your wife | 4  It's the Railroad Retirement Board. |
| 5  first married -- your ex-wife first married? | 5   A   Railroad Retirement Board. |
| 6   A   We got married in '89. | 6   Q   Do you know how much you were getting |
| 7   Q   So that was while you were in the Army? | 7  from the Railroad Retirement Board? |
| 8   A   Yes. | 8   A   No. I can't remember. |
| 9   Q   All right. And does she still work? I | 9   Q   Other than that, then, you got some |
| 10  know for a while she worked at the Department of | 10  money disability from the VA and that was, I |
| 11  Human Resources. Is she still working for them? | 11  guess, as a result of your hurting your leg in |
| 12   A   I don't know. | 12  the jump; right? |
| 13   Q   Don't know. When was the last time you | 13   A   Right. |
| 14  saw her? | 14   Q   And then you were getting some money |
| 15   A   Last time that she -- I think maybe | 15  from the Railroad Retirement Board as a result |
| 16  last October maybe. | 16  of hurting your shoulder? |
| 17   Q   Okay. Were you separated from her at | 17   A   Right. |
| 18  the time of the incident with the Corvette, 2000 | 18   Q   And was your wife contributing anything |
| 19  Corvette? | 19  at that time? |
| 20   A   Well, we was right at being separated. | 20   A   I think a little bit because she was |
| 21  I mean, everything was pretty much wrote out. | 21  going to school at that time. |
| 22  It was a done deal. | 22   Q   She was in school? |
| 23   Q   Were y'all living together? | 23   A   Right. |
| Page 37 | Page 39 |

| | |
|---|---|
| 1   A   Yeah, I think she was still staying | 1   Q   Where did she go to school? |
| 2  there. | 2   A   She went to several different schools, |
| 3   Q   Okay. That would be in Millbrook? | 3  but the last school she went to was Crimson Tide |
| 4   A   Yes. | 4  when she went and got -- I mean, in Tuscaloosa. |
| 5   Q   Where does she live now? Do you know? | 5  She went up there and that's where she got her |
| 6   A   No. | 6  Master's. |
| 7   Q   Where did she live the last time? | 7   Q   Where did she go to undergraduate |
| 8   A   I think she still stays in Elmore | 8  school? Do you know? |
| 9  County. I don't know whether she stays in | 9   A   Alabama State. |
| 10  Millbrook or Elmore or where, Deatsville. I | 10   Q   Alabama State first? |
| 11  think she still lives in the county. | 11   A   Right. |
| 12   Q   What were you using for income at the | 12   Q   Okay. Was she working while she was in |
| 13  time before you got your settlement on your | 13  school? |
| 14  shoulder? What were you using for income? | 14   A   I don't think so. |
| 15   A   My disability from the VA. | 15   Q   Okay. And if you had $50,000 in credit |
| 16   Q   How much was that? | 16  card debt and $43,000 in student loan debts, I |
| 17   A   I think it was about 1500. | 17  guess, you know, is it safe to say that when you |
| 18   Q   Per month? | 18  got the money on this settlement that you were |
| 19   A   Yeah. | 19  thin financially, that you didn't have much |
| 20   Q   What other income did you have? | 20  money? |
| 21   A   I think she -- I think she had a little | 21       MR. BURGE: Object to the form. |
| 22  money coming in, I think, and I was still | 22   A   Say that again. |
| 23  getting a little money from the railroad. | 23   Q   Let me go back and I'll rephrase that. |
| Page 38 | Page 40 |

10 (Pages 37 to 40)

MARTIN O. LONG

1  What was your financial situation like just
2  prior to the time that you got in the $175,000?
3     A   Oh, it was rough.
4     Q   It was rough?
5     A   (Witness nods head.)
6     Q   Why?
7     A   Because we didn't have no income coming
8  in. You know, the bills keep rolling. It was
9  hard, but, hey, we made it through it.
10    Q   And that's why the credit card bills
11 were so high, I suppose?
12    A   Partly. Right. Because, you know, we
13 really couldn't afford to pay too much. And
14 every time you don't pay it, they get higher and
15 then they add that money to the principal. It's
16 a rip off.
17    Q   And then you also had the debt on the
18 school loan and the Volvo as well; right?
19    A   Right. No. The student loan, she
20 didn't have to pay nothing.
21    Q   She didn't have to pay that back yet,
22 did she?
23    A   Right. You didn't have to pay the
Page 41

1  in a separate car with Felicia; right?
2     A   Yeah.
3     Q   How did Sandy get over there? Was he
4  with Ricky?
5     A   No. He was in his own vehicle.
6     Q   Okay. And why did y'all go over there?
7     A   See their brother.
8     Q   What is his name?
9     A   Donald.
10    Q   And that's Ware?
11    A   Yes.
12    Q   W-A-R-E?
13    A   Uh-huh.
14    Q   And had you ever been over to Atlanta
15 to see Mr. Ware, Donald Ware, before?
16    A   Yes.
17    Q   And did you go with Valerie on that
18 occasion?
19    A   Yes.
20    Q   Did you go with Ricky on that occasion?
21    A   Yes.
22    Q   Felicia went?
23    A   Yes.
Page 43

1  student loan until after you get a job or
2  something, you know.
3     Q   But you did have some car expense at
4  the time?
5     A   Right.
6     Q   How about the trailer that you're
7  living in? Was it financed with anybody?
8     A   Yes.
9     Q   Who was it financed with?
10    A   It was financed through Greentree.
11    Q   Okay. So you were having to pay on it
12 as well?
13    A   Right.
14    Q   When you went to Atlanta on the -- I
15 think it's February the 18th and took the
16 Corvette over to Lithonia, who did you go with?
17    A   I went with a guy named Ricky, his
18 brother Sandy. And their sister, Valerie, she
19 rode with me. And Ricky had a friend, Felicia.
20    Q   Who was in the car with you when you
21 went over to Atlanta on February the 18th?
22    A   Me and Val, Valerie.
23    Q   Okay. And then her brother Ricky was
Page 42

1     Q   And Sandy?
2     A   Right.
3     Q   So same group?
4     A   Right.
5     Q   How long before had y'all gone over
6  there?
7     A   I think it was months before then.
8     Q   Well, this was February the 19th when
9  this incident with the 2000 Corvette occurred.
10 So how much before then? A couple of months?
11    A   Right. Yes, about a couple of months.
12    Q   Okay. When you had gone over there
13 before a couple of months before, had you stayed
14 at the same place?
15    A   No. I think we -- we stayed with him.
16    Q   Stayed with him that time?
17    A   Right.
18    Q   Did he live in Lithonia, Georgia?
19    A   Yes.
20    Q   Or close to there?
21    A   Right. He lived in Lithonia.
22    Q   He lived in Lithonia?
23    A   Right.
Page 44

11 (Pages 41 to 44)

## MARTIN O. LONG

1  Q   How big a house did he have?
2  A   It's a pretty good size. It was like
3  a -- he got a kitchen, you know, living room,
4  and then upstairs is like three bedrooms and a
5  bathroom.
6  Q   Is Donald Ware married?
7  A   No.
8  Q   Was anybody living with him? Was he by
9  himself?
10 A   He was by himself.
11 Q   Does he work?
12 A   Yes.
13 Q   What does he do?
14 A   I don't know what he do.
15 Q   How about Sandy? Does Sandy work?
16 A   Yes.
17 Q   What does he do?
18 A   The last I knew, he was working with
19 one of the ambulances. I don't know if it
20 was --
21 Q   Okay.
22 A   I don't know which one it was.
23 Q   You don't know what he does for the

Page 45

1  ambulance service? Is he a driver or
2  stretcher --
3  A   He helps, you know, whatever.
4  Q   Paramedic-type person?
5  A   Uh-huh.
6  Q   And how about Ricky? Does Ricky work?
7  A   Yeah. Ricky works at the post office.
8  Q   Okay. And Valerie, does she work?
9  A   Yes.
10 Q   Where does she work?
11 A   She works at a doctor's office in
12 Montgomery.
13 Q   And is that how you first came to know
14 Valerie?
15 A   Yes.
16 Q   And that was when you were getting your
17 shoulder worked on?
18 A   Yeah.
19 Q   Was that after the operation?
20 A   Yes.
21 Q   What did she do at the doctor's office?
22 A   She's, I guess, a secretary. I know
23 she takes appointments and do all that.

Page 46

1  Q   How long -- if this accident -- I mean,
2  this incident in Atlanta is February the 19th of
3  2005. How long had you known Valerie Ware?
4  A   Since '04.
5  Q   Do you know when in '04?
6  A   I know my last surgery was in August,
7  and then, you know, we started talking after
8  that, after August '04.
9  Q   How many times had you been out with
10 Valerie as of February of '05?
11 A   A lot of times.
12 Q   Here in Montgomery?
13 A   Yes.
14 Q   And then the only two -- had you been
15 out of town with Valerie any time other than the
16 first time you went over to see Donald Ware and
17 the second time you went over to see Donald Ware
18 in February of '05?
19 A   No.
20 Q   When you say a lot of times you've been
21 out here in Montgomery -- the Montgomery area --
22 with Valerie, can you put a number on that?
23 A   I'm going to say at least -- at least

Page 47

1  ten.
2  Q   Okay. Is Valerie married?
3  A   Yes.
4  Q   Was she at the time?
5  A   Yes.
6  Q   How would you get in touch with her?
7  A   Call her on her cell phone or either
8  call the job.
9  Q   Call her cell phone?
10 A   Yes.
11 Q   From your cell phone?
12 A   Yes.
13 Q   Or else just call the office?
14 A   Right.
15 Q   What would y'all do the first time that
16 you went over to see her brother? I mean, did
17 you just go over and sit around the house and
18 visit, or did you go out and do something?
19 A   Well, he showed us around town a little
20 bit, and I think we went out then. I think we
21 barbequed.
22 Q   At his house?
23 A   Yes.

Page 48

12 (Pages 45 to 48)

**MARTIN O. LONG**

1    Q   And then y'all spent the night there at
2  his house?
3    A   Yes.
4    Q   Did you come back the next day?  Did
5  you stay over there one night?
6    A   Yeah, I think we stayed there one
7  night.
8    Q   What car did you drive over there the
9  first time?
10   A   I drove my Mustang the first time.
11   Q   And at that time was it still just you
12  and Valerie in the car?
13   A   Yes.
14   Q   The second time that you went you
15  stayed in the motel.  Any reason you stayed in
16  the motel other than staying with Donald Ware?
17   A   No.
18   Q   What did you do -- you were over there
19  that time two nights; right?
20   A   Yes.
21   Q   Okay.
22   A   That was like a weekend thing.  We had
23  planned it.

Page 49

1    Q   And what did you do that first night,
2  the night of February the 18th when you got
3  there?
4    A   Well, once we got there, we checked in
5  the hotel and then we went to Donald's house and
6  went and got something to eat.  And then I think
7  we came back to Donald's house, sat around for a
8  minute, then me and Val went to the hotel and
9  the rest of them went out.
10   Q   So you and Valerie go back to the hotel
11  and everybody else goes out somewhere?
12   A   Right.
13   Q   Do you know where they went?
14   A   No.
15   Q   Do you know what time they came in?
16   A   No.
17   Q   Did you and Valerie go on to bed that
18  night?
19   A   Yes.
20   Q   Let me get back to one thing that I
21  wanted to ask you about.  In one of your
22  previous -- you know, you've given -- talked to
23  the insurance company on a number of occasions,

Page 50

1  haven't you, Mr. Long?
2    A   Yes.
3    Q   And now you're talking to me; right?
4    A   (Witness nods head.)
5    Q   Now, on previous occasions, I know
6  you've talked to Mr. Todd Smith and he took a
7  recording of that?
8    A   Right.
9    Q   And then you talked to -- gave an
10  examination under oath.  We looked at Exhibit 10
11  to your deposition.  That was to Ms. Angela
12  Taylor, a lady lawyer; right?
13   A   Right.  I think he was there, too,
14  though.
15   Q   Mr. Todd Smith was?
16   A   Yeah.
17   Q   I believe he was.  And then you've also
18  talked to other people from State Farm from time
19  to time, haven't you?
20   A   No, not really.
21   Q   Well, let me ask you.  Do you remember
22  ever talking to a lady named Pearlie Harris --
23   A   No.

Page 51

1    Q   -- who called you about your
2  homeowner's claim?  Let me show you -- this,
3  again, is a transcript, and I think this was
4  typed from a recording.  I put it in here
5  somewhere.  I'm going to show you -- we'll mark
6  that in a minute.  But I want you to look at it
7  and see if that refreshes your recollection
8  about talking to Pearlie Harris.
9    A   I mean, where did I talk to her at?
10   Q   That looks like it's a telephone
11  interview.  It starts off and says this is
12  Pearlie Harris in Fire Claims Central
13  interviewing Mr. Martin Long on Monday, February
14  21st.  The year is 2005.  The time is
15  approximately 1:17 p.m.  This is concerning the
16  theft which occurred on or about February the
17  19th in the year 2005.  And then it gives a
18  claim number and a policy number, and then she
19  asks you some questions.  Does that refresh your
20  recollection, or do you have any recollection
21  of --
22   A   No.
23   Q   -- talking to Pearlie Harris on the

Page 52

13 (Pages 49 to 52)

MARTIN O. LONG

| | |
|---|---|
| 1  telephone? | 1   **Q   Okay.** |
| 2   A   No, I don't. | 2   A   I didn't go to school or nothing with |
| 3   **Q   Okay.  Let's go ahead and mark it so** | 3   them. |
| 4   **we'll at least know what we're talking about.** | 4   **Q   Okay.  I mean, but you knew their last** |
| 5 | 5   **name was Ware?** |
| 6   (Whereupon, Defendant's Exhibit | 6   A   No, I didn't know what their last name |
| 7   Number 13 was marked for identification | 7   was. |
| 8   and copy of same is attached hereto.) | 8   **Q   You didn't know the last name for Ricky** |
| 9 | 9   **or Donald or Sandy?** |
| 10   **Q   All right.  Now, you also have --** | 10   A   No. |
| 11   whether or not the statements have been recorded | 11   **Q   But you knew -- at the time you gave** |
| 12   or not, you have talked to people from State | 12   **this examination under oath, you knew Valerie's** |
| 13   Farm, including Mr. Smith, from time to time; | 13   **name was Ware?** |
| 14   right? | 14   A   Right.  But I didn't know nothing about |
| 15   A   Right. | 15   Temple. |
| 16   **Q   I mean, to communicate with them about** | 16   **Q   Did you know at the time you gave this** |
| 17   the loss; right? | 17   **statement that Ricky -- excuse me -- the** |
| 18   A   Right. | 18   **examination under oath that's Exhibit 10, did** |
| 19   **Q   Tell them what you knew about it;** | 19   **you know at that time that Donald, Ricky, and** |
| 20   right? | 20   **Sandy's last name was Ware?** |
| 21   A   Right. | 21   A   No. |
| 22   **Q   Okay.  Did you keep any kind of log or** | 22   **Q   Okay.  So the only thing you knew at** |
| 23   record of any off those telephone conversations? | 23   **the time about last names was you knew that one** |
| Page 53 | Page 55 |

| | |
|---|---|
| 1   A   No, I didn't. | 1   of Valerie's last names was Ware? |
| 2   **Q   Okay.  Now, in your examination under** | 2   A   Right. |
| 3   **oath, the one that's Exhibit 10 to today's** | 3   **Q   Okay.  What doctor's office did she** |
| 4   **deposition, the one that you gave to the lady** | 4   **work at?** |
| 5   **lawyer, the one when Mr. Smith was present, in** | 5   A   Dr. Chung, Tai Chung. |
| 6   **that examination under oath, you said that you** | 6   **Q   That's the one who was going to work on** |
| 7   **did not know Valerie's last name?** | 7   **your shoulder?** |
| 8   A   (Witness nods head.) | 8   A   Yes. |
| 9   **Q   Was that true at the time?** | 9   **Q   Did he do the actual operation?** |
| 10   A   Yes.  All I knew was Valerie Ware, but | 10   A   Yes. |
| 11   it's like Valerie Ware Temple. | 11   **Q   Have you had a good result with it, you** |
| 12   **Q   At the time you knew her last name --** | 12   think? |
| 13   one of her last names was Ware; right? | 13   A   I guess.  I mean, I still have pain in |
| 14   A   Right. | 14   it.  It still locks up at times, but it ain't |
| 15   **Q   You just didn't know about the Temple** | 15   hurting like it was. |
| 16   on the end? | 16   **Q   Did you know that Ware was Valerie's** |
| 17   A   Right. | 17   maiden name? |
| 18   **Q   But you did know about the Ware?** | 18   A   Yeah. |
| 19   A   Yes. | 19   **Q   How did you know that?  Did she tell** |
| 20   **Q   Because you knew her brothers were** | 20   you? |
| 21   named Ware; right? | 21   A   Yeah, once we got to talking. |
| 22   A   Right.  But I knew her brothers through | 22   **Q   And that would be getting to know each** |
| 23   her.  I met them through Val. | 23   other at the doctor's office? |
| Page 54 | Page 56 |

14 (Pages 53 to 56)

## MARTIN O. LONG

1    A   Yeah. I mean, I thought that was like
2  her married name or whatever. I didn't know
3  that was, you know...
4    Q   Well, you knew one of her names was
5  Ware; right?
6    A   Right.
7    Q   So the only one that you didn't know
8  was the Temple; right?
9    A   Right.
10   Q   How did you find out that your car was
11 missing -- the morning of February the 19th, you
12 and Valerie had gone back that night before.
13 Everybody else was gone out on the town.
14 They've come in, I suppose. You don't know when
15 they came in. But that kind of sets the stage.
16 Now, how do you find out your car is missing?
17   A   Because Ricky's girl Felicia had called
18 because I think she went to Wal-Mart or went to
19 get something to eat or something, but she had
20 called and asked Val where we were and Val said
21 we were in the room. She was like Martin's car
22 is gone. She said what do you mean it's gone.
23 She said his car is gone. She said the only
Page 57

1  thing in his spot is glass. So that's when she
2  woke me up and she woke up Ricky and them.
3  That's when we went outside and discovered that
4  my car was gone.
5    Q   What time of day was that?
6    A   It was that morning.
7    Q   Do you know what time?
8    A   It was kind of early. I think about
9  maybe seven, eight. Something like that.
10   Q   And what did you do when you found out?
11   A   Well, I went to the desk and asked the
12 guy about the camera, because where I parked, I
13 parked right in front of the camera. And he
14 said it wasn't working.
15   Q   The guy at the desk said that?
16   A   Yes.
17   Q   Did you intentionally park under the
18 camera?
19   A   That's right.
20   Q   Why?
21   A   Because I was in the Vette. I didn't
22 think nothing was going to happen but I wanted
23 to be for sure.
Page 58

1    Q   You thought there was a possibility
2  that somebody might steal something?
3    A   No, it wasn't no possibility but things
4  happen.
5    Q   I understand that. I'm asking you if
6  things happen is that why you parked in front of
7  the camera because you thought there was a
8  possibility that someone might steal something?
9    A   Yeah.
10   Q   So you tried to park it under the
11 camera where the camera would see it?
12   A   Yes, I did park it there.
13   Q   You did park it under the camera?
14   A   Right.
15   Q   All right. And how far was that place
16 that you parked from the front of the -- where
17 you walked into the hotel or motel?
18   A   Maybe 25, 30 yards.
19   Q   Okay.
20   A   And I parked like right up under some
21 light, too. Because right above the hill was
22 this gas station from where I parked it.
23   Q   So you intentionally parked it under
Page 59

1  that camera and you also parked it where there
2  was some light?
3    A   Right.
4    Q   Okay. You had had trouble before with
5  having someone take a Corvette; right?
6    A   Right. But that was at home.
7    Q   You had had guns stolen out of your
8  house, too; right?
9    A   Right.
10   Q   So you had had experience with people
11 taking things from you?
12   A   Yes.
13   Q   So you were parking under the camera
14 because you knew there was a possibility
15 somebody might take something?
16   A   Yes.
17   Q   All right. Now, early in the morning,
18 Felicia calls -- it may not be early. I guess
19 it depends on what time you get up in the
20 morning. But seven o'clock, 7:15, something
21 like that -- Felicia calls Valerie to tell her
22 that your car is missing?
23   A   Right. Well, no. She called to ask to
Page 60

15 (Pages 57 to 60)

MARTIN O. LONG

1  see where we were.
2  **Q   See where y'all were?**
3  A   Then Valerie said we was in the room.
4  **Q   So she called Val on Val's cell phone?**
5  A   Yes.
6  **Q   And did she at that time tell Val that**
7  **your car was missing?**
8  A   Yes.
9  **Q   Did she tell Val at that time that**
10  **there was glass where your car used to be?**
11  A   Yes.
12  **Q   How do you know she told Val that?**
13  A   Because Val woke me up and told me
14  that.
15  **Q   You were still asleep?**
16  A   Yes.
17  **Q   How did Felicia know where your car was**
18  **parked?**
19  A   She had to see it.
20  **Q   When did she see it?**
21  A   I don't know when she saw it. I don't
22  know if she saw it when she was coming in from
23  the club or when she left. No, she couldn't
Page 61

1  have saw it when she left out that morning. So
2  she had to see it when she come in from the --
3  when they came in from the club.
4  **Q   All right. So you went straight**
5  **downstairs and asked the desk clerk about the**
6  **camera?**
7  A   Yes.
8  **Q   That's the first thing you did?**
9  A   No. The first thing I did was I walked
10  out there to make sure. And I looked in my spot
11  and there was glass in my spot where my car was.
12  **Q   How much glass?**
13  A   Just a lot of shattered glass.
14  **Q   Okay. When you say a lot, are we**
15  **talking about -- I mean, can you tell me? Do**
16  **you have an idea of how much that would be?**
17  A   I mean, it was the passenger's side
18  window. So I don't know. Half was probably in
19  the seat and half was on the ground or all of it
20  was on the ground or whatever.
21  **Q   So there's some glass on the ground.**
22  **The car is not where you left it; right?**
23  A   Right.
Page 62

1  **Q   You go back inside then?**
2  A   Right.
3  **Q   And that's when you talked to the desk**
4  **clerk?**
5  A   Yes.
6  **Q   And you asked him where the camera is**
7  **or where the film is?**
8  A   Yeah.
9  **Q   Okay. And what did he say?**
10  A   He said the camera is not working.
11  **Q   Had you asked him before about the**
12  **camera?**
13  A   No. I mean, I just took for granted
14  the camera was working.
15  **Q   And what did you tell him when he said**
16  **the camera wasn't working?**
17  A   I told him my car got stolen.
18  **Q   And what did you do then?**
19  A   Well, I know I asked him about the
20  manager, and he was like the manager will be in
21  later on this evening. Then I got the police
22  number.
23  **Q   Now, did he tell you the camera wasn't**
Page 63

1  working, or did he tell you you'd have to ask
2  the manager about it?
3  A   No. He said the camera wasn't working.
4  **Q   Did you ask him why?**
5  A   Yeah, he said something about the
6  manager. I mean, he said something about him.
7  And that's when he said he'll be in that
8  evening. I said, okay, I'll come down and talk
9  to him that evening.
10  **Q   But you're sure the desk clerk told you**
11  **at that time that the camera wasn't working?**
12  A   Right.
13  **Q   Then what did you do after you learned**
14  **the camera wasn't working? What's the next**
15  **step?**
16  A   Well, I just went back -- like I said,
17  I got the number and I went upstairs and called
18  the police.
19  **Q   You called the police?**
20  A   Yeah.
21  **Q   All right. Where did you get the**
22  **telephone number to call the police?**
23  A   From the desk.
Page 64

16 (Pages 61 to 64)

1    Q   Okay. Did he look it up for you, or
2  did you look it up?
3    A   I don't know. I mean, well, we could
4  have looked it up in the room. I ain't going to
5  pinpoint and say he gave me the number. I know
6  he either gave us the number or we looked it up
7  when we got back in the room.
8    Q   Did you call the police on the cell
9  phone or on the motel phone?
10   A   I think I called on my cell phone. I
11 think me and Sandy called the police.
12   Q   You and Sandy?
13   A   Right.
14   Q   Sandy is involved by now?
15   A   Yeah.
16   Q   Was Sandy Felicia's boyfriend?
17   A   No. That was Ricky.
18   Q   Ricky. How did Sandy get down to the
19 desk area?
20   A   Val woke all of them up.
21   Q   So everybody come downstairs?
22   A   Yes.
23   Q   So your recollection now is that you

Page 65

1    A   Yeah, I think she gave me an 800
2  number.
3    Q   Okay. And did you call it then?
4    A   Yes.
5    Q   Do you remember whether you called the
6  insurance -- State Farm before or after you
7  called the police?
8    A   I think I called the police first.
9    Q   Do you remember about what time you
10 called the police?
11   A   Do I remember what time I called the
12 police?
13   Q   Yes.
14   A   No. I know it wasn't -- I don't know.
15 Maybe eight, nine maybe, I guess.
16   Q   You've seen -- and I think y'all went
17 over it in this EUO -- the police report where
18 the time they had stamped on there was like
19 11:17?
20   A   I called way before 11:17. I know I
21 had to call them back to finish a report. I
22 called them way before 11:17. I know when I
23 called the lady, told me to call them back once

Page 67

1  and Sandy called the police?
2    A   Right. Because I called them, and then
3  I hung up from them and I called my insurance.
4  And I think he had called then because they
5  never showed up.
6    Q   The police never showed you?
7    A   No. They never showed up. They took
8  the report over the phone.
9    Q   Let me go back and ask you about
10 calling the insurance. Did you call the
11 insurance, or did you call your niece about
12 getting you a number?
13   A   Yeah, I called my niece.
14   Q   And who is your niece?
15   A   Jackie.
16   Q   And who is her -- is that your --
17   A   My mamma --
18   Q   -- sister's --
19   A   My oldest sister's daughter.
20   Q   Oldest sister's daughter. And you
21 called Jackie, and Jackie gave you the name of
22 the State Farm -- what did she give you? An 800
23 number?

Page 66

1  I get everything that I wanted to tell them that
2  was in my car. Something like that.
3    Q   Let's go back and let me see if you can
4  help me with that. When you first called, who
5  did you talk to or did Sandy talk to? Who
6  talked to whoever?
7    A   Like I say, I think I called first.
8  But I do know both of us called them.
9    Q   Okay. And who did you talk to when you
10 talked to them? A lady or a man?
11   A   A man or a lady.
12   Q   Yes, sir.
13   A   I don't know because I talked to a man
14 and a woman before -- I don't know who I talked
15 to first. I think I talked to a girl first.
16   Q   Did you report that the car had been
17 stolen?
18   A   Yeah.
19   Q   Did you tell them where?
20   A   Yes.
21   Q   Did they ask any questions about it?
22   A   Yeah, I'm pretty sure they did. I
23 can't remember what all they asked me, though.

Page 68

17 (Pages 65 to 68)

MARTIN O. LONG

| | |
|---|---|
| 1  I guess the regular procedure that they ask. | 1    A   Right. |
| 2    **Q   How many times did you talk to the** | 2    **Q   Look up here at the top where -- of** |
| 3  **De Kalb Police Department -- is it De Kalb** | 3  **that same page where it's talking about the** |
| 4  **Police, or is it De Kalb Sheriff's Department?** | 4  **incident date/time.  It says 9:30 and 9:30.  You** |
| 5  **Which one was it?** | 5  **think that's -- you think that's when you called** |
| 6    A   I think it was the police department. | 6  **in, or do you think that's -- did you report** |
| 7    **Q   How many times did you talk to them** | 7  **that the car was stolen at that time?  Let me** |
| 8  **that day?** | 8  **ask you that again.  Do you know what that 9:30** |
| 9    A   I think it was at least two. | 9  **signifies?** |
| 10    **Q   And the first time was when you called** | 10    A   No. |
| 11  **in and then when was the second time?** | 11    **Q   Do you have any -- would that be about** |
| 12    A   Maybe a little time after that. | 12  **the time that you called the police department,** |
| 13    **Q   I'm sorry.  What did you say, sir?** | 13  **you think?** |
| 14    A   I'm saying I'm thinking it was a little | 14    A   I think so.  I mean, I know it wasn't |
| 15  time after that.  I called them the first time | 15  no 11 something, almost 12 o'clock. |
| 16  because I know -- I think I called them the | 16    **Q   But that would be almost two hours** |
| 17  first time.  Then, like I say, I had talked to | 17  **later -- a little over two hours -- after you** |
| 18  the insurance.  I don't know if I hung up with | 18  **first knew that the car was missing?** |
| 19  them.  Well, I had to hang up with them to call | 19    A   I didn't wait no two hours. |
| 20  them back or something.  I can't really remember | 20    **Q   And you don't remember why you would** |
| 21  the order or exactly how many times I talked to | 21  **have called back a second time that day?** |
| 22  them. | 22    A   No, unless to check to see what was |
| 23    **Q   I mean, why did you call back a second** | 23  taking them so long.  But the bottom line was, |
| Page 69 | Page 71 |

| | |
|---|---|
| 1  **time?** | 1  they never came out there at all. |
| 2    A   I guess because I didn't get it | 2    **Q   I understand about that.  But I'm just** |
| 3  straight the first time I talked with them, or | 3  **asking if you can remember why you called a** |
| 4  either I was waiting on them to come by or | 4  **second time.** |
| 5  something.  It was something.  Because, like I | 5    A   That was probably why, to see. |
| 6  say, they never ended up coming by at all. | 6    **Q   See why they weren't coming?** |
| 7    **Q   I want to show you what -- this was 13A** | 7    A   Yeah. |
| 8  **to your examination under oath.  That's the** | 8    **Q   At some time that day, you became aware** |
| 9  **De Kalb police report.  Look at the third page** | 9  **of the fact that they were not coming out there?** |
| 10  **of that report.** | 10    A   Yeah, because they told me. |
| 11    A   Third page? | 11    **Q   I want to show you what's the first** |
| 12    **Q   Is that -- it may be.  Let me see.** | 12  **page of Exhibit 13A, and it's a list of** |
| 13  **Maybe that's --** | 13  **property.  Is that the list of property that you** |
| 14      MR. BURGE:  Why don't you go one more? | 14  **say that was in the car at the time that this** |
| 15    **Q   I'm sorry.  I may be -- the third page** | 15  **incident occurred?** |
| 16  **from the bottom.  All right.  The second page** | 16    A   Yeah. |
| 17  **from the bottom of Exhibit 13A has something at** | 17    **Q   All right.  You gave this list to the** |
| 18  **the bottom that says Narrative Title, Initial** | 18  **De Kalb County Police Department?** |
| 19  **Report, date entered 2-19-2005, 11:17:42.** | 19    A   Yes. |
| 20    A   No.  I called them before that. | 20    **Q   But you didn't give it to them that** |
| 21    **Q   So whatever that time is, you're saying** | 21  **day.  This was a list that you put together** |
| 22  **that time is not -- that 11:17 would not be the** | 22  **after you thought about it some?** |
| 23  **time that you first called in; right?** | 23    A   Right.  Yeah, they told me to think |
| Page 70 | Page 72 |

18 (Pages 69 to 72)

| | |
|---|---|
| 1 about everything before I make a claim of what I | 1    Q    Do you remember who you talked to? |
| 2 had in there. | 2    A    At State Farm? |
| 3    Q    And then you called back at some point | 3    Q    Yes, sir. |
| 4 and gave them a list of the property? | 4    A    No. |
| 5    A    Yes. | 5    Q    What did you tell them? |
| 6    Q    Did you fill out this first page of | 6    A    I told them my car had gotten stolen. |
| 7 13A, or did they complete that? | 7    Q    Okay. Did you tell them at that time |
| 8    A    I guess they did, because I know I | 8 that there was some personal property in the |
| 9 ain't typed nothing. | 9 car? |
| 10    Q    Okay. That's my question. So the | 10    A    If they asked, I did. I can't |
| 11 total number of times, then, that you've talked | 11 remember. |
| 12 to the De Kalb County Police Department to the | 12    Q    Okay. Do you remember telling them |
| 13 best of your knowledge is three? | 13 that you were on a shopping spree in Atlanta? |
| 14    A    Are you talking about in all, or are | 14    A    Yeah. |
| 15 you talking about that day? | 15    Q    Why did you tell them that? |
| 16    Q    In all. | 16    A    They must have asked me. |
| 17    A    It was probably more than three in | 17    Q    Okay. Had you really bought anything |
| 18 all. I'd say at least three, I guess. | 18 in Atlanta? |
| 19    Q    Well, tell me about the other. We know | 19    A    Not really. |
| 20 the initial report. Then you say you called | 20    Q    Why did you tell them you were on a |
| 21 them back once that same day? | 21 shopping trip in Atlanta if you hadn't bought |
| 22    A    Right. | 22 anything? |
| 23    Q    Then you called them back when you | 23    A    I hadn't had a chance to buy nothing. |
| Page 73 | Page 75 |
| 1 turned in the list of personal property? | 1 The car got stolen the first night I got there. |
| 2    A    Right. | 2    Q    Didn't you tell them that what you had |
| 3    Q    Any other times? | 3 in the car was things that you had bought while |
| 4    A    No, not that I can think of. | 4 you were shopping in Atlanta? |
| 5        MR. NEWMAN: By the way -- and just for | 5    A    Huh-uh. Couldn't have told them that. |
| 6 the Record so we'll have this -- Defendant's | 6 I bought some stuff before I got to Atlanta. I |
| 7 Exhibit 10 has two stickers on it. One on the | 7 didn't have no chance to do no shopping in |
| 8 first page and one on the third page. Same | 8 Atlanta. |
| 9 number, Exhibit 10. | 9    Q    Did the Corvette run all right by the |
| 10    Q    When you called this report in to State | 10 way? You didn't have any trouble with it, did |
| 11 Farm, were you the one that talked to them or | 11 you? |
| 12 was that Sandy that called them? | 12    A    Oh, no. |
| 13    A    I think I called them. | 13    Q    Was there any particular reason you |
| 14    Q    Okay. But you think maybe both you and | 14 picked out to stay at the Country Hearth hotel? |
| 15 Sandy were involved in the initial report to the | 15    A    No. I know it was right around the |
| 16 police department; right? | 16 corner from their brother's house. |
| 17    A    Yes. | 17    Q    Did you make a reservations ahead of |
| 18    Q    Now, when you called in to State Farm, | 18 time, or did y'all just pull in? |
| 19 did you call the 800 number? | 19    A    Just pulled in. I think we just pulled |
| 20    A    Yes. | 20 in. I don't think we made no reservation. |
| 21    Q    Did you use your cell phone again? | 21    Q    Did you get there before -- did y'all |
| 22    A    I think I -- I'm pretty sure I did. | 22 caravan over there? |
| 23 Because I had my niece get me the number. | 23    A    Right. |
| Page 74 | Page 76 |

19 (Pages 73 to 76)

1    Q    All three cars?
2    A    Yes.
3    Q    This is Saturday morning.  Were you
4    able to arrange or did someone make arrangements
5    to get a rental car for you?
6    A    Yes.
7    Q    Who was that?
8    A    I made arrangements.
9    Q    You made arrangements?
10    A    Through State Farm.
11    Q    You made arrangements.  Did State Farm
12    tell you who to call?
13    A    Yes.
14    Q    Enterprise, or was it someone else?
15    A    I don't remember who it was.
16    Q    But they gave you the name of some
17    rental car company?
18    A    Right.
19    Q    Did they come to you, or did you have
20    to go out there and pick up the car?
21    A    I had to go get it.
22    Q    Do you remember where you went to pick
23    it up?
Page 77

1    A    No, not exactly.
2    Q    How far from where you were was it?
3    A    I don't think it was too far.  But
4    Donald, he took us where it was because we
5    didn't know how to get there.
6    Q    So by this time, Donald has left his
7    house and come over to the motel?
8    A    Either he came over there or we went to
9    where he was.  You know, one of the two.  I
10    can't remember.  I know, whichever way it was, I
11    was already set up to go get the rental car by
12    that time.
13    Q    Do you remember about what time of day
14    it was that you got the rental car?
15    A    Huh-uh.
16    Q    You went ahead and stayed in Atlanta or
17    Lithonia for the next night as well, didn't you?
18    A    Yes.
19    Q    And then drove the rental car back to
20    Montgomery?
21    A    Right.
22    Q    What did y'all do Saturday night?
23    A    Saturday night, I think we went to a
Page 78

1    club Saturday night.
2    Q    Okay.
3    A    I mean, I wasn't really -- I was upset
4    but I just -- I was like, okay, well, I've got
5    full coverage so they going to take care of it.
6    It didn't really, you know, sink in or really
7    just -- I ain't really get like pissed-pissed
8    until the dude just kept jiving me around.
9    Q    When you say the dude is that Todd
10    Smith?
11    A    Yes.
12    Q    Is he pretty much the one that you
13    dealt with the most at State Farm?
14    A    Yes.
15    Q    When did you find out that the -- that
16    there was a limit on -- dollar limit on the
17    amount of coverage for personal property in a
18    car under your automobile policy?
19    A    I don't know if I asked them that or
20    what.  I don't know.
21    Q    When did you find out that there was
22    only -- my question is, when did you find out
23    that your automobile policy only covered a
Page 79

1    certain amount?  I think it's $200 of personal
2    property coverage.
3    A    I think I either asked Leigh or Mike
4    Devers.
5    Q    Okay.
6    A    I think it was 250.
7    Q    It might be 250.  When did Mike Devers
8    tell you that?
9    A    I mean, I'm thinking I talked to one of
10    those.  I mean, I don't remember when he, you
11    know...
12    Q    You found that out after the theft
13    occurred; right?
14    A    Yeah, I found that out after the fact.
15    Q    Right.  And then did they then say,
16    well, if you've got that loss, you need to turn
17    it in on your homeowner policy?
18    A    Yeah.  Now, one of them did tell me
19    that.
20    Q    Do you remember who told you that?
21    A    No.
22    Q    Whether it was Mike or Leigh?
23    A    Right.  I don't remember which one it
Page 80

20 (Pages 77 to 80)

MARTIN O. LONG

1  was.
2    Q    What's Leigh's last name?
3    A   I don't know what.
4    Q    Is it McKenna?
5    A   All I know is Leigh.
6      MR. BURGE: Carmichael.
7    Q    Leigh Carmichael? Does that sound
8  right?
9    A   I don't know. I know she was a nice
10  lady. I didn't know her name.
11    Q    Did your Corvette have an alarm system
12  on it?
13    A   Yes.
14    Q    Did you ever hear the alarm system go
15  off?
16    A   No.
17    Q    I'm not talking about that night. I'm
18  talking about any time before then.
19    A   Oh, no.
20    Q    Did it have one of them little lights
21  that would blink when you would turn it off and
22  lock it?
23    A   Yes.

Page 81

1    Q    Would there be some light that would
2  blink inside of it?
3    A   Uh-huh.
4    Q    And that light was blinking?
5    A   Yeah. You said a blinking light on the
6  car?
7    Q    No. Inside the car.
8    A   No, I don't think that car came with
9  no -- huh-uh. I don't think it had no blinking
10  light.
11    Q    Was there anything that was indicated
12  to you that the alarm system was activated?
13    A   Yes. Because once you press lock, it's
14  locked, and then if you keep pressing the lock
15  every time you press it, boop, boop, the horn
16  will blow.
17    Q    That's what indicates that the alarm
18  system is activated?
19    A   Right.
20    Q    Okay.
21    A   That's something you can check, because
22  once you lock it, you know, with the thing, it's
23  automatically engaged in then. But you can

Page 82

1  press lock again and it will just -- each time
2  you press like that, the horn will just blow.
3    Q    And that indicates to you the alarm
4  system is working?
5    A   Right.
6      MR. NEWMAN: Off the Record.
7
8      (Whereupon, a discussion was held off
9  the Record.)
10
11  BY MR. NEWMAN:
12    Q    Mr. Long, best as you can -- and I'm
13  not looking for anything exact -- give me a
14  rough idea of where you were parked in relation
15  to the hotel. Can you draw the hotel and the
16  parking places and just very roughly show me
17  kind of where your car was parked, which way it
18  was facing?
19    A   Let me see. (Witness drawing.)
20    Q    All right, Mr. Long. What have we got
21  here?
22    A   That's like the hotel.
23    Q    You've got it labeled as hotel on

Page 83

1  there?
2    A   Uh-huh.
3    Q    All right, sir.
4    A   And that's like...
5    Q    Parking lot out beside it.
6    A   You know, like the spots for the cars.
7  You pull up in there.
8    Q    Yes, sir.
9    A   Spots right there, also. Then it's
10  like you past the hotel to get up in that,
11  and that area there is like grass.
12    Q    On the right side there?
13    A   Right. Because right here is where you
14  can park and get out and go right into the door
15  or whatever to get out of the rain.
16    Q    Yes, sir.
17    A   But, you know, I didn't draw no cover.
18  That camera, it was like at the right side of
19  the door.
20    Q    So the camera is on the thing that
21  overhangs where you drive your car through?
22    A   Yeah, you drive your car up under it.
23    Q    So it's like a little roof area?

Page 84

21 (Pages 81 to 84)

### MARTIN O. LONG

1    A   Yeah. It's out of the rain. Can't no
2  rain hit it.
3    Q   Is the camera out of the rain or is the
4  camera on top of the roof?
5    A   It's up under the thing.
6    Q   Under the roof. All right. Was it
7  pointed out towards where you've got labeled
8  parking lot?
9    A   No. It's pointed this way where my car
10 is.
11   Q   So it's pointed back towards where you
12 said -- this place that says car is where your
13 car was?
14   A   Right.
15   Q   All right.
16   A   And then, you know, above here --
17   Q   Above where you've written parking lot?
18   A   There's like a ladder area and there's
19 like a big hill, which was a gas station. So
20 that's the main drag because there was Super
21 Wal-Mart right across the street.
22   Q   Do you know what the main drag is
23 called?

Page 85

1    A   Huh-uh.
2    Q   Okay. That's a good drawing. And how
3  could you tell that the camera was aimed at your
4  car?
5    A   I mean, you could see it.
6    Q   You could tell which way it was aimed?
7    A   Yes.
8        MR. NEWMAN: Exhibit 14, that's the
9  diagram.
10
11       (Whereupon, Defendant's Exhibit
12   Number 14 was marked for identification
13   and copy of same is attached hereto.)
14
15   Q   Thank you, sir. One thing that you
16 brought to your examination under oath -- and
17 this was, I think, photographed or Xeroxed and
18 attached as an exhibit -- were the keys to the
19 Corvette. Let me show you what has been marked
20 as Defendant's Exhibit Number 4. That was taken
21 out of the State Farm file. Is that what your
22 keys looked like?
23   A   Yes.

Page 86

1    Q   And on it it's got lock, unlock, a
2  little horn-looking item, and trunk item. So
3  you're saying if you hit that lock button twice
4  and it honks, it means that the car alarm is
5  activated; right?
6    A   Right. But what I'm saying is, the
7  first time you lock it, it's activated.
8    Q   And the second time it tells you it's
9  activated by honking?
10   A   If you want to know. Right. That's
11 what I'm saying.
12   Q   All right.
13   A   As soon as you lock it, it's activated
14 then.
15   Q   I understand.
16   A   Sometimes people do that just to let
17 people know you've got an alarm. If they hear
18 that noise...
19   Q   Have you been able to find that second
20 set of keys?
21   A   No.
22   Q   Have you got any idea where they might
23 be?

Page 87

1    A   No. I mean, they're not in the house.
2  You know, I looked around everywhere. I don't
3  know. I mean, they could have been in the car.
4  I don't know.
5    Q   Well, now, in your examination under
6  oath, you were asked if they were in the car and
7  you said that they were not?
8    A   Right.
9    Q   Is that true?
10   A   At that time, yeah. But if I can't
11 find them, they got to be somewhere.
12   Q   Well, do you think that your extra set
13 of keys was in the car or not?
14   A   Well, they could be. I don't know. I
15 don't know. If they're not in the house, they
16 got to be somewhere. They might have been left
17 in the car.
18   Q   You don't have any knowledge one way or
19 another?
20   A   No. All I know is I don't know where
21 they are at.
22   Q   You don't know where they're at?
23   A   No.

Page 88

22 (Pages 85 to 88)

MARTIN O. LONG

1    Q   Okay. Before, though, Mr. Long, you
2  said that you were sure that the extra set was
3  not in your car?
4    A   Well, I thought I was. I mean, I
5  thought I would have found them by now, but I
6  never found them.
7    Q   No. I'm saying you thought the extra
8  set was not in your car. Oh, I see. You
9  thought you were going to find them? Is that
10 what you're saying?
11   A   Right.
12   Q   But as of this date, you have not found
13 them?
14   A   No, I haven't.
15   Q   Now, you've dealt with several State
16 Farm people since this loss. You've dealt with
17 Mr. Devers and Leigh Carmichael and some other
18 people from State Farm, you say, have called you
19 on the phone from time to time, other than
20 Mr. Smith now we've talked about; right?
21        MR. BURGE: Object to the form.
22 Ms. Carmichael I don't think was after the
23 lawsuit. That's who he got the insurance with

Page 89

1    Q   Okay. Well, for instance, when you
2  called in that morning to report the car
3  stolen --
4    A   Oh, okay. That's when that was taken?
5    Q   No. I'm not saying that either. But
6  you didn't talk to Todd Smith then, did you?
7    A   No.
8    Q   We know you've talked to some other
9  people other than Todd Smith?
10   A   Yes.
11   Q   Has everybody been courteous to you?
12   A   Yeah.
13   Q   How about Todd Smith? Has he been
14 courteous to you?
15   A   I mean, he just ain't really just -- he
16 just ain't been -- he just never would just talk
17 straight up and say, okay, we believe you took
18 your car. He kept jiving me around. You know,
19 he just never would just man up to what he said
20 I had did, what he was trying to do. He kept
21 jiving me around.
22   Q   Okay. But I mean --
23   A   I had to ask him do y'all -- I said,

Page 91

1  at Mike Devers' office.
2    Q   I thought you said that after the
3  accident Ms. Carmichael was the one who told you
4  that the personal property was not covered under
5  your auto policy?
6    A   It was one of them.
7    Q   You don't know whether it was Devers or
8  Carmichael?
9    A   No, I can't remember.
10   Q   Fair enough. Fair enough. You've
11 talked to some people from State Farm other than
12 Todd Smith and Devers, right, since this loss?
13 I'm not going to ask you who.
14   A   I can't remember. I'm just saying I
15 can't remember. You showed me some form -- what
16 was that form you showed me?
17   Q   I showed you a transcribed statement
18 that was taken --
19   A   Over the phone?
20   Q   Yeah.
21   A   And I don't even remember that.
22   Q   You don't remember that?
23   A   Huh-uh.

Page 90

1  man, do y'all think I took my car.
2    Q   What did he say?
3    A   I snapped out on him. He said yeah.
4    Q   When was that?
5    A   That was over the phone one day.
6    Q   Over the phone?
7    A   Yes. He kept saying every time I
8  talked to him, okay, well -- you know, he said
9  that he needed a copy of everything, so I gave
10 him all that. I'm waiting to hear back. He
11 finally called back and say I need -- no. I
12 think the first thing I did was talk to him over
13 the phone. That's when I told him -- you know,
14 like I said, I wasn't truthful to him the first
15 time because I didn't want Valerie to get in
16 trouble because I knew she was married. I knew
17 I was married, but I knew mine was already --
18 you know, already settled. We had already
19 talked about it.
20   Q   That's when you talked to him over the
21 phone?
22   A   The first -- no. That was in person.
23   Q   In person?

Page 92

23 (Pages 89 to 92)

1    A    In Montgomery.
2    Q    And is that when he took -- you know,
3    he took a recorded statement from you?
4    A    That was it.
5    Q    That was that time?
6    A    Right.  As soon as he stopped me and
7    said that was it, then I told him that I went
8    down there with Valerie, and he was like, well,
9    you know, I ain't really worried about that
10   part.  If I knew that I would have told you that
11   from the beginning.  I didn't want to get her in
12   trouble.  I guess I just didn't know what I was
13   dealing with as far as this insurance.
14   Q    Okay.
15   A    I guess I didn't think it was that
16   serious, I guess.
17   Q    Other than -- I'm not talking about
18   Ricky and Sandy and Felicia and Valerie and
19   Donald.  But other than those people, who did
20   you have conversations with when you were in
21   Atlanta that weekend, February 19th and 20th?
22   A    That's it.
23   Q    Well, no.  You had conversations with

Page 93

1    the clerk, desk clerk?
2    A    Oh, yeah, yeah.
3    Q    Had conversations with him.  He
4    initially told you that -- you said I'd like to
5    see the camera, what about the camera.  He told
6    you the camera wasn't working; right?
7    A    Right.
8    Q    And then you said you wanted to see the
9    manager; right?
10   A    Yeah.
11   Q    Anything else you remember about your
12   conversation between you and the desk clerk?
13   A    I think I cussed him out later.
14   Q    Anything else?
15   A    No.
16   Q    How about you and the manager?  Did you
17   have any conversations with him?
18   A    Yeah.  I asked him about the camera.
19   Q    That was later that day?
20   A    Yeah.
21   Q    What did he say?
22   A    He gave me -- I don't know exactly what
23   he said.  He gave me some kind of excuse why it

Page 94

1    wasn't working.
2    Q    Okay.  Anything else you remember about
3    conversations with the manager?
4    A    Huh-uh.
5    Q    Okay.
6    A    No.
7    Q    Why did you cuss -- you say you got mad
8    at the desk clerk later that day?  Why did you
9    get mad at him?
10   A    Well, he just made me mad because he --
11   when he said that -- the reason why it wasn't
12   working and the difference in what he and the
13   manager said was totally different.
14   Q    Well, he had told you initially it
15   wasn't working; right?
16   A    Yeah.
17   Q    Why did you get mad at him later if the
18   manager said the same thing?
19   A    Well, the manager -- I mean, I guess
20   the manager put it in a different route.  I was
21   just pissed off.  I was just mad.
22   Q    Were you mad at the desk clerk for any
23   particular reason?

Page 95

1    A    No.  I guess I was just mad anyway.
2    Q    Do you ever remember saying that the
3    desk clerk didn't tell you initially that the
4    camera wasn't working?
5    A    Huh-uh.
6    Q    You never told that to anybody?
7    A    That he said what, now?
8    Q    That when you first asked him about the
9    camera instead of telling you that it wasn't
10   working that he just said you'll have to talk to
11   the manager?
12   A    Oh, yeah.  He did, yeah.
13   Q    You just told me when you first talked
14   to him he told you that it wasn't working.
15   You're now saying that he told you that you're
16   going to have to talk to the manager about that?
17   A    Yeah.
18   Q    So he didn't tell you one way or
19   another when you first talked to him?
20   A    He did say it wasn't working.  I asked
21   him why it wasn't working.  He said I got to
22   talk to the manager.
23   Q    He told you it wasn't working, but when

Page 96

24 (Pages 93 to 96)

1  you asked him why, he said you've got to talk to
2  the manager?
3    A  Yes.
4    Q  Then you talked to the manager, the
5  manager said it wasn't working, and then you got
6  mad at the desk clerk; is that right?
7    A  Yeah.
8    Q  Have you got any reason why you got mad
9  at the desk clerk about that?
10   A  I was just mad.
11   Q  Any other conversations you had with
12  either the manager or the desk clerk?
13   A  No.
14   Q  Then you had two conversations when you
15  were in Atlanta with the De Kalb Police
16  Department. You called them then and then you
17  called them back to find out why they hadn't
18  shown up; right?
19   A  Yeah.
20   Q  All right. And during which of those
21  conversations did you say somebody told you to
22  call back in with the list of property that had
23  been stolen?

Page 97

1    Q  Are you on anything that would affect
2  your ability to answer my questions?
3    A  No.
4    Q  Okay. I should have asked you that
5  when we started. If you had said yeah, then we
6  would have had to do something else.
7       All right. Now, Mr. Long, I want you
8  to look at what was marked as Defendant's
9  Exhibit 17 to your examination under oath. Tell
10 me if you recognize that, please, sir.
11   A  Yeah.
12   Q  What is it?
13   A  Items that I said was in my vehicle.
14 Is that what you're talking about?
15   Q  It's what, now? Say it again, sir.
16   A  The items I said was in my vehicle.
17   Q  Yes, sir. Is that your handwriting?
18   A  Yes.
19      MR. BURGE: What's the date on that
20 first page at the bottom?
21      THE WITNESS: March the 2nd.
22      MR. BURGE: I just couldn't read the
23 first number. Is it a 3? I can't tell.

Page 99

1    A  I don't know. I don't know which call
2  it was.
3    Q  Any other conversations with anybody
4  else other than the police department, the
5  manager, and then Sandy and Ricky and Donald and
6  Felicia and Valerie?
7    A  Well, State Farm.
8    Q  State Farm. What else? That's the
9  reason we're going through them so we can see if
10 we're missing any.
11   A  And my niece.
12   Q  Your niece. You talked to her on the
13 telephone?
14   A  Yeah.
15   Q  Anybody else?
16   A  I don't think so.
17   Q  Okay. You don't take any kind of
18 medication, do you?
19   A  Yeah.
20   Q  What do you take?
21   A  I take pain pills and depression pills.
22   Q  Are you on anything today?
23   A  No.

Page 98

1       MR. NEWMAN: It looks like 3-2-05 to
2  me.
3       MR. BURGE: All right. That's fine.
4    Q  Did you prepare that at the -- the
5  other stuff that's below Exhibit 17 are other
6  exhibits. But just Exhibit 17, Mr. Long, did
7  you prepare that in order to make a claim on the
8  personal property that was in the Corvette?
9    A  Yes.
10   Q  Where did you get the values that you
11 got under column number 5 and under column
12 number 6?
13   A  I put them values in there myself.
14   Q  Where did you get them from, though?
15 What did you use in order to come up with those?
16   A  I got some receipts for a couple of
17 them. Then other things, I did on my own, just
18 put a price on them.
19   Q  Okay. All right. Let me go through
20 those with you and let's talk about those. On
21 there one of the items that you report is a --
22 the first one is a three-quarter length black
23 leather jacket?

Page 100

1    A   Right.
2    Q   And you've got a cost of how much on
3    there?
4    A   $250.
5    Q   And how did you come up with that cost?
6    A   That's what I paid for it.
7    Q   Where did you purchase it?  Do you
8    remember?
9    A   Yeah.  I got that out of Birmingham
10   years earlier.
11   Q   When did you get it?
12   A   I don't know exactly.  I probably had
13   it maybe three or four years.
14   Q   Three or four years.  And you just have
15   a recollection of buying it for $250?
16   A   Uh-huh.
17   Q   The next thing you've got is one .45
18   automatic handgun, and then you've got -- is
19   that the serial number on it?
20   A   Yes.
21   Q   NWD.  How did you get that serial
22   number?
23   A   From the receipt.

Page 101

1    and it's an abbreviation.  And that's -- I
2    probably did throw you off when I said that.
3    A   Okay.
4    Q   We're back on what's marked as 17 to
5    the examination under oath.  Okay?
6    A   Okay.
7    Q   All right.  And what I asked you about
8    is where you got the serial number, and you said
9    you got it off the receipt.  And I said did you
10   bring the receipt with you when you gave your
11   examination under oath, and I suppose the answer
12   to that is correct?
13   A   Yes.
14   Q   In this it said that it was purchased
15   in February of 2005; right?
16   A   Yes.
17   Q   And so that was purchased -- was it
18   purchased just before or just after the time
19   that you got the money?
20   A   I think it was after.
21   Q   We can look up the receipt if we need
22   to.
23   A   Yeah.  I can't remember.  That's been a

Page 103

1    Q   You still had the receipt from it?
2    A   Well, I turned it in.  I can go get it
3    from the pawn shop.
4    Q   No.  I mean, the receipt, you brought
5    the receipt to the EUO, didn't you, on that
6    date?
7        MR. BURGE:  He's asking whether when
8    you came here the last time and you were asked
9    questions if you brought the receipt at that
10   time.
11   A   If he asked for it, I did.
12   Q   Yeah.  If you don't understand what I'm
13   saying, you just stop me and we'll go over the
14   question again.
15       MR. BURGE:  I think you lost him at the
16   EUO.
17   Q   EUO is an abbreviation for examination
18   under oath, which was that -- you know, when I
19   asked you about Defendant's Exhibit 10 and asked
20   you if you'd looked at it and read it.  You said
21   it was all correct.  You remember that?
22   A   Yes.
23   Q   Well, that is called an EUO sometimes,

Page 102

1    long time ago.
2    Q   Let me see.  You've got 17 there.  So
3    it ought to be just a few after that.  Look
4    down -- on what you're looking at, look down two
5    or three pages and see if you see that receipt
6    in there.
7    A   Okay.
8    Q   That's...
9    A   The pawn shop.
10   Q   Yeah.  There's two from the pawn shop.
11   I'm not sure which one.
12   A   I got a bracelet from one of them.
13   599, I think that's the bracelet.
14   Q   What about number 20?  19 looks like
15   the bracelet.
16   A   Yeah.
17   Q   All right.  So 20 is the ticket on the
18   handgun; right?
19   A   I bought that February 16, 2005.
20   Q   So you bought that just, what, a couple
21   of days before?
22   A   Yeah.  I bought that on a Wednesday or
23   a Thursday.  Yeah, Wednesday.

Page 104

26 (Pages 101 to 104)

MARTIN O. LONG

1    Q    And then can you look at the date on
2  the bracelet and see when you bought it?
3    A    I had the bracelet a couple of years.
4  I bought that March the 10th of '03.
5    Q    How come you'd have the receipt for the
6  bracelet if you bought it all the way back in
7  '03?
8    A    Because it was in my car.  I had to go
9  get everything, all the receipts.
10    Q    I know.  How come you'd still have the
11  receipt on the bracelet?
12    A    Oh, I didn't.  I went to the pawn shop
13  and got it.
14    Q    The pawn shop had a record of it?
15    A    Yes.  I don't keep no receipts.
16    Q    Okay.  Looking back at your list now of
17  the personal property.  Now, the next thing you
18  say is $5,000 cash; right?
19    A    Right.
20    Q    And where physically in the auto was
21  that $5,000 cash?
22    A    Between my seats.
23    Q    Was it in an envelope, or was it in a
Page 105

1    A    Yes.
2    Q    Would it have been from your savings?
3    A    I believe so.
4    Q    And you left -- was it exactly $5,000?
5    A    I think it was in increments.
6    Q    Tell me what you mean by that.
7    A    Well, I think I got like 2500 one day
8  and I think I got maybe 2500 another day.
9    Q    All right.  Now, so you got a total of
10  $5,000 cash.  Did you have any cash in your
11  wallet?
12    A    No.  I don't carry no wallet.
13    Q    Do you carry a money clip?
14    A    No.
15    Q    How do you carry your money around?
16    A    I mean, I don't usually carry money
17  like that.  I had it.  When I do carry it, I
18  just carry the money in my front pocket.
19    Q    Front.  Well, now, why didn't you take
20  this cash inside with you?
21    A    I just didn't.
22    Q    I mean, you parked your car underneath
23  the camera because you're worried about
Page 107

1  rubber band?  Or how did you have that cash?
2    A    In the envelope.  In the middle of the
3  seats.
4    Q    Was it inside a console?
5    A    Yeah.
6    Q    And was the gun inside a console, too,
7  the handgun?
8    A    I think my gun was in the back.
9    Q    Under the hatchback?
10    A    (Witness nods head.)  Yes.
11    Q    Now, this $5,000 cash, under this date
12  of purchase here, you've got 2-2005.  What does
13  that mean?  You didn't purchase that cash, did
14  you?
15    A    No.  I withdrew it sometime before I
16  left.
17    Q    Would you have withdrawn that cash
18  before you left for your trip?
19    A    Yeah.
20    Q    Would you have withdrawn it from one of
21  the credit unions?
22    A    Yes.
23    Q    Max?
Page 106

1  something happening to it and you leave your
2  cash and your gun in the car?
3    A    Yeah.
4    Q    All right.  The next thing it says
5  three suits.  Are these suits that have the
6  matching pants and coats?
7    A    Yeah.
8    Q    And down here you've got that you
9  purchased them in February of 2005 for $600?
10    A    Yeah.
11    Q    I guess that would be $200 apiece;
12  right?
13    A    Uh-huh.
14    Q    Is that a yes?
15    A    Oh, I mean, I've got them on here, but
16  I ain't purchased them in February.
17    Q    When did you purchase them?
18    A    I had them for a minute.
19    Q    What do you mean a minute?  How long is
20  a minute?
21    A    I hadn't really bought nothing from
22  that store in over a year.
23    Q    Over a year?
Page 108

27 (Pages 105 to 108)

**MARTIN O. LONG**

1    A   (Witness nods head.)
2    Q   Is that right?
3    A   Right.
4    Q   Now, when you gave your statement
5    before, this examination under oath, you told
6    them you had bought them that same month, didn't
7    you?
8    A   Yeah, I did.
9    Q   Why did you lie about it?
10   A   Because I was pissed off at the
11   insurance.
12   Q   Why would that make a difference?
13   A   It would make a lot of difference. I
14   was trying to -- whatever I could say I had in
15   that car I was going to say I had it in there.
16   Q   Well, did you have the suits in there?
17   A   No.
18   Q   So you didn't have the suits in there?
19   A   No. I mean, yeah, I had them in there,
20   but I didn't buy them when I say I bought them.
21   Q   When did you buy them?
22   A   I had them for a while.
23   Q   You had them for about year, you said?

Page 109

1    A   Or more.
2    Q   A year or more?
3    A   Yeah.
4    Q   How much more?
5    A   Maybe a year or two years.
6    Q   Okay. Do you know how much you paid
7    for them a couple of years ago?
8    A   I know it wasn't no $600.
9    Q   Why did you put $600 down there?
10   A   I just told you. I was mad at the
11   insurance.
12   Q   You were trying to get something that
13   you weren't entitled to?
14   A   Yeah. Same way they trying to do me.
15   That's why I was pissed off at them.
16   Q   So you wrote down something that you
17   weren't -- you wrote down the date of purchase
18   February 2005 and that was wrong; right?
19   A   Right.
20   Q   And you wrote down $600 and that was
21   wrong?
22   A   Right.
23   Q   And then when you were sworn under oath

Page 110

1    on this examination under oath you said that
2    they did cost $600 and that you did buy them in
3    February 2005; right?
4    A   Right.
5    Q   And the only reason you can tell me
6    that you did that was because you were pissed
7    off at the insurance company?
8    A   Because that is why I did it.
9    Q   Okay. Because you're trying to get
10   something that you're not entitled to?
11   A   Not really get something I'm not
12   entitled to. I was just pissed off at them for
13   putting me through what they put me through.
14   Saying I stole my own car.
15   Q   So you put down -- on your personal
16   property claim, you put down more than what you
17   said you were -- more than what you really had;
18   right?
19   A   Right.
20   Q   All right. And you were pissed off at
21   them why? Because they told you you stole your
22   own car?
23   A   Right.

Page 111

1    Q   When did they tell you that?
2    A   They didn't up and just straight --
3    well, it's like this. The dude kept jiving me
4    around. I had to pretty much make them tell me
5    that. You know, he kept saying give me 30 more,
6    blah, blah, blah. And then I just finally asked
7    him. I said, man, y'all think I stole my car.
8    And he said yeah.
9    Q   How far into the deal was that? How
10   long after February the 19th was it that you
11   finally told him, hey, dude, do you think I
12   stole my car and he said yeah?
13   A   It was a couple of weeks or either the
14   same week that I called my lawyer. Once I
15   confronted him -- because he never would say
16   what he was doing. But, like I say, once I
17   asked him that question and he said yeah,
18   within -- sometime within that time frame,
19   that's when I called Mr. Tucker.
20   Q   Was it after he got that statement from
21   you? Do you remember when you got that recorded
22   statement? Was it after that time that you
23   confronted him and said, hey, man --

Page 112

28 (Pages 109 to 112)

1    A   Oh, after this time here?
2    Q   No, sir.  Just listen to what I'm
3  asking you, now.  What I'm trying to do is to
4  find out the time that you confronted him and
5  got mad at him and said, hey, man, are you
6  saying I stole my car and he said yeah.  When
7  was that?
8    A   I don't know.
9    THE WITNESS:  Can I...
10   Q   You can ask him.  I don't --
11   MR. BURGE:  If you don't know the
12 answer, tell him you don't know the answer.
13   A   I don't know the answer.
14   Q   Do you remember the time that he took a
15 recorded statement from you?
16   A   Yeah.  That was --
17   Q   And that was the time that you remember
18 you told him you were going over there by
19 yourself and then after you finished the
20 recorded statement you told him, you said, well,
21 now, wait a minute, I was over there with a
22 woman that night?
23   A   Right.

Page 113

1    A   Right.
2    Q   Okay.  Now, that statement was taken
3  March 31, 2005?
4    A   That one?
5    Q   Yes, sir.  Exhibit 10.
6    A   The other one was before that.
7    Q   The other one was before that?
8    A   You know, the very first one.
9    Q   Now, when you got mad at him and said,
10 hey, man, are you saying I stole my car, was it
11 before or after the time that you gave this
12 statement, Exhibit 10, that I'm holding up in my
13 hand?
14   A   It was after that.
15   Q   After Exhibit 10?
16   A   Because I had did everything he told me
17 to do.
18   Q   So you had done everything he told you
19 to do.  You'd given him a recorded statement,
20 you had given him -- you had come in and brought
21 all these documents with you; right?
22   A   Right.
23   Q   You'd told him everything in this

Page 115

1    Q   It was after that that you confronted
2  him, wasn't it?
3    A   Yeah.
4    Q   Well, not right after that, but it was
5  after that in point of time that you confronted
6  him?
7    A   Right.
8    Q   How many weeks after that, giving that
9  statement, was it?
10   A   I don't know.  It probably was a month
11 and a half or maybe two months.  Because after
12 that, I had another question and answer with --
13 you know, with him and another lady.
14   Q   Okay.  Yeah.  That's the one we're
15 talking about here.
16   A   Yeah.  See, I had all that before.
17   Q   I know.  First of all, you gave him a
18 recorded statement, and then after you gave him
19 the recorded statement, then you came in -- as a
20 matter of fact, you came into this office and a
21 lady took this recorded statement that's Exhibit
22 10 from you under oath and you gave those
23 answers; right?

Page 114

1  statement here that's Defendant's Exhibit 10,
2  answered all those questions; right?
3    A   Right.
4    Q   Ordered a credit report?
5    A   Right.
6    Q   So after doing all that and you still
7  hadn't gotten paid, that's when you confronted
8  him and you said, hey, man, you're jiving me
9  around; do you think I stole my car?
10   A   Right.
11   Q   And it was then that he said yes and it
12 was then you got mad?
13   A   Right.
14   Q   Okay.  So it was -- at least in point
15 of time, one thing we know is that that happened
16 sometime after March 31, 2005, which is the date
17 of Exhibit 10; right?
18   A   Right.
19   Q   Okay.  Now, let's keep going.  We
20 talked about the suits.  Now, let's talk about
21 the pantsuits.  What's a pantsuit?  Is that like
22 just pants and a shirt or something that match?
23   A   Yeah.

Page 116

29 (Pages 113 to 116)

1    Q   Okay.  And on that one, again, you say
2   you bought it in February 2005 in Montgomery for
3   $180, and you're going to tell me now that
4   that's not correct?
5    A   Right.
6    Q   But in this statement that you gave
7   that's Exhibit 10, you said it was correct;
8   right?
9    A   Right.
10   Q   All right.  And then we've got four
11  pairs of shoes bought in Montgomery in February
12  of 2005 for $1,100, and you're going to tell me
13  now -- and in your statement that's Exhibit 10,
14  you said that was when you bought them and
15  that's what they cost; right?
16   A   Right.  But I only had two pairs of
17  shoes and I bought them before February.
18   Q   So really there weren't four pairs of
19  shoes in the car, there were only two; right?
20   A   Right.
21   Q   The second thing you're telling me is
22  that you bought them before February of 2005?
23   A   Right.

Page 117

1    Q   All right.  And all of these things
2   here, these three items -- the three suits, the
3   two pantsuits, and the -- what you had is the
4   four pairs of shoes, but you're now saying two
5   pairs of shoes -- the cost of them are not
6   correct and in addition you didn't buy them in
7   February of 2005; right?
8    A   Right.
9    Q   Again, why did you put those down?
10  Because you were mad at the insurance company?
11   A   Yes.
12   Q   Okay.  Because you felt like they were
13  jacking you around?
14   A   Well, they accused me of something I
15  didn't do.
16   Q   Now, we go on to the next one, which is
17  four bracelets.  Did you really buy the
18  bracelets?
19   A   Yes.
20   Q   You did really buy the bracelets?
21   A   Yes.
22   Q   Did you really buy the bracelets in --
23  is that 2-2005 again?

Page 118

1    A   Some of them.  Like I said, the receipt
2   on the one I bought, I bought that back in '03.
3    Q   Okay.
4    A   From the pawn shop.
5    Q   You brought the receipt for that one?
6    A   (Witness nods head.)
7    Q   How much was that?  Look on that
8   receipt there, how much you paid for it.  It was
9   $500?
10   A   599.
11   Q   Okay.  So that's 600.  That leaves us
12  with almost $2,000 worth of bracelets.  So you
13  had -- in addition to that one you brought the
14  receipt in on, you had three more bracelets;
15  right?
16   A   Yeah.
17   Q   And were those all in the car that
18  night?
19   A   Yes.
20   Q   And did you pay $1900 for them?
21   A   Yes.  I bought them off the street.
22   Q   You don't have receipts for any of
23  them?

Page 119

1    A   No, I don't.
2    Q   How do you know you paid $1900 for
3   them?
4    A   I know what I gave for them.
5    Q   You do?
6    A   Yeah.
7    Q   How do you know that?
8    A   I bought them.
9    Q   Did you buy them in cash?
10   A   Yeah.
11   Q   So you bought them on the street?
12   A   Yes.
13   Q   Where?
14   A   Montgomery.
15   Q   Where?
16   A   Down off of that street down there by
17  the pawn shop.  You know, the back way of
18  Maxwell, the street the pawn shop is on.
19   Q   Okay.
20       MR. BURGE:  He's from Mobile.
21   Q   I don't know where Quick Pawn is, but
22  it might be on that receipt you've got there.
23  It might tell us where the Quick Pawn is.

Page 120

MARTIN O. LONG

| | |
|---|---|
| 1   A   Yeah. It's on Bell Street. Yeah, Bell | 1   the money from. |
| 2   Street. | 2   A   I got the money out of my pocket. |
| 3   Q   Okay. Now, did you just walk up to | 3   Q   You got the money in your pocket? |
| 4   somebody on the street and say, hey, man, you | 4   A   Yeah. |
| 5   got any bracelets for sale? | 5   Q   In your front pocket? |
| 6   A   They came to me. | 6   A   Yes. |
| 7   Q   They walked up to you and said, hey, | 7   Q   Had you withdrawn that money from the |
| 8   man, you want to buy some bracelets? | 8   bank? |
| 9   A   Yeah. | 9   A   Yes. |
| 10   Q   What were you doing down there anyway? | 10   Q   How long before? |
| 11   A   Coming out of the pawn shop. | 11   A   I don't know. I mean, I can't -- I |
| 12   Q   In February of '05? Is this February | 12   can't -- I don't know exactly how long but I got |
| 13   of '05 we're talking about? | 13   a receipt. |
| 14   A   Yeah. | 14   Q   From the bank? |
| 15   Q   So you bought all three of the | 15   A   Yes. |
| 16   remaining bracelets in February of '05? | 16   Q   Would that be, again, Max Federal |
| 17   A   Yes. | 17   Credit Union? |
| 18   Q   Coming out of the pawn shop? | 18   A   Yes. |
| 19   A   (Witness nods head.) | 19   Q   And is that, again, from your savings |
| 20   Q   And that's a yes? | 20   account? |
| 21   A   Yes. | 21   A   Yes. |
| 22   Q   What were you doing in the pawn shop in | 22   Q   All right. Now, you've got the rings, |
| 23   February of '05? | 23   three rings. You said there were three rings in |
|                       Page 121 |                       Page 123 |
| 1   A   Well, a lot of times I just go by there | 1   the car, the Corvette? |
| 2   and just look at things and see if they've | 2   A   Yes. |
| 3   got -- I love to buy guns. You know, I didn't | 3   Q   And you've got them down at $1200; is |
| 4   get no gun that day. | 4   that right? |
| 5   Q   That's not the day that you bought the | 5   A   Yes. |
| 6   .45, then? | 6   Q   Is that 400 apiece, or are they |
| 7   A   Huh-uh. | 7   different prices totaling $1200? |
| 8   Q   That's a no? | 8   A   Just different prices totaling $1200. |
| 9   A   Right. | 9   Q   When did you buy those? In February of |
| 10   Q   And someone came up to you and said, | 10   '05. |
| 11   hey, man, you want to buy some bracelets and you | 11   A   Yes. |
| 12   said sure and you bought the bracelets? | 12   Q   And I take it that both the bracelets |
| 13   A   Yeah. | 13   and the rings were bought after the time that |
| 14   Q   Did he have any more for sale other | 14   you got your money? |
| 15   than three you bought? | 15   A   Oh, yeah. I couldn't afford them any |
| 16   A   No. | 16   other time. |
| 17   Q   You bought everything he had? | 17   Q   And who did you buy the rings from? |
| 18   A   Well, I bought what I wanted, yeah. | 18   A   I mean, I don't know the guy's name. |
| 19   Q   Where did you have the money that you | 19   Just a dude. |
| 20   paid for them with? | 20   Q   Dude on the street? |
| 21   A   Where did I have it? | 21   A   Yeah. |
| 22   Q   You told me earlier you don't carry | 22   Q   Was it in that same location that you |
| 23   around much money, so I'm asking where you got | 23   bought the bracelets? |
|                       Page 122 |                       Page 124 |

31 (Pages 121 to 124)

**MARTIN O. LONG**

1    A   No.
2    Q   Where did you buy the rings?
3    A   Down off of Fairview.
4    Q   Off of Fairview?
5    A   Fairview Avenue.
6    Q   Yes, sir. Where off of Fairview Avenue
7    did you buy the rings?
8    A   Down by that McDonald's.
9    Q   And you were just walking along? Did
10   you go up to somebody and say you got any rings
11   for sale, or did someone come to you and say,
12   hey, I've got some rings?
13   A   Yeah, someone come to me.
14   Q   Okay. And you bought them all three at
15   once?
16   A   Yes.
17   Q   The next thing you've got is a DVD
18   player, and that's one of those kinds, I think,
19   that plugs into the car that you can play
20   through your cigarette lighter and sends a
21   signal to your radio?
22   A   Yes.
23   Q   And you've got down you bought it in
Page 125

1    January of 2005. So you bought that before you
2    got your settlement money?
3    A   Right.
4    Q   And you paid $160 for it?
5    A   Right.
6    Q   Did you have a receipt for it?
7    A   I can't remember. I know it come out
8    of Best Buy on Eastern Boulevard.
9    Q   Okay. And then you've got down here --
10   you've got one watch that you say you bought in
11   January of 2005 for a thousand dollars; right?
12   A   Right.
13   Q   And when you bought that watch, you
14   didn't have any money --
15   A   Right.
16   Q   -- to speak of?
17   A   Right.
18   Q   So where did you get the money to buy
19   the watch for a thousand dollars?
20   A   I just had it.
21   Q   Did you buy that watch over time?
22   A   Say again, sir.
23   Q   Didn't you buy that watch on
Page 126

1    installments from your nephew?
2    A   Yeah.
3    Q   He said you could pay him a little bit
4    along?
5    A   Yeah.
6    Q   How much were you paying him?
7    A   It went from like -- I think I paid him
8    like 50 something dollars.
9    Q   You mean when you first took it -- you
10   first got it you paid him $50?
11   A   Yes.
12   Q   Did you ever pay him the remaining
13   $950?
14   A   Yeah.
15   Q   When did you pay him that?
16   A   After I got my settlement.
17   Q   Sir?
18   A   After I got my settlement.
19   Q   Okay. And what's your nephew's name?
20   A   Bailey.
21   Q   Bailey what?
22   A   Chancey.
23   Q   Is it spelled C-H-A-N-C-Y or
Page 127

1    C-H-A-U-N-C-E-Y, or maybe neither one of them?
2    A   I think it's C-H-A-N-C-E-Y, I think.
3    Q   Okay. All right. So now what you're
4    telling me is that you did have -- on this
5    Exhibit 17 to your examination under oath, you
6    did have the jacket in there, the auto handgun,
7    you had $5,000 cash, you had four bracelets, you
8    had three rings, you had the DVD player, and you
9    had the watch. You had three suits, but you say
10   your suits, you didn't purchase them in February
11   and they didn't cost $600. You had two
12   pantsuits, but, again, you didn't purchase them
13   in February of 2005 and they didn't cost $180.
14   And instead of having four pairs of shoes, you
15   had two pairs of shoes and you didn't buy them
16   in February of 2005, and I guess they didn't
17   cost $1,100; right?
18   A   Right.
19   Q   And the reason you say that you put
20   down the inflated figures -- you understand what
21   inflated means. It means more than you really
22   should have put down; right?
23   A   Right.
Page 128

32 (Pages 125 to 128)

# MARTIN O. LONG

1    Q   The reason you put that down is because
2    you were mad at Todd Smith and mad at the
3    insurance company?
4      A   Right.
5    Q   And you were mad at them because you
6    had said are you saying I stole my car and he
7    said yeah and you got mad at him?
8      A   Yeah. Accused me of something I didn't
9    do. Why am I going to steal my own car for?
10   Q   So you decided as a result of that you
11   would write down some things that were higher
12   than what they really were?
13     A   Right.
14   Q   Let's go on. We got through that one.
15   Is your trailer still insured with State Farm?
16     A   No. They dropped me on everything.
17   Q   Okay.
18     A   I ain't had no insurance since the
19   first year the hurricane and stuff came through.
20   Q   Did you try to go anywhere else?
21     A   Yeah. Wouldn't nobody do it during
22   that time. I had to wait until hurricane season
23   was over.

Page 129

1    Q   Have you got it now?
2      A   Yes.
3    Q   Who have you got it with?
4      A   I can't think of the guy I got it now.
5    I know he out of Montgomery.
6    Q   Do you know what company?
7      A   No. I can't think of his name.
8    Q   Have you got your cars insured?
9      A   Yes.
10   Q   You've just got one car right now? The
11   Mustang Cobra.
12     A   I've got two cars.
13   Q   What's the other one?
14     A   I've got an '01 Vette.
15   Q   When did you buy the '01 Vette?
16     A   I bought it last year. I'm trying to
17   think when now. I think maybe -- October
18   maybe. Something like that. I've got the bill
19   of sale and everything in the car.
20   Q   October of '06?
21     A   Yes. I mean, somewhere around there.
22   Q   Yeah. Okay. How much did it cost?
23     A   24,000.

Page 130

1    Q   How did you pay for it?
2      A   With a loan. I'm still paying on it.
3    Q   You've got a loan on it?
4      A   Yes.
5    Q   Where did you buy it? What company did
6    you buy it from?
7      A   I bought it from a company in Florida.
8    Q   What's the name of it?
9      A   I don't know the -- I know I got it
10   from Ft. Walton Beach.
11   Q   Did you go down there to pick it up?
12     A   Yes. I got it the same way I got the
13   other one. I looked on the Internet.
14   Q   Okay. Is it a place that specializes
15   in Corvettes?
16     A   No. This place sells all kind of
17   vehicles.
18   Q   How did you find out about it? Oh, the
19   Internet, you said?
20     A   Yes.
21   Q   So right now you've got two cars.
22   You've still got the Mustang -- the Cobra -- and
23   then you've this '01 Vette that you paid $24,000

Page 131

1    for in October of 2006?
2      A   Right.
3    Q   How much did you pay down on the Vette?
4      A   I didn't pay nothing down.
5    Q   Nothing down?
6      A   No.
7    Q   What are your payments?
8      A   523.
9    Q   A month?
10     A   Yeah.
11   Q   What do you pay on your mortgage
12   payment?
13     A   292.
14   Q   292. And your total income at this
15   time since you've done the settlement is just
16   what you're getting from the government?
17     A   Say that again.
18   Q   Your settlement -- when you made your
19   settlement, you don't get any more from the
20   railroad retirement, do you?
21     A   I get a check a month from the
22   railroad.
23   Q   Oh, you do?

Page 132

33 (Pages 129 to 132)

## MARTIN O. LONG

| | |
|---|---|
| 1    A  Yes. | 1    A  Yes. |
| 2    Q  So you get that in addition to what you | 2    Q  How did you find that out? |
| 3  get from the VA? | 3    A  That they denied the claims? |
| 4    A  Yes. | 4    Q  Yes, sir. |
| 5    Q  Is it the same amount that you get from | 5    A  Because I asked him.  And after he told |
| 6  the railroad like that?  What is it?  A thousand | 6  me that, that's when I called Tucker. |
| 7  dollars?  You told me what it was. | 7    Q  Okay.  That's when you asked Mr. Smith; |
| 8    A  No.  I get 1400 from the railroad. | 8  right? |
| 9    Q  Okay.  Yeah, you said 14 or 1500 from | 9    A  Right. |
| 10 the railroad. | 10   Q  Okay.  Help me on this -- these calls |
| 11   A  No.  That was from the VA back then. | 11 that first day to the police department, did you |
| 12   Q  1500 from the VA back then.  How much | 12 tell them any time that day what you thought you |
| 13 do you get from the VA now? | 13 had lost, or did you just simply say I had some |
| 14   A  29. | 14 personal items in there and then they said to |
| 15   Q  It's gone up that much? | 15 report back?  How did that work? |
| 16   A  (Witness nods head.) | 16   A  He told me to call him back. |
| 17   Q  Is that -- | 17   Q  You said my car is gone and I had some |
| 18   A  Yes. | 18 things in it? |
| 19   Q  Why has it gone up? | 19   A  Right. |
| 20   A  Because I'm a hundred percent now. | 20   Q  And they said call back when you know |
| 21   Q  A hundred percent disabled? | 21 what you lost? |
| 22   A  Right. | 22   A  Yes. |
| 23   Q  Do you get any money from Social | 23   Q  Okay.  Did you ever give them -- you |
| Page 133 | Page 135 |
| 1  Security? | 1  know, when you called them, did you ever tell |
| 2    A  Right.  That's what the railroad gives | 2  them the things that you were missing?  There's |
| 3  me is Social Security. | 3  a difference between saying I lost some stuff |
| 4 | 4  or I lost a handgun, $5,000, a specific list. |
| 5    (Whereupon, Defendant's Exhibit | 5    A  I don't know.  I can't remember whether |
| 6  Numbers 15 and 16 were marked for | 6  I called them and told them that or not. |
| 7  identification and copies of same are | 7    Q  Okay.  So you don't recall when you |
| 8  attached hereto.) | 8  told them -- you don't recall when you called |
| 9 | 9  them the first time or the second time whether |
| 10   Q  Okay.  I'll show you what's been marked | 10 you gave them a specific list or whether you |
| 11 as Defendant's 15 and 16 to your deposition. | 11 just told them that there was stuff in the car? |
| 12 Those are written to your lawyer, not to you. | 12   A  Right. |
| 13   A  Okay. | 13   Q  But you do know -- whether you told |
| 14   Q  But they are letters that deny the | 14 them a specific list or whether you told them it |
| 15 claims on the homeowners policy and on the auto | 15 was just personal property in the car, you do |
| 16 policy.  That's what those are.  Have you ever | 16 know that they called -- that they told you to |
| 17 seen copies of those or seen those before? | 17 call back when you were able to tell them |
| 18   A  Huh-uh. | 18 exactly what it was? |
| 19   Q  All right.  You were informed by him or | 19   A  Right.  I think when I called them to |
| 20 you knew somehow that they had denied the | 20 tell them what I had I think I was at home. |
| 21 claims; right? | 21   Q  With the specific things? |
| 22   A  Uh-huh. | 22   A  Yeah. |
| 23   Q  Is that a yes? | 23   Q  Okay.  Now, did either Sandy or Ricky |
| Page 134 | Page 136 |

34 (Pages 133 to 136)

**MARTIN O. LONG**

| | |
|---|---|
| 1  Ware at the hotel, at the time that your Vette | 1   A   Cash. |
| 2  was missing, when you discovered it was | 2   Q   Okay.  Do you remember what you took |
| 3  missing -- did they ever tell you during that | 3  inside with you on the night that you got to |
| 4  time to make sure that you put down on your loss | 4  Lithonia, Georgia on February the 19th? |
| 5  report that you had a suitcase missing from the | 5   A   What I took in the motel? |
| 6  car? | 6   Q   Yeah.  It sounds like you left |
| 7   A   No. | 7  everything in the car. I'm just asking what you |
| 8   Q   You don't remember anything like that? | 8  took inside with you. |
| 9   A   No. | 9   A   I know I took a pair of shoes up there, |
| 10   Q   Okay.  And I'm not talking about just | 10  and I took -- took an outfit up there. |
| 11  the time right when it was -- when you noticed | 11   Q   Something to wear? |
| 12  it was missing, but any time did they ever tell | 12   A   Yeah.  For the next day.  But I left -- |
| 13  you that? | 13  I mean, I just -- I guess I was just... |
| 14   A   No. | 14   Q   Do you remember who you purchased those |
| 15   Q   Why did Ms. Ware purchase a cell phone | 15  bracelets or the rings from? |
| 16  for you? | 16   A   No. |
| 17   A   Say again, sir. | 17   Q   I mean, I know it wasn't anybody -- was |
| 18   Q   Why did Ms. Ware purchase a cell phone | 18  it anybody you had ever seen before? |
| 19  for you? | 19   A   No. |
| 20   A   Because at that time, I couldn't get | 20   Q   Anybody you've ever seen since? |
| 21  one in my name. | 21   A   No. |
| 22   Q   Why not? | 22   Q   If he walked up today, would you |
| 23   A   Because I had got some phones through | 23  recognize them? |
| Page 137 | Page 139 |

| | |
|---|---|
| 1  Verizon or Nextel.  Nextel, I think.  You know, | 1   A   No. |
| 2  I had -- I was able to get like three different | 2   Q   Either one of them? |
| 3  people on the line, and I did that.  And one of | 3   A   No. |
| 4  them reneged, and I never did pay the balance | 4   Q   You've seen -- you saw your car -- your |
| 5  off. | 5  car was returned to you after the incident on |
| 6   Q   So your credit for getting phones was | 6  February 19th; right? |
| 7  not good; is that right? | 7   A   No, my car wasn't returned.  I had to |
| 8   A   Right. | 8  go get my car. |
| 9   Q   And so that's why Ms. Ware purchased | 9   Q   I said you've seen it since then. |
| 10  one for you? | 10   A   Oh, yeah. |
| 11   A   Right. | 11   Q   That's what I said. |
| 12   Q   Were you reimbursing her for that? | 12   A   I thought you said returned to me. |
| 13   A   Yeah.  I was paying my own phone bill. | 13   Q   No, sir.  You've seen it since the -- |
| 14  That's what you mean?  Was I paying my phone | 14      MR. BURGE:  The Record will speak for |
| 15  bill? | 15  itself on that. |
| 16   Q   Yes, sir. | 16   Q   Okay.  Well, if I didn't, I certainly |
| 17   A   Yes. | 17  apologize to you.  What I'm asking you, have you |
| 18   Q   Did you pay her and then she paid the | 18  seen it since then? |
| 19  cell phone company, or did you pay it straight | 19   A   Yes. |
| 20  to the cell phone company? | 20   Q   And how did you come to see it? |
| 21   A   I paid her. | 21   A   I went to Georgia. |
| 22   Q   Okay.  Did you pay her in cash or did | 22   Q   Okay.  You went and picked it up? |
| 23  you pay her by check? | 23   A   Yes. |
| Page 138 | Page 140 |

35 (Pages 137 to 140)

MARTIN O. LONG

1    Q   Where was it?
2    A   It was in -- I can't remember the name
3   of the place, but it was like a big holding area
4   for stolen cars and wrecked cars. I think some
5   people come through and get it and, you know,
6   sell cars at auctions or whatever. Stuff like
7   that.
8    Q   How did you get over to Atlanta?
9    A   I rented a U-Haul.
10   Q   Okay. Did you leave the U-Haul in
11  Atlanta?
12   A   No. I rented.
13   Q   How did you -- the question I'm trying
14  to get is, how did you get the Corvette back to
15  Montgomery.
16   A   With a trailer.
17   Q   You put it on a trailer?
18   A   Yeah. I rented a truck. You know, the
19  trailer comes with the truck.
20   Q   Like a low boy, flatbed?
21   A   Yeah. With two wheels on the back of
22  the trailer. You hook it up to the back of the
23  U-Haul truck.

Page 141

1    Q   And then push the car up on that?
2    A   Yes.
3    Q   Was the car running?
4    A   Yeah.
5    Q   Were you able to drive it up on the
6   ramp to get it on the trailer?
7    A   Right. I didn't have no brakes,
8   though.
9    Q   And so then you took it back to
10  Montgomery --
11   A   Millbrook.
12   Q   -- in a U-Haul? I'm sorry. You're
13  right. To Millbrook in a U-Haul?
14   A   Yes.
15   Q   And then after that, did you sell it to
16  someone?
17   A   Yes.
18   Q   Who did you sell it to?
19   A   A guy named David.
20   Q   How much you did you get for it?
21   A   Six.
22   Q   And you got a bill of sale from that;
23  right?

Page 142

1    A   Yes.
2    Q   So that's 6,000, and the car had cost
3   you $25,000 new; right?
4    A   Right.
5    Q   What did it look like?
6    A   Well, it was -- like I said, the paint
7   wasn't messed up, the motor was still okay, the
8   transmission was still okay. It was just the
9   rims and tires was gone, brakes was gone, the
10  brake calipers was gone, seats was gone, the top
11  was out, and the inside had some dings to it.
12  The gear shifter thing, that was like took off.
13  The console part in the middle of the seat was
14  gone, and part of the vents was gone. But the
15  biggest thing, it had got rained in for like two
16  or three months, and it just -- you know, all
17  that water getting in the system, it was just --
18  that was the worst part. That was what made it
19  a total loss. All that rain had got all in the
20  wiring and all that stuff.
21        MR. BURGE: Did you mention the tires
22  and rims?
23        THE WITNESS: Yeah, I said tires and

Page 143

1   rims.
2        MR. NEWMAN: The Record will show that,
3   I think.
4    Q   How did the rain get in it? Was it
5   because the windows were broken or the top was
6   off?
7    A   Both. Mainly because of the top.
8    Q   The top was a removable, hard-top-type
9   car?
10   A   Right.
11   Q   Was the hard top on it when it was
12  sitting in the lot at the Country Inn?
13   A   Yes. The way I left it, yes.
14   Q   And when you got to Atlanta to pick it
15  up, was the hard top on it then?
16   A   No.
17   Q   Were you able to find the hard top?
18   A   No.
19   Q   So it was not with the car, then --
20   A   Right.
21   Q   -- when you went to get it?
22   A   Right.
23   Q   Were you able to tell whether the

Page 144

36 (Pages 141 to 144)

MARTIN O. LONG

1  windows were broken or not?
2      A   Yeah.  The passenger side window was
3  broken.
4      Q   Passenger side window was broken.
5  Completely broken out?
6      A   Yes.
7      Q   How about the windshield?
8      A   The front?  The windshield was there.
9      Q   And did it have a back windshield?
10     A   Yes.
11     Q   Was it still there?
12     A   Right.
13     Q   And how about the passenger --
14     A   You mean the driver side?
15     Q   The driver side window.
16     A   Yeah, it was still there.
17     Q   Does it have any -- in that little
18  hatchback area, are there any side windows back
19  in the back on it?
20     A   No.
21     Q   Do you have any idea who took the car?
22     A   No.
23     Q   Do you know anyone else who had --
                                          Page 145

1      Q   Okay.  You said your family.  I was
2  wondering --
3      A   No, I wasn't talking about her.  I was
4  talking about my brother.
5      Q   Your brother?
6      A   (Witness nods head.)
7      Q   What's your brother's name?
8      A   Wayne.
9      Q   Now, that's not the one who's got the
10  daughter that you called, the niece that you
11  called?
12     A   No.  That's my sister.
13     Q   Your oldest sister.  So you've got a
14  brother named Wayne.  Does he live here in
15  Montgomery?
16     A   Millbrook.
17     Q   What's his last name?
18     A   Long.
19     Q   Same name as yours?
20     A   Yes.
21     Q   Y'all got the same mother and father?
22     A   Right.
23         MR. NEWMAN:  Tucker, this is a real
                                          Page 147

1  excuse me.  Let me rephrase that.  I'm going to
2  strike the introductory part of that last
3  question.  This is my question.  Do you know
4  anyone who had anything to do with having --
5  with taking that car?
6      A   No.
7      Q   Do you know of anyone who had any
8  motive or desire to steal that car?
9      A   No.
10     Q   Have you got any enemies that would do
11  that to you just to be mean to you?
12     A   I mean, probably everybody's got
13  enemies.
14     Q   I mean, who knew that you were going to
15  Atlanta that day?
16     A   Oh, nobody except my family.  That's
17  about it.
18     Q   Do you know anybody who would take your
19  car just to be mean to you?
20     A   No.
21     Q   Did your wife know you were going to
22  Lithonia, to Atlanta?
23     A   I don't think she did.
                                          Page 146

1  good stopping point.  I can clean some things up
2  and get through these exhibits and we'll be
3  fine.
4
5      (Whereupon, a lunch recess was had in
6  the proceeding.)
7
8  BY MR. NEWMAN:
9      Q   Back on the Record.  Mr. Long, I want
10  to show you -- these are written questions that
11  were sent to you and you answered them probably
12  with the assistance of your lawyer and signed
13  them.  I want to ask you about number 5 in which
14  you talk about -- you write about someone named
15  General Long and someone named Walter Crosby.
16     A   Brother and nephew.
17     Q   General Long would be who?
18     A   My brother.
19     Q   That's the brother that knew that you
20  were going over to Atlanta that day?
21     A   No.
22     Q   Another brother?
23     A   Right.
                                          Page 148

37 (Pages 145 to 148)

1  Q  How many of y'all are there?
2  A  12.
3  Q  12 of y'all. Were y'all all born in
4  Millbrook?
5  A  Yes.
6  Q  So General -- but General Long is your
7  brother. Is General just his name, or was he
8  actually a general like in the Army?
9  A  No. General is his name.
10  Q  General is his name. Okay. Walter
11  Crosby, who is Walter Crosby?
12  A  That's my nephew.
13  Q  Is he General --
14  A  No. That's my sister's son.
15  Q  Sister's son. Okay. All right. And
16  then also attached to your interrogatories I've
17  got a little yellow sticker on it -- we can take
18  that off -- but it says page 1 of 1, U-Haul
19  equipment contract. And is that just something
20  that was --
21  A  I brought the other paper.
22  THE WITNESS: Didn't I give you that
23  this morning?
Page 149

1  (Whereupon, Defendant's Exhibit
2  Number 17 was marked for identification
3  and copy of same is attached hereto.)
4
5  Q  This is Defendant's Exhibit 1. These
6  were -- your lawyer and I at the first of the
7  case exchanged some paperwork related to the
8  case. And I marked the whole package. I'm not
9  going to ask you about the whole package. I'm
10  going to ask you just about a couple of things
11  here. All right. This very last part of your
12  disclosures appears to be an insurance policy on
13  your automobile. Do you have -- do you know
14  where that came from? I mean, your lawyer gave
15  it to me. I'm just asking if you knew where it
16  came.
17  A  My insurance policy on my car?
18  Q  Yes, sir.
19  A  From State Farm?
20  Q  Yes, sir.
21  A  I'm saying that's what you're asking
22  me?
23  Q  Do you know how that got into your
Page 151

1  A  I thought I had turned it into him.
2  But it had the price.
3  Q  But that's just part of the paperwork
4  that related to your renting the U-Haul to go
5  over to Atlanta to pick up the Corvette; right?
6  A  Yes, sir.
7  Q  Okay. Now, take a look now at --
8  MR. BURGE: I think I gave it back to
9  you. No. Here it is. Is that what you're
10  talking about?
11  THE WITNESS: Yeah.
12  MR. NEWMAN: You want to mark it or
13  what?
14  MR. BURGE: If you want to.
15  A  That's the price on how much it was.
16  Q  Okay. We're going to mark this as
17  Defendant's Exhibit 17. And you brought this
18  with you today. And this shows the cost of the
19  U-Haul with the trailer that you took over to
20  Atlanta to get the Corvette; right?
21  A  Right.
22  MR. NEWMAN: That's 17.
23
Page 150

1  lawyer's possession is what I'm asking you.
2  A  Let me see what it is.
3  Q  Yeah. I'm just showing you what was
4  attached to the complaint, and I'm asking you if
5  you -- I mean, to the disclosures, and I'm
6  asking if you know how he got ahold of that.
7  A  I don't know.
8  Q  And that's fine. I want to show you
9  also in part of the disclosures is a document
10  that's signed by Davis Carrera. Is the document
11  that shows the sale -- the bill of sale for the
12  Corvette that you brought back from Atlanta?
13  A  Yes.
14  Q  Okay. Enclosed also in this is a fax
15  sheet that, as far as I can tell, didn't have
16  anything attached to it. It may have. But it
17  says it's from the De Kalb County Police
18  Department Auto Theft Unit. At the bottom of it
19  says Auto Theft, Metro Atlanta's favorite group
20  participation sport. Do you know where that
21  document came from?
22  A  No.
23  Q  All right. Then I want to show you the
Page 152

38 (Pages 149 to 152)

1   document that's right underneath that in the
2   disclosures. All the disclosures we're talking
3   about are in Exhibit 1 by the way. And right
4   below that document we just talked about is a
5   title, State of Alabama Department of Revenue
6   Motor Vehicle Title, which has then got void
7   stamped all over it. Is this the title to -- do
8   you know what this is the title to?
9   A  Well, it's got Chevy Corvette on here.
10   Q  Was that the 2000 -- that's says 2000
11   Chevrolet Corvette.
12   A  I don't know why it's void.
13   Q  Well, they may have stamped void on it
14   because the car was totaled. It doesn't
15   matter. But as far as you know, that's the same
16   car we're talking about?
17   A  Okay. Yes.
18   Q  Okay. Just sometimes when there's a
19   certain amount of damage done to a vehicle
20   you've got to get a new title issued.
21      Okay. I also want you to look at
22   your -- that policy in the disclosures. This
23   will be marked as Defendant's Exhibit 18.

Page 153

1   A  Chase.
2   Q  Is that who you write your check to?
3   A  It was then. Yeah, it was Chase.
4   Q  Now it's changed?
5   A  Yeah. It's Vanderbilt now.
6   Q  Okay. And this indicates it was
7   through the Mike Devers Insurance Company. And
8   when I say this, I'm talking about page 2 of
9   Exhibit 18. And that's who your agent was;
10   correct?
11   A  Correct.
12   Q  Do you know who LaToya is?
13   A  LaToya? Huh-uh.
14   Q  LaToya?
15   A  No.
16   Q  Was there anybody else with y'all going
17   to Atlanta other than Felicia Flowers, Valerie,
18   Ricky, Sandy, and you? Was there another girl?
19   A  No.
20   Q  Sure?
21   A  Yes.
22   Q  Okay. Do you know any LaToyas?
23   A  No.

Page 155

1
2   (Whereupon, Defendant's Exhibit
3   Number 18 was marked for identification
4   and copy of same is attached hereto.)
5
6   Q  And I'll tell you ahead of time this
7   appears to me to be the insurance policy on your
8   trailer, on your manufactured home. I'll just
9   ask you have you ever seen it before is my
10   question.
11   A  (Witness reviews document.) Yeah.
12   Q  Do you know when you first saw it?
13   A  I guess at State Farm.
14   Q  I don't know. I'm asking you. I
15   pulled this stuff together from a lot of
16   different places, so I'm just asking you if
17   you've ever seen that before. I mean, you've
18   seen it before but you don't recall where you
19   saw it; is that right?
20   A  Right.
21   Q  Fair enough. This says on the policy
22   that your mortgagee was Chase Home Finance,
23   LLC. Was that the mortgagee?

Page 154

1   Q  Other than LaToya Jackson that's a
2   singer? Other than that, you don't know any
3   LaToyas?
4   A  No, I don't.
5   Q  And in your complaint, you talk about
6   the fact that the denial of coverage and the
7   actions of State Farm have caused you emotional
8   distress. Have you been to see any doctors
9   about emotional distress?
10   A  I mean, that's part of my claim. I
11   mean, you know, I went through stress class at
12   the VA. Well, anger management class at the
13   Department of VA.
14   Q  When did you do that?
15   A  I think in -- I think early part of
16   last year or the end part of '05.
17   Q  All right. Now, you had -- one of the
18   reasons for your discharge was emotional in
19   nature, was it not, from the Army?
20   A  What you mean emotional in nature?
21   Q  I mean, it wasn't totally from the
22   standpoint of your leg that you were
23   discharged. There were also depression problems

Page 156

39 (Pages 153 to 156)

1   associated with your discharge; correct?
2   A   No.
3   Q   That's not correct?
4   A   No, that's not correct.
5   Q   Have you ever told anybody that?
6   A   The only reason why the Army put me out
7   was because of my leg.
8   Q   There was never any assessment that
9   found that one of the reasons for your discharge
10  was emotional in nature?
11  A   No, not my discharge.
12  Q   Okay. Had you ever had any treatment
13  for emotional injury or emotional problems
14  before 2005?
15  A   Yeah.
16  Q   You told me you're on some pills for
17  depression. You told me that this morning?
18  A   Yes.
19  Q   Who prescribes those for you?
20  A   Psychiatrist.
21  Q   And how long -- what's his name?
22  A   The last one I saw was Tobino. It was
23  a female named Tobino.

Page 157

1   Q   Here in Montgomery?
2   A   At the VA, yes.
3   Q   At the VA in Montgomery?
4   A   Yes.
5   Q   Do you go to Maxwell for that? Is that
6   where you go for that?
7   A   No. I go to the regional office.
8   Q   Where is it?
9   A   Off Perry Hill Road.
10  Q   Okay. Is it a pretty big facility?
11  A   It's okay.
12  Q   Okay. Are all the psychiatrists that
13  you've seen -- have all of them been through the
14  VA?
15  A   Yes.
16  Q   Have you seen any private ones, ones
17  that are not VA employed?
18  A   Well, I saw one with the railroad.
19  Q   With the railroad?
20  A   Yes.
21  Q   Do you remember his or her name?
22  A   No. It was a female, though, but I
23  don't remember her name.

Page 158

1   Q   Where was she located?
2   A   I know the appointment was off of -- I
3   can't think where the appointment was. I know
4   it was off of Perry Hill Road, though.
5   Q   So the railroad retirement doctors were
6   off of Perry Hill Road as well?
7   A   (Witness nods head.)
8   Q   Just like the VA?
9   A   Just the opposite side. Once you get
10  off Perry Hill Road, you go to the left, but
11  whenever I seen the railroad psychiatrist I went
12  to the right.
13  Q   Okay. And when did you see -- you say
14  the last one you can remember seeing at the VA
15  was a psychiatrist named Tobino?
16  A   Yes.
17  Q   T-O-B-I-N-O?
18  A   I think so.
19  Q   And how long ago was that?
20  A   That was maybe last August, I think.
21  Somewhere around there.
22  Q   Okay. Do you remember who you saw
23  before Tobino?

Page 159

1   A   I saw Chille, Dr. Chille, C-H-I-L-L-E.
2   Q   Okay. Was that also at the VA here in
3   Montgomery?
4   A   Yes.
5   Q   How long ago was that you saw
6   Dr. Chille?
7   A   About a year. Because I saw him before
8   I saw her. Then they moved him to Tuskegee.
9   Q   Okay. Who initially prescribed -- what
10  kind of antidepressants do you take?
11  A   Let's see. I used to take -- I know
12  I've taken one. Then I stopped taking them.
13  Then I started Zoloft. Then I stopped taking
14  them, and I'm on some others now.
15  Q   Okay. Where do you get your
16  prescriptions filled?
17  A   VA.
18  Q   Okay. The one on Perry Hill Road?
19  A   Yes.
20  Q   Okay. Were you being treated -- when
21  you saw the railroad retirement psychiatrist,
22  was that before or after your injury, the
23  shoulder?

Page 160

40 (Pages 157 to 160)

## MARTIN O. LONG

1  A  After.
2  Q  After. Did you see any of the VA
3  psychiatrists before you injured yourself on the
4  railroad?
5  A  Yes.
6  Q  Okay. Do you remember was that
7  Dr. Chille, or was it somebody even before
8  Dr. Chille?
9  A  It was Dr. Chille. Well, no. It
10  was -- I can't think of the doctor's name. All
11  of it is in my records, though.
12  Q  I know it is, and I'm just trying to
13  make sure I can cover it so I can get it from --
14  you know, see if I can get it. But the other
15  thing I was going to ask you, have you been
16  under continuous treatment by psychiatrists or
17  psychologists since you were discharged from the
18  Army?
19  A  I mean, I didn't -- when I got
20  discharged from the Army, I didn't get up under
21  a psychiatrist's care.
22  Q  How long after you were discharged did
23  you see a psychiatrist?
Page 161

1  A  I think in...
2  Q  You were discharged in '97, you told
3  me.
4  A  Right. I think in '02 or '03.
5  Q  So it was four or five years later,
6  then; is that right?
7  A  Right.
8  Q  Other than the doctors that you've seen
9  at the VA, have you seen anyone else for
10  psychological or psychiatric problems?
11  A  No.
12  Q  And the one at the railroad retirement
13  board?
14  A  No.
15  Q  Anybody else?
16  A  No.
17  Q  Other than the, you know -- can you
18  tell me any way that this emotional distress
19  that you suffered from State Farm how that's
20  manifested itself? What it's done to you?
21  A  Well, I mean, it just -- it took me
22  through a lot because all I had -- I had been
23  through a lot already and then I had just called
Page 162

1  myself trying to get myself together once the
2  railroad come through for me. Then this
3  happened. And it was just -- it was like a
4  shock because, you know, I didn't think that it
5  would take this long and I didn't think they
6  just straight thought that I stole my own car.
7  I just couldn't grasp that, how they could think
8  that.
9  Q  And so I understand, because of that,
10  you've got these -- feel like that's caused
11  emotional distress, and I'm trying to ask you
12  how that manifested itself. I mean, did your
13  hair fall out? You understand what I'm saying
14  now? Did it turn gray like mine? I can tell it
15  didn't turn gray. Any kind of physical
16  manifestations of that --
17  A  I mean, I just --
18  Q  -- or did it just bother you?
19  A  Well, I mean, it did more than bother
20  me. I -- you know, I started just being
21  irritable and, you know, just not really wanting
22  to be around nobody.
23  Q  Made you irritable and not wanting to
Page 163

1  be around anybody?
2  A  I just stayed mad and frustrated all
3  the time.
4  Q  Anything else?
5  A  No. Because, I mean, I was already
6  going through things anyway.
7  Q  I mean, you already were -- had some
8  things that would make you irritable and
9  frustrated; right?
10  A  Right.
11  Q  I mean, you had problems with your
12  injury; right?
13  A  Right.
14  Q  And you were having problems with your
15  marriage; right?
16  A  Right.
17  Q  And you were having money problems;
18  right?
19  A  Before then, though. I'm talking about
20  all that was before then. But after -- you
21  know, like I said, I was pretty much caught up
22  after the lawsuit, you know, once I...
23  Q  You mean after the lawsuit against
Page 164

41 (Pages 161 to 164)

1    the --
2    A   Yeah.  I had paid off the bills and
3    pretty much was trying to move ahead and, you
4    know, then this happened and, you know, it just
5    throwed me for a loop because I could have --
6    like I said, I wasn't hurting for no money
7    because if I had wanted to sell the car or
8    something, you know, I still would have got the
9    car.  I just wouldn't have paid off as much
10   stuff as I paid for my wife.  I was going to get
11   the car regardless.  You know, after it was
12   took, that was just -- it was like -- I guess it
13   was like a low blow, I guess.
14       Q   I understand all that.  I'm just trying
15   to find out other than making you irritable and
16   mad if there was any other things that were
17   caused by your emotional distress as a result of
18   what you said State Farm did.
19       A   I mean, I was already having panic
20   attacks, but it was -- I guess it didn't help
21   them none.
22       Q   So you already had some panic attacks
23   before then; is that right?
                                            Page 165

1    A   Right.
2    Q   And is that what the anti-depressants
3    were treating?
4    A   Yeah.
5    Q   Are you still having the panic attacks,
6    or are they better?
7    A   They got better.
8    Q   Are you still seeing a psychiatrist?
9    A   Well, I haven't saw one in probably
10   about four months.
11       Q   Okay.  Have you got any visits
12   scheduled to go back?
13   A   Yes.
14       Q   When?
15   A   I've just got a call to make because
16   now they do it -- they'll see you like six
17   months out, but if you run out of medication
18   before then, then you can call and they'll see
19   you because they ain't going to give you more
20   medication without seeing you.
21       Q   I see.  So have you got any plans to go
22   back?
23   A   Yeah.
                                            Page 166

1    Q   Sir?
2    A   Yes.
3    Q   When?  I mean, have you made an
4    appointment is my question.
5    A   No, I haven't made an appointment.
6    Q   You haven't made an appointment, but
7    you plan to make an appointment?
8    A   Yes.
9    Q   Okay.  What I want you to do on this
10   diagram that you drew for us, which is Exhibit
11   14 -- let me make sure I understand it.  The
12   camera that you've written -- I mean, that
13   you've drawn here, you've drawn a little kind of
14   square and you've written camera by it.  And
15   that was under the -- under the overhang where
16   the cars would pull up right in front of the
17   hotel; is that right?
18   A   Right.  If I'm not mistaken, yeah.
19       Q   And it was on the side away from where
20   your car was?
21   A   Right.  But it was pointed toward -- it
22   was pointed toward this way (indicating).
23       Q   But it was pointed towards your car?
                                            Page 167

1    A   Right.
2    Q   And that's what you say -- about 20, 30
3    yards, you say?
4    A   It might not be that far.  I just say
5    20 or 30 yards.  It wasn't that far.
6    Q   You weren't able to climb up and look
7    through the lens of the camera and see where it
8    was pointed, were you?
9    A   No.  But you can look at a camera and
10   tell which way it's pointed, now.
11       Q   Was it a wide angle lens or was it
12   a narrow lens?
13   A   It was narrow.
14       Q   Narrow lens.  So how wide -- how much
15   territory would that camera cover at 30 yards?
16       MR. BURGE:  If you know.
17   A   I don't know.
18       Q   So you don't know whether your car was
19   in the field of vision of the camera or not, do
20   you?
21   A   Yes.  I know it was in the point of
22   aim.
23       Q   Okay.  So you think it was aimed right
                                            Page 168

MARTIN O. LONG

| | |
|---|---|
| 1   at it? | 1    A   Right.  Well, she called and told Val, |
| 2    A   I know it was aimed.  I could see it. | 2   then Val told me. |
| 3    Q   Go ahead. | 3    Q   And you said that the way that you |
| 4    A   I'm saying I could see the way the | 4   found out was because she called Val on the |
| 5   camera was pointing. | 5   telephone and then Val told you? |
| 6    Q   Were there any other cars where you | 6    A   Right.  Because she thought we was |
| 7   were parked? | 7   gone. |
| 8    A   Yes. | 8    Q   Okay.  What do you mean she thought you |
| 9    Q   On either side of you? | 9   were gone? |
| 10    A   Yeah. | 10    A   She thought we had went to the store or |
| 11    Q   Okay.  Any other banks you've banked at | 11   something because she didn't see the car. |
| 12   other than Max Federal Credit Union? | 12   That's why she called and asked where we were. |
| 13    A   I mean, I've got an account at -- are | 13    Q   And you never did any shopping in |
| 14   you talking about like now? | 14   Georgia on this trip; correct? |
| 15    Q   Yes, sir. | 15    A   Right. |
| 16    A   Yeah.  I've got an account at FedMont | 16    Q   Were any of the things that were in the |
| 17   Federal Credit Union and I've a -- I had an | 17   car things that you had bought immediately |
| 18   account at AmSouth. | 18   before going -- prior to going to Atlanta? |
| 19    Q   As of the time that you -- February 19, | 19    A   No. |
| 20   2005, did you have accounts anywhere but at -- | 20    Q   You said that you bought the gun on, |
| 21    A   Max. | 21   what, the 15th, which would have been a couple |
| 22    Q   -- Max? | 22   or three days before going over there; right? |
| 23    A   No. | 23    A   Right. |
| Page 169 | Page 171 |

| | |
|---|---|
| 1    Q   Okay.  Max is M-A-X? | 1    Q   Would that have been the most recent |
| 2    A   Right. | 2   purchase out of the things that were in the car? |
| 3    Q   It's Maxwell, isn't it?  For Maxwell? | 3    A   Yeah. |
| 4    A   Right.  Maxwell. | 4    Q   You had bought the rings and the |
| 5    Q   And since that time, you say you've had | 5   bracelets before then? |
| 6   one at Fairview Credit Union? | 6    A   Yes. |
| 7    A   FedMont. | 7    Q   Before you bought the gun? |
| 8    Q   FedMont.  And then also you had a | 8    A   I think so. |
| 9   account for a while at AmSouth? | 9    Q   Okay. |
| 10    A   Uh-huh. | 10    A   I'm not for sure. |
| 11    Q   Were both of those just checking | 11    Q   You didn't get any receipts for the |
| 12   accounts? | 12   rings or the bracelets when you bought them on |
| 13    A   Yes.  I've still got an account through | 13   the street, did you? |
| 14   FedMont now.  That's who financed the car. | 14    A   No. |
| 15    Q   That's who finances the new Corvette? | 15    Q   They wouldn't have given you those? |
| 16    A   Yes. | 16   That's not the way that business would be done? |
| 17    Q   Is that the reason you have an account | 17    A   Right. |
| 18   there? | 18    Q   Okay.  There wasn't any kind of receipt |
| 19    A   Yes. | 19   from the watch from your nephew, was it? |
| 20    Q   All right.  Now, let's see.  Mr. Long, | 20    A   No. |
| 21   it's your testimony today that Felicia is the | 21    Q   Was the cash in your car left over from |
| 22   one who told you that your vehicle was missing; | 22   the settlement of the lawsuit?  I mean, was it or not? |
| 23   correct? | 23   part of the lawsuit settlement money or not? |
| Page 170 | Page 172 |

43 (Pages 169 to 172)

MARTIN O. LONG

1   A   Yeah.
2   Q   It was?
3   A   Yeah.
4   Q   Now, when you gave this statement,
5   Exhibit 10, we talked about, you said it was not
6   left over from the lawsuit. Which one was it?
7   I just want to make sure.
8   A   Yeah, it is.
9       MR. BURGE: Object to the form.
10  Q   Let's see if I can find that and make
11  sure we're straight.
12      All right. Now, in the statement, it
13  appears that you said that it was not left over
14  from the settlement, but regardless of what it
15  says in this statement, what you're telling me
16  now is that it was left over from the
17  settlement?
18      MR. BURGE: Object to the form.
19  A   Yes.
20  Q   Okay. What color was the watch, the
21  watch that was --
22  A   Gold.
23  Q   Okay.

Page 173

1   A   It had like white little diamonds on
2   it.
3   Q   Okay. Did you ever tell anyone it was
4   silver instead of gold? Do you recall?
5   A   No.
6   Q   Let me show you what's been marked as
7   Defendant's Exhibit 3 to your deposition,
8   Mr. Long. It's a letter that was written to
9   you, and it was one of those ones you've got to
10  sign for. And it appears to have your signature
11  on page 2 of the exhibit.
12  A   What's that? Oh, something I got
13  through the mail?
14  Q   Yes, sir. Does that look like your
15  signature?
16  A   Uh-huh.
17  Q   It's got that date on it, March 10,
18  2005.
19  A   Okay.
20  Q   And in it this letter says that --
21  well, the letter says what it says. Did you
22  receive that letter?
23  A   Yes.

Page 174

1       MR. BURGE: What's the date on that?
2       MR. NEWMAN: March 4 is the letter and
3   the receipt is March 10 on the letter.
4   Q   Do you know if that letter was -- we
5   can look at it and see. This statement was
6   taken March 31. So you would have gotten that
7   letter -- at least according to the receipt that
8   says March 10, you would have gotten it about
9   three weeks before that; right?
10  A   Okay.
11  Q   Now, I asked you before about Pearlie
12  Harris. Do you remember that?
13  A   Who?
14  Q   Pearlie Harris. And we looked at the
15  transcript that you said you didn't remember
16  talking to her about?
17  A   Right.
18  Q   You still don't remember that?
19  A   No.
20  Q   Okay. Fair enough. Defendant's
21  Exhibit 5 is various documents that appear to
22  deal with your car or a car. And I want to just
23  go through those with you real quick. What's

Page 175

1   the first page of Exhibit 5? Can you tell me
2   what this is? It says plug on it. One plug
3   sold. That date is 9, February.
4   A   Oh, yeah. That's like a -- you know
5   how the Vette lights go up?
6   Q   Yes, sir.
7   A   Each corner has a little plug that you
8   can -- it pops out. I don't know what they
9   really used for. But one of mine was popped
10  out. And I just put it in there so when it
11  comes up the ring can't go inside and hit the
12  bulb itself.
13  Q   It's just a replacement part?
14  A   Uh-huh.
15  Q   All right. Now, what about this second
16  page? It looks like some kind of a plane ticket
17  at the bottom. Do you know what that is?
18  A   I don't know what that is.
19  Q   It's got Tuesday circled on it. You
20  don't know. Third page is Verastar. Do you
21  know who Verastar is?
22  A   That's where they had the car.
23  Q   Did you pay the Verastar or did State

Page 176

44 (Pages 173 to 176)

## MARTIN O. LONG

1  Farm pay Verastar?
2      A    State Farm paid, but I had to pay
3  something because they paid it up to a certain
4  limit but I still had to go down there and
5  pay...
6      Q    Is that where it was when you went to
7  get it?
8      A    Uh-huh.
9      Q    Do you remember how much you paid to
10  get it?
11      A    No.
12      Q    Okay.  Page 4 is Top Cat Towing.  It
13  looks like a record of the towing and the bill
14  for the towing for the Corvette by Top Cat
15  Towing.  Did you pay Top Cat?
16      A    I think I did.  I don't remember.
17      Q    Or did State Farm pay Top Cat, or do
18  you remember one way or another?
19      A    I don't remember who paid them, whether
20  I paid them or State Farm.
21          MR. NEWMAN:  This is page 4 to Exhibit
22  5.
23          MR. BURGE:  Is it Bates stamped?

Page 177

1  title on the vehicle.  Do you think that's what
2  it might be?
3      A    Yeah.
4      Q    And then, again, I'll show you what
5  looks to me to be the back of the title of the
6  car, and about four lines down, it's got, again,
7  a place for -- one, two, three blocks down, it's
8  got a place for a signature.  Is that your
9  signature, Martin O. Long?
10      A    Yeah.
11      Q    Okay.  I'll show you what's been
12  Exhibit Number 6.  Is the affidavit that you
13  filled out with regard to the loss of your
14  vehicle?
15      A    Yes.
16      Q    And that's your signature on the last
17  page of it?
18      A    Yes.
19      Q    And then I wanted to show you what's
20  been marked as 7.  Do you recognize that?
21      A    Yeah.
22      Q    What is it?
23      A    The tag, the registration.

Page 179

1          MR. NEWMAN:  No.  It's part of your
2  stuff, I think.
3      Q    Okay.  And this is --
4      A    That's where I bought the car from,
5  City Auto Sales.
6      Q    City Auto Sales.  The next page that's
7  got Re:  Martin O. Long at the bottom.  That's
8  from -- dealing with the purchase of the
9  Corvette; right?
10      A    Uh-huh.
11      Q    And then this is -- looks like a title
12  on a 2000 Chevrolet when it was owned by one
13  Shanon Hayes.  Do you know who the -- you bought
14  it, of course, from City Auto Sales; right?
15      A    Right.
16      Q    Do you know what this title has
17  anything to do with here?
18      A    No.
19      Q    On the next page is an application for
20  Certificate of Title, and down at the bottom it
21  says Martin O. Long.  Is that your signature?
22      A    Yes.
23      Q    Probably where you applied for the

Page 178

1      Q    Is that the title, or is it the tag
2  receipt?
3      A    It's the tag receipt.  Registration.
4      Q    And the second page of this Exhibit 7
5  appears to be what the reverse of the tag
6  receipt would be?
7      A    Are you talking about the back of it?
8      Q    Yes.
9      A    Yes.
10      Q    Okay.  Defendant's Exhibit 8 is some
11  documents from Big 10 Tire.  I know you're
12  tired.  I'm moving fast.  Do these documents --
13  are those the documents that substantiate the
14  work that you got done at Big 10 Tire on the
15  car?
16      A    Yes.
17      Q    Okay.  And I think we've looked at this
18  as part of -- do you recognize in 9 -- I pulled
19  it out separately -- but that's one of the pages
20  from the De Kalb police report; correct?
21      A    Correct.
22      Q    All right.  And those are the -- those
23  things that you reported there are the same

Page 180

45 (Pages 177 to 180)

1 things that are on the form that you handwrote
2 and gave to State Farm; correct?
3    A   Correct.
4    Q   And then I get to Defendant's
5 Exhibit -- just to keep the Record clear, I'm
6 going to mark another copy of the manufactured
7 home policy, if we haven't done it in the past.
8 But, again, this Defendant's Exhibit 11 appears
9 to be a policy from State Farm on your trailer.
10 Have you ever seen that before, or do you
11 recognize it?
12    A   Like I said, I think I remember this
13 right here.
14    Q   That's called the declarations page.
15 You think you may have seen that. But anyway,
16 we do know that it was a Mike Devers -- sold
17 through his agency; correct?  And at the time,
18 it was Chase Finance?
19    A   Right.
20    Q   Okay. Final thing I want to show you
21 here is Defendant's Exhibit 12 to your
22 deposition. And Defendant's Exhibit 12, can you
23 identify that, please?  I think it's the

Page 181

1    Q   Mr. Burge wasn't here then?
2    A   No.
3    Q   That was before he was involved?
4    A   Right.
5    Q   One more run through and then we'll
6 have it. I've got two more questions. When you
7 gave the answers that are reflected in Exhibit
8 10, were you telling the truth at that time?
9    A   Exhibit 10?
10    Q   Yes, sir. That's that statement that
11 you made here at the lawyer's office with the
12 lady lawyer.
13       MR. BURGE:  Asked and answered.
14    A   Are you talking about --
15    Q   Exhibit 10.
16    A   -- when I said all the stuff I had in
17 the car?
18    Q   Well, you want to take that out and say
19 with respect to the stuff you had in the car at
20 the time that you gave the statement you were
21 not telling the truth?
22    A   Meaning everything I said was true
23 except for what I said I had in the car?

Page 183

1 accident report that dealt with when you shot
2 through the roof of the car.
3    A   Okay.
4    Q   Have you ever seen it before?  If you
5 haven't ever seen it before, you can just say
6 I've never seen it before.
7    A   Yeah, I saw it before.
8    Q   Is that what that relates to?
9    A   Uh-huh.
10    Q   The date on that would be the date that
11 you did that?
12    A   Yes.
13    Q   All right. Now, Mr. Long, who was
14 present when you came into this office here and
15 there was a lady lawyer and Mr. Smith and you
16 brought in a bunch of documents with you that
17 they asked you to bring in?
18    A   Right.
19    Q   There was a court reporter like Stacey
20 here taking down what you said; correct?
21    A   Correct.
22    Q   Who else was here?
23    A   That was it.

Page 182

1    Q   Yeah.
2    A   Yeah.
3    Q   Everything that's in this statement
4 you're saying was the truth except for the part
5 that dealt with what you had in the car?
6    A   Right.
7    Q   And you're saying what you said in the
8 car made some of that up because you were
9 mad at State Farm?
10    A   Right.
11    Q   And you overstated the value of what
12 was in the car?
13    A   On the clothes, yeah.
14    Q   On the clothes?
15    A   Right.
16    Q   And you've at some point -- I'm not
17 saying today -- but at some point you had read
18 through this and it looked like to you that it
19 was accurate, true, and correct?
20    A   Correct.
21    Q   Looking at Exhibit 10, now?
22    A   Correct.
23       MR. NEWMAN:  That's all I've got.

Page 184

46 (Pages 181 to 184)

MARTIN O. LONG

1  Thanks.
2      Have you got anything, Tucker?
3          EXAMINATION
4  BY MR. BURGE:
5      Q   Mr. Long, you had a relationship with
6  State Farm Fire and Casualty Company that went
7  back a number of years before this 2000
8  Chevrolet Corvette was stolen; true?
9      A   True.
10     Q   You had a number of policies with that
11 company?
12     A   Yes.
13     Q   You purchased those policies through
14 Mike Devers' agency?
15     A   Yes.
16     Q   You purchased a homeowners policy from
17 him?
18     A   Yes.
19     Q   You purchased coverages on other
20 automobiles, the Mustang and the Volvo?
21     A   Yes.
22     Q   And you paid premiums to State Farm for
23 those different coverages?

Page 185

1      Q   Did you steal your Corvette?
2      A   No.
3      Q   Did the State Farm agency hesitate to
4  take your premium for the Corvette?
5      A   No.
6      Q   Did the State Farm agent or anyone on
7  State Farm's behalf ever suggest that State Farm
8  would hesitate to pay any claim on the policy
9  that you purchased for the Corvette because you
10 were a disabled veteran?
11     A   No.
12     Q   Because you were divorced?
13     A   No.
14     Q   Because you were disabled and
15 unemployed?
16     A   No.
17     Q   Because you had made previous claims?
18     A   No.
19     Q   Did anyone at State Farm suggest that
20 in the event you made a claim for that Corvette
21 that it would be sent to the special
22 investigation unit of that company?
23     A   No.

Page 187

1      A   Yes.
2      Q   You paid State Farm what they
3  determined was going to be the premium?
4      A   Yes.
5      Q   You had no input in how much the
6  premium should be?
7          MR. NEWMAN:  Object to the form of the
8  question.
9      A   No.
10     Q   State Farm determined how much you
11 would have to pay if you wanted insurance with
12 them for those coverages?
13     A   Yes.
14     Q   And you paid it?
15     A   Right.
16     Q   And they accepted it?
17     A   Right.
18     Q   Each time?
19     A   Yes.
20     Q   You had made some claims during the
21 years of your relationship with State Farm for
22 various matters?
23     A   Right.

Page 186

1      Q   Did you know this claim had been sent
2  to the special investigation unit of that
3  company six days after you filed the claim?
4      A   No.
5      Q   And I'm saying claim, but actually, you
6  filed two claims under two separate policies;
7  true?
8      A   True.
9      Q   You had an automobile policy?
10     A   Yes.
11     Q   And you filed a claim under that
12 automobile policy for the loss and damage to
13 your car?
14     A   Right.
15     Q   You also filed a claim under a
16 homeowners policy?
17     A   Yes.
18     Q   Was that for the lost contents of the
19 car?
20     A   Yes.
21     Q   Were you told that the special
22 investigations unit was commonly referred to as
23 their fraud unit?

Page 188

47 (Pages 185 to 188)

**MARTIN O. LONG**

1    A   No.
2    Q   Did they tell you that when claims are
3    sent to the special investigations unit that a
4    higher percentage of those claims are denied
5    than claims that are handled through the regular
6    claims process?
7        MR. NEWMAN:  Object to the form of the
8    question.
9    A   No.
10   Q   At the time that your car was stolen,
11   were you current on your bills?
12   A   Yes.
13   Q   Were you having any financial problems?
14   A   No.
15   Q   Were any creditors chasing you?
16   A   No.
17   Q   Had all of your creditors been paid off
18   with the settlement proceeds from your shoulder
19   injury claim against the railroad?
20   A   Yes.
21   Q   Did you own that Corvette free and
22   clear?
23   A   Yes.

Page 189

1    of the hotel on the night of February 18, 2005
2    did that car have any mechanical problems?
3    A   No.
4    Q   Were there any problems with the
5    brakes?
6    A   No.
7    Q   Do you know who took the car?
8    A   No.
9    Q   Do you know if State Farm performed any
10   forensic investigation to determine the identity
11   of people who had been in that car?
12   A   No.
13   Q   Do you know whether the police took any
14   fingerprints?
15   A   No.
16   Q   After the car was recovered, was there
17   any damage to the brake system?
18   A   Yes.
19   Q   Had all the brake fluid been drained?
20   A   No.
21   Q   Were there vice grips clamping off
22   certain hoses from the brakes under the car?
23   A   Yes, it was

Page 191

1    Q   Did you want to sell this car?
2    A   No.
3    Q   Did you want to get rid of this car?
4    A   No.
5    Q   You had made a number of improvements
6    to the car?
7    A   Yes.
8    Q   Had you actually made an improvement on
9    the car the very day that you took the trip to
10   Atlanta?
11   A   Yes.
12   Q   Could you have sold the car easily?
13   A   Yeah, I could have sold it if I wanted
14   to sell it.
15   Q   Could you have sold it quickly?
16   A   Yeah.
17   Q   How long had you wanted a car like
18   that?
19   A   I wanted a Vette period all my life,
20   but since that car came out in -- those cars
21   came out in '97. I wanted one since they come
22   out in '97.
23   Q   At the time you parked it out in front

Page 190

1    Q   Had the brake calipers been disabled?
2    A   Yeah.  They had been removed.
3    Q   Was there damage to the front bumper --
4    A   Yes.
5    Q   -- at the time you parked it before it
6    was stolen?
7    A   No.
8    Q   Afterwards was there damage in that
9    area?
10   A   Yes.
11   Q   Okay.  Did you ever use more than one
12   set of keys -- the set of keys that there's a
13   picture of -- to operate this car?
14   A   No.
15   Q   Do you know that the salespeople for
16   City Auto Sales of Hueytown told the State Farm
17   claims representative that he only remembered
18   you getting one set of keys?  Did the claim
19   representative ever tell you that?
20   A   No.
21   Q   Do you remember telling the claims
22   representative that another set of keys may have
23   been inside the car?

Page 192

48 (Pages 189 to 192)

MARTIN O. LONG

1    A   I could have told him that.
2    Q   If there was a second set of keys,
3    could it have been inside the car?
4    A   Yeah. I mean, you know, like I say, as
5    I look back on it -- I mean, they haven't came
6    up yet. They ain't in the house nowhere.
7    Q   Were there items taken from the car?
8    A   Yes.
9    Q   The seats?
10   A   Right.
11   Q   The T-tops?
12   A   Uh-huh.
13   Q   That's a yes?
14   A   Yes.
15   Q   And you mentioned personal property
16   items --
17   A   Yes.
18   Q   -- were taken from the car?
19   A   Right.
20   Q   And would it be fair to say it was
21   just -- the car was ransacked?
22       MR. NEWMAN: Object to the form of the
23   question.

Page 193

1    A   Yes.
2        MR. NEWMAN: Tucker, I've let you lead
3    him on every question so far. Let's ask
4    questions from this point forward.
5    Q   Have you been unable to find the keys
6    elsewhere?
7    A   No, I haven't found the keys.
8    Q   Okay. Was the car safe to drive
9    without brakes?
10   A   No.
11   Q   You made a claim for the fair value of
12   the stolen car under your automobile policy?
13   A   Yes.
14   Q   And for the contents of the car under
15   your homeowners policy?
16   A   Yes.
17   Q   Did you misrepresent anything about the
18   value of that stolen car in the claim you made
19   for it under your automobile policy?
20   A   No.
21   Q   Based on the improvements that you had
22   made to it, was it worth the same amount that
23   you paid for it, more, or less?

Page 194

1    A   I'd say maybe a little bit more. It
2    was really worth more than that when I bought
3    it. But once I just gave them cash, they just
4    said $25,000.
5    Q   After buying the car for cash, did you
6    use it as collateral so that any bank would have
7    a lien or encumbrance on it?
8    A   No.
9    Q   You have money coming in from your
10   disability?
11   A   Yes.
12   Q   Have you always been able to make ends
13   meet and pay your bills on that money since the
14   settlement occurred?
15   A   Yes.
16   Q   Your disability -- well, I'll ask
17   something else. Were the tires and rims that
18   were on the car when it was recovered -- at
19   least when you first saw it after it was
20   recovered -- the same as had been on it?
21   A   No.
22   Q   Did the State Farm representative tell
23   you that the hotel personal that he interviewed

Page 195

1    told him that there had been other problems with
2    cars being vandalized in the area?
3        MR. NEWMAN: Object to the form of the
4    question.
5    A   No, he didn't.
6    Q   And you saw the document that they
7    showed you earlier that reflects auto theft is
8    the number one pastime in Atlanta, or something
9    to that effect?
10   A   Yeah.
11   Q   You don't know who it was who took your
12   car, do you?
13   A   No, I don't.
14   Q   Do you know whether Corvettes are
15   subject to damage on the front bumper if they're
16   towed?
17   A   Yeah. You said are they subject to
18   damage?
19   Q   Right.
20   A   Yes.
21   Q   And was the damage that you saw
22   consistent with that?
23   A   Yes.

Page 196

49 (Pages 193 to 196)

MARTIN O. LONG

| | |
|---|---|
| 1  **Q   You called the police but they never** | 1        FURTHER EXAMINATION |
| 2  **came?** | 2   BY MR. NEWMAN: |
| 3    A   Right, they never come out there. | 3      **Q   What was the improvement that you did** |
| 4    **Q   Did you wait for them?** | 4   **on the Corvette on the day that you went over to** |
| 5    A   Yes. | 5   **Atlanta?** |
| 6    **Q   Did you call them back when they didn't** | 6      A   I bought some -- the rims the same day. |
| 7  **come the first time?** | 7   Once I -- |
| 8    A   Yeah. | 8        MR. BURGE: No. |
| 9    **Q   Do you know when they made their** | 9        MR. NEWMAN: Excuse me, Tucker. Excuse |
| 10 **report, the police made their report?** | 10  me, Tucker. Let me get this from him. |
| 11   A   No. | 11     A   Repeat that. |
| 12   **Q   Do you know who sent you Exhibit 10 for** | 12     **Q   What did you buy for the Corvette on** |
| 13 **sure?** | 13  **the day -- the improvement that you bought for** |
| 14   A   Do I know who sent it to me for sure? | 14  **the Corvette on the day you went over to** |
| 15   **Q   Uh-huh.** | 15  **Atlanta?** |
| 16   A   Well, not really. | 16     A   I didn't buy nothing the day I went to |
| 17   **Q   Do you know for sure that you did see** | 17  Atlanta. |
| 18 **it at one time before today?** | 18     **Q   Oh, you didn't?** |
| 19   A   Oh, yeah. Yeah. I remember seeing it. | 19     A   Oh, you're talking about Big 10 Tire. |
| 20   **Q   And did you bring these materials that** | 20  I got my tires put on. That was in Prattville. |
| 21 **are attached to Exhibit 10 to your examination?** | 21  Okay. |
| 22   A   Yes. | 22     **Q   What day did you get the tires put on?** |
| 23   **Q   Did you try to get them all the** | 23     A   Let me look on this receipt and I can |
| Page 197 | Page 199 |

| | |
|---|---|
| 1  **information that they wanted?** | 1   tell you. |
| 2    A   I did. | 2      **Q   Was that the most recent repair that** |
| 3    **Q   Okay.** | 3   **was done or the most recent improvement that was** |
| 4      MR. BURGE: You've had a -- some | 4   **done?** |
| 5   document in here, but I couldn't figure out what | 5      A   Right. |
| 6   the date was. It turned out to be March the | 6      **Q   Okay. That's fine. We can look it up.** |
| 7   2nd. Do you know about that? Do you know which | 7      A   What's the date on here? |
| 8   number that was? | 8        MR. BURGE: The first one, the tire rod |
| 9        MR. NEWMAN: I don't know. | 9   2-18. |
| 10   **Q   Do you know what, if anything, the** | 10     **Q   2-18, so that was the Friday; right?** |
| 11 **claims man did after speaking to the** | 11     A   Yeah. |
| 12 **representative from City Auto Sales of Hueytown** | 12     **Q   When you bought this car, you bought it** |
| 13 **who said that he believes there was only one set** | 13  **from, what, Car Auto Sales in Hueytown?** |
| 14 **of car keys?** | 14     A   City Auto Sales. |
| 15   A   No. | 15     **Q   City Auto Sales in Hueytown. Did you** |
| 16   **Q   But he never told you that? Did anyone** | 16  **get one or two sets of keys when you bought it?** |
| 17 **from State Farm ever tell you that, you know,** | 17     A   I think I got two sets of keys. |
| 18 **you say there was two sets of keys but the City** | 18     **Q   Two sets of keys when you bought it?** |
| 19 **Auto Sales representative only remembers one** | 19     A   I think I did. |
| 20 **set? Were you ever told anything in that** | 20       MR. NEWMAN: Thank you. That's all. |
| 21 **substance?** | 21       FURTHER EXAMINATION |
| 22   A   No, I wasn't. | 22  BY MR. BURGE: |
| 23     MR. BURGE: I think that's all I have. | 23     **Q   Are you absolutely positive?** |
| Page 198 | Page 200 |

50 (Pages 197 to 200)

## MARTIN O. LONG

1    A  I ain't going to say I'm positive, but
2  I'm, you know...
3        FURTHER EXAMINATION
4  BY MR. NEWMAN:
5    **Q**  **Did your lawyer just shake his head at**
6  **you when he asked you that question?**
7    A  No. I didn't see him.
8    **Q**  **You didn't see him?**
9    A  (Witness shakes head.)
10    **Q**  **Do you think you got two sets of keys**
11  **or one set of keys from Hueytown?**
12    A  I don't know how many I got.
13    **Q**  **You don't know how many?**
14    A  No, sir.
15    **Q**  **Don't remember one way or another?**
16    A  No.
17    **Q**  **Have you testified before on several**
18  **occasions that you got two sets of keys?**
19    A  Yeah, I did.
20        MR. NEWMAN: Okay. That's all. Thank
21  you, sir.
22        FURTHER DEPONENT SAITH NOT
23        C E R T I F I C A T E

Page 201

1
2  STATE OF ALABAMA   )
3
4  COUNTY OF MONTGOMERY )
5
6
7      I hereby certify that the above and
8  foregoing deposition was taken down by me in
9  stenotype, and the questions and answers thereto
10  were transcribed by means of computer-aided
11  transcription, and that the foregoing represents
12  a true and accurate transcript of the testimony
13  given by said witness upon said hearing.
14      I further certify that I am neither of
15  counsel, nor kin to the parties to the action,
16  nor am I in anywise interested in the result of
17  said cause.
18
19
20      ---------------------------
20      STACEY L. JOHNSON, Certified
21      Shorthand Reporter and
21      Commissioner for the State of
22      Alabama at Large.
22

Page 202

51 (Pages 201 to 202)

## Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4

5   MARTIN O. LONG,

    Plaintiff,
6
7   vs.            CIVIL ACTION FILE
               NO. 2:06CV816-MHT
8
9   STATE FARM FIRE & CASUALTY
    COMPANY, a corporation,
10
    Defendant.
11
12
13      DEPOSITION OF TODD SMITH
14

7:55 15   The deposition of TODD SMITH was taken before
        Sharon A. Gabrielli, RPR, commencing at
16   , on April 26, 2007, at the Hartsfield-Jackson
    International Airport, Suite 300,
    Atlanta, Georgia.
17
18
19        --oOo--
20
21
22
23
24
25

## Page 2

1        A P P E A R A N C E S
2
3
4
5
   Appearing For the Plaintiff:
6
      FRANK TUCKER BURGE, ESQ.
7     Burge & Burge
      850 Park Place Tower
8     2001 Park Place North
      Birmingham, Alabama 35203
9     205.251.9000
10
11
12
   Appearing For the Defendant:
13
      JAMES B. NEWMAN, ESQ.
14    Helmsing, Leach, Herlong,
      Newman & Rouse, P.C.
15    150 Government Street
      Suite 2000
16    Mobile, Alabama 36602
      251.432.5521
17
18
19   Also Present:
20    Tony D. Nix, State Farm
21        --oOo--
22
23
24
25

## Page 3

1              INDEX
2   EXAMINATION
3   Witness Name                      Page
4   Todd Smith
5    By Mr. Burge ............................... 7
6
7           EXHIBITS
8

9   Exhibit      Description        Page

10   1  State Farm Auto Claim Manual      30

11   2  State Farm Operation Guides       30

12   3  State Farm Mission Statement      35

13   4  State Farm Good Neighbor Service  35

14   5  "Red Flags" email (2/22/05)       51

15   6  Recommendation for assigning all 3 claims   54
       to SIU (2/22/05)
16   7  SIU Assignment Sheet              55
17   8  Referral of 2/13/05 auto claim to SIU   58
18   9  Auto Claim Service Record for 2/13/05 claim  61
19   10 Damage Report                     62
20   11 Photographs                       62
21   12 Police Report                     62
22   13 Property Loss Preliminary Report  63
23   14 Authorization to Pay Claim        63
24   15 Declaration page for Martin Long's   65
       auto policy
25

## Page 4

1
2     EXHIBITS (CONTINUED)
3

4   Exhibit      Description        Page

5   17  Auto Policy                      68

6   18  Referral of 2/19/05 auto claim to SIU   69

7   19  Auto Claim Service Record for 2/19/05 claim  66

8   20  Property Loss Preliminary Report for 2/19/05  71
        auto claim
9   21  Auto Claim Committee Report       82
10  22  Letter sending Affidavit of Theft  97
11  23  Affidavit of Theft                97
12  24  Ram Naidu Interview               98
13  25  Martin Long Interview            102
14  26  Police Reports                   106
15  27  Auto Theft Has A New Face        107
16  28  Evelyn Long Interview Note       109
17  29  Valerie Temple letter (4/18/05)  110
18  30  Examination Under Oath letter    113
19  31  Credit Report                    114
20  32  Credit Report                    114
21  33  Bank Records                     115
22  34  Cell Phone Records               116
23  35  Release                          117
24  36  Settlement Statement             117
25  37  Settlement Check                 117

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 5

EXHIBITS (CONTINUED)

| Exhibit | Description | Page |
|---|---|---|
| 38 | Deposit of Settlement Check | 117 |
| 39 | Divorce Settlement Agreement | 118 |
| 40 | City Auto Sales fax | 120 |
| 41 | Car Title | 120 |
| 42 | Tag Registration | 120 |
| 43 | Veteran's Administration verification | 121 |
| 44 | Big 10 Tire records | 121 |
| 45 | Key receipt and photograph | 119 |
| 46 | Autosource Valuation | 122 |
| 47 | Transportation Technologies Report | 125 |
| 48 | Transportation Technologies bill | 125 |
| 49 | Transportation Technologies Addendum (6/1/05) | 125 |
| 50 | Transportation Technologies Addendum (6/21/05) | 125 |
| 51 | Transportation Technologies bill | 125 |
| 52 | Topsat Towing receipt | 134 |
| 53 | Claim Tracking | 137 |
| 54 | Letter denying auto policy claim | 138 |
| 55 | (Not introduced) | |
| 56 | Smith memo to Nix | 138 |
| 57 | SIU Closing Procedures | 139 |
| 58 | Airborne Express receipt page | 139 |

## Page 6

EXHIBITS (CONTINUED)

| Exhibit | Description | Page |
|---|---|---|
| 60 | Renewal Certificate for homeowner's policy | 166 |
| 61 | Application for homeowner's policy | 164 |
| 62 | Homeowner's policy | 166 |
| 63 | PDQ Printout | 167 |
| 64 | Referral of homeowner's claim to SIU | 167 |
| 65 | Fire Claim Service Record | 167 |
| 66 | Property Loss Preliminary Report (3/4/05) | 169 |
| 67 | Property Loss Preliminary Report (3/11/05) | 169 |
| 68 | Martin Long statement | 170 |
| 69 | Personal Property Inventory form | 170 |
| 70 | Pawn Shop Receipts | 171 |
| 71 | Millbrook Police Report | 171 |
| 72 | Handwritten notes | 172 |
| 73 | Handwritten notes | 172 |
| 74 | Handwritten notes | 173 |
| 75 | ISO Claim Search | 174 |
| 76 | Reservation of Rights letter for homeowner's claim | 174 |
| 77 | Clothes receipt | 175 |
| 78 | Letter denying homeowners claim | 175 |
| 79 | Emails regarding roof damage claim | 176 |
| 80 | Bates Record Index | 177 |
| 91 | Post-examination under oath summary report | 144 |

—oOo—

## Page 7

1    TODD SMITH
2    having been first duly sworn, was deposed and testified
3    as follows:
4            EXAMINATION
5    BY MR. BURGE:
6        Q    Tell us your full name, please.
7        A    Todd —
8            MR. NEWMAN:  Just for the record, we
9    want to read and sign, please.  Thank you.
10            Go ahead.  I'm sorry, Tucker.  Go
11    ahead.
12            THE WITNESS:  Todd Edward Smith.
13        Q    (By Mr. Burge)  Edward, singular?
14        A    Yes.
15        Q    What is your current address?
16        A    I live in the Atlanta area, Atlanta, Georgia.
17        Q    Address?
18            MR. NEWMAN:  We're going to object to
19    that.  I mean, Tucker, I'll provide it to you
20    subject to a protective order.  I'll tell you
21    that he does not live in Montgomery, Alabama
22    or any place in Alabama.  You can ask him
23    about his family members.  And I will agree
24    to let him answer that — this part of the
25    deposition, if you'll agree not to share it

## Page 8

1    with anyone, including your client.
2            MR. BURGE:  I don't intend to share this
3    with anyone other than myself.
4            MR. NEWMAN:  And specifically, I'm
5    talking about your client.  We don't want it
6    shared with him just because of the guns and
7    stuff like that.
8            MR. BURGE:  That's fine.
9            MR. NEWMAN:  Thank you very much.
10        Q    (By Mr. Burge)  My client, if you shot at him
11    first, he will shoot back at you.
12        A    That's fair.
13        Q    Everybody in Alabama will do that.  This is
14    not a — just a Martin Long thing.
15            MR. NEWMAN:  Well, I'm not trying to
16    make an issue out of it.  I'm just asking
17    that, you know — and so you agree with that?
18            MR. BURGE:  That's fine.
19            MR. NEWMAN:  He's agreed he will not
20    share it with his client.  He's entitled to
21    it in that situation, and we'll give it to
22    him.
23            THE WITNESS:  Okay.  607 Valley Run —
24    that's two words — Valley Run Drive, Bremen,
25    B-R-E-M-E-N, Georgia, 30110.

2 (Pages 5 to 8)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 9

1   Q   (By Mr. Burge)  Current age?
2   A   39.
3   Q   Date of birth?
4   A   7/6/67.
5   Q   Where did you grow up?
6   A   In Bremen.
7   Q   Education?
8   A   Graduated from Bremen High School, then I
9   went to Jacksonville State University.  And that's in
10  Jacksonville, Alabama.  And I graduated with a
11  Bachelor's of Science in forensic science.
12  Q   And tell me about the forensic science that
13  you studied.  Is that studying chemistry data, or is it
14  studying metal failure, or what is it studying?
15  A   I guess it would be the -- related to
16  criminal justice.
17  Q   Is it part of the Criminal Justice
18  Department?
19  A   Yes, it is.
20  Q   And what year did you graduate?
21  A   1989.
22  Q   Do you have any military service?
23  A   No, I do not.
24  Q   What did you do when you got out of school at
25  Jacksonville State?

## Page 10

1   A   Went to work.  My first job was with the
2   Wackenhut Corporation.
3   Q   Would you spell Wackenhut?
4   A   It's W-A-C -- I think it's either H or K.  I
5   I'm not sure -- E-N-H-U-T.
6   Q   What did they do?
7   A   They were a security company.
8   Q   Where are they located?
9   A   At that time I worked out of Atlanta, but
10  they're all over the United States.
11  Q   What was your position?
12  A   Just an employee.  I did background checks on
13  people.
14  Q   Background checks for employment purposes?
15  A   Yes.
16  Q   How long did you do that?
17  A   Only a few months.
18  Q   And that was in 1989?
19  A   Yes.
20  Q   What job did you take next?
21  A   I guess my next full-time job would be with
22  State Farm.
23  Q   When did you begin with State Farm?
24  A   My start date was January 1990.
25  Q   Have you ever worked in law enforcement?

## Page 11

1   A   No, I have not.
2   Q   Are you married?
3   A   Yes, I am.
4   Q   Tell me about your family.
5   A   I got a wife and two little boys.
6   Q   How long have you been married?
7   A   14 years.
8   Q   Only marriage for both?
9   A   Yes.
10  Q   And your lawyer says that -- or the lawyer
11  for State Farm, who's here with us today, says that you
12  don't have any relatives in Alabama?
13  A   I have some distant cousins in Alabama.
14  MR. NEWMAN:  I think I said
15  Montgomery -- Montgomery, I said.  It's more
16  counties than that.
17  MR. BURGE:  It's four counties.
18  MR. NEWMAN:  Yeah, right.
19  Q   (By Mr. Burge)  Do you have any distant
20  cousins with the last name other than Smith?
21  A   Yes, I do.
22  Q   Okay.  What are the last names of your
23  relatives in Alabama?
24  A   Otwell, O-T-W-E-L-L.
25  Q   Botwell?

## Page 12

1   A   Otwell, O-T-W-E-L-L.
2   Q   And do you have any Smiths there?
3   A   Not that I know of.
4   Q   Do you know what part of Alabama the Otwells
5   live in?
6   A   Aniston, Oxford area.
7   Q   What is the title of -- or the correct name
8   of your employer?
9   A   Of my employer?  State Farm Insurance
10  Companies.
11  Q   Has that been your employer since January of
12  1990?
13  A   Yes.
14  Q   Have you ever been employed directly by State
15  Farm Fire & Casualty Company?
16  A   State Farm Fire & Casualty falls within State
17  Farm.
18  Q   And is there State Farm Automotive?
19  A   There's a State Farm Mutual Automotive, yes,
20  sir.
21  Q   Are there any others?  State Farm Life?
22  A   There is a life company, yes, sir.
23  Q   Have you done work for State Farm Life?
24  A   No, I have not.
25  Q   What are the companies that you have done

## Page 13

1  work for?

2  A   State Farm Mutual Company, State Farm Fire &

3  Casualty Company, State Farm General.  That's all I can

4  recall.

5  Q   When you began in January of 1990, what was

6  your position?

7  A   Claim representative.

8  Q   Where was your office?

9  A   In Decatur, Georgia.

10  Q   That's DeKalb County?

11  A   Yes, sir.

12  Q   Have you worked out of Decatur, Georgia, or

13  DeKalb County ever since?

14  A   I worked at – all over the state of Georgia.

15  Q   Has your office been in Decatur, or have you

16  had offices all over the state of Georgia?

17  A   I've had offices in multiple locations.

18  Q   Have you ever worked in Alabama?

19  A   Yes, I have.

20  Q   When did you work in Alabama?

21  A   It's – I started working in Alabama a few

22  years ago.

23  Q   Have you ever had an office specially located

24  in Alabama, or are you just talking about your

25  investigation would take you into Alabama?

## Page 14

1  A   My investigation would take me into Alabama.

2  Q   And have you had specific offices all over

3  the state where you've been transferred from place to

4  place?

5  A   Yes, I have.

6  Q   How long were you a claims representative in

7  Decatur?

8  A   I've been a claims representative for the

9  full time I've been employed with State Farm.

10  Q   How long were you in Decatur?

11  A   Initially four years.

12  Q   Then where did you go?

13  A   I went to one of our field claim offices in

14  Lithia Springs.

15  Q   So we're getting closer to Bremen?

16  A   Getting closer to Bremen.

17  Q   How long?

18  A   I was there approximately three years.

19  Q   Then where?

20  A   Carrollton, Georgia.

21  Q   That's not a very far change, is it?

22  A   No, sir.

23  Q   How long were you there?

24  A   Approximately two years.

25  Q   That only takes us to '99?

## Page 15

1  A   Then I was in Fayette, Georgia.

2  Q   How long?

3  A   Three to four years.  I'm not exactly sure.

4  Q   Then where?

5  A   Since then, I worked out of Marietta for

6  approximately one year.

7  Q   That's where you are presently?

8  A   No, it's not.

9  Q   Where are you now?

10  A   I have an office, I actually have two offices

11  that I use at the current moment, and that's back in

12  Decatur and Carrollton.  I split time between the two.

13  Q   Is that where you -- where did you go to

14  right after Marietta?

15  A   Back to Decatur.

16  Q   And you're still there?

17  A   That's where my unit is located, yes, sir.

18  Q   And you also have an office in Carrollton?

19  A   Yes, sir.

20  Q   How long have you also had an office in

21  Carrollton?

22  A   The same amount of time I've been back in

23  Decatur, for the past approximately -- between a year

24  and two years.

25  Q   When you first started out in Decatur, what

## Page 16

1  kind of claims were you handling?

2  A   Just automobile related claims.

3  Q   At Lithia Springs?

4  A   Same thing.

5  Q   Carrollton?

6  A   Same thing.

7  Q   Fayetteville?

8  A   The same thing.

9  Q   Marietta?

10  A   The same thing.

11  Q   And at present?

12  A   The same thing.  And now I also handle

13  homeowners in addition to that as well.

14  Q   When did you start handling both auto related

15  claims and homeowners claims?

16  A   Approximately two, two-and-a-half years ago.

17  Q   What would the date be when you moved to

18  Decatur and Carrollton and began doing that kind of –

19  began doing both?

20  A   I can't recall the exact date.

21  Q   Well, if we go back two-and-a-half years from

22  the present date, it puts us around November of 2004.

23  Does that sound correct?

24  A   I can't recall.  I've changed so many

25  different offices.  I'm sorry.

## Page 17

1  Q   So you can't be any more specific than saying
2  somewhere in the neighborhood of two, two-and-a-half
3  years ago you started working in both claims?
4      A   That's right -- that's right.
5      Q   How long has Mr. Nix been your boss?
6      A   Mr. Nix been my boss two separate times.  He
7  was my boss when I was in Fayetteville, and he was my
8  boss when I started back in the Decatur, Carrollton
9  area again, so I would say approximately six years.
10     Q   When you were in Marietta, were you in the
11 SIU?
12     A   Yes, sir.
13     Q   When you were in Fayetteville, were you in
14 the SIU?
15     A   Yes, sir.
16     Q   When you were in Carrollton, were you in
17 SIU?
18     A   No, sir.
19     Q   Were you handling both homeowner's claims and
20 auto-related claims when you adjusted Martin Long's
21 claim?
22     A   Yes, I was.
23     Q   Would that have been right about the same
24 time when you started doing both, when you handled his
25 claim?

## Page 18

1      A   I had started handling prior to that.  It
2  would have been maybe six months to a year prior to
3  that, maybe six -- six months.
4      Q   When you worked in Fayetteville, were you
5  doing only SIU claims?
6      A   Yes, sir.
7      Q   Marietta?
8      A   Yes, sir.
9      Q   And during the last several years in Decatur
10 and Carrollton?
11     A   Yes, sir.
12     Q   In other words, it's two to two-and-a-half
13 years you've been in Carrollton?
14     A   It's two, two-and-a-half years I've been in
15 Carrollton and the Decatur area.
16     Q   Two to two-and-a-half years since you left
17 Marietta?
18     A   Approximately, yes, sir.
19     Q   And when you handled Martin Long's claim, you
20 handled both the homeowner's claim for him and two
21 auto-related claims for him?
22     A   Yes, sir.
23     Q   When you started at State Farm, was there any
24 sort of general training that you were provided?
25     A   Yes, sir.

## Page 19

1      Q   What was that?
2      A   They sent me to claims school and our
3  corporate office in Bloomington, sent me to estimatics
4  school, on-hands training, obviously.
5      Q   On-the-job training?
6      A   Yes, sir.
7      Q   That's what lawyers do, too.  I asked a
8  witness one time what they meant by on-the-job
9  training, and the lawyer on the other side said "it's
10 sort of like what you're doing right now."  So I know
11 that.
12         How long was claim school?
13     A   Three weeks.
14     Q   How long was estimatics school?
15     A   Two weeks.
16     Q   Have you had any other training schools that
17 you've gone to during the course of your career?
18     A   Yes, sir.
19     Q   What other training have you had?
20     A   Catastrophe training.
21     Q   How long was that?
22     A   That was approximately two weeks and then had
23 on-the-job training with that.
24     Q   Any others?
25     A   Homeowner's school.

## Page 20

1      Q   How long was that?
2      A   The school itself was in Bloomington, it was
3  for two weeks; however, there was a comprehensive study
4  that went on for approximately three months after
5  school.
6      Q   When did you actually go to the school?
7  Would that have been in 2004 sometime?
8      A   No, I only recently went to school.  I
9  graduated from school in March of this year, '07.
10     Q   So you had not graduated from homeowner's
11 school when you adjusted Martin Long's claim?
12     A   No, I had not.
13     Q   Had you had any homeowner's formal training
14 when you started handling homeowner's claims in the SIU
15 unit?
16     A   Yes, I had.
17     Q   What formal training had you had for
18 homeowner policies?
19     A   The studying of builder's construction
20 training, policies, and I guess you would call it
21 on-the-job training or cross-training.
22     Q   Yeah, I'm talking about formal classroom.
23     A   Formal classroom?
24     Q   Right.
25     A   It was self-studies on the computer.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 21

1    Q    Builder's construction, was that a school?

2    A    No, sir. It was a CD ROM-based class.

3    Q    Any other training that we haven't talked

4    about?

5    A    Well, State Farm stresses continued

6    education, so throughout my career, I've attended

7    seminars sponsored by — for example, Georgia Fire

8    Investigators Association every year has a seminar and

9    other industry-sponsored seminars where they would hold

10    classes for approximately a week at a time. So I've

11    had continued education throughout my career.

12    Q    What fire seminars have you been to?

13    A    I can't recall all of them. I've been to a

14    couple in Savannah. I've been to a — I think I've

15    been to one in Orlando, one in Brunswick.

16    Q    Are you a certified fire investigator?

17    A    No, I'm not.

18    MR. NEWMAN:    SIU training.

19    Q    (By Mr. Burge) Your lawyer is whispering

20    "SIU training." Can you hear him?

21    MR. NEWMAN: Yeah, training in SIU; I

22    didn't want to — I can bring it up in cross,

23    if you would like. I was trying to make sure

24    that you heard it as well, Tucker.

25    MR. BURGE: I did.

## Page 22

1    THE WITNESS: Well, I have been — I

2    went to SIU school separate from all the

3    other schools.

4    Q    (By Mr. Burge) How long was SIU school?

5    A    It was three weeks.

6    Q    When did you go to that?

7    A    It would have been 1999, I think.

8    Q    Any other formal training that you've had?

9    A    I've had other training, like on the

10    computer, as far as like CD ROM-based training. I

11    can't recall the exact names or when.

12    Q    Any that were — that you relied upon in

13    adjusting Martin Long's claim?

14    A    No more that I could recall.

15    Q    From time to time, have you been called upon

16    to testify —

17    A    Yes, sir.

18    Q    — in cases?

19    How many times have you testified in the

20    past?

21    A    Approximately half dozen.

22    Q    When was the first time you were called upon

23    to testify?

24    A    I can't recall.

25    Q    Has it been more than ten years ago?

## Page 23

1    A    Probably.

2    Q    Tell me about the instances that you do

3    recall testifying.

4    A    I recall testifying in a — I've had a couple

5    of bodily injury claims that I was the claim rep that

6    handled the file and testified in those. I worked

7    subrogation for a while with State Farm. I had a —

8    testified in a subrogation case, diminution of value.

9    And I testified in a — a couple of arson cases. And

10    I've also testified outside of State Farm.

11    Q    Tell me about that.

12    A    I had a friend of mine I was very close

13    friends and worked part-time. He owned a convenience

14    store, and he loaned his vehicle to another guy that we

15    knew and with the instruction that this guy was going

16    to wash his vehicle. And the guy never brought his

17    vehicle back and eventually reported it stolen. And I

18    was a witness to that, and I was called upon to testify

19    after the guy was later arrested.

20    Q    Was your friend upset that his car had been

21    stolen?

22    A    Actually, my friend is very nice. He was

23    just trying to help this — this gentleman out. He was

24    disappointed.

25    Q    Did he get his car back in one piece?

## Page 24

1    A    He got his car back. Some items were missing

2    from the car and — outside of that, yes.

3    Q    And what was the nature of your testimony in

4    that matter?

5    A    I testified on two bases: One, I witnessed

6    the exchange of him giving him the keys with the

7    instruction to go wash it, and he paid him cash up

8    front. And secondly, I went to secure the vehicle from

9    the police station that evening the gentleman turned it

10    in, you know, for my friend; he had called me and asked

11    me if I could go pick it up. My wife took me to pick

12    it up. And when I got there, first off, the vehicle

13    wouldn't start; and second off, I noticed that his

14    child's car seat was missing and his golf clubs. My

15    friend never took his golf clubs out of back of his

16    Cherokee, and his golf clubs were missing. So I

17    reported the matter. I went back into the police and

18    reported it to them.

19    Q    The bodily injury claims, what was the nature

20    of your testimony in those cases?

21    A    I recall one was a — they disputed. We had

22    settled a bodily injury claim with an injured claimant,

23    and they had disputed that they actually did not sign a

24    release with State Farm; however, at the time of the

25    release, I had secured a copy of this person's driver's

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 25

1  license that had their signature on it. And when it
2  went to -- I testified to the account that when we
3  settled, she signed the release, and eventually the
4  driver's license came out, and it was a match to her
5  other signatures and...
6      Q  So one was a question of whether there was a
7  release of the claim?
8      A  Yes, sir.
9      Q  And what was the second bodily injury claim
10  about?
11      A  I think it had something to do with a school
12  bus and a garbage truck or something hit on a gravel
13  road or something, and we insured the school system.
14  And I advised -- if I remember correctly, they had, you
15  know, a camera inside mounted in the school bus that
16  looked back in where the children were, and I viewed
17  the images from the camera. And I think I testified to
18  what I saw when the accident occurred. And I can't
19  recall really much else about it. It was many years
20  ago.
21      Q  Do you think you maybe just said here's the
22  video that we looked at?
23      A  Well, I -- I testified to the -- to the
24  video. And I'm not a lawyer, so I don't know; I think
25  they argued something about the admissibility about the

## Page 26

1  video, but that was -- I just testified to what I saw.
2      Q  Subrogation claims, is that when you were
3  doing mostly auto claims?
4      A  Correct.
5      Q  And you would go into court and say we paid
6  the -- our insured for the damage to his car, and we
7  say the damage was caused by someone else and we want
8  that someone else to repay us what we paid our insured?
9      A  Correct.
10      Q  So you just go into court and say this is
11  what we paid?
12      A  Well, when called to go testify, I would.
13      Q  What's a diminution of value case?
14      A  Specifically I was involved in a subrogation
15  claim where the insured was -- another party struck our
16  insured's vehicle. We handled the claim; and then from
17  there, took over the claim and attempted to recover
18  money back for State Farm, And they ended up claiming
19  that the insured's vehicle had been diminished in value
20  as a result of the accident.
21      Q  And what was the nature of your testimony?
22      A  Just my involvement in the subrogation claim
23  and...
24      Q  Now, this wasn't Mr. Pope's big case against
25  State Farm over here, was it?

## Page 27

1      A  In Columbus?
2      Q  Yeah.
3      A  Yes, sir, it was.
4      Q  It was?
5      A  I don't know who Pope is, but I assume
6  that's --
7      Q  It was a verdict in favor of the insured
8  since State Farm?
9      A  Well, when I was involved, it wasn't the
10  actual class action lawsuit.
11      Q  Okay.
12      A  When I was involved, it was a lady; if I
13  remember correctly, it was McKenzie. And this
14  occurred -- this was prior to the class action lawsuit.
15      Q  Okay. You never had to testify in the class
16  action lawsuit?
17      A  I was called, I was subpoenaed, but I never
18  got -- they never actually made me testify.
19      Q  How many arson cases did you say?
20      A  Probably been a couple, two or three.
21      Q  And what do you testify to in those?
22      A  If memory serves me correctly, they were two
23  vehicle cases where the vehicles were recovered,
24  totally burned. And I was called upon to testify
25  regarding the results of our investigation and my

## Page 28

1  inspection of the vehicles.
2      Q  In those cases, did you determine that the
3  insured had burned their own cars?
4      A  I believe in both those cases, the police
5  arrested our insured and -- if I remember correctly.
6      Q  Well, without regard to whether or not the
7  police arrested them or did not arrest them, was it
8  your conclusion in both of those cases that the insured
9  had burned their own car?
10      A  If I remember correctly, in both those cases,
11  the -- the insured failed to cooperate, and we never
12  got to a point to where we made a final decision.
13      Q  When you say "failed to cooperate," is that
14  where you ask them to produce certain documents and
15  stuff and they -- they don't produce those documents?
16      A  I think in this case, they were in jail. And
17  at the -- if I remember correctly, at the advice of
18  their attorney, they didn't -- they basically did not
19  sit for statement under oaths, did not provide
20  documents and basically withdrew their claims, if I
21  remember correctly.
22      Q  And what was your involvement in testifying,
23  if they withdrew their cases?
24      A  Prior to that, I -- the insureds had
25  submitted documents, affidavits of vehicle thefts. I

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 29

1　had inspected the vehicles, started an investigation on
2　our end. And I mean, I can't remember everything --
3　everything about it, what all documents they provided,
4　but...
5　　Q　Have you ever worked in the actuarial
6　department of State Farm?
7　　A　No, I have not.
8　　Q　And those are the people that sort of design
9　the products; is that your understanding?
10　　A　To be honest, I don't know what they do.
11　　Q　You don't know that they -- they're the
12　department that decides what promises to -- to sell?
13　　A　I always thought actuary had something to do
14　with money, financing.
15　　Q　Okay. Have you ever worked in the marketing
16　department, people who are trying to advertise or -- or
17　sell the --
18　　A　No, I haven't.
19　　Q　-- sell the products.
20　　　Have you ever worked in the underwriting
21　department, the department that decides whether or not
22　to sell a specific promise to a specific person?
23　　A　No, I have not.
24　　Q　Your entire experience has been in the claims
25　department?

## Page 30

1　　A　Yes, sir.
2　　Q　And are there certain standards and
3　procedures that State Farm employees are trained and
4　taught to follow in handling claims?
5　　A　Yes, sir.
6　(WHEREUPON, Exhibit No. 1 and Exhibit No. 2 were
7　marked for identification.)
8　　Q　(By Mr. Burge) Let me show you what are
9　marked as Exhibits 1 and 2. Do you recognize Exhibit 1
10　as the auto claims manual for State Farm?
11　　A　Yes, sir.
12　　Q　Is that a document that you -- that you used
13　in adjusting the two claims that you handled in which
14　Mr. Long made claims under his auto policy?
15　　A　I used this -- this document in all my
16　claims.
17　　Q　Even in homeowner's claims?
18　　A　Well, I don't use the auto claim manual in
19　homeowner's claims.
20　　Q　And Exhibit 2, do you recognize that as
21　the -- at least a portion of the State Farm's operation
22　guides?
23　　A　Yes, sir, they appear to be operations
24　guides.
25　　Q　Are there more operation guides than those

## Page 31

1　that are in Exhibit 2? And I'll tell you those are the
2　ones that your employer has produced to me in this
3　case.
4　　A　May I take this clip off?
5　　Q　Please. I don't have a stapler big enough to
6　staple something that size so I had to use the clip.
7　　A　I can tell you I do not recall all the
8　operations guides; so to answer your question, I don't
9　know if this is all the operation guide.
10　　Q　Do you recall any operation guides that you
11　relied upon in handling any of the three claims that
12　you handled for Martin Long that are not included in
13　Exhibit 2?
14　　A　Repeat that question again, I'm sorry.
15　　Q　Do you recall any specific operations guides
16　that you would have relied upon in adjusting any of the
17　three claims that you handled for Martin Long that are
18　not included in Exhibit 2?
19　　A　Not that I can recall.
20　　MR. NEWMAN: This is off the record.
21　(Whereupon, a discussion ensued off the record.)
22　　Q　(By Mr. Burge) Are there any other manuals
23　or standards or guidelines that you used in adjusting
24　any of Martin Long's three claims other than those in
25　Exhibit 1 and 2?

## Page 32

1　　A　I don't know if -- if my boss is a standard
2　or a guideline, but he's a -- a reference that I use.
3　　Q　Are there certain recognized rules or
4　standards that you are required to follow at State Farm
5　when adjusting claims?
6　　A　We -- I mean, the operations guide that
7　you've got is -- is our guideline.
8　　Q　And there are certain practices that are
9　supposed to be followed, right?
10　　A　Yes, sir.
11　　Q　On the first page of Exhibit 1, it says that
12　"State Farm's claims philosophy is to pay what we owe."
13　Is that something that you're supposed to do?
14　　A　Yes, sir.
15　　Q　It says that "each claim, large or small,
16　should be handled only on its own merits in accordance
17　with the facts of the loss, the law, and the applicable
18　coverage." Is that a standard that you're required to
19　follow?
20　　A　Yes, sir.
21　　Q　And it says, "you don't decide cases based on
22　irrelevant considerations." Is that something you're
23　supposed to do?
24　　A　Yes, sir.
25　　Q　And it says that State Farm's claim

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 33

1 department has an obligation to fairly investigate the
2 claims; is that right?
3    A    Yes, sir.
4    Q    You can't enter a claim investigation with a
5 biased viewpoint either toward paying the claim or
6 either toward denying the claim, can you?
7    A    I never have.
8    Q    But you're not supposed to, certainly not
9 supposed to?
10    A    No, sir.
11    Q    You're supposed to look only at facts, true?
12    A    Correct.
13    Q    And you're not supposed to decide a claim
14 based on speculation or based on guess work, right?
15    A    You can decide claim based on the
16 preponderance of the evidence.
17    Q    And you're using legal terms now, but you're
18 not supposed to — you're not supposed to base it on facts
19 rather than speculation, true?
20        MR. NEWMAN:  I think speculation may be
21 troubling him, Tucker, the definition of it.
22    Q    (By Mr. Burge)  Do you know what speculation
23 is?
24    A    Give me a definition.
25    Q    Well, do you know what just surmising is, to

## Page 34

1 guess, to —
2        MR. NEWMAN:  Guess — guess is a good
3 word.  Just guess work.
4        THE WITNESS:  No, we — we don't use
5 guess work.
6    Q    (By Mr. Burge)  Certainly should not, right?
7    A    I agree with that.
8    Q    And you have to objectively evaluate the
9 facts that support the policy holder's claim, right?
10    A    Yes, sir.
11    Q    We're not supposed to deny a claim at State
12 Farm on insufficient information, are we?
13    A    I would say that's correct.
14    Q    Or on biased information?
15    A    That's correct.
16    Q    And when you take statements from people, it
17 is supposed to be an unbiased collection of the facts?
18    A    Correct.
19    Q    It's not like lawyering, where you try to box
20 somebody in and — and get them to say something that's
21 helpful to one side or another because that's really
22 not what you're trying to do; isn't that right?
23    A    Well, I'm not an attorney.  I don't know what
24 y'all's motive is, but I know what mine is not that.
25    Q    Okay.  So is it fair to say that what you

## Page 35

1 were trained to do is to treat the policy holder's
2 interest with equal regard to State Farm's?
3    A    That's fair.
4    Q    And you-all refer to that as your good
5 neighbor policy, right?
6    A    Our commitment to our policy of a good
7 neighbor, yes, sir.
8 (WHEREUPON, Exhibit No. 3 and Exhibit No. 4 were
9 marked for identification.)
10    Q    (By Mr. Burge)  In fact, on your -- on your
11 Web site, you state what your company mission is, and
12 you state what service you'll provide.  And I've given
13 you Exhibits 3 and 4, which come from your Web site.
14 Do you recognize those?
15    A    I recognize our mission, our vision, our
16 shared values.  To be honest, I haven't gone — I
17 assume this is an access — you went on on State Farm's
18 Web site to do.  I haven't went on and seen this
19 specific document and looked at it in a while.  I
20 recognize some of the verbiage in it, but when it
21 references like the Northridge, California earthquake
22 and 600 claims, I haven't looked at that.
23        MR. NEWMAN:  He is looking at 4.  He is
24 speaking of 4.
25    Q    (By Mr. Burge)  If you go down on 4 where the

## Page 36

1 blue flag is, where it says that in the insurance
2 industry you are selling an intangible, where the
3 policy holder gives State Farm money; and if there's no
4 claim, then they get nothing in return.  What they do
5 get for giving that money is the promise that when they
6 do make a claim, that State Farm will be there for them
7 and will treat them fairly; is that right?
8    A    What it says is when you buy insurance, you
9 invest in an intangible.  You don't have an object you
10 can set on a table or show your friends.  What you do
11 have is our promise to provide protection and give
12 excellent service.
13    Q    And part of that service is the claim
14 service?
15    A    Yes, sir.
16    Q    And to be treated like a good neighbor?
17    A    Yes, sir.
18    Q    I'm going to try to keep these in some order.
19    A    Do you need these back?
20    Q    Well, unless you need them, any time you need
21 them, let me know.  There is 90 of them so far, and
22 there is going to be more eventually, so...
23    A    Okay.
24 (Whereupon, a discussion ensued off the record.)
25    Q    (By Mr. Burge)  The standards in these

Page 37

1    guidelines and principles that you followed, are -- or
2    that we've been discussing, did you follow these back
3    in 2005?
4        A    Yes, I did.
5        Q    They're just as applicable at that period of
6    time as they are today?
7        A    Yes, sir.
8        Q    At some point in time, you became involved in
9    handling three claims made by Martin Long; is that
10   true?
11       A    Yes, sir.
12       Q    Two of those claims were made under his
13   automobile policy, correct?
14       A    Correct.
15       Q    One of those claims involved a property
16   damage to a Mustang caused by a gunshot; is that right?
17       A    Correct.
18       Q    And in that particular Mustang claim,
19   Mr. Long was asking that State Farm honor its promise
20   to pay for property damage?
21       A    To the Mustang, yes, sir.
22       Q    Right.  And he wanted them to pay under the
23   policy for repairs that were made to the Mustang?
24       A    For damages to the Mustang.
25       Q    For damages to the Mustang?

Page 38

1        A    Yes, sir.
2        Q    And another claim under the automobile
3    policy, he wanted -- he made a claim for State Farm to
4    pay the fair market value for a Corvette; is that
5    right?
6        A    He made a claim for theft of that Corvette.
7        Q    Right.  And he wanted -- and he asked for
8    State Farm to pay the -- for the car?
9        A    As a result of that theft, yes, sir.
10       Q    Right.  And then in a homeowner's claim, he
11   asked State Farm to pay for the loss of contents of the
12   Corvette when it was stolen?
13       A    When you say "of the Corvette," he asked for
14   contents within the Corvette.
15       Q    Okay.  That's a better preposition?
16       A    You say "of."  I didn't know if you meant --
17       Q    Okay.
18       A    -- contents as part of the Corvette or --
19       Q    No.  That's a good point.  He was asking for
20   State Farm to pay for any personal property contents
21   that he had in the Corvette when it was stolen that
22   were not in there when it was recovered?
23            MR. NEWMAN:  Object to the form of the
24   question.
25       Q    (By Mr. Burge)  Is that right?

Page 39

1        A    Contents that he -- he asked us to pay for
2    contents that he claimed were in the vehicle.
3        Q    Right.
4        A    At the time of the alleged theft, yes, sir.
5        Q    Right.  And he made that under the
6    homeowner's policy?
7        A    Yes, sir.
8        Q    And you handled all those three claims?
9        A    Yes, sir.
10       Q    And you handled them under this special
11   investigations unit?
12       A    I was in the special investigative unit at
13   the time, yes, sir.
14       Q    Explain to me what the special investigation
15   unit is and how it is different than just the regular
16   claim department.
17       A    Well, I handle claims just like the regular
18   claim department.  My title is claim representative,
19   just like -- the one major difference is that we -- we
20   go out and try to put the public on notice of insurance
21   fraud.  We do presentations, which I've done to the
22   public, and put them on notice.  We assist our other
23   internal customers, which would be other fellow claim
24   reps.  We assist them in recognition of -- of
25   indicators and claims that may warrant further

Page 40

1    investigation.  We -- I would say in SIU, when we get a
2    claim, we have the opportunity to more thoroughly
3    evaluate the claim as far as we -- we don't have the
4    volume of other claim reps, so we have more opportunity
5    to investigate the claim.
6        Q    Is there any other difference?
7        A    Not that I can -- no, sir.
8        Q    Do you know whether more claims that are
9    handled by the SIU on a percentage basis are denied for
10   fraud reasons than claims that are handled by the
11   regular claim department?
12       A    I'm not sure because I'm not sure what claims
13   are denied by the regular line unit.
14       Q    Okay.  What percentage of claims do you deny?
15       A    I don't have a percentage, but I can tell you
16   I pay -- the large majority of all the claims I'm
17   involved in, I pay.
18       Q    More than 90 percent?
19       A    I would say that's accurate.
20       Q    The compensation that you receive as a claims
21   representative in the SIU unit, is that more than you
22   were receiving when you were just in the regular claim
23   department?
24            MR. NEWMAN:  Object to the form of the
25   question, unless you factor in time and

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 41

1  grade, and that type of thing.
2      Go ahead and answer it, if you can.
3      THE WITNESS: Yes, sir, because I've
4  received periodic raises throughout there.
5  And it's my understanding that I would have
6  received those whether I was in a line unit
7  or in SIU on the same scale. I'm still
8  within the same pay scale as the regular
9  claim reps.
10     Q   (By Mr. Burge) The people that you started
11  with in January of 1990, assuming all things equal,
12  except for the fact that you're in the SIU and let's
13  say they've never done any SIU work, would be earning
14  the same thing, is your understanding; is that right?
15     A   Yes, sir.
16     Q   Do you receive supervisor evaluations from
17  time to time that affect your pay grade or bonuses?
18     A   Yes, sir.
19     Q   Are you evaluated based on the number of
20  claims that you handled?
21     A   I'm going to say no. No.
22     Q   Are you evaluated on the speed with which you
23  handle claims?
24     A   No, sir.
25     Q   Are you evaluated on how well you document

Page 42

1  your claim handling?
2      A   I would say yes because they do -- my boss
3  does file reviews, so I assume he looks at what I'm
4  documenting, but I can't answer. That's something you
5  need to take up with Mr. Nix.
6      Q   Are you evaluated on whether you recommend to
7  pay a claim or to deny a claim?
8      A   Never.
9      Q   Do you know what factors go into your
10  bonuses?
11     A   We -- my boss and I sit down and we go over
12  what's called an employee performance rating, correct.
13     Q   Do you know whether the SIU claims reps get
14  higher bonuses or -- than people in the regular claim
15  department?
16     A   I have no idea. I've never given any of my
17  bonus information to anyone. And I've never asked
18  anyone else.
19     Q   Have your bonuses been higher since you've
20  been in the SIU unit than they were before?
21     A   I never got bonuses when I was in the line
22  units because it's changed. At that time, we had cost
23  of living adjustments. They've done away with that
24  now.
25     Q   You mentioned that -- that part of your job

Page 43

1  in the SIU unit is to educate other State Farm claims
2  representatives about fraud indicators.
3      A   Yes, sir.
4      Q   Would you list for me the fraud indicators
5  that you educate them about?
6      A   I can't list them all. I can give you some
7  examples that they --
8      Q   Well, if you can give me as many as you can
9  think of.
10     A   P.O. box for an address, loss on new
11  business, claims frequency, insured is experiencing
12  financial problems, current marital problems, an
13  insured vehicle is stolen, recovered within a short
14  duration of time after theft allegedly occurred,
15  insured vehicle is not compatible with the insured's
16  income, insured vehicle has a history of salvage,
17  meaning it's rendered as salvage prior to this.
18     Q   Explain that one, sorry.
19     A   Let's say the vehicle has been rendered as
20  totaled before and then now it's a rebuilt salvage.
21  Insured vehicle is stolen, recovered within a short
22  duration of time, burned, loss occurs at night, there's
23  no evidence of any forced entry or damage to the
24  steering column or ignition. Insured goes to an
25  agent's office as walk-in business, never had any other

Page 44

1  business there before. Insured claims expensive
2  contents in their vehicle. Insured is aggressive or
3  overly pushy for a quick settlement. Insured may have
4  a large knowledge of insurance terminology that the
5  normal person wouldn't have. Insured has a leased
6  vehicle and he's over his mileage limitation. Insured
7  has had a history of prior injuries. Insured's policy,
8  he receives notice of cancellation just prior to filing
9  his claim. Insured vehicle is an older vehicle with
10  low mileage. Insured has had a history of mechanical
11  problems.
12     Q   With his vehicle?
13     A   With his vehicle. Insured is unemployed.
14  That's all I can recall at the time.
15     Q   Okay. We've been going for one hour. Each
16  hour I will give you --
17         MR. BURGE: -- or you when it's your
18  turn --
19     Q   (By Mr. Burge) -- the opportunity, or your
20  lawyer or the court reporter, anyone who wants to take
21  a break.
22         MR. BURGE: Does anyone want to take a
23  break now?
24         MR. NEWMAN: I do. Thank you.
25         MR. BURGE: Okay.

11 (Pages 41 to 44)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 45

1    THE WITNESS: Thanks.

2    (Whereupon, there was a brief recess.)

3    Q   (By Mr. Burge) Mr. Smith, these indicators
4    that you've talked about, where did you get these
5    indicators that you trained others about?

6    A   From the National Insurance Crime Bureau.

7    Q   Do you know where they get it from?

8    A   I have no idea.

9    Q   Is there a reason that a person using a post
10   office box would draw suspicion that you know of?

11   A   The only thing I can think of is they just
12   didn't want to give a -- an exact physical address for
13   someone to track them down.

14   Q   Oh, okay.

15   A   I'm not sure.

16   Q   And a loss on new business; so if I buy a new
17   car, is that new business even if I'm a long-time
18   customer with State Farm?

19   A   If you add that policy, yes, sir.

20   Q   And if my car is stolen in the first month,
21   that's a loss on new business?

22   A   Yes, sir.

23   Q   So that attracts suspicion under the
24   indicators?

25   A   Actually, that would be -- that would show up

## Page 46

1    under your coverages. It would give a policy inception
2    date, and it would show loss on new business, policy
3    inception date.

4    Q   It would kick it out and say this is
5    suspicious under the computer?

6    A   No.

7    MR. NEWMAN: Object to the form of the
8    question.

9    Q   (By Mr. Burge) Okay. I must have
10   misunderstood.

11   A   It will show -- when you -- when a claim is
12   filed, and I look at the coverages on the claim, it
13   will show, below the coverages, the policy inception
14   date. And if it's loss on new business, it will show
15   loss on new business.

16   Q   And if I've owned the car for six months, is
17   it still a loss on new business?

18   A   I think it will still, at six months -- I'm
19   not exactly sure, but I think it will still show you a
20   loss on new business, but I'm not sure.

21   Q   What qualifies as financial problems?

22   A   I mean, if someone is behind on their
23   payments of their vehicle or their mortgage or they've
24   gone through -- they've had a history of a bankruptcy
25   maybe or had liens filed against them or could be

## Page 47

1    behind on other utility bills, could -- what -- what
2    could be financial hardship on me may not be on another
3    person, so I can't list all of them. I don't really
4    know.

5    Q   So financial problems is going to vary from
6    person to person. What qualifies?

7    A   Some people don't -- don't have financial
8    problems. I'm sure you attorneys make a lot of money,
9    you-all probably don't.

10   Q   It varies from person to person?

11   A   I would say yes, sir.

12   Q   And if a person is paid up on their mortgage,
13   have their credit cards paid up to date, have their
14   cars paid for yet are disabled and live on a fixed
15   income, would that qualify potentially as financial
16   problems under your definition?

17   A   Well, if they can't buy groceries and
18   gasoline and pay their car insurance and other -- I
19   mean, it just depends on what other bills they have. I
20   can't really give you a definite answer on that.

21   Q   Okay. What qualifies as marital problems?

22   A   Separated or divorced.

23   Q   Okay. If it's amicable, the parties have
24   agreed but the divorce is not final, would that still
25   qualify under the State Farm definition of marital

## Page 48

1    problems?

2    A   Well, State Farm I don't think has a
3    definition of marital problems. I think that comes
4    from the National Insurance Crime Bureau. And to tell
5    you the truth, I've never really had marital problems,
6    so I don't know.

7    Q   So you don't know how the marital problem
8    indicator that you teach other State Farm claims reps,
9    what the boundaries of it are?

10   A   It's just a recognition if they're going
11   through a divorce or separation.

12   Q   But you recognize, of course, that some
13   people going through divorce have agreed to all of the
14   terms?

15   A   My parents are divorced.

16   Q   Okay. And -- and leave without really any
17   animosity, that they agree to the terms and they go
18   forward?

19   A   Like I said, I've never been through a
20   divorce, so I'm not really sure. I know my -- my --
21   that was not the case when my parents divorced.

22   Q   When you say it's an indicator of fraud or
23   suspicion when a vehicle is recovered quickly, how
24   quickly does a vehicle need to be recovered to fall
25   within that indicator?

12 (Pages 45 to 48)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 49

1    A   It just says within a short duration of time.
2    It does not give you any specifics.
3    Q   A vehicle not compatible with a person's
4    income; would that be like a person who makes $30,000 a
5    year driving a hundred-thousand-dollar car?
6    A   That's probably safe to say.  It could be a
7    person of my income trying to buy that same car.
8    Q   What about the -- what if the car is paid
9    off, it's paid for; does it still fall within that
10   indicator?
11   A   See, it doesn't give you specifics on the
12   indicators right there, so I can't really answer that.
13   Q   With your criminal investigations background,
14   did you learn whether most crimes occur during the day
15   or whether most crimes occur at night?
16   A   They weren't very specific that I would --
17   just from common-sense-wise, I would tell you I would
18   think most occur at night.
19   Q   What are the insurance terms that a person
20   has knowledge of that you wouldn't expect an ordinary,
21   you know, adult to know?
22   A   Well, if someone has been involved in a -- a
23   prior claim, and let's say they -- they advise you up
24   front that, hey, I know you're going to send me a -- an
25   affidavit, let's say, for me to complete; and that

## Page 50

1    might draw your attention to, well, I hadn't even got
2    to that point with you, for example.  Or some people
3    are -- are very knowledgeable about the -- the
4    provisions of their policy that, let's face it, most
5    people don't memorize their policy.
6    Q   You say when a person is unemployed, that's
7    one of the indicators?
8    A   Yes, sir.
9    Q   What if a person is disabled, they're not
10   working, they're disabled from working due to a
11   military disability, due to an -- an on-the-job injury
12   that resulted in disability, or a combination?
13   A   That indicator doesn't distinguish that.  It
14   just says unemployed.
15   Q   Okay.  So is it fair to say that you teach
16   other State Farm employees about these indicators to
17   let them know when claims should be referred to SIU,
18   but you didn't write these indicators?
19   MR. NEWMAN:  Object to the form of the
20   question.
21   THE WITNESS:  I disagree with that.
22   I -- I tell them just to -- where to find
23   these indicators, through NICB; and that just
24   because a claim has indicators present
25   doesn't mean that it's one that needs to be

## Page 51

1    referred to SIU.  It could mean that this
2    claim just needs to be looked at a little
3    closer.
4    Q   (By Mr. Burge)  Are these indicators
5    sometimes referred to in your industry as red flags?
6    A   Used to be, my knowledge.
7    Q   In 2005, were they being referred to at State
8    Farm as red flags?
9    A   I think your agents, some of our agents still
10   may use that terminology, but I try not to use that.
11   (WHEREUPON, Exhibit No. 5 was marked for
12   identification.)
13   Q   (By Mr. Burge)  Okay.  Let me show you what's
14   marked as Exhibit 5.  Have you seen that document
15   before?
16   A   Yes, I've seen this.
17   Q   And that is where SIU is first being -- or
18   the red flags or indicators are first mentioned related
19   to any of Martin Long's claims, true?
20   MR. NEWMAN:  Do you have a claim file
21   here?  I mean, if you --
22   THE WITNESS:  I would have to look at
23   the claim file, if you don't mind.
24   MR. NEWMAN:  If you're going to ask him
25   was that the first time, it may -- I don't

## Page 52

1    mind, Tucker, if you want to ask him is that
2    a time in which it was, you know, but the
3    first time is -- is hard for him --
4    THE WITNESS:  I mean, I can't say if
5    this is the first time.  This appears to be
6    an email, but it clearly says there are red
7    flags on this one.
8    Q   (By Mr. Burge)  And one of the red flags it
9    says is this is new business?
10   A   It says loss on new business.
11   Q   And they mention that Mr. Long wanted to
12   secure insurance on the car either right before or
13   right after he purchased it?
14   A   It says agent staff person advised the
15   insured wanted to secure insurance in haste.
16   Q   Is it reasonable, based on your experience in
17   the insurance industry, to want to have insurance on
18   the car right as soon as they buy it?
19   A   I would say they better.
20   Q   Another red flag is that he parked in view of
21   security cameras at the hotel where his car was stolen?
22   A   I don't think that that's an indicator I have
23   ever seen that I can recall, but I can -- apparently
24   that was a question they had.
25   Q   It was what they listed as a red flag, but

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

Page 53

1  it's not something that you taught; right?
2     A    Something I've what?
3     Q    You've taught others as indicators.
4     A    That's not a specific indicator that I can
5  recall that NICB produces.
6     Q    Is it reasonable to park a car in view of a
7  security camera?
8     A    Some people may choose to do that, some
9  people may choose not to. I'm not...
10    Q    It's certainly not unreasonable to park in
11 view of a security camera, is it?
12    A    No. You go to certain businesses, they have
13 them throughout their parking lot, so you can't avoid
14 it.
15    Q    But cars can be stolen despite security
16 cameras?
17    A    I would say yes, sir.
18    Q    Later on in the document, you-all -- you talk
19 to Ram, the manager at the Country Hearth Inn. And he
20 told you that despite security cameras at the Wal-Mart,
21 cars were being stolen from there, which is right
22 across the street from where this hotel was?
23    A    I would need to look at that -- that
24 statement.
25    Q    Okay. We'll do it.

Page 54

1     A    Okay. Thank you.
2     Q    Another red flag indicated on there is that
3  no police report was filed?
4     A    Correct.
5     Q    Is that true, that no police report was
6  filed?
7     A    No, that is not correct.
8     Q    Okay. And the last indicator is that he's
9  going through a divorce?
10    A    Correct.
11    Q    What is the date of that email?
12    A    Let's see. It looks like Tuesday, February
13 22nd, 2005.
14    Q    And what is the time of it?
15    A    About 9:40 a.m.
16 (WHEREUPON, Exhibit No. 6 was marked for
17 identification.)
18    Q    (By Mr. Burge) By 3 o'clock that afternoon,
19 showing you Exhibit 6, were all of the --
20    A    Can I see that one more time, please, sir?
21    Q    (Indicating).
22    A    Can I keep that for a second and look at it?
23    Q    Sure.
24    A    Okay, I'm sorry.
25    Q    By 3 o'clock that same afternoon, was a

Page 55

1  recommendation made that all three claims be assigned
2  to SIU?
3     A    Yes, it looks like we received a -- a
4  recommendation.
5     Q    And you have seen that recommendation which
6  is Exhibit 6 before, true?
7     A    Yes, I have.
8  (WHEREUPON, Exhibit No. 7 was marked for
9  identification.)
10    Q    (By Mr. Burge) And have you seen Exhibit 7
11 before?
12    A    Yes, I have.
13    Q    And that's the document in which all three
14 claims were formally assigned to SIU?
15    A    Yes.
16    Q    And you were designated as the person who
17 would be handling the claims?
18    A    Yes.
19    Q    And each of those claims has a different
20 claim number?
21    A    That's correct.
22    Q    And that just tells you that -- that I'm
23 dealing with three separate claims, right?
24    A    Three separate policies.
25    Q    Right. And you know that there are claims

Page 56

1  made under three separate policies, right?
2     A    There are claims made under three separate
3  policies, yes, sir.
4     Q    And you know from the first page of your
5  claim manual and your policies at State Farm that each
6  claim will be decided on its own merits, true?
7     A    Each loss, correct.
8     Q    Okay. And that would be the -- the first
9  loss would be the February 13th, 2005 loss relating to
10 the property damage to the Mustang, right,
11 chronologically?
12    A    I believe with -- without looking at the
13 claim, I believe that is the --
14    Q    Okay.
15    A    -- correct for the Mustang.
16    Q    And then there is the claim for the theft of
17 the Corvette under the automobile policy, correct?
18    MR. NEWMAN:  What's the question?
19    MR. BURGE:  That's the second.
20    MR. NEWMAN:  That a claim was made
21 on --
22    MR. BURGE:  Right.
23    MR. NEWMAN:  A claim was made on the
24 automobile policy?
25    MR. BURGE:  Right.

14 (Pages 53 to 56)

## Page 57

1  THE WITNESS: There was a claim made on
2  the automobile policy, correct.
3  Q  (By Mr. Burge)  Okay.  For the theft of the
4  car?
5  A  Correct.
6  Q  And then there was a claim made for the
7  personal property inside the car at the time of the
8  theft of the Corvette under the homeowner's policy,
9  right?
10  A  Correct.  There was a -- claim made for
11  contents stolen in connection with the alleged theft of
12  the Corvette.
13  Q  And those are the three claims that were sent
14  to you to be handled?
15  A  Correct.
16  Q  Now, are you handling all of these claims
17  sort of simultaneously at one point?
18  A  You're talking about in the same time of year
19  and month and everything, yes, sir.
20  Q  Okay.  What I want to do is, is to break them
21  out, okay?  And I think the easiest way to do it for me
22  is chronologically.  Is that okay with you?
23  A  That's fine.  You're asking the questions.
24  Q  Okay.  I'll take those and put them back in
25  order, so we'll be able to look...

## Page 58

1  (WHEREUPON, Exhibit No. 8 was marked for
2  identification.)
3  Q  (By Mr. Burge)  When a claim is referred to
4  SIU, is there generally a claim referral document of
5  some kind?  And let me show you Exhibit 8.
6  A  The majority of the time, from my experience,
7  we do get an auto fire claim referral to SIU, correct.
8  Q  And does that document generally tell you the
9  reason why that claim is being referred to SIU?
10  A  My experience, these -- these documents, a
11  majority of the time will list questions or factors
12  involved.
13  Q  Now, Exhibit 8 relates to the loss of
14  2/13/05, which is claim number 01-6596-758, correct?
15  A  That is a correct claim number and a date of
16  loss of 2/13/05 per this referral.
17  Q  And what was the reason given for referring
18  that claim to SIU?
19  A  You want me to read the brief facts?
20  Q  Just what you understand the reason to be
21  that that one was referred to SIU.
22  A  It looks like the insured was involved in
23  a -- a gun fight.  And in addition, it says "insured is
24  unemployed and based on the claim history."  May I see
25  that just for a moment, please.

## Page 59

1  Q  Under "reasons for referring," what does it
2  say?
3  A  "Insured is unemployed and claim history."
4  Q  Did you understand that ultimately that
5  Mr. Long is disabled from working?
6  A  Yes.
7  Q  But there's no distinction made between
8  disabled and unemployed, I believe you said?
9  A  Not that I can recall.
10  Q  When you get a claim in at State Farm, is
11  there a service record that needs to be generated?
12  A  Yes, an auto claim service record will be
13  generated.
14  Q  Is that where all the activity on the file is
15  supposed to be recorded?
16  A  A summary of the activity, yes, sir.
17  Q  And that's done in each and every file?
18  A  Yes, sir.
19  Q  And if something was done on a claim, there
20  should be some reference to it in the auto claim
21  service record?
22  MR. NEWMAN: Object to the form of the
23  question.
24  THE WITNESS: I disagree with that.
25  Q  (By Mr. Burge)  Okay.  Why do you disagree

## Page 60

1  with that?  Are there things that State Farm does that
2  are documented?
3  A  There are things that I do and I think all
4  claim reps do.  I think a lot about claims.  I use my
5  thought process on thinking about what took place on
6  this claim, and I -- and I look at the facts and
7  indicators.  And I can't put down my every thought
8  process, and I don't in a claim.
9  Q  In terms of actions, not thoughts, but
10  actions by a claims representative, such as attempting
11  to contact an individual or speaking to an individual
12  or taking a statement from an individual or canceling a
13  policy or refunding premiums or anything that might be
14  done like that, an actual action, is that documented in
15  the service record?
16  A  Most of the time, yes, sir.
17  Q  Based on your training, is it supposed to be
18  documented?
19  A  Based on my training, the activity log is
20  used for a summary of -- of what you -- you're doing in
21  the claim.
22  Q  And are you trained that when you do
23  something on a claim, you're supposed to log it in?
24  A  Getting back -- once again, if I'm looking at
25  a scenario, I'm not required to put that in a claim

## Page 61

1  file. If I'm evaluating a claim in my mind, I'm not
2  going to put that in a claim file.
3    Q   But --
4    A   But from your question as far as actions go,
5  I would say the majority of the time, yes, sir.
6    Q   Okay. And how do you know to put your
7  actions in the service record? Is that based on your
8  training?
9    A   Based on prior claim handling experience.
10   Q   And it's so people who come behind you and
11 want to look at this claim will know what was done?
12   A   That's safe to say, yes, sir.
13 (WHEREUPON, Exhibit No. 9 was marked for
14 identification.)
15   Q   (By Mr. Burge) Is Exhibit 9 a copy of the
16 claim service record for the gunshot damage to the
17 Mustang?
18   A   Can I look at it?
19   Q   Sure.
20   A   Yes, sir, this is the auto claim service
21 record for the Mustang.
22   Q   And it shows what you did and what conclusion
23 you ultimately reached?
24   A   Yes, sir.
25   Q   As part of the process of handling a claim

## Page 62

1  like this, do you try to document the damage to the
2  vehicle both by getting a repair estimate or appraisal
3  and by getting photographs of the damage?
4    A   It looks like the repair estimate and the
5  photos were secured prior to my involvement.
6    Q   Okay. And that's just normal claims
7  handling?
8    A   Evaluating the claim?
9    Q   Right.
10   A   Yes, sir.
11 (WHEREUPON, Exhibit No. 10 and Exhibit No. 11 were
12 marked for identification.)
13   Q   (By Mr. Burge) And 10 and 11 show the damage
14 report and the photographs?
15   A   Yes, sir.
16   Q   Do you secure police records when they're
17 available?
18   A   Yes, sir.
19 (WHEREUPON, Exhibit No. 12 was marked for
20 identification.)
21   Q   (By Mr. Burge) Is Exhibit 12 a -- a copy of
22 the incident report relating to that shooting that was
23 secured for that file by State Farm?
24   A   Yes, sir, this appears to be the police
25 report.

## Page 63

1    Q   And on the first page, does it show Martin
2  Long as the victim?
3    A   Yes, sir.
4    Q   What is a property loss preliminary report?
5    A   It is a report that I would -- I would
6  normally complete within a 10 to 15-day period that I
7  send to my team manager.
8  (WHEREUPON, Exhibit No. 13 was marked for
9  identification.)
10   Q   (By Mr. Burge) And is Exhibit 13 a copy of
11 the preliminary report you did for this claim relating
12 to the Mustang?
13   A   Yes, sir.
14   Q   Did you recommend that that claim be paid?
15   A   This claim was paid prior to my involvement,
16 a draft was issued.
17   Q   And a draft was stopped, correct?
18   A   Correct.
19 (WHEREUPON, Exhibit No. 14 was marked for
20 identification.)
21   Q   (By Mr. Burge) And then you authorized
22 payment as shown by Exhibit 14, true?
23   A   True, yes, sir.
24   Q   So you authorized the payment of this claim?
25   A   Well, the payment was authorized prior to my

## Page 64

1  involvement, and Mr. Long indicated he had never
2  received his payment; so as a result, when I met with
3  Mr. Long, I -- I stop payment at that moment and
4  reissued him another draft.
5    Q   Are you saying that you made no determination
6  regarding whether or not this claim was due to be paid?
7    A   I felt like looking at the claim that it was
8  a claim that should have been paid.
9    Q   Despite the fact that he was unemployed?
10   A   Despite the fact that he was unemployed, yes,
11 sir.
12   Q   Despite the fact that he had made other
13 claims relating to vehicle theft on 2/19/05?
14   MR. NEWMAN: Object to the form of the
15 question.
16   THE WITNESS: Repeat that question, I'm
17 sorry.
18   Q   (By Mr. Burge) You recommended that it be
19 paid and thought it was a claim that should be paid
20 despite the fact that he was not employed or the fact
21 that he had other claims that same month?
22   MR. NEWMAN: Same objection.
23   THE WITNESS: I saw nothing to warrant
24 me not issuing a -- or reissuing a draft that
25 had already been issued anyway.

Page 65

1    Q   (By Mr. Burge)  Because you thought it was a
2  claim that needed to be paid?
3    A   I saw nothing to warrant me reissuing another
4  draft to him, correct, yes, sir.
5        MR. NEWMAN:  You mean not reissuing
6  another draft, don't you?
7        THE WITNESS:  I saw nothing warranting
8  me not reissuing another draft.
9    Q   (By Mr. Burge)  You felt like that was the
10 appropriate thing to do --
11   A   Yes.
12   Q   -- based on the facts?
13   A   Yes, sir.
14   Q   Turning to the theft of the Corvette, is one
15 of the things that you had to do to determine whether
16 he even had insurance on the Corvette?
17   A   What's your question?
18   Q   Is one of the things that you had to do, as
19 part of your investigation of the theft of the Corvette
20 and the claim that he was making under the automobile
21 policy for the theft of the Corvette, is to determine
22 whether he actually had a policy that was in effect?
23   A   Correct, I -- I looked to see if he had
24 coverage in effect.
25 (WHEREUPON, Exhibit No. 15 was marked for

Page 66

1  identification.)
2    Q   (By Mr. Burge)  And do you recognize Exhibit
3  15 as being a copy of the declarations page that you
4  obtained?
5    A   Do you have the auto claim service record I
6  could look at?
7    Q   We'll get to that.  Did you not have a copy
8  of the dec page?
9    A   What I'd like to do is make sure it coincides
10 with the policy number on that claim, if you don't
11 mind.
12 (WHEREUPON, Exhibit No. 19 was marked for
13 identification.)
14   Q   (By Mr. Burge)  Let me show you Exhibit 19.
15 Is that the auto service claim record?
16   A   Yes, sir, that's the auto claim service
17 record.  And this declaration page appears to coincide
18 with the vehicle, the VIN number is the same, the
19 policy number appears to be the same.
20   Q   So you determined, during your investigation,
21 that he did have a policy in effect for the Corvette,
22 true?
23   A   Yes.
24   Q   And how much did he pay for that insurance
25 coverage for his Corvette?

Page 67

1    A   I'm not an agent, so I don't handle securing
2  premiums.  I'm not -- I can only give you what's on
3  this dec page, if that's --
4    Q   Okay.
5    A   If that's okay with you.
6    Q   That's fine.
7    A   Because I'm not an agent.  I don't -- and
8  this says "this is not a bill" on this, so I don't know
9  for sure, but this says total premium for this policy
10 period February 4th, 2005 to August 4th, 2005, $637.32.
11   Q   And did you determine that he had
12 comprehensive coverage?
13   A   Yes.
14   Q   And that's the coverage that would apply to
15 the value of a vehicle that is stolen?
16   A   Comprehensive coverage is available for
17 theft, yes.
18   Q   Okay.  Now, what a person has to pay can be
19 affected by a number of things, true?
20   A   That's my understanding, yes, sir.
21 (WHEREUPON, Exhibit No. 16 was marked for
22 identification.)
23   Q   (By Mr. Burge)  Okay.  And, in fact, on State
24 Farm's Web site you can see on Plaintiff's Exhibit 16,
25 is that something that State Farm advertises to the

Page 68

1  public as being various factors that can affect your
2  insurance premiums?
3    A   Yes, sir.
4    Q   In handling this claim, did you have to be
5  familiar with the policy language that was in the
6  automobile policy that was sold by State Farm to
7  Mr. Long?
8    A   Yes, sir.
9  (WHEREUPON, Exhibit No. 17 was marked for
10 identification.)
11   Q   (By Mr. Burge)  Is Exhibit 17 a copy of that
12 policy?  And I'll tell you it has been produced by
13 State Farm to me as being a copy of the policy.
14   A   Yes, sir, this appears to be a State Farm
15 Fire & Casualty policy.
16   Q   The type that was issued to this --
17   A   Car.
18   Q   To --
19   A   It's a fire and casualty policy for the car.
20 It's an auto policy.  It's form 9901.6 that -- and that
21 coincides with the fact that he has State Farm Fire &
22 Casualty.
23   Q   And just like with the Mustang claim, in this
24 one, there was an auto fire claim referral to SIU,
25 true?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 69

1    A   Yes, sir.
2    (WHEREUPON, Exhibit No. 18 was marked for
3    identification.)
4    Q   (By Mr. Burge) And Exhibit 18 is a copy of
5    that referral?
6    A   Is that a question?
7    Q   Yeah. That's true, isn't it?
8    A   Yes.
9    Q   When you got this claim, you paid a visit to
10   the hotel?
11   A   Yes, sir.
12   Q   Did you see cameras on the outside of the
13   building?
14   A   Yes, sir.
15   Q   Are there cameras that show the parking lot?
16   A   I did not see the actual camera itself, what
17   it viewed, so I can't say if it showed the parking lot.
18   Q   Are there cameras that appear to show the
19   parking lot?
20   A   There's cameras outside of the hotel.
21   Q   Okay.
22   A   I don't know the area that it's showing.
23   Q   Okay. Do you see where the blue tag is?
24   A   Yes, sir.
25   Q   And it mentions that when the claim was

Page 70

1    referred to SIU, hotel manager Ram had told State Farm
2    representatives that cars had been stolen from the
3    Wal-Mart across the street. Do you see that?
4    A   It says, "Ram has a friend who works at the
5    Wal-Mart across the street. His friend told him even
6    with 24/7 security, they continue to have cars stolen
7    from their parking lot."
8    Q   Did you do any investigation to determine how
9    many cars had been stolen from the Wal-Mart parking lot
10   during the time frame while you were investigating this
11   claim?
12   A   I spoke with a – if I recall correctly, I
13   spoke with a detective with the DeKalb County in their auto
14   theft unit and inquired about thefts in the area.
15   Q   And is there any record of that conversation
16   in Exhibit 19, the auto claim service record?
17   A   On February 28th, 2005, I spoke with a
18   detective Fitzpatrick with the DeKalb County PD.
19   Q   Okay. Do you mention any conversation that
20   you had with him concerning auto theft in that area
21   during the early part of 2005?
22   A   No, sir, this log does not reflect that
23   conversation.
24   Q   Did you get any information about the
25   statistics of auto thefts in DeKalb County for the

Page 71

1    12-month period before this incident with the Corvette
2    occurred?
3    A   No, sir.
4    Q   Did you do a property loss preliminary report
5    relating to the auto claim for the theft of the
6    Corvette?
7    A   Yes.
8    (WHEREUPON, Exhibit No. 20 was marked for
9    identification.)
10   Q   (By Mr. Burge) And is Exhibit 20 a copy of
11   that report?
12   A   Yes, sir.
13   Q   When the car was recovered, did you have an
14   opportunity to examine the car?
15   A   Yes, sir. Excuse me. Yes, sir.
16   Q   And on Exhibit 19, the service claim file,
17   did you note damage to the car in your notation of
18   March 1st?
19   A   Yes, sir.
20   Q   And what did you note?
21   A   The T-tops and the seats were missing, the
22   front center caps were missing, along with numerous lug
23   nuts, the ignition cylinder and column were damaged,
24   the vehicle had been rained in very heavily during the
25   past weekend.

Page 72

1    Q   When you discovered --
2    A   And, excuse me, I'm sorry. And there was no
3    tag on the vehicle.
4    Q   When you discovered --
5    MR. NEWMAN: Did you leave something
6    out? If you're reading it, you didn't read
7    this.
8    THE WITNESS: I'm sorry, "the exterior
9    of the insured vehicle and the engine
10   appeared to be okay. There was no tag on the
11   vehicle."
12   Q   (By Mr. Burge) When you find damage like
13   that, do you generally report it to the insured?
14   A   Do I usually tell the insured the condition
15   of the vehicle?
16   Q   Yeah, say, "We found your vehicle and I've
17   looked at it and this is what I saw"?
18   A   Yes, sir.
19   Q   And do you usually do that promptly?
20   A   Yes, sir.
21   Q   Do you recall if you did that promptly on
22   this occasion?
23   A   Yes, sir.
24   (Whereupon, there was a brief recess.)
25   Q   (By Mr. Burge) When did you tell Mr. Long

18 (Pages 69 to 72)

## Page 73

1  about the — what you saw in the car and the damage to
2  the car?
3      A   Shortly after the — the inspection of the
4  vehicle.
5      Q   So you called him later that day?
6      A   No, sir. I called him within the hour.
7      Q   Okay. On March 1st?
8      A   March 1st, yes, sir.
9      Q   Do you have some insureds whose claims you've
10  adjusted in the past who didn't want a car back that
11  had been badly damaged?
12     A   Yes, sir.
13     Q   Is that a rare thing?
14     A   I would say yes, sir, most people want their
15  vehicle back.
16     Q   Even -- even when they learn that it has been
17  severely damaged?
18     A   I guess we'd have to get into a definition of
19  what severely damaged is.
20     Q   But there are — Mr. Long was not the first
21  person that you ever dealt with who did not want to
22  have a car back that had been damaged in the way that
23  you described to him on March 1st?
24     A   I can't give you the — an answer directly to
25  that because you say in the way that it's damaged, and

## Page 74

1  so the way I'm interpreting your question is you're
2  saying exact damages? I can't recall having a vehicle
3  recovered with the exact damage and having the exact
4  vehicle.
5      Q   Have you had others in the past who did not
6  want a car back that had been severely damaged?
7      A   I've -- I've had claims that I can recall in
8  the past where the vehicle was totally burned and there
9  was nothing left but a shell, which is — no one wants
10  that.
11     Q   Other than that?
12         MR. NEWMAN:  Object to the form of the
13  question.
14         THE WITNESS:  I can't recall specific
15  claims, but I would — probably. I just — I
16  can't recall.
17     Q   (By Mr. Burge)  You don't recall any other
18  claims, do you, where — well, let me ask you this way:
19  Do you recall any claims where a car has been stripped
20  before?
21     A   I don't recall specific claims; but, yes, I
22  have been involved with vehicles that have been
23  stripped, yes, sir.
24     Q   And have you had cars that were stripped and
25  damaged by weather when they were recovered?

## Page 75

1      A   I've handled a large number of vehicles that
2  have been damaged by weather. When I was on the
3  catastrophe team, I handled flood claims, and these
4  vehicles were totally submerged in water, so, yes, sir.
5      Q   Have you handled a number of claims in
6  Atlanta where cars have been stolen and recovered in a
7  state where they were stripped?
8      A   Once again, I can't recall specifics of
9  claims; but, yes, I have handled some claims where they
10  involved the vehicle being recovered and — and
11  stripped.
12     Q   Here in the Atlanta metropolitan area?
13     A   Yes, sir. I can't recall specifically, but I
14  would say that's fair to say.
15     Q   On your preliminary report, you note some
16  reasons why the claim was referred to SIU?
17     A   Can I see that?
18         Yes, sir.
19     Q   And the first one listed is that prior to the
20  claim, the insured recently filed a claim under number
21  01-6596-758, whereas he was involved in an exchange of
22  gun fire with another person?
23     A   Yes, sir.
24     Q   And that's the claim we just talked about
25  earlier?

## Page 76

1      A   We did talk about a claim involving the
2  Mustang earlier.
3      Q   Okay.
4      A   Yes, sir.
5      Q   And that was the one you took was due to be
6  paid and was paid?
7      A   It was paid, yes, sir.
8      Q   Number 2 is that the insured is unemployed.
9  And do you know whether he was unemployed at the time
10  this policy was sold to him?
11     A   Can you repeat your question again, please,
12  sir.
13     Q   Number 2, the second reason for it being
14  referred to SIU is that he is unemployed, right?
15     A   That's what it says, yes, sir.
16     Q   Was he unemployed when State Farm sold him
17  the automobile policy for his Corvette?
18     A   I'm not sure.
19     Q   Did you check to find out at any point during
20  your investigation?
21     A   I questioned Mr. Long, if I recall correctly,
22  how long he had been unemployed. And if memory serves
23  me correctly, I would have to look at his recorded
24  statement; but if memory serves me correctly, it was
25  prior to the date of the policy issuance.

Page 77

1    Q    State Farm will sell insurance to unemployed
2    people, won't it?
3        A    I hope so.
4        Q    And they will sell insurance to disabled
5    people too, won't they?
6        A    I hope so.
7        Q    Number 3 relates to the homeowner claim, that
8    he made a claim under the homeowner's for expensive
9    items in the vehicle and that that claim was also
10    pending with you?
11        A    Yes, sir.
12        Q    Okay. We'll talk about that claim after a
13    bit. Number 4 relates to the high frequency of claims
14    recently.
15            What are the -- are we talking about the
16    Mustang claim, the theft of the car under the auto
17    policy and the theft of the contents under the
18    homeowner's policy?
19        A    Correct.
20        Q    Number 5 --
21        A    Can I see that for a second?
22        Q    Yeah.
23        A    I just want to make sure and read it before
24    you said number 4 and I hand't had an opportunity to.
25    Okay.

Page 78

1        Q    5 talks about him being disabled from the
2    Army as a reason and having settled a recent
3    compensation claim against the railroad.
4        A    Correct.
5        Q    Is a disability one of the indicators or red
6    flags under the NICB?
7        A    I can't recall if a military disability is.
8        Q    Is an on-the-job disability in which a
9    compensation case has recently been resolved an
10    indicator?
11        A    I think it -- being disabled -- or disability
12    and/or prior history of Worker's Comp. claims, I
13    believe they are, but I -- I'm not sure.
14        Q    Okay. And number 6 is the loss of new
15    business. And you explained that earlier, that it was
16    recently purchased so it's new business?
17        A    Yes, sir.
18        Q    Okay. 7 is marital problems, and you told us
19    about that being an indicator before?
20        A    Yes, sir.
21        Q    The next one is is the inability to produce
22    all of the keys to the vehicle?
23        A    Yes, sir.
24        Q    And the last one is that claim central
25    indicated that there was a delay in reporting the

Page 79

1    vehicle to the police?
2        A    Yes, sir.
3        Q    Is that true; did that turn out to be true?
4        A    Only from my recollection, only partially.
5        Q    He reported the loss to the police that
6    morning?
7        A    He --
8        Q    Or the morning of the 19th?
9        A    From what I recall, no, sir.
10        Q    He did not report it to the police that
11    morning?
12        A    No, sir.
13        Q    When did he report it?
14        A    From what I recall correctly, Mr. Long had a
15    friend report it for him to the police.
16        Q    The loss was reported to the police that
17    morning?
18        A    That morning, yes, sir.
19        Q    Okay.
20        A    A partial amount of the loss.
21        Q    That being the stolen car?
22        A    The stolen car was reported, yes, sir.
23        Q    And that's what you were handling under the
24    auto claim policy?
25        A    Can you be more specific? I'm sorry.

Page 80

1        Q    You were handling the stolen part of the
2    claim under the auto claim policy?
3        A    Yes, sir.
4        Q    Does it matter who dials the phone or speaks
5    to the police to State Farm when a car is stolen?
6        A    I -- I would say no.
7            Can I add something to that?
8        Q    You can add anything you want.
9        A    What matters to me is who says they report
10    the vehicle stolen.
11        Q    If I go outside to the parking lot and my car
12    is not there and I report it to my insurance company,
13    and I report it to the police; but in reporting it to
14    the police, I have someone, like the receptionist here,
15    this office complex where we are, say I'm going to call
16    the insurance company, I want you to call the police,
17    and then later I say that I -- I called the police and
18    it turns out I was wrong, would that be a reason to
19    deny the claim under your training?
20        A    Well, there's a couple of factors. One is I
21    don't know, in your scenario, who you're insured with,
22    so I don't know their procedure.
23        Q    If I say I'm insured by State Farm and you're
24    handling my claim, and I say I called the police and
25    you find out that someone other than me called the

Page 81

1  police to report the theft, do you deny that claim
2  based on that?
3      A   I question why you told me something
4  different.
5      Q   You question it, but do you deny the claim on
6  that basis?
7      A   I do not --
8          MR. NEWMAN:  Object to the form of the
9      question.  There are not enough facts
10     given.
11     Q   (By Mr. Burge)  Do you recommend that the
12  claim be denied on that basis, based on who called?
13         MR. NEWMAN:  Same objection, not enough
14     facts.
15     Q   (By Mr. Burge)  You can answer.
16     A   I look at the totality of the claim and the
17  facts and make my recommendation based on that.
18     Q   Have you ever made a claim or a
19  recommendation that a claim be denied based solely on
20  who called the police?
21     A   I can't recall specifics of other claims, so
22  I can't give you an exact answer on that.
23     Q   You may have; you may not.  I just don't
24  know.
25     A   I just don't recall.

Page 82

1      Q   Eventually, there was a claim committee
2  report generated based on your recommendations and a
3  claim committee meeting and the recommendations of your
4  section manager?
5      A   Let me -- can I look at that?
6  (WHEREUPON, Exhibit No. 21 was marked for
7  identification.)
8      Q   (By Mr. Burge)  Well, have you ever seen the
9  auto claim committee report, which is Exhibit 21?  The
10  question is have you ever seen it?
11     A   Can I look through it?
12     Q   Sure.
13     A   Okay.  Thank you.  Yes, sir.  This is an auto
14  claim committee report.
15     Q   The question is not whether it is; it's
16  whether you've ever seen that one, Exhibit 21.
17     A   This one, yes, sir.
18     Q   Okay.  Was there something on the last page
19  that told you that you had seen it before?
20     A   No.  I wanted to make sure and -- that there
21  were no pages deleted, and I also wanted to make sure
22  that there wasn't something added that should not be in
23  there.  That's why I reviewed the document.
24     Q   And what you see under Exhibit 21 is a full
25  copy of what you have seen in the past on this claim?

Page 83

1      A   Yes, sir, it appears to be.
2      Q   And this was after you had done your entire
3  investigation; is that right?
4      A   Yes, sir, as I can recall.
5      Q   When did the Corvette leave the Country
6  Hearth Inn in Lithonia, Georgia's parking lot?
7      A   I can't give you an answer to that, sir.
8      Q   How many people were involved in taking the
9  car from the Country Hearth Inn parking lot?
10     A   I can't give you an answer to that.
11     Q   Can you tell me who specifically took the car
12  from the Country Hearth Inn parking lot?
13     A   I can't tell you a specific person.  The only
14  thing I can tell you is that whoever last drove that
15  car had a specific key to that car.
16     Q   Can you tell us whether the car was driven
17  out of that parking lot or whether it was towed out of
18  the parking lot?
19     A   I can tell you based on my investigation that
20  whoever last drove that car and removed it from the
21  parking lot had a key to it, and that is -- the facts
22  supporting the claim are not conducive with towing that
23  vehicle.
24     Q   So is it your belief that the car had to have
25  been -- is the answer to my question that the car was

Page 84

1  driven out of the parking lot as opposed to being towed
2  out of the parking lot?
3      A   That is, yes, sir.
4      Q   Do you know which way the car turned?
5      A   No, sir.
6      Q   Do you know where it was stripped?
7      A   No, sir.
8      Q   Do you know when it was stripped?
9      A   Let me back up a minute, if you don't mind --
10     Q   Sure.
11     A   -- when you say "stripped."  I know parts
12  were we moved from that car.
13     Q   Right.
14     A   I'm not comfortable saying that it was
15  stripped.
16     Q   When the part -- do you know where the parts
17  were removed from the car?
18     A   Where?
19     Q   Right.
20     A   No, sir.
21     Q   Do you know when?
22     A   I can give you parameters of when.
23     Q   From the time that it left the lot until the
24  time that it was discovered by the police?
25     A   I would say that's safe to say, yes, sir.

21 (Pages 81 to 84)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 85

1  Q  Can you be any more specific than that?

2  A  No, sir.

3  Q  Do you know who removed the parts from the
4  car?

5  A  No, I did not.

6  Q  Did you examine the place where the car was
7  found?

8  A  Yes, sir, I did go to the recovery site.

9  Q  Where was it?

10  A  It in the -- I need to look at -- do you have
11  the claim file I can look at?

12  Q  I think you've got it there.

13  A  The entire claim file?

14  Q  I don't know that I have the entire claim
15  file, but I've got -- I know that I was never provided
16  any photographs of the scene, of the parking lot. I
17  know I haven't been provided with any photographs
18  showing where the car was recovered. So if that is
19  part of the entire claim file, then the answer is I've
20  never been provided with the entire claim file.

21  A  Have you been provided with a MapQuest?

22  MR. NEWMAN:  Yeah, he got the map.

23  Q  (By Mr. Burge)  Did you take photographs
24  where it was recovered?

25  A  It was outside of a neighborhood, because I

## Page 86

1  didn't know exactly at what place, because it had
2  already been picked up and towed.  So all I could do
3  was go in -- and the police report, if I recall, is not
4  exactly specific to the specific residence.  If I
5  remember correctly, it was in Decatur at a -- a Jane's
6  Valley or -- I can't remember the exact address without
7  looking at the file.

8  Q  Did you speak to the officer who recovered
9  the car to find out specifically where it was sitting
10  when it was recovered?

11  A  If memory serves me correctly, I didn't speak
12  with the officer, but I spoke with Top Cat, and they
13  would not give me any specific information about where
14  it was recovered.

15  Q  When Top Cat would not give you any specific
16  information, did you make an attempt to speak to the
17  officer?

18  A  I know that -- can I look back at the
19  activity log, if you don't mind?

20  Q  You can look back at anything you want to.

21  A  If I remember correctly, when I spoke with
22  detective Fitzpatrick, he told me it was located
23  abandoned.  He didn't have the specific information as
24  far as a specific address, and so there was no way to
25  tell exactly which, like if it was in front of a house

## Page 87

1  or in front of a pine tree or in front of a bush or --
2  there was no way to tell exactly.

3  Q  Without talking to the person who actually
4  found it, the officer who actually found it?

5  A  Without -- and even then, from my
6  recollection of dealing with other agencies, they
7  normally don't give you specifics on that information.

8  Q  Okay.  Did you try to speak with the officer
9  who actually recovered it?

10  A  I don't recall if I actually spoke with the
11  recovering officer.  I do recall speaking with the
12  detective and asking him if there were any arrests
13  made.

14  Q  And you learned there was no arrest?

15  A  Correct.

16  Q  Had there been any canvassing of the
17  neighborhood done by the police, to your knowledge?

18  A  Just to be honest, with my experience with
19  DeKalb County, they don't go out and do canvasses very
20  much.

21  Q  Okay.

22  A  I don't know if they've ever done it, to tell
23  you the truth.

24  Q  That was something that you knew about that
25  police department in 2005 while you were investigating

## Page 88

1  these claims, true?

2  A  I think it's in -- in my experience, I don't
3  think they've done that before.

4  Q  Did you or anyone on your behalf or State
5  Farm's behalf perform any neighborhood canvassing in an
6  attempt to find out when was this particular car left
7  and by whom?

8  A  Yes, sir.

9  Q  Okay.  Tell me where that neighborhood
10  canvass is reflected in the activity log.

11  A  There's not a neighborhood canvass that I can
12  recall.  I know I went to that area.

13  Q  And did you canvass the neighborhood?

14  A  Yes, I went and drove through the -- that's
15  why I'm saying I think I recall it was the Jane's
16  Valley area, if memory serves me correctly, that was
17  off of -- near Flat Shoals and 285.

18  Q  Did you interview anyone in the area?

19  A  There were no witnesses developed.

20  Q  Did you interview anyone?

21  A  No.

22  Q  Did you knock on any doors?

23  A  If memory serves me correctly, once again, I
24  did not know a specific door to knock on, but I stopped
25  and spoke to some passerbys in cars and people walking

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 89

1  around; and but once again, without knowing the exact,
2  specific location, I did not have a clue exactly which
3  house to knock on.
4      Q    Did you make any notes in your activity log
5  to reflect that you spoke with pedestrians or people
6  driving by?
7      A   Not that I can recall.
8      Q   What would you expect to see if a car was
9  towed?  You said there was no indication that the car
10 been told.  What would you expect to see?
11     MR. NEWMAN:  Object to the form of the
12 question.  He is misleading the witness.  He
13 never said that.
14     THE WITNESS:  I disagree with the theory
15 that the car was towed.
16     Q   (By Mr. Burge)  Okay.  What physical evidence
17 do you rely upon to conclude as a fact that the car was
18 driven out of the lot versus towed out of the lot?
19     A   Do you want me to go through my thought
20 process on it?
21     Q   I want to know physical facts.
22     A   Physical facts.  There was no skidmarks at
23 the scene.  The glass on the ground at the scene, why
24 would they bust the glass out if they wanted to tow the
25 vehicle.

## Page 90

1      In my experience, vehicles that are towed
2  where they have stolen parts, for instance, wheels and
3  tires, when and if they are recovered, from my
4  experience, they're recovered with no wheels or tires
5  on that vehicle.  They're just sitting on the rotors on
6  the ground.
7      The fact that the vehicle was parked in front
8  of a surveillance camera does not support that a thief
9  would pull a wrecker into the parking lot underneath
10 a -- or near a surveillance camera and take the time,
11 which sometimes takes awhile to hook up a car, and
12 especially a Corvette, which is that low to the ground.
13 The area where -- if I recall exactly where Mr. Long
14 said his vehicle was parked is very -- there is an
15 island, a grassy island that is near that area that
16 would make it hard for a wrecker to back in and secure
17 the vehicle, much less if there were other vehicles
18 close by.  If I recall, Mr. Long indicated that there
19 were other vehicles in the park -- parking lot next to
20 where his was parked.
21     The -- the fact that the -- if you were going
22 to tow a -- tow a vehicle, there would be no reason to
23 try to make the column look like it was defeated by
24 damaging the exterior of the column and the ignition
25 when, in essence, it was not defeated.  The ignition,

## Page 91

1  whoever last drove the vehicle had a key, so -- and
2  I'm -- one factor I like to add is there's no doubt in
3  my mind this vehicle has been towed.  It was towed from
4  the recovery site to Top Cat, and then it was -- I
5  don't know how many times it was towed once it was
6  within Top Cat's lot, but then it was also towed from
7  Top Cat to Verastar South.  And I know for a fact, once
8  the vehicle is at Verastar South, they periodically tow
9  and move these vehicles around the lot.
10     And then I also -- I'm not sure, but I
11 suspect the vehicle was towed from Verastar South at
12 the direction of -- of your client, I'm not sure, but I
13 suspect that's what it is.  So that's at least a few
14 times that it has been towed.
15     Q   Is a key necessary to tow a car, this kind of
16 car?
17     A   Well, it's necessary to -- from my
18 understanding, to disengage the transmission, to put it
19 in either neutral or drive to then be able to roll it
20 up; therefore, if it was still in park, you would have
21 skidmarks at the scene when you drug it up on to the
22 vehicle.
23     Q   How was Mr. Long's car parked in the lot?
24     A   My understanding is he pulled it into the
25 parking spot out of the parking lot.

## Page 92

1      Q   He just drove it right in?
2      A   It's -- I'd have to look at his recorded
3  statement and statement under oath.  Do you have that
4  present?
5      Q   I don't have the statement under oath, but do
6  you recall without looking at anything else?
7      A   I can't recall that he gave me specific
8  information, whether it was backed or pulled in
9  frontward.
10     Q   Do you know whether or not a car of this
11 nature would be towed from the back or from the front?
12     A   I've had a Corvette before; and to tell you
13 the truth, I wouldn't want it towed from either
14 direction.
15     Q   Why not?
16     A   They're just not easy to tow.  You have --
17 you have to have, from my knowledge -- you would need a
18 flatbed wrecker, something that -- because the Corvette
19 sits low to the ground, and you need something that you
20 can get a long angle to be able to -- without damaging
21 the vehicle, either the front end or rear end.
22     Q   Depending on which way you towed it?
23     A   Right.
24     Q   Do you make any notes in the activity log
25 relating to your evaluation of whether this car was

23 (Pages 89 to 92)

Page 93

1  driven out of the lot or towed?
2      A   I don't think I do in that, but I think I
3  previously gave you -- we discussed the fact that there
4  were things in my thought process that do not go down
5  in the activity log.
6      Q   I just want to know if there is anywhere in
7  the claim file where you decided to put down any
8  thought processes you had about whether or not there
9  was -- the car was driven or towed, any -- any writings
10  that would verify that you actually had those thought
11  processes back at that time?
12      A   I don't recall if there's anything in the
13  activity log, no, sir.
14      Q   Were you ever told by anyone that they
15  believed that the car only had one set of keys?
16      A   Can I look back through my activity log?
17      Q   Sure.
18      A   Is that okay?  It looks like on March 7th,
19  2005, I spoke with Max at City Auto.  And he originally
20  thought the insured received one key to the vehicle,
21  then he admitted he did not know for sure how many keys
22  that had -- they had to the vehicle.
23      Q   But he told you that he thought there was
24  only one but that he wasn't sure?
25      A   Correct.

Page 94

1      Q   And did he tell you that most of the cars
2  that are sold there only have one key?
3      A   No, he did not, that I can recall.
4      Q   Did you ask him?
5      A   I can't recall the -- specifically if he said
6  that.
7      Q   Did you interview any prior owners of the car
8  other than City Auto Sales?
9      A   No, sir.
10      Q   Did you try to?
11      A   I don't recall tracking down a prior history
12  on the vehicle, no, sir.
13      Q   Do you know how to do that?
14      A   I don't know.  I know that there's Web sites
15  where you can -- is it Carfax or something where you
16  can go through and see if there's a history of
17  mechanical problems?  I guess you could run a title
18  history on the vehicle; but I'm not familiar, in the
19  state of Alabama, their Department of Motor Vehicles
20  standards and if they release that, I'm not -- I'm not
21  sure about their...
22      Q   Have you ever done a title search before?
23      A   I've done one in the state of Georgia, yes,
24  sir.
25      Q   And it tells you the people who have owned

Page 95

1  the car, who registered it in the state of Georgia?
2      A   Within a certain -- I have seen before
3  previous owners, but their system changes so much in
4  the state of Georgia, it's...
5      Q   And before 2005, when you handled this claim,
6  had you done car title searches?
7      A   I don't recall specifically on claims, but
8  I'm -- I'm sure I probably did.
9      Q   So it would be fair to say you don't know
10  whether the car had -- whether prior owners only had
11  one key to the car or not?
12      A   I don't know how many the prior owner had.  I
13  know how many your client told me he had.
14      Q   Okay.  And did anyone ever tell you that a
15  second key to the car may have been in the car?
16      A   If memory serves me correctly, at one time,
17  your client said it may have been in there.  However,
18  in his statement under oath, if I recall, he retracted
19  that and said that he was sure he did not leave that in
20  there, or something to that effect.
21      Q   When did you last read his statement under
22  oath?
23      A   I reviewed a partial -- I looked through it
24  last night.
25      Q   Did you review all of the claim file last

Page 96

1  night?
2      A   Not all of it, but I have looked through
3  parts the claim file over the last week or so.
4      Q   How many hours do you reckon you've spent
5  going through the claims files relating to Mr. Long
6  during this last week?
7      A   I -- I don't know.
8      Q   What is your best judgment?
9      A   I can't even give you a best judgment,
10  because I handle other claims, so I don't sit down and
11  say I've just spent 15 minutes with this claim versus
12  the next one.  So, I'm sorry, I just can't give you an
13  answer.
14      Q   So under oath you can't tell us whether
15  you've spent one hour, five hours, ten hours?
16      A   I can say it has been more than -- it's
17  definitely been more than five hours, but looking
18  specifically at this one claim --
19      Q   But looking at the Mr. Long matter?
20      A   It's safe to say I spent maybe ten or more on
21  it.  Like I say, I can't give you a specific time.
22      Q   Have you reviewed any materials in the last
23  week, other than State Farm claims materials, such as
24  answers to interrogatories, expert reports,
25  litigation-related materials?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 97

1    A  I have reviewed the claim with Attorney
2  Newnan, if that's what you're asking, yes, sir.
3    Q  Have you reviewed any documents other than
4  documents in the claim file?
5    A  Related to Mr. Long's claim?
6    Q  Right.
7    A  Nothing related to Mr. Long.  I've reviewed a
8  lot of documents in the last week or two, but...
9    Q  When a car is stolen and a person wants to
10  claim the value of the stolen vehicle under an auto
11  policy, is there an affidavit of theft that needs to be
12  filled out?
13    A  We will -- as a normal rule, we will send an
14  affidavit of vehicle theft.
15  (WHEREUPON, Exhibit No. 22 was marked for
16  identification.)
17    Q  (By Mr. Burge)  And is that what you did in a
18  letter to Mr. Long, which is Exhibit 21?
19    A  Exhibit 22?
20    Q  Exhibit 22.  Excuse me.
21    A  Yes, sir, this is a letter that we sent to
22  Mr. Long that included an affidavit of vehicle theft.
23  (WHEREUPON, Exhibit No. 23 was marked for
24  identification.)
25    Q  (By Mr. Burge)  And Exhibit 23, is that his

Page 98

1  response?
2    A  Yes, sir.
3    Q  On the first page of Exhibit 23, does it ask
4  Mr. Long to say how much he's claiming under his auto
5  policy for the loss of the car?
6    A  There is a question "amount for which you're
7  making claim," and his response was "paid 25,000."
8    Q  And did you understand from that that he was
9  claiming at least $25,000 for his car?
10    A  I assume that's what that means, yes, sir.
11    Q  Okay.  In your investigation, you took
12  recorded statements from some individuals?
13    A  As I recall, yes, sir.
14    Q  One of them was Ram, Naidu, N-A-I-D-U?
15    A  Yes, sir.
16    Q  And he was the manager at the Country Hearth
17  Inn?
18    A  I believe he was the shift manager on duty
19  that evening, yes, sir.
20  (WHEREUPON, Exhibit No. 24 was marked for
21  identification.)
22    Q  (By Mr. Burge)  And is Exhibit 24 a copy of
23  the statement that you took from him?
24    A  Yes, sir.  This appears to be the statement
25  of Mr. Naidu.

Page 99

1    Q  Is that a correct and accurate copy of the
2  statement that you took?  It has been produced to me by
3  State Farm as being that.
4    A  Yes, sir.
5    Q  Did you ask Mr. Naidu anything about what he
6  overheard Mr. Long say about keys?  And I'll refer you
7  to page 5 in the middle of the page.
8    A  He said he never -- my question, "Did he ever
9  mention what was in the car?"  His answer was "No, he
10  never mentioned."
11    "Did he -- did he -- have you, do you ever
12  recall?"
13    "He did say that he had a bunch of keys in
14  there," he said.
15    "A bunch of keys in the car?"
16    And he's got "Um-hmm."
17    And I don't know if his "um-hmm" means yes or
18  no, but based off the previous question, I would assume
19  yes.
20    Q  Based on your recollection, did Ram Naidu
21  tell you that he overheard Mr. Long mention that he had
22  some keys in the car when it was stolen?
23    A  I can't recall specifically that.
24    Q  Is that your interpretation of your interview
25  notes or your interview transcript?

Page 100

1    A  Well, he -- based off this, he says he has a
2  bunch of keys in the car.  And I don't know
3  specifically.  He says "um-hmm," and, I, from being in
4  the south, I don't know if that means yes or no but --
5  and then it doesn't specifically say what type of keys;
6  if it was home, business, you know, what it could be, I
7  don't know.
8    Q  But from that interview, you did hear -- you
9  did obtain information from Ram Naidu that he overheard
10  Mr. Long say something about keys being inside the car
11  that -- during that morning?
12    A  Well, he's got an answer, "he did say he had
13  a bunch of keys in there."
14    Q  And the only time Ram was with Mr. Long, to
15  your knowledge, was that morning, after the car was
16  discovered stolen on 2/19/05?
17    MR. NEWMAN:  I'm sorry, repeat that,
18  Tucker.  I wasn't --
19    Q  (By Mr. Burge)  The only time that Ram was
20  with Mr. Long, to your knowledge, was on the morning of
21  2/19/05, after the car was stolen?
22    A  I disagree with that.
23    Q  Okay.  When did this conversation about --
24  when did he overhear Mr. Long make comments about
25  the -- there being keys in the car?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 101

1    A    I'm not sure if I recall. I think he also
2    spoke with Mr. Long and his manager at that -- later on
3    that night, so I don't know what he may have overheard.
4    And I think there was a discussion later on that night,
5    but I'm not quite sure.
6    Q    What's the -- do you know when -- when he
7    overheard comments about the keys being in the car?
8    A    I assume it was that morning, but I'm not
9    sure.
10   Q    You took a recorded statement from Mr. Long?
11   A    Yes, I did.
12   Q    Where did that statement -- where was it
13   taken?
14   A    If memory serves me correctly, I met him at
15   our field claims office in Montgomery, Alabama.
16   Q    Okay. How far is Montgomery from Decatur,
17   from DeKalb County?
18   A    It's about three hours or so, maybe. I'm
19   not -- just depending on traffic and -- it's a lengthy
20   drive.
21   Q    Okay. A couple of hundred miles?
22   A    I'm not sure of the exact mileage, I'm sorry.
23   Q    But you went to him; he didn't come to you?
24   A    Correct.
25   Q    Did he refuse to come to you?

## Page 102

1    A    No, he did not.
2    (WHEREUPON, Exhibit No. 25 was marked for
3    identification.)
4    Q    (By Mr. Burge) Okay. Is Exhibit 25 a copy
5    of the statement that you took from Mr. Long?
6    A    That appears to be the whole statement.
7    Q    Okay. Well, you spent some time looking at
8    it, some minutes looking at it, so are you confident
9    that that's the statement?
10   A    It looks like it. I was making sure that the
11   pages in it -- making sure that it looked like the
12   questions, I wanted to make sure that there wasn't
13   anything, but that looks like the whole statement, yes,
14   sir.
15   Q    Okay. And under where the blue tag is, do
16   you see that? What page is that?
17   A    Page 29.
18   Q    On page 29 of the statement, did you ask him
19   about the number of keys?
20   A    Yes, sir.
21   Q    And did you ask him about the location of any
22   other set of keys?
23   A    I asked him, "So when you bought your car,
24   how many keys did you get?"
25   "I got two keys."

## Page 103

1    "And is that -- there's one set. Where's the
2    other set?"
3    "I don't know. I'm thinking I must have
4    either left them in that car or somewhere. I don't
5    know where the other set of keys -- set of keys at."
6    Q    So he told you, when you interviewed him in
7    Montgomery, that the -- any second set of keys he might
8    have had might have been in the car when it was stolen?
9    A    He said, "I'm thinking I must have either
10   left them in the car or somewhere."
11   Q    Okay. So -- and what date is that?
12   A    The date of this statement is March the 2nd.
13   Q    The day after you had looked at the car?
14   A    I believe that's correct. Let me look. Hang
15   on one second, make sure, but I believe that is
16   correct. Yes, sir.
17   Q    Were there any personal items inside the car
18   when you looked at it?
19   A    Not that I can recall, no, sir.
20   Q    So if there were any keys in the car when
21   Mr. Martin Long parked it in the hotel parking lot that
22   night, there weren't any in it when you saw it on March
23   the 1s?
24   MR. NEWMAN: Object to the form of the
25   question.

## Page 104

1    THE WITNESS: When I inspected it on
2    March 1st, I -- I did not see any -- find any
3    keys or personal items.
4    MR. BURGE: We're at the one-hour mark
5    again.
6    (Whereupon, there was a brief recess.)
7    THE WITNESS: Mr. Burge, can I ask you a
8    question?
9    Q    (By Mr. Burge) Yes.
10   A    I asked Mr. Newman on a break if I could go
11   back and add something to a previous question that I
12   wanted to add, and apparently I was either kind of
13   confused or I didn't make a good point of it. Is that
14   okay?
15   Q    What is that?
16   A    A couple things. When you asked a question
17   about the police report, we had some lengthy discussion
18   about if someone else filed a police report, and I
19   think, in your scenario, even for you --
20   Q    Uh-uh.
21   A    -- I can't recall ever being involved in a
22   claim where that was the only thing that led to a -- a
23   recommendation for a denial, so I wanted to make sure
24   that that was -- that was correct. I can't recall
25   that.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 105

1    Q   I thought you said you couldn't recall one
2  way or another?
3    A   Yeah, I can't recall, though, I really can't.
4  And I want to make -- I was thinking about that, and I
5  want to make sure and go back and -- you know,
6  obviously there's always a situation where there could
7  be a scenario where maybe there's goofy facts or
8  something associated with that one call, but I can't --
9  and secondly, when -- when we were discussing the
10 wrecker portion, why I didn't think that it was towed,
11 a couple other things I -- that -- that I can think of,
12 and there's probably more, but at that time, when I
13 went to that hotel, you could not see the hotel parking
14 lot from Panola Road.  And the site was a pretty good
15 ways away from Farrington Road, but you could not see
16 at that time the car or the parking lot.  It was
17 down -- Panola Road is above, and the parking lot and
18 the motel sit way down below, and you couldn't see it
19 just with the normal traffic, the majority of traffic
20 is on Panola Road; and that, as well as the --
21 Mr. Naidu was sitting right there.  There's a window, a
22 bay window that -- or a square window, I don't know if
23 you call it bay, but it overlooks right to where the
24 vehicle was parked and -- which to me just doesn't
25 seem -- in my experience, it doesn't make sense that

## Page 106

1  someone would come up there to try and tow a vehicle
2  with that readily site and the fact of an alarm system
3  on the vehicle, the fact of an alarm and that alarm
4  went off.
5        And there could be more.  That was just some
6  I thought of.  I know I had given you a list of a few
7  things, and I want to make sure -- that's all I think
8  of right now, I'm sorry.
9    Q   Do you want to change the answer about
10 whether there is any documentation of your thought
11 process anywhere about whether the car was driven or
12 towed?
13   A   I don't -- I think that still remains the
14 same.  I don't think there's any -- anything in my
15 thought process, documenting -- I'm sorry, I hope I
16 didn't come across as sarcastic.  I didn't mean -- I'm
17 sorry.
18   Q   No, that's...
19 (WHEREUPON, Exhibit No. 26 was marked for
20 identification.)
21   Q   (By Mr. Burge) Exhibit 26 is a copy of
22 police reports that you got.
23   A   Yes, sir.
24   Q   And the first page of that exhibit is a fax
25 page sent to you by the officer -- is it Fitzpatrick?

## Page 107

1    A   Yes, sir, Detective Fitzpatrick.
2    Q   And it says that auto theft in the
3  metropolitan -- is metro Atlanta's favorite group
4  participation sport?
5    A   Yes, sir.
6    Q   That's the Dekalb Police Department telling
7  you that?
8    A   Yes, sir.
9    Q   And they show that it was reported that
10 morning, doesn't it, that the police were notified that
11 morning that the car was stolen?
12   A   Yes, sir.
13 (WHEREUPON, Exhibit No. 27 was marked for
14 identification.)
15   Q   (By Mr. Burge)  Exhibit 27, have you seen
16 State Farm's advertisement about the problem of auto
17 theft?
18   A   No, sir, I have not seen this article.
19   Q   State Farm doesn't provide that information
20 to adjustors?
21   A   I'm sure we have access to going on the State
22 Farm Web site just through the regular Internet at home
23 or even -- but I haven't seen this particular article.
24   Q   Okay.  Do you agree or have you been trained
25 through some other means that auto theft is the number

## Page 108

1  one -- what do they describe it at the bottom of the
2  page, of the first page?
3    A   Most expensive property crime.
4    Q   Do you agree with that based on your
5  training?
6    A   I would assume they wouldn't fabricate these
7  figures, my own company I work for; so if that's what
8  they have here, I will agree with that.
9    Q   Okay.  And do you agree or acknowledge that
10 it's a bigger problem in urban areas?  It's on the
11 second page where they talk about it.
12   A   Well, based on a 2001 study, it says produced
13 apparently by NICB, the National Insurance Crime
14 Bureau, it says it's primarily an urban problem, is
15 what it says, yes, sir.
16   Q   And based on your work here in Atlanta, is it
17 a problem here in the greater metropolitan area of
18 Atlanta?
19   A   Yes, sir, thefts occur in the metropolitan
20 area.
21   Q   And although Lithonia is on the interstate
22 between Atlanta and Augusta, it is -- it is still
23 considered in the greater Atlanta metropolitan area,
24 isn't it?
25   A   I would consider it in the greater

## Page 109

1  metropolitan area.
2  (WHEREUPON, Exhibit No. 28 was marked for
3  identification.)
4     Q   (By Mr. Burge)  Okay.  Exhibit 28, is that
5  your handwriting?
6     A   Yes, sir.
7     Q   Did you ever have the interview with Evelyn
8  Long transcribed?
9     A   I don't believe I did because I looked
10  through the file, and I don't recall seeing it.
11     Q   Did she tell you how many cars -- how many
12  sets of keys she ever saw to that Corvette?
13     A   I don't recall in our conversation.
14     Q   Did you do a criminal background search on
15  Mr. Long?
16     A   I'm sorry, I was going to look back through
17  and see if I had any documentation on my conversation
18  with Ms. Long, see if it prompted any memory.  I don't
19  recall specifically doing a background search on -- on
20  Mr. Long.
21         When you say "background," you're talking
22  about criminal, or --
23     Q   Right.  Do you know of him having any
24  criminal convictions whatsoever?
25     A   I think I -- I think I addressed that with

## Page 110

1  him in his recorded statement.
2     Q   Okay.
3     A   And I asked him if he had any -- without
4  looking exactly at it, I asked him if he had any prior
5  convictions or criminal, and I think he said no.
6     Q   And did you note, based on your examination
7  of records in this matter, that he had an honorable
8  discharge from the military?
9     A   I believe he -- did in his statement under
10  oath, I believe he did say that.
11     Q   Did you interview Valerie Temple?
12     A   Yes, sir.
13     Q   Was that interview recorded?
14     A   Yes, sir.
15     Q   Was it transcribed?
16     A   No, sir.
17  (WHEREUPON, Exhibit No. 29 was marked for
18  identification.)
19     Q   (By Mr. Burge)  Is this a letter that you
20  wrote, which is Exhibit 29?
21     A   Yes, sir, it's a letter I wrote.
22     Q   And in that letter, do you note what she told
23  you about how many keys he had to the car and the
24  location of those keys?
25     A   The third paragraph says, "As for the keys to

## Page 111

1  Mr. Long's vehicle, you indicated Mr. Long had one set
2  of keys with him that weekend; however, you confirm
3  having a conversation with Mr. Long after the reported
4  theft regarding the number of keys he had.
5  Specifically you said Mr. Long told you he had a second
6  set of keys that may have been left in the vehicle;
7  however, you only confirm seeing one set that weekend."
8     Q   Did Ms. Temple confirm that she was with
9  Mr. Long from the time that he parked the car in the
10  parking lot until it was discovered missing the
11  following morning?
12     A   It says, "You confirm staying at the Country
13  Hearth Inn at I-20 and Panola Road.  That Friday night
14  you confirm visiting your other brother, Donald Ware,
15  who resides in an apartment and/or condo in the
16  Decatur, Lithonia Georgia area.  Also, you confirm
17  recently speaking with Mr. Long as he contacted you and
18  secured a phone number to contact your brother Donald
19  in order to give this information to State Farm.  After
20  visiting your brother, you went to Country Hearth Inn
21  and arrived there around 10 p.m. Georgia time.  You
22  indicated Mr. Long parked his 2000 Chevrolet Corvette
23  near an area supposedly monitored by a surveillance
24  camera.  And this is the last time you saw the
25  vehicle."

## Page 112

1         I would assume that she was with him that
2  evening, that entire evening until the -- the -- was
3  your question until they left to go back to Alabama?
4     Q   Right.
5     A   I assume she was.
6     Q   When you took the statement from Mr. Long on
7  March the 2nd, 2005, and you finished asking him the
8  questions and you turned the tape recorder off, did he
9  tell you that, in fact, he had been over in Atlanta
10  with a woman?
11     A   Yes.
12     Q   Did he tell you that that woman was married?
13     A   Let me see if I can look at my activity log.
14  If memory serves me correctly, he -- he did say that he
15  was with another woman.  Let me see if I -- if memory
16  serves me correctly, he did say he was with another
17  woman, and I can't recall exactly, but I think he -- he
18  did say that this woman was married.
19     Q   Can you understand why a man would not want
20  to get a married woman involved in an insurance
21  investigation for the theft of his car?
22     A   I'm not being sarcastic here, but I've never
23  cheated on my wife, and I don't --
24     Q   I'm not asking about you, personally.
25     A   I know that.  I just...

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 113

1    Q   I'm asking whether you can understand why he
2  would not want to get a married woman involved.
3    A   I guess it's safe to say that, yeah.
4    Q   Okay. You can't decide a claim based on the
5  race of the insured, true?
6    A   True.
7    Q   That's not relevant, is it?
8    A   No.
9    Q   And you can't decide a claim based on the
10  company that he keeps at the time of the theft, can
11  you?
12    A   That's true.
13    Q   After he told you that he had been with a
14  woman, at some point there was a decision to get an
15  examination under oath?
16    A   Yes, sir.
17    Q   Okay. And the letter that was sent to him
18  included a schedule telling him to bring certain
19  materials, true?
20    A   Yes, sir.
21  (WHEREUPON, Exhibit No. 30 was marked for
22  identification.)
23    Q   (By Mr. Burge)  And that's Exhibit 30, right?
24    A   Yes, sir.
25    Q   And Mr. Long went to that examination under

Page 114

1  oath, didn't he?
2    A   Yes, sir.
3    Q   And looking to that page of schedule of
4  things that he was supposed to bring, what's the first
5  thing that he was asked to take to that examination
6  under oath?
7    A   Number 1 is "copies of your credit report."
8  (WHEREUPON, Exhibit No. 31 and Exhibit No. 32 were
9  marked for identification.)
10    Q   (By Mr. Burge)  Okay. Are Exhibits 31 and 32
11  copies of the credit reports that he took?
12    A   Without viewing the exhibits that he provided
13  at his statement under oath, I can only say that these
14  are two credit reports, it looks like, for Martin
15  O'Neil Long.
16    Q   Okay.
17    A   I mean, the date on this one is February
18  28th -- I mean, excuse me, March 28th, '05. So I would
19  assume that would be one that he provided. And this
20  other was dated report date March 9th, 2005, which both
21  would have been before the statement under oath, so I
22  assume, yes, these were the two he provided.
23    Q   And based on having spent at least ten hours
24  going through the file, are these reports that you
25  recognize?

Page 115

1    A   They look like the credit reports, yes, sir.
2    Q   And they've been produced to me, as you can
3  see, the Bates stamps at the bottom of the pages, as
4  being credit reports contained in the personnel file --
5  I mean, in the insurance claim file?
6    A   Yes, sir.
7    Q   What's the second thing that he's asked to
8  bring with him?
9    A   "Copies of your bank statements for the last
10  12 months."
11  (WHEREUPON, Exhibit No. 33 was marked for
12  identification.)
13    Q   (By Mr. Burge)  Let me show you Plaintiff's
14  Exhibit 33. Does that appear to be bank statements
15  that were received by the SIU?
16    A   Once again, without actually viewing the --
17  the physical file and the exhibits produced in the
18  statement under oath, I can't say for sure, but this
19  does look like a bank record from Evelyn G. Long, which
20  is my understanding is his wife, or was at that time.
21    Q   And you didn't bring the claim file with you
22  today, did you?
23    A   No, sir, I did not.
24    Q   So you don't have that to check against?
25    A   No, sir.

Page 116

1    Q   But do you have any reason to think that
2  what's been Bates stamped as being part of your claim
3  file, which I've marked as Exhibit 33 to your
4  deposition, as something that you didn't have?
5    A   No, I assume what's been provided to you is
6  what I have.
7    Q   Okay. What's the next item he was asked to
8  take to you?
9    A   It looks like "copies of your cell phone
10  records for the last four months."
11  (WHEREUPON, Exhibit No. 34 was marked for
12  identification.)
13    Q   (By Mr. Burge)  What is Exhibit 34?
14    A   Those are the credit reports.
15    Q   You're saying 31 and 32 are the correct
16  reports -- the credit reports?
17    A   The credit reports. I'm sorry, you've got a
18  lot of documents here, and I mistakenly picked those
19  up.
20      Yes, these appear to be the cellular phone
21  records, and it's under the name of Valerie Ware. And
22  if memory serves me correctly, in his statement under
23  oath, he mentioned that Valerie purchased a cell phone
24  for him.
25    Q   Okay. And he brought you those records?

29 (Pages 113 to 116)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 117

1    A    Yes, sir.

2    Q    What's the next thing that's asked for?

3    A    "Copies of any documents related to your
4    recent Worker's Compensation settlement."

5    (WHEREUPON, Exhibit No. 35 was marked for
6    identification.)

7    Q    (By Mr. Burge)  Okay.  Exhibit 35, do you
8    recognize that as a copy of the release agreement that
9    he brought to you relating to his compensation case
10   against CSX?

11   A    Yes, sir, it appears to be.

12   (WHEREUPON, Exhibit No. 36 was marked for
13   identification.)

14   Q    (By Mr. Burge)  And do you recognize Exhibit
15   36 as being a copy of the settlement statement that he
16   provided to you showing that he received $175,568.99 as
17   his share?

18   A    Yes, sir, that's what it appears to be.

19   (WHEREUPON, Exhibit No. 37 was marked for
20   identification.)

21   Q    (By Mr. Burge)  Do you recognize Exhibit 37
22   as being a copy of a bank draft paid to Martin Long in
23   the amount of $150,100.92 that he provided to you?

24   A    Yes, sir.

25   (WHEREUPON, Exhibit No. 38 was marked for

## Page 118

1    identification.)

2    Q    (By Mr. Burge)  And do you recognize
3    Plaintiff's Exhibit 38 as being a deposit ticket for
4    that check that Mr. Long provided to you?

5    A    Yes, sir.

6    Q    What's the next item that he was asked to
7    produce?

8    A    "Copies of your tax returns for the calendar
9    years 2003 and 2004."

10   Q    And did he produce those to you?

11   A    If memory serves me correctly, I believe he
12   did.

13   Q    What's the next item that was requested?

14   A    Copies of your divorce filings and papers.

15   (WHEREUPON, Exhibit No. 39 was marked for
16   identification.)

17   Q    (By Mr. Burge)  Do you recognize Exhibit 39
18   as being a copy of the settlement agreement that he
19   provided to you relating to his divorce?

20   A    Yes, sir.

21   Q    What is the next item?

22   A    "Copies of receipts surrounding your personal
23   items stolen."

24   Q    Okay.  And that was the claims he was making
25   under the homeowner's policy?

## Page 119

1    A    The claims of contents stolen in the vehicle
2    that he alleged were stolen in the vehicle.

3    Q    Right, that he was making a claim for under
4    the homeowner's policy?

5    A    Well, he initially made that claim under the
6    auto policy.

7    Q    But then it was pursued under the homeowner's
8    policy?

9    A    Correct, a claim was set up under the
10   homeowner's policy.

11   Q    Okay.  And I'm guessing that's going to be
12   further on down the stack when we talk about the
13   homeowner's claim.  What's the next after that?

14   A    Any additional keys to the vehicle in
15   question.

16   (WHEREUPON, Exhibit No. 45 was marked for
17   identification.)

18   Q    (By Mr. Burge)  Okay.  Is Exhibit 45 a
19   photograph and a copy of your handwritten receipt that
20   you received keys that Mr. Long had?

21   A    Yes, sir.

22   Q    And he gave you one set of keys and told you
23   that was all he had or could find?

24   A    He gave me one set of keys and said that was
25   all he could locate.

## Page 120

1    Q    Okay.  What is the next item?

2    A    "The title to the vehicle in question."

3    (WHEREUPON, Exhibit No. 40 was marked for
4    identification.)

5    Q    (By Mr. Burge)  Let me show you Exhibit 40
6    and ask you if this is a copy of a fax that you got
7    from City Auto Sales, which includes a copy of the sale
8    documents for the car and a copy of the title held by
9    the previous owner.

10   A    Yes, sir.

11   (WHEREUPON, Exhibit No. 41 was marked for
12   identification.)

13   Q    (By Mr. Burge)  Is Exhibit 41 a copy of the
14   title that Mr. Long provided to you for this car?

15   A    Yes, sir.

16   (WHEREUPON, Exhibit No. 42 was marked for
17   identification.)

18   Q    (By Mr. Burge)  Is Exhibit 42 a copy of the
19   tag registration that Mr. Long provided to you showing
20   that he applied for a tag on February the 10th of 2005?

21   A    Yes, sir.

22   Q    What is the next item that he was asked to
23   bring?

24   A    "Supporting documentation regarding your VA
25   disability payments."

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 121

1  (WHEREUPON, Exhibit No. 43 was marked for
2  identification.)
3      Q   (By Mr. Burge)  Is Exhibit 43 a copy of a
4  Department of Veterans Affairs letter to Mr. Long
5  reflecting that he received an honorable discharge and
6  had a service connected disability?
7      A   Yes, sir.
8      Q   He provided that to you?
9      A   Yes, sir.
10     Q   What's the next item?
11     A   That's the only – that's the only items on
12  this list.
13     Q   Was he also asked by you to provide him with
14  certain records relating to improvements that he had
15  made to the car between the time he purchased it on the
16  4th of February and when it was discovered missing from
17  the parking lot on February the 19th of 2005?
18     A   Yes, I asked him to bring any receipts or
19  documentation regarding maintenance or anything.
20     (WHEREUPON, Exhibit No. 44 was marked for
21  identification.)
22     Q   (By Mr. Burge)  And do you recognize Exhibit
23  44 as being some receipts that he provided to you
24  showing that he had new tires purchased and some work
25  done on the car at Big 10 Tires in Pratville, Alabama?

## Page 122

1      A   Yes, sir.
2      Q   As part of your claim, did you obtain an
3  Autosource Valuation report for this car?
4      A   I requested an ADP valuation, yes, sir.
5      Q   Okay.  What is that?
6      A   It – at that time, it was a valuation
7  company that performed a market survey for State Farm.
8      (WHEREUPON, Exhibit No. 46 was marked for
9  identification.)
10     Q   (By Mr. Burge)  Is Exhibit 46 a copy of that
11  report that you received?
12     A   Yes, sir.
13     Q   Whose handwriting is on the last page?
14     A   That's my handwriting.
15     Q   And what did you determine the value of that
16  car to be?
17     A   With tax and fees, the value is $25,789.50.
18     Q   And had you paid the claim, is that the
19  amount that would have been paid for his car on his
20  claim under the auto policy?
21     A   It would have been that amount less his $500
22  deductible, so it would have been – ACV after
23  deductible would have been 25,289.50.
24     Q   And ultimately when you have the reserves on
25  the case raised from $500 in – wherever it was set

## Page 123

1  initially, whoever set it initially at $500 to $27,500,
2  did that include not only the value of the car but the
3  rental as well?  I believe it was done on 5/11 of '05.
4      A   I believe that would include the
5  consideration, and that's just an approximate amount,
6  so there is no way to tell the exact amount.
7      Q   Who are Transportation Technologies?
8      A   It's a company that inspects vehicles.
9      Q   Was your first contact with that company in
10  March of 2005 when you were working on Martin Long's
11  claim?  Had you ever dealt with them before?
12     A   Yes, sir.
13     Q   On how many occasions had you dealt with
14  Transportation Technology before?
15     A   I can't recall over the years how many times.
16  Numerous times.
17     Q   Okay.  Do you have a judgment as to whether
18  it's more or less than ten times?
19     A   I deal with so many of these companies, I
20  would – safe to say it has been over ten times.
21     Q   Has it been over 20 times?
22     A   I can't recall the exact number.
23     Q   Can you tell me whether it's more or less
24  than 20 times?
25     A   I would probably say less than 20.

## Page 124

1      Q   What services does Transportation Technology
2  provide for you?
3      A   Well, we request that they look at vehicles
4  to determine if they – if there is fire damage
5  involved, we request to see if they look at it and see
6  if it was an intentionally set fire and where it may
7  have started.  We request that they look at ignitions
8  and columns to see if there is any – if they've been
9  damaged or anything, evidence to support how it could
10  have been driven.
11     Mechanically they would look at it to see –
12  let's say if a car has experienced some mechanical
13  problems, and they may look at it to see what caused
14  the mechanical problems.  They could also look at it to
15  see if there is recall items involved; let's say if
16  there is a national recall, they may look at it to see
17  what caused the damage and see if it was a recall item.
18  Let's say it was a switch, it could have caught on
19  fire.  There could be more, I'm not sure.
20     Q   Is Michael Bresnock the person that you deal
21  with at Transportation Technology each time?
22     A   Yes.
23     Q   Are there any other companies that perform
24  the same services for State Farm that you use?
25     A   Yes, sir.

31 (Pages 121 to 124)

Page 125

1    Q   Who were the other companies?

2    A   Well, that I recall, Keene Investigative

3    Services, and that's K-E-E-N-E.  A guy named Barry

4    Slaughter; he's with a -- I can't think of the exact

5    name of his company.  I think maybe Tony can assist me

6    on that one, but it's -- he's with another company.

7    There's a company called Technifire that I've dealt

8    with and a gentleman's name, Jerry Carter.  There's a

9    company called -- I just call it NATS for short,

10   N-A-T-S.  I think they're actually based out of Las

11   Vegas or somewhere, but they have representatives all

12   over the country.  I can't think of the guy's name

13   offhand, but he's out of Birmingham, and he's with --

14   he's done vehicles before for me.

15   Q   So is it fair to say that Mr. Bresnock has

16   some competition for y'all's business?

17   A   I think it's fair to say that about any one

18   of those, yes, sir.

19   Q   When you send him out to do an evaluation, do

20   you receive reports from him?

21   A   Yes, sir.

22   Q   And do you also receive bills from him?

23   A   Yes, sir.

24   (WHEREUPON, Exhibit No. 47 through Exhibit No. 51

25   were marked for identification.)

Page 126

1    Q   (By Mr. Burge)  Are Exhibits 47 through 51

2    correct copies of the reports and bills that you have

3    received from Mr. Bresnock relating to Mr. Long's

4    claims?

5    A   Yes, sir.

6    MR. BURGE:  While it's only been 50

7    minutes this time, it is probably as good a

8    time as any if you-all want to go see if the

9    lunch is ready.

10   (Whereupon, there was a lunch recess from 12:12 p.m to

11   12:46 p.m.)

12   Q   (By Mr. Burge)  Mr. Smith, what was the

13   condition of the alarm system when the car was

14   recovered?

15   A   When it was inspected, Mr. Bresnock's opinion

16   was at that time it was -- when he inspected, it was

17   not operating.

18   Q   It didn't work?

19   A   When he inspected it, it did not work, like I

20   said.

21   Q   And when he looked at the alarm system, it

22   didn't look like anything had been cut?

23   A   I'll have my understanding from his report.

24   If I recall, that is correct, there were no wires out

25   of place.

Page 127

1    Q   But it just didn't work for whatever reason?

2    A   There was numerous amount of messages that

3    came across.  Apparently the car was experiencing

4    electrical problems, was what I gathered out of it.

5    Q   Okay.  Do you know whether the alarm system

6    was working at the time it was taken from the lot,

7    given that it was not working when it was inspected by

8    the Transportation Technology?

9    A   All I've got to go on is what Mr. Long

10   advised me, and he said it was working.

11   Q   And did he say he'd ever heard it go off,

12   that he'd ever heard the alarm sound?

13   A   I'll look back through his recorded

14   statement.  I can't remember if he specifically said he

15   ever activated it or not.  I can't remember.

16   Q   But the only evidence you have of anyone who

17   inspected the alarm system to determine whether it

18   worked or not is Mr. Bresnock's report?

19   A   Yes, sir.

20   Q   Were you with him when he did his inspection?

21   A   Yes, sir.

22   Q   And were you aware that he was trying to make

23   the alarm system go off?

24   A   Yes, sir.

25   Q   Were you with him when he tried to use the

Page 128

1    key the first time?

2    A   Yes, sir.

3    Q   And it didn't work?

4    A   When -- the very first time, if memory serves

5    me correctly, the pellet reader was -- was out of --

6    wasn't turned correctly; and as soon as he turned it

7    correctly, he was able to insert it and start the car.

8    Q   The ignition was loose and he had to adjust

9    the pellet reader in the ignition in order to get the

10   key to work?

11   A   Right, the ignition cylinder, the pellet

12   reader is outside the cylinder, and he had to adjust

13   that back.

14   Q   Is it possible that whoever took the car

15   discovered the key inside the car and used a key that

16   was inside the car?

17   A   It just doesn't make sense to me.  If they

18   did, why would they beat the column up to make it look

19   like it was stolen?

20   Q   Do you think they might have beat the column

21   up to try to hot wire the car and then perhaps said,

22   well, look here, here is a key, why not use that; is

23   that possible?

24   A   My knowledge of those theft deterrent

25   systems, you don't just hot wire that car like an older

32 (Pages 125 to 128)

## Page 129

1   model car like you might used to.
2       Q   Of course, you don't know who the thieves
3   were, so you don't know what they knew?
4       A   I don't know who last drove that vehicle.
5       Q   Okay.  Did Ram see anyone looking around the
6   car before it was taken?
7       A   The best I can recall, he didn't comment that
8   he saw anyone around the vehicle.
9       Q   He didn't see it leave the parking lot or how
10  it left the parking lot?
11      A   Best I can recall, he did not see it.
12      Q   Was the car driveable other than the lack of
13  seats; could it be safely driven when it was recovered?
14      A   If memory serves me correctly, when
15  Mr. Bresnock started the vehicle up, he was able to put
16  it in drive, and he was able to move it forward and
17  then put it in reverse; so, yes, he could have driven
18  it.
19      Q   Was the brake system functioning?
20      A   If memory serves me correctly, the brake
21  system, the pedal went to the floor, and that was
22  another relay that came up and said that there was low
23  brake fluid.
24      Q   Had the brake fluid actually been drained
25  from the car?

## Page 130

1       A   If I recall, there was — he checked the
2   master cylinder, and I'm not exactly sure, I think it
3   was low on fluid, but I'm not exactly sure.
4       Q   In fact, was the brake master cylinder
5   reservoir empty?
6       A   I believe it was either almost drained or
7   empty.
8       Q   Were there brake system components missing or
9   disabled?
10      A   I don't recall if there were any missing or
11  disabled.  One thing you have to consider is that this
12  vehicle has sat in two salvage yards, that I've been to
13  both, and they are rough, that there is parts of these
14  salvage yards that you can't even get a vehicle down
15  into and driving.  And so it has been flat on the
16  ground, there's been jagged rocks, ditches around, so
17  the undercarriage of the vehicle, it is — in my
18  experience, it's very common that there's damage to
19  undercarriages of vehicles due to this rough ground,
20  generally result in the absence of calipers.  I can't
21  recall all claims, but I guess it's possible.
22      Q   Do you know what tools are required if you're
23  going to remove brake calipers in the conventional way?
24      A   I don't know specific tools.  I mean,
25  obviously, you'll need wrenches and sockets and — and

## Page 131

1   pliers and screwdrivers and — but I've never removed a
2   specific caliper on that year model Corvette.
3       Q   Did you inspect the undercarriage of the car?
4       A   I looked at the undercarriage.  Due to
5   insurance regulations, it's very difficult to get
6   authority from Verastar to let us look under it.  Yes,
7   I looked underneath, but I couldn't get directly
8   underneath the center of the vehicle.
9       Q   On how many occasions did you accompany
10  Mr. Bresnock to look at this car?
11      A   Two times, if I recall correctly.
12      Q   And did you ever have the car — or have a
13  chance to inspect the underside of the car while it was
14  raised?
15      A   The second time, I believe — I'd have to
16  look at the report.  I think the second time they —
17  they raised the vehicle up and — and we had an
18  opportunity to look underneath it then.  That's
19  correct.
20      Q   Did you ever check to find out why the
21  security cameras at the hotel were not operating at the
22  time that this theft was reported?
23      A   I spoke with the manager at the hotel, and
24  they — and for lack of knowledge — knowledge, I don't
25  know that much about computers, but they said something

## Page 132

1   about the CD ROM or something was damaged on their —
2   their system or something.
3       Q   Is that the kind of damage, to your
4   understanding, that someone just looking at the cameras
5   would — would realize and appreciate?
6       A   Can you be more specific?  I don't know what
7   you're asking me.
8       Q   Would just looking at the camera — based on
9   your understanding, if you're outside and you're just
10  looking at the camera, would you be able to tell that
11  the camera was not operating?
12      A   I don't think you would be able to, no.
13      Q   Do you know who maintained the hotel video
14  surveillance equipment?
15      A   Maintained as far as, what, worked on it,
16  maintenance?
17      Q   Yeah.
18      A   No, sir.
19      Q   Did you ever get any records from the hotel
20  relating to their surveillance equipment or the
21  maintenance on it or any proof that it was out of
22  service at the time?
23      A   No, I never got a — any maintenance records
24  or anything.
25      Q   Did you do any background checks on any of

33 (Pages 129 to 132)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 133

1  the hotel employees?
2      A   No, I did not.
3      Q   Was the -- there any damage to the
4  transmission linkage when the car was discovered?
5      A   Not that I can recall, but I'd have to look
6  back through the report.
7          Based on Mr. Bresnock's report, he says that
8  it is likely that the linkage was bent.
9      Q   Do you know what that signifies?
10     A   I assume, based on that, that this linkage on
11  the transmission could have been bent at some time.
12     Q   Do you know how a linkage becomes bent?
13     A   How does a linkage become bent?
14     Q   Do you know?
15     A   No, I mean -- I don't know.  It could be from
16  damage to the undercarriage of the vehicle or it could
17  be -- I assume multiple ways that that could be bent.
18     Q   Do you know if it could be bent by an
19  individual trying to force a -- a car from park into
20  neutral?
21     A   I'm not sure if that will cause that damage.
22     Q   Did you ever check out the possibilities for
23  why the linkage was bent?
24     A   I don't recall specifically asking why the
25  linkage was bent.

## Page 134

1  (WHEREUPON, Exhibit No. 52 was marked for
2  identification.)
3      Q   (By Mr. Burge)  Exhibit 52, is this the
4  receipt you got from Top Cat Towing?
5      A   It looks like it.  I believe this is most
6  likely the receipt that Verastar secured on the
7  vehicle, correct.
8      Q   Okay.  You had that as part of your claim
9  file?
10     A   From what I recall, yes, sir.
11     Q   Okay.  Does it indicate whether any keys were
12  needed to tow that car?
13     A   It doesn't say anything about keys.  It just
14  says "towed to lot."
15     Q   When you saw the car, were the lug nuts on
16  the -- for the tires all in place and secure?
17     A   If memory serves me correctly, there were
18  some lug nuts missing.
19     Q   Were some also loose?
20     A   I believe there were.
21     Q   In your experience as a claims adjustor, do
22  individuals generally drive cars that do not have
23  operable brakes or -- or have lug nuts missing or
24  loose?
25     A   I can't say what people drive -- how they

## Page 135

1  drive, the condition of their vehicles.  I mean, I know
2  people drive their vehicles in poor condition a lot of
3  times.
4      Q   That would be certainly an unreasonable thing
5  to do, wouldn't it, to be driving a car with no brakes?
6      A   From what I've seen in Atlanta, anything is
7  possible in driving in the Atlanta area.
8      Q   And while it would be possible, it wouldn't
9  be reasonable, would it?
10     A   What I consider reasonable and what somebody
11  does, I tell you it's -- it's -- I can't say.  I can't
12  speak for somebody else.  What I can say is in my
13  experience, I -- it's not reasonable that if they would
14  take the time to put wheels back on a vehicle once it
15  has been stolen.
16     Q   And would you need to have wheels on a
17  vehicle in order to tow it?
18     A   No.
19     Q   You would just be making sparks down the
20  road?
21     A   Not on a flatbed, you wouldn't.
22     Q   Okay.  So there's different kinds of tow --
23  tow trucks?
24     A   Correct.
25     Q   Okay.  Was there any damage to the front

## Page 136

1  bumper?
2      A   I would have to look at the photos of the
3  vehicle.
4      Q   Do you recall any damage to the front bumper?
5      A   I think I recall some scratches to the --
6  there were some minor scratches, if I recall, all over
7  the vehicle.
8      Q   Did I note at the top of page 3 of your -- of
9  the -- your report to the auto claim committee that the
10  front bumper cover was damaged?
11     A   It says here the front bumper cover was
12  damaged.
13     Q   Did you take any pictures of that damage?
14     A   It also says in my report there was all over
15  exterior scratches to the body.  I think I took photos
16  of the vehicle.  I would have to look at the claim file
17  to see.  I believe I did take some photos.
18     Q   If you did, then they were not -- the only
19  photos that have been produced to me are those that
20  under Mr. Bresnock's report.
21     A   I would have to go back and look at the file,
22  because if I did -- they could be in imaging if I took
23  any, but I'd have to go back and check.
24     Q   Did State Farm have any repairs made to the
25  vehicle?

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 137

1    A   Not that I'm aware of, no.

2    (WHEREUPON, Exhibit No. 53 was marked for

3    identification.)

4    Q   (By Mr. Burge)  What is Exhibit 53 that

5    comes – is routed to you and was produced to me as

6    part of your claims file?

7    A   This is a frequency tracking search response.

8    Q   And that shows that this gentleman has had

9    four claims in the period requested during the time

10   frame requested?

11   A   It shows, based on the address, the 2752

12   Carolina Drive in Millbrook, Alabama, he's had four

13   claims:  April 25th, 2003, February 13th, 2005, and two

14   claims on February 19th, 2005.

15   Q   And do you remember the 2003 claim being

16   a property damage claim under the homeowner policy for

17   damage to a carport connected to his mobile home?

18   A   I believe I recall Mr. Long, when we

19   discussed the claim, that he said something about

20   having some hail damage, if I remember correctly.

21   Q   Okay.  He was paid for that?

22   A   Yes, he was, I believe so.

23   Q   Okay.  When an individual receives money from

24   State Farm for a loss that's covered by their

25   insurance, can they use that money however they want,

## Page 138

1    or do they have to make the repairs that are the

2    subject of the claim?

3    A   I guess they can use that money any way they

4    want.

5    (WHEREUPON, Exhibit No. 54 marked for

6    identification.)

7    Q   (By Mr. Burge)  Okay.  Is Exhibit 54 a letter

8    that you sent to me relating to the automobile claim

9    for the Corvette?

10   A   Yes, sir.  You are F. Tucker?  That's

11   correct.

12   Q   That's correct.

13   A   I know it says Burge and Burge, so, yes, sir.

14   Q   Okay.  And did you receive this letter from

15   me dated June the 29th?

16   A   I received this letter, and I believe it was

17   routed to my team manager, correct.

18   Q   Okay.  You never responded to that letter,

19   did you?

20   A   No, sir, I believe that I – like I said, I

21   routed this letter to my team manager to respond.

22   (WHEREUPON, Exhibit No. 56 was marked for

23   identification.)

24   Q   (By Mr. Burge)  What is Exhibit 56?

25   A   This is a closing report.

## Page 139

1    Q   Okay.  And that was generated by you?

2    A   Correct.

3    Q   It's part of your claims file?

4    A   Correct.

5    (WHEREUPON, Exhibit No. 57 was marked for

6    identification.)

7    Q   (By Mr. Burge)  What is Exhibit 57?

8    A   I – I don't do these, but if memory serves

9    me correctly, this is something that my – that the

10   secretary within our unit would attach to a file once

11   it's prepared to be closed.

12   Q   And it says at the bottom, "external."  What

13   does the "external" part mean, if you know?

14   A   I'm not exactly sure.  Like I said, I never

15   complete this form, so...

16   (WHEREUPON, Exhibit No. 58 was marked for

17   identification.)

18   Q   (By Mr. Burge)  What is Exhibit 58, which was

19   produced to me as part of the claim file?

20   A   This appears to be a notice from the National

21   Insurance Crime Bureau where they -- we would get a

22   print, if a – regarding a vehicle, if it's been

23   cleared from a computer, from the police computer,

24   which I think they call theirs the NCIC, their little

25   national computer.  And on here, it's got "date

## Page 140

1    "recovered 2/25/2005, recovering LEA," which I think

2    stands for law enforcement agency, "DeKalb County

3    Police Department."

4    Q   And the top of the page appears to be an

5    Airborne Express receipt?

6    A   Correct.

7    Q   What were you sending and to whom?

8    A   I don't know why this was copied on this

9    right here, but I think the – if I remember correctly,

10   the inspection that Mr. Bresnock performed was sent to

11   a gentleman named Earl Hieser in our corporate office

12   for his review.

13   Q   Who is Mr. Hieser?

14   A   He is -- I think he's an engineer or he's in

15   our engineering department at State Farm.  Mr. Nix

16   might could answer that better than me.

17   Q   Okay.  On what date was it sent?

18   A   It says June 16th, 2005, but that's not my

19   handwriting on it.

20   Q   And does it show you as the sender?

21   A   It shows sent by me; but if memory serves me

22   correctly, it would have been sent from my secretary,

23   because I'll tell you the truth, I don't know how to

24   use Airborne Express.  And I can tell you I don't know

25   why this recovery notice -- unless it was just included

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 141

1    in -- in error, but --
2    Q   What did Mr. Long do with the money that he
3    received from the settlement based on your
4    investigation?
5    A   From the -- from the Worker's Comp.
6    settlement that he got?
7    Q   Correct.
8    A   From what I recall, he said he paid off some
9    credit card debt. I think he assisted his wife in
10   paying for some -- I think some -- some money for
11   college or tuition, whatever you want to call it. He
12   split some of the money with her, I think he said. He
13   purchased the Corvette, I think he said he bought some
14   personal items, some jewelry, maybe, and a -- and a gun
15   with it.
16   Q   Based on your review --
17   A   That's what I can recall.
18   Q   -- did you find anything unreasonable about
19   him paying off all of his credit card bills with the
20   money?
21   A   No, I didn't find that unreasonable at all.
22   Q   It might be responsible, wouldn't it?
23   A   Probably. It's what I would do.
24   Q   And paying off his wife's student loan, was
25   there anything unreasonable about that?

## Page 142

1    A   I don't know what type of agreement they had
2    in their relationship, so I don't know if that would be
3    unreasonable or not.
4    Q   You mentioned that you've had a Corvette in
5    the past. Is that something that you had always
6    wanted?
7    A   I wouldn't say I always wanted. I've -- when
8    I was young, I -- I restored a lot of hot rods.
9    Q   You don't find anything unreasonable about a
10   man wanting or dreaming to have a Corvette, do you?
11   A   No, I would -- I would love to have a '32
12   three-window coupe, but that doesn't mean I'm going to
13   get that.
14   Q   Based on your evaluation of this gentleman's
15   financial condition, he had money coming in every month
16   for disability?
17   A   That's my understanding, yes, sir.
18   Q   And he produced documentation of that, true?
19   A   Yes, he has -- I believe that disability
20   statement we went over earlier. I don't know if
21   that -- I'd have to look at it. I don't know if it
22   shows an exact amount, but if I can recall, he said he
23   got paid a thousand, 1100, something like that, a
24   month.
25   Q   Did you see his mobile home?

## Page 143

1    A   No, I did not see his mobile home.
2    Q   But you saw that it was valued at $50,000?
3    A   I would have to look at the --
4    Q   Okay.
5    A   -- the claim to see the value on the -- on
6    the claim. I can't recall the exact...
7    Q   Well, in terms of housing, was it your
8    finding that he did not live extravagantly?
9    A   I never -- I never came to that opinion on --
10   on how he lived.
11   Q   Did you find that his monthly expenses were
12   less than his monthly income?
13   A   I don't recall the exact amount of monthly
14   expenses. I know we went over some of them in his
15   recorded statement; but, no, I can't testify that that
16   was -- that he told me all of his expenses that he had.
17   Q   Did he tell you all of the expenses that you
18   asked for?
19   A   I would have to look at the recorded
20   statement and see.
21   Q   You wanted to look at his statement again?
22   A   Yes, thank you. Here he says he receives
23   $1100 in disability. Let me keep reading on. It looks
24   like it's $291 a month for his mobile home payment.
25   His utilities were $80 a month, it looks like, roughly.

## Page 144

1    Based on my initial statement and the
2    questions I asked him, I would say $1100 would be
3    sufficient to pay it; however, there's a lot of
4    questions that -- it could be a lot of other
5    outstanding bills, like food and miscellaneous toiletry
6    items. We have the insurance, I think, which we went
7    over earlier, which I'm not exactly sure if that's all
8    he pays a month in insurance. I think -- if I recall
9    in his statement under oath, the attorney that secured
10   it may have gone over more specific information on his
11   monthly expenses.
12   (WHEREUPON, Exhibit No. 91 was marked for
13   identification.)
14   Q   (By Mr. Burge) And is Exhibit 91 a report
15   that you wrote after that examination under oath? I
16   won't ask you if it's complete because it appears that
17   some parts of it has been whited out, but that's what
18   been produced to me.
19   A   Yes, this is something I completed, a
20   post-examination under oath summary report.
21   Q   And does that refresh your memory on the
22   first page as to his fixed monthly expenses on the
23   first page?
24   A   The expenses for the mobile home and for the
25   utilities, based off this, they were approximately

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

## Page 145

1   $591; but there again, there are possibly others,
2   expenses he may have.
3       Q   But you didn't bother to find those out,
4   true?
5       A   I did not request those in the examination
6   under oath, because I didn't question him on that. I
7   just left it to the attorney.
8       Q   At any time you did not request other
9   information about his monthly expenses?
10      A   Based on the recorded statement, I did not --
11  I did not request from him his specific additional
12  information.
13      Q   Was he essentially debt free when his car was
14  stolen, based on your investigation?
15      A   Based on his testimony, yes.
16      Q   Okay. And based on your review of records?
17      A   Looking at -- from what I recall from the
18  facts of the claim, he -- even though he had spent
19  almost all of his money he got from his settlement, he
20  was debt free from the bills that he had told us about.
21      Q   Could Mr. Long have -- well, first, did he
22  have any encumbrances that you know of on that
23  Corvette, any liens from anybody?
24      A   Is that what you mean by encumbrances?
25      Q   Right?

## Page 146

1       A   Not that I know of, no.
2       Q   Not based on your investigation?
3       A   No. He -- he provided a copy of the title
4   that showed no lien on the title.
5       Q   So he could have sold that car at any time,
6   true?
7       A   With the clear title, I -- yeah, I assume so.
8       Q   So if he needed money and wanted to sell that
9   car, there would be nothing to prevent him from doing
10  that, would there?
11          MR. NEWMAN: Object to the form of the
12      question.
13          THE WITNESS: Repeat the question again,
14      please.
15      Q   (By Mr. Burge)  If -- there was nothing that
16  would have inhibited him from selling that Corvette if
17  he needed money?
18          MR. NEWMAN: Same objection.
19          THE WITNESS: I guess if he needed
20      money, he could have sold anything that he
21      owned.
22      Q   (By Mr. Burge)  Okay. And he owned that
23  Corvette free and clear?
24      A   Based on the title, yes, sir.
25      Q   Based on your investigation, he had new tires

## Page 147

1   put on that car since he had purchased it?
2       A   As I recall looking at the receipts, I think
3   we looked at earlier, yeah, he had bought from Big 10
4   tire, I believe, is the...
5       Q   And he had last had work done on his car on
6   Friday, February 18th at Big 10 Tire?
7       A   Can I look at those receipts -- do you have
8   those? I want to make sure the dates are right.
9       Q   Well, but without looking at the date, do you
10  not recall when he last had work done on his car?
11      A   I recall that he had a suspension problem,
12  apparently because he had tie rod ends, if I remember
13  correctly, replaced, and an alignment done on the
14  vehicle prior to this, but I don't recall the exact
15  date. I'm sorry.
16      Q   It's the very first page, 2/18/05.
17      A   I see that. I haven't got to it. I'm sorry,
18  I'm a little slow. Okay?
19      Q   That's all right.
20      A   2/18, it looks like he had a thrust angle
21  alignment tie rod end, new, put on it; tire rod end,
22  labor, put on it, and then there is a fee for shop
23  materials.
24      Q   How much did he pay on that date?
25      A   Invoice total was $270.45.

## Page 148

1       Q   So he still had work done to improve his car
2   on the day he leaves for Atlanta based on the materials
3   that you were provided during your investigation, true?
4           MR. NEWMAN: Object to the form of the
5       question.
6           THE WITNESS: Rephrase that, if you
7       don't mind.
8       Q   (By Mr. Burge)  He was still having work done
9   to improve his car?
10          MR. NEWMAN: Same objection.
11      Q   (By Mr. Burge)  On the day that he left for
12  Atlanta based on your investigation?
13          MR. NEWMAN: Same objection.
14          THE WITNESS: Looking at -- looking at
15      this, it looks like when you start talking
16      about tie rod ends, that's talking about
17      front suspension and alignment, that tells me
18      that he was required to do this in order to
19      drive that vehicle.
20      Q   (By Mr. Burge)  And that improved the car,
21  true?
22      A   No, that would tell me that he gets it back
23  in the condition that another car similar to that would
24  be. I think a car of 70,000 miles, which this shows
25  the mileage of 70,000, that to me seems unusual that

## Page 149

1  you would need to replace tie rod ends on it.

2    Q   70,000 is the exact number, I'm sorry?

3    A   It says mileage, 70,000 -- it looks like 804.

4    Q   Okay.

5    A   That's -- I assume that's a 70,804, but

6  that's just based off this invoice.

7    Q   And the mileage on the one before, what was

8  that?

9    A   That was February the 10th, 70,000.

10   Q   So he's driving about 800 miles a day -- I

11  mean, excuse me, about a hundred miles a day on average

12  for that eight-day period between those two?

13   A   Based off this, yes, sir.

14   Q   Okay. Did you talk to anybody at Big Ten

15  Tire Company at any point during your investigation?

16   A   I don't recall talking to Big 10.

17   Q   Did you interview anyone at the State Farm

18  office in Millbrook where Mr. Long purchased this

19  policy?

20   A   Interview -- I believe I spoke to the -- the

21  agent contacted me on -- but I don't think I did a

22  formal interview where I would have recorded our

23  conversation.

24   Q   Did you speak with anyone who worked there

25  who saw Mr. Long's Corvette?

## Page 150

1    A   I believe I spoke to one of their

2  representatives, if I can look back through this. I

3  spoke with Lee, looks like, on March the 2nd. And she

4  was one that apparently Mr. Long had provided her a

5  copy of his Alabama DMV receipt, but I don't recall her

6  saying she ever physically inspected the vehicle. I

7  don't recall the agent saying if he ever physically

8  inspected the vehicle.

9    Q   And if you had asked that and they had told

10  you that, is that something that you expect would have

11  been in your report?

12   A   May or may not have. I can't -- I can't say.

13  Because, to be honest, I don't recall exactly what I

14  spoke with the agent about, about the claim. It has

15  been a long time ago.

16       THE WITNESS: Is it okay if we take

17  another break?

18  (Whereupon, a discussion ensued off the record.)

19   Q   (By Mr. Burge)  And you said you weren't part

20  of the claim committee?

21   A   Me?

22   Q   Right.

23   A   No, sir.

24   Q   Did you ever see in the claim committee

25  report where it noted that you recommended that the

## Page 151

1  claim be denied?

2    A   Yeah, I recommended the claim be denied.

3    Q   Okay. Based on your conclusion that there

4  had not been a loss as defined in the policy?

5    A   And based on material misrepresentation.

6    Q   What are the material misrepresentations

7  relating to the automobile claim?

8    A   Well, I got misrepresentations, and I can't

9  recall all of them, there is so many. But I can kind

10  of break them down in some categories for you, if you'd

11  like. I got -- there's misrepresentations related to

12  the facts of the claim. Initially, Mr. Long told me

13  that he went to the Atlanta area just to relax, and

14  that he chose a -- just a random hotel off the side of

15  the interstate. And after his initial statement, he

16  actually told me that, in essence, he actually had a

17  girl with him. He didn't go by himself, even though I

18  questioned him specifically about that.

19       I also questioned him at that time about if

20  there was any other friends or parties that were with

21  him, and he said, no, there were not. However, during

22  his statement under oath, he ended up changing that

23  story and said that there were two brothers and some

24  other friends. I guess these are two brothers of -- of

25  Valerie Ware that was with him.

## Page 152

1       As for Valerie Ware, he claimed he didn't

2  even know her last name. He said her name was Valerie,

3  and that was the only way he knew her. And he

4  continued to maintain that until throughout the

5  statement under oath, actually, until confronted, if I

6  remember correctly, with the cell phone records that

7  had her name on it.

8    Q   He brought you those cell phone records,

9  didn't he?

10   A   Correct, I believe.

11   Q   Okay. Go on.

12   A   He initially claimed that he discovered his

13  vehicle missing when he went just downstairs to the

14  lobby and was possibly going to get something to eat,

15  but he changed his story and ended up saying that

16  his -- one of the girls that was with one of Valerie's

17  brothers was actually the one that discovered the

18  vehicle missing the next morning. He initially said

19  that he reported the theft to the police, then he

20  changed his story and ended up saying that it was one

21  of the brothers that actually called the police.

22   Q   But the police were called that morning,

23  true?

24       MR. NEWMAN: Are you going to let him

25  finish?

## Page 153

```
 1        MR. BURGE:  No, I'm going to ask him
 2   this question.  I'm conducting the
 3   examination --
 4        MR. NEWMAN:  I know you are, that's
 5   fine.  Let me just put on the record an
 6   objection that you're not letting the witness
 7   finish his answer after you've asked him a
 8   question; you're interrupting him.
 9        Q    (By Mr. Burge)  And it was reported to the
10   police that morning, true?
11        A    Yes, it was reported.
12        Q    Okay.  Continue.
13        A    There were questions regarding the -- the
14   contents in the vehicle that he indicated he had
15   numerous contents in the -- in the vehicle, some
16   were -- some of which were suitpants and shoes that he
17   claimed he had purchased the month before the theft and
18   provided an invoice on that.
19        Q    And that's part of the homeowner's claim?
20        A    It's -- it's part of the loss, this one theft
21   loss.
22        Q    But it's the homeowner's claim?
23        A    Well, it goes to the totality of the alleged
24   theft.
25        Q    Well, I understand that that's what you're
```

## Page 154

```
 1   saying, but I just want to make clear that what you're
 2   talking about now are the claims that he made under the
 3   homeowner's policy, which we haven't got to yet.
 4        A    No, what I'm talking about now is the alleged
 5   theft of the vehicle.  He has two policies, however.
 6   To me, it is one theft that he's alleging.  He
 7   initially tried to -- was told during the initial
 8   stages that his auto policy would only pay up to $200
 9   for all these alleged personal items, and only at that
10   point in time did he turn around and file a separate
11   homeowner's claim, but --
12        Q    Regardless of the timing, the items were
13   claimed under the homeowner's policy, right?
14        A    They were -- it's still the same theft.
15        Q    Okay.  Two different claims arising out of
16   one theft, right --
17        A    Can I --
18        Q    -- is that right?
19        A    I would like -- which one do you want me to
20   answer?  Which --
21        Q    There were -- you're saying there is one
22   theft, but they're two claims out of one theft?
23        A    He has two policies available to address that
24   one theft claim.
25        Q    And he's making a claim under a policy that's
```

## Page 155

```
 1   a homeowner's policy, and he's making a claim under a
 2   policy --
 3        A    He's making a claim under both, correct.
 4        Q    And the --
 5        A    Are you going to give me an opportunity --
 6        Q    The first page of the auto claim manual says
 7   that each claim will be handled on its own merits,
 8   true?
 9        A    Each claim, yes, sir.
10        Q    It doesn't say each loss, does it?
11        A    Well, this is one theft.
12        Q    It doesn't say each theft will be handled on
13   its own loss; it says each claim, true?
14        A    It said -- let me look at that again.
15        Q    Each claim.
16        A    It does say that.  And then it goes on to say
17   on its own merits in accordance with the facts of the
18   loss.  And unfortunately you -- I don't know where I
19   was as far as on my answer now.
20        Q    You had talked about the contents, and we
21   started talking about those being under the homeowner's
22   policy.  Any other facts of the claim that you claim
23   were misrepresented?
24        MR. NEWMAN:  No, what he said -- I'm
25   going to move to strike because what he said
```

## Page 156

```
 1   was that it was part of the loss and that the
 2   whole thing was viewed together.  That's what
 3   he said.  That's -- you then have rephrased
 4   it.
 5        Q    (By Mr. Burge)  The facts of the claim, any
 6   other misrepresentations that prompted you to recommend
 7   against paying for his lost car?
 8        A    Once again, the items --
 9        MR. NEWMAN:  Same objection, I think he
10   is mischaracterizing the witness's
11   testimony.
12        Q    (By Mr. Burge)  You can go ahead.
13        A    The items that he claimed, the clothing items
14   that I was mentioning earlier, I went to the area where
15   he claimed he purchased them, and they verified that
16   not only had he purchased clothes there in the past,
17   but that he had specifically came there and requested
18   that they write him up an estimate and date it for
19   that -- that month, an invoice; and the owner there
20   said that when, in actuality, he had not purchased all
21   those items that month.
22        If memory serves me correctly, the -- at one
23   point in time, he had mentioned he went -- as for the
24   facts, he said he had went there and went to -- went
25   straight to the hotel and then went to bed that
```

### Page 157

1  evening. But however, I think in his statement under
2  oath, he went on to say that they actually went to one
3  of the girls he was with brother's home in the area and
4  saw them that evening.
5      As for the — the condition of the vehicle
6  itself, the — the fact that he would be concerned to
7  park his vehicle under a surveillance camera, however
8  then go and leave that much money and a never
9  unload his items out of the vehicle and leave all the
10 jewelry and everything in the vehicle, if he was that
11 worried about something happening to his vehicle, that
12 just doesn't make sense to me that he would leave that
13 many items in his vehicle, especially that much cash;
14 the fact that he — he claimed, and even on his
15 affidavit, said the vehicle, it was locked, and he
16 claimed that he had two sets of keys. And in his
17 statement under oath he testified that he, indeed, had
18 two sets of keys, but he could not explain the
19 whereabouts about the second set. And we know that the
20 vehicle was last driven using a — a key based on
21 the — Mr. Bresnock's report, the fact that it just
22 doesn't seem likely that a thief would have stolen that
23 vehicle with a surveillance camera there. Looking in
24 that area, the vehicle was — was parked in close
25 proximity to a window where it would have been readily

### Page 158

1  viewed from the inside of the Country Hearth at that
2  time.
3      Q   Where Ram was working?
4      A   Where Ram was working, correct.
5      Q   Ram, the one who said in the Wal-Mart across
6  the street, cars had been stolen where there are
7  security cameras, true?
8      A   I believe that's what he said, yes, sir.
9      Q   Okay.
10     MR. NEWMAN: I think the question was
11 directed to misrepresentations, and you've
12 kind of —
13     THE WITNESS: I'm sorry.
14     MR. NEWMAN: No, that's all right. It
15 may be fine for Tucker, but I think that's
16 what the question was — started out a long
17 time ago.
18     Q   (By Mr. Burge) Have you told me all the
19 misrepresentations that you relied upon?
20     A   There was a misrepresentation regarding
21 the — he indicated he advised the police of all the
22 items including the gun inside of the vehicle, but the
23 initial report failed to mention any personal items in
24 it. And it's my experience, dealing with DeKalb
25 County, especially if you're dealing with a gun that

### Page 159

1  would have been inside the vehicle, they would have
2  included that on their initial report.
3      Q   Any other reasons?
4      A   I'm sure there's more, but that's all that I
5  can recall at this time.
6      Q   Did he misrepresent the value of the
7  Corvette?
8      A   I can't recall if we ever had a — a
9  discussion regarding the actual value of the Corvette.
10 He said that he paid $25,000 for it, and the survey
11 came back that that was right in the ballpark of what
12 the value was.
13     Q   And on his affidavit of loss, he put — when
14 he's asked what he's claiming, he put, "I paid 25,000"?
15     A   Correct.
16     Q   Did you ever meet with Valerie's brothers?
17     A   I never met face to face, I'm sorry.
18     Q   Did you ever speak to them?
19     A   If I remember correctly, I spoke to Ricky
20 Ware, I think it was Ricky Ware. I would have to look
21 back through. I think I also may have spoke to Donald,
22 I'm not sure. I think it was Sandy that I attempted to
23 speak with, and we — and I never spoke to him outside
24 of one initial conversation where he said he didn't
25 have time to speak with me. Yes, I spoke to Ricky

### Page 160

1  Ware.
2      Q   Did each of them confirm that the car was in
3  good condition when they saw it?
4      A   As far as the condition of the car, I believe
5  they all said that it was, you know, a Corvette and in
6  nice shape.
7      Q   Did you find anybody who said that Mr. Long
8  was trying to get rid of that car, any witness
9  anywhere?
10     A   Not that I can recall.
11     Q   Did you ever send him back his premium for
12 the Corvette?
13     A   I'm not an agent. I'm not in charge of that.
14     Q   Does your claim file reflect that he was ever
15 repaid anything for the Corvette?
16     A   Not that I recall.
17     MR. NEWMAN: On the premium now, is
18 what —
19     MR. BURGE: On anything.
20     Q   (By Mr. Burge) Did he get his premium back
21 on the Corvette, based on your claim file?
22     A   I'm not an agent, so I don't — I don't know
23 how that works. I don't think anything in our file
24 here reflects that he got a paid premium back, but I'm
25 not sure.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 161

1   Q   So is it accurate that your recommendation,
2   at least in part, relating to the claim for the missing
3   automobile and damaged automobile was based on
4   misrepresentations regarding personal property contents
5   that were the subject of the homeowner's claim; is that
6   accurate?
7       MR. NEWMAN:  Object to the form of the
8   question.
9   Q   (By Mr. Burge)  You can answer.
10  A   My recommendation was based on the totality
11  of the misrepresentations that your client made during
12  the presentation of his claim.
13  Q   And I want you to answer my question.  You've
14  said that a number of times, and I appreciate it, but
15  did you or did you not recommend that the automobile
16  policy claim for the damage to the automobile be
17  denied?  Yes or no?
18  A   Yes.
19  Q   Did you, in part, make that recommendation
20  based on what you perceive to be misrepresentations
21  regarding the value of certain clothing items that were
22  contents of the car at the time that had left that
23  parking lot?
24      MR. NEWMAN:  Object to the form of the
25  question.  He's been over this.

Page 162

1   Q   (By Mr. Burge)  You can answer it.
2       MR. NEWMAN:  But he's been over it.
3       MR. BURGE:  No, but he didn't answer it,
4   so I want him to answer it.
5       MR. NEWMAN:  He can keep giving the same
6   answer because it's a satisfactory answer.
7       MR. BURGE:  No.
8       MR. NEWMAN:  You just don't like it.
9       MR. BURGE:  No, I object to counsel
10  instructing the witness how to answer the
11  question, and that's exactly what just went
12  on.  It's improper.
13      MR. NEWMAN:  I object to counsel
14  continuing to try to get the answer out of a
15  witness when he knows the witness has
16  answered the question several times.  He just
17  does not like it, and that's improper.
18  Q   (By Mr. Burge)  Was there a misrepresentation
19  about the value of the clothes that were personal
20  property in the car, based on your investigation, that
21  prompted you to recommend — at least in part prompt
22  you to recommend that the car be — the automobile
23  claim be denied?
24      MR. NEWMAN:  Same objection.
25      THE WITNESS:  I'm going to give you the

Page 163

1   same answer.  The totality of the
2   misrepresentations in this theft is what led
3   to my recommendation that this claim be
4   denied.
5   Q   (By Mr. Burge)  And the totality for the —
6   that resulted in your recommendation included what you
7   perceived to be misrepresentation about the value of
8   the clothing items, true?
9   A   I disagree because you said "value."
10  Q   What word would you prefer?
11  A   The question is were they ever — did they
12  ever exist.
13  Q   The totality, in your opinion, includes
14  whether or not there were clothing items inside the
15  car, true?
16  A   Once again, the totality of all the
17  misrepresentations I considered in the evaluation of
18  the theft claim loss.
19  Q   And my question is whether that totality
20  included misrepresentations that you believed were made
21  in the homeowner's claim?
22  A   It included the fact that he's claiming items
23  in that car that were not there.
24  Q   And those are items he claimed under the
25  homeowner's policy, right?

Page 164

1   A   Actually, no, he initially claimed he had
2   items stolen under his auto policy.
3   Q   And then you helped him revise his claim so
4   that it fit within his coverages, true?
5   A   No, I did not.
6   Q   Who did?
7   A   If memory serves me correctly, he spoke with
8   a — a field claim rep that initially told him that
9   only $200 was the only amount that was included under
10  his comprehensive coverage for contents.
11  Q   And so the items at the time that the claim
12  was denied, all the personal items were made under the
13  homeowner's policy, correct?
14  A   Rephrase that question, if you don't mind.  I
15  want to make sure —
16  Q   At the time that the claims were denied, all
17  of the personal items in the car were being — he was
18  seeking to recover under the homeowner's policy, true?
19  A   I think that's true.
20  Q   The homeowner's policy is something that he
21  had had in effect for a number of years, true?
22  A   I'm not sure how long he had had that in
23  effect.
24  (WHEREUPON, Exhibit No. 61 was marked for
25  identification.)

## Page 165

1    Q    (By Mr. Burge) In your claim file, you have
2  Exhibit 61, which is the manufacturer's home
3  application?
4        MR. NEWMAN:  It's not part -- I think,
5  let me see that, Tucker.  That's not part of
6  the claim file, but you can ask him that.
7        MR. BURGE:  That was sent to me as being
8  his application by State Farm's lawyers.
9        MR. NEWMAN:  That's right, your question
10  was was it in the claim file.
11    Q    (By Mr. Burge) Did you ever see that before
12  today?
13        MR. NEWMAN:  You asked for questions
14  concerning things in the underwriting as well
15  as the claim file.
16    Q    (By Mr. Burge) Have you ever seen that
17  before?
18    A    I don't recall seeing his manufactured home
19  application.
20  (WHEREUPON, Exhibit No. 59 was marked for
21  identification.)
22    Q    (By Mr. Burge) Have you ever seen Exhibit 59
23  before, which is his declarations page for his
24  homeowner's policy?
25    A    I don't recall seeing his declarations, no.

## Page 166

1  (WHEREUPON, Exhibit No. 60 was marked for
2  identification.)
3    Q    (By Mr. Burge) Do you ever recall seeing the
4  renewal certificate which says "we appreciate our
5  long-term customers," that's Exhibit 60?
6    A    No, I don't recall seeing this.
7    Q    Before adjusting his claim for the contents
8  of this car, did you undertake to find out whether he
9  had a policy in effect?
10    A    Pursuant to his -- a fire claim record, he --
11  he did have a policy in effect.
12    Q    And did you ever see a copy of that policy?
13    A    I saw the -- the fire claim report.
14    Q    Okay.  Did you ever see a copy of his policy?
15    A    The specific -- his specific policy?
16    Q    Or the policy --
17    A    No.
18    Q    -- that he had?
19    A    No.  I have seen a policy similar to the one
20  he had, but I did not see his policy.  I don't request
21  certified policies on every claim.
22  (WHEREUPON, Exhibit No. 62 was marked for
23  identification.)
24    Q    (By Mr. Burge) Is Exhibit 62 a copy of that
25  policy?

## Page 167

1    A    Do you have the fire record, fire service
2  record, fire claim service record I could look at?
3  (WHEREUPON, Exhibit No. 65 was marked for
4  identification.)
5    Q    (By Mr. Burge) That's Exhibit 65.
6    A    Thanks.  He had a manufactured home policy
7  7933 and, what you've got right here, without going
8  through the whole thing, I believe this is a 7933.  It
9  says it here.
10    Q    What is a PDQ printout?
11    A    I'm not sure exactly what you're saying about
12  PDQ.
13  (WHEREUPON, Exhibit No. 63 was marked for
14  identification.)
15    Q    (By Mr. Burge) Let me show you Exhibit 63
16  that was produced by State Farm in this case.  Are you
17  familiar with that document?
18    A    I've never seen this document.  I think this
19  appears to be some type of underwriting document, but
20  I'm not sure.
21  (WHEREUPON, Exhibit No. 64 was marked for
22  identification.)
23    Q    (By Mr. Burge) Let me show you Exhibit 64.
24  Is this the referral of this particular claim to the
25  SIU unit?

## Page 168

1    A    Yes, sir.
2    Q    What was the reason for sending that claim
3  over?
4    A    Do you want me to read the entire brief facts
5  of the claim?
6    Q    I think it has indicators at the back of the
7  third page.  At the bottom of the end of the third
8  page, it says these are the reasons.
9    A    Well, we also take into consideration the
10  facts, so...
11    Q    What does it have listed as your indicators?
12    A    "Indicators/reason for referring," it says,
13  "the insured is not employed.  The hotel night manager
14  overheard the insured and friends talking about adding
15  items to the items taken in the vehicle claim history."
16    Q    What is the policy number for that claim -- I
17  mean, the claim number for that particular claim?
18        MR. NEWMAN:  Let me see that a minute.
19  Okay.
20        THE WITNESS:  01 Q 177057.
21    Q    (By Mr. Burge) So it has a different claim
22  number than the claim for the Corvette under the auto
23  policy?
24    A    It has a different claim number, yes, sir.
25    Q    And did you do a preliminary report in that

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 169

1  case, just as you had done for the other claim?

2     A  I assume I would have.

3     Q  Okay. In fact, did you do two property loss

4  preliminary reports; one on the 4th of March, and one

5  on the 11th of March of 2005?

6     A  I assume I would have. Can I view those?

7  (WHEREUPON, Exhibit No. 66 and Exhibit No. 67 were

8  marked for identification.)

9     Q  (By Mr. Burge) Those are 67 and 66.

10    A  Correct.

11    Q  Would you hand me 66.

12    A  (Witness complied with the request of

13 counsel.)

14    Q  It looks like you have the same nine

15 indicators that you had on the other one in terms of --

16 in the automobile claim in terms of why it was sent

17 over to SIU. Here's that one. It's Exhibit 20, if you

18 want to compare.

19    A  This is the same one (indicating).

20    Q  Okay. Same -- the same indicators that we've

21 already talked about?

22    A  This is the same report you just gave me,

23 Exhibit 20 and Exhibit 66 are the same. Someone has

24 written -- put that number right there (indicating).

25 That's not my handwriting.

## Page 170

1     Q  Okay. So someone just took the auto one and

2  changed it to the homeowner's claim number?

3     A  No, I disagree with that. Somebody has just

4  marked through that and added that. I don't know why

5  they would do that, so that's not my handwriting.

6     Q  Is 67 one that is specifically for the

7  homeowner's claim?

8     A  Yes.

9     Q  Does it have the same indicators?

10    A  It looks like he has similar indicators.

11    Q  Okay. "He" being you? I mean, did you

12 generate that report?

13    A  This (indicating)?

14    Q  Yes.

15    A  Yes.

16 (WHEREUPON, Exhibit No. 68 was marked for

17 identification.)

18    Q  (By Mr. Burge) Okay. Did you have a copy of

19 this statement taken of the plaintiff by Pearlie

20 Harris, which is Exhibit 68?

21    A  Yes.

22 (WHEREUPON, Exhibit No. 69 was marked for

23 identification.)

24    Q  (By Mr. Burge) What is Exhibit 69?

25    A  That's a personal property inventory form.

## Page 171

1     Q  What claim number does that one relate to?

2     A  The homeowner's claim, 01 Q 177057. I was

3  talking to myself I'm sorry.

4     MR. NEWMAN: Go ahead. And say it out

5  loud for her.

6     THE WITNESS: 01 Q 177057.

7     Q  (By Mr. Burge) And does it include a gun and

8  a bracelet listed from a Quick Pawn Shop.

9     A  It doesn't say pawn shop on there, but it

10 does have a 45 auto handgun and four bracelets.

11 (WHEREUPON, Exhibit No. 70 was marked for

12 identification.)

13    Q  (By Mr. Burge) And Exhibit 70, are those

14 receipts that he provided to you for a handgun and for

15 a bracelet?

16    A  Yes, sir.

17    Q  Did I understand you earlier to say that you

18 would expect the DeKalb County Police report to mention

19 that a gun was -- had been stolen in the car?

20    A  In my experience, dealing with DeKalb County,

21 they, if a gun has ever been alleged to be stolen in a

22 vehicle -- along with a vehicle, they would include

23 that in their report.

24 (WHEREUPON, Exhibit No. 71 was marked for

25 identification.)

## Page 172

1     Q  (By Mr. Burge) Did you get Exhibit 71 from

2  the City of Millbrook Police during your investigation,

3  showing that on the morning of Monday, February 21st,

4  Mr. Long made a report for a 45 automatic handgun that

5  was stolen in Atlanta?

6     A  It is a report. I don't know what this

7  handwriting is on the bottom, though. But it

8  is underlined stolen in Atlanta.

9     Q  And that's a report that was sent to you by

10 the Millbrook Police Department as part of your

11 investigation?

12    A  Correct.

13 (WHEREUPON, Exhibit No. 72 and Exhibit No. 73 was

14 marked for identification.)

15    Q  (By Mr. Burge) What are Exhibits 72 and 73

16 and whose handwriting?

17    A  Exhibit 72, that's my handwriting. And I

18 believe these are notes that I was taking as I secured

19 Mr. Long's initial recorded statement. I'm going to

20 look through Exhibit 73. Hang on.

21    Q  First, whose handwriting is it?

22    A  Let me finish looking through it, and then I

23 can tell you. Exhibit 73 is my handwriting, and it

24 looks like this is his statement under oath, my notes I

25 was taking during his statement under oath. Mr. Long's

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 173

1  statement under oath.
2  (WHEREUPON, Exhibit No. 74 was marked for
3  identification.)
4      Q   (By Mr. Burge) What is Exhibit 74 and whose
5  handwriting is it?
6      A   This is my handwriting, and it looks like it
7  relates to valuation of his claim.
8      Q   What did you determine based on those notes?
9      A   This is not an exact determination. This
10  just looks like some notes where I was writing down
11  items. I know that, like, cash is -- there's only $200
12  available under the homeowner's for cash, so I've got
13  cash here, $200. At the bottom, it's got $3,078.24;
14  but in the absence of any additional things, this is my
15  notes, but I don't know the exact amount.
16      Q   Does it appear to be you were trying to
17  figure out what the maximum exposure could be?
18      A   Could be. I don't really know. I just know
19  it's apparently something I was doing as part of
20  valuating the claim.
21      Q   Do you know when you did that?
22      A   There's no date on here, and I can't recall
23  the exact.
24      Q   And when you say there's special limits, it
25  doesn't matter if he had had any amount of money more

## Page 174

1  than $200 in that car; 200 is all that would have ever
2  been covered?
3      A   That's all that's covered under the
4  homeowner's coverage, yes, sir.
5      Q   What is "ISO claim search"?
6      A   That's -- if I can remember correctly, it's
7  Insurance Services Organization, and we go in and do a
8  claim search to -- it's similar to frequency tracking;
9  whereas, we see if there's any history. Also, we enter
10  the claims on that.
11  (WHEREUPON, Exhibit No. 75 was marked for
12  identification.)
13      Q   (By Mr. Burge) And what is Exhibit 75?
14      A   It looks like this is the initial entry that
15  that would have went to ISO from State Farm by the
16  claim central unit when the claim was set up.
17  (WHEREUPON, Exhibit No. 76 was marked for
18  identification.)
19      Q   (By Mr. Burge) Let me show you what's marked
20  as Exhibit 76. Is this a letter that you were copied
21  with that Mr. Nix sent to Mr. Long?
22      A   Yes, sir.
23      Q   And you said that that -- you mentioned
24  earlier that misrepresentation that's mentioned in
25  there, is that concerning the contents of the car?

## Page 175

1      MR. NEWMAN: Object to the form of the
2  question.
3      THE WITNESS: Repeat the question again,
4  I'm sorry. I'm sitting here looking at the
5  form.
6      Q   (By Mr. Burge) The misrepresentation
7  language that's in there mentions there -- "we're
8  reserving our rights based on the potential for there
9  being misrepresentations." Do you know if that relates
10  to the contents that were in the car?
11      A   Since it's under that policy number and claim
12  number for the homeowner's, yes, sir.
13  (WHEREUPON, Exhibit No. 77 was marked for
14  identification.)
15      Q   (By Mr. Burge) And Exhibit 77, is that what
16  you mentioned earlier about being the receipt for the
17  clothes?
18      A   Yes, sir.
19  (WHEREUPON, Exhibit No. 78 was marked for
20  identification.)
21      Q   (By Mr. Burge) Exhibit 78, is this showing
22  that -- that claim was denied for concealed or
23  misrepresented facts?
24      A   Correct.
25      Q   What is the date of that?

## Page 176

1      A   June 29th, 2005.
2      Q   Did you agree with the denial of that claim?
3      A   Yes, I did.
4      Q   And when did you recommend that that claim be
5  denied, on what day?
6      A   I don't recall the exact day of my
7  recommendation.
8      Q   Do you make a recommendation first to your
9  supervisor, Mr. Nix, and then he, in turn, makes a
10  recommendation to someone above him in authority and so
11  forth?
12      A   We discussed the claim, Mr. -- my team
13  manager, Mr. Nix and I, we discussed the claim. And
14  it -- and at that point in time, I will complete a
15  draft of a recommendation, and then it goes to him; and
16  after that, it goes to -- a claim committee will hear
17  it next.
18  (WHEREUPON, Exhibit No. 79 was marked for
19  identification.)
20      Q   (By Mr. Burge) Exhibit 79, did you have a
21  copy of this, which apparently relates to the hail
22  damage from -- this gentleman's -- to this gentleman's
23  house, and his statement that since he had been out of
24  work for some time, that he had spent the money to
25  repair the roof?

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 177

1 　　　MR. NEWMAN: Object to the form of the
2 question.
3 　　Q   (By Mr. Burge) Or to pay bills rather than
4 repair the roof?
5 　　A   I've never seen this document.
6 (WHEREUPON, Exhibit No. 80 was marked for
7 identification.)
8 　　Q   (By Mr. Burge) Okay. Here's Exhibit 80. Do
9 you recognize that document? It's got your name at the
10 top. It's Bates stamped records relating to the
11 homeowner's claim file.
12 　　　MR. NEWMAN: It looks like one of my
13 documents that we created. Probably
14 shouldn't have been produced to you.
15 　　　THE WITNESS: That's not one of my
16 documents. I've never seen that before. Is
17 that yours?
18 　　　MR. NEWMAN: Yeah.
19 　　Q   (By Mr. Burge) When your friend's car was
20 stolen, did you see the golf clubs in it before it was
21 stolen?
22 　　A   Yes, I did.
23 　　Q   Okay. If you hadn't seen the golf clubs in
24 there and he had said I have had my car stolen and I
25 want to report the golf clubs under the homeowner's

## Page 178

1 policy and I want to recover for the car under my
2 automobile policy, would you treat that as one theft?
3 　　A   I don't think he was insured with State Farm,
4 so I don't know how he would handle that and --
5 　　Q   If an individual has a car that has some
6 contents in it, let's say they are golf clubs --
7 　　A   Okay.
8 　　Q   -- and that a person has both homeowner's and
9 automobile coverage, would it be common for them to
10 claim the loss of the golf clubs under the homeowner's
11 portion and then the loss or damage to the car under
12 the auto part?
13 　　A   Once again, depending on their policy, I
14 guess I would have to see what their policy says and
15 how much is allowed for underneath their auto policy.
16 I'm -- I can't give you an exact answer there, I'm
17 sorry.
18 　　Q   If I say that that there was -- the golf
19 clubs were worth enough that they were more than any
20 contents coverage that would have been associated with
21 the automobile policy, would it be common to have a
22 homeowner's claim and an auto claim?
23 　　A   When you say "more," I'm sorry, you're losing
24 me. I'm -- I'm sorry.
25 　　Q   Is this the first time you had ever handled a

## Page 179

1 claim that had a homeowner's -- is this the first
2 homeowner's claim you ever handled?
3 　　A   No.
4 　　Q   Is it the first homeowner's claim you had
5 ever handled in connection with a theft of a car?
6 　　A   No, not that I recall.
7 　　Q   Is that common, that there are times when
8 you've handled those claims in connection with the
9 theft of a car?
10 　　A   I can't speak for other people, but I have
11 done that before in the past.
12 　　Q   And if it turns out that the -- on the
13 homeowner's portion of the claim that the insured
14 claims something was in the car that you do not believe
15 was in the car, it is your practice to deny the entire
16 homeowner's claim or just that -- for that article?
17 　　A   I look at the -- all the facts associated
18 with the theft.
19 　　Q   And then do you deny only the item that you
20 do not believe was in the car or do you deny the claim
21 in its entirety for the contents of the car?
22 　　A   I don't deny.
23 　　Q   Okay. Do you recommend that the claim be
24 paid up to the amount of the items without the item
25 that you don't believe was in the car, or do you

## Page 180

1 recommend that nothing be paid on the claim?
2 　　　MR. NEWMAN: Object to the form of the
3 question.
4 　　　THE WITNESS: I can't recall the outcome
5 of the other claims whereas it would have had
6 a -- two separate policies involved. I'm --
7 I'm telling you all I can speak for is on
8 this particular theft loss.
9 　　Q   (By Mr. Burge) Have you ever, on a
10 homeowner's claim, told the insured I'm only going to
11 pay the claim for these particular items, and I'm not
12 going to pay the claim for those particular -- other
13 particular items because I don't believe these other
14 particular items were present?
15 　　　MR. NEWMAN: Object to the form of the
16 question.
17 　　　THE WITNESS: I guess the easiest way to
18 answer that is at what point in time; if
19 someone is misrepresenting information, how
20 do you know what is legitimate and how do you
21 know what is falsified?
22 　　Q   (By Mr. Burge) And my question is: Have you
23 ever paid part of a claim but not another part of the
24 claim because you believe part of the items claimed
25 were not in the -- were not lost?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 181

1    MR. NEWMAN:  Same objection.

2    THE WITNESS:  If someone has

3    misrepresented facts of a claim and -- once

4    again, how do you know what part is

5    legitimate and how -- what part -- so to

6    answer your question, I don't recall paying a

7    partial amount.

8    Q    (By Mr. Burge)  If you find that a car was

9    stolen and you believe that the car was stolen, and the

10   insured also makes a homeowner's claim for personal

11   contents, and you don't believe that the personal

12   contents were in the car, have you ever paid the value

13   of the lost automobile and denied the homeowner's

14   claim, or do you just deny everything?

15   MR. NEWMAN:  Same objection.

16   THE WITNESS:  I don't recall prior

17   claims, the results, if they were -- I'm

18   sorry, I just don't recall the outcome.

19   Q    (By Mr. Burge)  Is auto theft a problem in

20   DeKalb County, as this fax cover sheet for the incident

21   report indicates?

22   A    There is -- there is auto theft in DeKalb

23   County, yes, sir.

24   Q    Have you ever read where auto theft chop

25   shops have been broken up in DeKalb County?

## Page 182

1    A    I can't recall if specifically in DeKalb

2    County, but I know that there is chop shops in all

3    states.

4    Q    Have you read about chop shops in the Atlanta

5    metropolitan area?

6    A    I've had -- yeah, I can't -- once again, I

7    can't recall the specifics of it, but I know that I

8    received notices from NICB, if I remember correctly, in

9    the past where they said something about a chop shop.

10   Q    Have you ever received information about auto

11   thefts involving towing?

12   A    What is your specific question regarding

13   towing?

14   Q    Have you ever received any information of tow

15   trucks being used in auto theft?

16   A    I've heard the discussion come up on, like,

17   high-end cars, like Mercedes and BMWs before, but I

18   can't recall the specific amount.

19   Q    Did you make any reports to the police

20   relating to Mr. Long's claims?

21   A    What do you mean police?

22   Q    Did you call the DeKalb County police or

23   notify the DeKalb County police and say, "you know that

24   Corvette theft that Martin Long reported to you, well,

25   I'm the insurance adjustor for State Farm, and he made

## Page 183

1    a claim under his automobile policy, and, you know, we

2    denied it because I think he stole his own car"?

3    Did you ever do anything that, in substance,

4    reported his claim to the police or your suspicion that

5    he was involved?

6    A    No, sir.  This is a civil matter, and this is

7    not a criminal matter.

8    Q    Okay.  But you -- auto theft is a serious

9    issue, isn't it?

10   A    There is a lot of auto theft all over the

11   United States.

12   Q    And but you didn't report Mr. Long to any

13   authority saying that he had stolen his own car?

14   A    I made a referral to the National Insurance

15   Crime Bureau, the results of the investigation, and

16   which is under our guidelines, that's what I'm -- I'm

17   required to do.

18   Q    And --

19   A    But that's not a police.

20   MR. NEWMAN:  He asked you about

21   police.

22   THE WITNESS:  Police, then, no.

23   Q    (By Mr. Burge)  When did you publish to that

24   insurance group the findings of your investigation?

25   A    I don't recall the specific date, but it

## Page 184

1    would have been after a decision was -- was reached.

2    Q    Is it not in your claim report?

3    A    Do you have the other -- the auto report so I

4    can look through it?  I'm sure it's under this.

5    Q    I believe you've got it.

6    A    There's nothing in the activity log, but I --

7    this is something -- I normally would not make an

8    activity log reflecting that I did that.

9    MR. BURGE:  This is as good a time as

10   any for a break, if you-all want.

11   MR. NEWMAN:  Okay.

12   (Whereupon, there was a brief recess.)

13   Q    (By Mr. Burge)  Are there any other records

14   that you've reviewed in this last week that we haven't

15   gone over, because I've gone over now the materials

16   that relate -- that you generated that were produced to

17   me.  You mentioned there may be some photographs.  Are

18   there anything else that you can think of?

19   A    I'll -- I'll check -- on the photographs, but

20   I -- if they weren't produced to you, then apparently I

21   didn't get any.  But I thought that -- the only other

22   thing I can -- that I looked at that I think would have

23   been produced to you was the examination under oath.

24   Q    Did you ever talk to Felicia Flowers?

25   A    No, I did not.

## Page 185

1  Q   Did anyone on your behalf ever speak to her?

2  A   Not on my behalf, no, sir.

3  Q   By the time the claims were denied, had you

4  had a chance to talk to everybody that you wanted to

5  talk to who had been on that trip to Atlanta when the

6  car was stolen?

7  A   I never got an opportunity to speak with -- I

8  had attempted to speak with Sandy, and Sandy had not

9  called me back. But, you know, I had spoke to his

10 brother, which he didn't add anything of any relevance

11 to the investigation.

12     And at -- at some point in time, you can't

13 wait for -- for months for a witness to decide to call

14 you; you've got to move forward and -- and make a

15 decision based on the evidence that you gathered in

16 your investigation.

17 Q   Did either of the Wares that you spoke to,

18 did they sound Jamaican to you?

19 A   I can't exactly recall exactly how they

20 sound.

21 Q   Do you remember reading where -- or do you

22 remember Ram telling you that the gentlemen who were

23 with Mr. Long sounded like they were Jamaican?

24 A   I remember seeing that comment, yes, sir.

25 Q   Do you have any doubt after your

## Page 186

1  investigation that the gentlemen that were with

2  Mr. Long were the Ware brothers?

3  A   I don't doubt that.

4  Q   Is it y'alls responsibility, when a car is

5  recovered and you-all put it in storage, to have it

6  evaluated to protect it against further damage from the

7  elements?

8  A   I mean, we've -- not if it's -- in this

9  particular instance, the vehicle, in my opinion, was

10 a -- rendered a total loss, so what was there to

11 protect?

12 Q   And when did you determine that, at least on

13 the automobile claim, the automobile policy claim, you

14 were dealing with a total loss?

15 A   When I initially inspected the vehicle at Top

16 Cat, it had sit out through a -- a rain and sleet

17 storm. We don't have many snow and sleet storms in

18 this area, but we had snow that weekend or a few -- the

19 few days in advance. And when I initially inspected

20 the car, it was approximately four to six inches in

21 water. And from my experience dealing with cars that

22 have been submerged or had that much water in them,

23 there's a lot of electrical problems that result from

24 that. And it's better to total the vehicle.

25 Q   Why did you have Mr. Bresnock evaluate the

## Page 187

1  car more than once?

2  A   Well, the -- the second inspection was

3  actually at the direction of my management.

4  Q   You didn't think you needed it, but they did?

5  A   They did, correct.

6  Q   And how was that one supposed to be different

7  from the first one?

8  A   Well, we had a question regarding the

9  actual -- what type of alarm system this vehicle had on

10 it. And Mr. Bresnock sent me a one-page report that

11 identified the type of alarm system; however -- and I

12 can't speak for management, but it was my understanding

13 that they felt like they needed him to do a

14 supplemental inspection.

15 Q   If this kind of car is towed from the rear,

16 you said, you know, this is the kind of car you

17 mentioned it's so low to the ground, would there be

18 risk of the front bumper scraping if you tried to tow

19 it from the rear?

20 A   I would say there would be risk of -- of the

21 vehicle scraping whether you tow it from the front or

22 the rear.

23 Q   But if you towed it from the rear, it would

24 be the front that would scrape, would be my point?

25 A   Yes, sir.

## Page 188

1  Q   Okay. Can this car be towed from the rear

2  without leaving skidmarks?

3  A   I'm not sure.

4  Q   Did you do any investigation to find out

5  during your evaluation of this claim?

6  A   When you say "investigation," what do you

7  mean?

8  Q   When you investigated this claim, you know,

9  between the time that it was assigned to you at SIU and

10 the time that you sent the letter to me saying that it

11 had been denied, at any point in time did you --

12 A   I didn't send you that letter.

13 Q   -- investigate to determine whether the case

14 had -- or whether or not the claim had been -- I mean,

15 the car could be towed without leaving skidmarks?

16     MR. NEWMAN: Object to the form of the

17 question.

18     THE WITNESS: I didn't specifically go

19 to a wrecker service and ask are -- is there

20 any way possible, because I knew the

21 vehicle -- there was evidence that the

22 vehicle had been towed and damaged, and there

23 was -- it was obvious in my mind it had been

24 towed at least two times, as well as possibly

25 other times within the wrecker yards. But

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 189

1    from my understanding and experience on --
2    if -- just never mind.
3        Q    (By Mr. Burge)  Have you ever worked for a
4    tow company?
5        A    No, I have not.
6        Q    Has any of your training ever been for a tow
7    company?
8        A    For a tow company?
9        Q    Yeah.  Has any of your training been --
10       A    No.
11       Q    -- involved towing?
12       A    I've never trained with a tow company, but
13   I've seen a lot of vehicles towed.
14       Q    Have you had any specialized training in what
15   to do when a -- or how to investigate a claim to
16   determine whether or not there has been a theft by
17   towing?
18       A    I don't know if there's a school in the
19   United States that teaches that.
20       Q    Okay.  The letter that you sent to me was
21   saying here are the keys and here's where the car is.
22       A    "We've attached one set of keys to the
23   vehicle provided by your client," correct.
24       Q    And you had already spoken to my office, to
25   Jane?

## Page 190

1        A    If I recall from my log, you were not in, and
2    I spoke with Jane.
3        Q    And that's a letter saying that, in
4    follow-up, that you had told her that the claim was
5    being denied?
6        A    Correct, I do recall speaking with -- I think
7    it was Jane.
8        Q    And do you recall telling her on June the
9    28th of 2005 that the claim was going to be denied and
10   that this gentleman was going to have only a limited
11   amount of time in which to pick up his car from the
12   storage facility?
13       A    It's obvious, per my letter here, that we
14   said we would agree to pay for the fees associated with
15   the vehicle through July 1st, 2005 in the amount of
16   $307.  I can't recall the specific telling her that
17   date, but obviously, I have it in a letter to you.
18       Q    How many automobile theft claims have you
19   denied?
20       A    I can't recall exact numbers.
21       Q    Dozens?
22       A    I would say it's safe to say probably, in the
23   last nine years since I've been in SIU, probably
24   theft-related claims, not specific vehicle but
25   theft-related claims, probably a couple dozen.

## Page 191

1        Q    And is it fair to say that you denied a lot
2    more of them since you've been in SIU than you did
3    before you were in SIU?
4        A    No, I handled a -- I handled auto-related
5    claims when I was in the regular line unit, and I
6    handled denials at that time also.  I did
7    investigations at that time as well.
8        Q    So over the years, you have denied dozens of
9    claims relating to the theft of automobiles?
10       A    Not specific automobiles, but related to --
11   yeah, some automobiles, some contents.
12       Q    And have others of these cases ended up in
13   court where you've testified?
14       A    I don't think I've ever had one -- I think
15   this is the first -- there's been other suits filed but
16   never where I had to testify.  If memory is serving
17   correctly, they withdrew before I ever was at the point
18   of testifying.
19       Q    So on other occasions where you have denied a
20   claim --
21       A    I -- can I take that back?  I do -- I was
22   involved, I think, in a magistrate, one that was filed
23   in magistrate court where I was called to testify.  And
24   we got a defense verdict, if I remember correctly on
25   that one, but that's been a few years ago.

## Page 192

1        Q    So by and large, when you deny a claim, State
2    Farm doesn't have to pay and doesn't hear -- doesn't
3    hear about the claim again, as far as you know?
4        A    I disagree on that also.
5        Q    Okay.  I thought you said you denied dozens
6    of theft-related claims?
7        A    Let me --
8        Q    A couple of times --
9        A    Can I elaborate on something?
10       Q    Okay.
11       A    Under our policy, if we denied claims and a
12   lien holder presents a claim following the denial, we
13   will honor a lien holder claim.  So I have been
14   involved before in claims that resulted in a denial
15   where we ultimately paid the lien holder.
16       Q    But in a case like this where there's no lien
17   holder -- you know, a lien holder would be like a bank
18   holding a note on a car?
19       A    Yes, sir.
20       Q    So if there had been a bank holding a note on
21   the car, Mr. Long didn't own the car outright, you
22   might have paid the lien off on the car?
23       A    Well, there's other factors involved in that;
24   they have to repossess the vehicle, they have to
25   dispose of the salvages, other requirements under the

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 193

1  policy for them to file that type of claim.

2      Q   Do you know how far the car was driven, if it

3  was, in fact, ever driven when it left that lot?

4      A   I know the – the approximate distance from

5  the – the area where it was recovered versus where he

6  had claimed he last saw the vehicle.

7      Q   But if it was actually driven from that lot,

8  do you know how many miles it was driven?

9      A   I don't have – no.

10     Q   Did Ram see Mr. Long in the parking lot that

11 night after Mr. Long parked the car and went upstairs

12 with Ms. Temple?

13     A   I don't recall him saying he saw him in the

14 parking lot.

15     Q   Did anybody, based on your investigation, see

16 Mr. Long after he parked that car and went upstairs

17 with Ms. Temple until it was discovered missing the

18 next day?

19     A   Not that I can recall.

20     Q   You just don't know who took that car, do

21 you?

22     A   I just – I suspect who took that car.

23     Q   Okay.  And you have suspicions, but you don't

24 have anyone with firsthand knowledge who says I know I

25 saw this man take this car at this time; you don't have

## Page 194

1  any information like that?

2      A   I don't know specifically who last drove the

3  car.

4      Q   Or when it was last driven?

5      A   Or when it was last driven.

6          MR. BURGE:  I think that's all I have.

7  Thank you.

8          MR. NEWMAN:  Stay here, I'm going to

9  speak with Tommy for a minute.

10         (Whereupon, there was a brief recess.)

11         (Deposition concluded at 3:11 p.m.)

12              –oOo–

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 195

1             C E R T I F I C A T E

2   STATE OF GEORGIA:

3   COUNTY OF FULTON:

4

5       I HEREBY CERTIFY that the foregoing

6   deposition was taken down by me in stenotype, and the

7   questions and answers thereto were transcribed by means

8   of computer-aided transcription, and that the foregoing

9   represents a true and correct transcript of the

10  testimony given by said witness.

11

12      I FURTHER CERTIFY that I am not kin or

13  counsel to the parties in the case; am not in the

14  regular employ of counsel for any of said parties; nor

15  am I in any way financially interested in the result of

16  said case.

17

18

19         _____

19         SHARON A. GABRIELLI, RPR

20         CCR-B-2002

21

22

23

24

25

## Page 196

1

2   TODD SMITH

3   INSTRUCTIONS TO THE WITNESS

4       PLEASE READ YOUR DEPOSITION OVER CAREFULLY
    BEFORE YOU SIGN IT.  YOU SHOULD MAKE ALL YOUR CHANGES
5   ON THE ATTACHED ERRATA SHEET.  PLEASE DO NOT MARK ON
    THE ORIGINAL DEPOSITION.
6       AFTER MAKING ANY CHANGES WHICH YOU HAVE NOTED
    ON THE ATTACHED ERRATA SHEET, SIGN YOUR NAME ON THE
7   ERRATA SHEET AND DATE IT.
        THEN SIGN YOUR DEPOSITION AT THE END OF YOUR
8   TESTIMONY IN THE SPACE PROVIDED.  YOU ARE SIGNING IT
    SUBJECT TO THE CHANGES YOU HAVE MADE ON THE ERRATA
9   SHEET, WHICH WILL BE ATTACHED TO THE DEPOSITION.
        RETURN THE ORIGINAL ERRATA SHEET AND
10  TRANSCRIPT TO MERRILL LEGAL SOLUTIONS, 1201 PEACHTREE
    STREET, N.E., SUITE 200, GEORGIA 30361.
11      ACCORDING TO THE RULES OF CIVIL PROCEDURE,
    YOU WILL HAVE THIRTY (30) DAYS FROM THE DATE YOU
12  RECEIVE THIS DEPOSITION IN WHICH TO READ, SIGN AND
    RETURN YOUR DEPOSITION TO THE ABOVE OFFICE.  IF YOU
13  FAIL TO DO SO, YOU AUTOMATICALLY WAIVE YOUR RIGHT TO
    MAKE ANY CORRECTIONS TO YOUR DEPOSITION.
14      PURSUANT TO RULE 30(E) OF THE FEDERAL RULES
    OF CIVIL PROCEDURE AND/OR THE OFFICIAL CODE OF GEORGIA
15  ANNOTATED 9-11-30(E), BOTH OF WHICH READ IN PART:  ANY
    CHANGES IN FORM OR SUBSTANCE WHICH YOU DESIRE TO MAKE
16  SHALL BE ENTERED UPON THE DEPOSITION...WITH A STATEMENT
    OF THE REASONS GIVEN...FOR MAKING THEM.  ACCORDINGLY,
17  TO ASSIST YOU IN EFFECTING CORRECTIONS, PLEASE USE THE
    FORM BELOW:
18
19  PAGE       LINE     EXPLANATION

20  _____

21  _____

22  _____

23  _____

24
25

49 (Pages 193 to 196)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 197

1  PAGE        LINE        EXPLANATION
2  _____
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23
   DEPONENT'S SIGNATURE _____
24
25 DATE _____

Page 198

1
2        SIGNATURE PAGE OF WITNESS
3
4
5
   I HEREBY ACKNOWLEDGE THAT I HAVE READ THE FOREGOING
6  DEPOSITION AND THAT THE SAME IS A TRUE AND CORRECT
   TRANSCRIPTION OF THE ANSWERS GIVEN BY ME TO THE
7  QUESTIONS PROPOUNDED, EXCEPT FOR THE CHANGES, IF ANY,
   NOTED ON THE ATTACHED ERRATA SHEET.
8
9
10
11
12
13 SIGNATURE:_____
14
   SWORN TO AND SUBSCRIBED BEFORE ME,
15 THIS THE      DAY OF     2007.
   NOTARY PUBLIC
16 MY COMMISSION EXPIRES:
17
18
19
20
21
22
23
24
25

# RICKY WARE

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 | CASE NO.: 2:06cv816-MHT |
| 5 | |
| 6 | MARTIN O. LONG, |
| 7 | Plaintiff, |
| 8 | V. |
| 9 | STATE FARM FIRE AND CASUALTY COMPANY, |
| 10 | Defendants. |
| 11 | |
| 12 | |
| 13 | S T I P U L A T I O N S |
| 14 | |
| 15 | |
| 16 | IT IS STIPULATED AND AGREED by and |
| 17 | between the parties, through their respective |
| 18 | counsel, that the deposition of RICKY WARE may |
| 19 | be taken before STACEY L. JOHNSON, Commissioner, |
| 20 | at the Offices of Beers, Anderson, Jackson, |
| 21 | Patty, Van Heest & Fawal, 250 Commerce Street, |
| 22 | Suite 100, Montgomery, Alabama, on the 27th day |
| 23 | of March, 2007. |

Page 1

| | |
|---|---|
| 1 | IT IS FURTHER STIPULATED AND AGREED |
| 2 | that the signature to and the reading of the |
| 3 | deposition by the witness is hereby waived, the |
| 4 | deposition to have the same force and effect as |
| 5 | if full compliance had been had with all laws |
| 6 | and rules of Court relating to the taking of |
| 7 | depositions. |
| 8 | IT IS FURTHER STIPULATED AND AGREED |
| 9 | that it shall not be necessary for any |
| 10 | objections to be made by counsel to any |
| 11 | questions except as to form or leading |
| 12 | questions, and that counsel for the parties may |
| 13 | make objections and assign grounds at the time |
| 14 | of trial, or at the time said deposition is |
| 15 | offered in evidence, or prior thereto. |
| 16 | IT IS FURTHER STIPULATED AND AGREED |
| 17 | that the notice of filing of the deposition by |
| 18 | the Commissioner is waived. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | INDEX |

Page 2

| | |
|---|---|
| 1 | EXAMINATION BY:            PAGE NUMBER: |
| 2 | Mr. Newman...............................5-24 |
| 3 | Mr. Burge...............................25-26 |
| 4 | Mr. Newman...................................26 |
| 5 | |
| 6 | EXHIBITS: |
| 7 | There were no exhibits marked to this |
| 8 | deposition. |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

Page 3

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | FOR THE PLAINTIFF, MARTIN O. LONG: |
| 3 | BURGE & BURGE |
| 3 | F. Tucker Burge |
| 4 | 2001 Park Place North |
| 4 | Suite 850 |
| 5 | Birmingham, Alabama  35203 |
| 5 | |
| 6 | |
| 7 | FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY |
| 8 | COMPANY: |
| 9 | HELMSING, LEACH, HERLONG, NEWMAN & ROUSE |
| 9 | James B. Newman |
| 10 | (NEWMJ8049) |
| 10 | jbn@helmsinglaw.com |
| 11 | 150 Government Street |
| 11 | Suite 2000 |
| 12 | Mobile, Alabama  36602 |
| 12 | (251) 432-5521 |
| 13 | |
| 14 | ALSO PRESENT: |
| 15 | MR. MARTIN O. LONG |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

Page 4

1 (Pages 1 to 4)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

1    I, STACEY L. JOHNSON, a CSR of Montgomery,
2  Alabama, and Notary Public for the State of
3  Alabama at Large, acting as Commissioner,
4  certify that on this date, as provided by the
5  Federal Rules of Civil Procedure and the
6  foregoing stipulation of counsel, there came
7  before me at 250 Commerce Street, Suite 100,
8  Montgomery, Alabama, beginning at 3:09 p.m.,
9  RICKY WARE, witness in the above cause, for oral
10 examination, whereupon the following proceedings
11 were had:
12            RICKY WARE,
13 the witness, after having been first duly sworn
14 to speak the truth, the whole truth, and nothing
15 but the truth, testified as follows:
16            EXAMINATION
17 BY MR. NEWMAN:
18    Q   You are Ricky Ware; right?
19    A   Yes.
20    Q   And, Ricky, my name is Jim Newman, and
21 I'll be asking you some questions today.  It
22 shouldn't be long.
23    A   Okay.

Page 5

1    Q   And if you don't understand any of my
2  questions, I would ask you that you stop me and
3  ask me to rephrase them or to state them in a
4  another way so that you'll understand them.
5  Okay?
6    A   Okay.
7    Q   All right.  If you answer them, I'm
8  going to assume that you understood what I
9  asked.
10   A   Okay.
11   Q   Now, when we take these depositions --
12 I think you're going to be good at this -- but
13 sometimes people have a tendency to say uh-huh
14 and huh-uh instead of yes and no and it's hard
15 for her to take down anything but a yes and no
16 or a right or whatever, so let's try to -- if we
17 can.  I'll help you with it because I do it,
18 too.
19   A   Yes.  Okay.
20   Q   Would you state your name, please?
21   A   Ricky L. Ware.
22   Q   And how are you employed?
23   A   With the U.S. Postal Service.

Page 6

1    Q   How long have you been employed by
2  them?
3    A   Nine years.
4    Q   Okay.  And where do you live?
5    A   Edna Brake Lucas Drive, Montgomery,
6  Alabama.
7    Q   Are you married?
8    A   Yes.
9    Q   How long have you been married?
10   A   Eight years, I believe.
11   Q   Okay.  And what's your wife's name?
12   A   Brenda Ware.
13   Q   Do y'all have any children?
14   A   Yeah, we have two kids.
15   Q   Okay.  Did you go to high school around
16 here?
17   A   Yes.
18   Q   Where did you go?
19   A   Robert E. Lee High School.
20   Q   Did you go to any schooling after high
21 school?
22   A   Yes, I did.  Well, I went off to the
23 military first, joined the military.  Did that

Page 7

1  for four years, the Marine Corps.  I came back
2  and I started Trenholm.  I went to Trenholm
3  Technical College.
4    Q   How long were you at Trenholm?
5    A   Like for a year and a half.
6    Q   What did you take there?
7    A   Horticulture.
8    Q   And that somehow got you to the post
9  office, huh?
10   A   No, not at all.
11   Q   If you've been a veteran, you get a
12 preference for the civil service like the post
13 office?
14   A   Right.  You're on a different scale
15 than everybody else when they start hiring.
16   Q   Right.  So you were able to get with
17 the post office?
18   A   Pretty quickly.
19   Q   And where were you when you were in the
20 Marine Corps?
21   A   I was stationed in Yuma, Arizona.  Also
22 stationed Japan.
23   Q   And what did you do in the Marine

Page 8

2 (Pages 5 to 8)

1  Corps?
2     A   Aircraft mechanic.  I worked on the
3  AVAB harrier.
4     Q   That's the one that goes straight up
5  and down?
6     A   Right.
7     Q   You miss it?
8     A   Well, sometimes.
9     Q   You liked the Marines?
10    A   I got out because I had a baby, thought
11 it was the thing to do at the time getting out,
12 supporting my -- instead of being deployed.  But
13 I do miss it.
14    Q   What was your rank when you got out?
15    A   Corporal, E4.
16    Q   Okay.  E4.  And you were honorably
17 discharged?
18    A   Yes.
19    Q   And have you ever been in any lawsuits
20 before?
21    A   No.
22    Q   Where you've been either the person
23 suing or the person being sued?

Page 9

1     A   No.
2     Q   And you've never been convicted of a
3  crime?
4     A   No.
5     Q   You are the brother of Valerie Ware?
6     A   Valerie Ware Temple.
7     Q   And you're the brother of Sandy Ware?
8     A   Correct.
9     Q   And you're the brother of Donald Ware?
10    A   Yes.
11    Q   Okay.  Are there any other Wares?
12    A   Yes.  I have two more brothers.  One of
13 them, he just retired from the Marine Corps.
14 He's in, I think, Virginia right now.  I have
15 another brother right here in Montgomery.
16 There's like five boys and one girl.
17    Q   And Donald lives in Atlanta?
18    A   In Atlanta.  Correct.  The youngest.
19    Q   And on this weekend we're talking
20 about, February the 18th, 19th, and 20th of
21 2005, you and Sandy were going over with Martin
22 and Valerie to visit Donald?
23    A   Right.

Page 10

1     Q   And did you drive your own car over?
2     A   Yes, I drove my own car.
3     Q   Did you have anybody in the car with
4  you?
5     A   Yes.
6     Q   Who?
7     A   A girl named Felicia.
8     Q   Felicia.  Was Felicia your girlfriend?
9     A   Yes, pretty much.
10    Q   Is she still?
11    A   No.  We talk time to time.  You know, I
12 do see her but I can't say girlfriend.  That's
13 not a good word for it.
14    Q   All right.  She was in the car with
15 you, then?
16    A   Right.
17    Q   And was Sandy in the car by himself?
18    A   Yes.
19    Q   Okay.  And what kind of car did you
20 drive over there?
21    A   Drove my Lincoln Navigator.
22    Q   Okay.  Now, did you know Martin Long?
23    A   Well, I knew him through my sister from

Page 11

1  time to time.
2     Q   Okay.
3     A   You know, I think I met him like once
4  or twice.
5     Q   Were you aware whether Martin and
6  Valerie had ever gone to the Atlanta area before
7  to visit Donald?
8     A   No, I don't think so.  I don't think
9  so.
10    Q   You don't know one way or another?
11    A   No.
12    Q   You don't know?
13    A   I don't think so.  I don't think they
14 ever went over there.
15    Q   Had you ever gone over --
16    A   Right.
17    Q   -- to Atlanta with Valerie and Martin
18 to visit Donald?
19    A   I think this was --
20    Q   Before this one time?
21    A   No.  I think it was our first time.
22 Was it our first time?  I think it was our first
23 time.  It was our first time going.  It was our

Page 12

3 (Pages 9 to 12)

1  first time. Right.
2    Q   Okay. You don't remember ever going
3  over there before and staying at Donald's house?
4    A   Not with Martin. Me and Felicia stayed
5  at my brother's house several times.
6    Q   How about with Martin and --
7    A   No.
8    Q   -- Valerie?
9    A   No.
10   Q   Okay. So your recollection is that you
11 and Martin had never been in the Atlanta area
12 together with Donald before?
13   A   Correct.
14   Q   Okay. This was the only time?
15   A   Only time. I had to think about it for
16 a minute.
17   Q   Okay. But you and Felicia had been
18 over there?
19   A   Right. Several times.
20   Q   And stayed with Donald?
21   A   Stayed with Donald, hotel room.
22 Several times.
23   Q   Now, on this particular occasion, y'all
Page 13

1  having -- whether y'all ate together or what
2  happened?
3    A   Okay. We went out -- we ate first. We
4  all ate together. Then we went back to my
5  brother's house.
6    Q   Okay.
7    A   And then me and Felicia and my brother
8  said we was going out.
9    Q   You and Sandy and Felicia?
10   A   Right. Said we were going out. I
11 don't think Martin and my -- I don't think they
12 went out that night. I don't think so.
13   Q   So your best recollection now is that
14 you and Sandy and Felicia went out together and
15 maybe and Valerie and Martin went back?
16   A   Right. Went back to the room.
17   Q   Okay. What time did y'all get in?
18   A   I want to say around about three or
19 four in the morning.
20   Q   Pretty late?
21   A   It was pretty late in the morning.
22   Q   When you came in, did you notice one
23 way or another whether Martin's car was there?
Page 15

1  were staying at a hotel?
2    A   Correct.
3    Q   Country Hearth or something like that?
4    A   I forgot the name of it, but it's like
5  maybe two minutes from my brother's house, two
6  or three minutes.
7    Q   It's on the highway? It's in Lithonia;
8  right?
9    A   Correct.
10   Q   When you got to the hotel, did y'all
11 check in first?
12   A   Did we check in? No. I think we went
13 to my brother's -- how did that happen? It's
14 been a while back. Did we go and check in
15 first, or did we go to my brother's house? I'm
16 not sure. I really don't know.
17   Q   Well, at some point, you checked in,
18 didn't you?
19   A   Right.
20   Q   And that night, Friday night, you did
21 go over to your brother's house?
22   A   Correct.
23   Q   And did you -- do you remember
Page 14

1    A   No.
2    Q   So you didn't see it or not see it?
3    A   I didn't see it. Wasn't even thinking
4  about it or anything.
5    Q   Okay.
6    A   But I know they didn't go out with us.
7  I do know that.
8    Q   You do know they didn't go out?
9    A   They didn't go out.
10   Q   But when you came in, you don't
11 remember seeing his car?
12   A   No.
13   Q   But you don't remember not seeing his
14 car?
15   A   Not seeing his car either.
16   Q   You just weren't paying any attention?
17   A   Wasn't paying no attention at all.
18   Q   Okay. Tell me when you first found out
19 that the car was missing.
20   A   Felicia got up early in the morning,
21 and the Wal-Mart was pretty much right across
22 the street from the hotel room and she went to
23 Wal-Mart. As a matter of fact, I didn't even
Page 16

4 (Pages 13 to 16)

1    know she was going to Wal-Mart. When she came
2    back, I think she called my sister. My sister
3    ran out of the hotel room knocking on my door
4    boom, boom, boom early in the morning. Ricky,
5    somebody stole Martin's car; it's not out
6    there. So I jumped up, threw on some clothes,
7    and ran downstairs.
8    Q    Okay. You didn't even know Felicia had
9    gone?
10    A    I didn't know she had gone.
11    Q    You were sound asleep?
12    A    Right. Sound asleep.
13    Q    Okay. And so the first thing you knew
14    about it was when Valerie knocked on your door?
15    A    Knocked on the door.
16    Q    And then what did you do?
17    A    I jumped up, put on clothes, and I ran
18    downstairs to see what was going on. And sure
19    enough, the car was gone. I'm looking like --
20    even though it was gone, you could see glass
21    right there. I didn't know he was parked
22    there.
23    Q    Okay. What did you do then?

Page 17

1    thing. Just get with the hotel clerk and they
2    will be able to pull the film and we can see who
3    stole it or whatever. And they was like, well,
4    the film wasn't in there, it wasn't on. And the
5    first thing I'm thinking, Martin, I think they
6    had something to do with it.
7    Q    There was some confusion about the
8    film?
9    A    Right.
10    Q    And y'all -- you or somebody --
11    speculated that perhaps they had something to do
12    with it?
13    A    That was me. I speculated on that. It
14    was a young guy. And watching The Fast and The
15    Furious, that's the kind of cars they like.
16    Q    Okay. And you weren't the one who
17    called the police?
18    A    No, I didn't call the police.
19    Q    Did you ever talk to the police?
20    A    No, I didn't.
21    Q    Did you ever talk to the insurance
22    company?
23    A    No, I didn't.

Page 19

1    A    It was puzzling to me because we
2    looked -- man, I can't believe -- everybody was
3    in shock. I know this didn't happen. It was
4    like a -- one time looked -- went looking
5    through parking lot. And we looked across the
6    street at Wal-Mart and we were like, hey, there
7    go the car right over there, but we looked
8    closer and it wasn't it. So we talked to the
9    hotel clerk at the desk. I forgot who called
10    the police. I know I didn't call the police.
11    Q    You know you did not?
12    A    I didn't. I did not call the police.
13    And just so happened -- the camera, we asked --
14    there go the camera. I don't know who pointed
15    out the camera.
16    Q    Did somebody point out the camera that
17    morning?
18    A    Right. We seen the camera was right
19    there. I'm not sure who pointed it out. I
20    think my brother did or Martin. I'm not sure.
21    But the camera was aimed dead at his car. Just
22    so happened the camera was aimed dead at his
23    car. So we were like, well, that's a good

Page 18

1    Q    Did anyone from the insurance company
2    ever call you?
3    A    No, I don't think so.
4    Q    Okay. Have you talked to Mr. Burge
5    before?
6    A    Right. I think so.
7    Q    When did you talk to him?
8    A    It was last week or this week, I
9    believe.
10    Q    Fairly recent?
11    A    Yeah.
12    Q    Okay. What did y'all talk about?
13    A    I think the meeting was going to be
14    here, I believe. He asked me, I think, about my
15    brother's address, asked me for brother's
16    telephone number.
17        THE WITNESS: Is that right?
18    Q    He can't tell you.
19    A    I think he asked me for my brother's
20    telephone number, best way to get in touch with
21    my brother. I give him the number.
22    Q    Did y'all talk about what happened over
23    there in Atlanta on that weekend?

Page 20

5 (Pages 17 to 20)

RICKY WARE

1    A   No, I don't think so. I don't think
2   so. No, we didn't. We didn't.
3    Q   Okay. Have you talked to -- other than
4   your brothers Donald and Sandy, your sister
5   Valerie, Felicia, have you talked to anyone else
6   about that weekend?
7    A   No.
8    Q   Okay. When you've talked to them, have
9   y'all just talked generally about the fact that
10  the car wasn't there, the car was missing, the
11  car was stolen or whatever?
12   A   Recently?
13   Q   No. At any time. Or have y'all tried
14  to go back and put together exactly what
15  happened?
16   A   Well, I would say when it first
17  happened, I called my sister, y'all heard
18  anything about Martin's car? What is what? But
19  until now, maybe a year, I've forgot all about
20  it. I didn't think anything about it.
21   Q   Have you seen Martin since that
22  weekend?
23   A   I think I seen Martin walking out of

Page 21

1    A   Uh-huh.
2    Q   What did you talk about?
3    A   I know he say he had his gun in there.
4    Q   Anything else?
5    A   And he made a comment about he had a
6   brand new pair of shoes he had never worn
7   before, and we made a joke like, well, you'll
8   never wear them shoes. I think that's about all
9   I can remember, his gun and his shoes.
10   Q   Okay. Did you say anything about
11  reporting that to the insurance company?
12   A   No, no. It was a nice car.
13   Q   What kind of car was it that Martin
14  had?
15   A   I want to say a Corvette.
16   Q   Had you ever ridden in it?
17   A   No.
18   Q   Going over there, did you follow it or
19  did it follow you?
20   A   Well, pretty much back and forth,
21  pretty much back and forth.
22   Q   Okay.
23   A   I never seen anything like that happen

Page 23

1   Wal-Mart. Well, we was inside Wal-Mart. But I
2   wasn't sure is that Martin or not. So I didn't
3   say anything too tough.
4    Q   I'm talking ever since February of 2005
5   until today?
6    A   And I think I seen him at my sister's
7   job. I seen his car parked outside my sister's
8   job. I knew he was in there, so I just kept on
9   going.
10   Q   Have you had any --
11   A   Conversations, no.
12   Q   -- conversations, Ricky? Have you had
13  any conversations with him?
14   A   No.
15   Q   Okay.
16   A   You know, I asked my sister have y'all
17  heard anything about Martin's car.
18   Q   Have you ever talked to Martin about
19  what he had in the car that night?
20   A   Yes, I did.
21   Q   When?
22   A   That same night.
23   Q   This same time it was stolen?

Page 22

1   before.
2    Q   What's that?
3    A   A car getting stolen like that. I
4   never seen anything like that happen before.
5   Never witnessed or seen anything like that
6   happen before. You see it on TV and hear about
7   it, but to be right there.
8    Q   Did he say anything about it having an
9   alarm on it? Do you remember anything like
10  that?
11   A   No, he didn't say anything.
12   Q   Okay.
13   A   See, when you from the country, you
14  don't think people do that. I've lived in the
15  country all my life, so I'm not a city boy.
16   Q   I thought you lived in Montgomery?
17   A   That's pretty much -- that's the
18  country.
19   Q   Where you live is in the outskirts?
20   A   Right. Maybe like three minutes from
21  the city limits.
22    MR. NEWMAN: Okay. All right. That's
23  all I've got. I appreciate you coming in.

Page 24

6 (Pages 21 to 24)

EXAMINATION
BY MR. BURGE:
 Q   You and I spoke a number of months ago
on the phone, and I did not speak to you last
week. Did somebody call you up last week trying
to get in touch with --
 A   With my brother. Right.
 Q   I wonder if it was the process server.
Were you served with a subpoena for this?
 A   I was served with a subpoena -- they
give it to my sister and my sister give it to
me.
 Q   Okay.
 A   But I talked with somebody in -- I know
it was dealing with this. They said they was
trying to get into contact with my brother and
give them numbers.
 Q   On the morning that this happened, did
Martin appear to be upset?
 A   Yes.
   MR. BURGE: Thank you.
 A   But, you know, he was upset but not as
upset as I would have thought he would be. He

Page 25

CERTIFICATE

STATE OF ALABAMA    )

COUNTY OF MONTGOMERY )


     I hereby certify that the above and
foregoing deposition was taken down by me in
stenotype, and the questions and answers thereto
were transcribed by means of computer-aided
transcription, and that the foregoing represents
a true and accurate transcript of the testimony
given by said witness upon said hearing.
     I further certify that I am neither of
counsel, nor kin to the parties to the action,
nor am I in anywise interested in the result of
said cause.


     ---------------------------
     STACEY L. JOHNSON, Certified
     Shorthand Reporter and
     Commissioner for the State of
     Alabama at Large.

Page 27

was upset, but he kept his cool. He wasn't
yelling. He kept his cool, but he was upset.
 Q   Did the police come?
 A   Yeah. They came later. It took them a
while to get there.
      FURTHER EXAMINATION
BY MR. NEWMAN:
 Q   Did you talk to the police when they
came?
 A   No, I didn't.
   MR. NEWMAN: All right. Thanks a lot.

FURTHER DEPONENT SAITH NOT

Page 26

7 (Pages 25 to 27)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| MARTIN O. LONG, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) |
| | ) |
| STATE FARM FIRE AND CASUALTY | ) |
| COMPANY, | ) |
| | ) |
| **Defendant.** | ) |

**CASE NO. 2:06CV816-MHT**

STATE OF GEORGIA

_____ COUNTY

## AFFIDAVIT OF ROBERT J. SHARP

Before me, the undersigned for said County and in said State, personally appeared Robert J. Sharp, who is known to me and who, after first being duly sworn, deposes and says:

My name is Robert J. Sharp. I am over the age of 21. I have personal knowledge of the facts contained in this affidavit. I am aware that this affidavit is being submitted in opposition to State Farm's Motion for Summary Judgment in the above-styled case.

**Qualifications and Experience:**

My curriculum vitae is attached as Exhibit 1. The experience and qualifications set forth on the curriculum vitae are accurately recited. Among other things, I have had oversight responsibility for over 260 insurance industry employees, 20,000 claim files and 3,000 litigated files during my tenure in the insurance industry. I have familiarity with the customs and practices in the insurance industry for handling claims and denial of claims. I have taught on the subject of casualty claim handling and have managed a special investigative unit for an insurance company. My work experience includes handling first party insurance claims relating to claims for stolen automobiles. During my career in the insurance industry, I have personally handled and supervised thousands of property and casualty claims. I have been personally involved in

1

estimating claim damages, claim coverages, denials and procedures. I have served as an instructor in claims training and insurance procedures classes. I am familiar with insurance regulations and practices. I am familiar with proper insurance industry standards and procedures for handling property and casualty claims. I am familiar with the custom and practices in the insurance industry for investigating and handling of property and casualty claims, including litigated issues. I have chaired instructional seminars for the Property Loss Research Bureau and the National Association of Mutual Insurance Companies. I have served as a law committee member for the National Association of Independent Insurers. I have served as an instructor and presented seminars at the National Association of Arson Investigators and International Association of Arson Investigators as well as for state and local claims organizations.

I have been designated in approximately 30 cases in the last two years as an expert to testify on the issues of insurance industry claims practices and handling. In addition, I have qualified to testify at trial as an expert witness and testified on insurance industry claims practices and handling approximately 25 times during my career in the insurance industry. A list of the case in which I have given trial or deposition testimony in the last three years is attached as Exhibit 2. In addition, I testified concerning insurance claims practices and claims decisions on numerous occasions on behalf of the insurance companies that I worked for during my career in handling insurance claims while employed with insurance companies.

### Materials Reviewed:

I have been retained by the law firm of Burge & Burge to evaluate State Farm's handling of two claims that Martin Long filed concerning the loss of his 2000 Chevrolet Corvette on February 19, 2000. I have reviewed the following:

- Complaint
- Answer
- Plaintiff's interrogatory answers
- Defendant's interrogatory answers
- Claim file for claim number 01-6596-564 (SF1 00001 through SF1 00831)
- Claim file for claim number 01-Q177-057 (SF2 00001 through SF2 00119)
- State Farm Auto Claim manual and claim operation guides (SF1 0001 - P through 0107 - P)
- Documents concerning policy 01-CW-7517-0 (SF-H 001 through SF-H 058)
- Documents concerning policy 886750-B04-01 (SF-A 001 through SF-A 027)
- Code of Alabama, 1975, § 27-14-28
- Deposition of Martin Long
- Deposition of Todd Smith
- Deposition of Tony Nix
- Scene photographs of hotel parking lot
- Expert disclosures of Donal O'Shaughnessy

### Factual Background:

From my review of the materials listed above, I learned the following facts that are relevant to my opinions in this case.

1.    On February 4, 2005 Martin Long purchased a 2000 Chevrolet Corvette from City Auto Sales. Long paid for the car in full. Specifically, he paid the $25,000.00 purchase price at the time of the sale and there were no bank liens on the car or other encumbrances whatsoever.

2.    Martin Long purchased an automobile policy covering this Corvette from State Farm Fire & Casualty Company. Long paid State Farm a $637.32 premium payment for full coverage on the Corvette from February 4 to August 4, 2005. The policy that State Farm issued on the Corvette was policy number 88 6750-B04-01.

3.    Martin Long improved the 2000 Chevrolet Corvette from the time that he bought it up until the time that he last saw the car before it was stolen. Long replaced the tires, rims, a tie-rod and added other accessories to the car. He produced receipts to State Farm for the work performed by Big 10 Tires. These receipts totaled $1,572.14 and reflect that the last work done by Big 10 Tires on this car was performed on February 18, 2005.

4.    On February 18, 2005, Long drove his Corvette from Montgomery to Lithonia, Georgia, to spend the weekend at the Country Inn Suites with Valerie Ware Temple. They parked the Corvette near the hotel entrance, in plain view of the hotel security camera. Long and Ms. Temple were together in the hotel room when his Corvette was taken from the parking lot. Long learned of the theft the following morning. He notified the hotel management, the police and State Farm that same morning.

5.    Martin Long made a claim for the fair market value of his stolen Corvette under State Farm automobile policy 0886-750-01 and the claim number for that claim was 01-6596-564. He made a separate claim for the personal property stolen from the car under a manufactured home policy issued by State Farm bearing policy number 01-CW-7517-0 and the claim number for that claim was 01-Q177-057. Long paid separate premiums for these policies and State Farm accepted these premiums. I understand that this lawsuit concerns only State Farm's denial of Claim No. 01-6596-564.

6.    Long submitted an Affidavit of Vehicle Theft in support of his claim for the full market value of the Corvette. He wrote that the amount of his claim was $25,000.00, the amount that he had paid for the car. State Farm concluded that the actual cash value of the Corvette was $25,789.50. Thus, if State Farm had paid Mr. Long's claim, it would have been obligated to pay $25,289.50 (the fair market value less a $500.00 deductible).

3

7.      The claim file contains no direct proof suggesting that Long was involved in the theft of his 2000 Corvette. Long denies any involvement in the loss of his car. No witness claims to have seen him take his car from the parking lot after he and Ms. Temple went up to their room for the night. The hotel security camera system was inoperable and did not record who took the car or how. Mr. Long discovered that the hotel security video camera system was out of order when he asked the hotel staff to view it. Because Mr. Long was with Ms. Temple in the hotel room from the time they parked the car on the night of February 18 until they discovered the car was gone the next morning, Long lacked the opportunity to move the car.

8.      The claim file contains no suggestion of who took the car from the parking lot of the hotel. No arrests were ever made. Neither the police nor State Farm performed any forensic examination to determine who specifically took the car from the hotel parking lot or how.

9.      The claims file contains numerous and conflicting references to the keys for the 2000 Chevrolet Corvette. The dealer who sold Martin Long the car told State Farm that he believed only one set of keys came with the car. Long believed he got two sets of keys and told State Farm that the second set of keys may have been inside the car when it was stolen. Valarie Ware Temple told State Farm that Long mentioned to her that a second set of keys may have been inside the car when it was stolen. The hotel manager overheard Long say there were keys inside the car when it was stolen. The car was ransacked after it was stolen and no keys were in it when it was recovered. Mr. Long has not been able to find any other set of keys.

10.     The car was not in driveable condition when it was recovered. The brake system on the 2000 Chevrolet Corvette was not functional when the car was recovered. The brake fluid had been drained. The brake master cylinder reservoir was empty. Brake system components were missing or disabled. The instrument cluster on the dash indicated brake system and traction control failures. The brake system problem was verified by Michael Bresnock who noted a brake application allowed the pedal to travel almost to the floor board. Michael Bresnock was not able to verify the traction control system failure. Moreover, Michael Bresnock was unable to move the car out of park when he first inspected the car and expressed his belief that a bent transmission linkage accounted for the inability to shift the car into gear. There were missing lug nuts and loose lug nuts on the wheels of the car. Without functioning brakes, an operable transmission or secure wheels, it is unlikely that the car was being driven.

11.     State Farm speculated that the Corvette had to have been driven out of the hotel parking lot by whoever took it and points to Mr. Bresnock's report as support for that speculation. However, Mr. Bresnock's report does not say how the car left the lot. He merely says that whoever last drove the Corvette used a key.

Mr. Bresnock's report does not rule out towing as the means by which the Corvette was stolen from the hotel. Donal O'Shaughnessy, who repossesses cars via towing, explained that there was sufficient room to tow the car from where Long parked it and that contact marks on the undercarriage of the Corvette and the front bumper scratches indicated that the car had been

4

towed. The claim file contains no indication that State Farm ever considered the possibility that the Corvette was stolen via towing. The testimony of State Farm's claim supervisor that the Corvette could not be seen from the road is contrary to the photographs that plainly show otherwise.

12.     Automobile theft is a serious problem in the Atlanta metropolitan area. The Dekalb County Police Department maintains an Auto Theft Unit. Detective Fitzpatrick of that unit provided reports to State Farm pertaining to the theft of Long's car. The first page of the materials he provided contains the following statement: "AUTO THEFT, METRO ATLANTAS FAVORITE GROUP PARTICIPATION SPORT." Given the magnitude of the car theft problem known to exist in the community, to guess that Long was responsible for this theft is not reasonable from a claims handling standpoint given that no one saw what happened.

13.     State Farm based its denial of claim number 01-6596-564 on a financial motive but had documentation showing that Long was essentially debt free. Long acted responsibly when he received his personal injury settlement by paying off all of his credit card bills, his wife's car and his wife's student loans. He had a credit score of 651 which is considered fair/good. He receives a disability check each month that is more than adequate to pay his modest living expenses. He owned the Corvette free and clear, so if he wanted money for the car, he could have sold it.

### Opinions:

After reviewing the materials listed above, I have formed the following opinions. I hold these opinions to a reasonable degree of certainty. These opinions are based upon my training and experience in the adjustment of insurance claims and my review of the facts of Mr. Long's claims.

1.     **State Farm Fire and Casualty Insurance Company owed Martin Long various duties in the handling of the claim he filed under his automobile insurance policy.**

During the claim handling process, every insurer must treat its insured's interest equally with its own, must investigate claims fairly and objectively, and must not deny claims based on speculation and conjecture. State Farm's Auto Claim Manual acknowledges these basic principles and standards:

> "STATE FARM'S CLAIM PHILOSOPHY IS TO PAY WHAT WE OWE– promptly, courteously and efficiently. To accomplish this each claim, large or small, should be handled only on its own merits, in accordance with the facts of the law, the law, and applicable coverage–not on the basis of a person's race, age, religion, sex, national origin, or any other irrelevant consideration.

5

Our commitment to policyholders, claimants, and others with whom we do business, as well as our internal communications, should clearly and consistently demonstrate this claim philosophy. State Farm's claim department has an obligation to its insureds to fairly and promptly investigate and then appropriately negotiate, settle or defend covered claims for damages."

In its statement of "Commitment to Our Policyholders", State Farm says:

"It is the responsibility of the State Farm claims staff to implement Company philosophy with respect to claim handling. Our commitment to our policyholders is to treat them like a good neighbor. We should:

- Listen, be fair, be open, and carry out our part of the bargain under the contract in good faith.
- Be familiar and in compliance with those laws and regulations that impact claims in the appropriate state, and treat policyholders consistent with requirements of the law.
- Explain all relevant coverages under the policy. Encourage policyholders to report all losses and avail themselves of all benefits under their coverages.
- Diligently investigate the claims to determine if a claim is valid. Reasonably evaluate the claim, and act promptly in resolving the claim. If it is necessary to reject a claim for coverage or damages, it should be done promptly and courteously, with an explanation for the decision.
- Make an objective evaluation of the facts and circumstances supporting our policyholders' claims. Doing so helps insure our policyholders obtain all benefits available provided by the insurance policy.
- Give insureds a reasonable opportunity to comply with their responsibilities under the policy. If a claim is rejected, be willing to listen to subsequent input from the insured. Complete any necessary follow-up in a timely fashion, giving due consideration to any additional findings.
- Communicate with and be responsive to inquiries from insureds and their attorneys by promptly answering letters and phone calls.

> In addition to our obligation to deal fairly with each
> policyholder, we also have an obligation to pay only
> covered claims in the proper amount.  Payment of
> those claims not covered, or fraudulent claims,
> unnecessarily increases insurance costs for all
> policyholders.

In summary, we are committed to paying what we owe, promptly,
courteously, and efficiently."

## 2.    State Farm Fire and Casualty Company committed serious violations of insurance industry standards and best practices in its handling of claim number 01-6596-564.

Martin Long submitted a claim under the automobile insurance policy that State Farm
Fire and Casualty Company sold to him to cover his 2000 Chevrolet Corvette.  This automobile
insurance policy bears policy number 0886-750-01.  The claim number for this claim was
01-6595-564.  The claim that Mr. Long submitted under this policy was for the actual value of
the car at the time that it was stolen from the hotel parking lot.  This policy was in full force and
effect on the date of the loss.

State Farm had no reasonably legitimate or arguable reason for refusing to pay Mr.
Long's claim for the loss of his car.  State Farm's speculation that Mr. Long participated in the
theft of his car is an insufficient reason to have denied this claim and is not supported by an
objective evaluation of the facts and circumstances.  No witness claims to have seen Mr. Long
remove his car from the parking lot after he and Valerie Ware Temple went up to their room for
the night.  At the time that State Farm denied this claim, it knew that Valerie Ware Temple
confirmed that Mr. Long was with her in the hotel room from the time that they parked the car on
the night of the 18th until they discovered the car was gone the next morning.  An objective
assessment of this evidence shows that Mr. Long did not have the opportunity to steal his car.
Mr. Long parked his car in plain view of a hotel security camera.  Unknown to Mr. Long, the
camera was not working at the time of the theft.  Mr. Long did not learn that the camera was
inoperable at the time of the theft until after he reported the theft to hotel management and asked
to view the security camera footage.

Martin Long's inability to produce a second set of keys for the Corvette was not a
reasonably legitimate reason to refuse his claim.  At the time that State Farm refused its claim, it
knew that the dealer who sold Martin Long the car told State Farm that he believed that only one
set of keys came with the car and that any second set of keys may have been in the car at the time
that it was stolen and ransacked.

State Farm's speculation that a second set of keys must have been used to drive the car

7

from the parking lot is in conflict with other evidence. The brake system on the Corvette was not functional when the car was recovered. All of the brake fluid had been drained and brake system components were missing or disabled. Without functional brakes, it is not likely that the car was being driven. The damage to the front bumper and contact marks on the undercarriage discovered after the car was recovered suggest a likelihood that the car was towed from the hotel parking lot by the thieves.

The State Farm claim file contains no suggestion as to the identity of the person or persons who took the car from the parking lot at the hotel. No arrests have ever been made. The Atlanta metropolitan area is a big city with a well-known auto theft problem. Neither the police nor State Farm undertook to perform forensic analysis of the car after it was recovered in an effort to determine the identity of the thieves. At the time that State Farm denied this claim, it knew that another car had been broken into at the hotel during the same time frame when Mr. Long's car was stolen.

State Farm's handling of claim number 01-6596-564 reflects a predisposition for denying it. State Farm referred Mr. Long's claim to its special investigation unit six days after he reported the car stolen. From the beginning, State Farm's claim file documentation reflects State Farm's suspicion that Mr. Long stole his own car for financial reasons. Not only did its investigation fail to disclose any objective reasonably legitimate reason for concluding that Mr. Long stole his own car, State Farm's investigation failed to establish any objective reasonably legitimate reason for concluding that Mr. Long had a financial motive for stealing his own car. Mr. Long was essentially debt free when his car was stolen. He had paid off his credit card bills, his wife's car and his wife's student loans with the proceeds that he received from the settlement of his on-the-job injury claim. He had a good credit score. He received a monthly disability check that was more than adequate to pay his modest living expenses. He owned the Corvette free and clear and could have sold it easily and quickly. At the end of the day, the facts established by the investigation did not support the theory that Mr. Long had a financial motive for having his car stolen.

Numerous other facts negate State Farm's speculation that Mr. Long was somehow involved in having his car stolen. Mr. Long had spent time and money improving the car from the time he purchased it. In fact, he took his car to Big Ten Tires to have work performed on February 18, 2005, the same day he parked his car in the hotel parking lot before it was stolen.

Without objective evidence of a financial motive, State Farm had no reasonably legitimate or arguable reason for denying his claim on that basis. Likewise, State Farm's investigation does not support that he made a misrepresentation concerning a material fact regarding claim number 01-6596-564. Mr. Long's failure to disclose that he was with Valerie Ware Temple, a married woman, at the time that his car was stolen is not a legitimate reason to deny him insurance coverage for the theft of his car. It is clear that Mr. Long was trying to save his companion from embarrassment. He advised the State Farm claim agent of her presence as soon as the recorder was turned off. State Farm had the opportunity to interview Valerie Ware

8

Temple two months before denying the claim. State Farm was able to confirm with Ms. Temple that Mr. Long was with her and thus did not have the opportunity to take his car. Denying Mr. Long coverage based on his reluctance to say on a recorded statement that he was with a married woman is an irrelevant consideration which State Farm's own policy manual says should not be a basis for deciding a claim.

State Farm's assertion that Mr. Long misrepresented material facts concerning who called the police on the morning that the theft of the Corvette discovered should certainly not be the basis of denying any claim. The undisputed proof shows that the theft was reported to police on the morning it was discovered. It is ludicrous from a claim handling standpoint to suggest that who placed such a call dictates whether a claim is paid or rejected.

Mr. Long made a valid claim under his automobile insurance policy. State Farm should have paid Mr. Long for the theft of his car. State Farm breached its contract with Mr. Long by not paying him under the automobile insurance policy for the loss of his car. State Farm lacked any objective, reasonably legitimate or arguable reason for refusing to pay the claim under his automobile policy for the loss of his car. State Farm's conduct was in violation of its obligations of good faith and fair dealing with Mr. Long. The reasons cited by State Farm for denying Mr. Long's claim under his automobile insurance policy reflect bad faith on the part of State Farm.

### 3. Martin Long made no material misrepresentations in the presentation of claim number 01-6595-564.

To the extent that State Farm denied Long's automobile claim because of claims he made for personal property under the homeowner's policy, it violated accepted insurance standards, as well as applicable insurance law. Section 27-14-28, Code of Alabama (1975) provides:

> No misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy unless such misrepresentation is made with actual intent to deceive as to a matter material to the insured's rights under the policy.

In Long's claim for the fair market value of his Corvette, he made no material misrepresentations affecting State Farm's rights under that policy. The amount that he claimed in his Affidavit of Theft was less than State Farm determined the fair market value of the stolen Corvette to be. Long's representations in a proof of loss for another claim under another policy is not material to his claim for the fair market value of the Corvette. State Farm's handling procedures mandate that "each claim, large or small, should be handled on its own merits." By basing any part of its denial of his automobile claim on representations that he made in the proof of loss for his homeowner's claim, State Farm violated proper insurance practices and standards. Whether Mr. Long added a pair of shoes to his proof of loss for his contents claim under a separate homeowner's policy is simply of no consequence to a proper evaluation of his claim for the fair market value of the Corvette under the automobile policy for which he paid a separate premium.

It is worth noting that many individuals have different insurance carriers for their automobile coverage versus their homeowner's coverage.  It would be absurd to suggest that one company could deny coverage for a claim made against it because the insured inflated a claim he made against another insurer under a separate policy.  Yet that is essentially just what State Farm seeks to do in this case and it is wrong.

_____

ROBERT J. SHARP

Sworn to and subscribed before me this

_____ day of May, 2007.

_____
Notary Public

My Commission Expires: _____

# SHARP & ASSOCIATES, LLP

GUIDANCE
###### DIRECTION
###### EFFECTIVE SOLUTIONS





*Insurance
Consultants/Experts*

West Coast Office
21520 Yorba Linda Blvd. Suite G
#257
Yorba Linda, CA 92887
Business: (213) 407 9957

**East Coast Offices:**
325 East Paces Ferry Rd suite 1603
Atlanta, GA 30305
Phone: 213-407-9957

Email: rsharp1959@aol.com
Website: sharpandassociates.org

## Curriculum Vitae

**Robert Sharp & Associates** provides insurance industry related services including:

Expert witness testimony, Appraisal, Umpire and Mediation services, and Consultation. Provides service nationwide, from West & East Coast offices.

## Background & Qualifications:

Mr. Sharp has over 32 years' experience in insurance management and multi-line property and casualty claim handling. Most recently he served as President and CEO of Workmen's Insurance Group, from 1997 - 2004. In addition he also held the positions of Executive Vice President, Senior Vice President and Senior Vice President of Claims. During that time, Workmen's had an operating budget of $40,000,000. Mr. Sharp had oversight responsibility for over 260 insurance industry employees, 20,000 claim files and 3000 litigated files in 25 different states. He has served as Assistant Vice President/Regional Claim Manager for J.C. Penney Property & Casualty Insurance Company and Vice President of claims for Columbia Insurance Group. He also served as regional property claim manager for Shelter Insurance.

He has a BA Degree in Business from the University of Northern Iowa with an emphasis on business and finance.

As an instructor, he taught courses in:
Shelter Insurance Internal Claim School, classes in policy interpretation, claim investigation and documentation and property estimatics.
 Speaker at local claim adjuster association's and seminars in file documentation and investigation in numerous Midwest cities as well as Los Angeles claims association.

Instructor and chairman for Property Loss Research Bureau, national seminars.

Instructor and panelist for International and National Arson Investigators Association.

Chairman of NAMIC's (National Association of Mutual Insurance Company's) claim educational committee. Served as instructor and a panelist. Also developed seminars that were presented throughout the United States for this organization.

Conducted numerous seminars for Midwest mutual insurance companies while working for Columbia Mutual Insurance, which was acting as a reinsurer.

Served on NAII (National Association of Independent Insurers) law review committee and national legislative committee.

**In 32 years of experience,** he has held a myriad of both management and claim-handling positions in the insurance industry which makes him eminently qualified to render expert opinions in regard to all aspects of claim handling including:

- Methods and procedures of claim handling, unfair claim practice issues
- Internal controls, Billing issues, underwriting issues and cancellations
- Clearly defined protocols, Agent and Broker issues
- Complex claim handling issues and practices
- Claim adjusting and coverage issues; including policy cancellations and denials
- Claim community standards and insurance consulting
- Breach of contract
- **Bad faith issues**

### LITIGATION EXPERIENCE

In addition to having direct hands-on experience with litigation during his 32-year career in the insurance industry, Mr. Sharp has testified numerous times in insurance related cases in the capacity as an adjuster, as well as in upper level management, in over 25 states and in Federal court. In addition to claim issues he has testified as the most knowledgeable person in regards to insurance company methods and procedures, billing and IT issues.

# Web Site:  sharpandassociates.org

# FEE SCHEDULE:

**Original retainer fee may be charged in the amount of $1000.00
(Credited towards the final invoice)**

| | |
|---|---|
| Expert Witness: | $190.00 per hour. |
| Research: | $175.00 per hour. |
| Litigation Consultant: | $190.00 per hour. |
| Mediation & Appraisal: | $150.00 per hour. |
| Reserve Review and Claim File Audits: | $150.00per hour. |
| Expert Witness Designation: | $250.00  (flat fee) |
| Deposition Fee & Trial Testimony: | $250.00 per hour |

# Exhibit 2

List of cases I have testified at trial in the last three years.:

1. Barney v. Workmen's Insurance (Reno, Nevada)
2. Patel v. Infinity Insurance Company (Orange County, California)
3. Turner v. Sterling Casualty Insurance (Los Angeles, California)
4. David Brien v. Amica Mutual Insurance Company (Los Angeles, California)
5. Decena v. Pacific Specialty Insurance Company ( Los Angeles, California)

**Exhibit 1**

Cases I have given trial or deposition testimony in the last 3 years

1. David Brien v.Amica Mutual (Los Angeles, CA)
2. Diane Padillo v. USAA Ins. Co. (Las Vegas, Nevada)
3. Aero Falcons v. American Alternative (Los Angeles, California)
4. Crown Professional v. State Farm (Newport Beach, California)
5. Barney v. Workmens Insurance Co. (Reno Nevada)
6. Explorer v. Brandt (Ventura, California)
7. Professional Claims Services v. AIG (Los Angeles, California)
8. Zurich Insurance v. Drennan (Las Vegas, NV)
9. Sterling Casualty v. Turner (Orange County, California)
10. Patel v. Infinity (Fullerton, California)
11. Sibrian v. Infinity Insurance and Zavala (Los Angeles, California)
12. Putnam Leasing v. Nelson (Orange County, California)
13. Richardson v. Lough (Wheeling, West Virgina)
14. Decena v. Pacific Specialty Insurance Co. ( Los Angeles, CA )

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| MARTIN O. LONG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    CASE NO. 2:06CV816-MHT |
| | ) |
| STATE FARM FIRE AND CASUALTY | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

STATE OF ALABAMA)
                )
JEFFERSON COUNTY)

## AFFIDAVIT

Before me, the undersigned for said County and in said State, personally appeared F. Tucker Burge, who is known to me and who, after first being duly sworn, deposes and says:

My name is F. Tucker Burge. I am of the full age of majority. I have knowledge of the facts set forth this affidavit. I am aware that this affidavit may be used in the <u>Martin O. Long v. State Farm Fire and Casualty Company.</u> case which is pending in the United States District Court for the Middle District of Alabama, Northern Division, Civil Action No. 2:06CV816-MHT. Pursuant to F.R.C.P. 56(f), I represent to the Court that I am unable to file the signed affidavit of Robert Sharp and the deposition of Donal O'Shaughnessy on May 31, 2007, which is when the Plaintiff's response to the Defendant's Motion for Summary Judgment is due. The executed affidavit of Mr. Sharp is in the mail to the Plaintiff. Plaintiff's counsel understands that the court reporter has not yet transcribed Mr. O'Shaughnessy's deposition despite promises that it would have been sent to him by today. Plaintiff's counsel will submit both of these documents when they arrive.

Dated this _31st_ day of May, 2007.

1

FRANK TUCKER BURGE

Sworn to and subscribed before me

this _31_ day of May, 2007.

NOTARY PUBLIC

MY COMMISSION EXPIRES: _5/11/2010_

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARTIN O. LONG,                          *

    Plaintiff,                        *

vs.                                      *        Case Number:  2:06cv816-MHT

STATE FARM FIRE AND                      *
CASUALTY COMPANY,
                                         *
    Defendant.

## ANSWER

Defendant State Farm Fire and Casualty Company (hereinafter "State Farm")
answers the Complaint of Plaintiff as follows:

### FIRST DEFENSE

State Farm answers the Complaint of Plaintiff, paragraph by paragraph, as
follows:

### NATURE OF THE CASE

1.    Admitted that State Farm issued an automobile insurance policy ("the
policy") covering the vehicle forming the basis of Plaintiff's lawsuit. State Farm also
admits that Plaintiff submitted a claim under the policy and that State Farm denied that
claim. State Farm denies the remaining allegations of this paragraph.

### PARTIES

2.    Admitted.

3.     Admitted that State Farm is incorporated under the laws of Illinois and that at the times referred to herein sold or issued insurance policies and that it marketed its products. All allegations not specifically admitted are denied.

4.     Admitted.

## STATEMENT OF THE FACTS

State Farm adopts its responses made above.

5.     State Farm is without sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore denies the same.

6.     State Farm admits that it issued automobile insurance which included coverage as provided in the policy and that the policy was purchased through Mike Devers Insurance Agency, Inc., in Millbrook, Alabama.  As to any allegations not specifically admitted, State Farm is without sufficient knowledge or information to form a belief as to the truth of those allegations and therefore denies the same.

7.     State Farm is without sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

8.     State Farm is without sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore denies the same.

9.     State Farm admits that the Plaintiff was at the Country Hearth Inn in Lithonia, Georgia, on February 18, 2005.  All allegations not specifically admitted are denied.

10.     Admitted that Plaintiff reported the loss to State Farm and to the DeKalb County Sheriff's office.  Admitted that he told an employee of the Country Hearth Inn

2

and Suites that his car was missing. All allegations not specifically admitted are denied.

11.    State Farm admits that, when the vehicle was recovered by the police, it was damaged. As for the remaining allegations of this paragraph, State Farm is without knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies the same.

12.    State Farm admits that Plaintiff did provide some information and documents and gave statements. All allegations not specifically admitted are denied.

13.    Admitted that State Farm denied Plaintiff's claim. All allegations not specifically admitted are denied.

14.    Denied.

## FIRST CAUSE OF ACTION - BREACH OF CONTRACT

15.    Denied.

## SECOND CAUSE OF ACTION - BAD FAITH

16.    Denied.

## DAMAGES

17.    Denied.

18.    Denied.

19.    No response is required to this paragraph.

## SECOND DEFENSE

State Farm denies that it is guilty of any conduct which would entitle Plaintiff to recover punitive damages.

3

## THIRD DEFENSE

State Farm avers that any award of punitive damages to Plaintiff in this case will violate the constitutional safeguards provided to it under the Constitution of the State of Alabama.

## FOURTH DEFENSE

State Farm affirmatively avers that any award of punitive damages to Plaintiff in this case will violate the constitutional safeguards provided to it under the Constitution of the United States of America.

## FIFTH DEFENSE

State Farm affirmatively avers that any award of punitive damages to Plaintiff in this case will violate the constitutional safeguards provided to it under the due process clause of the Fourteenth Amendment to the Constitution of the United States.

## SIXTH DEFENSE

State Farm avers that any award of punitive damages to Plaintiff in this case will violate the procedural safeguards provided to it under the Sixth Amendment to the Constitution of the United States.

## SEVENTH DEFENSE

Plaintiff's claims of punitive damages violate the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the Constitution of the United States on the following grounds:

4

(a)    It is a violation of the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution to impose punitive damages, which are penal in nature, against a civil defendant upon the plaintiff's satisfying a burden of proof which is less than "beyond a reasonable doubt" burden of proof required in criminal cases;

(b)    The procedures pursuant to which punitive damages are awarded may result in an award of joint and several judgments against multiple defendants for different alleged acts of wrongdoing, which infringes upon the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution;

(c)    The procedures pursuant to which punitive damages are awarded fail to provide a reasonable limit on the amount of the award against a defendant, which thereby violate the due process clause of the Fourteenth Amendment of the United States Constitution;

(d)    The procedures pursuant to which punitive damages are awarded fail to provide specific standards for the amount of the award of punitive damages which thereby violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

(e)    The procedures pursuant to which punitive damages are awarded result in the imposition of different penalties for the same or similar acts and, thus, violate the equal protection clause of the Fourteenth Amendment of the United States Constitution;

5

(f)    The procedures pursuant to which punitive damages are awarded permit the imposition of punitive damages in excess of the maximum criminal fine for the same or similar conduct, which thereby infringes upon the due process clause of the Fifth and Fourteenth Amendments and the equal protection clause of the Fourteenth Amendment of the United States Constitution.

## EIGHTH DEFENSE

Plaintiff's claims of punitive damages violates the due process clause of Article I, § 6 of the Constitution of Alabama for the same grounds as stated above.

## NINTH DEFENSE

Any award of punitive damages to Plaintiff in this action would constitute a deprivation of property without due process of law required under the Fifth and Fourteenth Amendments of the United States Constitution.

## TENTH DEFENSE

Any award of punitive damages against State Farm in this action would violate the prohibition against laws that impair the obligations of contracts in violation of Article 1, § 22 of the Constitution of Alabama.

## ELEVENTH DEFENSE

The Complaint fails to state a claim for punitive damages under §§ 6-11-20 to 6-11-30, Code of Alabama, 1975, and is barred.

## TWELFTH DEFENSE

Any award of punitive damages against State Farm in this action would violate the due process clause of the United States Constitution, in accordance with the decisions of

6

the United States Supreme Court in <u>BMW of North America v. Gore</u>, 517 U.S. 559, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996), <u>Coopers Industries, Inc. v. Leatherman Tool Group, Inc.</u>, 532 U.S. 424, 121 S. Ct. 1678 (2001), and <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003), and the Alabama Supreme Court in <u>BMW v. Gore</u>, 701 So.2d 507 (Ala. 1997) on various grounds including the following:

(a)    It is a violation of this Defendant's rights to due process to impose punitive damages to deter future misconduct, where less drastic remedies could achieve this goal;

(b)    It is a violation of due process to subject this Defendant to punitive damages without providing this Defendant fair notice of the conduct that will subject it to punishment and the severity of the penalty that may be imposed;

(c)    It is a violation of due process to punish this Defendant with the intent of changing its lawful conduct in other states; and

(d)    It is a violation of this Defendant's rights to due process to impose punitive damages which are grossly excessive.

### THIRTEENTH DEFENSE

Punitive damages are to be limited or in the alternative not allowed under Code of Alabama § 6-11-21 (1975).

### FOURTEENTH DEFENSE

State Farm avers that there exists a lawful basis upon which to refuse payment of the claim submitted by Plaintiff.

7

## FIFTEENTH DEFENSE

State Farm avers there was no absence of a legitimate or arguable reason for the denial of benefits claimed under the policy by Plaintiff.

## SIXTEENTH DEFENSE

State Farm avers that Plaintiff's policy of insurance is the best evidence of its contents and is pled herein as though copied herein in its entirety. State Farm specifically denies any allegations which tend to contradict, contravene or enlarge upon the terms, conditions, exclusions or limitations of said policy.

## SEVENTEENTH DEFENSE

State Farm affirmatively pleads all conditions precedent, conditions subsequent, exclusions and limitations set forth in the policy and coverage as a defense to the Plaintiff's claims.

## EIGHTEENTH DEFENSE

State Farm pleads the defense of misrepresentation pursuant to § 27-14-28, Code of Alabama, 1975. Under Plaintiff's automobile insurance policy, there is no coverage if an insured makes a false statement with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under the policy. State Farm contends that Plaintiff concealed and misrepresented his involvement with the loss claimed under the policy.

_____s/ James B. Newman_____
JAMES B. NEWMAN (NEWMJ8049)

8

Attorney for Defendant State Farm Fire
and Casualty Company


OF COUNSEL:
HELMSING, LEACH, HERLONG,
    NEWMAN & ROUSE
POST OFFICE BOX 2767
MOBILE, ALABAMA  36652
(251) 432-5521
Facsimile:  (251) 432-0633
Email:  jbn@helmsinglaw.com

## CERTIFICATE OF SERVICE

       I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> F. Tucker Burge
> Burge & Burge
> 2001 Park Place North, Suite 850
> Birmingham, Alabama  35203


this 15th day of September, 2006.


                                      s/James B. Newman
                                      OF COUNSEL


Doc 118333

June 29, 2005

**<u>CERTIFIED MAIL – RETURN RECEIPT REQUESTED</u>**
**PERSONAL AND CONFIDENTIAL**

Attorney F. Tucker Burge
Burge & Burge
850 Park Pl Tower
Birmingham, AL 35203

RE: Claim Number: 01-6596-564
   Policy Number: 0886-750-01
   Vehicle: 2000 Chevrolet Corvette
   VIN: 1G1YY22G9Y5132554

Dear Mr. Burge:

This letter is being sent to you as legal representative of Martin Long.

State Farm Fire and Casualty Company has made a comprehensive investigation into the reported incident of February 19, 2005, involving the above mentioned vehicle and policy.

Based on the investigation, we must advise you a "loss" as defined in the policy has not occurred as the destruction of the insured vehicle was by or at the direction of an insured. We must additionally advise you that our investigation has established that your client misrepresented material facts in the presentation of his claim. Because of these findings, we will be unable to make any payments under the policy.

By providing the above information, State Farm Fire and Casualty Company does not waive any of its rights, but rather, specifically reserves it rights to deny coverage and defend any action based on all information now known or which may become known to State Farm.

Sincerely,

Tony D. Nix, CPCU, CIFI
Team Manager
State Farm Fire and Casualty Company

TN/pg

bcc: Attorney Angela Taylor/Mike Beers
    Todd Smith

Long/State Farm
SF1  00132



PLAINTIFF'S
EXHIBIT

85

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARTIN O. LONG,                    )
                                   )
          Plaintiff,               )          CIVIL ACTION NO.
                                   )
vs.                                )          2:06CV816-MHT
                                   )
STATE FARM FIRE & CASUALTY         )
COMPANY, a corporation,            )
                                   )
          Defendant.               )

## PLAINTIFF'S ANSWERS TO INTERROGATORIES AND RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS

1.     You have alleged in your Complaint that on or about February 19, 2005, you made a claim with State Farm for benefits under your automotive policy, and that State Farm denied said claim:

          a.     State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

          b.     Please produce any and all documents relating to the information requested in this interrogatory.

1

ANSWER:

On the first page of its Answer, Defendant State Farm admits that it issued an automobile policy covering the Plaintiff's car, that the Plaintiff submitted a claim under the policy and that Defendant State Farm denied the claim.

2.    You have alleged in your Complaint that you "enhanced" your insured vehicle (2000 Chevrolet Corvette):

    a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

    b.    Please produce any and all documents relating to the information requested in this interrogatory.

ANSWER:

The Plaintiff enhanced his car from the time he bought it until it was stolen in the following ways: replacing all tire rims, replacing all tires, aligning the wheels, replacing a tie rod, adding a Corvette logo accessory and ordering louvers for the tail lights. The Plaintiff, the employees at Big Ten Tire in Prattville, the employees where he bought the rims in Birmingham, Donald Long, Victor Long and Walter Crosby may have knowledge or information about these enhancements. The receipts for the $1,572.14 the Plaintiff paid to Big Ten Tire are attached.

2

3.    You have alleged in your Complaint that, on or about February 2005, you took a trip to Georgia and stayed at the Country Hearth Inn, where you parked your car under some lights and in view of security cameras:

a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

b.    Please produce any documents relating to the information requested in this interrogatory.

**ANSWER:**

Plaintiff has firsthand, personal knowledge that he traveled in his Corvette to the Country Hearth Inn in Lithonia, Georgia, and parked under some lights and in view of security cameras. Valerie Ware Temple was with Plaintiff on this trip and saw where he parked the car before it was stolen. Ricky Rhodes, Sandy Ware and Felicia Flowers saw where Plaintiff parked the Corvette before it was stolen. Plaintiff is sure the Country Hearth Inn has a record that he stayed at the hotel and reported his car stolen.

4.    You have alleged in your Complaint that your insured vehicle was stolen:

a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely

3

in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

b. Please produce any documents relating to the information requested in this interrogatory.

**ANSWER:**

The Plaintiff knows that he left his car in the hotel parking lot, that the car was not there the next morning, that he did not give anyone permission to take his car and that he has no idea who took his car without his knowledge or permission; in short, he knows that his car was stolen. Valerie Ware Temple knows that the Plaintiff left his car in the hotel parking lot, that the car was not there the next morning, that the Plaintiff did not leave the hotel room between the time he entered it immediately after parking the car and when they learned that it was gone, that the Plaintiff was upset when he learned that his car was stolen and that he immediately reported the theft to the hotel, the police and his insurance. Ricky Rhodes, Sandy Ware and Felicia Flowers know that the Plaintiff left the car in the hotel parking lot, that the car was missing the next day, that the Plaintiff was upset to learn that his car had been stolen and that he immediately reported the theft to the hotel, the police and his insurance. The hotel staff, police and Defendant State Farm know that the Plaintiff reported the theft of his car. The police reports and insurance claim information relating to this stolen car are already in the possession of the Defendant.

5. You have alleged in your Complaint that, when your insured vehicle was

4

recovered, it was severely damaged and that your personal items that had been in the car were missing:

       a.      State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

       b.      Please produce any documents relating to the information requested in this interrogatory.

**ANSWER:**

The Plaintiff's car was in excellent condition and in perfect working order when he left it in the hotel parking lot. When the police finally recovered the Plaintiff's car it had been stripped. The seats were gone. The top was gone. The passenger window was broken. The ignition cylinder and steering column were damaged. Parts of the dash and console had been removed. Air conditioner vents were broken. The brake fluid had been drained and brake system components were missing or disabled. The front bumper area was damaged. The interior was rain-damaged. The Plaintiff's personal items were gone.

The Plaintiff, General Long, Walter Crosby, David Carrera, the police who found the stolen car, the storage facility personnel, Todd Smith and others saw that the Plaintiff's car had been stripped and damaged.

5

The Defendant's claim file contains a number of references to the damaged condition of the Plaintiff's car after it was recovered.

6.    You have alleged in your Complaint that State Farm "delayed and delayed" its decision on your claim and did not interview all of the available witnesses to the alleged theft:

        a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

        b.    Please produce any documents relating to the information requested in this interrogatory.

**ANSWER:**

The Plaintiff reported the theft of his car to Defendant State Farm on February 19, 2005, soon after he found that his car had been stolen. The Defendant knew of the severe damage to the car by February 28, 2005. The Defendant had the Plaintiff's statements, outline of claimed loss and financial information by March 31, 2005. The Defendant had Valerie Ware-Temple's statement by April 18, 2005. In his letter to Ms. Ware-Temple on that date, State Farm claim representative Todd Smith acknowledges that he had been advised that a second set of keys may have been in the vehicle, that Felicia Flowers discovered that the car was missing and that there was broken glass where the Plaintiff had parked the car, and that the Plaintiff had personal items

6

in the car. The Defendant's activity log reflects no attempt to speak to any witness to the theft between April 19, 2005, and June 16, 2005. The Defendant never did interview Felicia Flowers or Sandy Ware. The Defendant's activity reflects no attempt was ever made to contact Ms. Flowers only mentions trying to contact Sandy Ware on June 16, 2005. The Defendant's claim file contains no itemization of damage to the Plaintiff's car which sets forth the costs of repair, the anticipated labor costs or the salvage value. Defendant State Farm did not issue a decision on the claim until June 29, 2005. In a letter dated June 29, 2005, State Farm team manager Tony Nix stated that the Defendant was denying the claim after a "comprehensive" investigation based on its determination that "the destruction of the insured vehicle was by or at the direction of an insured" and that the Plaintiff "misrepresented material facts in the presentation of his claim." Despite a request to specifically state the material misrepresentations it alleged in its letter, the Defendant never did so.

7.    You have alleged in your Complaint that you do not know who stole your car, who damaged your car, or who stole the contents of your car:

        a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

        b.    Please produce any documents relating to the information requested in this

7

interrogatory.

**ANSWER:**

The Plaintiff does not know who stole his car, damaged his car and stole the contents. Valerie Ware-Temple knows that the Plaintiff did not leave the room between parking the car and finding out that it had been stolen.

8.    You have alleged in your Complaint that State Farm's representatives falsely accused you of criminal conduct:

    a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

    b.    Please produce any documents relating to the information requested in this interrogatory.

**ANSWER:**

In a letter on State Farm stationary that is dated June 29, 2005, State Farm team manager Tony Nix stated that "the destruction of the insured vehicle was by or at the direction of the insured." That statement is an absolute lie. The Plaintiff neither destroyed his car nor directed others to do so. The Plaintiff has no idea who stole and stripped his car. The Defendant's false assertion labels the Plaintiff as a thief, a criminal conspirator and a defrauder when in reality he is

8

the victim of a crime.

9.    You have alleged in your Complaint that State Farm breached a valid insurance contract:

   a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

   b.    Please produce any documents relating to the information requested in this interrogatory.

**ANSWER:**

In its Answer, Defendant State Farm admits that it issued an automobile insurance policy that covered the Plaintiff's car and that the Plaintiff purchased this policy through Mike Devers Insurance Agency in Millbrook. The Defendant admits that the Plaintiff submitted a claim under the policy which it denied.

The theft and destruction of the Plaintiff's car by unknown criminals was a loss covered by the insurance contract. The Plaintiff lived up to his end of the insurance contract by paying the premiums charged by Defendant State Farm. When it accepted the Plaintiff's premium payment and issued the policy, the Defendant State Farm promised to pay for the Plaintiff's car if it was stolen or damaged. The Defendant State Farm has breached the insurance contract by

refusing to honor and pay this valid claim.

      10.    You have alleged in your Complaint that State Farm violated a duty of good faith and fair dealing:

          a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

          b.    Please produce any documents relating to the information requested in this interrogatory.

**ANSWER:**

Every policy of insurance contains a duty implied by law of good faith and fair dealing. This duty requires that insurance companies not interfere with their insured's rights to receive the benefits of the policy.

In this case, Defendant State Farm breached its duty of good faith and fair dealing to the Plaintiff. It did not properly investigate this claim. The results of its claim were not subjected to a reasoned and informed evaluation and review before the claim was denied. It did not treat the Plaintiff's interests with equal regard as its own interests. It treated the claims process with the Plaintiff as adversarial and competitive in nature. It did not fully, fairly and promptly evaluate and adjust the claim. It denied the claim based upon insufficient information, speculation and a

biased, one-sided outlook. Throughout the claims process, it exhibited a reckless indifference to the facts. In denying the claim, it did not give a written explanation pointing to facts, despite being requested to do so.

Defendant State Farm's claim file reflects that the Defendant entered the process of adjusting this claim with a biased, one-sided view toward denying the claim and that it systematically ignored facts that the Plaintiff's claim was valid and due to be paid. The Plaintiff reported his loss to the Defendant on February 19, 2005, and the Defendant referred the claim to its Special Investigation Unit six days later. The Special Investigation Unit is where claims are sent that the Defendant believes are fraudulent. The Defendant did not interview the Plaintiff concerning what happened in any detail before referring his claim to its "claim denial for fraud" unit nor had it examined the car. The Property Loss Preliminary Report created on March 4, 2005, proves the Defendant had already assumed a position adverse to the Plaintiff's claim based on its speculations that he participated in the theft of his car. The Defendant's preliminary report lists nine reasons/indicators for referring the Plaintiff's claim to its "special claim denial for fraud unit." None of the listed reasons/indicators concern an eyewitness claiming to know that the Plaintiff stole or arranged the theft of his car. One of the listed reasons says that the Plaintiff delayed reporting the theft to the police, yet the police incident report and the Defendant's own claim activity log confirm that the Plaintiff reported the theft the morning that he discovered that his car was gone. Another listed reason is that the Plaintiff "was unable to provide all of the keys to his vehicle." However, the Defendant's claim file shows that the claim had been referred to its claim denial for fraud unit before it asked the Plaintiff for keys. Moreover, on the subject of keys, the Defendant knew within the first month after receiving the claim that the dealership

11

recalled the Plaintiff was given just one key to the vehicle and that any second set of keys that might have existed may have been in the car at the time it was stolen, stripped and ransacked. Other facts listed as reasons for referring this claim to the deny for fraud unit is that the Plaintiff is disabled from the Army, the car was recently purchased, the Plaintiff recently settled a lawsuit for an on-the-job injury, the Plaintiff was divorcing from his wife, the Plaintiff had a prior claim involving his car being shot, the Plaintiff had expensive personal items in the car when it was stolen and he was "unemployed." The policy does not mention any of these factors as legitimate reasons paying a claim if the insured car is stolen, and the Defendant did not mention that such factors might be considered to deny him coverage if his car was stolen when it accepted the Plaintiff's premium payment. Suggesting that the Plaintiff is a person prone to lying, cheating and committing insurance fraud because he is a disabled veteran, a crime victim, divorcing, etc., is sheer stereotyping and not a legitimate excuse to deny coverage.

The Defendant State Farm slanted and directed its processing to deny this claim. For example, the Defendant claims to "know" that the insured "is unable to explain [the] whereabouts" of a second set of keys to the stolen car. In fact, the Defendant knew: (1) the dealer believed that the Plaintiff only got one set of keys to the car; (2) the Plaintiff told the adjuster that a second set of keys may have been inside the car when it was stolen; (3) the hotel clerk heard the Plaintiff mention having keys in the car; and (4) Valerie Ware-Temple told the adjuster that the Plaintiff mentioned to her that a second set of keys may have been in the car when it was stolen. That the Plaintiff does not know the whereabouts of such keys now is hardly surprising; he has no idea who stole his car, the seats, the tops or other contents.

The Defendant claims that the Plaintiff had a financial motive to conspire to have his car

12

stolen and destroyed, yet he could have gotten more money faster by just selling the car. Also, the Plaintiff was not in financial distress. He received a disability check each month that more than covered his modest living expenses, the prospects for an increased disability award were good, he had paid off most of his debts with the proceeds of his on-the-job injury settlement, he had satisfied his financial commitments relating to the divorce agreement and he owned the car free and clear.

Defendant State Farm refused to believe or neglected to develop facts supporting the validity of the Plaintiff's claim. These facts included the following: the Plaintiff had a longstanding desire to purchase a car like the one that he bought from City Auto Sales on February 4, 2005; he spent hours searching for just the right one; he was proud of his car; he enjoyed driving the car and showing it to his friends; he had no remorse, regrets or second-thoughts after buying the car; he enjoyed enhancing the car and adding to its value; he had never offered to sell the car; he had no desire to sell the car; he was financially solvent and his income exceeded his bills; he parked the car where he thought it would be safe; he went into his hotel room after parking the car and did not leave the room until learning that he car was missing; there was broken glass on the ground at the place where the car had been; he was visibly upset that his car was missing; he asked the hotel clerk if he saw what happened to his car; he asked if the hotel security cameras could be accessed to find out what happened to his car; he reported the theft to the police; he reported the theft to the Defendant; he has never been accused of or convicted of theft, criminal conspiracy or fraud; and, he was understandably upset when the Defendant State Farm labeled him a thief, criminal conspirator and defrauder. By ignoring and neglecting to develop these facts and others, Defendant State Farm acted in reckless indifference

13

in denying the Plaintiff's claim and labeling him a thief.

Defendant State Farm denied the Plaintiff's claim without a single witness stating that they saw him take the car from the parking lot, that he was present when the car was taken from the parking lot or that he was heard arranging the theft. The Defendant's claim file contains no mention of any efforts to obtain fingerprints or other evidence from inside the car to try to identify who was responsible. The Defendant's claim file contains no mention of the volume of other automobile thefts in the area. The Defendant ignored the hotel clerk's report that another car was broken into the week after the Plaintiff's was stolen and that he told the police that there was a serious problem so that more patrolling at night was needed.

The Defendant did not deal with the Plaintiff's claim in good faith from the outset. It sent the claim for fraud unit review before discussing the claims with the Plaintiff. It treated the Plaintiff's reluctance to involve his companion for the weekend as proof that he stole his car when in fact her evidence showed that he could not have. It claimed he was in financial trouble when he was solvent and debt free. It disregarded all facts favorable to the Plaintiff in favor of speculation that he was a thief and a cheat. It led him to believe that it was actively working to resolve his claim when all it was doing was going through motions before denying the case. It never advised the Plaintiff that his claim had been red-flagged and referred to the unit that denies clams it chooses to call fraudulent. It did not even remotely treat the Plaintiff's interest with equal regard to its own.

11.    You have alleged in your complaint that State Farm had no reasonably legitimate, arguable or debatable reason for its denial of the claim:

      a.    State each and every fact upon which you rely in support of said

allegation; identify each and every document upon which you rely

in support of said allegation, and identify by name, home address,

business address, place of employment and job title, each and every

person having knowledge or information upon which you rely in

giving your answers to this interrogatory and state the knowledge

or information each person has.

 b.  Please produce any documents relating to the information

requested in this interrogatory.

**ANSWER:**

See response to Interrogatory 10.

12. You have alleged in your complaint that State Farm intentionally failed to

determine whether there was a reasonably legitimate, arguable or debatable reason to pay the

claim:

 a.  State each and every fact upon which you rely in support of said

allegation; identify each and every document upon which you rely

in support of said allegation, and identify by name, home address,

business address, place of employment and job title, each and every

person having knowledge or information upon which you rely in

giving your answers to this interrogatory and state the knowledge

or information each person has.

 b.  Please produce any documents relating to the information

requested in this interrogatory.

15

ANSWER:

See response to interrogatory 10.

13.    You have alleged in you Complaint that State Farm failed to properly investigate the claim, that its investigation was unduly biased, and that the results of the investigation were not subjected to a reasoned and informed evaluation and review:

    a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

    b.    Please produce any documents relating to the information requested in this interrogatory.

ANSWER:

See response to interrogatory 10.

14.    Please describe in detail the type and dollar amount of damages you allege that you are entitled to in this action.

    a.    State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every

16

person having knowledge or information upon which you rely in

giving your answers to this interrogatory and state the knowledge

or information each person has.

b.    Please produce any documents relating to the information

requested in this interrogatory.

**ANSWER:**

Automobile damage and loss:  $27,500.00 to $30,000.00

Stolen personal items:  $5,000.00

Travel expenses:  $400.00

Loss of use of car:  $8,500.00 to $12,000.00

Mental and emotional distress:  $100,000.00 to $200,000.00

Punitive damages:  $500,000.00 to $800,000.00

15.    Have any photographs been taken of you, the scene of the incident referred to in

the Complaint, or the vehicle involved in the incident referred to in the Complaint? If so, for each

such photograph, respectively, state the name, address and occupation of the photographer; the

name and address of each person who was present when the photograph was taken; the name and

address of the person who suggested, ordered or authorized that such photograph(s) be taken; the

date and place where each such photograph was taken; and the name and address of each person

who has custody, possession or control of a copy, negative or original of each such photograph.

a.    Please produce any such copy, negative or original

photograph to your answers to these interrogatories for

inspection and reproduction. Said copy, negative or original

17

photograph will be returned to you forthwith.

**ANSWER:**

None at this time.

16.    Have you ever been convicted of a crime, whether felony or misdemeanor? If so, state the exact charge for which you were convicted and when you were convicted.

**ANSWER:**

None other than traffic tickets.

17.    State the name and address of each person you may expect to call as an expert witness at the trial of this matter and further state the subject matter on which each such expert is expected to testify.

**ANSWER:**

Plaintiff will identify his expert witnesses in accordance with the Court's Scheduling Order.

18.    State whether you had consumed any alcohol or drugs of any kind during the (24) hour period immediately prior to the alleged theft; if so, state the type of drug you consumed, the quantity consumed and when and where same were twenty-four alcohol or consumed.

**ANSWER:**

No.

19.    Produce all documents and any other tangible items which would tend to prove, disprove or relate to any of the allegations in your Complaint not specifically requested above.

**RESPONSE:**

The Defendant State Farm has copies of all of the documents that the Plaintiff has

18

relating to his purchase of the car, financial condition, divorce and so forth because he gave them

to its representatives months before it declined his claim.  A copy of the Defendant's certification

of the Plaintiff's policy is attached.  A U-haul bill to retrieve the damaged car is attached.


_Martin O' Long_
MARTIN O. LONG

Sworn to and subscribed before me this

_14th_ day of February, 2007.

_Notary Public_

My Commission Expires: _10-03-10_


**OF COUNSEL:**

BURGE & BURGE
850 Park Place Tower
2001 Park Place North
Birmingham, AL  35203
(205)251-9000


## CERTIFICATE OF SERVICE

I hereby certify that I have this _20th_ day of February, 2007, served a copy of the above
and foregoing upon all counsel of record by placing a copy of same in the United States Mail,
postage pre-paid and properly addressed to:  James B. Newman, Helmsing, Leach, Herlong,
Newman & Rouse, Post Office Box 2767, Mobile, AL 36652.


_F. Tucker Burge_
OF COUNSEL