IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARTIN O. LONG,                          *

      Plaintiff,                        *

vs.                                      *          Case Number:   2:06cv816-MHT

STATE FARM FIRE AND                      *
CASUALTY COMPANY,
                                         *
      Defendant.

### STATE FARM'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE PLAINTIFF'S EXPERT, ROBERT SHARP, AND TO STRIKE SHARP'S AFFIDAVIT

COMES NOW, State Farm Fire and Casualty Company ("State Farm"), and files this memorandum brief in support of its motion to exclude Plaintiff's "bad-faith expert," Robert Sharp, and to strike Sharp's affidavit, relied upon by Plaintiff in opposition to State Farm's motion for a summary judgment.[1]

Mr. Sharp is considered by Plaintiff to be an expert on the insurance industry and on bad-faith claims.  Sharp gives the following opinions in his affidavit, relied upon by Plaintiff in opposition to State Farm's motion for a summary judgment: 1) State Farm owed various duties to Long, 2) State Farm did not have a reasonably legitimate or arguable reason for denying Long's claim made under his auto policy (and that State Farm breached that policy),[2] and 3) State Farm, in denying the auto claim, was not entitled to rely on misrepresentations made

---

[1] Exhibit A hereto is Sharp's affidavit, filed in support of Plaintiff's opposition to State Farm's motion for a summary judgment.  Exhibit B consists of excerpts from the rough-draft transcript of Sharp's deposition.

[2] While the heading of Sharp's second opinion (in his affidavit) states that State Farm violated insurance industry standards and practices, it appears that the substance of the opinion set out under that heading is that State Farm did not have a reasonably legitimate or arguable reason for denying Long's auto claim, and that it breached the auto policy. (Ex. A., 7-9).  This opinion is nothing more than a recitation of the allegations of the complaint.

regarding the personal property that was allegedly in the car when it was taken.[3] (Ex. A).  Sharp should be prohibited from testifying, and his affidavit should be stricken and not considered by the Court in ruling on State Farm's motion for a summary judgment.

The Court's general gate-keeping obligation under the Federal Rules of Evidence applies to scientific, technical, and specialized knowledge.  *Kumho Tire v. Carmichael*, 526 U.S. 137, 147 (1999).  That obligation applies to all expert testimony. Id.  The objective of the requirement is to ensure relevancy and reliability whether the expert basis his testimony on professional studies or personal experience.  This requirement will not be met if Sharp's opinion is allowed.

Sharp's opinion is, quite simply, a pre-digestion of the evidence and a verdict that he proposes to "feed" to the jury. See *Thompson v. State Farm Fire and Casualty Co.*, 34 F. 3d 932, 941 (10th Cir. 1994).  Allowing Sharp's opinion in this case would create the impression that the Court is shifting to the expert the responsibility for deciding the case.  McCormick on Evidence § 12 at 27 (1992).  Simply put, allowing Sharp's opinion would elevate him to the status of a "super juror." *Haas v. Abrahamson*, 705 F. Supp. 1370, 1375 (E.D. Wis. 1989).  As one federal court of appeals has explained: "By appearing to put the expert's stamp of approval on the [plaintiff's] theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged." *United States v. Montas*, 41 F.3d 775, 784 (1st Cir. 1994).  As is shown herein, Sharp's opinions are due to be excluded.

---

[3] Sharp only cites those "facts" that support his opinion.  That Sharp fails to acknowledge a significant and substantial amount of evidence that opposes his opinions and supports State Farm's position is evident from State Farm's brief in support of its motion for a summary judgment.

**I.**     **Sharp's opinions should not be allowed because they invade the province of the Court and the jury.**

**A.**

First, Sharp's statement of the duties allegedly owed by State Farm to Long constitutes a usurpation of the Court's role in determining what the law is. "The existence of a duty is a question of law to be determined by the trial court." *Ex parte Farmers Exchange Bank*, 783 So. 2d 24 (Ala. 2000). State Farm does not dispute that, under Alabama law, it has a duty to act in good faith towards its insureds. See *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 303-04 (Ala. 1999) ("'Bad faith ... is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.'") (quoting *Gulf Atlantic Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981)). However, State Farm's duty to Long is determined by Alabama law, and an expert witness should not be allowed to define that duty. See *KW Plastics v. U.S. Can Co.*, 199 F.R.D. 687 (M.D. Ala. 2000) ("No witness may testify to the 'legal implications of conduct; the court must be the jury's only source of law.' *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F. 2d 1537, 1541 (11th Cir. 1990) (member of insurance industry could not testify as to insurer's duty under contract)."). *Craggs Const. Co. v. Federal Ins. Co.*, Slip Copy, 2007 WL 1452927 (M.D. Fla. 2007) ("[A]n expert is not allowed to impede on the role of the Court, whose job it is to instruct the jury as to the requirements of law that apply to the particular facts of the case. See Fed. R. Evid. 704 commentary; see also *Cook v. Sheriff of Monroe County*, 402 F. 3d 1092, 1112 (11th Cir. 2005) (stating that 'testifying experts may not offer legal conclusions')"). Accordingly, Sharp should not be allowed to testify as to State Farm's duties to Long.

**<u>B.</u>**

Second, Sharp opines that State Farm did not have a reasonably legitimate or arguable reason for denying Long's auto claim. (Ex. A., 7-9). This ultimate conclusion is based on Sharp's opinion that the evidence does not support State Farm's conclusions that Long was involved in the theft of his own car and that Long made misrepresentations concerning material facts regarding the auto claim. (Id.).[4] This "expert" opinion invades the province of the jury and is not helpful. Therefore, it should not be allowed.

Pursuant to Rule 702, Fed. R. Evid.:

"If scientific, technical, or other specialized knowledge *will assist the trier of fact to understand the evidence or to determine a fact in issue*, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

(Emphasis added). "Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Associates Ltd v. Board of Trustees*, 50 F. 3d 908, 917 (11th Cir. 1995). Whether or not all of the information that State Farm had before it at the time it denied Long's auto claim made it reasonably legitimate for State Farm to conclude that Long had been involved in the theft of his own car is not a complex question that jurors cannot comprehend for themselves. It is clear from Sharp's affidavit that he simply lists what he considers the relevant evidence to be, and then weighs that evidence, which is something that a jury is perfectly capable of doing itself. Similarly, whether the evidence arguably supported State Farm's conclusion that material misrepresentations had been made in connection with Long's claim under his auto policy is not a complex question that jurors cannot answer themselves. Accordingly, Sharp's opinions on those

---

[4] Under Long's auto policy, there is no coverage if Long made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under the policy. There is also no coverage if the loss of the vehicle was not accidental.

subjects should not be allowed, should be stricken, and should not be considered by this Court in resolving State Farm's motion for a summary judgment.

In *Thompson v. State Farm Fire and Casualty Co.*, 34 F.3d 932 (10th Cir. 1994), the plaintiffs sued State Farm for bad faith after State Farm had denied their homeowner's claim. As a defense, State Farm asserted the fraud and concealment provision of the policy in question. The plaintiffs argued on appeal that the trial court had erred in excluding their so-called "expert in 'bad faith denial and investigation of insurance claims.'" 34 F.3d at 941. The 10th Circuit disagreed, stating:

> "[J]urors may properly be viewed as capable of evaluating good and bad faith (just as they regularly determine what constitutes the conduct of a 'reasonable person') by bringing their own common sense and life experience to bear ....
>
>      "....
>
> "... what we have already said as to the jury's competence to deal with the bad faith issue on its own confirms the discretionary power of the magistrate judge to bar testimony by the asserted expert. It must be remembered that Fed. R. Evid. 702 includes a requirement that the testimony will 'assist the trier of fact to understand or to determine a fact in issue,' a requirement that 'goes primarily to relevance' (*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, ----, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993)). And as we said in *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991), under Fed. R. Evid. 702 'the "touchstone" of admissibility is helpfulness to the trier of fact.'
>
>      "Expert testimony, like any other evidence, is subject to exclusion if it fails the Fed. R. Evid. 403 balancing test (*United States v. Onumonu*, 967 F.2d 782, 786 (2d Cir. 1991)). And where as here expert testimony is offered on an issue that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible because it would not even marginally 'assist the trier of fact,' while it must be viewed as a 'needless presentation' (Fed. R. Evid. 403) for the reasons that we have already explained."

