**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **MARTIN O. LONG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:06CV816-MHT** |
| | ) | |
| **STATE FARM FIRE AND CASUALTY** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**SECOND EVIDENTIARY SUBMISSION IN SUPPORT OF**
**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S**
**MOTIONS FOR SUMMARY JUDGMENT**

Comes now the Plaintiff in the above-styled cause and submits the following evidentiary

documents in support of his Brief in Opposition to Defendant's Motions for Summary Judgment:

1.    Executed Affidavit of Robert Sharp

2.    Miniscript of deposition of Donal O'Shaughnessy

Respectfully submitted,

s/F. Tucker Burge
F. TUCKER BURGE
BURGE & BURGE
2001 Park Place #850
Birmingham, AL   35203
(205)251-9000
(205)323-0512 (Facsimile)

1

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this 4th day of  May, 2007, electronically filed  the above and foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to James B. Newman, Esq., Helmsing, Leach, Herlong, Newman & Rouse, Post Office Box 2767, Mobile, AL 36652.


s/ F. TUCKER BURGE
                                     OF COUNSEL

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **MARTIN O. LONG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:06CV816-MHT** |
| | ) | |
| **STATE FARM FIRE AND CASUALTY** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

STATE OF GEORGIA

_____ COUNTY

### AFFIDAVIT OF ROBERT J. SHARP

Before me, the undersigned for said County and in said State, personally appeared Robert J. Sharp, who is known to me and who, after first being duly sworn, deposes and says:

My name is Robert J. Sharp. I am over the age of 21. I have personal knowledge of the facts contained in this affidavit. I am aware that this affidavit is being submitted in opposition to State Farm's Motion for Summary Judgment in the above-styled case.

**Qualifications and Experience:**

My curriculum vitae is attached as Exhibit 1. The experience and qualifications set forth on the curriculum vitae are accurately recited. Among other things, I have had oversight responsibility for over 260 insurance industry employees, 20,000 claim files and 3,000 litigated files during my tenure in the insurance industry. I have familiarity with the customs and practices in the insurance industry for handling claims and denial of claims. I have taught on the subject of casualty claim handling and have managed a special investigative unit for an insurance company. My work experience includes handling first party insurance claims relating to claims for stolen automobiles. During my career in the insurance industry, I have personally handled and supervised thousands of property and casualty claims. I have been personally involved in estimating claim damages, claim coverages, denials and procedures. I have served as an

1

instructor in claims training and insurance procedures classes. I am familiar with insurance regulations and practices. I am familiar with proper insurance industry standards and procedures for handling property and casualty claims. I am familiar with the custom and practices in the insurance industry for investigating and handling of property and casualty claims, including litigated issues. I have chaired instructional seminars for the Property Loss Research Bureau and the National Association of Mutual Insurance Companies. I have served as a law committee member for the National Association of Independent Insurers. I have served as an instructor and presented seminars at the National Association of Arson Investigators and International Association of Arson Investigators as well as for state and local claims organizations.

I have been designated in approximately 30 cases in the last two years as an expert to testify on the issues of insurance industry claims practices and handling. In addition, I have qualified to testify at trial as an expert witness and testified on insurance industry claims practices and handling approximately 25 times during my career in the insurance industry. A list of the case in which I have given trial or deposition testimony in the last three years is attached as Exhibit 2. In addition, I testified concerning insurance claims practices and claims decisions on numerous occasions on behalf of the insurance companies that I worked for during my career in handling insurance claims while employed with insurance companies.

**Materials Reviewed:**

I have been retained by the law firm of Burge & Burge to evaluate State Farm's handling of two claims that Martin Long filed concerning the loss of his 2000 Chevrolet Corvette on February 19, 2000. I have reviewed the following:

$ Complaint
$ Answer
$ Plaintiff's interrogatory answers
$ Defendant's interrogatory answers
$ Claim file for claim number 01-6596-564 (SF1 00001 through SF1 00831)
$ Claim file for claim number 01-Q177-057 (SF2 00001 through SF2 00119)
$ State Farm Auto Claim manual and claim operation guides (SF1 0001 - P through 0107 - P)
$ Documents concerning policy 01-CW-7517-0 (SF-H 001 through SF-H 058)
$ Documents concerning policy 886750-B04-01 (SF-A 001 through SF-A 027)
$ Code of Alabama, 1975, § 27-14-28
$ Deposition of Martin Long
$ Deposition of Todd Smith
$ Deposition of Tony Nix
$ Scene photographs of hotel parking lot
$ Expert disclosures of Donal O'Shaughnessy

**Factual Background:**

2

From my review of the materials listed above, I learned the following facts that are relevant to my opinions in this case.

1.    On February 4, 2005 Martin Long purchased a 2000 Chevrolet Corvette from City Auto Sales. Long paid for the car in full. Specifically, he paid the $25,000.00 purchase price at the time of the sale and there were no bank liens on the car or other encumbrances whatsoever.

2.    Martin Long purchased an automobile policy covering this Corvette from State Farm Fire & Casualty Company. Long paid State Farm a $637.32 premium payment for full coverage on the Corvette from February 4 to August 4, 2005. The policy that State Farm issued on the Corvette was policy number 88 6750-B04-01.

3.    Martin Long improved the 2000 Chevrolet Corvette from the time that he bought it up until the time that he last saw the car before it was stolen. Long replaced the tires, rims, a tie-rod and added other accessories to the car. He produced receipts to State Farm for the work performed by Big 10 Tires. These receipts totaled $1,572.14 and reflect that the last work done by Big 10 Tires on this car was performed on February 18, 2005.

4.    On February 18, 2005, Long drove his Corvette from Montgomery to Lithonia, Georgia, to spend the weekend at the Country Inn Suites with Valerie Ware Temple. They parked the Corvette near the hotel entrance, in plain view of the hotel security camera. Long and Ms. Temple were together in the hotel room when his Corvette was taken from the parking lot. Long learned of the theft the following morning. He notified the hotel management, the police and State Farm that same morning.

5.    Martin Long made a claim for the fair market value of his stolen Corvette under State Farm automobile policy 0886-750-01 and the claim number for that claim was 01-6596-564. He made a separate claim for the personal property stolen from the car under a manufactured home policy issued by State Farm bearing policy number 01-CW-7517-0 and the claim number for that claim was 01-Q177-057. Long paid separate premiums for these policies and State Farm accepted these premiums. I understand that this lawsuit concerns only State Farm's denial of Claim No. 01-6596-564.

6.    Long submitted an Affidavit of Vehicle Theft in support of his claim for the full market value of the Corvette. He wrote that the amount of his claim was $25,000.00, the amount that he had paid for the car. State Farm concluded that the actual cash value of the Corvette was $25,789.50. Thus, if State Farm had paid Mr. Long's claim, it would have been obligated to pay $25,289.50 (the fair market value less a $500.00 deductible).

7.    The claim file contains no direct proof suggesting that Long was involved in the theft of his 2000 Corvette. Long denies any involvement in the loss of his car. No witness claims to have seen him take his car from the parking lot after he and Ms. Temple went up to their room for the night. The hotel security camera system was inoperable and did not record who took the car or how. Mr. Long discovered that the hotel security video camera system was out of order when he asked the hotel staff to view it. Because Mr. Long was with Ms. Temple in the hotel room from the time they parked the car on the night of February 18 until they discovered the car was gone the next morning, Long lacked the opportunity to move the car.

8.    The claim file contains no suggestion of who took the car from the parking lot of the hotel. No arrests were ever made. Neither the police nor State Farm performed any forensic examination to determine who specifically took the car from the hotel parking lot or how.

9.    The claims file contains numerous and conflicting references to the keys for the 2000 Chevrolet Corvette. The dealer who sold Martin Long the car told State Farm that he believed only one set of keys came with the car. Long believed he got two sets of keys and told State Farm that the second set of keys may have been inside the car when it was stolen. Valarie Ware Temple told State Farm that Long mentioned to her that a second set of keys may have been inside the car when it was stolen. The hotel manager overheard Long say there were keys inside the car when it was stolen. The car was ransacked after it was stolen and no keys were in it when it was recovered. Mr. Long has not been able to find any other set of keys.

10.    The car was not in driveable condition when it was recovered. The brake system on the 2000 Chevrolet Corvette was not functional when the car was recovered. The brake fluid had been drained. The brake master cylinder reservoir was empty. Brake system components were missing or disabled. The instrument cluster on the dash indicated brake system and traction control failures. The brake system problem was verified by Michael Bresnock who noted a brake application allowed the pedal to travel almost to the floor board. Michael Bresnock was not able to verify the traction control system failure. Moreover, Michael Bresnock was unable to move the car out of park when he first inspected the car and expressed his belief that a bent transmission linkage accounted for the inability to shift the car into gear. There were missing lug nuts and loose lug nuts on the wheels of the car. Without functioning brakes, an operable transmission or secure wheels, it is unlikely that the car was being driven.

11.    State Farm speculated that the Corvette had to have been driven out of the hotel parking lot by whoever took it and points to Mr. Bresnock's report as support for that speculation. However, Mr. Bresnock's report does not say how the car left the lot. He merely says that whoever last drove the Corvette used a key.

Mr. Bresnock's report does not rule out towing as the means by which the Corvette was stolen from the hotel. Donal O'Shaughnessy, who repossesses cars via towing, explained that there was sufficient room to tow the car from where Long parked it and that contact marks on the undercarriage of the Corvette and the front bumper scratches indicated that the car had been towed. The claim file contains no indication that State Farm ever considered the possibility that

4

the Corvette was stolen via towing. The testimony of State Farm's claim supervisor that the Corvette could not be seen from the road is contrary to the photographs that plainly show otherwise.

      12.      Automobile theft is a serious problem in the Atlanta metropolitan area. The DeKalb County Police Department maintains an Auto Theft Unit. Detective Fitzpatrick of that unit provided reports to State Farm pertaining to the theft of Long's car. The first page of the materials he provided contains the following statement: "AUTO THEFT, METRO ATLANTAS FAVORITE GROUP PARTICIPATION SPORT." Given the magnitude of the car theft problem known to exist in the community, to guess that Long was responsible for this theft is not reasonable from a claims handling standpoint given that no one saw what happened.

      13.      State Farm based its denial of claim number 01-6596-564 on a financial motive but had documentation showing that Long was essentially debt free. Long acted responsibly when he received his personal injury settlement by paying off all of his credit card bills, his wife's car and his wife's student loans. He had a credit score of 651 which is considered fair/good. He receives a disability check each month that is more than adequate to pay his modest living expenses. He owned the Corvette free and clear, so if he wanted money for the car, he could have sold it.

**Opinions:**

After reviewing the materials listed above, I have formed the following opinions. I hold these opinions to a reasonable degree of certainty. These opinions are based upon my training and experience in the adjustment of insurance claims and my review of the facts of Mr. Long's claims.

      **1.**      **State Farm Fire and Casualty Insurance Company owed Martin Long various duties in the handling of the claim he filed under his automobile insurance policy.**

During the claim handling process, every insurer must treat its insured's interest equally with its own, must investigate claims fairly and objectively, and must not deny claims based on speculation and conjecture. State Farm's Auto Claim Manual acknowledges these basic principles and standards:

> "STATE FARM'S CLAIM PHILOSOPHY IS TO PAY WHAT
> WE OWE– promptly, courteously and efficiently. To accomplish
> this each claim, large or small, should be handled only on its own
> merits, in accordance with the facts of the law, the law, and
> applicable coverage–not on the basis of a person's race, age,
> religion, sex, national origin, or any other irrelevant consideration.
> Our commitment to policyholders, claimants, and others with
> whom we do business, as well as our internal communications,

5

should clearly and consistently demonstrate this claim philosophy.
State Farm's claim department has an obligation to its insureds to
fairly and promptly investigate and then appropriately negotiate,
settle or defend covered claims for damages."

In its statement of "Commitment to Our Policyholders", State Farm says:

"It is the responsibility of the State Farm claims staff to implement
Company philosophy with respect to claim handling. Our
commitment to our policyholders is to treat them like a good
neighbor. We should:

$        Listen, be fair, be open, and carry out our part of the bargain under the contract i
good faith.

$        Be familiar and in compliance with those laws and regulations that impact claim
in the appropriate state, and treat policyholders consistent with requirements of the law.

$        Explain all relevant coverages under the policy. Encourage policyholders to
report all losses and avail themselves of all benefits under their coverages.

$        Diligently investigate the claims to determine if a claim is valid. Reasonably
evaluate the claim, and act promptly in resolving the claim. If it is necessary to reject a
claim for coverage or damages, it should be done promptly and courteously, with an
explanation for the decision.

$        Make an objective evaluation of the facts and circumstances supporting our
policyholders' claims. Doing so helps insure our policyholders obtain all benefits
available provided by the insurance policy.

$        Give insureds a reasonable opportunity to comply with their responsibilities und
the policy. If a claim is rejected, be willing to listen to subsequent input from the insure
Complete any necessary follow-up in a timely fashion, giving due consideration to any
additional findings.

$        Communicate with and be responsive to inquiries from insureds and their
attorneys by promptly answering letters and phone calls.

In addition to our obligation to deal fairly with each
policyholder, we also have an obligation to pay only
covered claims in the proper amount. Payment of
those claims not covered, or fraudulent claims,
unnecessarily increases insurance costs for all
policyholders.

In summary, we are committed to paying what we owe, promptly,
courteously, and efficiently."

**2.      State Farm Fire and Casualty Company committed serious violations of
insurance industry standards and best practices in its handling of claim**

6

**number 01-6596-564.**

Martin Long submitted a claim under the automobile insurance policy that State Farm Fire and Casualty Company sold to him to cover his 2000 Chevrolet Corvette. This automobile insurance policy bears policy number 0886-750-01. The claim number for this claim was 01-6595-564. The claim that Mr. Long submitted under this policy was for the actual value of the car at the time that it was stolen from the hotel parking lot. This policy was in full force and effect on the date of the loss.

State Farm had no reasonably legitimate or arguable reason for refusing to pay Mr. Long's claim for the loss of his car. State Farm's speculation that Mr. Long participated in the theft of his car is an insufficient reason to have denied this claim and is not supported by an objective evaluation of the facts and circumstances. No witness claims to have seen Mr. Long remove his car from the parking lot after he and Valerie Ware Temple went up to their room for the night. At the time that State Farm denied this claim, it knew that Valerie Ware Temple confirmed that Mr. Long was with her in the hotel room from the time that they parked the car on the night of the 18th until they discovered the car was gone the next morning. An objective assessment of this evidence shows that Mr. Long did not have the opportunity to steal his car. Mr. Long parked his car in plain view of a hotel security camera. Unknown to Mr. Long, the camera was not working at the time of the theft. Mr. Long did not learn that the camera was inoperable at the time of the theft until after he reported the theft to hotel management and asked to view the security camera footage.

