IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MARTIN O. LONG, | * | |
| Plaintiff, | * | |
| vs. | * | Case Number:  2:06cv816-MHT |
| STATE FARM FIRE AND CASUALTY COMPANY, | * | |
| | * | |
| Defendant. | | |

**STATE FARM'S RESPONSE TO PLAINTIFF'S
MOTION FOR PROTECTIVE ORDER**

COMES NOW, State Farm Fire and Casualty Company, defendant in the above-styled matter, and responds to Plaintiff Martin Long's motion for a protective order regarding his psychotherapy records.

1. State Farm agrees with Long that Alabama law controls issues relating to privilege. See generally, *McClary v. Walsh*, 202 F.R.D. 286, 290 (N.D. Ala. 2000) ("Because the rule of decision in this diversity case is supplied by Alabama state law, the law of privileges also comes from state law.").

2. Under Alabama law, however, privileges are waived if certain matters are placed in issue. See Rule 510, Ala. R. Evid. (Waiver of Privilege by Voluntary Disclosure). According to the Advisory Committee's Notes to Rule 510, Ala. R. Evid.:

> "The concept of fairness underlies the waiver doctrine. It has been held unfair to permit offensive assertion of a privilege. When a party, for example, offers a portion of the privileged matter in proof of his or her case, fairness dictates that the opponent be allowed to offer or discover the remainder. *Ginsberg v. Fifth Court of Appeals*, 686 S.W. 2d 105 (Tex.

1985). This is consistent with preexisting Alabama law under which *the attorney-client privilege falls when a plaintiff client puts the attorney-client communications* at issue or charges the attorney with misconduct." (Emphasis added).

3. The above-emphasized statement applies equally to Long's claim of the psychotherapist-patient privilege, because, under Alabama law, the psychotherapist-patient privilege is afforded the same protection as the attorney client privilege. See § 34-26-2, Ala. Code 1975; Advisory Committee's Notes to Rule 503, Ala. R. Evid. ("Alabama statutory law has long recognized a psychologist-client privilege. Ala. Code 1975, § 34-26-2. This particular statutory privilege was amended in 1979 to include psychiatrists within its coverage. The legislative act creating the privilege stipulates that it is to be placed upon the same basis as the privilege that arises by law between an attorney and a client; consequently, Rule 503 is modeled after the rule providing for the corresponding attorney-client privilege.").

4. Long has placed his mental condition in issue by claiming mental anguish damages, and by claiming that he has undergone therapy as a result of his mental anguish. See Long's response to State Farm interrogatory No. 14, attached hereto as Exhibit A. See also excerpt from Long's deposition, attached hereto as Exhibit B. Accordingly, he has waived his claim of privilege.

5. Further, it is Long's burden to show that the records State Farm seeks are privileged. *Lynch v. Hamrick*, ___ So. 2d ___, 2007 WL 1098574 (Ala. 2007) ("The burden is on the party asserting the attorney-client privilege to establish the existence of an attorney-client relationship as well as other facts demonstrating the claim of privileged

information."); Advisory Committee's Notes to Rule 503, Ala. R. Evid., quoted above. He has not met that burden.

      6.    In the alternative, if State Farm is not entitled to discovery of the records, it is entitled to comment upon Long's claim of privilege, and an appropriate inference may be drawn from his claim of privilege. See Rule 512A, Ala. R. Evid.  See also, *Ex parte United Service Stations, Inc.*, 628 So. 2d 501, 506 (Ala. 1993), (Houston, J., concurring specially) ("If [the plaintiff] continues to seek damages for mental pain and anguish and to insist on her psychotherapist-patient privilege of confidentiality (Ala.Code 1975, § 34-26-2), the trial court, in this civil case, should permit the defendant to argue to the jury the inconsistency in the plaintiff's claiming such damages while insisting on the privilege (Colquitt, Alabama Law of Evidence § 513, at 193 (1990)); and there is a presumption that the jury will do its job as finder of the facts."); Charles W. Gamble, *Alabama Evidence* § 414.01(7)(f) (5th ed. 1996) ("When such a claimant [of the psychotherapist-patient privilege] successfully claims the privilege, however, the opponent is allowed to comment to the jury upon the assertion of the privilege as being inconsistent with claiming mental and emotional injuries.").

      7.    Because Alabama law allows State Farm to comment on Long's claim of privilege and entitles the trier of fact to draw a proper inference, State Farm is entitled to a jury instruction stating that the jury is allowed to draw such an inference.