34 F.3d at 939-41. See also, *Bergman v. United Services Auto. Assoc.*, 742 A.2d 1101, 1105-07 (Penn. Super. Ct. 1999) (holding that the trial court did not err in excluding the insured plaintiff's insurance-industry "expert" and stating: "[E]xpert testimony should not invite the fact-finder to

abdicate its responsibility to ascertain and assess the facts and, instead, defer to the expert's opinion. … '[B]ad faith is a legal concept of general application which does not require that scientific, technical or specialized knowledge be presented to assist the trier of fact.'") (quoting in part, *Dattilo v. State Farm Ins. Co.*, 1997 WL 644076 (E.D. Pa. 1997)).  Cf. *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F. 2d 1537, 1541 (11th Cir. 1990) ("The district court abused its discretion by allowing [an expert] to testify about the scope of [insurer's] duty under the [insurance] policy."); *Palomar Ins. Corp. v. Guthrie*, 583 So. 2d 1304, 1306-07 (Ala. 1991) (holding that expert testimony is not required to show that an insurance agent had a duty to provide coverage and stating: "[E]xpert testimony is not necessary, indeed should not be admitted, unless it is clear that the jurors themselves are not capable, from want of experience or knowledge of the subject, to draw correct conclusions from the facts.") (internal quotation marks omitted).  Accordingly, Sharp should not be allowed to testify that State Farm had no reasonably legitimate or arguable reason to deny the auto claim.

## C.

Finally, Sharp opines that State Farm was not justified in relying on misrepresentations Long made regarding the personal property allegedly contained in the car when it was taken. (Ex. A., 9).  It appears that Sharp is offering his interpretation of § 27-14-28 and the auto policy, and is applying his version of the "facts" to those interpretations.

For the reasons stated above, Sharp should not be allowed to offer his interpretation of an Alabama statute or the insurance policy.  Further, Sharp's application of his findings of fact to his interpretation of the policy and the law invades the province of the jury and is not helpful under Rule 702, as the jury is fully capable of drawing its own conclusions.  See also, *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F. 2d 1537, 1541 (11th Cir. 1990) ("The district court

abused its discretion by allowing [an expert] to testify about the scope of [insurer's] duty under the [insurance] policy."); *Phillips v. Harris*, 643 So. 2d 974, 976 (Ala. 1994) ("[A] witness, whether expert or lay, cannot give an opinion that constitutes a legal conclusion or amounts to the application of a legal definition."); *American Home Assur. Co. v. Merck & Co., Inc.*, 462 F. Supp. 2d 435, 448 (S.D. N.Y. 2006) (holding that an insurance expert could not testify to his interpretation of a policy and stating: "Expert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it by definition does not aid the jury in making a decision; rather it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's.") (internal quotation marks omitted).

Because Sharp's opinions invade the province of the Court and the jury, and are not helpful within the meaning of Rule 702, Sharp should be precluded from testifying, his affidavit should be stricken from the record, and the Court should not consider his testimony in ruling on State Farm's motion for a summary judgment.

## II.    Sharp is not qualified to give his opinion and he does not satisfy the *Daubert* and *Kumho Tire* requirements.

Assuming that the issues associated with the bad faith denial of insurance claims and the breach of insurance contracts are beyond the common understanding of juries and cannot be comprehended by juries, Sharp should still not be allowed to testify to his opinions in this case, because he is not qualified to do so and because his opinions are unreliable.

### A.

Sharp was President and CEO of Workmen's Insurance Group until 2004. (Ex. B., 10). However, while Sharp was with Workmen's, Workmen's never did any business in Alabama. (Id at 7 (lines 19-21)). Before Sharp was employed with Workmen's, he was with J.C. Penney

Property and Casualty Insurance Company, but he never did any work in Alabama for that company. (Id at 12).  Before he was with J.C. Penney, Sharp was employed with Columbia Mutual Insurance Company, which did not do business in Alabama. (Id at 17).  Finally, before Sharp was with Columbia, he was with Shelter Insurance, which did no business in Alabama. (Id at 18).  Further, as his curriculum vitae shows, he has not testified in any Alabama cases. (Ex. A., lists of cases at end of affidavit).   Finally, Sharp conceded during deposition that he has no knowledge of the Alabama bad-faith standard. (Ex. B., 170).

It is clear that Sharp has absolutely no first-hand experience with Alabama's legal requirements regarding investigating and resolving insurance claims, including when those claims should be paid, and when failure to pay them constitutes bad faith.  Accordingly, he is not qualified to give the opinions he has given in this case.  See *City v. Hartford Fire Ins. Co.*, 162 F. 3d 576, 587-88 (10th Cir. 1998) (affirming the trial court's exclusion of a bad-faith expert in part because he did not have specialized knowledge of New Mexico bad-faith law).  That Mr. Sharp has reviewed the pleadings on file, various State Farm documents, and § 27-14-28, Ala. Code 1975, does not qualify him to give his opinions.  *Taylor v. Watters*, 655 F. Supp. 801, 805 (E.D. Mich. 1987) ("A course of self-study is not adequate, in the opinion of this Court, to create an expert.").

## B.

Further, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), the United States Supreme Court held that the gate-keeping obligation set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993), applies to all types of expert testimony, not just "scientific" expert testimony.  Accordingly, this Court "must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*,

526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). As noted by the Court in *Kumho Tire*, trial courts may apply certain factors in considering the reliability and admissibility of an expert's testimony. Those factors include:

> 1) Whether an expert's theory or technique can be (and has been) tested;
>
> 2) Whether an expert's theory or technique has been subjected to peer review and publication;
>
> 3) Whether there is a high known or potential rate of error with respect to an expert's technique and whether there are standards controlling that technique's operation; and
>
> 4) Whether an expert's theory or technique enjoys general acceptance within a relevant scientific community.

As noted, Sharp is of the opinion that the evidence is not sufficient to show that State Farm had a legitimate or arguable reason for denying Long's auto claim. He also opines that State Farm, in denying the auto claim, was not entitled to consider the evidence of misrepresentations regarding the personal property allegedly left in the car. Finally, Sharp opines that State Farm breached the auto policy.