Martin Long's inability to produce a second set of keys for the Corvette was not a reasonably legitimate reason to refuse his claim. At the time that State Farm refused its claim, it knew that the dealer who sold Martin Long the car told State Farm that he believed that only one set of keys came with the car and that any second set of keys may have been in the car at the time that it was stolen and ransacked.

State Farm's speculation that a second set of keys must have been used to drive the car from the parking lot is in conflict with other evidence. The brake system on the Corvette was not functional when the car was recovered. All of the brake fluid had been drained and brake system components were missing or disabled. Without functional brakes, it is not likely that the car was being driven. The damage to the front bumper and contact marks on the undercarriage discovered after the car was recovered suggest a likelihood that the car was towed from the hotel parking lot by the thieves.

The State Farm claim file contains no suggestion as to the identity of the person or persons who took the car from the parking lot at the hotel. No arrests have ever been made. The Atlanta metropolitan area is a big city with a well-known auto theft problem. Neither the police nor State Farm undertook to perform forensic analysis of the car after it was recovered in an effort to determine the identity of the thieves. At the time that State Farm denied this claim, it knew that another car had been broken into at the hotel during the same time frame when Mr. Long's car was stolen.

State Farm's handling of claim number 01-6596-564 reflects a predisposition for denying it. State Farm referred Mr. Long's claim to its special investigation unit six days after he reported the car stolen. From the beginning, State Farm's claim file documentation reflects State Farm's suspicion that Mr. Long stole his own car for financial reasons. Not only did its investigation fail to disclose any objective reasonably legitimate reason for concluding that Mr. Long stole his own car, State Farm's investigation failed to establish any objective reasonably legitimate reason for concluding that Mr. Long had a financial motive for stealing his own car. Mr. Long was essentially debt free when his car was stolen. He had paid off his credit card bills, his wife's car and his wife's student loans with the proceeds that he received from the settlement of his on-the-job injury claim. He had a good credit score. He received a monthly disability check that was more than adequate to pay his modest living expenses. He owned the Corvette free and clear and could have sold it easily and quickly. At the end of the day, the facts established by the investigation did not support the theory that Mr. Long had a financial motive for having his car stolen.

Numerous other facts negate State Farm's speculation that Mr. Long was somehow involved in having his car stolen. Mr. Long had spent time and money improving the car from the time he purchased it. In fact, he took his car to Big Ten Tires to have work performed on February 18, 2005, the same day he parked his car in the hotel parking lot before it was stolen.

Without objective evidence of a financial motive, State Farm had no reasonably legitimate or arguable reason for denying his claim on that basis. Likewise, State Farm's investigation does not support that he made a misrepresentation concerning a material fact regarding claim number 01-6596-564. Mr. Long's failure to disclose that he was with Valerie Ware Temple, a married woman, at the time that his car was stolen is not a legitimate reason to deny him insurance coverage for the theft of his car. It is clear that Mr. Long was trying to save his companion from embarrassment. He advised the State Farm claim agent of her presence as soon as the recorder was turned off. State Farm had the opportunity to interview Valerie Ware Temple two months before denying the claim. State Farm was able to confirm with Ms. Temple that Mr. Long was with her and thus did not have the opportunity to take his car. Denying Mr. Long coverage based on his reluctance to say on a recorded statement that he was with a married woman is an irrelevant consideration which State Farm's own policy manual says should not be a basis for deciding a claim.

State Farm's assertion that Mr. Long misrepresented material facts concerning who called the police on the morning that the theft of the Corvette discovered should certainly not be the basis of denying any claim. The undisputed proof shows that the theft was reported to police on the morning it was discovered. It is ludicrous from a claim handling standpoint to suggest that who placed such a call dictates whether a claim is paid or rejected.

Mr. Long made a valid claim under his automobile insurance policy. State Farm should have paid Mr. Long for the theft of his car. State Farm breached its contract with Mr. Long by not paying him under the automobile insurance policy for the loss of his car. State Farm lacked

8

any objective, reasonably legitimate or arguable reason for refusing to pay the claim under his automobile policy for the loss of his car. State Farm's conduct was in violation of its obligations of good faith and fair dealing with Mr. Long. The reasons cited by State Farm for denying Mr. Long's claim under his automobile insurance policy reflect bad faith on the part of State Farm.

3.    **Martin Long made no material misrepresentations in the presentation of claim number 01-6595-564.**

To the extent that State Farm denied Long's automobile claim because of claims he made for personal property under the homeowner's policy, it violated accepted insurance standards, as well as applicable insurance law. Section 27-14-28, Code of Alabama (1975) provides:

> No misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy unless such misrepresentation is made with actual intent to deceive as to a matter material to the insured's rights under the policy.

In Long's claim for the fair market value of his Corvette, he made no material misrepresentations affecting State Farm's rights under that policy. The amount that he claimed in his Affidavit of Theft was less than State Farm determined the fair market value of the stolen Corvette to be. Long's representations in a proof of loss for another claim under another policy is not material to his claim for the fair market value of the Corvette. State Farm's handling procedures mandate that "each claim, large or small, should be handled on its own merits." By basing any part of its denial of his automobile claim on representations that he made in the proof of loss for his homeowner's claim, State Farm violated proper insurance practices and standards. Whether Mr. Long added a pair of shoes to his proof of loss for his contents claim under a separate homeowner's policy is simply of no consequence to a proper evaluation of his claim for the fair market value of the Corvette under the automobile policy for which he paid a separate premium. It is worth noting that many individuals have different insurance carriers for their automobile coverage versus their homeowner's coverage. It would be absurd to suggest that one company could deny coverage for a claim made against it because the insured inflated a claim he made against another insurer under a separate policy. Yet that is essentially just what State Farm seeks to do in this case and it is wrong.

ROBERT J. SHARP

Sworn to and subscribed before me this

_31_ day of May, 2007.

9

Notary Public

My Commission Expires: 7-25-2010

JESSICA SOLOMON
Notary Public
Fulton County
State of Georgia
My Commission Expires Jul 25, 2010

05-21-2007DonalO'Shaughnessy
00001 { 8:57:08am}
01            IN THE UNITED STATES DISTRICT COURT
02            FOR THE MIDDLE DISTRICT OF ALABAMA
03                 NORTHERN DIVISION
04   CASE NO.:  2:06cv816-MHT
05
06   MARTIN O. LONG,
07            Plaintiff,
08               v.
09   STATE FARM FIRE AND CASUALTY COMPANY,
10            Defendants.
11
12
13              S T I P U L A T I O N S
14
15
16            IT IS STIPULATED AND AGREED by and
17   between the parties, through their respective
18   counsel, that the deposition of DONAL
19   O'SHAUGHNESSY may be taken before STACEY L.
20   JOHNSON, Commissioner, at the Offices of Burge &
21   Burge, 2001 Park Place North, Suite 850,
22   Birmingham, Alabama, on the 17th day of May,
23   2007.
00002 { 8:57:08am}
01               IT IS FURTHER STIPULATED AND AGREED
02   that the signature to and the reading of the
03   deposition by the witness is hereby waived, the
04   deposition to have the same force and effect as
05   if full compliance had been had with all laws
06   and rules of Court relating to the taking of
07   depositions.
08               IT IS FURTHER STIPULATED AND AGREED
09   that it shall not be necessary for any
10   objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties may
13   make objections and assign grounds at the time
14   of trial, or at the time said deposition is
15   offered in evidence, or prior thereto.
16               IT IS FURTHER STIPULATED AND AGREED
17   that the notice of filing of the deposition by
18   the Commissioner is waived.
19
20
21
22
23
00003 { 8:57:08am}
01                        INDEX
02   EXAMINATION BY:                   PAGE NUMBER:
03   Mr. Newman.................................6-98
04   Mr. Burge................................98-110
05   Mr. Newman..............................110-114
06
07   EXHIBITS:
08   Defendant's Exhibit 1..........................6
09      (notice)
10   Defendant's Exhibit 2..........................6
11      (Expert Witness Declarations)
12   Defendant's Exhibit 3..........................6
13      (TerraServer aerial photograph)
14   Defendant's Exhibit 4.........................36

```
                                    05-21-2007DonalO'Shaughnessy
15       (Auto Claim Committee Report)
16    Defendant's Exhibit 5........................37
17       (Transportation Technology Report)
18    Defendant's Exhibit 6........................37
19       (Transportation Technology Report)
20    Defendant's Exhibit 7........................37
21       (Transportation Technology Report)
22    Defendant's Exhibit 8........................98
23       (Expert Witness Declarations)
00004 { 8:57:08am}
01    Defendant's Exhibit 9........................83
02       (photographs)
03    Defendant's Exhibit 10.......................84
04       (photographs)
05
06
07
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23
00005 { 8:57:08am}
01                  A P P E A R A N C E S
02    FOR THE PLAINTIFF, MARTIN O. LONG:
03       BURGE & BURGE
03       F. Tucker Burge
04       2001 Park Place North
04       Suite 850
05       Birmingham, Alabama  35203
05
06
07    FOR THE DEFENDANT, STATE FARM FIRE AND CASUALTY
08    COMPANY:
09       HELMSING, LEACH, HERLONG, NEWMAN & ROUSE
09       James B. Newman
10       (NEWMJ8049)
10       jbn@helmsinglaw.com
11       150 Government Street
11       Suite 2000
12       Mobile, Alabama  36602
12       (251) 432-5521
13
14
15
16
17
18
19
20
21
22
```

05-21-2007DonalO'Shaughnessy
23
00006 { 8:57:08am}
01        I, STACEY L. JOHNSON, a CSR of Montgomery,
02   Alabama, and Notary Public for the State of
03   Alabama at Large, acting as Commissioner,
04   certify that on this date, as provided by the
05   Federal Rules of Civil Procedure and the
06   foregoing stipulation of counsel, there came
07   before me at 2001 Park Place North, Suite 850,
08   Birmingham, Alabama, beginning at 9:01 a.m.,
09   DONAL O'SHAUGHNESSY, witness in the above cause,
10   for oral examination, whereupon the following
11   proceedings were had:
12
13        (Whereupon, Defendant's Exhibit
14   Numbers 1 through 3 were marked for
15   identification and copies of same are
16   attached hereto.)
17
18                    DONAL O'SHAUGHNESSY,
19   the witness, after having been first duly sworn
20   to speak the truth, the whole truth, and nothing
21   but the truth, testified as follows:
22                    EXAMINATION
23   BY MR. NEWMAN:
00007 { 8:57:10am}
01        Q    All right.  Would you state your name,
02   please, sir?
03        A    Donal O'Shaughnessy.
04        Q    And where do you live?
05        A    Alabaster.
06        Q    And what's your address,
07   Mr. O'Shaughnessy, your home address?
08        A    103 Maple Crest Drive.
09        Q    And how long have you lived there?
10        A    Eight years.
11        Q    Mr. O'Shaughnessy, my name is Jim
12   Newman.  I represent State Farm Fire and
13   Casualty in this case.  I'm going to be asking
14   you some questions this morning about your
15   expert opinions in this case.  If you don't
16   understand any of my questions, I'd ask you to
17   stop me and ask me to rephrase them; is that
18   fair?
19        A    Sure.
20        Q    Otherwise, if you answer them, I'm
21   going to assume that you understood them and
22   that you answered what I asked; fair enough?
23        A    Okay.
00008 { 9:01:53am}
01        Q    How old are you?
02        A    45.
03        Q    Are you married?
04        A    Yes.
05        Q    Any children?
06        A    No.
07        Q    How long have you been married?
08        A    Eight years.
09        Q    How many times have you been married?
10        A    Just once.
11        Q    And your wife's name?
12        A    Cathy O'Shaughnessy.
13        Q    All right.  Does she work?
                                        Page 3

05-21-2007DonalO'Shaughnessy
```
14       A    Yes.
15       Q    Where does she work?
16       A    Southern Company.
17       Q    And what does she do for Southern
18  Company?
19       A    System analyst for the...
20       Q    Some office-type --
21       A    Yes.
22       Q    -- technology --
23       A    She's a manager.
00009 { 9:02:21am}
01       Q    -- work?  Okay.  And how long has she
02  worked there?
03       A    20 years.
04       Q    Since before y'all were married, then?
05       A    Yes.
06       Q    What is your present employment?
07       A    I own a recovery business.
08       Q    How many people work for you?
09       A    About five or six right now.
10       Q    And what kind of equipment do you --
11  and by recovery, are we talking about --
12       A    Repossession company.
13       Q    Repossession of automobiles?
14       A    Yes.  Cars, trucks, anything.  Anything
15  they pay me to do.
16       Q    Okay.  Well, you don't repossess
17  furniture, do you?
18       A    I have.  Not recently.
19       Q    Okay.  But what your primary business
20  is is repossess --
21       A    Automobiles, yes.
22       Q    -- vehicles?
23            And one thing that she's going to have
00010 { 9:03:10am}
01  to do is take everything we have down here that
02  we say.  She'll be taking it down.  You
03  understand that?
04       A    Uh-huh.
05       Q    And the reason I point that out is
06  because you've got to let me finish before you
07  answer.
08       A    Oh, okay.
09       Q    Because she can't do two -- she can,
10  believe it or not, do two at once, but it's hard
11  for her.
12       A    Okay.
13       Q    Good.  And if it -- you know, we'll
14  start over if it happens.  It's not -- it won't
15  be a fatal thing.
16            What type of equipment do you have in
17  your business?
18       A    Well, myself I drive the company truck,
19  but I have rig in the back of it, a sling truck
20  that folds out.  I can tow things.  My partner
21  has one, the same.  We have three other wheel
22  lift trucks and one roll back wrecker.
23       Q    All right.  Now, we're going to have to
00011 { 9:04:00am}
01  start over again, because I need to be educated
02  on those things.  First of all, I guess, what's
03  the name of your business?
04       A    American Lender Service Company.
```
                              Page 4