        **/s/ D. Andrew Stivender**
        JAMES B. NEWMAN (NEWMJ8049)
        D. ANDREW STIVENDER (STIVD4909)
        Attorneys for Defendant State Farm Fire
          and Casualty Company

OF COUNSEL:
HELMSING, LEACH, HERLONG,
    NEWMAN & ROUSE
POST OFFICE BOX 2767
MOBILE, ALABAMA 36652
(251) 432-5521
Facsimile: (251) 432-0633
Email: jbn@helmsinglaw.com
      das@helmsinglaw.com

## CERTIFICATE OF SERVICE

      I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

      F. Tucker Burge
      Burge & Burge
      2001 Park Place North, Suite 850
      Birmingham, Alabama 35203

this 14th day of June, 2007.

        **/s/ D. Andrew Stivender**
        OF COUNSEL



See response to interrogatory 10.

13. You have alleged in you Complaint that State Farm failed to properly investigate the claim, that its investigation was unduly biased, and that the results of the investigation were not subjected to a reasoned and informed evaluation and review:

    a. State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

    b. Please produce any documents relating to the information requested in this interrogatory.

**ANSWER:**

See response to interrogatory 10.

14. Please describe in detail the type and dollar amount of damages you allege that you are entitled to in this action.

    a. State each and every fact upon which you rely in support of said allegation; identify each and every document upon which you rely in support of said allegation, and identify by name, home address, business address, place of employment and job title, each and every

person having knowledge or information upon which you rely in giving your answers to this interrogatory and state the knowledge or information each person has.

b.  Please produce any documents relating to the information requested in this interrogatory.

**ANSWER:**

Automobile damage and loss: $27,500.00 to $30,000.00

Stolen personal items: $5,000.00

Travel expenses: $400.00

Loss of use of car: $8,500.00 to $12,000.00

Mental and emotional distress: $100,000.00 to $200,000.00

Punitive damages: $500,000.00 to $800,000.00

15.  Have any photographs been taken of you, the scene of the incident referred to in the Complaint, or the vehicle involved in the incident referred to in the Complaint? If so, for each such photograph, respectively, state the name, address and occupation of the photographer; the name and address of each person who was present when the photograph was taken; the name and address of the person who suggested, ordered or authorized that such photograph(s) be taken; the date and place where each such photograph was taken; and the name and address of each person who has custody, possession or control of a copy, negative or original of each such photograph.

a.  Please produce any such copy, negative or original photograph to your answers to these interrogatories for inspection and reproduction. Said copy, negative or original

17

1   Q   Other than LaToya Jackson that's a
2   singer?  Other than that, you don't know any
3   LaToyas?
4   A   No, I don't.
5   Q   And in your complaint, you talk about
6   the fact that the denial of coverage and the
7   actions of State Farm have caused you emotional
8   distress.  Have you been to see any doctors
9   about emotional distress?
10  A   I mean, that's part of my claim.  I
11  mean, you know, I went through stress class at
12  the VA.  Well, anger management class at the
13  Department of VA.
14  Q   When did you do that?
15  A   I think in -- I think early part of
16  last year or the end part of '05.
17  Q   All right.  Now, you had -- one of the
18  reasons for your discharge was emotional in
19  nature, was it not, from the Army?
20  A   What you mean emotional in nature?
21  Q   I mean, it wasn't totally from the
22  standpoint of your leg that you were
23  discharged.  There were also depression problems

1  associated with your discharge; correct?
2      A    No.
3      Q    That's not correct?
4      A    No, that's not correct.
5      Q    Have you ever told anybody that?
6      A    The only reason why the Army put me out
7  was because of my leg.
8      Q    There was never any assessment that
9  found that one of the reasons for your discharge
10 was emotional in nature?
11     A    No, not my discharge.
12     Q    Okay.  Had you ever had any treatment
13 for emotional injury or emotional problems
14 before 2005?
15     A    Yeah.
16     Q    You told me you're on some pills for
17 depression.  You told me that this morning?
18     A    Yes.
19     Q    Who prescribes those for you?
20     A    Psychiatrist.
21     Q    And how long -- what's his name?
22     A    The last one I saw was Tobino.  It was
23 a female named Tobino.