By the date of his deposition, Sharp had had only one conversation with Long (which took place on the morning of the deposition), had not interviewed any of the other people who accompanied Long on his trip to Georgia the weekend of the alleged theft, and had never been to the hotel from whose parking lot Long's vehicle was allegedly stolen. (Ex. B., 150). During his deposition, Sharp testified that he had not utilized any particular method in determining which evidence was most significant. Rather, he simply cherry-picked the evidence that supported his opinion that State Farm had no reasonably legitimate or arguable reason to deny Long's auto claim. (Id. at 108-09).[5] Clearly, it has not been shown that Sharp's technique in formulating his

---

[5] Similarly, Sharp also testified that he utilized no method or system for determining that the evidence did not support State Farm's conclusion that Long had a motive for orchestrating the theft of his own car. Rather, he simply

opinion has been tested, subjected to peer review and publication, or enjoys general acceptance within the insurance community.  In fact, his "technique" appears to be nothing more than the fact that he has experience in the insurance industry. (Id.).  As he testified during his deposition, his "methodology" for formulating his opinions consisted of applying common sense, and he justified his opinions by stating that he was an expert. (Id.).  See also, Ex. B., 118-19 ("Q: What methodology did you use to be able to imply that from the report? … Q: This is again you're [an] expert for 30 years and that's what it says to you when you look at it? A: Yes. Q: So trust me I've done this before? A: If you wanted to state it that way.").[6]

With respect to his opinion that State Farm was not entitled to consider evidence of misrepresentations in connection with the personal property that Long claimed was in the car at the time it was taken, Sharp simply stated during his deposition that there were two separate policies, an auto policy and a homeowner's policy. (Id. at 36).  The auto policy, according to Sharp, principally covered the car while the homeowner policy covered personal property. (Id.). Sharp does not "believe that it's appropriate to use some of the same reasoning for denial under the [homeowner] contract as well as the auto." (Id. at 38).  However, Sharp admits that the auto policy contained language stating that a material misrepresentation eliminates coverage under that policy. (Id. at 36).  Sharp further conceded that the auto policy actually does cover personal property and that Long made a claim for personal property under that policy. (Id at 36-37). Other than his "experience," Sharp presents no methodology, technique, or other objective basis for his conclusion that State Farm, in denying the claim made under the auto policy, was not entitled to rely on misrepresentations regarding the personal property.  Therefore, Sharp cannot show that his "theory" or "technique" has been tested, subjected to peer review or publication, or

---

reviewed the claim file and, in conclusory fashion, determined that sufficient evidence did not exist. (Ex. B., 137-38).

[6] Sharp also testified during deposition that the margin of error for his opinions is immeasurable. (Ex. B., 167-68).

enjoys general acceptance within the insurance community.  As noted, Sharp testified during his deposition that his methodology for formulating his opinions consisted of applying common sense, and he justified his opinions by stating that he was an expert. (Id.).  See also, Ex. B., 118-19 ("Q: What methodology did you use to be able to imply that from the report? … Q: This is again you're [an] expert for 30 years and that's what it says to you when you look at it? A: Yes. Q: So trust me I've done this before? A: If you wanted to state it that way.")  As further noted, Sharp admitted that he could not state the margin of error for his opinions. (Ex. B, 167-68).

### C.

State Farm notes that, in *Kumho Tire*, which involved expert engineering testimony, the Court went on to state: "Engineering testimony rests upon scientific foundations, the reliability of which will be at issue … In other cases, the relevant reliability concerns may focus upon personal knowledge or experience." 526 U.S. at 150.  To the extent that the *Daubert / Kumho Tire* reliability-factors do not apply in this case, and to the extent that the reliability of Sharp's testimony should be determined based simply on his personal knowledge or experience, it is nevertheless clear that his opinions should be excluded.  As noted above, Mr. Sharp lacks any experience with *Alabama* insurance practice and bad-faith law.

### III.    Conclusion

First and foremost, Sharp should not be allowed to testify to his opinions because his testimony invades the province of the Court and jury and is not helpful.  In other words, he should not be elevated to the status of a "super juror."  Alternatively, he should not be allowed to

testify because he is not qualified to do so and because his testimony is unreliable.[7]  Accordingly, State Farm respectfully requests that this Court enter an order excluding Sharp's testimony and striking Sharp's affidavit.  State Farm further requests that the Court refuse to consider Sharp's opinions in ruling on State Farm's motion for a summary judgment.

Respectfully submitted,

s/ James B. Newman
JAMES B. NEWMAN (NEWMJ8049)
D. ANDREW STIVENDER (STIVD4909)
Attorneys for Defendant State Farm Fire
and Casualty Company

OF COUNSEL:
HELMSING, LEACH, HERLONG,
     NEWMAN & ROUSE
POST OFFICE BOX 2767
MOBILE, ALABAMA   36652
(251) 432-5521
Facsimile:   (251) 432-0633
Email:   jbn@helmsinglaw.com

CERTIFICATE  OF  SERVICE

     I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

     F. Tucker Burge
     Burge & Burge
     2001 Park Place North, Suite 850
     Birmingham, Alabama   35203

this 4th day of June, 2007.

     s/James B. Newman
     OF COUNSEL

---

[7] Further, even if Sharp is qualified to give his opinions, and even if those opinions are proper subjects of expert testimony, Sharp's testimony should still be excluded under Rule 403, Fed. R. Evid.  The probative value of Sharp's opinions, which are based on his subjective speculation, is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, undue delay, waste of time, and needless presentation of cumulative evidence.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EXHIBIT

A

| | | |
|---|---|---|
| MARTIN O. LONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 2:06CV816-MHT |
| | ) | |
| STATE FARM FIRE AND CASUALTY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

STATE OF GEORGIA

_____ COUNTY

### AFFIDAVIT OF ROBERT J. SHARP

Before me, the undersigned for said County and in said State, personally appeared Robert J. Sharp, who is known to me and who, after first being duly sworn, deposes and says:

My name is Robert J. Sharp. I am over the age of 21. I have personal knowledge of the facts contained in this affidavit. I am aware that this affidavit is being submitted in opposition to State Farm's Motion for Summary Judgment in the above-styled case.

**Qualifications and Experience:**

My curriculum vitae is attached as Exhibit 1. The experience and qualifications set forth on the curriculum vitae are accurately recited. Among other things, I have had oversight responsibility for over 260 insurance industry employees, 20,000 claim files and 3,000 litigated files during my tenure in the insurance industry. I have familiarity with the customs and practices in the insurance industry for handling claims and denial of claims. I have taught on the subject of casualty claim handling and have managed a special investigative unit for an insurance company. My work experience includes handling first party insurance claims relating to claims for stolen automobiles. During my career in the insurance industry, I have personally handled and supervised thousands of property and casualty claims. I have been personally involved in

1

estimating claim damages, claim coverages, denials and procedures. I have served as an instructor in claims training and insurance procedures classes. I am familiar with insurance regulations and practices. I am familiar with proper insurance industry standards and procedures for handling property and casualty claims. I am familiar with the custom and practices in the insurance industry for investigating and handling of property and casualty claims, including litigated issues. I have chaired instructional seminars for the Property Loss Research Bureau and the National Association of Mutual Insurance Companies. I have served as a law committee member for the National Association of Independent Insurers. I have served as an instructor and presented seminars at the National Association of Arson Investigators and International Association of Arson Investigators as well as for state and local claims organizations.

I have been designated in approximately 30 cases in the last two years as an expert to testify on the issues of insurance industry claims practices and handling. In addition, I have qualified to testify at trial as an expert witness and testified on insurance industry claims practices and handling approximately 25 times during my career in the insurance industry. A list of the case in which I have given trial or deposition testimony in the last three years is attached as Exhibit 2. In addition, I testified concerning insurance claims practices and claims decisions on numerous occasions on behalf of the insurance companies that I worked for during my career in handling insurance claims while employed with insurance companies.

**Materials Reviewed:**

I have been retained by the law firm of Burge & Burge to evaluate State Farm's handling of two claims that Martin Long filed concerning the loss of his 2000 Chevrolet Corvette on February 19, 2000. I have reviewed the following:

- Complaint
- Answer
- Plaintiff's interrogatory answers
- Defendant's interrogatory answers
- Claim file for claim number 01-6596-564 (SF1 00001 through SF1 00831)
- Claim file for claim number 01-Q177-057 (SF2 00001 through SF2 00119)
- State Farm Auto Claim manual and claim operation guides (SF1 0001 - P through 0107 - P)
- Documents concerning policy 01-CW-7517-0 (SF-H 001 through SF-H 058)
- Documents concerning policy 886750-B04-01 (SF-A 001 through SF-A 027)
- Code of Alabama, 1975, § 27-14-28
- Deposition of Martin Long
- Deposition of Todd Smith
- Deposition of Tony Nix
- Scene photographs of hotel parking lot
- Expert disclosures of Donal O'Shaughnessy

2

**Factual Background:**

From my review of the materials listed above, I learned the following facts that are relevant to my opinions in this case.