05       Q    Is it a corporation?
06       A    Yes.
07       Q    And are you one of the primary
08   stockholders?
09       A    Yes.
10       Q    How much of the stock do you own?
11       A    50.
12       Q    And then who is your partner?
13       A    Scott Campbell.
14       Q    And he owns the other 50 percent?
15       A    Yes.
16       Q    And between -- and then you say that
17   y'all have three or four employees?
18       A    Three office employees and three other
19   repo men and two lot guys.
20       Q    Okay.  Now, describe for me the
21   equipment that you have there that you use.  I
22   understand you may have a personal vehicle
23   that's a company-owned vehicle, but I'm talking
00012 { 9:04:48am}
01   about equipment that you actually would use to
02   repossess automobiles with, assuming you do not
03   have a key.
04       A    All right.  Well, the truck I have,
05   that's what I do all of my repossession out of.
06   It's the one I drive back and forth to my home
07   and all.  It's a stow away lift.  It folds into
08   the bed of the truck and pulls the tailgate up
09   by it where you can't tell it's a repo truck
10   until I hit a switch and it folds out of the
11   back.  It has two slings, two rubber straps on
12   it that will lift the vehicle up.  Then I tow it
13   and I chain it up with some chains, J hooks.
14   And our other three trucks are wheel lift
15   trucks.
16       Q    Let's stop with that first truck right
17   now.
18       A    Uh-huh.
19       Q    You call it a sling truck?
20       A    Yes.
21       Q    And when you fold the mechanism out of
22   the bed of the truck, does it stick up in the
23   air?
00013 { 9:05:36am}
01       A    Yes.
02       Q    And then it has cables that come down
03   from that that you would attach to the vehicle?
04       A    Yes.
05       Q    And then is that designed to pick up a
06   car -- a vehicle from the rear or from the
07   front?
08       A    Either one.
09       Q    Okay.  Does it make a difference?
10       A    Well, if you have a -- if the vehicle's
11   powered by the rear, you'll want to pick it up
12   from the rear because that's -- get the drive
13   axle off the ground where it will tow freely.
14       Q    And I guess if it's a front wheel
15   drive, you'd want to pick the front up?
16       A    Yes.
17       Q    All right, sir.  So you know in your
18   business probably most of the time whether a car
19   is front wheel drive or rear wheel drive?
                                          Page 5

05-21-2007Donalo'Shaughnessy
```
20     A    Yes.
21     Q    Do you try to find that out before you
22   go?
23     A    I pretty much know what it is, but if
00014 { 9:06:26am}
01   I'm not sure, I can just look up under it.
02     Q    Okay.  Tell me how you go about
03   attaching -- you say the J hooks are at the end
04   of the cables?
05     A    Well, they're separate from the sling
06   itself, but it's got four hooks on the -- on the
07   sling.  So on the actual lift part that I just
08   pull the chain across it and attach it to the
09   hook.
10          MR. BURGE:  Do you have those here
11   today in the parking lot?
12          THE WITNESS:  Yes, they're in my truck.
13          MR. BURGE:  So we can go take pictures
14   afterwards if that will help.
15     A    But a lot of cars -- the tow trucks,
16   it's stationary.  Mine just folds in and out, so
17   I have a little extra advantage.  But most of
18   them, you can see them driving down the road.
19   They've got a big A-frame --
20     Q    Yeah.
21     A    -- stuck to the back of it.
22     Q    I've seen those.  Yours is like that
23   except for it folds down --
00015 { 9:07:14am}
01     A    Right.
02     Q    -- into the truck?
03     A    Yes.
04     Q    And the advantage of that is that
05   people don't know you're a tow truck, I guess?
06     A    Right.
07     Q    So you can get and be in the -- right
08   up to the act of repossessing before they know
09   you're a tow truck?
10     A    Yes.
11     Q    And you say your partner drives the
12   same thing?
13     A    Yes.
14     Q    Is that like a three-quarter ton pickup
15   that you would have?
16     A    Yes.
17     Q    And I guess it's four-wheel drive and
18   it's a V8 engine and it's probably a fairly
19   powerful truck?
20     A    It's not four-wheel drive, but it's got
21   a V8 in it, yes.
22     Q    Is it a GM truck?
23     A    Yes.
00016 { 9:07:53am}
01     Q    What other equipment do you have there?
02     A    The three wheel lift trucks.  Those
03   just fold down.  And it's got the jaws on the
04   back of it.  You just slide up under where you
05   want to pick up either the front or the back of
06   the truck, hit another button and it will
07   separate and grab the wheels and you just lift
08   it up and go from there.
09     Q    Well, that sounds like to me that it's
10   similar to a forklift; is that right?
```
                                            Page 6

05-21-2007DonalO'Shaughnessy
11      A    Yes.  Similar, yeah.
12      Q    Explain it to me one more time,
13  Mr. O'Shaughnessy.  I don't know if I've ever
14  seen one of those.
15      A    It's got a boom on the back of it
16  (indicating), and it's got the jaws folded in so
17  when you -- you lower it down and it'll just be
18  one rod going up between the wheels.  You get
19  back far enough until the rods -- the two pieces
20  hit the front -- front of the tire.  Then you
21  hit another button and those will expand and it
22  will grab the back of the tire.  Then you just
23  lift it up.
00017 { 9:08:47am}
01      Q    All right.  Now, once you lift it up,
02  do you just keep it on those rods that it's on
03  or do you then move the vehicle some other way?
04      A    Well, if it's a -- in a bad situation,
05  you can just move it off to where you can get it
06  a little more secure and then you strap the
07  tires down or you can strap it down as soon as
08  you pick it up.
09      Q    But you take it to wherever you're
10  going to take it with those rods --
11      A    Yes.
12      Q    -- extended; is that right?
13      A    Yes.
14      Q    Okay.  So you don't let it down and
15  then attach J hooks and pick it back up the same
16  way that you do your truck?  It's a different --
17      A    No.
18      Q    -- system?
19      A    No.  It's totally different.
20      Q    When would you use one and not the
21  other?
22      A    You don't want to -- it might damage --
23  if the front end's got a bunch of little
00018 { 9:09:35am}
01  spoilers on it or maybe it's kind of weak, not a
02  steel bumper.  I might damage some.  Those are
03  damage free.  The wheel lifts are damage free.
04      Q    How many of those do you have?
05      A    Three wreckers.
06      Q    And is that the total that you've got
07  are the two that you and your partner drive and
08  then the other three?
09      A    I have the three wheel lifts, the two
10  sling trucks, and a roll back wrecker.
11      Q    All right.  What's a roll back wrecker?
12      A    That's when you just -- it's a flatbed
13  where you put the vehicle totally up on the bed
14  of the truck.
15      Q    And that's the one where the -- it's a
16  flatbed and you put a ramp down from the flatbed
17  down to the pavement, attach some type of a
18  pulling device, and actually pull the vehicle up
19  on the flatbed?
20      A    Yes.
21      Q    Okay.  And I guess you've got some type
22  of hydraulic system that would pull -- is it
23  hydraulic, or is it --
00019 { 9:10:29am}
01      A    Yeah.  The bed actually -- it rolls
                                              Page 7

05-21-2007Dona1O'Shaughnessy
02  back and then tilts back, and you shift it all
03  the way to the front of the vehicle and then you
04  hook a winch up to it and winch it on there.
05       Q    Is the winch just electrical run?
06       A    Yes.
07       Q    Electric winch?
08       A    Yes.
09       Q    Just like you'd have on a hunting truck
10  or something like that?
11       A    Yes.
12       Q    And then you just pull the vehicle up
13  on the flatbed surface?
14       A    Right.
15       Q    Okay.  And when do you use that one as
16  opposed to the other two?
17       A    Something that's real heavy, you know,
18  I can't tow with either of our trucks or it's a
19  total loss and you can't tow it, like all the
20  tires are blown off of it or mangled and you
21  can't tow it.
22       Q    Okay.  Which of those is the most
23  maneuverable of those three that you've told me
00020 { 9:11:21am}
01  about?
02       A    They're all about the same.
03       Q    You can get them all -- which one is --
04       A    The wheel lift and my sling, they're
05  both about the same.
06       Q    The wheel lift and your sling are about
07  the same?
08       A    Yes.
09       Q    The flatbed is a little longer, isn't
10  it?
11       A    Well, ours is biggest.  It's probably
12  about 30 feet long.  It's a big truck.  They
13  make smaller ones, but that's a -- that's kind
14  of hard to maneuver around.
15       Q    All right.  Now, when you pick up a
16  rear wheel drive vehicle from the rear, under
17  the present system that most cars have, the
18  steering column is locked in place; correct?
19       A    A lot of them.
20       Q    You're able to tow that vehicle even
21  though you can't steer the vehicle?
22       A    Yes, if the steering is locked
23  straight.
00021 { 9:12:22am}
01       Q    If it's locked straight?
02       A    Yes.
03       Q    Is there any problem taking a curve or
04  anything like that?
05       A    No.
06       Q    Okay.  Now, if the steering is locked
07  at an angle, are you able to tow the vehicle?
08       A    It depends on how bad.  If it's real
09  bad, you might have to get it out of there and
10  then maybe call a roll back to come pick it up.
11       Q    Roll back is --
12       A    A roll back wrecker.  That big flatbed.
13       Q    Flatbed.  Thanks.  Okay.  Now, when the
14  vehicle is in park, if it's an automatic
15  transmission like this 2000 Corvette we're
16  talking about, is that going to make -- is that
                                              Page 8

05-21-2007DonalO'Shaughnessy
17  going to complicate the ability to tow the
18  vehicle?
19        A    If it was what?
20        Q    In park.
21        A    Well, depends if it was backed in or
22  pulled in straight.
23        Q    If it's pulled in straight, it --
00022 { 9:13:58am}
01        A    It wouldn't be any problem.
02        Q    Okay.  Does the alarm system on a
03  vehicle go off when you use this recovery
04  process?
05        A    No.
06        Q    Never?
07        A    No.
08        Q    Okay.  Why is that?  Because you don't
09  breach one of the secured areas?
10        A    I would assume, yes.
11        Q    You don't break the glass or open the
12  door or anything like that?
13        A    Right.
14        Q    Okay.  How do you get your
15  assignments?  Are you called by the financing
16  companies?
17        A    Some we get off our computer they send
18  to us and some are faxed.
19        Q    Okay.  Do they give you the location of
20  the vehicle?
21        A    Yes.
22        Q    What happens if you go to that location
23  and the vehicle is not there?
00023 { 9:14:57am}
01        A    Keep checking for it and knock on the
02  door, talk to some neighbors.
03        Q    Do you ever have to do it when they
04  don't know about it?
05        A    That's the best time.
06        Q    And you do that at night usually?
07        A    I do -- I own the company, so I do most
08  of my stuff during the day.  And all the guys I
09  hire, they work at night various times.  Night
10  is usually the best time.
11        Q    How many -- what percentage of time do
12  the people who own the car know that you're
13  coming to tow it away?
14        A    Well, a lot of them know they're behind
15  and some are trying to work things out.  I'd say
16  90 percent of the time they know.
17        Q    They know, but how many of the times
18  are they told you're coming to take it away as
19  opposed to --
20        A    Never.
21        Q    Never?
22        A    Well, I don't know about never, but
23  probably a low percentage.
00024 { 9:15:48am}
01        Q    I mean, they know because they know
02  they're behind, there's a chance somebody is
03  going to come get it; right?
04        A    Yes.
05        Q    But as far as calling them up and
06  saying, hey, we're going to come get your car,
07  make sure you park it straight in the place and
                                              Page 9

05-21-2007DonalO'Shaughnessy
```
08  have it available for us, that doesn't happen?
09       A    Well, the voluntary repossession they
10  do.
11       Q    Oh, there are some of those?
12       A    They've called them and say, okay, we
13  can't pay for it; I'm going to leave the keys up
14  under the mat, and you can come get it.
15       Q    What percentage of the time does that
16  happen?
17       A    15, 20.
18       Q    Okay.  Now, out of the total number of
19  repossessions that you do, Mr. O'Shaughnessy,
20  how many are done with the key and how many are
21  done without a key?
22       A    I'd say zero percent with the key.
23       Q    Zero percent?
00025 { 9:16:30am}
01       A    Unless it's a voluntary repossession.
02       Q    Good.  Because you've told me 15 to 20
03  percent were voluntary; right?
04       A    Right.
05       Q    In which case, they might give you the
06  key?
07       A    Yes.
08       Q    So you're saying that probably zero
09  percent of the involuntaries?
10       A    Well, the ones that I get that I don't
11  talk to anybody, I go up to their house and the
12  car is there and I might start hooking it up and
13  they'll come out and want to get their personal
14  effects out and they'll give me a key.
15       Q    Okay.  So that happens some?
16       A    It's happens a lot.
17       Q    Okay.  That's if they actually see you
18  do it?
19       A    Yes.
20       Q    If you do it at night, they wouldn't
21  see you do it?  Well, that probably wouldn't
22  happen, would it?
23       A    They might hear you and come out, but
00026 { 9:17:15am}
01  we'll just tow it off without anything.
02       Q    Okay.  How often are you supplied a key
03  in advance by the financing company?
04       A    None.
05       Q    Never?
06       A    We have -- some of our accounts have
07  key codes on them.  We can go get a key cut.  A
08  lot of them they'll just maybe turn the switch,
09  like they have a -- just the key fob or the --
10  what have they got -- the little code in the key
11  head that matches.  I can't remember the -- but
12  it will just turn the switch and it won't start
13  the vehicle.  But on a pickup truck or
14  something, you can straighten the wheels out of
15  it or anything or something like that.
16       Q    What would be the advantage to being
17  able to do that, to straighten the wheels?
18       A    If it's a pickup truck you don't -- if
19  the steering is cocked all the way to one side,
20  it's going to -- you pick it up and start going,
21  the front end is going to shift all the way to
22  one side, so you need -- and the steering wheel
```

05-21-2007DonalO'Shaughnessy
 23  is locked.  So with a key, you unlock it,
00027 { 9:18:15am}
 01  straighten the wheel up, and tow it off
 02  straight.
 03      Q   Okay.  Why a pickup truck makes a
 04  difference from other types of vehicles?
 05      A   It's rear wheel drive and you've got to
 06  pick it up from the rear and the front end is --
 07      Q   So any -- you're talking about not just
 08  a pickup truck, but any rear wheel drive
 09  vehicle --
 10      A   Yes.
 11      Q   -- would have that same problem?
 12      A   Yes.
 13      Q   All right.  But you're never supplied a
 14  key from someone to go and crank up the vehicle
 15  and move it?
 16      A   Right.
 17      Q   You either have to get the key on your
 18  own or the person would come out and voluntarily
 19  give you a key?
 20      A   Yes.
 21      Q   Now, you've been doing this kind of
 22  business for how long?
 23      A   18 years.
00028 { 9:19:01am}
 01      Q   How did you get started in it?
 02      A   I used to work at U.S. Pipe Foundry in
 03  Bessemer and we went on strike.  And my partner,
 04  Scott, he's being doing this longer than I
 05  have.  He just needed some help, and I needed a
 06  job while we were on strike.  I started helping
 07  him repossess cars.  And came off strike and I
 08  didn't want -- I hated it there anyway, so I
 09  just kept on doing this.  And eventually just
 10  came -- we bought the company.
 11      Q   All right.  Mr. O'Shaughnessy, do this
 12  for me if you will.  How old are you?
 13      A   45.
 14      Q   Take me from high school -- where you
 15  graduated from high school -- and kind of give
 16  me a very -- you know, just a running history
 17  summary of your work experience.
 18      A   I graduated from WA Berry High School,
 19  went to work for a little -- you know, doing odd
 20  things.  Then started --
 21      Q   For what doing odd things?
 22      A   Like during high school.
 23      Q   Okay.
00029 { 9:19:54am}
 01      A   You know, just -- then I started
 02  working at U.S. Pipe.
 03      Q   So you went to work for U.S. Pipe right
 04  out of high school?
 05      A   No, not right out of -- you know, a few
 06  years later.  I think I was there for eight
 07  years or something like that.  Then I went to
 08  UAB on and off for a while.  That didn't work
 09  out, so I -- then I started repossessing cars.
 10      Q   What did you do between the time that
 11  you were at U.S. Pipe and the time you graduated
 12  from high school?  What did you do then?
 13      A   I think I worked at Don Drennen.
                                        Page 11