MARTIN O. LONG

| | | |
|---|---|---|
| 1 | Q | Here in Montgomery? |
| 2 | A | At the VA, yes. |
| 3 | Q | At the VA in Montgomery? |
| 4 | A | Yes. |
| 5 | Q | Do you go to Maxwell for that?  Is that |
| 6 | where you go for that? | |
| 7 | A | No.  I go to the regional office. |
| 8 | Q | Where is it? |
| 9 | A | Off Perry Hill Road. |
| 10 | Q | Okay.  Is it a pretty big facility? |
| 11 | A | It's okay. |
| 12 | Q | Okay.  Are all the psychiatrists that |
| 13 | you've seen -- have all of them been through the | |
| 14 | VA? | |
| 15 | A | Yes. |
| 16 | Q | Have you seen any private ones, ones |
| 17 | that are not VA employed? | |
| 18 | A | Well, I saw one with the railroad. |
| 19 | Q | With the railroad? |
| 20 | A | Yes. |
| 21 | Q | Do you remember his or her name? |
| 22 | A | No.  It was a female, though, but I |
| 23 | don't remember her name. | |

```
 1      Q     Where was she located?
 2      A     I know the appointment was off of -- I
 3  can't think where the appointment was.  I know
 4  it was off of Perry Hill Road, though.
 5      Q     So the railroad retirement doctors were
 6  off of Perry Hill Road as well?
 7      A     (Witness nods head.)
 8      Q     Just like the VA?
 9      A     Just the opposite side.  Once you get
10  off Perry Hill Road, you go to the left, but
11  whenever I seen the railroad psychiatrist I went
12  to the right.
13      Q     Okay.  And when did you see -- you say
14  the last one you can remember seeing at the VA
15  was a psychiatrist named Tobino?
16      A     Yes.
17      Q     T-O-B-I-N-O?
18      A     I think so.
19      Q     And how long ago was that?
20      A     That was maybe last August, I think.
21  Somewhere around there.
22      Q     Okay.  Do you remember who you saw
23  before Tobino?
```

1   A   I saw Chille, Dr. Chille, C-H-I-L-L-E.

2   Q   Okay. Was that also at the VA here in
3   Montgomery?

4   A   Yes.

5   Q   How long ago was that you saw
6   Dr. Chille?

7   A   About a year. Because I saw him before
8   I saw her. Then they moved him to Tuskegee.

9   Q   Okay. Who initially prescribed -- what
10  kind of antidepressants do you take?

11  A   Let's see. I used to take -- I know
12  I've taken one. Then I stopped taking them.
13  Then I started Zoloft. Then I stopped taking
14  them, and I'm on some others now.

15  Q   Okay. Where do you get your
16  prescriptions filled?

17  A   VA.

18  Q   Okay. The one on Perry Hill Road?

19  A   Yes.

20  Q   Okay. Were you being treated -- when
21  you saw the railroad retirement psychiatrist,
22  was that before or after your injury, the
23  shoulder?

1    A    After.

2    Q    After. Did you see any of the VA

3    psychiatrists before you injured yourself on the

4    railroad?

5    A    Yes.

6    Q    Okay. Do you remember was that

7    Dr. Chille, or was it somebody even before

8    Dr. Chille?

9    A    It was Dr. Chille. Well, no. It

10   was -- I can't think of the doctor's name. All

11   of it is in my records, though.

12   Q    I know it is, and I'm just trying to

13   make sure I can cover it so I can get it from --

14   you know, see if I can get it. But the other

15   thing I was going to ask you, have you been

16   under continuous treatment by psychiatrists or

17   psychologists since you were discharged from the

18   Army?

19   A    I mean, I didn't -- when I got

20   discharged from the Army, I didn't get up under

21   a psychiatrist's care.

22   Q    How long after you were discharged did

23   you see a psychiatrist?

MARTIN O. LONG

1   A   I think in...

2   Q   You were discharged in '97, you told
3   me.

4   A   Right.  I think in '02 or '03.

5   Q   So it was four or five years later,
6   then; is that right?

7   A   Right.

8   Q   Other than the doctors that you've seen
9   at the VA, have you seen anyone else for
10  psychological or psychiatric problems?

11  A   No.

12  Q   And the one at the railroad retirement
13  board?

14  A   No.

15  Q   Anybody else?

16  A   No.

17  Q   Other than the, you know -- can you
18  tell me any way that this emotional distress
19  that you suffered from State Farm how that's
20  manifested itself?  What it's done to you?