1.      On February 4, 2005 Martin Long purchased a 2000 Chevrolet Corvette from City Auto Sales. Long paid for the car in full. Specifically, he paid the $25,000.00 purchase price at the time of the sale and there were no bank liens on the car or other encumbrances whatsoever.

2.      Martin Long purchased an automobile policy covering this Corvette from State Farm Fire & Casualty Company. Long paid State Farm a $637.32 premium payment for full coverage on the Corvette from February 4 to August 4, 2005. The policy that State Farm issued on the Corvette was policy number 88 6750-B04-01.

3.      Martin Long improved the 2000 Chevrolet Corvette from the time that he bought it up until the time that he last saw the car before it was stolen. Long replaced the tires, rims, a tie-rod and added other accessories to the car. He produced receipts to State Farm for the work performed by Big 10 Tires. These receipts totaled $1,572.14 and reflect that the last work done by Big 10 Tires on this car was performed on February 18, 2005.

4.      On February 18, 2005, Long drove his Corvette from Montgomery to Lithonia, Georgia, to spend the weekend at the Country Inn Suites with Valerie Ware Temple. They parked the Corvette near the hotel entrance, in plain view of the hotel security camera. Long and Ms. Temple were together in the hotel room when his Corvette was taken from the parking lot. Long learned of the theft the following morning. He notified the hotel management, the police and State Farm that same morning.

5.      Martin Long made a claim for the fair market value of his stolen Corvette under State Farm automobile policy 0886-750-01 and the claim number for that claim was 01-6596-564. He made a separate claim for the personal property stolen from the car under a manufactured home policy issued by State Farm bearing policy number 01-CW-7517-0 and the claim number for that claim was 01-Q177-057. Long paid separate premiums for these policies and State Farm accepted these premiums. I understand that this lawsuit concerns only State Farm's denial of Claim No. 01-6596-564.

6.      Long submitted an Affidavit of Vehicle Theft in support of his claim for the full market value of the Corvette. He wrote that the amount of his claim was $25,000.00, the amount that he had paid for the car. State Farm concluded that the actual cash value of the Corvette was $25,789.50. Thus, if State Farm had paid Mr. Long's claim, it would have been obligated to pay $25,289.50 (the fair market value less a $500.00 deductible).

7.    The claim file contains no direct proof suggesting that Long was involved in the theft of his 2000 Corvette. Long denies any involvement in the loss of his car. No witness claims to have seen him take his car from the parking lot after he and Ms. Temple went up to their room for the night. The hotel security camera system was inoperable and did not record who took the car or how. Mr. Long discovered that the hotel security video camera system was out of order when he asked the hotel staff to view it. Because Mr. Long was with Ms. Temple in the hotel room from the time they parked the car on the night of February 18 until they discovered the car was gone the next morning, Long lacked the opportunity to move the car.

8.    The claim file contains no suggestion of who took the car from the parking lot of the hotel. No arrests were ever made. Neither the police nor State Farm performed any forensic examination to determine who specifically took the car from the hotel parking lot or how.

9.    The claims file contains numerous and conflicting references to the keys for the 2000 Chevrolet Corvette. The dealer who sold Martin Long the car told State Farm that he believed only one set of keys came with the car. Long believed he got two sets of keys and told State Farm that the second set of keys may have been inside the car when it was stolen. Valarie Ware Temple told State Farm that Long mentioned to her that a second set of keys may have been inside the car when it was stolen. The hotel manager overheard Long say there were keys inside the car when it was stolen. The car was ransacked after it was stolen and no keys were in it when it was recovered. Mr. Long has not been able to find any other set of keys.

10.    The car was not in driveable condition when it was recovered. The brake system on the 2000 Chevrolet Corvette was not functional when the car was recovered. The brake fluid had been drained. The brake master cylinder reservoir was empty. Brake system components were missing or disabled. The instrument cluster on the dash indicated brake system and traction control failures. The brake system problem was verified by Michael Bresnock who noted a brake application allowed the pedal to travel almost to the floor board. Michael Bresnock was not able to verify the traction control system failure. Moreover, Michael Bresnock was unable to move the car out of park when he first inspected the car and expressed his belief that a bent transmission linkage accounted for the inability to shift the car into gear. There were missing lug nuts and loose lug nuts on the wheels of the car. Without functioning brakes, an operable transmission or secure wheels, it is unlikely that the car was being driven.

11.    State Farm speculated that the Corvette had to have been driven out of the hotel parking lot by whoever took it and points to Mr. Bresnock's report as support for that speculation. However, Mr. Bresnock's report does not say how the car left the lot. He merely says that whoever last drove the Corvette used a key.

Mr. Bresnock's report does not rule out towing as the means by which the Corvette was stolen from the hotel. Donal O'Shaughnessy, who repossesses cars via towing, explained that there was sufficient room to tow the car from where Long parked it and that contact marks on the undercarriage of the Corvette and the front bumper scratches indicated that the car had been

towed. The claim file contains no indication that State Farm ever considered the possibility that the Corvette was stolen via towing. The testimony of State Farm's claim supervisor that the Corvette could not be seen from the road is contrary to the photographs that plainly show otherwise.

     12.    Automobile theft is a serious problem in the Atlanta metropolitan area. The Dekalb County Police Department maintains an Auto Theft Unit. Detective Fitzpatrick of that unit provided reports to State Farm pertaining to the theft of Long's car. The first page of the materials he provided contains the following statement: "AUTO THEFT, METRO ATLANTAS FAVORITE GROUP PARTICIPATION SPORT." Given the magnitude of the car theft problem known to exist in the community, to guess that Long was responsible for this theft is not reasonable from a claims handling standpoint given that no one saw what happened.

     13.    State Farm based its denial of claim number 01-6596-564 on a financial motive but had documentation showing that Long was essentially debt free. Long acted responsibly when he received his personal injury settlement by paying off all of his credit card bills, his wife's car and his wife's student loans. He had a credit score of 651 which is considered fair/good. He receives a disability check each month that is more than adequate to pay his modest living expenses. He owned the Corvette free and clear, so if he wanted money for the car, he could have sold it.

**Opinions:**

After reviewing the materials listed above, I have formed the following opinions. I hold these opinions to a reasonable degree of certainty. These opinions are based upon my training and experience in the adjustment of insurance claims and my review of the facts of Mr. Long's claims.

     1.    **State Farm Fire and Casualty Insurance Company owed Martin Long various duties in the handling of the claim he filed under his automobile insurance policy.**

During the claim handling process, every insurer must treat its insured's interest equally with its own, must investigate claims fairly and objectively, and must not deny claims based on speculation and conjecture. State Farm's Auto Claim Manual acknowledges these basic principles and standards:

> "STATE FARM'S CLAIM PHILOSOPHY IS TO PAY WHAT WE OWE– promptly, courteously and efficiently. To accomplish this each claim, large or small, should be handled only on its own merits, in accordance with the facts of the law, the law, and applicable coverage–not on the basis of a person's race, age, religion, sex, national origin, or any other irrelevant consideration.

5

Case 2:06-cv-00816-MHT-CSC     Document 35     Filed 05/31/2007     Page 6 of 15

Our commitment to policyholders, claimants, and others with whom we do business, as well as our internal communications, should clearly and consistently demonstrate this claim philosophy. State Farm's claim department has an obligation to its insureds to fairly and promptly investigate and then appropriately negotiate, settle or defend covered claims for damages."