05-21-2007DonalO'Shaughnessy
```
14      Q    Doing what?
15      A    Doing some cleanup, stuff like that.
16      Q    Cleaning cars?
17      A    Yes.
18      Q    Okay.  Now, then, so you had, I guess,
19  odd jobs -- well, not odd jobs, but you didn't
20  have -- I get they were permanent jobs, weren't
21  they, between high school and the time you went
22  to U.S. Pipe?
23      A    Yes.
```
00030 { 9:20:44am}
```
01      Q    But you had several different types of
02  jobs, is that right, or did you work at Don
03  Drennen the whole time?
04      A    I worked at a few restaurants, you
05  know, as a cook and as just -- you know, looking
06  for something better, you know.
07      Q    Okay.  How long did you do that?  Three
08  or four years, you say?
09      A    Probably something like that.  I don't
10  even know if it was that long.  I can't
11  remember.
12      Q    And then you went to work for U.S.
13  Pipe, and how long did you work at U.S. Pipe
14  before they went on strike?
15      A    Eight years, I think.
16      Q    What did you do there?
17      A    Everything.  We rolled pipe and then I
18  went to the shipping department.  We were
19  loading trucks.
20      Q    Did you have any kind of a job
21  description, job title, like, you know, pipe
22  roller, pipefitter?
23      A    Yes.  It was a pipe roller.  That was
```
00031 { 9:21:37am}
```
01  the prescription then.  For the last probably
02  four or five years, I ran a forklift.
03      Q    And that was your job at the time that
04  you got laid off was running a forklift?  You
05  went on strike?
06      A    I quit.  Right.
07      Q    And so the whole company -- the whole
08  union went on strike there?
09      A    Yes.
10      Q    What union was that?
11      A    I have no idea.
12      Q    Okay.
13      A    Pipefitters maybe.  Something like
14  that.  I don't know.
15      Q    And you were a member of the union?
16      A    Yes.
17      Q    You don't remember what it was?
18      A    No.
19      Q    Are you still a member of it?
20      A    No.
21      Q    So you go on strike, and how long were
22  you on strike before you started working with
23  your partner?
```
00032 { 9:22:16am}
```
01      A    A couple of weeks.
02      Q    And I'm sorry.  I've forgotten his
03  name.
04      A    Scott Campbell.
```
                                    Page 12

05-21-2007DonalO'Shaughnessy
```
05      Q      How did you and Mr. Campbell know each
06  other?
07      A      We've been friends.  He went to a
08  different high school, but just through other
09  friends we've been friends for a long time.
10      Q      Is he about your age?
11      A      Yes.
12      Q      So he had been doing it ever since he
13  got out of high school, I guess?
14      A      Yes.
15      Q      And then, I guess, y'all started
16  smaller than you are now and the business grew
17  over time?
18      A      Yes.
19      Q      What companies do you repossess cars
20  for?
21      A      Ford Motor Credit, Landmark Credit
22  Union.
23      Q      GMAC?
00033 { 9:23:01am}
01      A      Yes.  But we don't have their business
02  right now.  We used to do a lot of business for
03  GMAC.  City Financial and just other kind of
04  little smaller various ones.
05      Q      Is Ford Motor Credit your largest?
06      A      I would say so, yes.
07      Q      Have you ever been convicted of a
08  crime?
09      A      Yes.
10      Q      What?
11      A      Let's see.  I got in trouble -- let's
12  see.  Public intoxication.  And then I guess the
13  police, they beat me up or something.  They
14  charged me with -- he hurt himself beating me
15  up.  So I can't exactly -- what it was, I'm not
16  sure.
17      Q      Charged with resisting arrest?
18      A      Probably.
19      Q      Any other trouble?
20      A      No.
21      Q      That's it?
22      A      Huh-uh.
23      Q      No other crimes?
00034 { 9:24:01am}
01      A      Not that I can think of right now.
02      Q      I'd think you'd remember, wouldn't you?
03      A      Well, I think I had a DUI 20, 30 years
04  ago.
05      Q      When was the time -- the public
06  intoxication, the resisting arrest charge?
07      A      15, 20 years.
08      Q      Okay.  You carry a firearm when you're
09  doing these repossessions?
10      A      I do, yes.
11      Q      And is it licensed with the County?
12      A      Yes.
13      Q      And what kind of firearm do you carry?
14      A      Taurus .9 millimeter
15      Q      Automatic?
16      A      Yes.  I don't carry it with me.  It's
17  just in my truck.
18      Q      That's what I mean, you've got it in
19  your truck?
```
Page 13

05-21-2007DonalO'Shaughnessy
```
20      A    Yes.
21      Q    Where do you keep it in the truck?
22      A    It's in the overhead storage thing.
23      Q    Okay.  Have you ever had to use it?
00035 { 9:24:46am}
01      A    No.
02      Q    Let me show you if I could here what's
03   been marked as Defendant's Exhibit 1, which is
04   the -- asked you to bring various things.  It's
05   your notice of deposition.  Did you get a copy
06   of that?
07      A    Yes.
08      Q    From somebody somewhere?
09      A    Yes.
10      Q    And it asked you to bring certain
11   things with you.  One of the things that it
12   asked you to bring with you were all the
13   materials you reviewed.  Did you bring those?
14      A    I forgot them.
15      Q    I think Mr. Burge has tried to, you
16   know, provide those.  As I understand it, the
17   things that you looked at were the Auto Claim
18   Committee Report; is that right?
19      A    Yes.
20      Q    And what was that?  Do you know what
21   that was?  The Auto Claim Committee Report?
22      A    Not really.
23      Q    I mean, did you read it?  I tell you
00036 { 9:25:59am}
01   what I want -- this one has certain things on it
02   that --
03           MR. BURGE:  I think I made a copy for
04   you in the materials when I was trying to
05   recreate his file.
06           MR. NEWMAN:  You did?
07           MR. BURGE:  I thought I did.
08           MR. NEWMAN:  Sure did.  Thank you,
09   Tucker.  You sure did.
10      Q    All right.  Let's mark that as
11   Defendant's Exhibit 4.
12
13           (Whereupon, Defendant's Exhibit
14   Number 4 was marked for identification
15   and copy of same is attached hereto.)
16
17      Q    So let me show you Defendant's Exhibit
18   4.  That's the Auto Claim Committee Report.  Did
19   you review that, or did you just receive that?
20      A    I read it.
21      Q    Okay.  Was there anything in that that
22   bore on your opinions, anything that you took
23   out of that?
00037 { 9:26:53am}
01      A    No.
02      Q    Okay.  You read it and looked at it and
03   decided that it was not relevant to your
04   opinion; correct?
05      A    Right.
06      Q    All right.  Now, let me show you what's
07   been marked as -- what we will mark as
08   Defendant's Exhibit 5 and 6...
09
10           (Whereupon, Defendant's Exhibit
                                        Page 14
```

05-21-2007DonalO'Shaughnessy
11  Numbers 5 through 7 were marked for
12  identification and copies of same are
13  attached hereto.)
14
15      Q     That is -- let me see that back for a
16  second.  Make sure I'm looking at the same thing
17  here.  Now, I'll show you what's been marked as
18  Defendant's Exhibit 5, 6, and 7.  Do you
19  recognize those?
20      A     Yes.
21      Q     Did you review those?
22      A     Yes.
23      Q     Were there materials in those that were
00038 { 9:28:50am}
01  relevant or significant to your opinions?
02      A     Not that would change anything.
03      Q     That's not what I asked.  I asked you
04  if there were things in there that you used in
05  order to develop your opinions.
06      A     No.
07      Q     Nothing in there you used to develop
08  your opinion?
09      A     No.
10      Q     Not the condition of the vehicle as he
11  found it or anything like that?
12      A     No.
13      Q     What are those three exhibits there?
14      A     That one's an Auto Claim Committee
15  Report.
16      Q     No.  We've talked about that, and you
17  said you didn't get anything out of that.  What
18  are the three -- 5, 6, and 7?  Didn't I give you
19  three there?
20      A     Yeah, I think so.
21      Q     Yeah, there you go.  What are -- do you
22  know what they are?
23      A     Just where somebody hired the guy that
00039 { 9:29:52am}
01  looked over the cars and just what they thought
02  happened, just marks and scratches and
03  everything that were on the vehicle.  The type
04  of keys that was used, the transponders, and all
05  that, I assume.
06      Q     Is that all of them, or are there
07  differences in those three?
08      A     This one just says that the horn
09  disabling didn't work.
10      Q     I don't think that's what -- you're
11  talking about 6?
12      A     Yes.
13      Q     Is that what that says, or does that
14  describe the type of security that it has?
15      A     Yes.
16      Q     All right.  And then, I think, there's
17  another one that said when he checked it it did
18  not work; right?
19      A     Yes.
20      Q     All right.  But you're saying none of
21  those were relevant to your opinion, none of the
22  facts or findings in there had anything to do
23  with your opinion?
00040 { 9:30:49am}
01      A     Right.

Page 15

05-21-2007DonalO'Shaughnessy
02      Q    Did you personally inspect this
03  vehicle?
04      A    No.
05      Q    How did you determine what the
06  condition of it was at the time that it was
07  first discovered?
08      A    I really didn't know what it was.  Just
09  these pictures here.  That's all I've ever seen
10  of --
11      Q    So there were some things in these
12  reports that you used to develop your opinion,
13  then?
14      A    Well, I just said that it could be
15  towed.  There's nothing here that says it wasn't
16  towed.
17      Q    Okay.  With respect to the findings of
18  the condition of the car at the time that it was
19  recovered or when it was in the yard, I guess,
20  is a better way to put it -- I think that's
21  where Mr. Breznock first saw it was in a yard;
22  correct?
23      A    I don't know.
00041 { 9:31:46am}
01      Q    You don't know whether Mr. Breznock
02  inspected it on the scene when it was first
03  found or whether he inspected it in a yard after
04  it was towed to the yard by the police?
05      A    No.
06      Q    Okay.  What is your opinion in this
07  case, Mr. O'Shaughnessy?
08      A    That it's possible that it could have
09  been towed.
10      Q    Is your opinion that it was definitely
11  towed or that it could have been?
12      A    It could have been towed.
13      Q    Okay.  So you're not saying that as an
14  absolute matter of your opinion that it was
15  towed and the key was not used; correct?
16      A    Right.
17      Q    Let me show you what's been marked --
18  what we're going to mark as -- let me do this
19  while we're on this subject.  Let's go back and
20  do this.  Your opinion is that it was possible
21  to tow this car?
22      A    Yes.
23      Q    And what leads you to that opinion?
00042 { 9:32:57am}
01  Give me the facts that you can give me that
02  leads you to that opinion.
03      A    Well --
04      Q    Let's go back and let me say this.  You
05  understand and I understand that it was towed
06  from the place it was recovered to a yard;
07  correct?
08      A    Yes.
09      Q    And it was towed again from that yard
10  to another yard; correct?
11      A    Yes.
12      Q    And there's a possibility that one or
13  other of those yards they might have towed it
14  around in that yard making place for other
15  vehicles; correct?
16      A    Yes.

Page 16

05-21-2007DonalO'Shaughnessy
```
17      Q    So we know it can be towed; right?
18      A    Yes.
19      Q    So when I'm asking you about your
20 opinion concerning the fact that it's possible
21 to tow the car, I want to focus on where it was
22 the night that it was lost from Mr. Long, who is
23 the owner, at the Country Inn Suites.  All
00043 { 9:33:51am}
01 right?
02      A    Yes.
03      Q    What is your basis of your opinion that
04 it could be towed from that location?
05      A    It was missing, and I think the shifter
06 was bent on it.  I assumed it was -- the car was
07 backed in, we think, or was it?  Do we know?
08 And there were no skid marks on the ground, so
09 they bent the linkage to get it into neutral or
10 to move it out of there without the tires
11 locking up and leaving marks.  And I think there
12 was some front end damage where a possible sling
13 was up under it.  And I think maybe there were
14 some chain marks up under the rear end where
15 possible chains were hooked up to it.
16      Q    Okay.  Let's go through that one.  What
17 was the -- what was the -- how was the car
18 parked in the place that it was in?
19      A    I never saw it, so I'm not sure but --
20 I don't know.
21      Q    You've never personally inspected it?
22      A    Right.
23      Q    I know that.  How do you understand
00044 { 9:34:51am}
01 that it was parked?
02      A    Backed in.
03      Q    Backed in?
04      A    Uh-huh.
05      Q    So that would be with the rear against
06 the curb and the front end pointed out?
07      A    Yes.
08      Q    So that -- as you've told me, that
09 would create a little more of a problem for
10 towing the vehicle than if he had pulled it in
11 straight; correct?
12      A    Yes.
13      Q    So how -- what is your opinion on the
14 way that it was towed from that location or from
15 that position?
16      A    They backed into it and hooked it up
17 from the front.
18      Q    All right.  Wait a minute.  Backed the
19 tow truck --
20      A    Backed the tow truck up to the front
21 end of the Corvette and then hooked it up from
22 there.  Then I guess broke the window and got
23 the shifter and jammed it and bent the linkage
00045 { 9:35:41am}
01 into neutral.
02      Q    Have you ever done that?
03      A    Not on a Corvette.  Other front wheel
04 drive cars, yes.
05      Q    You've never done that on a Corvette?
06      A    No.
07      Q    Do you know how -- if it's possible to
                              Page 17
```

05-21-2007DonalO'Shaughnessy
08  move the gear shift from park into neutral?
09       A    You have to have a key unless you force
10  it.
11       Q    Okay.  Is it possible to force a
12  Corvette from park into neutral?
13       A    I have never done it, but I would think
14  you could.
15       Q    And when this car was found, was it in
16  park or neutral?
17       A    I don't know.
18       Q    Okay.  Now, assuming -- so they would
19  have broken a window; right?
20       A    Yes.
21       Q    Okay.  Climbed into the vehicle?
22       A    Or opened the door.
23       Q    Opened the door?
00046 { 9:36:31am}
01       A    Yes.
02       Q    Gotten into the driver's seat or
03  passenger's seat, either one, I guess, and with
04  as much force as it would take moved the shifter
05  from park -- and we're talking about the gear
06  shift, right, when we say shifter?
07       A    On the console.
08       Q    Yes.  Moved it from park to neutral?
09       A    Right.
10       Q    All right.  And the purpose of that
11  would be to get it in a position where you could
12  roll the car back?
13       A    Right.
14       Q    And in the process, you think that that
15  could have bent the transmission linkage?
16       A    Yes.
17       Q    Do you know that will happen as a
18  matter of fact, or are you just assuming that?
19       A    No, I don't know it for a fact.
20       Q    Okay.  Is it possible to -- would it be
21  possible to get that Corvette out of there
22  without -- in that -- parked the way it was
23  without getting the transmission into neutral?
00047 { 9:37:25am}
01       A    They would have had to drag it out.
02       Q    Which would have left skid marks?
03       A    Probably.
04       Q    Now, assuming we've got it into neutral
05  some way or another -- one way to get it into
06  neutral would be if you had a key; right?
07       A    Yes.
08       Q    Okay.  Because if you had a key, you'd
09  just slip it in and turn it to the on position
10  and wiggle the steering wheel and shift it into
11  neutral; right?
12       A    If they had one that wouldn't start the
13  car, it'd just turn the switch.
14       Q    Right.  I guess if they had one that
15  would start the car, they could just drive it
16  away; right?
17       A    I would assume that's what they'd do.
18       Q    But if they -- what kind of key can be
19  used to turn the car on to shift it from park to
20  neutral without starting it?
21       A    It would have to be the same cuts on
22  the key, the same blank.  The same cuts on the
                                                    Page 18