21  A   Well, I mean, it just -- it took me
22  through a lot because all I had -- I had been
23  through a lot already and then I had just called

1  myself trying to get myself together once the
2  railroad come through for me.  Then this
3  happened.  And it was just -- it was like a
4  shock because, you know, I didn't think that it
5  would take this long and I didn't think they
6  just straight thought that I stole my own car.
7  I just couldn't grasp that, how they could think
8  that.
9       Q    And so I understand, because of that,
10 you've got these -- feel like that's caused
11 emotional distress, and I'm trying to ask you
12 how that manifested itself.  I mean, did your
13 hair fall out?  You understand what I'm saying
14 now?  Did it turn gray like mine?  I can tell it
15 didn't turn gray.  Any kind of physical
16 manifestations of that --
17      A    I mean, I just --
18      Q    -- or did it just bother you?
19      A    Well, I mean, it did more than bother
20 me.  I -- you know, I started just being
21 irritable and, you know, just not really wanting
22 to be around nobody.
23      Q    Made you irritable and not wanting to

1  be around anybody?
2      A    I just stayed mad and frustrated all
3  the time.
4      Q    Anything else?
5      A    No.  Because, I mean, I was already
6  going through things anyway.
7      Q    I mean, you already were -- had some
8  things that would make you irritable and
9  frustrated; right?
10     A    Right.
11     Q    I mean, you had problems with your
12 injury; right?
13     A    Right.
14     Q    And you were having problems with your
15 marriage; right?
16     A    Right.
17     Q    And you were having money problems;
18 right?
19     A    Before then, though.  I'm talking about
20 all that was before then.  But after -- you
21 know, like I said, I was pretty much caught up
22 after the lawsuit, you know, once I...
23     Q    You mean after the lawsuit against

MARTIN O. LONG

1  the --
2      A    Yeah.  I had paid off the bills and
3  pretty much was trying to move ahead and, you
4  know, then this happened and, you know, it just
5  threw me for a loop because I could have --
6  like I said, I wasn't hurting for no money
7  because if I had wanted to sell the car or
8  something, you know, I still would have got the
9  car.  I just wouldn't have paid off as much
10 stuff as I paid for my wife.  I was going to get
11 the car regardless.  You know, after it was
12 took, that was just -- it was like -- I guess it
13 was like a low blow, I guess.
14     Q    I understand all that.  I'm just trying
15 to find out other than making you irritable and
16 mad if there was any other things that were
17 caused by your emotional distress as a result of
18 what you said State Farm did.
19     A    I mean, I was already having panic
20 attacks, but it was -- I guess it didn't help
21 them none.
22     Q    So you already had some panic attacks
23 before then; is that right?

1    A    Right.
2    Q    And is that what the anti-depressants
3    were treating?
4    A    Yeah.
5    Q    Are you still having the panic attacks,
6    or are they better?
7    A    They got better.
8    Q    Are you still seeing a psychiatrist?
9    A    Well, I haven't saw one in probably
10   about four months.
11   Q    Okay. Have you got any visits
12   scheduled to go back?
13   A    Yes.
14   Q    When?
15   A    I've just got a call to make because
16   now they do it -- they'll see you like six
17   months out, but if you run out of medication
18   before then, then you can call and they'll see
19   you because they ain't going to give you more
20   medication without seeing you.
21   Q    I see. So have you got any plans to go
22   back?
23   A    Yeah.

MARTIN O. LONG

```
 1      Q    Sir?
 2      A    Yes.
 3      Q    When?  I mean, have you made an
 4   appointment is my question.
 5      A    No, I haven't made an appointment.
 6      Q    You haven't made an appointment, but
 7   you plan to make an appointment?
 8      A    Yes.
 9      Q    Okay.  What I want you to do on this
10   diagram that you drew for us, which is Exhibit
11   14 -- let me make sure I understand it.  The
12   camera that you've written -- I mean, that
13   you've drawn here, you've drawn a little kind of
14   square and you've written camera by it.  And
15   that was under the -- under the overhang where
16   the cars would pull up right in front of the
17   hotel; is that right?
18      A    Right.  If I'm not mistaken, yeah.
19      Q    And it was on the side away from where
20   your car was?
21      A    Right.  But it was pointed toward -- it
22   was pointed toward this way (indicating).
23      Q    But it was pointed towards your car?
```