In its statement of "Commitment to Our Policyholders", State Farm says:

"It is the responsibility of the State Farm claims staff to implement Company philosophy with respect to claim handling. Our commitment to our policyholders is to treat them like a good neighbor. We should:

- Listen, be fair, be open, and carry out our part of the bargain under the contract in good faith.
- Be familiar and in compliance with those laws and regulations that impact claims in the appropriate state, and treat policyholders consistent with requirements of the law.
- Explain all relevant coverages under the policy. Encourage policyholders to report all losses and avail themselves of all benefits under their coverages.
- Diligently investigate the claims to determine if a claim is valid. Reasonably evaluate the claim, and act promptly in resolving the claim. If it is necessary to reject a claim for coverage or damages, it should be done promptly and courteously, with an explanation for the decision.
- Make an objective evaluation of the facts and circumstances supporting our policyholders' claims. Doing so helps insure our policyholders obtain all benefits available provided by the insurance policy.
- Give insureds a reasonable opportunity to comply with their responsibilities under the policy. If a claim is rejected, be willing to listen to subsequent input from the insured. Complete any necessary follow-up in a timely fashion, giving due consideration to any additional findings.
- Communicate with and be responsive to inquiries from insureds and their attorneys by promptly answering letters and phone calls.

6

In addition to our obligation to deal fairly with each policyholder, we also have an obligation to pay only covered claims in the proper amount. Payment of those claims not covered, or fraudulent claims, unnecessarily increases insurance costs for all policyholders.

In summary, we are committed to paying what we owe, promptly, courteously, and efficiently."

2.    **State Farm Fire and Casualty Company committed serious violations of insurance industry standards and best practices in its handling of claim number 01-6596-564.**

Martin Long submitted a claim under the automobile insurance policy that State Farm Fire and Casualty Company sold to him to cover his 2000 Chevrolet Corvette. This automobile insurance policy bears policy number 0886-750-01. The claim number for this claim was 01-6595-564. The claim that Mr. Long submitted under this policy was for the actual value of the car at the time that it was stolen from the hotel parking lot. This policy was in full force and effect on the date of the loss.

State Farm had no reasonably legitimate or arguable reason for refusing to pay Mr. Long's claim for the loss of his car. State Farm's speculation that Mr. Long participated in the theft of his car is an insufficient reason to have denied this claim and is not supported by an objective evaluation of the facts and circumstances. No witness claims to have seen Mr. Long remove his car from the parking lot after he and Valerie Ware Temple went up to their room for the night. At the time that State Farm denied this claim, it knew that Valerie Ware Temple confirmed that Mr. Long was with her in the hotel room from the time that they parked the car on the night of the 18th until they discovered the car was gone the next morning. An objective assessment of this evidence shows that Mr. Long did not have the opportunity to steal his car. Mr. Long parked his car in plain view of a hotel security camera. Unknown to Mr. Long, the camera was not working at the time of the theft. Mr. Long did not learn that the camera was inoperable at the time of the theft until after he reported the theft to hotel management and asked to view the security camera footage.

Martin Long's inability to produce a second set of keys for the Corvette was not a reasonably legitimate reason to refuse his claim. At the time that State Farm refused its claim, it knew that the dealer who sold Martin Long the car told State Farm that he believed that only one set of keys came with the car and that any second set of keys may have been in the car at the time that it was stolen and ransacked.

State Farm's speculation that a second set of keys must have been used to drive the car

7

from the parking lot is in conflict with other evidence. The brake system on the Corvette was not functional when the car was recovered. All of the brake fluid had been drained and brake system components were missing or disabled. Without functional brakes, it is not likely that the car was being driven. The damage to the front bumper and contact marks on the undercarriage discovered after the car was recovered suggest a likelihood that the car was towed from the hotel parking lot by the thieves.

The State Farm claim file contains no suggestion as to the identity of the person or persons who took the car from the parking lot at the hotel. No arrests have ever been made. The Atlanta metropolitan area is a big city with a well-known auto theft problem. Neither the police nor State Farm undertook to perform forensic analysis of the car after it was recovered in an effort to determine the identity of the thieves. At the time that State Farm denied this claim, it knew that another car had been broken into at the hotel during the same time frame when Mr. Long's car was stolen.

State Farm's handling of claim number 01-6596-564 reflects a predisposition for denying it. State Farm referred Mr. Long's claim to its special investigation unit six days after he reported the car stolen. From the beginning, State Farm's claim file documentation reflects State Farm's suspicion that Mr. Long stole his own car for financial reasons. Not only did its investigation fail to disclose any objective reasonably legitimate reason for concluding that Mr. Long stole his own car, State Farm's investigation failed to establish any objective reasonably legitimate reason for concluding that Mr. Long had a financial motive for stealing his own car. Mr. Long was essentially debt free when his car was stolen. He had paid off his credit card bills, his wife's car and his wife's student loans with the proceeds that he received from the settlement of his on-the-job injury claim. He had a good credit score. He received a monthly disability check that was more than adequate to pay his modest living expenses. He owned the Corvette free and clear and could have sold it easily and quickly. At the end of the day, the facts established by the investigation did not support the theory that Mr. Long had a financial motive for having his car stolen.

Numerous other facts negate State Farm's speculation that Mr. Long was somehow involved in having his car stolen. Mr. Long had spent time and money improving the car from the time he purchased it. In fact, he took his car to Big Ten Tires to have work performed on February 18, 2005, the same day he parked his car in the hotel parking lot before it was stolen.

Without objective evidence of a financial motive, State Farm had no reasonably legitimate or arguable reason for denying his claim on that basis. Likewise, State Farm's investigation does not support that he made a misrepresentation concerning a material fact regarding claim number 01-6596-564. Mr. Long's failure to disclose that he was with Valerie Ware Temple, a married woman, at the time that his car was stolen is not a legitimate reason to deny him insurance coverage for the theft of his car. It is clear that Mr. Long was trying to save his companion from embarrassment. He advised the State Farm claim agent of her presence as soon as the recorder was turned off. State Farm had the opportunity to interview Valerie Ware

8

Temple two months before denying the claim. State Farm was able to confirm with Ms. Temple that Mr. Long was with her and thus did not have the opportunity to take his car. Denying Mr. Long coverage based on his reluctance to say on a recorded statement that he was with a married woman is an irrelevant consideration which State Farm's own policy manual says should not be a basis for deciding a claim.

State Farm's assertion that Mr. Long misrepresented material facts concerning who called the police on the morning that the theft of the Corvette discovered should certainly not be the basis of denying any claim. The undisputed proof shows that the theft was reported to police on the morning it was discovered. It is ludicrous from a claim handling standpoint to suggest that who placed such a call dictates whether a claim is paid or rejected.

Mr. Long made a valid claim under his automobile insurance policy. State Farm should have paid Mr. Long for the theft of his car. State Farm breached its contract with Mr. Long by not paying him under the automobile insurance policy for the loss of his car. State Farm lacked any objective, reasonably legitimate or arguable reason for refusing to pay the claim under his automobile policy for the loss of his car. State Farm's conduct was in violation of its obligations of good faith and fair dealing with Mr. Long. The reasons cited by State Farm for denying Mr. Long's claim under his automobile insurance policy reflect bad faith on the part of State Farm.

### 3.    Martin Long made no material misrepresentations in the presentation of claim number 01-6595-564.

To the extent that State Farm denied Long's automobile claim because of claims he made for personal property under the homeowner's policy, it violated accepted insurance standards, as well as applicable insurance law. Section 27-14-28, Code of Alabama (1975) provides:

> No misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy unless such misrepresentation is made with actual intent to deceive as to a matter material to the insured's rights under the policy.