05-21-2007DonalO'Shaughnessy
```
 23  key but it doesn't have the transponder chip.
00048 { 9:38:21am}
 01      Q    Okay.  Are those readily available?
 02      A    No.
 03      Q    I mean, you'd have to plan a long time
 04  in advance to do that, I guess?
 05      A    You would have to -- yes.  You'd have
 06  to have a key code on it and go get it cut
 07  and...
 08      Q    All right.  Now we've broken in,
 09  somehow got it into neutral, shifted it into
 10  neutral.  Is it now able to roll?  It's freed up
 11  where we can roll it; is that right?
 12      A    Yes.
 13      Q    So then you would do what?  Pull it --
 14  pull it towards you?
 15      A    Yes.
 16      Q    Would you then pick it up and drag it
 17  out of there from the --
 18      A    You would have already lifted it up.
 19  Lift it up and drive off.
 20      Q    You'd already lift it up and drive
 21  off.  So you --
 22      A    If you've got it in neutral, you'd lift
 23  it up and take off.
00049 { 9:39:26am}
 01      Q    So in this situation, you would be
 02  pulling -- you would have lifted the front of
 03  it; right?
 04      A    Yes.  That's assuming we used a sling
 05  truck.
 06      Q    We used a sling truck.  We picked it up
 07  from the front and we drug it out of there.  So
 08  the back end would be -- the back tires is what
 09  would be making contact with the pavement?
 10      A    Yes.
 11      Q    And we would just drive it off like
 12  that?
 13      A    Yes.
 14      Q    Is that right?
 15      A    Uh-huh.
 16      Q    Say yes for me.
 17      A    Yes.
 18      Q    There would not be a necessity, then,
 19  to then -- to stop, lower it back down, and pick
 20  it up from the rear and pull it off?
 21      A    It might be.  It wouldn't look good
 22  towing a Corvette like that.  And it's possible
 23  you'd damage the transmission.
00050 { 9:40:19am}
 01      Q    Why?
 02      A    Because the transmission is turning.
 03  It's not made to be towed like that.  If you
 04  turn it around and get it the from the rear --
 05  pick up the rear drive, then the transmission
 06  doesn't have any -- it's not moving at all.
 07      Q    I understand that.  And that's why I'm
 08  asking you.  On the way that you've just
 09  described to me, I thought that we had picked up
 10  the front of the vehicle.
 11      A    Yes.
 12      Q    And the back wheels were still being --
 13  rolling on the pavement; right?
```
                                                              Page 19

05-21-2007DonalO'Shaughnessy
```
14      A    Right.
15      Q    And then I asked you if you would just
16 simply drive it off like that, and I thought you
17 told me that you would.
18      A    For a little while.  It depends on how
19 far they've got to go.  If they have to go a
20 long distance, it's possible to damage the
21 transmission.  It could lock up.
22      Q    You and I are together now.  Okay.  So
23 it would be better if you're going to tow the
00051 { 9:41:13am}
01 Corvette to pick up the front -- to pick up the
02 rear, right, as opposed to the front?
03      A    Yes.
04      Q    And that's because it's a rear wheel
05 transmission?
06      A    Right.
07      Q    Okay.  Now, is there anything about
08 this vehicle that you know from looking at the
09 materials that you've looked at that would help
10 us determine whether this vehicle was picked up
11 from the front or from the rear?
12      A    If you could have -- see what kind of
13 damage there was to the front of the vehicle.  I
14 think it's made out of fiberglass.  It might
15 have done some significant damage to the front
16 possibly.  Or if there were possible J hook
17 marks on the rear axle.  On independent
18 suspension, there's two little things that come
19 out.  It looks like there were some hook marks
20 on the back of it.
21      Q    There were?
22      A    Possible.  One of these were pointing
23 out where there were some marks on each side.
00052 { 9:42:05am}
01      Q    Okay.  That's in Mr. Breznock's
02 materials?
03      A    The one with all the pictures of the
04 car in it, yes.
05      Q    Show me which ones you're talking
06 about.
07           MR. BURGE:  I think they both have
08 pictures of the car.
09           MR. NEWMAN:  They do.
10      A    It's kind of hard to tell with these
11 pictures.  Okay.  I believe it's some kind of
12 mark up here.  This is basically where you'd
13 hook the chain up to it.
14      Q    This is just so we'll know on the
15 Record, SF1, page 243, SF1-243.  Photograph
16 number 9.  And you're pointing to some --
17      A    I think there are some scratches all
18 right here (indicating) where you would be
19 hooking the chain up to.
20      Q    Have you seen the originals of this
21 photograph?
22      A    No.
23      Q    Would that help you in determining
00053 { 9:43:19am}
01 that?
02      A    It's possible.
03      Q    But you're looking at -- 59    18
04           Does that come from the inside of the
```
Page 20

```
05  wheel itself and attach to the axle?
06      A    The frame.  That doesn't have an axle.
07      Q    It attaches to the frame.  And that's
08  where you would hook if you were using a J
09  hook?
10      A    Yes.
11      Q    Can you look at this and tell me if
12  that's the front tire or the back tire?
13      A    That's the rear tire.  I'm pretty sure
14  it is.
15      Q    How can you tell by looking at it?  And
16  I'm sure you can.  I just want to know.
17      A    I think that's the gas tank right
18  there.  I'm pretty sure.  You can see where the
19  rod that goes in the -- powers the rear wheel.
20  I'm pretty sure that's it going in right there
21  (indicating).
22      Q    So you would think that that's the --
23  you would think that's the rear wheel that we're
00054 { 9:44:10am}
01  looking at in that photograph?
02      A    Yes.
03      Q    Any other photographs in here that show
04  marks that would indicate that it was towed from
05  the rear?
06      A    No.
07      Q    Is there anything there that shows that
08  it was towed from the front?
09      A    No.
10      Q    Now, towing it from the rear would not
11  have been done in this situation, would it?  I
12  mean to get it out of the parking lot?
13      A    Right.
14      Q    Because to get it out of the parking
15  lot, we had to pull it from the front?
16      A    If it was backed in.
17      Q    Well, that's what you told me you
18  assumed to start with; right?
19      A    I think that's what I was told.
20      Q    Okay.  You were told by who?  By
21  Mr. Burge?
22      A    Yes.
23      Q    So to tow it, then, from the rear is
00055 { 9:45:05am}
01  not something that would have happened in the
02  parking lot of the hotel; right?
03      A    They could have.  They might have moved
04  it just to a different location and turned it
05  around there.
06      Q    Possible that they stopped in the
07  parking lot of the hotel, let it back down,
08  drove around to the other side, and then picked
09  it up from the rear as opposed to the front?
10      A    It's possible, yes.
11      Q    But in that situation, they still had
12  to pull it out from the parking space it was in
13  from using -- attaching to the front of the
14  vehicle?
15      A    Yes.
16      Q    Okay.  Do you know of any physical
17  marks on the car that would show that it was
18  hooked from the front?
19      A    None that I've seen.
```
Page 21

05-21-2007DonalO'Shaughnessy
20      Q    Okay.  What would you see if it had
21  been hooked from the front?
22      A    Just possibly these same marks that I
23  saw on the back or up under the front carriage.
00056 { 9:46:03am}
01  The front of the front bumper, there might have
02  been some cracks.
03      Q    Okay.  Would you hook to the same frame
04  members or the corresponding frame members on
05  the inside of the front wheels as you would to
06  the inside of the back wheels?
07      A    Well, it's different from the front and
08  the back, but there are several places you can
09  hook to it.  It's similar.
10      Q    When you do that, would you damage the
11  bumper?
12      A    If you used a sling truck, it probably
13  would.
14      Q    Why is that?
15      A    Because the lift -- that's where all
16  the weight is on those things.  And a Corvette
17  is made of fiberglass.  It's possible that it
18  might have cracked some of that fiberglass.  If
19  they used a wheel lift truck there wouldn't have
20  been any damage.
21      Q    All right.  I'm going to get to that in
22  a minute.  But if you picked it up from the
23  rear, you also have a situation where you could
00057 { 9:46:55am}
01  drag the front bumper on the ground; right?
02      A    Yes.
03      Q    And that could also damage the front
04  bumper?
05      A    Yes.
06      Q    Corvettes are slung low to the ground,
07  aren't they?
08      A    Yes.
09      Q    So one thing that you would experience
10  if you picked up from the rear is damage to the
11  front bumper?
12      A    Yes.
13      Q    So you've got a chance of damaging the
14  front bumper whether you're picking it up from
15  the rear or picking it up from the front?
16      A    Yes.
17      Q    Okay.  And is the damage going to --
18  are you going to be able to distinguish between
19  the types of damage, you think?
20      A    If it's rubbing on the ground, you
21  could probably tell if it's just a long -- how
22  long it's -- if it's been towed for a few miles
23  or something, you could probably tell it's been
00058 { 9:47:33am}
01  rubbed raw, rubbed on the ground.
02      Q    All right.  But damage in either
03  situation?
04      A    I would think so, yes.
05      Q    Okay.  All right.  Now, we have talked
06  about how you would get the car out whether it
07  was backed in or whether it was driven straight
08  in.  Would the fact that there were two cars
09  parked on either side of this vehicle -- like,
10  you know, on each side -- would that make a
                                              Page 22

05-21-2007DonalO'Shaughnessy
```
11  difference in the ability to tow the vehicle
12  out?
13       A    No.
14       Q    What about if the front wheels were
15  locked in place and they were at an angle?
16       A    That would be a problem.  I heard in
17  here that the plate had been taken out of the
18  steering column, so the wheels didn't lock.
19  What I'd do if I have something like that and
20  the steering wheel doesn't lock, I'll secure it
21  with a seat belt, tie it around tight, and put
22  it straight -- put the wheels straight, then
23  secure the steering wheel.
00059 { 9:48:40am}
01       Q    If they don't lock?
02       A    Right.
03       Q    What if they're locked in place?
04       A    If it's locked straight, there's no
05  problem.
06       Q    If they're locked at an angle and
07  you've got cars on either side?
08       A    Then that's a problem.
09       Q    In that situation, is there a way to
10  get it out without damaging the car on either
11  side?
12       A    Well, we have some go jacks that you
13  can jack up that has rollers on each side and it
14  rolls in on each side of the tire.  You jack it
15  up -- the front end -- and then you can maneuver
16  the front end to either -- you can roll the
17  front end.
18       Q    You have go jacks on all of the
19  equipment that you have?
20       A    No, we don't have any right now.  We
21  used to.
22       Q    Okay.  If the wheels are not locked in
23  place with the steering column locked and there
00060 { 9:49:54am}
01  are still vehicles on each side of the parked
02  Corvette is that going to create -- are those
03  two vehicles going to create a problem for you
04  in pulling it out?
05       A    If the steering wheel is not locked?
06       Q    Yes, sir.  Or if it's straight?
07       A    Yes.
08       Q    They are still going to create a
09  problem?
10       A    Well, I'll have to secure that steering
11  wheel and tie it down and make sure it doesn't
12  go to either side.
13       Q    Okay.  Assuming that you've done that,
14  are you then able to pull it out without concern
15  about the vehicles on either side?
16       A    Yes.
17       Q    Because you know that when you pull it,
18  the car is going to come straight out?
19       A    Yes.
20       Q    And you'll tie -- what you would do in
21  that situation is actually tie the column in
22  some way?
23       A    There are several ways.  You can just
00061 { 9:50:47am}
01  get a long length of rope, wrap it around the
                                        Page 23
```

05-21-2007DonalO'Shaughnessy
02  steering wheel, and pull it out the -- well,
03  that window -- I guess the window was broke.
04  But normally what I would do is I'd pull the
05  seat all the way forward that has the part of
06  the seat belt that you click into rides forward
07  with the seat and then pull the seat all the way
08  up, wrap the rope around the steering wheel,
09  pull it down back down onto the --
10      Q   Wrap the belt around the steering wheel
11  and the seat?
12      A   On the bottom of the steering wheel and
13  buckle it up.  Then pull the seat back and it
14  tightens it.
15      Q   Okay.
16      A   Or I've had other guys just sit in it
17  and hold it straight while I tow it out.
18      Q   Sure.  I understand that one.  Now, if
19  the steering column is locked but the wheels are
20  straight do the cars on either side of you
21  create a problem in that situation?
22      A   No.
23      Q   Because in that situation, you're able
00062 { 9:51:57am}
01  to pull it straight back?
02      A   They're locked straight -- that's the
03  way I want it -- so there's no problem.
04      Q   And something in your report that says
05  it could be better for them to be locked in
06  place.  Is that what you're talking about?
07      A   Yes.  I would rather it be locked
08  straight.
09      Q   So if I want -- I mean, just as a
10  layman if I want to decrease the likelihood of a
11  tow truck taking my car, then I would angle my
12  wheels as far I could one way or another and
13  then lock it in place; right?
14      A   Right.
15      Q   That would complicate your life?
16      A   Yes.  If it's a front wheel drive,
17  you'd pull in straight.  Rear wheel, you'd back
18  in to make it harder.
19      Q   Okay.  Now, what we had talked about up
20  to this point is the use of a sling truck.  Is a
21  sling truck going to cover the kind that comes
22  up out of the bed or the kind that's already
23  positioned and stationary, sticking straight up?
00063 { 9:53:44am}
01      A   Yes.  It has the two black straps on
02  it.
03      Q   And then -- but you told me that there
04  would be another type of the truck that you
05  could use in that situation?
06      A   Wheel lift.
07      Q   Wheel lift.  What would be the
08  advantages or disadvantages of using a wheel --
09  is the wheel lift the flatbed?
10      A   No.
11      Q   The wheel lift is the one that has the
12  rods that come out, lock into the tires, and
13  then pick it up; right?
14      A   Yes.  Mostly for -- it's damage free
15  towing.  You hook onto the wheels and strap it
16  onto the wheels.  You don't touch the car in any
                                          Page 24