In Long's claim for the fair market value of his Corvette, he made no material misrepresentations affecting State Farm's rights under that policy. The amount that he claimed in his Affidavit of Theft was less than State Farm determined the fair market value of the stolen Corvette to be. Long's representations in a proof of loss for another claim under another policy is not material to his claim for the fair market value of the Corvette. State Farm's handling procedures mandate that "each claim, large or small, should be handled on its own merits." By basing any part of its denial of his automobile claim on representations that he made in the proof of loss for his homeowner's claim, State Farm violated proper insurance practices and standards. Whether Mr. Long added a pair of shoes to his proof of loss for his contents claim under a separate homeowner's policy is simply of no consequence to a proper evaluation of his claim for the fair market value of the Corvette under the automobile policy for which he paid a separate premium.

9

It is worth noting that many individuals have different insurance carriers for their automobile coverage versus their homeowner's coverage. It would be absurd to suggest that one company could deny coverage for a claim made against it because the insured inflated a claim he made against another insurer under a separate policy. Yet that is essentially just what State Farm seeks to do in this case and it is wrong.

_____

ROBERT J. SHARP

Sworn to and subscribed before me this

_____ day of May, 2007.

_____

Notary Public

My Commission Expires: _____

10

# SHARP & ASSOCIATES, LLP

GUIDANCE
DIRECTION
EFFECTIVE SOLUTIONS




*Insurance Consultants/Experts*

West Coast Office
21520 Yorba Linda Blvd. Suite G
#257
Yorba Linda, CA 92887
Business: (213) 407 9957

East Coast Offices:
325 East Paces Ferry Rd suite 1603
Atlanta, GA 30305
Phone: 213-407-9957

E-mail: rsharp1959@aol.com
Website: sharpandassociates.org

## Curriculum Vitae

**Robert Sharp & Associates** provides insurance industry related services including:

Expert witness testimony, Appraisal, Umpire and Mediation services, and Consultation. Provides service nationwide, from West & East Coast offices.

## Background & Qualifications:

Mr. Sharp has over 32 years' experience in insurance management and multi-line property and casualty claim handling. Most recently he served as President and CEO of Workmen's Insurance Group, from 1997 - 2004. In addition he also held the positions of Executive Vice President, Senior Vice President and Senior Vice President of Claims. During that time, Workmen's had an operating budget of $40,000,000. Mr. Sharp had oversight responsibility for over 260 insurance industry employees, 20,000 claim files and 3000 litigated files in 25 different states. He has served as Assistant Vice President/Regional Claim Manager for J.C. Penney Property & Casualty Insurance Company and Vice President of claims for Columbia Insurance Group. He also served as regional property claim manager for Shelter Insurance.

He has a BA Degree in Business from the University of Northern Iowa with an emphasis on business and finance.

As an instructor, he taught courses in:
Shelter Insurance Internal Claim School, classes in policy interpretation, claim investigation and documentation and property estimatics.
Speaker at local claim adjuster association's and seminars in file documentation and investigation in numerous Midwest cities as well as Los Angeles claims association.

Instructor and chairman for Property Loss Research Bureau, national seminars.

Instructor and panelist for International and National Arson Investigators Association.

Chairman of NAMIC's (National Association of Mutual Insurance Company's) claim educational committee. Served as instructor and a panelist. Also developed seminars that were presented throughout the United States for this organization.

Conducted numerous seminars for Midwest mutual insurance companies while working for Columbia Mutual Insurance, which was acting as a reinsurer.

Served on NAII (National Association of Independent Insurers) law review committee and national legislative committee.

**In 32 years of experience,** he has held a myriad of both management and claim-handling positions in the insurance industry which makes him eminently qualified to render expert opinions in regard to all aspects of claim handling including:

- Methods and procedures of claim handling, unfair claim practice issues
- Internal controls, Billing issues, underwriting issues and cancellations
- Clearly defined protocols, Agent and Broker issues
- Complex claim handling issues and practices
- Claim adjusting and coverage issues; including policy cancellations and denials
- Claim community standards and insurance consulting
- Breach of contract
- **Bad faith issues**

### LITIGATION EXPERIENCE

In addition to having direct hands-on experience with litigation during his 32-year career in the insurance industry, Mr. Sharp has testified numerous times in insurance related cases in the capacity as an adjuster, as well as in upper level management, in over 25 states and in Federal court. In addition to claim issues he has testified as the most knowledgeable person in regards to insurance company methods and procedures, billing and IT issues.

# Web Site:  sharpandassociates.org

Case 2:06-cv-00816-MHT-CSC     Document 35     Filed 05/31/2007     Page 13 of 15

## FEE SCHEDULE:

**Original retainer fee may be charged in the amount of $1000.00
(Credited towards the final invoice)**

| | |
|---|---|
| Expert Witness: | $190.00 per hour. |
| Research: | $175.00 per hour. |
| Litigation Consultant: | $190.00 per hour. |
| Mediation & Appraisal: | $150.00 per hour. |
| Reserve Review and Claim File Audits: | $150.00 per hour. |
| Expert Witness Designation: | $250.00  (flat fee) |
| Deposition Fee & Trial Testimony: | $250.00 per hour |

## Exhibit 2

List of cases I have testified at trial in the last three years.:

1. Barney v. Workmen's Insurance (Reno, Nevada)
2. Patel v. Infinity Insurance Company (Orange County, California)
3. Turner v. Sterling Casualty Insurance (Los Angeles, California)
4. David Brien v. Amica Mutual Insurance Company (Los Angeles, California)
5. Decena v. Pacific Specialty Insurance Company ( Los Angeles, California)

**Exhibit 1**

Cases I have given trial or deposition testimony in the last 3 years

1. David Brien v. Amica Mutual (Los Angeles, CA)
2. Diane Padillo v. USAA Ins. Co. (Las Vegas, Nevada)
3. Aero Falcons v. American Alternative (Los Angeles, California)
4. Crown Professional v. State Farm (Newport Beach, California)
5. Barney v. Workmens Insurance Co. (Reno Nevada)
6. Explorer v. Brandt (Ventura, California)
7. Professional Claims Services v. AIG (Los Angeles, California)
8. Zurich Insurance v. Drennan (Las Vegas, NV)
9. Sterling Casualty v. Turner (Orange County, California)
10. Patel v. Infinity (Fullerton, California)
11. Sibrian v. Infinity Insurance and Zavala (Los Angeles, California)
12. Putnam Leasing v. Nelson (Orange County, California)
13. Richardson v. Lough (Wheeling, West Virgina)
14. Decena v. Pacific Specialty Insurance Co. ( Los Angeles, CA )

ROBERT J. SHARP - ROUGH DRAFT

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4    CASE NO.:  2:06cv816-MHT

5

6    MARTIN O. LONG,

7         Plaintiff,

8              V.

9    STATE FARM FIRE AND CASUALTY COMPANY,

10        Defendants.

11

12

13        S T I P U L A T I O N S

14

15

16

17        IT IS STIPULATED AND AGREED by and

18   between the parties, through their respective

19   counsel, that the deposition of ROBERT J. SHARP

20   may be taken before STACEY L. JOHNSON,

21   Commissioner, at the Offices of Burge & Burge,

22   2001 Park Place North, Suite 850, Birmingham,

23   Alabama, on the 17th day of May, 2007.

EXHIBIT "B"

**ROBERT J. SHARP - ROUGH DRAFT**

2

```
 1          IT IS FURTHER STIPULATED AND AGREED

 2    that the signature to and the reading of the

 3    deposition by the witness is hereby waived, the

 4    deposition to have the same force and effect as

 5    if full compliance had been had with all laws

 6    and rules of Court relating to the taking of

 7    depositions.

 8          IT IS FURTHER STIPULATED AND AGREED

 9    that it shall not be necessary for any

10    objections to be made by counsel to any

11    questions except as to form or leading

12    questions, and that counsel for the parties may

13    make objections and assign grounds at the

14    time of trial, or at the time said deposition is

15    offered in evidence, or prior

16    thereto.

17          IT IS FURTHER STIPULATED AND AGREED

18    that the notice of filing of the deposition by

19    the Commissioner is waived.

20

21

22

23
```