05-21-2007Dona1O'Shaughnessy
17  way, just the tires.
18     Q    And that's the one that once you get it
19  out to where you want it to go, do you then pick
20  it up like you do with the sling lift or do you
21  leave it on those rods?
22     A    No. You just lift it up and leave.
23     Q    So those must be awfully strong steel
00064 { 9:54:38am}
01  rods that go out underneath the car?
02     A    Yes.
03     Q    They can take the weight of a car, I
04  guess?
05     A    Yes.
06     Q    Can they take the weight of a truck?
07     A    Yes.
08     Q    A big truck, like a three-quarter ton
09  truck?
10     A    Yes.
11     Q    How far out do they protrude?
12     A    Just a little -- let's say this is the
13  length of your tire, it probably comes out a
14  little bit like that (indicating.)  You know,
15  they extend -- you've got them --
16     Q    They go all the way to the front tire,
17  though; right?
18     A    Yes. Well, past it.
19     Q    Past the front tire?
20     A    Yes.
21     Q    So you're talking about over ten feet,
22  then?
23     A    No. Well, I don't -- no.
00065 { 9:55:17am}
01     Q    Just --
02     A    Just as wide as --
03         THE REPORTER:  Wait.
04     A    -- the truck is.  Not much more.
05     Q    As wide --
06     A    Wide as the car you're towing.
07     Q    I'm talking about the length of them.
08     A    Oh, the length of the tow truck?
09     Q    No.  The length of the rods that come
10  out that attach to the tires?
11     A    That's a boom.  It comes in and out.
12  You can --
13     Q    Well, how far out does it go?
14     A    You can extend it all the way out.  You
15  mean the ones that actually attach to the tires?
16     Q    Yes, sir.
17     A    They're probably about that long
18  (indicating).  A couple of feet maybe.
19     Q    But how far out do they go from the --
20     A    A few inches.
21     Q    Okay.  I guess I don't understand them,
22  then.  I think we're going to have to go through
23  this again.
00066 { 9:55:55am}
01     A    It's a boom that you can put up and
02  down and it's like forks.  Well, it would be
03  coming out this way (indicating).  And you would
04  put these in.  As you're coming in, these are
05  flat up against the other one.  And when you
06  pull in, you put -- the front ones will go up
07  against the tires like that (indicating).  And
                                        Page 25

05-21-2007DonalO'Shaughnessy
08  then as soon as you're rested up against the
09  tires, the ones in the back will fold back up
10  around the tire. Well, actually, it will come
11  out, come out of --
12      Q    But you're not going around all four
13  tires, then?
14      A    No. Just the front two.
15      Q    Either the front two or the back two
16  depending on how you approach the vehicle?
17      A    Yes.
18      Q    So how does that -- then you don't need
19  to raise it. You just slightly raise it off the
20  ground at that point?
21      A    Yeah.
22      Q    All right. I see. And why is that --
23  why does that give you a towing situation where
00067 { 9:56:54am}
01  you're going to create less damage than you do
02  with a sling truck?
03      A    You're just towing it from the tires.
04  The contact points is all tire.
05      Q    So you're not going to have your cables
06  going under a bumper rubbing against --
07      A    No. You're not going to touch the car
08  in any way.
09      Q    Not going to rub against a frame member
10  or anything?
11      A    Right.
12      Q    All right. The reason I was asking
13  those questions, Mr. O'Shaughnessy, is I had in
14  my mind the impression that these -- the rods
15  that were coming out, the booms, were going all
16  the way past the rear tires to the front tires
17  and then picking the whole car up at once.
18      A    No.
19      Q    But that's not what we're talking
20  about?
21      A    No. Just one end or the other.
22      Q    And just enough to get that end up off
23  the ground where you can, then, tow it out of
00068 { 9:57:46am}
01  there?
02      A    Yes.
03      Q    Now, in this situation, assuming that
04  the car -- that the vehicle was pulled in where
05  the -- front ways with the front against the
06  curb, then you would have simply picked up those
07  back tires and pulled it out and that would have
08  created a little problem for that type of truck;
09  right?
10      A    No, it wouldn't have created any
11  problem.
12      Q    How about if it were the other way? If
13  it were backed in, would you be able to -- you'd
14  still have the same problems --
15      A    Yes.
16      Q    -- of getting the car into neutral or
17  some way freeing up the rear wheel drive?
18      A    Yes. It would be just the same thing,
19  except you're just towing this one from the
20  tires instead of going up under the car and
21  touching the front or rear bumper.
22      Q    And both of those in this situation
                                              Page 26

05-21-2007DonalO'Shaughnessy
```
 23  would fit into this area?
00069 { 9:58:42am}
 01      A    Yes.
 02      Q    All right.  Let's go to the third
 03  situation, the flatbed truck.  Would it fit into
 04  situation?
 05      A    Yes.
 06      Q    It would?
 07      A    I believe from where I saw the car was
 08  parked there was plenty of room for it to --
 09  pull it up on there.
 10      Q    Now, if you did that, you would be
 11  pulling the car from the pavement up onto the
 12  flatbed itself.  In that situation, would you go
 13  through the same steps of putting it into
 14  neutral?
 15      A    If you wanted to not leave any skid
 16  marks or sounds of the tires squealing on the
 17  ground.
 18      Q    But the winch is strong enough to pull
 19  it up there with the wheels still locked in
 20  place?
 21      A    Yes.
 22      Q    It'd just skid and bump?
 23      A    Yes.
00070 { 9:59:27am}
 01      Q    Okay.  Are you a mechanic, auto
 02  mechanic?
 03      A    No.
 04      Q    Have you ever worked as one?
 05      A    No.
 06      Q    Have you ever worked in a transmission
 07  shop?
 08      A    No.
 09      Q    When you tow a car, whether you tow it
 10  from the rear or the front or whether -- no
 11  matter what type of vehicle it is, where do you
 12  take it?
 13      A    To my lot.
 14      Q    You've got a lot?
 15      A    Yes.
 16      Q    Okay.  And when you get it to the lot,
 17  where do you put it?
 18      A    Up against a fence or one of our
 19  parking spots.
 20      Q    Wherever there's a place; right?
 21      A    Yes.
 22      Q    Does there come a time sometimes where
 23  you have to get that car out in order to get to
00071 {10:00:39am}
 01  another car?
 02      A    No, our lot's big enough where we don't
 03  have to do that.  Well, every once in a while
 04  you might have one that doesn't run and it's
 05  blocked in.
 06      Q    Where you'd have to move it in order to
 07  get to the one you're trying to get to?
 08      A    Yes.
 09      Q    How do the financing companies get the
 10  vehicles from your lot?
 11      A    They send a transport truck or we might
 12  take them to the auto auction.
 13      Q    Okay.  At that time, has a key been
```

05-21-2007DonalO'Shaughnessy
```
14  provided or are we still without keys?
15      A    No.  We have a locksmith that comes in
16  and makes a key to the vehicle if we don't have
17  one.
18      Q    And what about if they're the kind that
19  require some type of transponder or pellet
20  reader or something like that?
21      A    He can make one.
22      Q    The locksmith can?
23      A    Yes.
00072 {10:01:23am}
01      Q    How does he know how to make that
02  vehicle with the correct pellet reader?
03      A    Well, he's got a machine that he can
04  hook up to the computer in the car and it has a
05  readout and it tells him -- I think there's like
06  ten different -- like one through ten, all the
07  different -- all the cars.  And it tells him you
08  need number two transponder to program.  Then he
09  puts it in the machine and it will program it to
10  number two.
11      Q    No kidding.  So then he can actually
12  make a key regardless of the safety features
13  that the vehicle has and the anti-theft
14  features?  He can come, attach his machine up to
15  it, and create a key that will then work in that
16  vehicle just like one would from the factory?
17      A    Yes.
18      Q    So after they get to your lot, that's
19  when keys are made for them?
20      A    If we don't have one, yes.
21      Q    You have them sometimes?
22      A    Yeah, when they give me a key.
23      Q    Okay.  When they give you a key.  And
00073 {10:02:24am}
01  then is it -- that key that the locksmith uses
02  is the one that's used to drive the car to
03  wherever the financing company wants it?
04      A    Yes.
05      Q    Do you ever get involved in buying and
06  selling the vehicles that are sold at auction?
07      A    Not at the auction, no.
08      Q    Do you ever get involved in buying them
09  at any point?
10      A    We sell -- some of our credit unions,
11  we sell their vehicles for them.
12      Q    Oh, you do?
13      A    Yes.
14      Q    Right from your lot?
15      A    Yes.
16      Q    And do you handle the paperwork on
17  those?
18      A    No, I don't.  My partner does most of
19  that.
20      Q    That's some of the smaller credit
21  unions?
22      A    Yes.
23      Q    Some of the smaller financing
00074 {10:03:10am}
01  companies?
02      A    Yes.
03      Q    Can you get a pretty good deal on them?
04      A    Some.  Sometimes we take bids on them.
```
Page 28

05-21-2007DonalO'Shaughnessy
05 You know, the highest bid will take it. But the
06 credit union has to approve that, of course.
07       Q    Are they mainly bought by dealers or
08 bought by individuals?
09       A    Some both. Usually by just
10 individuals.
11       Q    Okay. What have you looked at to be
12 able to determine that there was enough room in
13 that parking lot to move the vehicles?
14       A    The pictures.
15       Q    Okay. And you're talking about -- I'm
16 going to hold these up for right now. We're
17 talking about these photos that I'm holding in
18 my hand?
19       A    Yes.
20       Q    Or are we talking about the aerial
21 photo that I'm holding in my hand?
22       A    The ones in your hand.
23       Q    Did the aerial photo help you any?
00075 {10:05:26am}
01       A    I'm not sure.
02       Q    I'm showing you what's been marked as
03 Defendant's Exhibit 3 with the caveat that
04 Mr. Burge has told me that he may have given a
05 different perspective of that photo to
06 Mr. O'Shaughnessy.
07       A    Well, yes, this one, also.
08            MR. BURGE:  It would have a different
09 date on it, too.
10       A    This picture, also.
11       Q    So we're talking about Exhibit 3 as
12 well as the photos?
13       A    Yes. I've towed some cars out of half
14 that room.
15       Q    Okay. Do you know how much room that
16 is, or are you just eyeballing it from --
17       A    It just looks like a standard parking
18 lot. And there was no parking in front of it.
19 There was just that one single up against the
20 curb.
21       Q    Okay. One of these photos that
22 Mr. Burge has supplied me with shows a tape
23 measure from the end of the line -- the parking
00076 {10:06:19am}
01 line -- over to where the plants are in this
02 little planting area on the other side. Do you
03 know how far that is?
04       A    I think it was 25 feet from the end of
05 the line to that curb.
06            MR. BURGE:  Yeah. There is a --
07            MR. NEWMAN:  Is there another photo
08 that would show us --
09            MR. BURGE:  Well, that's 25 feet to the
10 end of this one. And I went -- and the next one
11 will have -- it should show -- the very next one
12 shows the measure.
13            MR. NEWMAN:  Is that it?
14            MR. BURGE:  That's going from side to
15 side.
16            MR. NEWMAN:  Is this it, Tucker?
17            MR. BURGE:  Yeah. And that's a
18 different one because that one is going all the
19 way to the curb from this one by the manhole
                                        Page 29

05-21-2007DonalO'Shaughnessy
20  cover.  And it should be -- they're all right at
21  300, which is 25 feet.  But some are like 296.
22        Q    Let me show you two of these
23  photographs.  One of them shows a tape measure
00077 {10:07:37am}
01  that goes out to close to 300 inches, it looks
02  like, and the other one shows a tape measure
03  stretched from the end of the parking line to
04  this particular point.  And that -- 12 goes into
05  300 about 25 times, I guess.
06        A    Do we know which spot it was in?
07        Q    I think we do, yeah.  I think it was
08  in -- well, we know approximately which spot it
09  was in.  And it was in a spot, as I recall, that
10  would be across from this planted area.
11             MR. BURGE:  Object to the form.  I
12  don't remember.  So whether that accurately
13  states the evidence --
14        Q    Well, let me just ask you this.
15  Assuming that you've got that 25 feet in there
16  is that enough room for the sling truck?
17        A    Yes, I would think so.  Do we know if
18  there's cars on either side of it?
19        Q    There are cars on either side.
20        A    Both sides?
21        Q    Yes, sir.
22        A    I think you can get it out.
23        Q    You still think you can get it out?
00078 {10:08:52am}
01        A    Yes.
02        Q    Would it be hard?
03        A    It depends on how long your truck is
04  that you're getting in there.
05        Q    Well, let's talk about your sling truck
06  that's set up in a way to minimize or keep
07  people from knowing that it's a tow truck.  How
08  long is it?
09        A    I've never measured it.  It's one of
10  the longest ones there are.  Sometimes that's a
11  problem, but I've seen some that are almost half
12  that size.
13        Q    Okay.  But you're going to have to have
14  one that's -- let me go back.  When you've got
15  the vehicles on either side isn't it true that
16  you're going to have to position the towing
17  truck -- no matter what type of towing truck it
18  is -- so that it is directly lined up with the
19  cars that you're going to pull out?
20        A    It doesn't have to be exactly, but
21  that's best.
22        Q    More chances of damaging the cars on
23  either side?
00079 {10:09:51am}
01        A    Yes.
02        Q    Okay.  So, again, just looking at these
03  photographs, your opinion is that there was
04  enough space in there to do that?
05        A    Yes.
06        Q    What about if there's a vehicle parked
07  on the other side where that planted area was,
08  if there's a vehicle parked there?
09        A    Up against the curb?
10        Q    Yes, sir.
                                        Page 30

05-21-2007DonalO'Shaughnessy
```
11      A     That would have probably made it a lot
12  harder.
13      Q     Does the width of the parking area --
14  and I'll show you one of these photographs
15  that's got -- somebody measured -- I think
16  Mr. Burge measured the width there.  Does that
17  make a difference when you're trying to pull the
18  vehicle out?
19      A     Well, the more spaced out the cars are
20  parked next to it, the better.  The further the
21  better.
22      Q     In order not to damage those cars?
23      A     Yes.
00080 {10:11:07am}
01      Q     But you yourself, Mr. O'Shaughnessy,
02  have never been, as I understand it, to the
03  Country Inn Suites where these photographs were
04  taken?
05      A     No.
06      Q     And you don't know whether these
07  photographs represent what the parking lot
08  looked like on the day that the Corvette was
09  missing?
10      A     Right.
11      Q     Is there anything about a Corvette
12  that's different or harder -- let's go back.  Is
13  there anything about a Corvette that makes it
14  more difficult to tow than another type of
15  vehicle?
16      A     Just maybe some towing damage.
17      Q     Because it's low to the ground?
18      A     Yes.  And it's made of fiberglass.
19      Q     Okay.  When you tow vehicles from
20  parking lots are you aware of where surveillance
21  cameras are?
22      A     No.
23      Q     Don't worry about that?
00081 {10:12:31am}
01      A     No.  Well, it's in the back of your
02  mind, but it doesn't matter.  You've got to go
03  in there anyway.
04      Q     I mean, according to the financing
05  companies, you're supposed to be legal; right?
06      A     Yes.  I am legal, yes.
07      Q     Are they the ones that tell you that
08  you have the authority to go and do that, or do
09  you do your own independent research?
10      A     No.  They give us -- sometimes they'll
11  give us an address where they live and sometimes
12  a place of employment.
13      Q     Right.  But you don't go back and look
14  at the documents and the payment history and all
15  that to determine whether or not you've got a
16  right to pick it up; right?
17      A     No.  Once they send us the account we
18  assume it's okay to pick up.
19      Q     Okay.
20            MR. NEWMAN:  Tucker, what's that?
21            MR. BURGE:  That's a camera that is on
22  the breezeway.
23            MR. NEWMAN:  Okay.  Thank you.  Just
00082 {10:14:17am}
01  sticking out.  I see how it's positioned now.
```
                                    Page 31