3

**ROBERT J. SHARP - ROUGH DRAFT**

1                           INDEX

2    EXAMINATION BY:                    PAGE NUMBER:

3    Mr. Newman................................5-192

4    Mr. Burge...............................192-204

5    Mr. Newman..............................204-207

6    EXHIBITS:

7    Defendant's Exhibit 1

8         (notice)

9    Defendant's Exhibit 2

10        (materials reviewed)

11   Defendant's Exhibit 3

12        (File:  Martin Long v. State Farm)

13   Defendant's Exhibit 4

14        (photographs)

15   Defendant's Exhibit 5

16        (JurisPro Expert Witness Directory:

17         Rob Painter)

18   Defendant's Exhibit 6

19        (Outstanding Invoices Sharp & Associates)

20   Defendant's Exhibit 7

21        (CV)

22   Defendant's Exhibit 8

23        (Expert Witness Declarations)

ROBERT J. SHARP - ROUGH DRAFT

```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF, MARTIN O. LONG:
 3       BURGE & BURGE
 3       F. Tucker Burge
 4       2001 Park Place North
 4       Suite 850
 5       Birmingham, Alabama   35203
 5
 6
 7   FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY
 8   COMPANY:
 9       HELMSING, LEACH, HERLONG, NEWMAN & ROUSE
 9       James B. Newman
10       (NEWMJ8049)
10       jbn@helmsinglaw.com
11       150 Government Street
11       Suite 2000
12       Mobile, Alabama   36602
12       (251) 432-5521
13
14
15
16
17
18
19
20
21
22
23
```

5

**ROBERT J. SHARP - ROUGH DRAFT**

1    I, STACEY L. JOHNSON, a CSR of Montgomery,

2    Alabama, and Notary Public for the State of

3    Alabama at Large, acting as Commissioner,

4    certify that on this date, as provided by the

5    Federal Rules of Civil Procedure and the

6    foregoing stipulation of counsel, there came

7    before me at 2001 Park Place North, Suite 850,

8    Birmingham, Alabama, beginning at 10:07 a.m.,

9    ROBERT J. SHARP, witness in the above cause, for

10   oral examination, whereupon the following

11   proceedings were had:

12                ROBERT J. SHARP,

13   the witness, after having been first duly sworn

14   to speak the truth, the whole truth, and nothing

15   but the truth, testified as follows:

16                EXAMINATION

17   BY MR. NEWMAN:

18   Q    Would you state your name, please?

19   A    Robert J. Sharp.

20   Q    Mr. Sharp, I'm Jim Newman, and I

21   represent State Farm in this case and this is

22   your deposition of course.  You've been through

23   this before, haven't you?

ROBERT J. SHARP - ROUGH DRAFT

1      A     Correct.

2      Q     What is Workmen's Insurance Group?

3      A     Workmen's is a property casualty

4  carrier writes homeowners actually licensed

5  to -- write commercial, homeowners, auto.  Wrote

6  all three lines during my tenure there.

7  Primarily it was a west coast company.  In the

8  mid '90s it expanded to the Midwest as well as

9  the Southeast.

10     Q     I'd never heard of Workmen's.  Is it in

11 the southeast?

12     A     Yes, we have an office in Orlando.

13     Q     You consider Florida being the

14 Southeast?

15     A     No.  But we also did business in

16 Georgia.

17     Q     I understand.

18     A     As well.

19     Q     How about Alabama?  Did it do business

20 in Alabama?

21     A     No.

22     Q     And how large was Workmen's Insurance

23 Group?

10

## ROBERT J. SHARP - ROUGH DRAFT

1      A      I started with workmen in claims and

2   executive vice-president I still oversaw claims

3   then and I assumed the position of president and

4   CEO.    Company prior to that JC Penney Casualty.

5      Q      How long were you at Workmen's?

6      A      16 years.

7      Q      Okay.  So you went you were there from

8   say '88 all the way to 2004?

9      A      Correct.

10      Q      Something like that?

11      A      (Witness nods head.)

12      Q      And then why did you leave Workmen's?

13      A      Workmen's was closely held company.

14   Nicholas Shamus.  He died.  Management changed.

15      Q      Why did you leave Workmen's?

16      A      It was time for me to go.

17      Q      Did they terminate you?

18      A      No.

19      Q      Did you resign?

20      A      Yes.

21      Q      Was it arranged resignation did you

22   voluntarily resign or did they ask you to

23   resign?

12

**ROBERT J. SHARP - ROUGH DRAFT**

1    the insurance consultant/experts business?

2        A    Yes.

3        Q    Before before Shelter you were with JC

4    Penney Property and Casualty Insurance Company?

5        A    Correct.

6        Q    And you were the assistant

7    vice-president and regional claim manager for

8    them?

9        A    Correct.

10       Q    Where was your region?

11       A    It was west coast California organ

12    Washington and Arizona.

13       Q    Any did you ever work for JC Penney in

14    the southeast?

15       A    No.

16       Q    Alabama?

17       A    No.

18       Q    And what did you do for JC Penney?

19       A    Oversaw the claim operations on the

20    west coast.

21       Q    What size of company was JC Penney

22    property and casualty insurance company?

23       A    I think whether they sold they were

### ROBERT J. SHARP - ROUGH DRAFT

1    Q    Okay.  And both JC Penny Columbia and

2  Columbia wrote through independent agent?

3    A    No JC Penney was direct writer.

4    Q    Through the stores I guess.

5    A    Yes.

6    Q    And then how about Shelter insurance

7  regional probably claim manager for Shelter

8  insurance first of all where was your region?

9    A    East coast.  It was called the east

10  region.

11    A    They don't write on eastern region.  My

12  office was in St. Louis, Missouri.

13    Q    Okay.  Any did by the way did Columbia

14  Mutual Insurance Company write any in the

15  southeast?

16    A    No well Arkansas but that's and

17  southeast.

18    Q    And no one in Alabama?

19    A    No.

20    Q    And how about Shelter did it write any

21  coverage or any policies in the southeast?

22    A    Yes part of my territory was Louisiana

23  Mississippi Tennessee Kentucky independent

**ROBERT J. SHARP - ROUGH DRAFT**

1    Illinois and with a you call the boot hill of

2    Missouri from St. Louis down into cape injury

3    regard doe area.

4         Q     Did Shelter write any policies in

5    Alabama?

6         A     No.

7         Q     And what was your job as regional

8    property claim manager for Shelter?

9         A     Oversaw the property division and SI U.

10        Q     What did what type of policies did

11   Shelter write?

12        A     Homeowners principally homeowner auto

13   some commercial.

14        Q     And on the auto what were the limits

15   that they wrote on it?

16        A     You take me way back.  Statutory minute

17   I believe up to 100/300.  They could have

18   written some.

19        Q     How long were you with Shelter?

20        A     Ten years approximately.

21        Q     Okay.  I've got you back to 1970 now

22   with Shelter start nothing Shelter in about

23   1970.  What did you do prio to Shelter?

**ROBERT J. SHARP - ROUGH DRAFT**

1     A     Well first of all logically you have a
2   property contract which is separate and diverse
3   from an auto contract.   The auto crack
4   principlely is covering the automobile.   The
5   property crack is covering personal property
6   away weigh from the premises.

7     A     The contract around even similar.

8     Q     Both of them you'll agree with me
9   contain language that's stating that material
10  misrepresentation can eliminate coverage
11  correct?

12    A     If it's material to that loss.

13    Q     I said material misrepresentation?

14    A     Correct.

15    Q     Yeah.   And you've agree with many that
16  there is personal property coverage under the
17  auto policy?

18    A     Personal property as it relates to the
19  automobile correct correct.

20    Q     As it relates to property left in the
21  automobile correct?

22    A     Correct.

23    Q     Some of which is claimed in this case

ROBERT J. SHARP - ROUGH DRAFT

1    right?