05-21-2007DonalO'Shaughnessy
02 Thank you.
03          Is the only difference in the piles
04 that they came out of different cameras?
05          MR. BURGE:  That should be the only
06 difference.  Now, they should be separated in
07 that manner.  Now, whether they are, I guess
08 we'll have to look at the legend to see.
09          MR. NEWMAN:  I'm going to mark --
10          MR. BURGE:  One's marked 0A through 25A
11 where 0A begins with a picture looking from the
12 breezeway that shows a green Explorer or
13 something and 25A is a white Expedition parked
14 along the same side where Mr. Long's was.  And
15 the other set --
16          MR. NEWMAN:  I think it also goes 0A
17 through 25A.  There ought to be some other
18 identification.
19          Tucker, look at the sequence on them.
20 It looks like one pile starts with 874.  It
21 looks like one pile starts on the back with
22 number 874 and goes through 897.  And then the
23 next bunch starts with 898 and goes through
00083 {10:17:25am}
01 923.  I guess that's how we can tell them apart.
02          MR. BURGE:  Well, one set is going to
03 have 1197 as the identifying mark on the back
04 and the other one is going to have 1198.
05          MR. NEWMAN:  Right.  I agree with that,
06 too.  And that's also consistent with what I
07 just told you.
08          MR. BURGE:  And here I have a copy of
09 the detail thing if you need those.
10          MR. NEWMAN:  I'm going to mark the ones
11 that have 1197 and the numbers that start with
12 874, I think, but have 1197 on the back as
13 Defendant's Exhibit Number 9.  I'm going to mark
14 it on the back of photograph 25A.
15
16      (Whereupon, Defendant's Exhibit
17 Number 9 was marked for identification
18 and copy of same is attached hereto.)
19
20          MR. NEWMAN:  And then I'm going to mark
21 the photographs that are 1198 on the back and
22 I'll mark those as Exhibit 10.  I'm going to
23 mark those on the back of photograph number
00084 {10:18:47am}
01 24A.  And we're going to take a short break.
02
03      (Whereupon, Defendant's Exhibit
04 Number 10 was marked for identification
05 and copy of same is attached hereto.)
06
07      (Whereupon, a brief recess was had in
08 the proceeding.)
09
10 BY MR. NEWMAN:
11      Q   Mr. O'Shaughnessy, as I understand it,
12 you've used the photographs which we've marked
13 as Defendant's Exhibit 9 and 10 and the aerial
14 photo which you have that is similar to the
15 Defendant's Exhibit 3 to come up with your
16 opinion -- as the basis of your opinion that it
                                    Page 32

05-21-2007DonalO'Shaughnessy
```
17  would be feasible to tow the Corvette from the
18  location that it was in?
19       A    Yes.
20       Q    And from what source did you obtain the
21  information that the vehicle was parked at the
22  Country Inn Suites?
23       A    From Tucker.
00085 {10:26:13am}
01       Q    Okay.  And from what source did you
02  obtain the information that one of the parking
03  places that are indicated on the photographs was
04  the parking place where the Corvette was?
05       A    The same.
06       Q    Mr. Burge?
07       A    Yes.
08       Q    And from what source did you obtain the
09  information that the vehicle, the Corvette, was
10  backed in?
11       A    Tucker.
12       Q    From what source did you obtain the
13  information that the linkage on the transmission
14  was bent?
15       A    The same.
16       Q    Mr. Burge?
17       A    Yes.
18       Q    And from what source did you obtain --
19  did you obtain all your information from
20  Mr. Burge?
21       A    Yes.
22       Q    None of it from the documents that you
23  reviewed; correct?
00086 {10:26:55am}
01       A    Yes.  There were pictures in there that
02  said it was -- the linkage was bent in there,
03  too.
04       Q    Okay.  So what else did you obtain from
05  the documents other than the photographs and the
06  place in the -- where it said the linkage was
07  bent?
08       A    That's about all.
09       Q    Everything else you would have obtained
10  from Mr. Burge?
11       A    Yes.
12       Q    And I think I've gone over this.  But
13  you've never been to the Country Inn Suites and
14  you've never seen this Corvette; right?
15       A    Right.
16       Q    Where did you get the information that
17  the brake fluid was drained from the vehicle?
18       A    Mr. Burge.  And I believe it's
19  somewhere in these documents.
20       Q    How about the fact that the master
21  cylinder may have been inoperative?
22       A    From the document.
23       Q    Right.  Do you remember which one that
00087 {10:27:58am}
01  was?
02       A    No.  This is -- you want me to go
03  through all of them?
04       Q    We might be able to find it pretty
05  quick.
06            MR. BURGE:  Which one are we looking
07  for?
```
Page 33

```
08          MR. NEWMAN:  The brake fluid.
09          MR. BURGE:  In the first one.  And it's
10 in the -- it's in that auto claim thing, too.
11     Q    Is there any reference to the master
12 cylinder -- that's the one I want you to point
13 me to -- any reference in any of these documents
14 to the master cylinder?
15     A    I think it said the master cylinder was
16 full, didn't it?
17          MR. BURGE:  Huh-uh.  It says it's
18 empty.  It's right there.
19          MR. NEWMAN:  Okay.  Thanks.
20          MR. BURGE:  It may be in Smith's, one
21 of his things, because he quoted out of this.
22          MR. NEWMAN:  But he didn't look at
23 that.  That's what I'm asking, what he looked
00088 {10:29:43am}
01 at, not what it may be in.
02     Q    In towing a vehicle is there any reason
03 to drain the master cylinder or the brake
04 reservoir?
05     A    No.
06     Q    All right.  Mr. O'Shaughnessy, I want
07 you to look now, if you would, please, at
08 Defendant's Exhibit 2 to your deposition.  And
09 this is the report that was required by the
10 Court in this case.  And it contained your
11 opinions.  And it's signed by you; correct?
12     A    Yes.
13     Q    Do you agree with me that the only
14 opinion that you have is that it was feasible
15 for that vehicle to be towed from the place that
16 it was?
17     A    Yes.
18     Q    You do not have the opinion that it was
19 necessarily towed, do you?
20     A    No.
21     Q    Okay.  The reason that I ask you, I
22 want you to look at the top of page 4 under
23 opinion 2.  And it says, Martin Long's 2000
00089 {10:31:10am}
01 Chevrolet Corvette was stolen via towing.  Is
02 it -- am I correct that that is not your
03 opinion?
04     A    Well, I don't know for sure that's how
05 it happened, but I'm saying it's possible that
06 it was towed.
07     Q    That's not what this says, though.
08 This says that is how it happened.  And I'm
09 saying I know that you're saying it was possible
10 to tow it, but you're not saying that it was
11 towed, are you?
12     A    No.
13     Q    Okay.  So if number 2 says that it is
14 your opinion that it was stolen by towing that
15 would be wrong; correct?
16     A    Well, I guess that's what I am saying,
17 that it was stolen -- taken by towing.
18     Q    By the way, who typed this up?
19     A    I don't know.  It wasn't me.
20     Q    Mr. Burge did, didn't he?
21     A    Yes.
22     Q    So it's in his words; correct?
                                    Page 34
```

05-21-2007DonalO'Shaughnessy
```
23      A    Yes.
00090 {10:32:08am}
 01      Q    So you are not saying -- I mean, it's
 02  your opinion.
 03      A    Yes.
 04      Q    And so is it your opinion that it's
 05  possible to tow it and it's your opinion that
 06  it's possible to put a key in it and drive it
 07  away; right?
 08      A    Yes.
 09      Q    So you don't know and you don't have an
 10  opinion as to whether it was towed or whether it
 11  was driven away from that parking lot, do you?
 12      A    Right.
 13      Q    But you do have an opinion clearly that
 14  it's possible to tow it away from the parking
 15  lot?
 16      A    Yes.
 17
 18          (Whereupon, Defendant's Exhibit
 19  Number 8 was marked for identification
 20  and copy of same is attached hereto.)
 21
 22      Q    Okay.  And that's fine.  That's the
 23  reason we're here is to get that kind of stuff
00091 {10:32:42am}
 01  straight.
 02          On page 2 where it says factual
 03  background underneath that if you'll read with
 04  me it says, from my review of the materials
 05  listed above, I learned the following facts that
 06  are relevant to my opinions in this case, and
 07  then a number of facts are listed.  Are those
 08  facts that Mr. Burge put down on this report?
 09      A    Yes, sir.
 10      Q    You didn't tell him what to put down,
 11  did you?
 12      A    No.
 13      Q    And under the opinions, I know that
 14  we've gone over the fact that it is your opinion
 15  that it is feasible to tow the 2000 Chevrolet
 16  Corvette from that particular place, but the way
 17  that this is worded, is it Mr. Burge that worded
 18  it this way?
 19      A    Yes.
 20      Q    And then it's not your opinion that it
 21  was necessarily stolen by towing; correct?
 22      A    Right.
 23      Q    A key could have been used just like it
00092 {10:34:31am}
 01  could have been a tow truck; right?
 02      A    That's possible, yes.
 03      Q    Now, you are being paid $100 per hour;
 04  correct?
 05      A    Yes.
 06      Q    And you've never testified as an expert
 07  witness in the past?
 08      A    No.
 09      Q    Okay.  Look at opinion number 3 for me,
 10  please, sir.  I'm sorry.  Factual background,
 11  number 3.  My fault.  Page 2, factual
 12  background, number 3.  An examination of the
 13  undercarriage of the car revealed scratches and
                                        Page 35
```

05-21-2007DonalO'Shaughnessy
14  contact marks in the area where J hooks and/or
15  chains would be used to tow the car.  We're
16  talking about the J hooks and/or chain marks in
17  the rear of the vehicle; correct?
18      A    Yes.
19      Q    Okay.  With respect to number 5, which
20  says the car's universal theft deterrent system
21  did not work as intended when tested.  The
22  system was able to be armed but failed to
23  operate when the system was violated by opening
00093 {10:36:25am}
01  the door or opening the hood, et cetera -- with
02  respect to that factual background, was it your
03  understanding that that was a finding that it
04  never worked or it did not work at the time that
05  it was tested?
06      A    It didn't work when it was tested.
07      Q    Do you know of anyone who ever did an
08  inspection to see if the linkage was, indeed,
09  bent?
10      A    I believe it was.
11      Q    Somebody actually saw it was bent or
12  somebody said there was a likelihood it was
13  bent?
14      A    I'm not sure.  I'd have to look at it
15  again where it said that.
16      Q    Would you do that, please, sir?
17      A    Where is the...
18           MR. BURGE:  Exhibit 7.
19           THE WITNESS:  This one?
20           MR. BURGE:  Uh-huh.  Where it says 232
21  at the bottom.  One of these little numbers says
22  232.  There you go.
23      A    It says a likelihood the linkage was
00094 {10:37:37am}
01  bent.
02      Q    So as far as you know, there was never
03  an inspection of the linkage?
04      A    Right.
05      Q    Do you disagree in any way with
06  Mr. Breznock's opinion that the vehicle was not
07  operated without a key that would have the
08  correct cut and correct pellet?
09      A    No.
10      Q    You've never worked in law enforcement
11  in any way?
12      A    No.
13      Q    By the way, when you tow the vehicles,
14  do you report to the police that the vehicle has
15  been towed?
16      A    Yes.
17      Q    Okay.  Are you required to do that, or
18  is that just something you do because -- as a
19  courtesy?
20      A    It's required.
21      Q    Who requires it?
22      A    Our finance companies and our own
23  office.
00095 {10:39:19am}
01      Q    Okay.  But it's not required by the
02  police, to your knowledge?
03      A    It might be.  It might be, yes.
04      Q    But do you it anyway?
                                        Page 36

05-21-2007DonalO'Shaughnessy
```
05    A    Yes.
06    Q    And do you know -- I guess which police
07 department would depend on what jurisdiction
08 you're in?
09    A    Yes.
10    Q    Let's get back to this Notice of
11 Deposition that we sent you. We've talked about
12 the things that you looked at and we've gone
13 over your background, and if I saw your entire
14 file, it would contain the information that
15 we've looked at today; correct?
16    A    Uh-huh.
17    Q    Except for we might have a different
18 perspective on Number 3; correct? Maybe a
19 different angle, a different size of the photo.
20 Apparently Mr. Burge says that the way this
21 software works is you can position what you're
22 looking at and so you may have a little
23 different position on Number 3, but generally
00096 {10:41:22am}
01 it's the same; right?
02    A    Yes.
03    Q    Did you make any notes when you
04 reviewed the material or at any time?
05    A    No.
06    Q    Have you corresponded with Mr. Burge in
07 any way?
08    A    Just when we've met.
09    Q    How about by e-mails? Did y'all send
10 e-mails back and forth?
11    A    No.
12    Q    How did you get a copy of the facts and
13 the opinion he wrote for you?
14    A    He gave me one.
15    Q    When you met?
16    A    Yes.
17    Q    Was that here at his office?
18    A    No. He came to my office.
19    Q    How many times have you met with
20 Mr. Burge?
21         THE WITNESS:  Just that once, wasn't
22 it, or --
23         MR. BURGE:  Twice.
00097 {10:42:05am}
01    A    It was twice. Yes, twice.
02    Q    Where were those meetings?
03    A    One at my office and one in Tuscaloosa,
04 I believe it was.
05    Q    Okay. What was the meeting in
06 Tuscaloosa about?
07    A    He just wanted me to sign one of these
08 documents here.
09    Q    Why did you meet in Tuscaloosa?
10    A    That's where -- that's where I was.
11    Q    So he went down there to find you?
12    A    Yes.
13    Q    How big an area is it that you tow cars
14 in?
15    A    About from Clanton on up the whole
16 state. About half the state.
17    Q    Okay. And are y'all busy every day?
18    A    Yes.
19    Q    You didn't e-mail things back and forth
                                    Page 37
```