2         A    Correct.

3         Q    And you'll agree with me that initially

4    Mr. Long made a claim under his automobile

5    policy and not under his homeowners possibly?

6         A    Yes?

7         Q    And he made a claim for personal

8    property at that time?

9         A    Yes.

10        Q    And you'll also agree with me won't you

11   that if one were to cause the cause a car to be

12   stolen in order to claim the personal property

13   in the car fraudulently then those would

14   naturally be part of the same investigation

15   correct?

16        A    Correct.

17        Q    Okay.  What else either than the fact

18   that they are different policies what other

19   factors do you rely upon to say that you cannot

20   that you can't investigate them together or

21   consider fact ascertained in your investigation

22   as to both policies?

23        A    I don't think that's exactly what I

**ROBERT J. SHARP - ROUGH DRAFT**

1   said.

2       Q     Tell me what you did say and let me

3   rephrase it?

4       A     What I said was you have two different

5   policies.  I don't believe that it's appropriate

6   to use some of the same reasoning for denial

7   under the property contract as well as the auto.

8       Q     Even under these circumstances?

9       A     Correct.

10      Q     Other than what you just said do you

11  have any other reasons that it's and

12  appropriate?

13      A     Well for example the material

14  misrepresentation the one item I think it was

15  stated that about shoes or something of that

16  nature.  Shoes have nothing to do with the

17  automobile claim.  Whatever they're and

18  conferred under property claim one did not

19  relate to the other.

20      Q     Except for in the circumstances you and

21  I have discussed?

22      A     Well again as the example I gave the

23  analogy of Farmers was on the homeowner are

**ROBERT J. SHARP - ROUGH DRAFT**

1    in support of them?

2         A      Correct.

3         Q      And what I'm asking is you why did you

4    use those factors as opposed to other factors

5    other facts?

6         A      Because at the time I prepared the

7    report I felt that those were the most salient

8    ones and demonstrative and.  There are other

9    factors, too, I'm sure.

10        Q      I understand that and I want to know

11   what was your methodology what system did you

12   use to pick out those factors as Poe pose to

13   others?

14        A      I think I'm like everyone I don't have

15   a mental system I do that with.  It just

16   happens.

17        Q      Was it just common sense?

18        A      Common sense logical my personal

19   opinion that these really demonstrate and

20   support the opinion this I'm giving here based

21   on my review of the document.

22        Q      I mean aren't you saying I'm expert an

23   I've reviewed these and these the thing that

ROBERT J. SHARP - ROUGH DRAFT

1  appear important to me?

2      A    Correct.

3      Q    Okay.  I mean there's no other than

4  your men at that time operation there's no

5  remethodology that used to pick those out

6  correct?

7      A    I don't think any expert does.

8      Q    Okay.  Let me ask this.  If I had to

9  formulate a test to decide whether you had

10  picked the Wright or the wrong factors how would

11  I design that test?

12      A    I have no idea.

13      Q    Do you have such a test?

14      A    No?

15      Q    Is there any way we could test to see

16  whether or not you had pick the right or wrong

17  factors?

18      A    I think that's ridiculous.

19      Q    I understand I've got to ask it though?

20      A    I know but I wouldn't even have an

21  answer for.

22      Q    While I've got to ask this one too.

23  Have you ever been convicted of a crime?

**ROBERT J. SHARP - ROUGH DRAFT**

1      A     Correct.

2      Q     Now your first interview with the

3  plaintiff Mr. Martin was today?

4      A     Correct.

5      Q     Have you interviewed any of the friends

6  or the Ware brothers from Atlanta?

7      A     No.

8      Q     How about any of the girlfriends that

9  were involved?

10     A     No.

11     Q     Ms. Wood infestation report or appoint

12  Flowers?

13     A     No.

14     Q     Have you seen the car?

15     A     No.

16     Q     Seen pictures of it?

17     A     Yes.

18     Q     Have you been to the hotel?

19     A     No but I know where it's at.

20     Q     Well I mean I know why read scare is?

21     A     I have not been to the hotel but I know

22  where it's at and I've seen the photographs.

23     Q     Okay.  Have you interviewed the in a

**ROBERT J. SHARP - ROUGH DRAFT**

1    other financial issues.  Who knows.

2          Q     Okay.

3          A     I mean there's a variety of issues.

4          Q     You've [TP-EUFRPB] opinions here on the

5    automobile policy and homeowners policy correct?

6          A     Correct.

7          Q     Was the degree of accuracy for your

8    opinions you think?

9          A     That's kind of a silly question.

10          Q     Well your opinions an human endeavor?

11          A     My opinion is a human endevor.  I put

12    myself in the shoes for example this particular

13    scenario any scenario if I was the insured's

14    carrier and I was reviewing this file and based

15    on experience both handling cases granting

16    authority files being litigated, i.e., were

17    where he got sues a insurer what would I do.

18          Q     My question is what error margin of

19    error do you think is present in your opinions

20    or can you measure it?

21          A     I don't think that's measurable.  I

22    think every case is different.  I think that's I

23    am possibly to measure.

**ROBERT J. SHARP - ROUGH DRAFT**

1    Q    You couldn't 1 percent marging of error

2    2 percent?  You just can't measure that?

3    A    I think every case is different.  I

4    don't think you can measure quantitate I feel a

5    thing that you can measure.  I don't think so.

6    Q    So we're not able to calculate the

7    degree of accuracy for your opinions correct?

8    A    I think the jury decides that.

9    Q    As a matter of fact isn't what you've

10   done in this case is baskly to decide what the

11   jury is going to decide?

12   A    I don't believe that would be a correct

13   statement what I'm doing is giving an opinion

14   from and insurance perspective was there

15   sufficient investigation and evidence to support

16   the denial of this claim.  I'm not trying to be

17   the judge and the jury no.

18   Q    But don't you agree that this is your

19   opinions in this case are the same as the

20   allegations in the complaint in this case?

21   A    In this case yes.

22   Q    Mean is there anything?

23   A    Similar probably is better word.

170

ROBERT J. SHARP - ROUGH DRAFT

1    don't have the definition of Alabama bad faith

2    law or statute.

3        Q    The you'll [TKR-ERPLD] about will a

4    [A-L] [HRO-PB] and you not insure standard

5    correct?

6        A    Do you know the standard in Alabama

7    is?  What the law is on this bad faith.

8        A    No.

9        Q    Is it your opinion that deviated from

10   the standard of care of an order nature and

11   reasonable in answer company?

12       A    Yes.

13       Q    Would you agree with me that breach of

14   contract is it is it not in and of itself bad

15   faith?

16       A    Correct.

17       Q    Failing if you are to anticipate policy

18   doesn't equal bad faith.

19       A    Correct.

20       Q    And you would agree with me that

21   mistake in evaluating the claim does not equal

22   bad faith either does under the industry

23   standard?

**ROBERT J. SHARP - ROUGH DRAFT**

1              C E R T I F I C A T E

2

3    STATE OF ALABAMA        )

4

5    COUNTY OF MONTGOMERY )

6

7         I hereby certify that the above and

8    foregoing ROUGH DRAFT deposition was taken down

9    by me in stenotype, and the questions and

10   answers thereto were transcribed by means of

11   computer-aided transcription, and that the

12   foregoing represents a true and accurate

13   transcript of the testimony given by said

14   witness upon said hearing.

15         I further certify that I am neither of

16   counsel, nor kin to the parties to the action,

17   nor am I in anywise interested in the result of

18   said cause.

19

20

21   _____

21         STACEY L. JOHNSON, Certified

22         Shorthand Reporter and

22         Commissioner for the State of

23         Alabama at Large.

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**