05-21-2007Dona1O'Shaughnessy
```
20  to Mr. Burge?
21       A    No.
22       Q    Okay.  You've never written any
23  articles, given any speeches about towing
00098 {10:43:00am}
01  vehicles or anything like that?
02       A    No.
03       Q    This is the first time you've ever
04  testified as an expert; correct?
05       A    Yes.
06       Q    Have you ever had your deposition taken
07  before like we're doing now?
08       A    No.
09       Q    Never been in a lawsuit of any kind?
10       A    Yes.
11       Q    What kind of lawsuit was that?
12       A    I wasn't in a -- I guess just when I
13  got in trouble 20, 30 years ago.
14       Q    Other than that?
15       A    No.
16            MR. NEWMAN:  That's all I have.
17                      EXAMINATION
18  BY MR. BURGE:
19       Q    Mr. O'Shaughnessy, this report that is
20  Exhibit Number 8, does that accurately reflect
21  your qualifications and experience and the
22  factual background that we went over?
23       A    Yes.
00099 {10:44:12am}
01       Q    And in terms of the materials reviewed,
02  in addition to the reports from Transportation
03  Technology, the Auto Claim Committee Report, and
04  the aerial photograph of the hotel parking lot,
05  have you now seen the photographs contained in 9
06  and 10 that I took for you?
07       A    Yes.
08       Q    Based on this information, was it
09  feasible, in your judgment, to have towed that
10  Corvette out of that parking lot?
11       A    Yes.
12       Q    In terms of the room needed, was there
13  enough room?
14       A    Yes.
15       Q    Does it matter to you whether that car
16  was backed in or pulled out straight in terms of
17  the feasibility of getting it out of this
18  parking lot?
19       A    No.
20       Q    Is it sometimes necessary to get inside
21  a car in order to tow it out?
22       A    Yes.
23       Q    And was that to get it from park to
00100 {10:45:11am}
01  neutral as you mentioned?
02       A    Yes.  Or to secure the steering wheel.
03       Q    And under Exhibit 7 at page 230, did
04  you learn that the steering wheel did not lock
05  when the car was turned off?
06       A    Yes.
07       Q    In terms of towing it, is that a good
08  fact or a back fact?
09       A    Well, if it's locked in the -- where
10  the wheels are turned all the way, that's bad,
                                      Page 38
```

05-21-2007DonaloʼShaughnessy
11  but if it's locked straight, that's good.
12      Q    And in this case, it didn't lock either
13  way.  What does that mean?
14      A    That would be better.  Then you
15  straighten the wheel and make it straight and
16  then secure it and tow it out that way.
17      Q    Securing it would be done from the
18  inside with the seat belt is how you'd do that?
19      A    Yes.  Or a rope.
20      Q    From time to time, have you taken --
21  had to take cars that were backed in and in park
22  and with the wheels turned to the side and
23  locked and across from a planter?
00101 {10:46:28am}
01      A    Yes.
02      Q    Is that the worst case scenario for a
03  Corvette, taking a Corvette?
04      A    If I've got enough room it's -- yes.
05      Q    How long is it going to take us to do
06  that?
07      A    If I'm by myself, it's going --
08  probably five or ten minutes.  But if I'm
09  coordinated with somebody else, it would be
10  probably under -- less than five, I would say.
11      Q    Have you had to force cars'
12  transmissions from park to neutral in your job?
13      A    Yes.
14      Q    How many times have you had to do that?
15      A    A hundred.
16      Q    Is that your basis for believing --
17  that experience your basis for believing that a
18  Corvette could be forced from parked into
19  neutral?
20      A    Yes.
21      Q    Have you forced other General Motors
22  products from park to neutral?
23      A    They're not going to hear about this,
00102 {10:47:19am}
01  are they?  Yes.
02      Q    And what sort of force are we talking
03  about that we're exerting to get the car from
04  park to neutral?
05      A    Each of them are different, but it
06  probably -- might be pretty difficult.
07      Q    And your familiarity with the force on
08  a transmission does that play any part in your
09  opinion that the bent linkage that's reflected
10  in Mr. Breznock's report could be related to
11  that?
12      A    Yes.
13           MR. NEWMAN:  Object to the form of the
14  question because he said it's a likelihood of
15  bent linkage.  There's no inspection.  He's
16  testifed that he doesn't know about
17  transmissions and he's not a mechanic.  I don't
18  think he knows the effect and the amount of
19  force that would be required to do that, so we
20  make the objection on those grounds.
21           MR. BURGE:  We're in federal court.  We
22  can rely on the facts made known through others
23  even if not admissible.
00103 {10:48:27am}
01      Q    And you did have Exhibit 7 that we went
                                        Page 39

05-21-2007Dona1O'Shaughnessy
02  over before you formed your opinions; true?
03      A    Yes.
04      Q    And at page 232 of Exhibit 7, did
05  Mr. Breznock note anything about the vehicle's
06  transmission being difficult to move the shift
07  from park?
08      A    Yes.
09      Q    And what did he indicate that that
10  indicated?
11      A    That the linkage was bent.
12      Q    Do you agree or disagree with that?
13      A    Yes, I would agree with that.
14      Q    Do you know whether or not there was
15  any difficulty in moving the transmission from
16  park into gear before it was taken?
17      A    No.
18           MR. NEWMAN:  Object to the form of the
19  question.
20      Q    Would there be any need to force a
21  transmission from park into neutral if one had
22  the key?
23      A    No.
00104 {10:49:46am}
01      Q    Would there be any risk of damaging the
02  transmission linkage by shifting a car from park
03  into neutral with the key?
04      A    No.
05      Q    Have you ever had to enter a car to
06  secure the steering wheel or to get it from park
07  into neutral and had the alarm begin to sound?
08      A    Yes.
09      Q    Have you towed cars with the alarm
10  sounding?
11      A    Yes.
12      Q    When we looked at Exhibit -- what is
13  now Exhibit 7 at page 231, did you have an
14  opportunity to review any testing performed by
15  Transportation Technology of the alarm system
16  for State Farm before it made its decision in
17  this case?
18      A    Yes.
19      Q    And what happened when he tested it
20  based on that report?
21      A    It didn't work.
22      Q    Does the absence of skid marks mean
23  that a car was not towed?
00105 {10:51:05am}
01      A    No.
02      Q    Is it fair to suggest that?
03      A    Yes.
04      Q    That if you don't have skid marks that
05  it wasn't towed?
06      A    No.
07           MR. NEWMAN:  Move to strike.
08      A    It could have been towed.  It doesn't
09  mean anything.
10      Q    You can tow a car without leaving any
11  skid marks?
12      A    Yes.
13      Q    You mentioned that there have been
14  occasions when you've changed the towing
15  position from towing it from the rear to towing
16  it from the front, and you've mentioned that
                                        Page 40

```
17  that related to the transmission?
18     A    Yes.
19     Q    Would you explain that to me?
20     A    You can't -- you don't want to damage
21  the transmission by towing it -- by having it
22  turning while you're on the drive axle.  It
23  would damage the transmission.
00106 {10:51:53am}
01     Q    What are go jacks?
02     A    You can -- they have rollers -- rollers
03  that are on wheels that you can place up under
04  the tires and jack that end up and maneuver that
05  end and push it -- maneuver it to wherever you
06  want to go.
07     Q    Have you ever used go jacks to push a
08  car out of a parking space before towing it
09  away?
10     A    Yes.
11     Q    Would that have been feasible here?
12     A    Yes.
13     Q    Have you ever forced a car's
14  transmission from park into neutral, let off the
15  emergency brake, and just pushed it out of a
16  parking space?
17     A    Yes.
18     Q    And you mentioned that you use a
19  locksmith who can make keys even with pellet
20  readers?
21     A    Yes.
22     Q    They come to your lot and do that?
23     A    Yes.
00107 {10:52:51am}
01     Q    They don't have to go back to their
02  shop to make the key.  They can do it right
03  there on site?
04     A    Right.  They have a van or -- a big van
05  and they have everything they need right there.
06     Q    How long does it take them to make the
07  key?
08     A    Well, depends on how good they are.
09  Probably -- well, like on a Ford, they have to
10  go through -- it goes through a sequence and it
11  takes about like a half hour for them to get the
12  right code to come up.  So probably a half hour
13  for some; some a lot quicker.
14     Q    Is it important for the brakes to be
15  working on a car when you're towing it?
16     A    No.
17     Q    Is it important to have tires on a car
18  when you're towing it?
19     A    Yes.
20     Q    If it's been suggested by a State Farm
21  claims supervisor that the visibility into this
22  lot diminished the chance of having it towed --
23  have you looked at the photographs?
00108 {10:54:13am}
01     A    Yes.
02     Q    Do you agree with that?
03     A    No.
04     Q    Why not?
05     A    You could see it from the road.  Was
06  that the interstate we were looking at there?
07     Q    (Counsel nods head.)
```

Page 41

05-21-2007Donal0'Shaughnessy
```
08      A    Yes.
09      Q    If that has been suggested by State
10  Farm's claims personnel that they ruled out
11  towing because there were no skid marks, would
12  you agree with that?
13      A    No.
14      Q    Having looked at the Transportation
15  Technology report and the claim committee report
16  and the photographs can towing be ruled out?
17      A    No.
18      Q    If State Farm says they did rule out
19  towing, do you agree?
20      A    No.
21      Q    Have you seen anything in these
22  documents which reflects that they attempted to
23  rule out towing --
00109 {10:55:25am}
01           MR. NEWMAN:  Object to the form of the
02  question.
03      Q    -- as the method by which this was
04  taken out of the parking lot
05           MR. NEWMAN:  Same objection.
06      Q    You can answer.
07      A    What's the question again?
08      Q    Whether you've seen anything in any
09  documents reflecting any effort by State Farm to
10  rule out towing.
11           MR. NEWMAN:  Same objection.
12      A    I think they're trying to, yes.
13      Q    By taking your deposition?
14      A    Yes.
15           MR. NEWMAN:  Same.
16      Q    But have you seen anything in the
17  documents which says they tried to rule it out?
18           MR. NEWMAN:  Same objection.
19      A    Yes.
20      Q    What have you seen in that regard?
21      A    They're saying that they have -- it
22  wasn't possible to remove it without a key.
23      Q    And do you agree with that?
00110 {10:56:11am}
01      A    No.
02      Q    And have you been removing cars without
03  a key for sometime?
04      A    Yes.
05      Q    How long?
06      A    18 years.
07           MR. BURGE:  Thank you.
08              FURTHER EXAMINATION
09  BY MR. NEWMAN:
10      Q    Just a few things to follow up,
11  Mr. O'Shaughnessy.
12           Do we agree that in order to tow the
13  vehicle from the parking lot where it was at the
14  Country Inn Suites it would have been necessary
15  to move the shift lever from park to neutral?
16      A    Yes.  If it was backed in, yes.
17      Q    All right.  And then how was the
18  vehicle found?  In what gear was it found when
19  it was eventually found?
20      A    I don't know.
21      Q    Okay.  And what gear was it in when it
22  was inspected at the yard?
```
Page 42

05-21-2007DonalO'Shaughnessy
 23      A    I don't know.
00111 {10:57:07am}
 01      Q    Okay.  And when the tow truck came to
 02  take it from where it was found back to the
 03  yard, did it tow it from the rear or from the
 04  front?
 05      A    I have no idea.
 06      Q    Okay.  When that happened, did they
 07  force it from park to neutral?
 08      A    I don't know.
 09      Q    If it had been in park and they did not
 10  have a key at that time and they had to tow it
 11  back to the police yard or wherever the police
 12  take those vehicles, someone would have had to
 13  force it at that time from park to neutral,
 14  wouldn't they?
 15      A    Not if they towed it from the rear or
 16  put it up on a flatbed.
 17      Q    If they had decided to tow it from
 18  the -- if it had been towed from the front at
 19  that time, it would have been necessary to force
 20  it from park to neutral; correct?
 21      A    Did they have the key at that time?
 22      Q    Assume for me they did not have a key.
 23      A    They probably didn't tow it from the
00112 {10:58:07am}
 01  front.  They would know better than that.
 02      Q    If it were in the yard and towed from
 03  the front at some point, they would have had to
 04  force it from park to neutral; correct?
 05      A    Either did that or they went up under
 06  the car and undid the linkage from there.
 07      Q    So that may have been done as well by
 08  the yard?
 09      A    It's possible.
 10      Q    Okay.  Now, if the car were towed from
 11  the parking lot of Country Inn Suites and the
 12  shifter was moved into neutral, then it would
 13  have been sensible to leave it in neutral if
 14  they were going to continue to tow it; correct?
 15      A    Yes.
 16      Q    It's also true, isn't it, that when
 17  you're towing a vehicle that it's possible that
 18  you will leave skid marks depending on the
 19  situation?
 20      A    Not if it's in neutral, no, it won't.
 21      Q    If it's not in neutral, it's possible
 22  to leave skid marks; correct?
 23      A    Yes.
00113 {10:59:20am}
 01      Q    How many people do you know of who do
 02  the same kind of thing you do?
 03      A    Just the guys that work with me.
 04      Q    I'm talking about other companies that
 05  repossess vehicles.
 06      A    There are several.
 07      Q    Several of them?
 08      A    Yes.
 09      Q    Like how many in the area that covers
 10  the same area you do?
 11      A    I know three or four.
 12      Q    Three or four.  Do the police require
 13  you to register your trucks with them?
                                          Page 43

05-21-2007Dona1O'Shaughnessy
```
14      A    No.
15      Q    No.   They're just like any other
16  equipment?
17      A    Yes.
18      Q    The photos that you were shown, do you
19  know when those were taken?
20      A    No.
21      Q    Do you know if they were taken at the
22  time that the car was located at the Country Inn
23  Suites or was it some years after that?
00114 {11:00:33am}
01      A    I don't know.
02      Q    I don't know if I ever asked you to
03  identify that, but Exhibit 8 is your Expert
04  Witness Declaration; right?
05      A    Yes, sir.
06           MR. NEWMAN:   That's all I have.
07           MR. BURGE:   That's all.
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23           FURTHER DEPONENT SAITH NOT
00115 {00:00:00PM}
01                C E R T I F I C A T E
02
03  STATE OF ALABAMA        )
04
05  COUNTY OF MONTGOMERY )
06
07
08           I hereby certify that the above and
09  foregoing deposition was taken down by me in
10  stenotype, and the questions and answers thereto
11  were transcribed by means of computer-aided
12  transcription, and that the foregoing represents
13  a true and accurate transcript of the testimony
14  given by said witness upon said hearing.
15           I further certify that I am neither of
16  counsel, nor kin to the parties to the action,
17  nor am I in anywise interested in the result of
18  said cause.
19
20
21           ----------------------------
21                STACEY L. JOHNSON, Certified
22                Shorthand Reporter and
22                Commissioner for the State of
23                Alabama at Large.
23
```

Page 44